**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**(Austin Division)**



ABIGAIL NOEL FISHER; and
RACHEL MULTER MICHALEWICZ

        Plaintiffs,

     v.

STATE OF TEXAS; UNIVERSITY OF TEXAS AT
AUSTIN; MARK G. YUDOF, CHANCELLOR OF
THE UNIVERSITY OF TEXAS SYSTEM IN HIS
OFFICIAL CAPACITY; DAVID B. PRYOR,
EXECUTIVE VICE CHANCELLOR FOR
ACADEMIC AFFAIRS IN HIS OFFICIAL
CAPACITY; BARRY D. BURGDORF, VICE
CHANCELLOR AND GENERAL COUNSEL IN
HIS OFFICIAL CAPACITY; WILLIAM POWERS,
JR., PRESIDENT OF THE UNIVERSITY OF
TEXAS AT AUSTIN IN HIS OFFICIAL
CAPACITY; BOARD OF REGENTS OF THE
TEXAS STATE UNIVERSITY SYSTEM; JOHN W.
BARNHILL, JR., H. SCOTT CAVEN, JR., JAMES
R. HUFFINES, JANIECE LONGORIA, COLLEEN
MCHUGH, ROBERT B. ROWLING, JAMES D.
DANNENBAUM, PAUL FOSTER, PRINTICE L.
GARY, AS MEMBERS OF THE BOARD OF
REGENTS IN THEIR OFFICIAL CAPACITIES;
BRUCE WALKER, VICE PROVOST AND
DIRECTOR OF UNDERGRADUATE
ADMISSIONS IN HIS OFFICIAL CAPACITY

        Defendants.

Civil Action No.  1:08-cv-00263-SS

**AMENDED COMPLAINT FOR
DECLARATORY, INJUNCTIVE,
AND OTHER RELIEF**

## AMENDED COMPLAINT

### NATURE OF THE ACTION

1.     This action is brought by Plaintiffs Abigail Noel Fisher and Rachel Multer

Michalewicz ("Plaintiffs") to preliminarily and permanently enjoin Defendants the State

of Texas, *et al.*, ("Defendants") from employing racially discriminatory policies and

procedures in administering the undergraduate admissions program at the University of Texas at Austin ("UT Austin").  The admissions policies and procedures currently applied by Defendants discriminate against Plaintiffs on the basis of their race in violation of their right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV, § 1, and federal civil rights statutes, 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.*

2.     Plaintiffs seek preliminary injunctive relief requiring Defendants to re-evaluate them for admission to the undergraduate program at UT Austin under race-neutral criteria and requiring Defendants to admit Plaintiffs to UT Austin's undergraduate program so long as each is qualified under race-neutral criteria.

3.     Plaintiffs seek permanent relief in the form of: a declaratory judgment from the Court that Defendants' admissions policies and procedures violate the United States Constitution and federal civil rights statutes; injunctive relief prohibiting Defendants from using race as a factor in undergraduate student admissions decisions at UT Austin; injunctive relief requiring Defendants to re-evaluate Plaintiffs for admission to the undergraduate program at UT Austin under race-neutral criteria; and injunctive relief requiring Defendants to admit Plaintiffs to UT Austin's undergraduate program so long as each is qualified under race-neutral criteria.

4.     Plaintiffs seek attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable legal authority, as well as all other relief this Court finds appropriate and just.

## JURISDICTION AND VENUE

5.    This action arises under section 1 of the Fourteenth Amendment to the United States Constitution and under federal civil rights statutes 42 U.S.C. §§ 1981, 1983, and 2000d *et seq*. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

6.    Venue is proper in the Western District of Texas under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the Western District of Texas.

## THE PARTIES

### *Plaintiffs*

7.    Plaintiff Abigail Noel Fisher is an 18-year-old Caucasian female who resides in Richmond, Texas.

8.    Ms. Fisher is currently enrolled as a full-time high school student at Stephen F. Austin High School in Sugar Land, Texas.

9.    At the time of her application to UT Austin, Ms. Fisher maintained a 5.1111 grade point average on a weighted 6.0 scale and/or a 3.5926 grade point average on a 4.0 scale at Stephen F. Austin High School.

10.    At the time of her application to UT Austin, Ms. Fisher was ranked 82 out of 674 students in her graduating class. Thus, Ms. Fisher was ranked in approximately the top 12 percent of her class at Stephen F. Austin High School.

11.    At the time of her application to UT Austin, Ms. Fisher had taken the Scholastic Aptitude Test ("SAT") twice. The SAT is administered by the College Board, a nonprofit educational association that liaises with high schools and colleges to facilitate

the undergraduate application process.  The test is composed of three sections—critical reading, mathematics, and writing—each scored on scale from 200 to 800 points.  The critical reading section (formerly known as the "verbal" section) evaluates reading comprehension skills through a series paragraph-length excerpts and sentence-completion drills.  The mathematics section includes topics covered in high school algebra, geometry, and pre-calculus curricula.  The writing section, added to the SAT in 2005, includes multiple-choice questions that test grammar, usage, and word choice, and also requires students to compose a short, persuasive essay.  UT Austin did not consider the writing section in its undergraduate admissions decision for the 2008 incoming freshman class.

12.     On the first occasion that Ms. Fisher took the SAT, she scored a 540 on the critical reading portion of the exam and a 630 on the math portion of the exam for a total of 1170.  On the second occasion, she scored a 500 on the critical reading portion of the exam and a 680 on the math portion of the exam for a total of 1180.  For undergraduate applicants who take the SAT more than once, UT Austin considers the higher combined score from one test when making admissions decisions.

13.     Plaintiff Rachel Multer Michalewicz is a 17-year-old Caucasian female who resides in Buda, Texas.

14.     Ms. Michalewicz is currently enrolled as a full-time high school student at Jack C. Hays High School in Buda, Texas.

15.     At the time of her application to UT Austin, Ms. Michalewicz maintained a 3.867 grade point average on a 4.0 scale at Jack C. Hays High School.

16.     At the time of her application to UT Austin, Ms. Michalewicz was ranked 36 out of 355 students in her graduating class.  Thus, Ms. Michalewicz was ranked in the top 10.14 percent of her class according to UT Austin.  According to Jack C. Hays High School, Ms. Michalewicz is ranked in the Top 10 percent of her class.  Ms. Michalewicz appealed the denial of admission.  UT Austin rejected the appeal.

17.     At the time of her application to UT Austin, Ms. Michalewicz had taken the Scholastic Aptitude Test ("SAT") once, scoring a 670 on the critical reading portion of the exam and a 620 on the math portion of the exam for a total of 1290.

### *Defendants*

18.     UT Austin is a public educational institution authorized by Article 7, section 10 of the Texas Constitution and is funded by the State of Texas and the United States Government.

19.     John W. Barnhill, Jr., H. Scott Caven, Jr., James R. Huffines, Janiece Longoria, Colleen McHugh, Robert B. Rowling, James D. Dannenbaum, Paul Foster, and Printice L. Gary are the nine members of the Board of Regents, the governing body of the University of Texas System.  The Board of Regents is responsible for the central management and coordination of the University of Texas System's component institutions.  The Board of Regents promulgates regulations that authorize the colleges, departments, and other programs in the University of Texas System to develop and implement undergraduate admissions policies.  The members of the Board of Regents are all named defendants in their official capacities only.

20.     Mark G. Yudof is the Chancellor of the University of Texas System.  As Chancellor, Yudof serves as the chief executive officer of the University of Texas System

charged with instituting the policies and procedures of the Board of Regents. Yudof is responsible for all aspects of the University of Texas System's operations, including oversight and implementation of the admissions policy at UT Austin. Yudof is sued in his official capacity.

21.     David B. Pryor is the Executive Vice Chancellor for Academic Affairs of the University of Texas System. According to the Rules and Regulations of the Board of Regents, Pryor is responsible for the review and approval of any proposal for admissions policies. He is sued in his official capacity.

22.     Barry D. Burgdorf is the Vice Chancellor and General Counsel of the University of Texas System. According to the Rules and Regulations of the Board of Regents, Burgdorf is responsible for the review and approval of any proposal for admissions policies. He is sued in his official capacity.

23.     William Powers, Jr., is the President of UT Austin. As President, Powers is responsible for the implementation and administration of undergraduate admissions at the UT Austin. He is sued in his official capacity.

24.     Bruce Walker is Vice Provost and Director of Undergraduate Admissions at UT Austin. Walker administers UT Austin's undergraduate admissions office and implements the undergraduate admissions policies promulgated by the University System. Walker's name and signature are affixed to the respective letters from UT Austin to each Plaintiff stating that UT Austin denied each Plaintiff admission into UT Austin's undergraduate program for the incoming freshman class of 2008. *See* Letter from Bruce Walker to Abigail Fisher of March 25, 2008 (Exhibit A "Ex." A");   Letter

from Bruce Walker to Rachel Michalewicz of March 24, 2008 (Ex. B). Walker is sued in his official capacity.

## UT AUSTIN'S UNDERGRADUATE ADMISSIONS POLICIES

25.     UT Austin is selective in its admissions process in that the number of applicants seeking admission into its undergraduate program each year exceeds the number of available slots.

26.     UT Austin has modified its undergraduate admissions policies over time, generally in response to judicial decisions in the federal courts regarding public undergraduate and graduate schools' consideration of race as a factor in admissions decisions.

### *UT Austin's Pre-Hopwood Admissions Policies*

27.     In the years immediately preceding the decision by the United States Court of Appeals for the Fifth Circuit in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996), UT Austin employed race-based criteria in its undergraduate admissions program.

28.     UT Austin formulated a system of predicting freshman grade point average based upon an applicant's standardized testing (SAT and/or ACT) scores and class rank.

29.     During this time, UT Austin's undergraduate admissions program employed this predicted freshman grade point average in conjunction with race-based affirmative action to make admissions decisions ("Pre-*Hopwood* Race-Based Plan").

30.     According to UT Austin, relying exclusively on predicted freshman grade point average for admissions decisions "would have produced classes with unacceptably

low diversity levels." *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (June 2003), at 2.

31.     UT Austin employed an admissions plan relying on race-based affirmative action in order to increase the number of African-American and Hispanic students admitted to UT Austin.

32.     Under the Pre-*Hopwood* Race-Based Plan, in 1996, 17,263 students applied for admission to UT Austin's incoming freshman class, 809 of whom were African-American students, and 2,492 of whom were Hispanic students.   Thus, 4.7 percent of UT Austin's pool of applicants for the incoming freshman class were African-American students, and 14.4 percent of UT Austin's pool of applicants for the incoming freshman class were Hispanic students.   *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

33.     Under the Pre-*Hopwood* Race-Based Plan, in 1996, UT Austin admitted 11,456 students to its incoming freshman class, 501 of whom were African-American students and 1,761 of whom were Hispanic students.  Thus, 4.4 percent of UT Austin's admitted class were African-American students, and 15.4 percent of UT Austin's admitted class were Hispanic students.   *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

34.     Under the Pre-*Hopwood* Race-Based Plan, in 1996, 6430 students enrolled in UT Austin's incoming freshman class, 266 of whom were African-American students and 932 of whom were Hispanic students.   Thus, 4.1 percent of UT Austin's enrolled

freshman class were African-American students, and 14.5 percent of UT Austin's enrolled freshman class were Hispanic students. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

### The Hopwood Case

35.     In 1996, the United States Court of Appeals for the Fifth Circuit held that UT Austin was prohibited from considering race as a criterion for admission to the University of Texas at Austin Law School. *See Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996).

36.     Under the Fifth Circuit's *Hopwood* decision, it was unlawful for universities and graduate schools in Texas to use race-based criteria in their admissions decisions.

37.     Following the Fifth Circuit's *Hopwood* decision, UT Austin ceased employing race as a factor in its undergraduate admissions decisions.

38.     According to UT Austin, the last freshman class admitted under this race-based admissions program was for the Summer/Fall of 1996.

### UT Austin's Post-Hopwood Admissions Policies

39.     Beginning with the entering freshman class of 1997, UT Austin implemented a new admissions policy that did not take an applicant's race into account.

40.     During this time, UT Austin evaluated undergraduate applicants according to their academic performance and their personal achievements.

41.     For each applicant, UT Austin computed an Academic Index ("AI") and a Personal Achievement Index ("PAI").

42.     UT Austin has stated in public documents that an applicant's AI is a figure that reflects the applicant's high school record, taking in to account the applicant's class rank, the applicant's completion of a UT Austin-required high school curriculum, the extent to which the applicant exceeded the required curriculum, and the applicant's SAT/ACT score.

43.     UT Austin has stated in public documents that an applicant's PAI is a figure that takes into account the applicant's scores on two essays, leadership, extracurricular activities, awards/honors, work experience, and service to school or community, as well as other special circumstances.

44.     The other special circumstances that UT Austin considers are the socio-economic status of the applicant's family, whether the applicant lives in a single-parent home, the language spoken at home, the applicant's family responsibilities, the socio-economic status of school attended, and the average SAT/ACT of school attended in relation to student's own SAT/ACT.

45.     Neither race nor ethnic origin were included among the special circumstances that were considered part of an applicant's PAI under UT's post-*Hopwood* admissions plan.

46.     Under this admissions plan ("AI/PAI Plan"), in 1997, 14,982 students applied for admission to UT Austin's incoming freshman class, 639 of whom were African-American students, and 1,955 of whom were Hispanic students.   Thus, 4.3 percent of UT Austin's pool of applicants for the incoming freshman class were African-American students, and 13.0 percent of UT Austin's pool of applicants for the incoming freshman class were Hispanic students. *Implementation and Results of the Texas*

*Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

47.     Under the AI/PAI Plan, for the entering freshmen class of 1997, UT Austin admitted 12,289 students to its incoming freshman class, 419 of whom were African-American students and 1,592 of whom were Hispanic students.   Thus, 3.4 percent of UT Austin's admitted freshman class of 1997 were African-American students, and 13.0 percent were Hispanic students.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

48.     Under the AI/PAI Plan, for the entering freshmen class of 1997, 7085 students enrolled in UT Austin's incoming freshman class, 190 of whom were African-American students and 892 of whom were Hispanic students.  Thus, 2.7 percent of UT Austin's 1997 enrolled freshmen class were African-American students, and 12.6 percent of UT Austin's 1997 enrolled freshmen class were Hispanic students.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

### The Top 10 Percent Law

49.     In 1997, the Texas legislature passed House Bill 588, Tex. Educ. Code § 51.803 (1997).  House Bill 588 is often referred to as HB 588, or the "Top 10 Percent Law."

50.     Under the Top 10 Percent Law, Texas public high school students who graduate in the top 10 percent of their class are guaranteed admission to UT Austin.

51.     The Top 10 Percent Law effectively creates a large pre-qualified applicant pool for UT Austin, including a large number of pre-qualified minority applicants.

52.     The legislative history of the Top 10 Percent Law confirms that the goal of the law was to not only "ensure a highly qualified pool of students each year in the state's higher educational system" but also to promote diversity among the applicant pool in order to "ensure that a large, well qualified pool of minority students [is] admitted to Texas universities." HB 588, House Research Organization Digest at 4, 5 (Apr. 15, 1997).

53.     Students admitted pursuant to the Top 10 Percent Law do not fill UT Austin's entire incoming freshman class.

54.     Thus, UT Austin continued to use the AI/PAI Plan.  UT Austin would admit as freshmen all students who qualified under the Top 10 Percent Law and then use the AI/PAI Admissions Plan to fill the remainder of its incoming freshman class.

55.     From 1998 through 2004, UT Austin admitted applicants under the Top 10 Percent Law and then used the AI/PAI Plan to fill the remainder of each incoming freshman class (the "Top 10-AI/PAI Plan").

56.     Neither race nor ethnic origin was considered in admissions to UT's incoming freshman class under the Top 10-AI/PAI Plan used for admissions from 1998 through 2004.

57.     The Top 10-AI/PAI Plan was very successful in promoting diversity in UT Austin's undergraduate student body.

58.     In 2000, UT Austin President Larry R. Faulkner stated that "the Top 10 percent law has enabled us to diversify enrollment at UT Austin with talented students

who succeed. Our 1999 enrollment levels for African American and Hispanic freshmen have returned to those of 1996, the year before the *Hopwood* decision prohibited the consideration of race in admissions policies." *The "Top 10 Percent Law" is Working for Texas*, Dr. Larry Faulkner, President, The University of Texas at Austin (October 19, 2000), *available at* http://www.utexas.edu/student/admissions/research/faulknerstatement .html.

59.     In an October 19, 2000 press release entitled *The "Top 10 Percent Law" is Working for Texas*, UT Austin President Larry R. Faulkner stated that "minority students have earned higher grade point averages last year [in 1999] than in 1996 and have higher retention rates. An impressive 94.9 percent of 1998 African American freshmen returned to enroll for their sophomore year 1999. For Hispanics, 85.8 percent returned for their second year. So, the law is helping to create a more representative student body and enroll students who perform well academically." *The "Top 10 Percent Law" is Working for Texas*, Dr. Larry Faulkner, President, The University of Texas at Austin (October 19, 2000), *available at* http://www.utexas.edu/student/admissions/research/faulknerstatement .html.

60.     In a January 16, 2003 press release, UT Austin stated that the Top 10 Percent Law "has effectively compensated for the loss of affirmative action." *The University of Texas at Austin's experience with the "Top 10 Percent" Law* (January 16, 2003), *available at* http://www.utexas.edu/news/2003/01/16/nr_toptenpercent/.

61.     In a January 16, 2003 press release, UT Austin stated that "the first-year class included 272 African Americans, or 3.4 percent of the total of 7,936. It also included 1,138 Hispanics, or 14.3 percent of the total. The percentage of entering

African American and Hispanics in the Fall of 1996, the year the 5th Circuit Court of Appeals' decision struck down the use of affirmative action in Texas, was 4 and 14, respectively." *The University of Texas at Austin's experience with the "Top 10 Percent" Law* (January 16, 2003), *available at* http://www.utexas.edu/news/2003/01/16/ nr_toptenpercent/.

62.     In a January 29, 2003 press release, UT Austin announced that "[d]iversity efforts at The University of Texas at Austin have brought a higher number of freshman minority students—African Americans [and] Hispanics . . . —to the campus than were enrolled in 1996, the year a court ruling ended the use of affirmative action in the university's enrollment process.  A report by the university's Office of Institutional Research for the 2002 Fall/Summer enrollment shows there were 266 African Americans [and] 932 Hispanics . . . enrolled as first-time freshmen at the university in 1996.  The numbers of African Americans and Hispanics dropped after the *Hopwood* ruling . . . .  In 1997, the numbers for first-time freshmen were down to 190 African Americans [and] 892 Hispanics . . . .  More recent enrollment figures show a more encouraging trend.  The Summer/Fall 2002 semester report shows that first-time freshmen enrollment for [these] ethnic groups has increased to a level above the 1996 pre-Hopwood figures.  Minority enrollment last fall included 272 African Americans, 1,137 Hispanics . . . ." *Enrollment of first-time freshman minority students now higher than before Hopwood court decision* (January 29, 2003), *available at* http://www.utexas.edu/news/2003/01/29/nr_diversity/.

63.     In 2004, the last year under the Top 10-AI/PAI Plan, 23,008 students applied for admission to UT Austin's incoming freshman class, 1,456 of whom were African-American students, and 4,035 of whom were Hispanic students.  Thus, 6.3

percent of UT Austin's pool of applicants for the incoming freshman class were African-American students, and 17.5 percent of UT Austin's pool of applicants for the incoming freshman class were Hispanic students. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

64.     In 2004, the last year under the Top 10-AI/PAI Plan, UT Austin admitted 11,788 students to its incoming freshman class, 569 of whom were African-American students and 1,911 of whom where Hispanic students. Thus, 4.8 percent of UT Austin's admitted class were African-American students, and 16.2 percent of UT Austin's admitted class were Hispanic students. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

65.     In 2004, the last year under the Top 10-AI/PAI Plan, 6,796 students enrolled in UT Austin's incoming freshman class, 309 of whom were African-American students and 1,149 of whom where Hispanic students. Thus, 4.5 percent of UT Austin's enrolled class were African-American students, and 16.9 percent of UT Austin's enrolled class were Hispanic students. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1.

66.     In 2004, the last year under the Top 10-AI/PAI Plan, out of the 569 African-American students admitted into the incoming freshman class, 428 were admitted under the Top 10 percent law and 141 under the AI/PAI criteria. Of the 428 African-American students admitted under the Top 10 percent law, 225 enrolled in the

incoming freshman class and 203 of the automatically admitted African-American students did not. There were 84 African-American students admitted to the 2004 incoming freshman class under the AI/PAI criteria who enrolled in UT Austin. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1, Table 1-A, Table 2.

67.     In 2004, the last year under the Top 10-AI/PAI Plan, out of the 1911 Hispanic students admitted into the incoming freshman class, 1,451 were admitted under the Top 10 percent law and 460 under the AI/PAI criteria. Of the 1,451 Hispanic students admitted under the Top 10 percent law, 887 enrolled in the incoming freshman class and 564 of the automatically admitted Hispanic students did not. There were 262 Hispanic students admitted to the 2004 incoming freshman class under the AI/PAI criteria who enrolled in UT Austin. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (December 2006), Table 1, Table 1-A, Table 2.

### *The* Grutter *Decision*

68.     The *Hopwood* case was abrogated on June 23, 2003 by the Supreme Court's decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003).

69.     The Supreme Court reaffirmed in *Grutter* both that "[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race," 539 U.S. at 341, and that "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection," 539 U.S. at 327.

70.     Government discrimination based upon race is the exception rather than the rule under the Fourteenth Amendment.

71.     The Supreme Court held that courts must apply strict scrutiny to racially discriminatory university admissions programs in order to ensure that admissions committees are "pursing a goal important enough to warrant use of a highly suspect tool." *Grutter*, 539 U.S. at 326.

72.     The Supreme Court explained that "racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342.

73.     The Supreme Court held in *Grutter* that universities have a compelling interest in "student body diversity" such that, under limited circumstances, they may consider race or ethnicity as a factor in their admissions processes. *Grutter*, 539 U.S. at 328.

74.     The Supreme Court further explained in *Grutter* that government is constrained in how it may pursue those ends, even where the end is a compelling state interest.  The means chosen by the government must be narrowly tailored to fit its purpose. *Grutter*, 539 U.S. at 333.

75.     The Supreme Court therefore held in *Grutter* that universities must engage in "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks" before turning to racial preferences. *Grutter*, 539 U.S. at 339.

### *UT Austin's Post-*Grutter *Admissions Policies*

76.     On June 23, 2003, the same day that the United States Supreme Court decided *Grutter*, UT Austin decided to resume employing race as a factor in undergraduate admissions decisions.

77.     On June 23, 2003, Larry Faulkner, then-President of the UT Austin, publicly announced that race-based admissions criteria would quickly be re-introduced to the undergraduate admissions process at UT Austin and become effective for the upcoming 2004 admissions cycle. *See* Ron Nissimov, *UT Austin to Reintroduce Race-Based Criteria*, Houston Chronicle, June 24, 2003.

78.     On June 23, 2003, UT Austin issued a press release entitled *The University of Texas at Austin reacts to the Supreme Court's affirmative action decisions* ("*UT Austin Reacts to Grutter*"): "Dr. Larry R. Faulkner, president of The University of Texas at Austin, said the rulings [in *Grutter*] sweep away the restrictions of the 1996 *Hopwood* decision, a decade long case that eliminated the consideration of race."

79.     As stated in the *UT Austin Reacts to Grutter* press release: "The University of Texas at Austin will modify its admissions procedures to comply with the court's rulings in time for the Fall 2004 semester, Faulkner said. This will include implementing procedures at the undergraduate level that combine the benefits of the Top 10 Percent Law with affirmative action programs that can produce even greater diversity." *UT Austin Reacts to Grutter* (June 23, 2003).

80.     On June 23, 2003, President Larry R. Faulkner stated at a news conference that "the Supreme Court's rulings today place the state of Texas and higher education

institutions in the state on the same competitive basis as education institutions throughout the United States." *UT Austin Reacts to Grutter* (June 23, 2003).

81.     At the same time, UT Austin decided to resume employing race as a factor in graduate and professional programs.  President Faulkner explained that employing racial preferences in admissions decisions for graduate and professional programs is a "priority" because "we don't have a good substitute for affirmative action in those programs." *UT Austin Reacts to Grutter* (June 23, 2003).

82.     On August 7, 2003, the Board of Regents adopted a resolution authorizing UT Austin to develop and implement policies and procedures for its undergraduate admissions program that take race into account.

83.     Pursuant to the Board's authorization, beginning with the 2005-2006 academic year, UT Austin implemented race-based criteria as part of its undergraduate admissions program.

84.     Since the 2005-2006 academic year, UT Austin has employed race as a factor in its undergraduate admissions decisions by including the applicant's race as a component of the applicant's PAI (the "race-adjusted AI/PAI criteria").

85.     Since the 2005-2006 academic year, UT Austin has admitted students to its undergraduate program consistent with the Top 10 Percent Law and has filled the remainder of its incoming freshman classes in accordance with the AI/PAI Plan as modified to account for race (the "Top 10-Race-Based Plan").

86.     Although it is not clear how much weight the race-adjusted AI/PAI criteria gives to an applicant's race, it is clear that UT Austin grants to African-American and

Hispanic students a substantial advantage in the admissions process that it does not grant to other students such as Plaintiffs.

87.    The average SAT scores for students admitted under the race-adjusted AI/PAI criteria demonstrate that African-American and Hispanic students are given a substantial advantage on the basis of their race in the admissions process.  The average SAT scores for non-Top-10% students from Texas high schools who enrolled in the 2006 UT Austin incoming freshman class are as follows:  Caucasian students—1,286; African-American students—1,086; Hispanic students—1,154.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Tables 6a, 6b, 6d.

88.    In 2005, during the first year under the Top 10-Race-Based Plan, 23,925 students applied for admission to UT Austin's incoming freshman class, 1,552 of whom were African-American students, and 4,457 of whom were Hispanic students.  Thus, 6.5 percent of UT Austin's pool of applicants for the incoming freshman class were African-American students, and 18.6 percent of UT Austin's pool of applicants for the incoming freshman class were Hispanic students.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1.

89.    In 2005, during the first year under the Top 10-Race-Based Plan, UT Austin admitted 12,207 students to its incoming freshman class, 617 of whom where African-American students and 2,183 of whom where Hispanic students.  Thus, 5.1 percent of UT Austin's admitted class were African-American students, and 17.9 percent of UT Austin's admitted class were Hispanic students. *Implementation and Results of the*

*Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1.

90.     In 2005, during the first year under the Top 10-Race-Based Plan, 6,912 students enrolled in UT Austin's incoming freshman class, 351 of whom were African-American students and 1,244 of whom were Hispanic students.  Thus, 5.1 percent of UT Austin's enrolled class were African-American students, and 18.0 percent of UT Austin's enrolled class were Hispanic students.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1.

91.     In 2005, under the Top 10-Race-Based Plan, out of the 617 African-American students admitted into the incoming freshman class, 441 were admitted under the Top 10 percent law and 176 under the race-adjusted AI/PAI criteria.  Of the 441 African-American students automatically admitted under the Top 10 Percent Law, 252 enrolled in the incoming freshman class and 189 of these automatically admitted African-American students did not.  There were 99 African-American students admitted to the 2005 incoming freshman class under the race-adjusted AI/PAI plan who enrolled at UT Austin. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1, Table 1-A, Table 2.

92.     In 2005, under the Top 10-Race-Based Plan, out of the 2,183 Hispanic students admitted into the incoming freshman class, 1,656 were admitted under the Top 10 Percent Law and 527 under the race-adjusted AI/PAI criteria.  Of the 1,656 Hispanic students automatically admitted under the Top 10 Percent Law, 966 enrolled in the incoming freshman class and 690 of these automatically admitted Hispanic students did

not.  There were 278 Hispanic students admitted to the 2005 incoming freshman class under the race-adjusted AI/PAI criteria who enrolled at UT Austin.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1, Table 1-A, Table 2.

93.    In 2007, the most recent year for which there is data under the Top 10-Race-Based Plan, 27,237 students applied for admission to UT Austin's incoming freshman class, 1,952 of whom were African-American students, and 5,335 of whom were Hispanic students.  Thus, 7.2 percent of UT Austin's pool of applicants for the incoming freshman class were African-American students, and 19.6 percent of UT Austin's pool of applicants for the incoming freshman class were Hispanic students.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1.

94.    In 2007, the most recent year for which there is data under the Top 10-Race-Based Plan, UT Austin admitted 13,800 students to its incoming freshman class, 747 of whom where African-American students and 2,632 of whom where Hispanic students.  Thus, 5.4 percent of UT Austin's admitted class were African-American students, and 19.1 percent of UT Austin's admitted class were Hispanic students.  *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1.

95.    In 2007, the most recent year for which there is data under the Top 10-Race-Based Plan, 7,485 students enrolled in UT Austin's incoming freshman class, 431 of whom where African-American students and 1,472 of whom where Hispanic students. Thus, 5.8 percent of UT Austin's enrolled class were African-American students, and

19.7 percent of UT Austin's enrolled class were Hispanic students. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1.

96.     In 2007, under the Top 10-Race-Based Plan, out of the 747 African-American students admitted into the incoming freshman class, 485 were admitted under the Top 10 Percent Law and 262 under the race-adjusted AI/PAI race-based criteria. Of the 485 African-American students admitted under the Top 10 percent law, 284 enrolled in the incoming freshman class and 201 of the automatically admitted African-American students did not. There were 147 African-American students admitted to the 2007 incoming freshman class under the race-adjusted AI/PAI criteria who enrolled at UT Austin. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1, Table 1-A, Table 2.

97.     In 2007, under the Top 10-Race-Based Plan, out of the 2,632 Hispanic students automatically admitted into the incoming freshman class, 1,974 were admitted under the Top 10 Percent Law and 658 under the race-adjusted AI/PAI criteria. Of the 1,974 Hispanic students automatically admitted under the Top 10 Percent Law, 1,109 enrolled in the incoming freshman class and 865 of these automatically admitted Hispanic students did not. There were 363 Hispanic students admitted to the 2007 incoming freshman class under the race-adjusted AI/PAI criteria who enrolled at UT Austin. *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin* (October 2007), Table 1, Table 1-A, Table 2.

98.     Under *Grutter*, UT Austin's race-based admissions policies are not narrowly tailored as a matter of law because UT Austin failed to consider and take

advantage of alternative race-neutral means of achieving diversity prior to implementing their racially discriminatory policies.

99.    Institutions cannot use race-conscious admissions policies if they can achieve racial diversity through the use of race-neutral alternatives.

100.    UT Austin failed to consider and take advantage of the obvious and proven alternative of continued utilization of the Top 10-AI/PAI Plan, which had demonstrated success in promoting diversity, a fact UT Austin has acknowledged and even lauded.  In each year since the enactment of the Top 10 Percent Law, UT Austin has failed to attract numerous automatically admitted minority students to enroll.  In 2007, there were 201 African-American students and 865 Hispanic students who were automatically admitted to UT Austin under the Top 10 Percent Law who chose not to enroll at UT Austin.

101.    UT Austin also failed to consider and take advantage of numerous other available race-neutral alternatives, including but not limited to options such as increased minority recruitment and outreach efforts, focus on socio-economically disadvantaged students through increased availability and funding for financial aid and scholarships, financial and resource investment in low-performing elementary and secondary schools, and partnerships with private and not-for-profit institutions, such as the College Board and College Summit.

102.    UT Austin's precipitous return to race-based admissions criteria ignored the success UT Austin achieved with regard to student body diversity under the Top 10 Percent Law, failed to consider the use of other race-neutral options, and therefore, does not meet the narrow tailoring requirement of the Fourteenth Amendment.

103.   UT Austin's use of racial preferences in addition to its Top 10 Percent Law is not narrowly tailored.  It has had a pervasive negative effect on non-minority applicants, while producing only marginal increases in minority admissions and enrollment to UT Austin.

## PLAINTIFFS' APPLICATIONS TO UT AUSTIN

### *Abigail Noel Fisher*

104.   On or about January 27, 2008, Ms. Fisher applied to the undergraduate program at UT Austin, seeking to be admitted to the 2008 entering freshmen class.

105.   At the time of her application to UT Austin, Ms. Fisher had a 5.1111 grade point average on a weighted 6.0 scale and/or a 3.5926 grade point average on a 4.0 scale at Stephen F. Austin High School.

106.   At the time of her application to UT Austin, Ms. Fisher's class rank was 82 out of 674 students in her graduating class.  Ms. Fisher was ranked in approximately the top 12 percent of her class at Stephen F. Austin High School.

107.   Ms. Fisher received recognition for academic excellence at Stephen F. Austin High School for having scored above 80 in all of her classes during her freshman, junior and senior years at Stephen F. Austin High School.

108.   Ms. Fisher took the SAT and scored a 500 on the critical reading portion of the exam and a 680 on the math portion of the exam for a total of 1180.  Ms. Fisher's SAT scores are competitive with the historical SAT scores of students who enroll at UT Austin's undergraduate program.

109.   The 25/75 percentile SAT scores for students who enrolled in UT Austin's 2006 incoming freshman class are 1120-1370.  *See* US News & World Report http://

colleges.usnews.rankingsandreviews.com/usnews/edu/college/directory/brief/drglance_3 658_brief.php.

110.   Ms. Fisher engaged in a number of extra-curricular activities during her high school career.  Ms. Fisher is a member and co-president of the Stephen F. Austin High School orchestra.  Indeed, Ms. Fisher is an accomplished cellist, having been a member of not only the Stephen F. Austin High School orchestra, but also city and regional youth orchestras. Ms. Fisher also competes in math competitions, and she has competed in co-educational sports, including soccer and bowling.  In addition, Ms. Fisher does volunteer work and community service ranging from Habitat for Humanity to playing holiday music in a local nursing home.

111.   Ms. Fisher's application to UT Austin's undergraduate program reflects that she has expressed an interest in studying finance.

112.   Because Ms. Fisher's class rank at Stephen F. Austin High School fell outside of the top 10 percent, her application for admission was considered under the race-adjusted AI/PAI criteria.

113.   On or about March 25, 2008, Ms. Fisher received a rejection letter from UT Austin signed by Defendant Bruce Walker, Vice Provost and Director of Admissions, explaining that her application for admission to UT Austin's undergraduate program had been rejected. *See* Ex. A.

114.   UT Austin offered Ms. Fisher admission to UT Austin's Coordinated Admission Program ("CAP").  Students who enroll in CAP may enroll in a participating University of Texas System campus; students who fulfill the requirements of CAP may then enroll at UT Austin after their freshman year, but are guaranteed admission into only

the College of Liberal Arts or the College of Natural Sciences.  The requirements of CAP include the completion of at least 30 transferable semester credit hours and a minimum 3.2 GPA on all hours attempted while enrolled in CAP.  *See* Ex. A.

115.    Students who wish to enroll in CAP must complete an online acceptance agreement on UT Austin's website by May 1, 2008.

116.    Under the procedures for admission at UT, students who are admitted to UT Austin's 2008 incoming freshman class must make payment to UT Austin in the amount of $200 in order to secure a place in the incoming freshman class.  This $200 enrollment deposit becomes nonrefundable after May 1, 2008.

117.    Ms. Fisher has applied and been admitted to the undergraduate program at Louisiana State University ("LSU").   On the basis of her academic and personal achievements, Ms. Fisher has received a Tigers Scholar Award, entitling her to a partial scholarship in the amount of $2,075 to LSU.   The deadline to accept her offer of admission and the Tigers Scholar Award is May 1, 2008.  If Ms. Fisher elects to enroll at LSU, all tuition and fees for the 2008 Fall semester are due by August 7, 2008.

118.    Ms. Fisher has applied and been admitted to the undergraduate program at Baylor University ("Baylor").  On the basis of her academic and personal achievements, Baylor awarded Ms. Fisher a partial scholarship in the amount of $3,500.  In order to secure a place in the 2008 incoming freshman class at Baylor, Ms. Fisher must make an enrollment deposit in the amount of $300 by May 1, 2008.  If Ms. Fisher elects to enroll at Baylor, all tuition and fees for the 2008 Fall semester are due by July 31, 2008.

119.    Ms. Fisher has been injured by UT Austin's use of racial preferences because she was not considered on an equal basis with African-American and Hispanic applicants who applied for admission to the same incoming freshman class at UT Austin.

120.    On information and belief, given Ms. Fisher's record of achievement, it is likely that her application would have been accepted and she would have been admitted into UT Austin's undergraduate program but for UT Austin's use of race-based criteria in its admissions decisions.

121.    As an applicant ineligible for the race-based admissions preference employed by UT Austin, Ms. Fisher was injured by the University's race-based criteria when she was considered for admission under the Top 10-Race-Based Plan and ultimately refused admission to the UT Austin's undergraduate program on the basis of her race.

122.    Unless enjoined by this Court, Defendants will continue to implement race-based admissions policies and procedures which prevent future non-minority applicants from having their applications considered on a race-neutral basis and, with respect to Ms. Fisher, from gaining admission to UT Austin in violation of her rights under the United States Constitution and federal law.

123.    Without a remedy from this Court, Ms. Fisher will have been denied the opportunity to compete for admission to UT Austin's undergraduate program on an equal basis with African-American and Hispanic applicants because of Defendants' racially discriminatory admissions policies.

124.    Without a remedy from this Court, Ms. Fisher will have been deprived of the opportunity to attend the UT Austin, an injury that cannot be redressed by money damages.

### Rachel Multer Michalewicz

125.    On or about November 12, 2007, Ms. Michalewicz applied to the undergraduate program at UT Austin, seeking to be admitted to the 2008 entering freshmen class.

126.    At the time of her application to UT Austin, Ms. Michalewicz had a 3.867 grade point average on a 4.0 scale at Jack C. Hays High School.

127.    At the time of her application to UT Austin, Ms. Michalewicz's class rank was 36 out of 355 students in her graduating class.  Ms. Michalewicz was ranked in the top 10.14 percent of her class at Jack C. Hays High School according to UT Austin.

128.    Ms. Michalewicz received recognition as an Advanced Placement Scholar by the College Board for receiving a grade of 3 or higher on three Advanced Placement exams.

129.    Ms. Michalewicz took the SAT and scored a 670 on the critical reading portion of the exam and a 620 on the math portion of the exam for a total of 1290.  Ms. Michalewicz's SAT scores are competitive with the historical SAT scores of students who enroll at UT Austin's undergraduate program.

130.    Ms. Michalewicz engaged in a number of extra-curricular activities during her high school career.  Ms. Michalewicz is a member of the Jack C. Hays High School Marching Band, Jazz Band/Concert Band, and the Math Club.   Ms. Michalewicz participated in Junior ROTC during her freshman and sophomore years at Jack C. Hays high school.  Ms. Michalewicz also volunteered with the St. Vincent DePaul Food Bank

and participated in Cast Event for Kids, a fishing event for handicapped children. Ms. Michalewicz also worked 20 hours per week at HEB Grocery Store in Kyle, Texas.

131.    Ms. Michalewicz's application to UT Austin's undergraduate program reflects that she has expressed an interest in studying Asian Cultures and Languages.

132.    Because Ms. Michalewicz's class rank at Jack C. Hays High School fell outside of the top 10 percent according to UT Austin, her application for admission was considered under the race-adjusted AI/PAI criteria.

133.    On or about March 24, 2008, Ms. Michalewicz received a rejection letter from UT Austin signed by Defendant Bruce Walker, Vice Provost and Director of Admissions, explaining that her application for admission to UT Austin's undergraduate program had been rejected.  UT Austin offered Ms. Michalewicz admission to the CAP program. *See* Ex. B.

134.    Ms. Michalewicz appealed her denial of admission on March 26, 2008. Ex. C.  Ms. Michalewicz informed UT Austin that Jack C. Hays High School considered her in the Top 10 percent of her class.  Ex. D.  Ms. Michalewicz received an informal response from UT Austin explaining that UT Austin disagreed with, and was therefore rejecting, the method of calculating class rank employed by Jack C. Hays High School. According to UT Austin, Ms. Michalewicz falls within the top 11% of her high school class.  Subsequently, Ms. Michalewicz's appeal was formally rejected by UT Austin.

135.    Ms. Michalewicz has applied and been admitted to the undergraduate program at Texas State University-San Marcos ("Texas State").  If Ms. Michalewicz elects to enroll at Texas State, all non-refundable tuition and fees for the 2008 Fall semester are due by August 26, 2008.

136.   Ms. Michalewicz has been injured by UT Austin's use of racial preferences because she was not considered on an equal basis with African-American and Hispanic applicants who applied for admission to the same incoming freshman class at UT Austin.

137.   On information and belief, given Ms. Michalewicz's record of achievement, it is likely that her application would have been accepted and she would have been admitted into UT Austin's undergraduate program but for UT Austin's use of race-based criteria in its admissions decisions.

138.   As an applicant ineligible for the race-based admissions preference employed by UT Austin, Ms. Michalewicz was injured by the University's race-based criteria when she was considered for admission under the Top 10-Race-Based Plan and ultimately refused admission to the UT Austin's undergraduate program on the basis of her race.

139.   Unless enjoined by this Court, Defendants will continue to implement race-based admissions policies and procedures which will prevent future non-minority applicants from having their applications considered on a race-neutral basis and, with respect to Ms. Michalewicz, from gaining admission to UT Austin in violation of her rights under the United States Constitution and federal law.

140.   Without a remedy from this Court, Ms. Michalewicz will have been denied the opportunity to compete for admission to UT Austin's undergraduate program on an equal basis with African-American and Hispanic applicants because of Defendants' racially discriminatory admissions policies.

141.   Without a remedy from this Court, Ms. Michalewicz will have been deprived of the opportunity to attend the UT Austin, an injury that cannot be redressed by money damages.

## PLAINTIFFS' CLAIMS

### *Count I—Violation of the Fourteenth Amendment to the United States Constitution*

142.   Plaintiffs incorporate the allegations and averments contained in paragraphs 1-141 as if fully set forth herein.

143.   The Fourteenth Amendment to the United States Constitution forbids the States from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

144.   In order to survive constitutional scrutiny, racial classifications must be narrowly tailored to further compelling government interests.

145.   To the extent that UT Austin articulates an interest in promoting "student body diversity," Plaintiffs do not challenge this interest.

146.   Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives that will achieve" the compelling government interest.

147.   When UT Austin elected to resume employing racial preferences in its undergraduate admissions decisions following *Grutter*, it failed to consider and take advantage of numerous obvious and proven race-neutral means to achieve diversity.

148.   UT Austin failed to consider any race-neutral alternatives.  Rather, it reflexively resumed employing racial preferences immediately following the Supreme Court's decision in *Grutter*.

149.   UT Austin failed to consider and fully take advantage of the Top 10 Percent Law, which UT Austin previously had lauded as successfully promoting diversity, and other race-neutral alternatives to meets its diversity interest.

150.   UT Austin also failed to consider and fully take advantage of the existing race-neutral AI/PAI criteria that successfully produced a diverse student body.

151.   UT Austin's use of racial preferences in addition to its Top 10 Percent Law has had a pervasive negative effect on non-minority applicants, while producing only marginal increases in minority admissions and enrollment to UT Austin.

152.   Because UT Austin failed to consider race-neutral alternatives before employing racial preferences in its undergraduate admissions decisions, UT Austin has violated the Fourteenth Amendment.

153.   Because UT Austin could have achieved the same or substantially similar levels of diversity through race-neutral means, UT Austin's admissions policies are not narrowly tailored and, therefore, violate the Fourteenth Amendment.

154.   Plaintiffs were deprived of their rights under the Fourteenth Amendment because UT Austin failed to consider their applications for undergraduate admission on an equal basis with the applications of the African-American and Hispanic students.

155.   Plaintiffs were injured because UT Austin failed to consider their applications for undergraduate admission on an equal basis with the applications of the African-American and Hispanic students.

156.   Plaintiffs were injured by UT Austin's use of racial preferences because each was rejected for admission to UT Austin's undergraduate program on account of their race.

157.   Plaintiffs are entitled to both preliminary and permanent injunctive relief against Defendants because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to discriminate on the basis of race in their admissions policies and procedures and because the harm Plaintiffs have suffered and will otherwise continue to suffer is irreparable.

### Count II—Violation of 42 U.S.C. §§ 1981 & 1983

158.   Plaintiffs incorporates the allegations and averments contained in paragraphs 1-157 as if fully set forth herein.

159.   Defendants acted under color of law in developing and implementing race-based policies and procedures that led UT Austin to deny Plaintiffs equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1981 and 1983.

160.   Plaintiffs were deprived of their rights under the Fourteenth Amendment because UT Austin failed to consider their applications for undergraduate admission on an equal basis with the applications of African-American and Hispanic students.

161.   Plaintiffs are entitled to both preliminary and permanent injunctive relief against Defendants because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to discriminate on the basis of race in their admissions policies and procedures and because the harm Plaintiffs have suffered and will otherwise continue to suffer is irreparable.

### Count III—Violation of 42 U.S.C. § 2000d et seq.

162.   Plaintiffs incorporate the allegations and averments contained in paragraphs 1-161 as if fully set forth herein.

163.   UT Austin, a recipient of federal funds, discriminated against Plaintiffs on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

164.   Plaintiffs are entitled to both preliminary and permanent injunctive relief against Defendants because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to discriminate on the basis of race in their admissions policies and procedures and because the harm Plaintiffs have suffered and will otherwise continue to suffer is irreparable.

## RELIEF SOUGHT

165.   Wherefore, Plaintiffs pray for the following relief as to all counts:

(a)   A preliminary injunction requiring Defendants to re-evaluate Plaintiffs for admission to the undergraduate program at UT Austin under race-neutral means in accordance with the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983;

(b)   A preliminary injunction requiring Defendants to admit Plaintiffs to UT Austin's undergraduate program so long as each is qualified under race-neutral criteria;

(c)   A declaratory judgment from the Court that Defendants' admissions policies and procedures violate the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983;

(d)   A permanent injunction prohibiting Defendants from using race as a factor in future undergraduate student admissions decisions at UT Austin;

(e)   A permanent injunction requiring Defendants to re-evaluate Plaintiffs for admission to the undergraduate program at UT Austin under race-neutral criteria;

(f)     A permanent injunction requiring Defendants to admit Plaintiffs to UT Austin's undergraduate program so long as each is qualified under race-neutral criteria;

(g)     Attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable legal authority; and

(h)     All other relief this Court finds appropriate and just.


Respectfully submitted,


Bert W. Rein                                    Paul M. Terrill
Thomas R. McCarthy                          The Terrill Firm, P.C.
Suzzette Rodriguez Hurley                    810 W. 10th Street
David C. Rybicki                               Austin, Texas 78701
(admitted pro hac vice)                      TEL. 512.474.9100
WILEY REIN LLP                               FAX: 512 474.9888
1776 K Street, N.W.
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049                           Texas State Bar No. 00785094


*Counsel for Plaintiffs*


Dated: April 17, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2008, I directed true and correct copies of the foregoing to be served by hand delivery on those listed below.  Counsel for Plaintiffs was informed that Mishell B. Kneeland, Assistant Attorney General of the State of Texas, is authorized to accept service on behalf of all defendants.

State of Texas
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701

University of Texas at Austin
Office of the President
Main Building 400
Austin, TX 78713

Board of Regents of the Texas State University System
201 W 7th Street
Ste 820
Austin, TX 78701

John W. Barnhill, Jr.
201 W 7th Street
Ste 820
Austin, TX 78701

Mark G. Yudof
Chancellor of the University of Texas System
601 Colorado Street
4th Floor
Austin, TX 78701

H. Scott Caven, Jr.
201 W 7th Street
Ste 820
Austin, TX 78701

William Powers, Jr.
President of the University of Texas at Austin
Office of the President
Main Building 400
Austin, TX 78713

James R. Huffines
201 W 7th Street
Ste 820
Austin, TX 78701

David B. Pryor
Executive Vice Chancellor for Academic Affairs
of the University of Texas System
601 Colorado Street
4th Floor
Austin, TX 78701

Janice Longoria
201 W 7th Street
Ste 820
Austin, TX 78701

Barry D. Burgdorf
Vice Chancellor and General Counsel
of the University of Texas System
601 Colorado Street
Austin, TX 78701

Coleen McHugh
201 W 7th Street
Ste 820
Austin, TX 78701

Robert B. Rowling
201 W 7th Street

James D. Dannenbaum
201 W 7th Street

Ste 820
Austin TX 78701

Ste 820
Austin, TX 78701

Paul Foster
201 W 7th St.
Ste 820
Austin TX 78701

Printice L. Gray
201 W 7th Street
Ste 820
Austin, TX 78701

Bruce Walker
Vice Provost and Director of Undergraduate Admissions
at the University of Texas at Austin
Office of Admissions
Main Building 7 Austin, TX 78713-8058

Paul M. Terrill
The Terrill Firm, P.C.
810 W. 10th Street
Austin, Texas 78701
TEL. 512.474.9100
FAX: 512 474.9888

Texas State Bar No. 00785094