### \`IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### (Austin Division)

ABIGAIL NOEL FISHER; and
RACHEL MULTER MICHALEWICZ

         Plaintiffs,

   v.

UNIVERSITY OF TEXAS AT AUSTIN; *et al.*

         Defendants.

Civil Action No.  1:08-cv-00263-SS

**MOTION FOR PARTIAL
SUMMARY JUDGMENT**

     Plaintiffs, by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 56(d) and the Orders of this Court, respectfully move this Court for a grant of summary judgment as to liability for the reasons set forth in the accompanying Memorandum in Support of Motion for Partial Summary Judgment.  Plaintiffs respectfully move this court for an Order declaring that Defendants' use of race in undergraduate admissions decisions at the University of Texas at Austin violates the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

Respectfully submitted,


\_ /s/ Paul M. Terrill_____


Bert W. Rein                              Paul M. Terrill
Thomas R. McCarthy                        Texas State Bar No. 00785094
Suzzette Rodriguez Hurley                 Joshua Katz
(*admitted pro hac vice*)                 Texas State Bar No. 24044985
WILEY REIN LLP                            The Terrill Firm, P.C.
1776 K Street, N.W.                       810 W. 10th Street
Washington, DC  20006                     Austin, Texas 78701
TEL: 202.719.7000                         TEL. 512.474.9100
FAX: 202.719.7049                         FAX: 512 474.9888


*Counsel for Plaintiffs*


Dated: January 23, 2009

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(Austin Division)**

ABIGAIL NOEL FISHER; and
RACHEL MULTER MICHALEWICZ

    Plaintiffs,

  v.

UNIVERSITY OF TEXAS AT AUSTIN; *et al*.

    Defendants.

Civil Action No.  1:08-cv-00263-SS

**PLAINTIFFS' MEMORANDUM
<u>IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................... 1

II.  BACKGROUND ....................................................................................................... 3

III.  SUMMARY OF ARGUMENT ................................................................................. 6

IV.  ARGUMENT ........................................................................................................... 12

    A.  UT Austin's Use Of Race In Admissions Decisions Does Not Further A Compelling Government Interest...................................................................... 12

        1.  UT Austin's Use Of Race Does Not Further The Compelling Government Interest In Student Body Diversity Articulated By The Supreme Court's *Grutter* Decision. ......................................................... 13

        2.  UT Austin's Use Of Race Has Already Exceeded Any Level Justifiable Under *Grutter's* Student Body Diversity Rationale ............... 17

    B.  UT's Austin's Use Of Race in Admissions Decisions Is Not Narrowly Tailored ............................................................................................................ 19

        1.  The Minimal Impact on Minority Enrollment Demonstrates That UT Austin's Use of Race as a Factor In Admissions Decisions Is Not Narrowly Tailored to Advance UT Austin's Interest in Student Body Diversity ................................................................................... 19

        2.  UT Austin Is Not Narrowly Tailored Because UT Austin Can Meet Any Legitimate Interest in Student Body Diversity Without Resorting to Racial Preferences ............................................................ 22

        3.  UT Austin's Use of Race is Not Narrowly Tailored Because it is Over-Inclusive........................................................................................... 28

        4.  UT Austin's Consideration of Race is Not Narrowly Tailored Because It Has No Logical End Point.................................................... 30

V.  CONCLUSION........................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

**Page**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)........................................................................1, 6, 22

*Alexander v. Sandoval*,
532 U.S. 275 (2001)...............................................................................12

*Board of Regents of the University of California v. Bakke*,
438 U.S. 265 (1978)...........................................................................13, 14

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)..............................................8, 11, 14, 22, 23, 29

*Comfort ex rel. Neumyer v. Lynn School Committee*,
283 F. Supp. 2d 328 (D. Mass. 2003) .......................................................18

*General Building Contractors Ass'n v. Pennsylvania*,
458 U.S. 375 (1982)...............................................................................12

*Gratz v. Bollinger*,
539 U.S. 244 (2003).........................................................................7, 8, 12

*Grutter v. Bollinger*,
539 U.S. 306 (2003)...................................................................... *passim*

*Grutter v. Bollinger*,
137 F. Supp. 2d 821 (E.D. Mich. 2001)..............................................15, 18

*Hopwood v. Texas*,
78 F.3d 932 (5th Cir. 1996) .....................................................................3

*Johnson v. Board of Regents of University of Georgia*,
263 F.3d 1234 (11th Cir. 2001) ..............................................................28

*Johnson v. California*,
543 U.S. 499 (2005)...............................................................................10

*McDonald v. Santa Fe Trail Transportation Co.*,
427 U.S. 273 (1976)...............................................................................12

*Palmore v. Sidoti*,
466 U.S. 429 (1984)............................................................................6, 19

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    127 S. Ct. 2738 (2007) ........................................................................................ *passim*

*Runyon v. McCrary*,
    427 U.S. 160 (1976) ..........................................................................................12

*United States v. Paradise*,
    480 U.S. 149 (1987) ..........................................................................................22

*United States v. Virginia*,
    518 U.S. 515 (1996) ..........................................................................................18

*Virdi v. DeKalb County School District*,
    135 Fed. Appx. 262 (11th Cir. 2005) ................................................................23

*Walker v. City of Mesquite*,
    169 F.3d 973 (5th Cir. 1999) .......................................................................22, 23

*Wygant v. Jackson Board of Education*,
    476 U.S. 267 (1986) ...............................................................................10, 21, 23

## CONSTITUTION, STATUTES, AND LEGISLATIVE MATERIALS

U.S. Const. amend. XIV, § 1 ...............................................................................6

42 U.S.C. § 1981 ..............................................................................................12

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 ..............................12

Tex. Educ. Code § 51.803 (1997) .........................................................................3

## MISCELLANEOUS

Bernadette D. Proctor & Joseph Dalaker, U.S. Census Bureau, *Poverty in the United States: 2001* (Sept. 2002), *available at*
    http://www.census.gov/prod/2002pubs/p60-219.pdf....................................27

College Summit: Let Talent Shine,
    www.collegesummit.org ...................................................................................27

College Summit: Why Colleges Partner,
    http://www.collegesummit.org/colleges/why-colleges-partner/................................27

Lisa Sandberg, *Top 10 Rule Limits UT-Austin, Says School President,*
    Houston Chronicle, Mar. 20, 2008.........................................................................6, 26

U.S. Department of Education, Office for Civil Rights, *Race-Neutral Alternatives*
    *in Postsecondary Education: Innovative Approaches to Diversity,*
    (Mar. 2003),
    http://www.eric.ed.gov/ERICDocs/data/ericdocs2sql/content_storage_01/000
    0019b/80/1a/f8/f0.pdf ...................................................................................................27

University of California, Educational Outreach, *Expanding Educational*
    *Opportunity: A Status Report on the Educational Outreach and K-12*
    *Improvement Programs of the University of California* (Fall 2001),
    http://www.ucop.edu/outreach/statusreport2001.pdf............................................27, 28

I.    **INTRODUCTION**

The University of Texas at Austin ("UT Austin") seeks to increase the enrollment of what it considers "under-represented" minorities at the university by making race a factor in undergraduate admissions decisions.  By making race a decisional factor, UT Austin has caused "an injury [to Plaintiffs] that falls squarely within the language and spirit of the Constitution's guarantee of equal protection."  *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-230 (1995)).  Nevertheless, UT Austin contends that its consideration of race is narrowly tailored to further a compelling government interest in student body diversity, as articulated by *Grutter*.

But *Grutter* is not a blanket endorsement of the use of race as a factor in university admission decisions.  And the circumstances presented by this record are not at all like the circumstances surrounding the University of Michigan Law School's consideration of race as upheld by the Supreme Court in *Grutter*.

*Grutter* endorses a compelling government interest "in obtaining the educational benefits that flow from a diverse student body."  539 U.S. at 343.  And it endorses a university's consideration of race in admissions decisions only where it is narrowly tailored to further *that* compelling government interest.

The University of Michigan Law School met these constitutional requirements in *Grutter* because it targeted a level of enrollment — that is, a "critical mass" — of minority students that would allow the realization of the educational benefits that flow from a diverse student body; because race-neutral alternatives to obtain the educational benefits of student body diversity did not exist; because without the consideration of race the University of Michigan Law School's minority enrollment would have been approximately 4% but, by considering race, the University of Michigan Law School achieved an educationally significant level of minority enrollment

(14%) that was within the range of "critical mass"; and because the University of Michigan Law School conducted meaningful periodic reviews to determine whether it was necessary to continue to use race to meet its educational goals.

UT Austin has never articulated any educational goal for minority enrollment, much less one that is tied to the educational benefits of a diverse student body; UT Austin's concept of "under-represented" minorities strongly suggests that its goal is demographically, not educationally, based; UT Austin has existing race-neutral alternatives which have achieved substantial levels of minority enrollment—much higher than the University of Michigan Law School could achieve even using race as a factor in admissions; UT Austin's consideration of race has yielded minimal increases in the minority enrollment; UT Austin has no end in sight to its use of race given that its use of race in admission decisions lacks any sunset provision; and UT Austin lacks any way to meaningfully review of its use of race because it has no goal for minority enrollment and does not even measure the effect of its use of race on minority enrollment.

As the Supreme Court emphasized in *Grutter*, "context matters" in the realm of racial classifications because the constitution demands strict scrutiny of race-based government action. *Grutter*, 539 U.S. at 327.  The context here reveals that UT Austin is one of the most racially diverse schools in the nation with race-neutral means of maintaining a high level of minority enrollment.  Strict scrutiny simply cannot condone UT Austin's further consideration of race where it is untethered to the educational benefits of a diverse student body and divides the applicant pool by race while actually doing very little to increase minority enrollment.  The Court should hold that UT Austin's consideration of race in undergraduate admissions decisions is unconstitutional.

II.     **BACKGROUND**

UT Austin is a highly competitive undergraduate university; each year, there are many more applicants than there are available spaces in the incoming freshman class.  (App. ¶ 1.) Thus, for many years, UT Austin has operated a selective admissions process to determine which applicants will be offered admission to UT Austin.

Prior to the Fifth Circuit's decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996), UT Austin's admissions decisions relied on predicted freshman grade point averages derived from an applicant's class rank and standardized test (SAT and/or ACT) scores supplemented by race-based affirmative action in order to increase minority enrollment.  (App. ¶¶ 8-12)  When the *Hopwood* court declared unconstitutional the use of race-based criteria in the admissions decisions of the University of Texas Law School, the Texas Attorney General issued a written opinion interpreting *Hopwood* as prohibiting undergraduate and graduate programs at Texas state universities from employing race as a factor in their admissions decisions.  (App. ¶ 15.)  A decrease in minority enrollment at UT Austin followed.

Both UT Austin and the Texas legislature took action in response to the *Hopwood* decision.   In 1997, UT Austin adopted a facially race-neutral review process to guide its admissions decisions.  (App. ¶¶ 17-24.)  As part of this process, which UT Austin characterizes as "holistic," UT Austin considers several "personal achievement" factors and special circumstances of each applicant, including multiple factors such as the socio-economic status of the family, language spoken at home, and single-parents homes, that are intended, at least in part, to help increase minority enrollment.  (App. ¶¶ 18, 31-32.)  At about the same time, the Texas legislature enacted House Bill 588, Tex. Educ. Code § 51.803 (1997) ("HB 588" or the "Top 10% Law"), under which all Texas high school seniors who are in the top ten percent of their

class at the time of their application are automatically admitted to UT Austin.  (App. ¶¶ 58-60.) This, too, was intended to increase minority enrollment at UT Austin.  (App. ¶ 65.)

Together, these measures resulted in a two-tiered admissions process at UT Austin by which a large portion of each incoming freshman class was filled pursuant to HB 588 and the remainder of each class was filled pursuant to UT Austin's so-called holistic review process. (App. ¶ 66.)  On top of these measures, UT Austin instituted a series of race-neutral outreach efforts and scholarship programs also designed, in part, to increase minority enrollment.  (App. ¶¶ 140-54.)

The combination of all of these race-neutral measures achieved substantial increases in minority enrollment.  (App. ¶ 79.)  UT Austin lauded the results of these measures, even announcing that it had "effectively compensated for the loss of affirmative action."  (App. ¶ 70.) Yet, after the Supreme Court authorized the use of race as a factor at the University of Michigan Law School in 2003, *see Grutter v. Bollinger*, 539 U.S. 306 (2003), and despite the fact that it was then achieving, through race-neutral means, substantial levels of minority enrollment that were increasing steadily, (App. ¶¶ 68-72), UT Austin elected to inject race back into its admissions process (App. ¶¶ 73-76),.  In 2004, the last year before UT Austin reverted to using race, under-represented minorities composed over 21% of the incoming freshman class — almost 40% if one were to include Asian-Americans (a group which UT Austin includes when touting its minority enrollment but does not include when defending its use of race in admissions decisions).  (App. ¶ 79.)  Curiously, although UT Austin injected race back into its admissions process in order to increase minority enrollment, it has never made an attempt to articulate any sort of educational target level of enrollment for what it deems under-represented minorities. (App. ¶¶ 97-98.)

UT Austin's use of race as a factor is meaningful, just as are all the other factors in its admissions calculus.  (App. ¶ 33.)  Indeed, race can make a difference in admissions decisions.  (App. ¶ 92.)  Admissions statistics bear this out.  SAT scores (which help make up each applicant's Academic Index score) for admitted applicants demonstrate that Hispanic and African-American applicants have much lower average SAT scores than their Asian-American and White counterparts.  (App. ¶ 102.)  And admissions data demonstrate that Hispanic and African-American applicants make up a much higher proportion of the summer freshman class (when admissions decisions are made without regard to the quasi-objective scores assigned to applicants' respective files) than the fall freshman class where academic and personal achievement scoring determine admissions.  (App. ¶ 137.)  Perhaps more importantly, UT Austin has testified that the factor of race actually increases the enrollment of Hispanic and African-American students.  (App. ¶ 95.)

Although UT Austin's use of race does increase the enrollment of Hispanic and African-American applicants (the minorities that UT Austin considers under-represented), those minority enrollment increases have been only minimal.  Indeed, in 2008, only 244 Hispanic and African-American students who were admitted outside of the operation of HB 588 actually enrolled in the incoming freshman class.  (App. ¶ 103.)  And, the number of these students who were admitted by virtue of UT Austin's consideration of race is far lower given that hundreds of Hispanic and African-American applicants admitted outside the operation of HB 588 enrolled each year when UT Austin was not considering race as a factor in admissions decisions.  The actual number of Hispanic and African-American students enrolled in the 2008 incoming freshman class who benefited from UT Austin's consideration of race is unknown because UT Austin does not keep track of how many students are admitted who benefit from the

consideration of race in admissions.  (App. ¶ 96.)  Yet, whatever the actual number, it is clear that the increase in enrollment of under-represented minorities is minimal – far less than 244 students out of an enrolled freshman class of 6715.  (App. ¶ 103.)

Although UT Austin does not even know how much its consideration of race increases minority enrollment at the university, it persists in using race as a factor in admissions decisions. Moreover, UT Austin has no projected end in sight for its consideration of race.  (App. ¶ 99.) Although UT Austin asserts that it intends to review its admissions program to determine whether it should continue considering race in admission decision, it has not yet undertaken such a review.  Nor could any such review be meaningful when UT Austin has no minority enrollment goals and does not measure how much its consideration of race actually increases minority enrollment.  And despite the fact that UT Austin is one of the most racially diverse universities in the country — UT Austin is one of the top 10 producers of minority undergraduate degrees — it actually protests the fact that HB 588 prevents UT Austin from given greater consideration to race.  Lisa Sandberg, *Top 10 Rule Limits UT-Austin, Says School President*, Houston Chronicle, March 20, 2008.

## III.    <u>SUMMARY OF ARGUMENT</u>

The Fourteenth Amendment to the United States Constitution guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The "core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race."  *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984).  Accordingly, "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized" without regard to "the race of those burdened or benefited by a particular classification."  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995).

The Supreme Court has concluded that, under certain circumstances, a university may have a compelling government interest in student body diversity that can justify the university's consideration of race in university admissions decisions. *See Grutter v. Bollinger*, 539 U.S. 306, 328 (2003). However, even in the context of university admissions, strict scrutiny remains the *rule*, not the exception, for racial classifications. *Grutter*, 539 U.S. at 326; *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). Thus, a public university, such as UT Austin, bears a heavy burden in demonstrating that its consideration of race is constitutional. To withstand strict scrutiny, UT Austin must prove that "the University's use of race in its current admissions program employs narrowly tailored measures that further compelling governmental interests." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (citations and quotations omitted); *see also Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2752 (2007) ("[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.").

In order for a university's interest in student body diversity to be a "compelling government interest" under *Grutter*, that interest must be tied to the educational benefits that student body diversity is intended to achieve. *Grutter*, 539 U.S. at 342 ("[T]he Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body."). Moreover, that compelling government interest exists only to enable the achievement of "critical mass"—the level of enrollment of underrepresented students which allows for the realization of the educational benefits of a diverse student body. *Id.* at 333. In other words, the need to achieve a critical mass of under-represented minority students, cannot justify race-based admissions decisions that expand discriminatory selections beyond that goal.

*See id.* at 327 (explaining that the use of race "does not violate the constitutional guarantee of equal protection" only where "necessary to further a compelling governmental interest" and "so long as the narrow-tailoring requirement is also satisfied").

Even where a university's interest in student body diversity is a "compelling" government interest, the university's consideration of race must still be narrowly tailored. *Parents Involved*, 127 S.Ct. at 2752; *Grutter*, 539 U.S. at 333; *Gratz*, 539 U.S. at 270.  This means that the consideration of race must not be beyond the level "necessary" to achieve student body diversity and must achieve more than "minimal" advancement of student body diversity. *See Parents Involved*, 127 S.Ct. at 2759-60.  Narrow tailoring also requires that the consideration of race not be over- or under-inclusive.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989).  Moreover, the narrow tailoring requirement demands that the university undertake "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks."  *Grutter*, 539 U.S. at 339.  This is because racial classifications "may be considered legitimate only if they are a *last resort* to achieve a compelling interest," *Parents Involved*, 127 S. Ct. at 2792 (Kennedy, J., concurring).  And even then, "race-conscious admissions policies must be limited in time."  *Grutter*, 539 U.S. at 310.

UT Austin's use of race in making undergraduate admissions decisions is unconstitutional because it neither serves a compelling government interest nor is narrowly tailored.  UT Austin's use of race does not serve the compelling government interest in student body diversity as identified in *Grutter* because it is completely unmoored from the educational benefits student body diversity is intended to achieve.  As an initial matter, UT Austin has utterly failed to make any attempt to determine what level of minority enrollment is necessary to achieve "critical mass" and realize the educational benefits of a diverse student body. (App. ¶

97.))  UT Austin's open-ended pursuit of student body diversity reveals a naked desire for higher enrollment of allegedly under-represented minorities for its own sake, without regard to staying within the bounds of critical mass and the educational benefits secured by reaching it.  (App. ¶ 6.)  That UT Austin's pursuit of student body diversity is divorced from the educational benefits of critical mass is demonstrated by UT Austin's treatment of Asian-American students as compared to Hispanic students who are considered under-represented.  In fact, UT Austin has a higher enrollment of Hispanic students than Asian-American students—as has been the case the entire time since UT Austin re-injected race into its admissions process (App. ¶ 103.).  If Asian-American students are sufficiently represented at UT Austin in terms of a proper critical mass analysis, Hispanic students also must be sufficiently represented.  As seems apparent, UT Austin's goal is demographic representation rather than educational enhancement.  (App. ¶ 6.) A critical mass analysis would at least question whether the level of Asian-American students has reached the level necessary to ensure the full contribution to the educational experience at UT Austin and, if so, why any higher level if necessary for other minorities.

Indeed, even assuming that UT Austin had a compelling interest in student body diversity when the use of race was restored, that interest could not justify UT Austin's continued use of race because UT Austin had already exceeded critical mass by any objective measure.  Indeed, UT Austin long ago announced that its utilization of HB 588 and other race-neutral measures had "effectively compensated" for UT Austin's loss of its ability to consider race in admissions decisions.  (App. ¶ 70)  (stating that "The University of Texas at Austin has effectively compensated for the loss of affirmative action").  That UT Austin has already exceeded critical mass is no doubt the reason why it has refused to even attempt to articulate critical mass or any other goal for enrollment of under-represented minorities.

This failure to define and adhere to a compelling government interest is itself fatal to UT Austin's use of race in admissions decisions.  However, even if UT Austin were pursuing a compelling government interest in student body diversity, UT Austin cannot satisfy the "narrow tailoring" prong of the equal protection analysis.  *See Johnson v. California,* 543 U.S. 499, 505-06 (2005).  UT Austin fails to meet its narrow-tailoring burden for several reasons.  First, UT Austin's use of race results in only "minimal" increases in the enrollment of under-represented minorities.  For the incoming freshman class of 2008, only 224 African-American and Hispanic students who were admitted to UT Austin outside the operation of HB 588 actually enrolled in UT Austin.  (App. ¶ 103.)  Far fewer of these African-American and Hispanic students were admitted because of UT Austin's consideration of race.  Indeed, UT Austin does not even know how much its consideration of race in admissions decisions increases the enrollment of under-represented minorities.  (App. ¶ 96.)  This minimal impact on student body diversity generated by UT Austin's consideration of race is thus even more deficient than the racial assignment plans struck down by the Supreme Court in *Parents Involved* because it labeled all students by race while failing to achieve more than minimal gains in minority enrollment.  127 S. Ct. at 2759-60.  UT Austin's use of race simply is not "necessary" to the advancement of minority enrollment, *id.* at 2756, 2760; race-neutral measures have and will continue to work about "as well,"  *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986).

In addition, UT Austin has failed to undertake "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks."  *Grutter*, 539 U.S. at 339.  Racial classifications "may be considered legitimate only if they are a *last resort* to achieve a compelling interest," *Parents Involved*, 127 S. Ct. at 2792 (Kennedy, J., concurring).  Although UT Austin considers race-neutral factors in the admissions process and

has implemented race-neutral scholarship programs and outreach efforts to Texas high schools students that have a positive effect on the enrollment of under-represented minorities (App. ¶¶ 149), other race-neutral measures are readily available.  In particular, UT Austin could focus more on increasing its yield among African-American and Hispanic applicants automatically admitted by the operation of HB 588.  Indeed, given that the yield rate among African-American and Hispanic students admitted to UT Austin has dropped over the past few years and lags behind that of White and Asian-American students (App. ¶ 103), this seems like an appropriate place for UT Austin to focus its race-neutral efforts.

UT Austin's consideration of race also fails the narrow tailoring requirement because it is over-inclusive.  As highlighted above, UT Austin considers Hispanic students under-represented but not Asian-American students, despite that fact that UT Austin has a higher enrollment of Hispanic students than Asian-American students. (App. ¶ 103.)  Given that UT Austin has been recognized as one of the nation's "Best Schools for Hispanics" by Hispanic Business magazine (a fact trumpeted by UT Austin on its public website) (App. ¶ 4), it is clear that Hispanic students are not under-represented at UT Austin, at least in any way that is constitutionally relevant and do not need the benefit of the consideration of race.  This over-inclusiveness dooms UT Austin's consideration of race as a constitutional matter.  *See J.A. Croson*, 488 U.S. at 506.

Last, UT Austin fails to meet the requirements of narrow tailoring because its consideration of race is not limited in time.  UT Austin readily admits that its use of race in admissions decisions has no projected end date.  (App. ¶ 99.)  To the extent that UT intends to conduct a review of its admissions program to determine whether to continue using race as a factor in admissions decisions, any such review would be an empty gesture given that UT Austin does not even track how many applicants are impacted (positively or negatively) by the use of

race.  (App. ¶ 96.)  UT Austin's constant efforts to free itself from HB 588 so that it may undertake greater consideration of race—especially when universities are supposed to be sunsetting the consideration of race (*see Grutter*, 539 U.S. at 342-43)—confirm this point.

Although UT Austin claims that its consideration of race is modeled on the University of Michigan Law School program—whose use of race in admissions was upheld by the Supreme Court in *Grutter*—there are stark differences between the circumstances here and there.  As the Supreme Court has emphasized, in the realm of racial classifications, "context matters."  *Grutter*, 539 U.S. at 327.  And strict scrutiny places the onus on UT Austin to demonstrate that its use of race "employs narrowly tailored measures that further compelling governmental interests."  *Gratz*, 539 U.S. at 270.  Context does matter, and the facts here demonstrate that UT Austin has failed to survive strict scrutiny.  Accordingly, UT Austin's use of race in undergraduate admissions decisions is unconstitutional.[1]

## IV.   ARGUMENT

### A.   UT Austin's Use of Race in Admissions Decisions Does Not Further a Compelling Government Interest.

A university's interest in increasing minority enrollment may rise to the level of a "compelling government interest" only where it is tied to the educational benefits that a diverse student body is intended to attain.  And this compelling government interest exists only insofar

---

[1]      Because UT Austin's admissions program is unconstitutional, it violates other federal laws as well.  Discriminatory policies that violate the Equal Protection Clause of the Fourteenth Amendment promulgated by an institution that accepts federal funds also violate Title VI of the Civil Rights Act.  *See Alexander v. Sandoval,* 532 U.S. 275, 281 (2001).  Likewise, with respect to 42 U.S.C. § 1981, the Supreme Court explained that the provision was "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race," *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 295-296 (1976), and that a contract for educational services is a "contract" for purposes of Section 1981.  *See Runyon v. McCrary,* 427 U.S. 160, 172 (1976).  Purposeful discrimination that violates the Equal Protection Clause therefore also violates Section 1981.  *See General Building Contractors Ass'n., Inc. v. Pennsylvania,* 458 U.S. 375, 389-390 (1982).

as the university seeks to achieve a critical mass of under-represented minority students in order to enable the realization of these educational benefits.  Here, UT Austin's interest in enhancing under-represented minority enrollment is unmoored from any educational benefit and appears related only to racial demographics.  (App. ¶ 5) ("[UT Austin] strives to continue building a diverse student body, faculty and staff that truly reflect Texas ….")  In addition, UT Austin has already exceeded critical mass by using flexible admissions criteria not tied directly to race.  For each of these independent reasons, UT Austin's interest in increasing the enrollment of under-represented minorities does not rise to the level of a compelling government interest under *Grutter*.

> **1.    UT Austin's Use Of Race Does Not Further The Compelling Government Interest In Student Body Diversity Articulated By The Supreme Court's *Grutter* Decision.**

*Grutter* accepts that "student body diversity is a compelling state interest that can justify the use of race in university admissions."  539 U.S. at 325.  However, this interest in student body diversity is not an unlimited license to discriminate.  Rather, strict scrutiny demands that the use of race in the admissions process be tied to "the educational benefits that [student body] diversity is designed to produce."  *Id*. at 330.  In other words, an asserted interest in student body diversity untethered to the educational benefits it is designed to produce is not a "compelling government interest."  *See id.* at 343 ("[T]he Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions to further a *compelling interest in obtaining the educational benefits that flow from a diverse student body*.") (emphasis added); *id.* at 330 ("[C]ritical mass is defined by reference to the educational benefits that diversity is designed to produce.").

As first articulated by Justice Powell in *Board of Regents of Univ. of Cal. v. Bakke*, the educational benefits produced by student body diversity arise from the "robust exchange of

ideas" and "wide exposure to the ideas and mores of students as diverse as this Nation of many peoples."  438 U.S. 265, 313 (1978) (internal quotations omitted).  To obtain these educational benefits, a university may seek to achieve a "critical mass" of minority enrollment—a level of minority enrollment "such that underrepresented minority students do not feel isolated or like spokespersons for their race."  *Grutter*, 539 U.S. at 319; *id.* at 318 (describing "critical mass" as "a number that encourages under-represented minority students to participate in the classroom and not feel isolated").  But because strict scrutiny limits the use of racial classifications, a university may employ racial classifications to achieve a critical mass of underrepresented minority students only where such use of race is "narrowly tailored . . . to further a compelling interest in obtaining the educational benefits that flow from a diverse student body."  *Id.* at 343. A university's "compelling government interest" is thus bounded by critical mass—*i.e.,* the pedagogical understanding of the level of minority enrollment necessary to achieve these educational benefits.  A university is not authorized to engage in an unbounded and indeterminate pursuit of "diversity" or an effort to match enrollment percentages with the racial composition of the general population.  *Id.* at 343.  Any pursuit of increased minority enrollment beyond critical mass would amount to "racial balancing, which is patently unconstitutional."  *Id.* at 330; *see also J.A. Croson*, 488 U.S. at 493 (explaining that strict scrutiny "ensure[s] that the means chosen 'fit' th[e] compelling goal . . . closely").  Thus, a university's compelling government interest in pursuing diversity at the expense of non-minority applicants must have a "critical mass" target to which its mechanisms can be narrowly tailored.

Here, Defendants' use of race does not serve the compelling interest in student body diversity articulated in *Grutter*.  Defendants' open-ended pursuit of ever-increasing minority enrollment is divorced from the educational benefits associated with a diverse student body.  As

the Supreme Court has explained, critical mass — which "is defined by reference to the educational benefits that diversity is designed to produce," *Grutter*, 539 U.S. at 330—is the key that unlocks the educational benefits associated with a diverse student body.  But UT Austin has made no attempt ever at determining what level of enrollment of under-represented minorities would constitute critical mass.  (App. ¶ 97.)[2]  UT Austin thus has failed to determine the level of minority enrollment necessary to realize the educational benefits of a diverse student body.  In other words, UT Austin's use of race to increase the enrollment of African-American and Hispanic students without regard to the determination of critical mass reflects a pursuit of racial balancing that reflects Texas' racial demographics.  Because UT Austin's interest in advancing student body diversity is unmoored from any pedagogical notion of the proper level of minority enrollment to allow the flow of the asserted educational benefits, it is not a compelling government interest and cannot survive strict scrutiny.

---

[2]     UT Austin's refusal to even attempt to determine critical mass distinguishes the present case from *Grutter*.  In *Grutter*, several representatives of the University of Michigan Law School testified about critical mass and articulated what level of minority enrollment might constitute critical mass.  *See Grutter v. Bollinger*, 137 F. Supp. 2d 821, 832 (E.D. Mich. 2001) (highlighting testimony that critical mass was within the range of "11% to 17%," that those "admitted for diversity purposes shall not exceed 20% of the expected matriculants in a class," that "five percent would [not] be enough," and that "10% might suffice"); *see also id.* at 840 ("While 'critical mass' has proved to be a concept that has eluded precise quantification, over the years it has meant in practice that the law school attempts to enroll an entering class 10% to 17% of which consists of underrepresented minority students.").  More importantly, the University of Michigan Law School determined an approximate range for critical mass *before* using race as a factor in making admissions decisions.  *See id.* at 835 ("Professor Lempert testified that the '11% to 17%' figure, which is the range he believes constitutes critical mass, was omitted from the final version of the admissions policy because percentages were too rigid and could be misconstrued as a quota.  Another provision omitted for the same reason stated on page 12 of the draft that 'non-grid admittees admitted for diversity purposes shall not exceed 20% of the expected matriculants in a class.'  One faculty member, Don Regan, argued for retaining the 'numbers on the target range . . . [f]or a variety of reasons, including candor.'").  By contrast, UT Austin has failed to offer even a *post hoc* articulation of critical mass.  Thus, unlike the University of Michigan Law School, UT Austin has made no "complex educational judgments in an area that lies primarily within the expertise of the university," which might warrant deference. *Grutter*, 539 U.S. at 328.

That UT Austin's use of race is divorced from the educational benefits attained by the achievement of critical mass is demonstrated by UT Austin's treatment of Asian-American students as compared with Hispanic students.  UT Austin's use of race is intended to increase the enrollment of African-American and Hispanic students, but not Asian-American students.  This is because UT Austin does not consider Asian-American students to be under-represented, (App. ¶ 84), *despite the fact that the level of enrollment of Asian-American students lags behind the level of enrollment of Hispanic students*.  (App. ¶ 103.)  Any sort of pedagogical concept of student body diversity could not support this disparate treatment.[3]

---

[3]    It may be the case that Asian-Americans are not under-represented at UT Austin when compared with the Asian-American population across the State of Texas, and it may be the case that Hispanics are underrepresented at UT Austin when compared with the Hispanic population across the State of Texas.  Indeed, at times during this litigation, Defendants have suggested their goal for diversity is tied to the State's racial demographics.  *See, e.g.,* Defs.' Opposition to Pls.' Mot for Preliminary Injunction at 21 ("They suggest that UT Austin may not consider race in any manner because the racial and ethnic diversity at UT Austin achieved under Top 10% mirrors 1996 levels prior to *Hopwood*.  Mot. at 12.  But demographics have changed since 1996, rendering Plaintiffs' comparison obsolete at best."); *see also* Tr. of Hrg. on Mot. for Preliminary Injunction ("We've already talked extensively about critical mass.  But their position [is] wrong on the facts, in light of the changing demographics of the state."); Exhibit A, Affidavit of Perry Weirich (Document 47, Exhibit 8); App. ¶ 68.  However, changes occurring only in the world *outside* the university—even within the state of Texas—would have no effect on what a minority student requires to feel comfortable *while at the university*.  As *Grutter* makes clear, critical mass is the level of minority students *among the student body* necessary to ensure that such students "do not feel isolated or like spokespersons for their race" while at the university.  539 U.S. at 318.  Tying their vision of student body diversity to racial demographics *outside* the university demonstrates clearly that UT Austin's vision of student body diversity is divorced from the "educational benefits of a diverse student body."  *Grutter*, 539 U.S. at 333.

Moreover, any attempt at engineering the racial demographics of UT Austin to correspond to the racial demographics of the State would amount to racial balancing, which is "patently unconstitutional."  *See Grutter*, 539 U.S. at 330; *see also Parents Involved*, 127 S. Ct. at 2755 (striking down the student assignment plans as unconstitutional because they "are tied to each district's specific racial demographics, rather than to any pedagogic concept of the level of diversity needed to obtain the asserted educational benefits").  If a court were to permit such racial engineering, a university located in a state with a population more homogeneous than Texas would be less entitled to a diverse student population than Texas (or perhaps entitled to operate a "plus" system in favor of Caucasian students).  This cannot be the law.  Linking critical mass to state demographics is nothing more than a disguised quota.

2.     **UT Austin's Use of Race Has Already Exceeded Any Level Justifiable Under *Grutter's* Student Body Diversity Rationale.**

Although UT Austin has never determined critical mass, UT Austin has admitted in numerous press releases and statements by UT Austin officials that it has achieved satisfactory minority enrollment without the use of race in admissions decisions.   (App. ¶¶ 68-72.) Defendants fail to even address these statements other than to say they were taken out of context. But the context could not be clearer.  Because of *Hopwood*, Texas was forced to find a race-neutral path to critical mass; the legislature decided on HB 588 and the university expanded on its non-HB 588 race-neutral admissions criteria.   Having reviewed the results, UT Austin proudly announced that it had achieved its objective.  Defendants should not be allowed to walk away from these statements.

Under any objective measure, UT Austin achieved critical mass before it resumed employing race as a factor in admissions in 2005.  In *Grutter*, although law school officials disclaimed any quantification of critical mass in terms of numbers or percentages, the Court recognized that the goal of attaining critical mass "of course" involves "some attention to numbers."  539 U.S. at 336.  The very idea of critical mass is that "there is . . . some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those [minority] students admitted."  *Id*.  As a result, what constitutes a "reasonable environment" must be an objective determination.  *Id.*  Stated differently, the relevant question is what enrollment percentage, or range of percentages, would be sufficient for the average minority student to feel encouraged and not isolated.  As *Grutter* makes clear, this is ultimately a question for the Court.[4]

---

[4]     The *Grutter* Court deferred to the law school on its educational judgment that critical mass would have educational benefits; however, it did *not* defer to any subjective assertion as to what would suffice for a critical mass.  Rather, the Court determined on its own review whether

As indicated above, UT has never determined critical mass; thus the question for the Court is an easy one.  Strict scrutiny places the onus on UT Austin to justify its use of race in admissions decisions.  *Grutter*, 539 U.S. at 326-27.  Accordingly, UT Austin's failure to determine critical mass is fatal to UT Austin's defense of its use of race.  Setting aside UT Austin's failure to determine critical mass, Supreme Court precedent demonstrates that critical mass can be no greater than 20% minority enrollment.  *Compare id.* (accepting university's contention articulation of critical mass) *with Grutter v. Bollinger*, 137 F. Supp. 2d 821, 832-35 (E.D. Mich. 2001) (various officials of the University of Michigan Law School offering different, yet not inconsistent, estimates of critical mass, variously stating that five percent was too low, that ten percent might suffice, and that a range of eleven percent to seventeen percent); *cf United States v. Virginia*, 518 U.S. 515, 523 (1996) (describing 10% female enrollment as "a sufficient 'critical mass' to provide the female cadets with a positive educational experience"); *see also Comfort ex rel. Neumyer v. Lynn School Committee*, 283 F. Supp. 2d 328, 357 (D. Mass. 2003) (noting that "studies describe[e] a 20% figure below which members of a racial minority in a given setting feel isolated or stigmatized" and emphasizing that 20% is "a number well-established in the literature").  By 2004, under UT Austin's race-neutral admissions plan, which implemented HB 588 and filled the remainder of the class through the AI/PAI analysis without regard to race, underrepresented minorities made up 21.4% of the incoming freshman class. (App. ¶ 79.)  Thus, UT Austin had achieved critical mass and, as a result, no longer had a basis for using race in its admission process.  Indeed, that UT Austin has already exceeded critical mass is no doubt the reason why it has refused to even hazard a guess at what level of minority enrollment might constitute critical mass.

---

the law school had adequately considered race-neutral alternatives and whether those alternatives were "currently capable of producing a critical mass."  *Grutter*, 539 U.S. at 340.

**B.**     <u>UT's Austin's Use of Race in Admissions Decisions Is Not Narrowly Tailored.</u>

    **1.**     **The Minimal Impact on Minority Enrollment Demonstrates That UT Austin's Use of Race as a Factor In Admissions Decisions Is Not Narrowly Tailored to Advance UT Austin's Interest in Student Body Diversity.**

UT Austin's consideration of race also is not narrowly tailored because it produces only minimal gains in the enrollment of under-represented minorities. To meet strict scrutiny, UT Austin must prove "the way in which [it] . . . employed individual racial classifications" was "necessary to achieve [the university's] stated ends." *Parents Involved*, 127 S. Ct. at 2759; *see also Palmore*, 466 U.S. at 432-33 (explaining that for racial classifications "to pass constitutional muster" they "must be 'necessary . . . to the accomplishment' of their legitimate purpose") (citations and quotations omitted). On this basis, the Supreme Court recently found that secondary school assignment plans of Seattle, Washington and Louisville, Kentucky, which only affected a "small number" of students while classifying all by race, failed to meet this requirement. *Parents Involved*, 127 S. Ct. at 2759. Under the Seattle school assignment plan only about "307 student assignments were affected," and the Louisville assignment plan "account[ed] for only 3 percent of assignments." *Parents Involved*, 127 S. Ct. at 2759-60. The Court struck down both assignment plans. The "minimal effect these classifications [had] on student assignments . . . suggest[ed] that other means would [have been] effective." *Id.*; *see also id.* at 2793 (Kennedy, J., concurring) (agreeing that "the small number of assignments affected suggests that the schools could have achieved their stated ends through different means"). That is, the trivial "annual effect" that the use of race-based policies had on student assignments proved that Seattle and Louisville had not "met [their] burden of proving these marginal changes . . . outweigh the cost of subjecting hundreds of students to disparate treatment based solely upon the color of their skin." *Id.* at 2760.

The present case is no different.  If anything, this case is worse.  UT Austin's injection of race into its admissions process has subjected plaintiffs and several thousands of other applicants to racial classification, while at the same time failing to meaningfully increase student body diversity.  In 2008, only 224 African-American and Hispanic students who were admitted to UT Austin outside the operation of HB 588 actually enrolled in UT Austin's incoming freshman class.  (App. ¶ 103.)  This is only 3.6 percent of the incoming freshman class.  Although this figure is comparable to the percentage of students affected by the school assignment plans struck down in *Parents Involved*, *see supra* — and thus demonstrates that UT Austin's use of race is not narrowly tailored — the actual increase in minority enrollment attributable to UT's Austin's consideration of race is much smaller.  This is because, as Defendants have explained, although UT Austin's consideration of race increases the enrollment of under-represented minorities, not every minority applicant is benefited by the use of race in admissions decisions.  Indeed, the fact that 346 African-American and Hispanic students were admitted outside of the operation of HB 588 in 2004 (the last year before UT Austin injected race into its non-HB 588 review process) (App. ¶ 79) demonstrates that many of the 224 African-American and Hispanic students admitted outside the operation of HB 588 might have been admitted even without UT Austin's consideration of race.  Indeed, the clearest indictment of UT Austin's consideration of race is that UT Austin does not even know how much the consideration of race has increased the enrollment of under-represented minorities.  (App. ¶ 96.)  UT Austin officials testified at deposition that UT Austin does not even keep track of how many students are positively impacted by the consideration of race.  (App. ¶ 96.)  Strict scrutiny places the onus on UT Austin to demonstrate that its consideration of race is narrowly tailored.  Having failed to determine how much their consideration of race increases minority enrollment, UT Austin cannot ""me[e]t

[its] burden of proving these marginal changes . . . outweigh the cost of subjecting [thousands] of students to disparate treatment based solely upon the color of their skin." *Id.* at 2760.  Thus, like the Seattle and Louisville plans in *Parents Involved*, UT Austin's race-based admissions program stands in stark contrast to the plan endorsed in *Grutter*, under which "the consideration of race was viewed as indispensable in more than tripling minority representation at the law school — from 4 to 14.5 percent." *Id*. at 2760.  Given that minority enrollment within the non-HB 588 pool of applicants increased by some undetermined, yet clearly negligible, amount, UT Austin's employment of race in the admissions process is neither "necessary" nor "indispensable" to meeting the university's legitimate government interest.  In fact, as explained above, drawing a moderately higher yield of minority students automatically admitted under HB 588 would have worked "about as well," *Wygant*, 476 U.S. at 280 n.6, and possibly even better.[5]

A program of race-based decision-making that increases in minority enrollment by an indeterminate yet meager amount simply cannot be justified as a "last resort" under governing Supreme Court precedent.  Of course, this is not to "suggest that *greater* use of race would be preferable;" rather, as the Supreme Court has explained, "the minimal impact of the districts'

---

[5]    In 2008, of the 6,184 White and Asian-American students admitted to UT Austin pursuant to HB 588, 3,505 of these students actually enrolled in the incoming freshman class. Thus, UT Austin's yield rate for these students was 56.7 percent.  In the same admissions cycle, of the 2800 African-American and Hispanic students admitted to UT Austin pursuant to HB 588, only 1,469 of these students actually enrolled in the incoming freshman class.  Thus, UT Austin's yield rate for these under-represented minority students was only 52.5 percent.  If UT Austin were to raise this yield rate—perhaps through additional recruiting and outreach efforts— to the same level of as the yield rate for White and Asian-American students (56.7 percent), another 118 African-American and Hispanic students would have enrolled in UT Austin's incoming freshman class for 2008.  Such a yield rate certainly seems possible given that UT Austin's yield rate for African-American and Hispanic students admitted pursuant to HB 588 in 2007 was 56.6 percent (1,393 of 2,459).  (App. ¶ 103.)

Moreover, given that Top 10% minority students have historically performed better academically than those admitted outside the Top 10%, (App. ¶ 69), HB 588 accompanied by UT Austin's race-neutral efforts, achieves the university's professed interest in increased diversity without sacrificing UT Austin's elite academic standards.

racial classifications on school enrollment casts doubt on the necessity of using such classifications" in the first instance. *Parents Involved*, 127 S. Ct. at 2760. If UT Austin is to employ a method for choosing students that "by [its] very nature [is] odious to a free people whose institutions are founded upon the doctrine of equality," *Adarand*, 515 U.S. at 214, it must demonstrate that the benefits of the program are clearly worth its cost, *Parents Involved*, 127 S. Ct. at 2767. Here, where UT Austin has denied thousands of students consideration on an equal basis in the admission process, UT Austin has not "carried [its] burden of showing that the ends [it] seek[s] justify the particular extreme means [it has] chosen—classifying individual students on the basis of their race and discriminating among them on that basis." *Id.* UT Austin's consideration of race is not narrowly tailored and, therefore, is unconstitutional.

> **2.      UT Austin Is Not Narrowly Tailored Because UT Austin Can Meet Any Legitimate Interest in Student Body Diversity Without Resorting to Racial Preferences.**

UT Austin failed to undertake "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Grutter*, 539 U.S. at 339. Although "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," *id.*, racial classifications "may be considered legitimate only if they are a last resort to achieve a compelling interest," *Parents Involved*, 127 S. Ct. at 2792 (Kennedy, J., concurring); *see also J.A. Croson Co.*, 488 U.S. at 519 (Kennedy, J., concurring) (explaining that "the strict scrutiny standard . . . forbids the use even of narrowly drawn racial classifications except as a last resort"); *United States v. Paradise,* 480 U.S. 149, 171 (1987) ("In determining whether race-conscious remedies are appropriate, we look to several factors, including the necessity for relief and the efficacy of alternative remedies."). Thus, "arriving at an exact fit between harm and remedy requires consideration of whether a race-neutral or less restrictive remedy could be used. This is because a race-conscious remedy should be the remedy of last resort." *Walker v. City of*

*Mesquite*, 169 F.3d 973, 982-83 (5th Cir. 1999).  A "race-conscious remedy will not be deemed narrowly tailored until less sweeping alternatives—particularly race-neutral ones—have been considered and tried."  *Id*. (quoting *Williams v. Babbit*, 115 F.3d 657, 66 (9th Cir. 1997).

Narrow tailoring therefore requires "particularly intense scrutiny to whether a nonracial approach . . . could promote the substantial interest about as well and at tolerable administrative expense."  *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986); *see, e.g.*, *J.A. Croson Co.*, 488 U.S. at 509-10 (plurality opinion) (striking down race-based government program for failing to take advantage of a "whole array of race-neutral devices" that "would have little detrimental effect on the city's interests and would serve to increase the opportunities available to minority business without classifying individuals on the basis of race"); *Virdi v. DeKalb County Sch. Dist.*, 135 Fed. Appx. 262, 268 (11th Cir. 2005) (unpublished) ("Because the state's proffered interest could be served equally well by race-neutral measures, the adoption of a racial classification is not narrowly tailored to achieving that interest.").  The Supreme Court's narrow tailoring standard draws a common-sense line; government need not test "every conceivable" race-neutral alternative through trial and error, *Grutter*, 539 U.S. at 339, but it must take advantage of "viable nonracial, non-discriminatory . . . criteria" before resorting to racial classifications.  *Walker*, 169 F.3d at 985.  While the former is an unrealistic and unfair measure of the "fit" between means and ends, the latter "ensure[s] that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype."  *Grutter*, 539 U.S. at 333.

Here, UT Austin has injected race into its review process even though a race-neutral approach to admissions is fully capable of meeting any legitimate interest it might have in student body diversity.  Before *Hopwood* prohibited the use of race in admissions, the university

employed a race-based admissions plan that resulted in an African-American and Hispanic enrollment rate of approximately 4% and 14% respectively as necessary to achieve student body diversity.  (App. ¶ 13.)  UT Austin has repeatedly used these levels of minority enrollment as benchmarks for measuring its success in achieving diversity.  More particularly, UT Austin has trumpeted the success of the Top 10% Law because it met these very benchmarks.  In 2003, President Faulkner applauded the Top 10% Law's impact on diversity not in the abstract, but as judged against these goals:  "[T]he Top 10 percent law has enabled us to diversify enrollment at UT Austin with talented students who succeed.  Our 1999 enrollment levels for African-Americans and Hispanic freshman have returned to those of 1996, the year before the *Hopwood* decision prohibited the consideration of race in admissions policies."  (App. ¶  68.)  UT Austin issued a January 29, 2003 press release that likewise stated: "Diversity efforts at The University of Texas at Austin have brought a higher number of freshman minority students . . . to the campus than were enrolled in 1996, the year a court ruling ended the use of affirmative action in the university's enrollment process."  (App. ¶ 72.)  It came as no surprise, therefore, when UT Austin proudly announced that the Top 10% Law, accompanied by other race-neutral measures, had "effectively compensated for the loss of affirmative action."  (App. ¶ 70.)

Statistical evidence validates the university's public statements.  In 1996, the last year of the pre-*Hopwood* race-based admissions program, UT Austin's freshman class was 4.1% African-American and 14.5% Hispanic.  (App. ¶ 13.)  In 2004, the final year of the race-neutral Top 10% admissions plan, the freshman class was 4.5% African-American and 16.9% Hispanic.  (App. ¶ 79.)  Moreover, as President Faulkner explained, relying on the Top 10% instead of racial preferences to meet the university's legitimate diversity goal produced additional educational benefits: "minority students earned higher grade point averages last year [in 1999]

24

than in 1996 and have higher retention rates.   An impressive 94.9 percent of 1998 African American [sic] freshmen returned to enroll for their sophomore year in 1999.   For Hispanics, 85.8 percent returned for their second year.   So, the law is helping to create a more representative student body and enroll students who perform well academically."   (App. ¶ 69.)   At bottom, whether based on UT Austin's contemporaneous examination of its own admissions data, or an independent examination of the relevant statistical evidence, the answer is the same — UT Austin is able to meet its legitimate interest in "student body diversity" through existing race-neutral means.

Given the objective evidence and the university's public admissions, UT Austin's re-introduction of race was and remains without constitutional warrant.   UT Austin is not being asked to experiment with speculative and unproven race-neutral policies before adopting a race-based admissions plan.   Rather, the uncontroverted evidence and the university's own statements prove that UT Austin is able to meet its legitimate diversity goals under the race-neutral admissions plan as operated from 1997 to 2004.   Indeed, the fact that UT Austin does not even know how much its consideration of race has increased minority enrollment demonstrates that, had UT Austin simply continued its race-neutral review process after 2004, minority enrollment at UT Austin would likely be approximately the same as it is now.   *See Parents Involved*, 127 S. Ct. at 2759 ("The minimal effect these classifications have on student assignments, however, suggests that other means would be effective.").   If narrow tailoring has any meaning, it must forbid a university from re-introducing race as a factor in admissions decisions when its existing admissions program is meeting its legitimate government interest.

What is particularly striking about UT Austin's consideration of race is that UT Austin recently asked the legislature to scale back the Top 10% Law because it "has hurt the

university's ability to increase its racial and ethnic diversity" and because "the university could attract a more diverse student body if it was not forced by the state, under a decade-old law, to accept every student with a high class rank."  Lisa Sandberg, *Top 10 Rule Limits UT-Austin, Says School President*, Houston Chronicle, March 20, 2008.   According to UT Austin President William Powers, "'[o]nly about one in four students admitted under the top 10 percent law is African-American or Hispanic, so there's a natural limit if we don't have discretion in who we can go after.'"  *Id*.  "Powers supports capping at 50 percent the number of incoming freshmen admitted by UT-Austin under the top 10 percent law, and giving admission officers more discretion to use other factors, including race, when considering the rest."  *Id*.  UT Austin thus appears to blame the very law that allowed it to meet its compelling government interest as an impediment to its increased consideration of race in the admissions process.  The university clearly has a desire to increase minority enrollment that far exceeds its right to use racial classifications to achieve that goal.  Even more troubling, however, it has declared an intention to widen the use of racial classifications at a time when universities are supposed to be sunsetting such practices.  *See Grutter*, 539 U.S. at 342-43.

In any event, although UT Austin is forbidden by the Constitution from continuing to employ racial preferences, the university is free to more fully explore the array of race-neutral alternatives that can assist it in further boosting UT Austin's minority enrollment.  Indeed, UT Austin already takes into account the socio-economic status of the applicant's family, whether the applicant lives in a single-parent home, the language spoken at home, the applicant's family responsibilities, the socio-economic status of the high school attended, and the average

SAT/ACT of the high school attended in relation to the student's SAT/ACT score.  (App. ¶ 32.)[6]

And UT Austin offers various scholarships and engages in numerous race-neutral recruitment

and outreach activities that have the effect of increasing minority enrollment.  (App. ¶ 150.)

Indeed, the use of these race-neutral measures, in conjunction with the Top 10% Law, from 1997

to 2004, proved sufficient to meet UT Austin's legitimate government interest.  In addition, the

upward trend in minority enrollment over this period made clear that this admissions program,

had it not been abandoned, promised higher minority enrollment in the coming years.

In particular, UT Austin should focus efforts on increasing its yield among African-

American and Hispanic students automatically admitted through the Top 10% Law.[7]  Indeed,

_____

[6]       Socio-economic outreach is particularly effective given the fact that 22.7% of African-
Americans and 21.4% of Hispanics live below the poverty line.  *See* Bernadette D. Proctor
& Joseph Dalaker, U.S. Census Bureau, *Poverty in the United States: 2001*, at 4 (Sept. 2002),
*available at* http://www.census.gov/prod/2002pubs/p60-219.pdf (Document 29-19).   As UT
Austin has acknowledged, increasing enrollment among low-income students has the effect of
increasing the enrollment of under-represented minority students.  (App. ¶ 149)

[7]       For example, UT Austin could participate in the College Summit program, which is run
by a national nonprofit organization that focuses on increasing the number of low-income
students to enroll in college.   *See generally* College Summit: Let Talent Shine,
http://www.collegesummit.org.  Many colleges and universities participate in this program and
"contribute to a college transition solution that strengthens [] high schools from within, so that all
students who can make it in college, make it to college."  *See generally* College Summit: Why
Colleges Partner, http://www.collegesummit.org/colleges/why-colleges-partner/.  In addition, UT
Austin "can and should draw on the most promising aspects of [the] race neutral alternatives"
adopted by other institutions in the search for race-neutral ways to increase minority enrollment.
*Grutter*, 539 U.S. at 342.  The University of California System, for example, has begun a series
of "student-centered" outreach programs in which University of California professors and
students work directly with K-12 students in areas of mentoring, advising about college
admissions, and assisting with college preparatory coursework.  United States Department of
Education, Office for Civil Rights, *Race-Neutral Alternatives in Postsecondary Education:
Innovative Approach to Diversity* at 12-13, (March 2003), (Document 29-21).  Nearly 100,000
California elementary and secondary students are currently served by this race-neutral program.
*Id.* at 13.  California also has instituted a school "partnerships" program under which University
of California campuses assist with curriculum development, student instruction, and community
engagement in 256 of the state's lowest performing elementary, middle, and high schools.  *See
generally* Univ. of Cal., Educ. Outreach, Expanding *Educational Opportunity: A Status Report
on the Educational Outreach and K-12 Improvement Programs of the University of California*,

given the number of automatically admitted African-American and Hispanic students that do not choose to enroll at UT Austin, concentrating and expanding outreach in an effort to increase the yield among this group of admitted students would make a meaningful difference in overall minority enrollment.   In 2008, out of the 2,800 African-American and Hispanic students automatically admitted under the Top 10% Law, UT Austin failed to convince 1,331 of these students—a number equal to roughly 20 percent of the incoming freshman class—to enroll at the university.   (App. ¶ 103.)   UT Austin's failure to realize the potential of these academically qualified minority students to increase minority enrollment provides further evidence that its use of racial preferences is not narrowly tailored.  *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1259-60 (11th Cir. 2001).

UT Austin, of course, is not required to implement any particular race-neutral measure. But because the university would be able to meet any legitimate diversity interest through a race-neutral admissions plan, it cannot rely on race-based admissions policies to increase minority enrollment for social remediation or any other reason.  If UT Austin has a continuing desire to further boost its minority enrollment, it has race-neutral options at its disposal to accomplish that policy goal.  For this additional reason, UT Austin's use of race is not narrowly tailored; it is thus unconstitutional under the Fourteenth Amendment.

### 3.      UT Austin's Use of Race is not Narrowly Tailored Because it is Over-Inclusive.

"The purpose of the narrow tailoring requirement is to ensure that 'the means chosen "fit" th[e] compelling goal so closely that there is little or no possibility that the motive for the

---

(Fall 2001), *available at* http://www.ucop.edu/outreach/statusreport2001.pdf (Document 29-22) "[T]he students with whom the University has worked have made substantial progress in recent years and the rates of change are expected to increase rapidly over the next several years." *Id.* at 5.

classification was illegitimate racial prejudice or stereotype.'" *Grutter*, 539 U.S. at 333 (quoting *Croson*, 488 U.S. at 493). Thus, a racial classification cannot meet the narrow tailoring requirement if it is either over-inclusive or under-inclusive. *See J.A. Croson Co.*, 488 U.S. at 506 (finding that the overinclusiveness of Richmond's racial preference, which would grant racial preferences to, among other minorities, "an Aleut citizen who moves to Richmond tomorrow" renders it not narrowly tailored).

UT Austin's use of race is clearly over-inclusive. UT Austin's consideration of race as a factor in admissions decisions is intended to increase the enrollment of African-American and Hispanic students because UT Austin considers these groups under-represented minorities. But, it is quite a stretch to argue that Hispanic students are under-represented or that they feel "isolated or like spokespersons for their race," *Grutter*, 539 U.S. at 319; *id.* at 318 (describing "critical mass" as "a number that encourages underrepresented minority students to participate in the classroom and not feel isolated"), given that UT Austin has been recognized as one of the nation's "top producers of undergraduates for Hispanics" by *Diverse Issues in Higher Education* magazine and one of the nation's "Best Schools for Hispanics" by *Hispanic Business* magazine, (App. ¶ 4) As UT Austin has proudly announced, "according to the May 31, 2007 edition of Diverse Issues in Higher Education magazine, . . . the university ranks 10th nationally among the magazine's Top 100 producers of undergraduates for Hispanics." (App. ¶ 4.)[8] Given the educational successes of Hispanic students at UT Austin, UT Austin's consideration of race —

---

[8] In addition, several of UT Austin's undergraduate academic programs have been ranked highly "[a]mong undergraduate academic programs in the top 100." (App. ¶ 5.) For example, Engineering ranks fifth for Hispanics; Mathematics ranks third for Hispanics; Biological and biomedical sciences ranks fourth for Hispanics; Social sciences ranks seventh for Hispanics; Area ethnic, cultural and gender studies ranks seventh for Hispanics; Computer and information science and support services rank 37th for Hispanics; English ranks 11th for Hispanics; and Psychology ranks 27th for Hispanics. (App. ¶ 5.)

which is intended to and does increase Hispanic enrollment — is over-inclusive.  Because it is over-inclusive, UT Austin's consideration of race is not narrowly tailored.[9]

### 4. UT Austin's Consideration of Race is not Narrowly Tailored Because It Has No Logical End Point.

As Justice O'Connor emphasized in *Grutter*, "race-conscious admissions policies must be limited in time."  *Grutter*, 539 U.S. at 342.  This durational requirement "reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands.  Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle."  *Id*.  UT Austin "offends this fundamental equal protection principle" because it readily admits that it sees no end in sight for its use of race in admissions decisions.  (App. ¶ 99.)  To the extent that UT Austin intends to conduct periodic reviews of its admission program to determine whether it should continue employing race as a factor in making admissions decisions,  any such review would be a hollow exercise given that UT has never articulated what critical mass is (App. ¶ 97); has no minority enrollment goal in sight (App. ¶ 98); and does not even measure (much less know) the actual number of students impacted (positively or negatively) by its consideration of race (App. ¶ 96).  Without any guidepost or benchmark by which to judge its use of race (and, indeed, without any measurements), this periodic review process is  meaningless, at least in any constitutional sense.  For this additional reason, UT Austin's use of race is not narrowly tailored.

## V. <u>CONCLUSION</u>

For all of these reasons, Plaintiffs respectfully request that the Court grant the Motion for Partial Summary Judgment.

---

[9]     That UT Austin's use of race is intended to increase the enrollment of Hispanic students but not Asian-American students further demonstrates that it is over-inclusive.

Respectfully submitted,


_ /s/ Paul M. Terrill_____

Bert W. Rein                                    Paul M. Terrill
Thomas R. McCarthy                   Texas State Bar No. 00785094
Suzzette Rodriguez Hurley           Joshua Katz
(*admitted pro hac vice*)               Texas State Bar No. 24044985
WILEY REIN LLP                          The Terrill Firm, P.C.
1776 K Street, N.W.                       810 W. 10th Street
Washington, DC  20006               Austin, Texas 78701
TEL: 202.719.7000                       TEL. 512.474.9100
FAX: 202.719.7049                       FAX: 512 474.9888


*Counsel for Plaintiffs*


Dated: January 23, 2009

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Mishell B. Kneeland
Assistant Attorney General
Texas Attorney General's Office
300 W. 15th Street
Austin, TX 78701
mishell.kneeland@oag.state.tx.us


/s/
_____
Paul M. Terrill
The Terrill Firm, P.C.
810 W. 10th Street
Austin, Texas 78701
TEL. 512.474.9100
FAX: 512.474.9888

Texas State Bar No. 00785094

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(Austin Division)**

ABIGAIL NOEL FISHER; and
RACHEL MULTER MICHALEWICZ

                Plaintiffs,

      v.

UNIVERSITY OF TEXAS AT AUSTIN; *et al.*

                Defendants.

Civil Action No.  1:08-cv-00263-SS

**PROPOSED ORDER
GRANTING PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

        Plaintiffs have filed a MOTION FOR PARTIAL SUMMARY JUDGMENT.  Having considered the papers submitted in connection with the MOTION PARTIAL SUMMARY JUDGMENT, the Court is of the opinion that Plaintiffs' motion is well taken and should be **GRANTED**.

        IT IS THEREFORE ORDERED that Plaintiffs' MOTION FOR PARTIAL SUMMARY JUDGMENT is **GRANTED**.  IT IS ORDERED that Plaintiffs' request for declaratory relief is **GRANTED**.  The court finds and DECLARES that Defendants' use of race in its undergraduate admissions decisions at the University of Texas at Austin violates the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

        DATE:_____, 2009

                        _____
                        UNITED STATES DISTRICT JUDGE