# EXHIBIT

# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ABIGAIL NOEL FISHER; and RACHEL MULTER MICHALEWICZ<br>Plaintiffs,<br>v.<br>STATE OF TEXAS; UNIVERSITY OF TEXAS AT AUSTIN; et al,<br>Defendants. | Civil Action No. 1:08-cv-00263-SS |

---

ORAL DEPOSITION OF
BRIAN BREMEN
October 6, 2008

---

ORAL DEPOSITION of BRIAN BREMEN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on October 6, 2008, from 10:03 a.m. to 11:58 a.m., before Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of University of Texas at Austin, Main Building, Suite 210, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:
Mr. Thomas R. McCarthy
WILEY REIN, L.L.P.
1776 K Stree, N.W.
Washington, DC 20006
202/719-7000

FOR THE DEFENDANTS:
Ms. Mishell B. Kneeland
OFFICE OF THE ATTORNEY GENERAL
Assistant Attorney General
300 West Fifteenth Street
Austin, Texas 78701
512/463-2004

ALSO PRESENT:

Mr. Leo Barnes
Ms. Patricia C. "Patti" Ohlendorf

INDEX

PAGE
Appearances.............................................. 2
BRIAN BREMEN
Examination by Mr. McCarthy........................ 4
Changes and Signature.................................. 62
Reporter's Certification............................... 64

EXHIBITS

NO. DESCRIPTION PAGE
2...................................................... 33
Office of Admissions - Freshman Application Review Sheet
3...................................................... 37
Freshman Application Review Sheet
4...................................................... 51
Essays, Instructions, and Scoring Guide
5...................................................... 54
Sample Essay A
6...................................................... 56
Sample Essay A

* * * * *

THE REPORTER: On the record, 10:03.

BRIAN BREMEN,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. McCARTHY:

Q. Good morning.

**A. Morning.**

Q. My name is Thomas McCarthy and I represent the plaintiffs in this case. And, Dr. Bremen -- Is it doctor?

**A. Sure.**

Q. Dr. Bremen, are you here in response to this notice of deposition?

**A. Yes, I am.**

Q. Okay.

MS. KNEELAND: And at this point for the record, I'll state that the topic for which Dr. Bremen has been designated is the broad topic of No. 11, the training process for admissions officials and undergraduate application readers at the University of Texas at Austin.

MR. McCARTHY: Okay.

Q. (By Mr. McCarthy) And, Dr. Bremen, I'll try to stick to that topic. If I start to ask you questions that are outside of that that you're not prepared for, you can go ahead and tell me that you're not prepared to talk about that today.

**A. Sure thing.**

Q. Now, have you ever been deposed before?

**A. No, I haven't.**

Q. Okay.

**A. No, this is the first time.**

Q. Well, I'll tell you a little bit about it. Basically, I'm going to ask you a series of questions that relate to your role and your responsibilities that are relevant to this case and you'll be testifying on behalf of the University. Just answer the questions to the best of your ability. If you don't know the answer, feel free to say you don't know. If my question is unclear, feel free to ask me to repeat it. And if you have a question that you would like to ask Ms. Kneeland, your attorney here, feel free to ask her. I just ask that you answer my question first and then go ahead and ask her.

**A. Sure.**

Q. If you need to take a break for whatever reason, use the men's room, get a drink of water, we can certainly take some breaks. And I also ask that when I ask a question, if your answer is a yes or a no, please state it verbally rather than nod your head so that the court reporter can put it into the record.

**A. Sure.**

Q. Okay. Do you have any questions about the

Page 6

procedure?
A. **No.**
Q. Okay, great. I'm going to ask you just a few more sort of standard logistical questions before we actually get started into the meat of this.
Have you taken any medications or ingested anything that might affect your ability to testify here today?
A. **No.**
Q. Okay. Did you meet with anyone to prepare for this deposition?
A. **Yes.**
Q. Okay. Did you meet with Ms. Kneeland?
A. **Yes.**
Q. Did you meet with anyone else?
A. **Leo Barnes.**
Q. Okay. About how many times did you meet with them?
A. **I met with Ms. Kneeland and Leo once and then once before with Leo and Patti Ohlendorf. I forgot her last name.**
Q. Okay.
MS. KNEELAND: And just so you know, she's legal counsel for the University of Texas at Austin as well --

Page 7

MR. McCARTHY: Thank you.
MS. KNEELAND: -- to clear that up before you ask.
Q. (By Mr. McCarthy) Did you review any documents in preparation for this deposition?
A. **Well, the only reason I'm -- I had given documents to Leo and I don't believe, though, that we actually reviewed them. We talked about them, but didn't look at them.**
Q. Okay.
MS. KNEELAND: I think he's stating the difference between he gave documents for us to produce to you versus having gone over them.
MR. McCARTHY: That's what I figured.
Q. (By Mr. McCarthy) Okay. What is your job title?
A. **I'm an associate professor in the Department of English.**
Q. Okay. And what are your responsibilities with regard to the admissions program?
A. **The admissions program hired me awhile ago now as a cross-campus consultant to help them with the essay process in admissions.**
Q. Okay. And how long have you been in that position with the admissions office?
A. **I want to say about 15 years --**

Page 8

Q. Okay.
A. **-- 13 to 15.**
Q. Okay. Have you held any other positions while you've been at UT Austin?
A. **Just the associate professorship.**
MS. KNEELAND: Just -- You mean positions at UT Austin or do you mean other positions outside of the University?
MR. McCARTHY: I mean other positions at UT Austin.
MS. KNEELAND: Then I think you answered.
THE WITNESS: Right.
MR. McCARTHY: Okay.
Q. (By Mr. McCarthy) Have you held other positions outside of UT Austin that relate to these duties?
A. **Yeah. I've been a consultant for the College Board for about 30 years now. I was the chair of the Test Development Committee for the SAT II writing test, I was a chief reader for the SAT II writing test, and was a member of the SAT Writing Test Development Committee when the SAT II writing test was suspended and that test then became part of the overall SAT battery. I was then a special consultant for the College Board once the SAT writing test was administered where I would fly up to Iowa City every time there was an administration of the SAT**

Page 9

**to sat up the scoring and training procedures for that test.**
Q. Okay. And what's your educational background?
A. **My educational background, I was a AB in economics from Princeton University, taught high school for eight years and while I was doing that went back and worked on a master's degree in English, and then went back to Princeton to finish a Ph.D. in English literature.**
Q. Are you able to testify on behalf of the University of Texas at Austin for the purposes of the topics that Ms. Kneeland mentioned earlier?
A. **As far as the essays and the training goes, absolutely.**
Q. Okay. Can you tell me about the training that's given to the readers that review applications?
A. **Sure. This is the same process that we used at the College Board for grading -- for evaluating essays. It's a process known as holistic scoring. It was actually developed in the '60s by a woman named Trudy Conlan at Educational Testing Services and it's -- also I should say I developed a workshop for the College Board for in, again, essay scoring and evaluating essays as a piece of writing.**
**Would you like me to explain the process itself?**
Q. Sure, please continue.
A. **All right. The major principle, I guess, of**

**holistic scoring is that you try to establish a set criteria for an essay as an overall piece of writing. Would you use a -- Using a six-point scale, you evaluate a population of essays according to, you know, again, those that are good, as good, better than the majority, those that are not as successful, less successful, you know, than the majority of the essays. It's a -- a process that involves evaluating a population of essays beforehand in order to pick sample essays for particular score points so that the training can -- will involve, then, triangulating between a set of principles in holistic scoring, a scoring guide, and these sets of samples.**

Q. Okay. Now, you talked about -- In your answer there you talked about setting up a scoring guide?

A. **Yes, the scoring guide.**

Q. What do you mean by that?

A. **The scoring guide is a set of really varying descriptions for each score point so that -- I tell readers that they want to sort of evaluate each essay in three dimensions so that you're looking at complexity of thought, substantiality of development, and facility with language and so -- I believe there's a copy of the scoring guide that we use in the material that I gave to Leo and Mishell, but that each score point then has a description along with it that's really made specific, though, in relation to the**

**sample essays that readers then are trained on.**

Q. Okay. So now this scoring guide, you talked about complexity of the issues --

A. **Complexity of thought.**

Q. Sorry, complexity of thought and the substantiality of the --

A. **Of development.**

Q. -- development, and the facility with language?

A. **That's correct.**

Q. Okay. So those -- Are those sort of the major components that you look at when you review an essay?

A. **Well you want to negotiate among those three axes really, those three components.**

Q. Okay. So in other words, an essay that shows the complexity and the facility and the substantiality is one that will get a higher score.

A. **In varying degrees, sure.**

Q. Okay.

A. **Absolutely, yeah. I was going to say it might be helpful for me to actually look at the scoring guide if we're going to talk about it.**

MS. KNEELAND: It's Mr. McCarthy's deposition. I don't know if he has it with him, so --

MR. McCARTHY: I intend -- I intend to show it to you in a little bit and we'll talked about.

THE WITNESS: Okay, sure.

Q. (By Mr. McCarthy) Okay. When you were first talking about how the holistic review is done and you mentioned the scoring guide, you also talked about setting criteria. And was that the scoring guide?

A. **I --**

Q. You used the word setting criteria, I believe. Maybe I misheard you.

A. **Well in other words, the -- the scoring guide establishes the criteria -- the general criteria, general descriptions for each score point.**

Q. Okay.

A. **Those descriptions, though, are made specific in relation to the sample essays, then, the readers are trained on --**

Q. Okay.

A. **-- if that helps.**

Q. Okay, yeah. And we'll get back to that in a little bit.

Let me ask you this. How often is training given to the application readers?

A. **There's two -- two times when -- when the readers are trained. The senior staff -- Each group is trained once. The senior staff is trained once and then the group of junior staff readers are trained a second time.**

Q. Okay. And senior staff, would these be the senior readers?

A. **They're senior members of the admissions staff.**

Q. Okay. And is this training repeated after certain periods of time?

A. **No. There -- there are validity studies done and checks throughout the reading process to make sure that readers are staying on point in line.**

Q. Okay. I'm not sure if it's Dr. or Mr. Lavergne, but he was testifying earlier a little bit about interrater reliability studies.

A. **Yeah.**

Q. Is that what you're talking about?

A. **There's that, there's also the fact that files and essays will -- you know, can be reviewed, say, by the senior staff or by another person looking at that file and then checking to make sure that the essay scores and the PAI scores seem in line --**

Q. Okay.

A. **-- with what they would give.**

Q. Okay. So in addition to this interrater reliability study --

A. **Right.**

Q. -- there is some review by senior admissions officials that's sort of a quality control?

**A. Yes.**
Q. And from time to time when quality control analysis is done, is it the case that some readers have been giving sort of variant PAI scores or essay scores?
**A. You know, I -- I have to admit I don't know, I'm not really part of that process.**
MS. KNEELAND: Can we just go off the record a second?
(Discussion off the record)
Q. (By Mr. McCarthy) Okay. When -- when a reader is reviewing an application to determine a personal achievement score -- well, can you -- can you talk about that? Can you talk about how readers determine a personal achievement score from an applicant's file?
**A. Sure. I should say up front that it's different than reading the essays holistically. There was a holistic evaluation now of the entire file and so the essays themselves are used differently in that process in which readers are told to read the essays first and score them holistically. Then with the PAI determination, there's this negotiation between a breadth of involvement with a depth of involvement. There are a number of criteria, then, that we've established to, again, use a six-point scale to evaluate a file in terms of whether this is better or as good of the majority or, you know, in the lower half.**

**There's that -- that sense of someone who has made a difference, there is, you know, someone who has maximized circumstances is another sort of criteria that's used, and, you know, someone who's gone outside of themselves, really gotten involved with the community, with a job, with a family, made a difference again in some way.**
Q. Okay.
MS. KNEELAND: And I'm not interrupting to be obstructionist, I'm interrupting just so the record's clear because we have some looseness in our characterization sometimes. When he's talking about the personal achievement index right now, he's talking about the personal achievement score which is one to six that feeds into the PAI calculation that Mr. Lavergne talked about.
MR. McCARTHY: I'll just ask him a question and make sure he can make that clear.
MS. KNEELAND: Okay.
MR. McCARTHY: That's what I thought.
Q. (By Mr. McCarthy) Okay. So when you're talking about reviewing a file and I think you mentioned for breadth and depth of involvement --
**A. Right.**
Q. -- you were talking about reviewing to determine a personal achievement score --
**A. That's right.**

Q. -- which is a part of the personal achievement index.
**A. Index, that's correct.**
Q. Okay. And you said that the reader reviews first the essays?
**A. That's -- that's the way they've been trained. First they score the essays holistically, then they look at the entire file holistically for specific information, again, how it will show this particular applicant's personal achievement.**
Q. Okay. And when they review the whole file to determine that personal achievement score, do you mean the whole file apart from the essays or the essays --
**A. The essays are included as a part of that file.**
Q. Okay. So the essays are read -- Let me back up.
So readers are trained to read and score the essays individually first.
**A. And to evaluate them as a piece of writing. So in other words, it's the quality of the essay as a piece of writing. That's the holistic essay score.**
Q. Okay. So first -- So the readers are trained to review and score in a holistic manner the essays individually first.
**A. That's correct.**
Q. And then after that --

**A. Right.**
Q. -- the readers are trained to review the entire file, including those essays, and they review the entire file holistically.
**A. Yes. There, though, the essays are used for any specific information they may reveal or verify.**
Q. So, okay, let me ask about that. So in other words, when the essays are reviewed and it's part of the holistic review of the entire file --
**A. Right.**
Q. -- they are no longer considered for the quality of the writing?
**A. It's more information that they reveal; in other words, there's one time where just as part of an applicant's resume he had a line item that was Kings and Queens of the Court. It was in his essay that you learn that Kings and Queens of the Court was a charity basketball game that this guy had established at Phillips Andover in order to raise scholarship money for needy students. So that information, right, in other words, elevated what was just a bold description in to really valuable information.**
Q. Okay. So I guess would it be accurate to say, then, that when the essays are reviewed as part of the holistic review of the entire file, they are reviewed for this breadth and depth of involvement?


Page 18

**A. Could you repeat that?**
Q. Sure. So when the essays are reviewed as part of the holistic review of the entire file, the essays are reviewed for this breadth and depth of involvement?
**A. The essays are reviewed in the -- for the way that they contribute to the reader's understanding of the student's breadth and depth of involvement --**
Q. Okay.
**A. -- yeah.**
Q. Okay. And then there's also an optional third essay that's part of the application.
**A. Right.**
Q. Where does that come into play in the holistic review?
**A. If it's there, again, it would be for the information it reveals about the applicant's involvement as a student.**
Q. Okay. And does that go into the personal achievement score?
**A. I believe it would be part of the -- it would be part of the personal achievement score, right. I want to make sure about the score versus the index.**
Q. So it's part of the personal achievement score as distinguished from the personal achievement index. Well, actually, I should restate that. It's a part -- So the

Page 19

third essay is part of the personal achievement score which is a component of the personal achievement index.
**A. Right. It would be read along with the other information in that file, yes.**
Q. Okay. In this third essay, if the third essay contributes nothing to the breadth and depth of the applicant's involvement, does it just have no effect on the personal achievement score?
**A. I would imagine.**
Q. Would it be possible for the third essay to have a negative effect on the personal achievement score?
**A. You know, throughout the holistic process you're always told -- or readers are always told to reward students for what they do well, so you really don't discuss things in terms of negative effects, taking away.**
Q. Okay. So then would you say that the third essay would not have a negative effect on a --
**A. Well, you hope -- We're getting double negatives here. I would say the third essay, along with other -- any other information in that file, you know, determines what you reward that student for having achieved.**
Q. Okay. And that makes sense to me and I'm just trying to understand exactly what that means.
**A. Sure.**
Q. So is it the case, then, that the third essay

Page 20

would either have a positive effect or no effect on the personal achievement score?
**A. Well, the only -- the only reason I'm hesitant to answer is that in holistic evaluation, you really don't want to isolate any one item. The metaphor that I've used to train people since I came to Texas is it's like judging chili. You know, either a chili's damn good, you know, or that chili stinks. It's -- You know, it's afterwards that the individual ingredients, you know, come in to play, you know, where the beans could have been cooked better or, you know, the cayenne pepper wasn't very hot. So, you know, it's not that something doesn't count more than something less, it's not that something doesn't count at all, it's that all of the ingredients are evaluated as a whole.**
Q. Okay. So I guess is it impossible to say whether the third essay might have a negative effect on the personal achievement score?
**A. The only thing you can say is that the third essay is one of a set of criteria that a reader would be expected to judge and evaluate in that holistic manner.**
Q. Okay. I guess I'm just having a hard time understanding and I'm thinking about your example with the chili --
**A. Sure.**
Q. -- and to me, like, chili could be pretty good,

Page 21

but the beans be not very good and that would detract from the overall, you know, rating of the chili.
**A. Absolutely.**
Q. Okay. So it seems to me that this third essay was -- something about it was poor -- if it was poorly done, that is, and, you know, it seems possible that it could have a negative effect on personal achievement score or that it might just not have any negative effect at all, just as a positive or a nothing thing, but not a negative thing.
**A. I guess I'm not sure what you mean by "poorly done."**
Q. I don't know what I mean either. I'm trying to figure out what the holistic review is.
**A. Yeah.**
Q. And I'm sorry I'm having difficulty understanding. We'll move along and I'll ask some more questions and we'll see if I can understand the holistic review process.
**A. Sure thing.**
Q. Let me ask, when did the University begin including this optional third essay?
**A. You know, I honestly don't know.**
Q. Okay. How are the various personal achievement factors weighed or -- I mean, not to use the word weighed, I know that's -- How are the personal achievement factors considered when computing the personal achievement score?

Page 22

MS. KNEELAND: Object to the form.
You can answer it if you can.
A. Yeah, again, in other words, if you're asking how individual factors within the file add up to the personal achievement score --
Q. (By Mr. McCarthy) Uh-huh
A. -- you know, again there's that holistic consideration. You can't -- And readers are, you know, strictly sort of instructed not to break things down into individual criteria and then add them up. Again, it's a sort of holistic impression that is made specific with, again, sets of samples, though these samples are reached by unanimous agreement among the senior staff.
Q. Okay.
A. And one other thing with the samples. There are always ranges with any score point, so you try get some sense of the range within a score point.
Q. Could you give me an example of what you might see in an applicant's file that would result in them getting a high personal achievement score?
A. Sure. Again, you know, there will be variety -- a variety of types. You know, we've said if there is only one activity that that student has -- Let's say the only thing that that student has is that they swim, but they're an Olympic-level swimmer, right, that's that mixture of breadth

Page 23

with depth. We may have someone else who's been, you know, a recognized leader in a variety of activities, student government along with, you know, teams, along with clubs, has a job, was promoted to manager and, you know, in that way is seen to be an outstanding candidate. You may have someone who had to work two jobs to help support a family and so didn't have the opportunity to get involved with a lot of school activities, but has still been outstanding in those jobs, still involved with the community, still distinguished themselves as someone, again, who has made a difference. So there's really a kind of variety of ways in which students will distinguish themselves. And, again, it's those -- that idea of maximizing circumstances of someone who's made a difference and of kind of mixing this breadth and depth of experience.
Q. Okay. Let's use your example of an Olympic swimmer.
A. Sure.
Q. So an Olympic swimmer is, you know, a person who had nothing really in their file in terms of personal achievement other than that they were an Olympic swimmer. They have a very high level of depth of involvement, but not necessarily not breadth. What -- what kind of personal achievement score might that type of applicant get?
A. If they were, you know, an Olympic swimmer, I

Page 24

mean -- you know, I have to say the danger of answering questions about sort of hypothetical files is the same danger, I guess, of answering about hypothetical essays. And so I've always made it a practice of never to answer questions about hypothetical essays because, you know, what I found is what's in my mind when I answer that is often different than what's in the mind of the person that's asking me. So I guess I'd have to see the file is what I'm saying and then I could show you sort of in that file what is it that made that person a six or a five or a four or a three, a two, or a one.
Q. Okay.
A. It's very hard to answer in the abstract in a hypothetical.
Q. And I guess part of the reason is that -- I should ask you. Is part of the reason for that that there can be a range of personal achievement scores that might be appropriate for any one given applicant's file?
A. I don't think so. Could you repeat that again?
Q. Is part of the reason why it's -- Let me just ask this and make it easier.
For any given applicant's file --
A. Right.
Q. -- is there an acceptable range of personal achievement scores?

Page 25

A. No. I mean, you would -- The one thing we ask in both the essays and the personal achievement score is that if there was any kind of variance, it would be at least contiguous scores. But you hope for exact agreement so that the training is always aiming for everyone to see this file in exactly the same way.
Q. And when you say contiguous scores, do you mean up or down one from --
A. Yes.
Q. Okay. Up or down one from a mean?
A. No, no, upper one -- up or down one from -- you know, from other -- what other readers would give that score.
Q. Okay. And now Mr. or Dr. Lavergne -- I'm sorry, I can't remember -- testified earlier about how quality control tests are done and he talked about interrater reliability analysis.
A. Correct.
Q. And he said that when these studies are done, first a true score is assigned to an applicant's file. Is that correct?
A. Yes.
Q. Okay. Can you tell me a little bit about that process?
A. What we -- we've used with the essays, they have

Affiliated Reporters & Video 800-969-2752
805 West 10th Street, Suite 400, Austin, Texas 78701

Page 26

been essay scores that I've determined and then for the files, that those are essay scores, again, that the senior staff has unanimously agreed on. So those would determine those sort of target scores for both the essays and then for the personal achievement score.

Q. Okay. So when training is conducted, are the trainees in that class given practice essays to review?

A. Yeah. The training is actually different for the essays than for the personal achievement scores.

Q. Okay, we'll do those one at a time.

A. Okay.

Q. Why don't we do -- why don't we talk about personal achievement scores.

A. Okay.

Q. Tell me how that's done.

A. The 14 or 15 senior staff members are in a room with a pile of about 40 or 50 files in front of them. They're each then asked to find two or three files that they think are perfect examples of a particular score point. And they should be different score points, so one may be a five, one may be a three, one may be a one, one may be a six. They get those then, you know, two or three files, make a sort of packet of them, and put their name on it and have recorded their scores. Then those packets are read by four other members of the senior staff, so for a total of five

Page 27

evaluations. Then as a group we see what scores were given to what files and files that receive a unanimous agreement on the score point are then used for those samples. So in other words, these are files where five members of the senior staff and then everyone else sort of in review agrees, yes, that is a perfect three, yes, that's a perfect five.

Q. Okay. Could you tell me a little bit about the similar process for the personal achievement score?

A. That was the personal achievement score.

Q. Oh, I'm sorry, I thought that was the essays.

A. No, no, the essays --

Q. I'm sorry. Can tell me a little bit about the same process, but for the essays?

A. Sure. The essays -- before the training occurs, I get about a thousand samples of each essay and from those thousand I'm the one who picks, then, examples of particular score points and put together packets, then, to train the readers on so that the first set that they look at -- there are about five or six set of six essays, then, that they are given to look at, so a total of about 36 essays for -- you know, for each essay type.

The first one they look at is in ascending order a one, a two, a three, a four, a five, a six. The second set, then, they look at, there's one for each score

Page 28

point, but they're not in order so the readers have to put it in order. They then put it back in alphabetical order. Right? Each of these samples is marked by an alphabet letter, not by the score point. So they put it back in alphabetical order and we take scores. All right? So I say for Paper K, who gave it a six, who gave it a five, who gave it a four, a three, a two, a one? So then after that second set of six -- we sort of get one for each score point, so now they have two essays for each score point to use as samples. We go through a number of sets of three -- and these can be any score -- to get them used to that variety within the population that they're going to see, as well as the variety within a score point and get them to, you know, hone in on what the correct score is. And, again, through -- You know, there is a little bit of peer pressure involved, I mean, through group agreement. I mean, it's amazing the group -- you know, I tell groups -- I've trained groups across the country in holistic scoring and the most accurate group I've ever trained is the admissions staff. Amazing agreement.

Q. Okay. And now if there is disagreement, let's say if there is one reader who's training in a class who is consistently off the rest of the group for whatever reason, does that individual receive extra training?

A. You know, we've never really had that. I mean,

Page 29

what happens in training inevitably is there will be one or two where somebody will be just off. The real value of training I've told readers is that really in training you learn your own peccadilloes as a reader and so it's really sort of to learn, you know, what do you respond to a little too critically, what do you need to back away from, you know, what do you need to -- maybe take a cup of coffee before you read, you know, a second time. So, you know, we've -- you know, I don't know that we've had a case where there's somebody who has just been consistently off through training.

Q. So then is the training designed to sort of work out this uniformity?

A. Absolutely, to gain consensus. I mean, that's what -- One of the principles of the holistic scoring is that readers are asked to go with the group agreement and so that the main thing is that they learn how the group would score a particular essay, that they learn to recognize, you know, a variety of successful strategies, styles, ways of responding to a particular prompt.

Q. Okay. Before 2005 the factor of race was not a consideration in the admissions process. Correct?

A. I believe that's correct.

Q. Well, let's say this. Was the -- was the holistic training any different before race became a consideration in

Page 30

admissions decisions than it is now?
**A. No. I mean, I think it was one of the strengths of our training process that, you know, the only way throughout that we've considered, you know, race and ethnicity in any way is the way a student or an applicant will reveal a sense of cultural awareness with regard to that issue. That's really the only way it's entered into the personal achievement. It's never really been a factor in the essay scoring. That's remained -- Both have remained exactly the same.**
Q. Okay. So has the training with regard to the personal achievement score -- Sorry. Has the training with regard to the personal achievement score changed at all since the introduction of race as a factor?
**A. Not in any substantial way that I would say.**
Q. In any substantial way. Any small way?
**A. Again, no. I mean, we've -- you know, we've talked kind of throughout the admissions process and, again, given the criteria of, you know, someone who shows, you know, an awareness of their community, you know, a sense of -- altruistic sense of contributing to -- you know, to the community, to their schools, to their families. The only way I think, you know, again, race and ethnicity has entered into the process in any way is, again, the way it reveals that sense of cultural awareness I would say.**

Page 31

Q. Okay. Now, admissions officials who read applicants' files -- Let me back up.
Are admissions officials who review applicants' files given training at periodic intervals?
**A. I'm only involved with that -- those two -- those two meetings, those two trainings.**
Q. Okay. So but do people repeat the training after a year or two years?
**A. Oh, it's very year we repeat the training.**
Q. Every year.
**A. Yes.**
Q. Okay. So there must have been training prior to the introduction of race as a factor and then again afterwards.
**A. Absolutely, sure.**
Q. In these training classes, did any of these individual readers ask a question, how do we do this now that race is a factor?
**A. I think it was less -- I mean, there were meetings that we -- that I was a part of with the admissions committee outside of the training where those discussions really took place. I think, you know, if -- if it did come up at all during the training, again, the answer was exactly the answer that I've given you; in other words, that the only way race is a criteria is the way that it enters -- it**

Page 32

**would enter into -- Well I guess I would say as an individual criteria, it's never been really anything important.**
Q. So as an individual criteria, race has some consideration to the extent it contributes to the applicant's cultural awareness.
**A. Well that's why I hesitated to say that it had any individual impact at all because what's more important is the way an applicant reveals some sense of cultural awareness and that has really very little to do -- it has nothing to do with a particular racial or ethnic background. You know, there have been -- I remember one sample, in fact, from the personal achievement scores was, you know, an Anglo student who lived in a predominantly Hispanic community and how that unusual position of being an Anglo as a minority revealed to that particular person, you know, again, aspects of cultural awareness that showed a kind of maturity, a real reflectiveness and, again, a sense of how this particular individual was able to contribute to that community.**
Q. Okay.
**A. So, you know, that's the way that, again, that sense of maturity with regard to cultural awareness has been sort of the major focus.**
Q. Okay.
MR. McCARTHY: Can we take a break for a few

Page 33

minutes?
THE REPORTER: Off the record, 10:43.
(Recess)
THE REPORTER: On the record, 10:50.
Q. (By Mr. McCarthy) Dr. Bremen, you've been discussing scoring of essays and personal achievement scores and training. In order to help me understand how this works, I want to give you -- can I give you an application and you can look at it --
**A. Sure.**
Q. -- and give me an idea of how it might work? Okay. This is --
MR. McCARTHY: Can I have this marked as an exhibit?
(Deposition Exhibit No. 2 marked for identification)
Q. (By Mr. McCarthy) Dr. Bremen, do you see what's marked as Deposition Exhibit 2?
**A. Uh-huh.**
Q. And can you tell me what that is?
**A. It's a file from the year 2006 --**
Q. Okay.
**A. -- of an applicant.**
Q. And I think it has Bates numbers at the bottom. Could you tell me what those are, the pages, just so we

can --
A. **This number here (indicating)?**
Q. Yeah, sure.
A. **D-175.**
Q. Okay.
MS. KNEELAND: Maybe for the record, can you go ahead and tell him what the last page is?
MR. McCARTHY: Yeah.
THE WITNESS: D-188.
Q. (By Mr. McCarthy) So D-175 to D-188.
A. **Yes.**
Q. And that's Deposition Exhibit 2.
A. **Yes.**
Q. Okay.
MS. KNEELAND: Can I just have a quick second to look at it?
MR. McCARTHY: Sure, go ahead, take your time.
Q. (By Mr. McCarthy) So -- and if it helps, take your time and sort of review it because I know the process is a holistic review --
A. **Sure.**
Q. -- but why don't you take a few moments to look at that and then, you know, try to explain to me how the scoring works using that as an example.

A. **Sure (examining document).**
**So looking at it again with that criteria in mind of someone who has maximized circumstances, this is someone from a relatively under-privileged background, a household income less than $20,000 with a father education level high school graduate or equivalent, mother education level no high school, and yet this applicant has really done an exemplary job in terms of achievement and involvement in their schools. Member of the -- or vice president, in fact, of the National Honor Society, president of -- I believe it was Student Council, four-year member, a three-year member of the National Honor Society, UIL competitor for six years.**
**So this is someone who has been very involved in a very consistent way over a number of years in high school, someone who has also done work outside of the school. Dare Program activity, along with a hospital volunteer, Vocation Bible School, worked for a golf tournament. And then in terms of awards, Honor Roll, Presidential Award, and then first place in a UIL tournament along with first division trumpet assemble medal. So just, again, a kind of quick look, again, given the criteria somebody who's maximized circumstances, made a difference, made a contribution, I mean, it looks like, you know, an outstanding candidate. I would say -- It wouldn't surprise me a six.**

Q. Okay. And would there be -- in your mind, would there be a range of acceptable personal achievement scores that this applicant might get?
A. **You know, I would say this should be somebody who should get a six. You know, we would, again, in training insist on, you know, that's the score it should get.**
Q. So if you saw on a application like this in training and, you know, you thought it was a six but someone else thought it was a five, is that acceptable?
A. **In training?**
Q. Yeah.
A. **No.**
Q. No. What about in practice?
A. **Again, you have to check with the admissions staff. I would -- I would imagine there would be a kind a -- I would hope there would be a correction. Again, I don't know about the day-to-day practice.**
Q. Okay. And how might that applicant's race weigh in to that personal achievement score?
A. **In my determination it didn't at all.**
Q. Okay. And are you -- Were you aware of that applicant's race when you looked at the file?
A. **Only that I had read it, I mean, that it says ethnicity, Hispanic.**
Q. Okay. Is it the case when readers review

applicants' files that they know the race?
A. **It's part of -- it's part of the information that they're given.**
Q. Okay. So they know it when they're reading it.
A. **Yes.**
Q. Okay.
MR. McCARTHY: Can we mark this as Deposition Exhibit 3?
(Deposition Exhibit No. 3 marked for identification)
Q. (By Mr. McCarthy) This is a document that's Bates labeled D-144, it's marked as Deposition Exhibit 3 and that's one page of a file and what I want to ask about there is that there are a list of extracurricular activities on that page and next to each one of those extracurricular activities there's a note in the margin, there's a numerical value there.
A. **Right.**
Q. Do you know what those signify?
A. **Yeah. It's the number of years they were involved with that activity.**
Q. Okay.
A. **So it's the same as the "X"s here.**
Q. Okay.
A. **They just -- This person just put those there, but**

Page 38

if you notice organization/position, swimming, varsity captain, four years, so there's a four in the margin; club swimming, three years, three in the margin.
Q. And so is that tracked to -- I'm sorry, let me back up.
Is that noted because that relates to that applicant's depth of involvement?
MS. KNEELAND: Object to the form.
MR. McCARTHY: I'm sorry, what's the objection?
MS. KNEELAND: I think it presupposes facts that he hasn't testified to. I just objected to form --
MR. McCARTHY: Okay.
MS. KNEELAND: -- he can answer it.
MR. McCARTHY: I just was wondering what form, if it was vague or whatever.
Q. (By Mr. McCarthy) Let me try and ask it again.
A. Sure.
Q. Earlier you talked about how a personal achievement score is determined considering an individual's depth and breadth of involvement. Correct?
A. As one -- one set of criteria, right, that we use, sure.
Q. Sure. So that's one set of criteria, the depth and breadth of involvement --

Page 39

A. Right.
Q. -- is one set of involvement.
A. Right.
Q. So would -- would the amount of time an individual has spent on a certain project or activity, does that relate to the depth of involvement?
A. No, not necessarily. It shows more consistency of involvement over time which would be another -- if you look at the description, there's also a scoring guide for the personal achievement scores and, again, one through six. And there in those descriptions it talks about consistency of involvement as opposed to sporadic as opposed to somebody who's a member as opposed to an officer. So I think that the number of years that they're involved with an activity speaks more to their consistency of involvement.
Q. Okay. All right. The personal achievement score is given a numerical value but, again, I believe you testified that the components that make up that score don't get numerical values themselves.
A. Yes, that you don't want -- Since it's reached holistically, you don't want individual criteria to be considered in an individual way. You want them to be considered holistically.
Q. Okay. What is the benefit of considering it holistically as opposed to giving numerical value to each

Page 40

component?
A. I think you get greater objectivity.
Q. All right.
A. In other words, with, say, essays, for example, you always tell readers not to focus on, say, individual errors, that they may be so irritated by a comma splice that they miss two or three really nice sentences. And so by focusing on those individual criteria, you may actually skew your sense of the entire piece that you are looking at, whether that's an essay or whether that's a file.
Q. Okay. Now speaking in terms of essays, so -- so when an essay is reviewed holistically, does the grammar, punctuation, et cetera, not make a difference to the score?
A. It's actually one of the principles of holistic scoring. It's not that these things don't count, it's not that any one of them count more than one of the others. It's that you want your overall impression of the essay as it relates to those samples in relation to the scoring -- scoring guide descriptions to determine the score that some -- that an essay gets.
Q. Okay. You testified before that race may play a factor in personal achievement scores where it shows some sense of cultural awareness?
A. Well, I guess I wouldn't put it that way, I -- because I believe what I said was that the only way that

Page 41

race and ethnicity enter into a consideration of personal achievement score is the way in which a student reveals a sense of cultural awareness.
Q. Okay.
A. So in other words, it doesn't depend on the race and ethnicity of the applicant, it depends on their awareness of race and ethnicity as a cultural issue.
Q. Okay. And that's the only way that race is a factor.
A. That's the only way in the training that I've done with the admissions group that we've talked about it.
Q. Okay. So that race -- I'm sorry, I'm just trying to understand.
A. Sure.
Q. So race is only a factor to the extent it reveals some sort of cultural awareness on the part of the applicant.
A. Again --
Q. I'm sorry if I'm misstating this, I'm just trying to --
A. Because race wouldn't be the factor, it's the exhibition of cultural awareness that's the factor.
Q. Okay. So -- so race only impacts a personal achievement score to the extent that it reveals something about the cultural awareness of the applicant?

Page 42

A. I think you're still using it as a cause; in other words -- and it doesn't have that causal relationship.
Q. Okay. So -- so I guess what it sounds like you're saying, then, is race isn't really a factor at all.
A. An applicant's race is part of their file and so you would read the entire file and, again, get a sense of, you know, that student's achievement. So that's -- I guess, that's -- you know, that's as close as I could come to saying how race is simply part of an applicant's profile and so since you read the entire file and read all of the, you know, various things that are in that file and to then come to some evaluation of that person's personal achievement.
Q. Okay. So it's certainly the applicant's race is part of the file.
A. Uh-huh.
MS. KNEELAND: You need to --
A. Yes.
Q. (By Mr. McCarthy) Certainly the applicant's race is part of the file. Correct?
A. Yes.
Q. But it has no impact on the personal achievement score in and of itself?
A. In and of itself, no.
Q. Okay. So then why is it that race is listed as one of the special circumstances to be considered in

Page 43

computing a PAI score?
A. I'm not sure what you mean by race is listed as one of the special circumstances.
Q. In the University's publications about the admissions process, in Report 10 -- What I have here is Deposition Exhibit 1, this is commonly known as HB 588 Report, this is Report No. 10. Are you familiar with this?
A. Not -- not intimately.
Q. Not intimately, okay. Can you take a look and see if you recognize it?
A. Sure (examining document).
Q. Go ahead and take a moment to flip through it.
A. Sure, I know of this. I have heard about the report, never actually read through it --
Q. Okay.
A. -- in any detailed way.
Q. Okay, that's fine. If I could turn to a page here, this is the second page of Deposition Exhibit 1, this HB 588 report, Report No. 10 and it talks about the factors that go into the personal achievement index there. Do you see that, it's sort of in the middle of the page?
A. Yes, sir.
Q. Can you just read through those factors for me?
A. Scores on two essays, leadership, extracurricular activities, awards, honors, work experience, service to

Page 44

school or community. Special circumstances: Socioeconomic status of family, single-parent home, language spoken at home, family responsibility, socioeconomic status of school attended, average SAT/ACT of school attended in relation to student's own SAT/ACT, race, parenthesis, addition approved by the UT Board of Regents in 2003.
Q. So the University in their official publications states that race is one of the special circumstances to be considered as part of a PAI score. Correct?
A. It is listed here, yes, sir.
Q. Okay.
MS. KNEELAND: Just off the record for a second.
(Discussion off the record)
Q. (By Mr. McCarthy) So -- so, Dr. Bremen, again -- And I'm not trying to belabor the point, I just want to make sure I understand. So race in and of itself has no impact on a personal achievement score.
A. Race in and of itself I would say no.
Q. Well, let me -- let me try and come up with an example here. Okay. Well, actually, you had an example earlier. You talked about a Caucasian student --
A. Right.
Q. -- who grew up in racially diverse community, I think you said it was a heavily Hispanic community.

Page 45

A. That's correct.
Q. And an essay written by such an applicant, if it revealed a real sense of cultural awareness, in that respect that cultural awareness could contribute positively to that applicant's personal achievement score.
A. That's correct, yes.
Q. Okay. So in that instance, is it that that applicant's race contributed to their personal achievement score?
A. Well, I guess I would say the fact that they were Anglo in a heavily Hispanic community certainly led to that student's understanding of, you know, a variety of positions within racial groups within American culture sort of at large and border culture in particular. So, you know, and this is, I think, what happens, again, with kind of holistic evaluations. Certainly the student's racial background and ethnicity is part of that hodgepodge that led to this sense of cultural awareness. So you really can't separate out any one factor, right, they all contribute to what was revealed in that case, a mature sophisticated sense of cultural awareness.
Q. Okay. And it's that cultural awareness as revealed through the essay in that example?
A. Essays, as well as extracurricular activities, involvement in the community, particular clubs,

**organizations.**

Q. I understand that all those things contribute to the personal achievement score, but in terms of the cultural awareness, does that come out in participation in clubs?

**A. Yeah, I don't remember the exact names of the clubs or organizations, but they were organizations that dealt with, you know, kind of sharing prospectives, bringing people together. So that -- you know, the cultural awareness that was demonstrated through essays, I believe even through recommendations that were written about that student that were part of the file were also then revealed in the kinds of activities that that student participated in.**

Q. Okay. And would the -- would the opposite scenario deal with the same type of -- Would the opposite scenario where you have, let's say, a Hispanic student in a, you know, heavily Caucasian community, could that have the same sort of positive effect in terms of cultural awareness?

**A. Again, it depends on the file --**

Q. Sure.

**A. -- but there's no reason why, you know, one particular racial or ethnic identity would impact one's cultural awareness more than another.**

Q. Okay. So would it be accurate to say that race comes into play in an applicant's file -- I'm sorry, strike

that, let me back up.

Would it be accurate to say that race contributes positively to a personal achievement score only where it reveals some other positive characteristic about that applicant?

MS. KNEELAND: Object to the form, but you can answer.

**A. Yeah, again, it's -- and, you know, it's back to that idea of holistic scoring, to isolate any one factor, right; in other words, that entire file is the reason why that student got the score they did.**

Q. (By Mr. McCarthy) Uh-huh. Okay. Let's talk about some other factors. Some of the other factors on that -- Can you read some of the other special circumstances on that page?

**A. Sure. Socioeconomic status of family, single-parent home, language spoken at home, family responsibilities --**

**(Reporter interrupts)**

**A. -- socioeconomic status of school attended, average SAT, slash, ACT of school attended in relation to student's own SAT/ACT, and race, addition approved by the UT Board of Regents in 2003.**

Q. Okay. So we've talked about race quite a bit here.

**A. Right.**

Q. Let's talk about those other special circumstances. How might those contribute to an applicant's personal achievement score?

**A. I think they all contribute to the circumstances, right, that the student operates from. So, again, along with this idea of balancing breadth and depth, looking at someone who has maximized circumstances so that the circumstances in which a student, you know, spends his or her high school years, how they're able to maximize those circumstances in terms of contributions to community, school, family, their ability to make a difference, they would all, then, factor into that context in which a student is operating.**

Q. So is the idea, then, that because these are indicators of that student's contributions to family, school, community, that they would be likely to contribute positively to the experience at University of Texas?

**A. No. Again, it's that same kind of error that you're making. Right? These are the context in which the student operates from. What they make of those -- those circumstances, that's what receives the PAI score.**

Q. Okay, that makes sense to me. Is the reason -- What is the reason why the University gives some positive effect to those types of considerations?

**A. Again, I wouldn't say the University gives positive effects to those considerations. You know, the University evaluates each file holistically and, you know, if anything, the University wants to recognize the varying sets of circumstances in which students who apply to the University of Texas operate.**

Q. Okay, okay. Let's talk a little bit more about training. I think we've mostly talked about how admissions office officials receive training for their review of essays and personal achievement scores.

**A. Right.**

Q. Is it true that sometimes applicants' files are given a second read by senior readers?

**A. For the -- I have -- I'm less involved with the actual reading.**

Q. Okay.

**A. I honestly -- I honestly don't know the answer --**

Q. That's fine.

**A. -- to be able to say for sure.**

Q. If I'm getting out of the range of your subjects, that's fine.

**A. That's really out of my expertise.**

Q. Okay, that's fine.

When readers are trained, are they trained that the consideration of race can positively impact the

Page 50

personal achievement score of a non-minority student?
MS. KNEELAND: Object to the form.
A. **Readers -- you know, readers are trained to evaluate amongst, you know, a range of factors and come to some holistic decision. So, again, it's that isolation of individual factors that doesn't jive with the holistic evaluation.**
Q. (By Mr. McCarthy) Okay. All right, let me give you an example. If you have two applicants' files that are essentially the same in terms of personal achievements in terms of, let's say, school activities, work activities, and the like, but one is, let's say, a Hispanic student that grew up in a predominantly Hispanic neighborhood or community and the other one is Hispanic student what grew up in a predominantly White community, would you expect to see some difference in their personal achievement scores?
MS. KNEELAND: Object to the form.
You can answer it.
A. **Again, I'd have to see the files. It's really impossible to answer questions about hypothetical files.**
MR. McCARTHY: Can we take a break?
THE REPORTER: Off the record, 10:20.
(Recess)
THE REPORTER: On the record, 10:41.
Q. (By Mr. McCarthy) Dr. Bremen, we're going to continue a little bit more here and this won't take too long.

Page 51

A. **Absolutely.**
MR. McCARTHY: I'd like to mark this as Deposition Exhibit No. 4.
(Deposition Exhibit No. 4 marked for identification)
Q. (By Mr. McCarthy) Dr. Bremen, can you take a look at what's Deposition Exhibit 4? It's a few pages that are all Bates numbered there, and can you just take a look at it and sort of see what it is?
A. **(Examining document.)**
Q. Are you familiar with what it is?
A. **Yes, I am.**
Q. And can you tell me what it is?
A. **It's a collection of the admission essay topics, Topic A, B, D, and then instructions for Essay C, Special Circumstances, the principles of holistic scoring handout, and the scoring guide for the essay scoring.**
Q. Okay. Now you can certainly use those as a reference, but can you tell me a little bit about the principles of holistic scoring?
A. **Sure. The principles of holistic scoring are really the guidelines for readers to engage the process of holistic scoring of essays. The first -- first principle to**

Page 52

**read quickly for impression of the whole essay and score immediately, not to reread or analyze, not to let the scoring guide become a crutch, for them to use the standards they've internalized from the range finders. So that's that triangulating among the scoring guide the sample essays and the essay that's in front of them.**
**No. 3, which I think is the most important, to read supportively, to look for and reward what's done well rather than what's been done badly or omitted.**
**And then No. 4, take everything in the essay into account, organization, spelling, diction, sentence structure, everything. There are ten criteria as you go through.**
Q. Okay. And could you tell me a little bit about the scoring guide?
A. **Sure. The scoring guide is a series of descriptions from a score of six down to a score of one that characterizes the essay and that score point in general terms. So a score of six, for example, reads, An essay in this category demonstrates clear and consistent competence, though it may have occasional errors. Such an essay effectively and insightfully addresses the writing task, is well organized and fully developed using clearly appropriate examples to support ideas, displays consistent facility in the use of language, demonstrating variety in sentence**

Page 53

**structure and range of vocabulary.**
**Five then moves down to reasonably consistent competence, it effectively addresses the writing task, generally well organized and adequately developed using appropriate examples to support ideas, it displays facility in the use of language demonstrating some syntactic variety and range of vocabulary.**
**These are basically the criteria that we used for the SAT II writing test by the College Board.**
Q. Okay. And can you tell me in practice, how does it work out -- in practice, how can you discern a score of six from a score of five on two essays?
A. **The -- You know, the thing about holistic scoring is everybody always thinks that you're trying to distinguish between James Joyce and Virginia Woolf. They'd both get sixes. Really it's between two sentences that you can barely make out, that's a one, and just a really enjoyable, well-developed, thoughtful, insightful piece of writing that takes you through an interesting idea and that's a six.**
**So, again, there's a variety of criteria that could enter into the difference between a score point. It's not that, you know, any one, say, criteria predominates for a score point. It's that negotiation among the facility with language, the complexity of thought, and the substantiality of development.**

Page 54

I ask readers to make a first decision about whether this paper belongs in the upper half or the lower half. So if it's as good or better than the majority of the essays they've read, not quite as successful, less good, and then to make the more particular decision whether it's a six, a five, a four, a three, a two, or a one, but to do so in relation to the sample essays that they've been trained on.

Q. Okay. And I believe I've got some sample essays here.

A. Uh-huh.

Q. What I'd like to do is just pull one out here and have you sort of walk through it, along with the scoring guide, if that works.

A. Sure.

MR. McCARTHY: Let me mark this real quick as Deposition Exhibit No. 5.

(Deposition Exhibit No. 5 marked for identification)

Q. (By Mr. McCarthy) Now is this one of your sample essays?

A. Yes, it is.

Q. Okay. Could you sort of tell me what it is about that essay that would give it a -- some sort of particular score?

Page 55

A. Sure. This was an essay about -- This is a student's response to the essay question that asked them to talk about a person who influenced them in their life and this person has made the relatively unusual choice of Eleanor Roosevelt. It begins, "In third grade, I stumbled upon a" --

(Reporter interrupts)

A. "In third grade, I stumbled upon a children's biography of Eleanor Roosevelt at a book store. Since it was on sale, my mom purchased it for me." It then moves through a growing sophistication and awareness of Eleanor Roosevelt as a person, as a role model beginning with these first child-like impressions of a person that they put up on a pedestal. Ending, as she continues -- I'm going to just give her the feminine pronoun here. "As I matured intellectually and perused more historically accurate works, I developed an awareness for the multifaceted person that was Eleanor Roosevelt." There's that facility with language. This is a really insightful essay that has a complex argument, again, that develops the idea of this is the person who has influenced me from that child-like awareness to a growing sophistication.

She ends, "Yet, despite her complexities, which arguably make her more human, that first children's book still taints my image of Roosevelt. Although I, now

Page 56

older, no longer view the world in terms of black and white, good and evil, with Mrs. Roosevelt firmly planted on the good side of the two-tone spectrum, I continue to harbor a reverent awe for her devotion to humanitarian service."

She really hits all three criteria demonstrating clear consistent competence, effectively and insightfully addressing the writing task. You couldn't ask for a more fully developed essay with more clearly appropriate examples. And, again, consistent facility in the use of language, really a skilled writer.

Q. (By Mr. McCarthy) Okay. And I'd like to give you -- I'd like to give you just one more to look at.

A. Sure.

MR. McCARTHY: Can we mark this as Deposition Exhibit 6.

(Deposition Exhibit No. 6 marked for identification)

MR. McCARTHY: I should say for the record that Deposition Exhibit 5 is Bates numbered D-504 and D-505 and Deposition Exhibit 6 is Bates numbered D-512.

Q. (By Mr. McCarthy) Dr. Bremen --

A. Sure.

MS. KNEELAND: Just for the record, you only want him to look at the front of that?

MR. McCARTHY: I believe it's a one-page

Page 57

essay.

Am I correct in that, Doctor?

THE WITNESS: Yes. The essay on the back is a different essay.

MR. McCARTHY: Okay.

A. Well this is an essay that's a one and, again, kind of exhibits that wide range between score points. Where the first essay was four full paragraphs, I believe this one is all of 11 lines long, barely getting going on a description of General Robert E. Lee. The essay says, "Although a Confederate leader I have always admired his great talent in organization and planning which I greatly value in my life today because it helps making simple things like home work or projects much easier to do."

It's a pretty convoluted idea how Robert E. Lee impacts this student's homework. There are grammatical errors in that sentence. It moves on to his studies at West Point and just jumps very vaguely from idea to idea.

The score of one reads that an essay in this category demonstrates incompetence. Such an essay is seriously flawed by one or more of the following weaknesses: Very poor organization, very thin development, expression so awkward that meaning is somewhat obscured. And, again, it's not that you have to have all three of those criteria or any

Page 58

**one is more important than the other, though in this case it really is the very thin development along with the poor organization of thought that puts this at the bottom.**

Q. (By Mr. McCarthy) Okay. Now, with regard to Deposition Exhibit No. 6 that you were currently speaking about --

**A. Right.**

Q. -- would it be reasonable for that essay to get a score of two or is one the only acceptable number?

**A. No, this is a solid one and this is -- this is why it's used in the sample selection to get readers to see what a one needs to be.**

Q. Okay. And then sort of in that same light, the one that we talked about before that which was Deposition Exhibit No. 5, the one about Eleanor Roosevelt, that is a six and only a six?

**A. We would hope that all of the readers would see that and give it a score of a six, yes.**

Q. Okay. All right. Let's move along a little bit to how the holistic scoring applies to the personal achievement score. How do those principles of holistic scoring apply to the personal achievement score?

**A. The descriptions are different on the personal achievement score that you're looking -- and I'm not going to remember the exact wording, but you are looking for,**

Page 59

**again, a sense of laudable achievement and that that achievement can be manifested in a variety of ways. It can be through school activities, through community work, through a job even, and that you are looking for a sense of maturity and -- I don't believe the word sophistication is used, but I know that maturity enters into that score point. Then similar to the scoring guide for the essays, there are varying adjectives, right, for the score of five, score of four, score of three, two, one.**

Q. Okay. Now earlier when we talked about personal achievement scores, we talked a little bit about how race is a component of those personal achievement scores.

MS. KNEELAND: Object to the form.

Q. (By Mr. McCarthy) When we -- Am I correct in stating that race does not, in and of itself, play a role in the personal achievement score?

**A. I guess I'm more comfortable saying, right, that an applicant's -- I guess I would agree with that, yeah, sure.**

Q. Okay. So in and of itself race plays no -- in and of itself race has no effect on an applicant's personal achievement score?

**A. In and of itself.**

Q. Yes, in and of itself and I'm qualifying with in and of itself.

Page 60

**A. Right.**

Q. So in and of itself race has no impact on individual's personal achievement score.

**A. That's correct.**

Q. Okay. Now where race does have some impact on a personal achievement score, that's where it shows some revelation about the applicant's cultural awareness.

MS. KNEELAND: Object to the form.

Q. (By Mr. McCarthy) Correct?

**A. No. Again, it's a kind of causal relationship in that sentence that makes me say --**

Q. Okay.

**A. -- you know, no.**

Q. I'm sorry, please go ahead and state it in your words, then, because I --

**A. A student's exhibition of cultural awareness and a sense of sophistication about their positioning within culture, that's what is -- that's what's rewarded with a score for the personal achievement.**

Q. Okay. Do you know about how often that -- that type of -- Let me back up a little bit here.

Do you know how often it is that applicants have that type of cultural awareness exhibited in their file?

**A. I really don't. I mean, not reading the files, I**

Page 61

**wouldn't know in terms of the population.**

Q. Okay. I don't think I have anything else right now, but before I let you go, let me just ask you a few simple questions.

Are there any answers you've given me today that you thought about and you'd like to change for any reason?

**A. No.**

Q. Okay. Is there anything that you've thought of that you wish you had stated earlier when I asked you a question?

**A. No.**

Q. Okay. Well before we conclude, let me just say I don't think this is likely, but there's a chance that I'll recall you back to ask you a few questions this afternoon or tomorrow. Again, I don't think it's likely --

**A. Okay.**

Q. -- and I don't want to interfere with your time and I appreciate your time here so far. Okay?

**A. You bet.**

Q. Thanks.

MS. KNEELAND: We'll reserve.

THE REPORTER: Off the record, 11:58.

(Deposition concluded)

Page 62

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

I, BRIAN BREMEN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________
BRIAN BREMEN

Page 63

THE STATE OF ______________)
COUNTY OF ________________)

Before me, ____________________, on this day personally appeared BRIAN BREMEN, known to me or proved to me on the oath of _____________ or through __________________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of __________________, 2008.

__________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________

My Commission Expires: __________

Page 64

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and )
RACHEL MULTER MICHALEWICZ )
)
Plaintiffs, )
)
v. ) Civil Action No.
) 1:08-cv-00263-SS
)
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al, )
)
Defendants. )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF BRIAN BREMEN
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, BRIAN BREMEN, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

Page 65

attorney or counsel employed by the parties hereto or financially interested in the action.

I further certify that the deposition transcript was submitted on __________________ to the witness or to the attorney for the witness for examination, signature and return to me by ________________;

The original deposition was/was not returned to the deposition officer on __________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Thomas R. McCarthy, Custodial Attorney;

That $_______ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

WITNESS MY HAND AND SEAL OF OFFICE, this ______ day of ________________, 2008.

______________________________
TRACIE L. CHEW, CSR #6503
Expiration: 12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ABIGAIL NOEL FISHER; and RACHEL MULTER MICHALEWICZ | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:08-cv-00263-SS |
| STATE OF TEXAS; UNIVERSITY OF TEXAS AT AUSTIN; et al, | ) | |
| Defendants. | ) | |

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF BRIAN BREMEN
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, BRIAN BREMEN, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

attorney or counsel employed by the parties hereto or financially interested in the action.

I further certify that the deposition transcript was submitted on October 16th, 2008 to the witness or to the attorney for the witness for examination, signature and return to me by November 17th, 2008;

The original deposition was/was not returned to the deposition officer on ____________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Thomas R. McCarthy, Custodial Attorney;

That $________ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

WITNESS MY HAND AND SEAL OF OFFICE, this 14th day of October, 2008.

RealLegal, Notary for E-Transcript

TRACIE L. CHEW, CSR #6503
Expiration: 12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782