# EXHIBIT

# 5

Page 1

(1)                   IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
(2)                          AUSTIN DIVISION

(3) ABIGAIL NOEL FISHER; and          )
    RACHEL MULTER MICHALEWICZ          )
(4)                                    )
        Plaintiffs,                    )
(5)                                    )
    v.                                 )    Civil Action No.
(6)                                    )    1:08-cv-00263-SS
                                       )
(7) STATE OF TEXAS; UNIVERSITY_ OF )
    TEXAS AT AUSTIN; et al,            )
(8)                                    )
        Defendants.                    )
(9)

(10)

(11) _____

(12)                       ORAL DEPOSITION OF
                             KEDRA ISHOP
(13)                        October 6, 2008

(14) _____

(15)

(16)      ORAL DEPOSITION of KEDRA ISHOP, produced as a witness

(17) at the instance of the Plaintiffs and duly sworn, was taken

(18) in the above-styled and numbered cause on October 6, 2008,

(19) from 2:10 p.m. to 4:50 p.m., before Tracie L. Chew,

(20) Certified Shorthand Reporter in and for the State of Texas,

(21) reported by machine shorthand at the offices of University

(22) of Texas at Austin, Main Building, Suite 210, Austin, Texas,

(23) pursuant to the Federal Rules of Civil Procedure and the

(24) provisions stated on the record or attached hereto.

(25)

Page 2

(1)          APPEARANCES
(2) FOR THE PLAINTIFFS:
(3)   Mr. Thomas R. McCarthy
          WILEY REIN, L.L.P.
(4)       1776 K Stree, N.W.
          Washington, DC 20006
(5)       202/719-7000
(6)
(7) FOR THE DEFENDANTS:
(8)   Ms. Mishell B. Kneeland
          OFFICE OF THE ATTORNEY GENERAL
(9)       Assistant Attorney General
          300 West Fifteenth Street
(10)      Austin, Texas 78701
          512/463-2004
(11)
(12)
     ALSO PRESENT:
(13)
      Mr. Leo Barnes
(14)  Ms. Patricia C. "Patti" Ohlendorf
      Mr. Joseph D. Hughes
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 3

(1)          INDEX
(2)                      PAGE
(3) Appearances.............................. 2
(4) KEDRA ISHOP
(5) Examination by Mr. McCarthy................ 4
(5) Examination by Ms. Kneeland............... 91
(6) Further Examination by Mr. McCarthy........ 92
(7) Changes and Signature..................... 95
(8) Reporter's Certification.................. 97
(9)
(10)        EXHIBITS
(11) NO. DESCRIPTION                   PAGE
(12) 7.................................... 37
          Matrix
(13)
(13) 8.................................... 56
(14)  Affidavit of Kedra B. Ishop
(15)
(16)
(17)        * * * * *
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 4

(1)          THE REPORTER:  On the record, 2:10.
(2)             KEDRA ISHOP,
(3) having been first duly sworn, testified as follows:
(4)             EXAMINATION
(5) BY MR. McCARTHY:
(6)   Q.  Hi.
(7)   A.  Hello.
(8)   Q.  My name is Thomas McCarthy, I'm the attorney for
(9) the plaintiffs.  And can I ask you, are you appearing here
(10) today because of this notice of deposition?
(11)  A.  Yes, I am.
(12)  Q.  Okay.  And --
(13)         MS. KNEELAND:  And for the record, we've
(14) designated Dr. Ishop for several topics on the notice which
(15) I will not read because I assume you'll put it in the
(16) record.  Topic 1, Topic 2, Topic 3, the portion of Topic 12
(17) that has to do with consideration of the AI and PAI scores,
(18) and the search for documents responsive to Plaintiffs'
(19) discovery requests which is No. 17 --
(20)         MR. McCARTHY:  Okay.
(21)         MS. KNEELAND:  -- which means a lot of
(22) things.
(23)  Q.  (By Mr. McCarthy)  Dr. Ishop -- Am I saying that
(24) right?
(25)  A.  Dr. Ishop.

Page 5

(1)   Q.  I'm sorry.  Dr. Ishop, have you ever been deposed
(2) before?
(3)   A.  No, I have not.
(4)   Q.  No, okay.  Well then I'll tell you a little bit
(5) about how it goes.  I'm going to ask you just a series of
(6) questions about your role and responsibilities at the
(7) University which relate to this case.
(8)   A.  Okay.
(9)   Q.  Just answer the questions to the best you can.  If
(10) you don't know the answer, feel free to tell me you don't
(11) know the answer.  If my question doesn't make sense, go
(12) ahead and ask me to rephrase it, restate it.  If I ask you a
(13) question that's outside of the topics that Ms. Kneeland
(14) identified that you're not prepared to answer, you can go
(15) ahead and tell me that.  I'll try to keep inside those
(16) topics that we agreed that I'd ask you about, but if I go
(17) outside of it by accident, just tell me you're not prepared
(18) to answer that.  If you feel like you need to talk to
(19) Ms. Kneeland at some point, you're welcome to go ahead and
(20) talk to her.  I only ask that if I -- that you answer my
(21) question first before you talk to Ms. Kneeland.
(22)         Does all that make sense?
(23)  A.  Yes, it does.
(24)  Q.  Okay.  And also, if you need to take a break for
(25) any reason to go to the ladies' room or to get a drink, just

2 (Pages 2 to 5)

Page 6

(1) let us know, we can certainly take a break.
(2) **A. Okay.**
(3) Q. Okay?
(4) **A. Okay.**
(5) Q. Okay. I'll ask you a few sort of logistical
(6) questions as we get started.
(7) **A. Okay.**
(8) Q. First, are you taking any medications or have you
(9) ingested anything that might affect your ability to testify
(10) today?
(11) **A. No, I have not.**
(12) Q. Okay. Did you meet with anyone to prepare for
(13) this deposition?
(14) **A. Yes.**
(15) Q. Okay. With whom?
(16) **A. With my attorneys.**
(17) Q. Who?
(18) **A. My attorneys, Ms. Kneeland and Mr. Barnes.**
(19) Q. Okay. How many times did you meet with them?
(20) **A. Twice last week in preparation for the deposition.**
(21) Q. Okay. Did you review any documents in preparation
(22) for the deposition?
(23) **A. Yes.**
(24) Q. Could you tell me about what documents you
(25) reviewed in preparation for the --

Page 7

(1) **A. We looked at one of our 4104 reports, which is one**
(2) **of the documents that we submit -- that we use in our review**
(3) **of the applications for students in review of the matrix.**
(4) Q. Okay. And you said that's a 4104 report?
(5) **A. Yes.**
(6) Q. Okay. And was this document previously produced
(7) to us?
(8) **A. Yes, it was provided to you --**
(9) Q. Okay.
(10) **A. -- as well.**
(11) Q. Did you review any other documents in preparation
(12) for this deposition?
(13) **A. No.**
(14) Q. Okay. What is your job title here at the
(15) University?
(16) **A. Associate director of admissions.**
(17) Q. Okay. And what do you do in that role?
(18) **A. I am responsible for admissions policy, I direct**
(19) **and lead our communications team which puts out all of our**
(20) **publications, brochures --**
(21) (Reporter interrupts)
(22) **A. -- which is responsible for our brochures and**
(23) **publications, manuals, the things that we provide to our**
(24) **prospective students. I also am in charge of the admission**
(25) **of the freshman class.**

Page 8

(1) Q. Okay. Have you held any other positions here at
(2) the University of Texas?
(3) **A. I have within the Office of Admissions. I've been**
(4) **assistant director at two of our regional offices, as well**
(5) **as admission counselor. Prior to that I was a student**
(6) **employee.**
(7) Q. And what is your educational background?
(8) **A. I have a bachelor's, master's, and doctorate from**
(9) **the University of Texas.**
(10) Q. Okay. Do you have any expertise or training
(11) outside of the University of Texas on the matters that you
(12) work on right now?
(13) **A. I have never worked for another institution. I**
(14) **have served on admissions boards and committees and such**
(15) **with the College Board, with the IB National Committee, have**
(16) **presented in forum -- national forums, national conferences,**
(17) **presented to students for many, many years as well.**
(18) Q. Okay. Are you able to fully testify as a
(19) representative of the University of Austin today?
(20) **A. Yes, I am.**
(21) Q. Okay.
(22) MS. KNEELAND: Let's be clear, it's the
(23) University of Texas at Austin. It's not the University of
(24) Austin.
(25) MR. McCARTHY: Yeah, sorry. Did I say

Page 9

(1) University of Austin?
(2) MS. KNEELAND: Yes.
(3) MR. McCARTHY: Sorry about that. University
(4) of Texas at Austin.
(5) THE WITNESS: I understand.
(6) Q. (By Mr. McCarthy) Generally stated, what is the
(7) University's admissions policy with regard to undergraduate
(8) admissions?
(9) **A. The admissions policy is that we are missioned to**
(10) **provide an opportunity for students in the State of Texas,**
(11) **outside of the State of Texas, and internationally to**
(12) **achieve an excellent education here at the University of**
(13) **Texas at Austin. The policies are both legislative and**
(14) **internal. Legislatively we are mandated to admit top**
(15) **ten percent students in the State of Texas, as well we have**
(16) **developed internally an admissions policy geared towards**
(17) **admitting a diverse class of students representative from**
(18) **all backgrounds, all walks, to our freshman class.**
(19) Q. Okay. And does the University consider itself
(20) selective?
(21) **A. We are selective by nature of the number of spaces**
(22) **that we have relative to the number of applications that we**
(23) **receive.**
(24) Q. In a typical year, how many applications does the
(25) University receive for the incoming freshman class?

3  (Pages 6 to 9)

## Page 10

(1)   A. Last year for the class that just enrolled for
(2)   August, we received just under 30,000 applications.
(3)   Q. And how many spaces are usually available for
(4)   incoming freshman class?
(5)   A. We offer about -- just under 13,000 spaces.
(6)   Q. About how many of those 13,000 spaces were filled
(7)   by students pursuant to SB 588?
(8)   A. Just over 9,000 of those spaces.
(9)   Q. So is it accurate to say the remaining approximate
(10)  21,000 applications are competing for approximately 4,000
(11)  spots?
(12)  A. Yes, that's approximate. At UT Austin we admit a
(13)  class for both the summer and the fall. So when we talk
(14)  about enrolling our class, we are always talking about our
(15)  summer and our fall enrollment.
(16)  Q. Okay. And does the approximately 30,000
(17)  application number, does that relate to summer and fall?
(18)  A. Those students -- The students typically are
(19)  applying for the fall semester, but it's our policy that we
(20)  may admit some student to the summer session, whether or not
(21)  they applied to that session.
(22)  Q. Okay. And this 13,000 number of the -- which is
(23)  the number admitted. Is that correct?
(24)  A. That's correct.
(25)  Q. So this -- the -- of the 13,000 students admitted

## Page 11

(1)   this year, that -- that's to fall and summer classes?
(2)   A. That's correct.
(3)   Q. Okay. And does the University employ a system for
(4)   making undergraduate admissions decisions that focuses on an
(5)   applicant's academic performance and their personal
(6)   achievement performance?
(7)   A. What do you mean by a system?
(8)   Q. Well, does the University consider both an
(9)   applicant's academic performance and their personal
(10)  achievement --
(11)  A. Yes.
(12)  Q. -- in making admissions decisions?
(13)  A. Yes.
(14)  Q. Okay. Could you explain how that works generally?
(15)  A. Yes.
(16)       MS. KNEELAND: Objection; form, a bit
(17)  overbroad, but she can answer it.
(18)  A. It will just take a little bit. The admissions
(19)  process, when we describe it, we often describe it as
(20)  twofold; there's an academic component and there's a
(21)  personal achievement component. And when we're talking with
(22)  students and families, we share with them that both are
(23)  equally and as important as the other because per our
(24)  mission, we believe in admitting students who can contribute
(25)  to our campus and contribute to the variety of activities,

## Page 12

(1)   as well as participate in the classroom. On the academic
(2)   component, we examine primarily three things: A students
(3)   class rank, which is representative of their GPA; we also
(4)   consider their standardized test score, SAT or ACT, in the
(5)   case of this class the plaintiffs were a part of, the higher
(6)   score that's submitted for them from a single test date; and
(7)   we also have a component that we call units plus which is
(8)   where we reward students who are taking more than our
(9)   minimum requirements in two of three subject areas. That
(10)  comprises the academic component of the -- those are
(11)  numerical, objective. Those numbers are reported by testing
(12)  agencies, by high schools, or on the high school transcript.
(13)       The other side of the application is -- of
(14)  the admissions process encompasses all of the additional
(15)  materials that students submit in their file. The Apply
(16)  Texas Application contains essays that students submit.
(17)  They're required to submit two. Most students submit Topics
(18)  A and B, but there are other topics if they're applying to
(19)  Art or Art History, School of Architecture. They also
(20)  submit a resume or record of activities. They may do so
(21)  completely on the application, there's a page of the
(22)  application where they can input that information, it's
(23)  broken down into four areas; or they may submit a resume of
(24)  their choosing, they put together their own document and
(25)  submit their resume. Students essentially can tell us

## Page 13

(1)   anything they want to tell us in the resume, although the
(2)   Apply Texas Application has points, extracurricular
(3)   activities, honors, rewards, work experience. Many students
(4)   will go outside of that and tell us whatever they feel they
(5)   need to tell us.
(6)       The personal achievement portion of the file
(7)   is an examination of the two essays individually, those
(8)   essays are scored as a piece of writing; and a read of the
(9)   entire file, what we call whole file review, full file
(10)  review, which is a read of the entire application which is
(11)  essentially seeing everything that a student submitted. We
(12)  know their test score, we know their class rank, we know
(13)  what courses they took, we know what they took their senior
(14)  year, a read of the essays for information, and a read of
(15)  the full file of the resume portion. Students may also
(16)  submit letters of recommendation if they choose to do so and
(17)  if they have, then that's read as part of that file. Some
(18)  students choose to submit slides, pictures, samples of --
(19)  other samples of writing, art work, any number of things and
(20)  if those things are submitted as part of their application,
(21)  then they are reviewed as well.
(22)  Q. (By Mr. McCarthy) Okay. When did the University
(23)  begin considering -- I'm sorry. When did the University
(24)  begin making admissions decisions on this basis?
(25)  A. This --

4 (Pages 10 to 13)

Page 14

(1)         MS. KNEELAND: Objection; form.
(2)         Please go ahead.
(3)     A.  This whole file review process began, I believe,
(4) in 1998.
(5)     Q.  (By Mr. McCarthy) And currently the University is
(6) bound to admit students pursuant the HB 588. Correct?
(7)     A.  That's correct.
(8)     Q.  Okay. So the AI-PI -- I'm sorry, the AI-PAI whole
(9) file review happens with regard to the students outside of
(10) the top ten. Correct?
(11)    A.  Not necessarily. The -- When students apply to
(12) the University of Texas, they select a first- and a
(13) second-choice major. We have a third-choice major of
(14) Liberal Arts Undeclared which is kind of a last effort for
(15) all students applying to try to get into the fall semester.
(16) Top ten percent -- top ten percent students, those
(17) admissible under HB 588, are guaranteed admission per law to
(18) the University of Texas. They're not guaranteed to their
(19) major of choice.
(20)        So there are some programs that have
(21) restricted entry, we call them impacted majors. For
(22) instance, the College of Business could not accommodate all
(23) top ten percenters that would want to apply to the School of
(24) Business and so we've limited the number of top ten
(25) percenters who can gain automatic entry into that program

Page 15

(1) and those who don't gain automatic entry then compete for
(2) admission along with all other non-top ten percenters. So
(3) all of those factors in their file -- their test score,
(4) class rank, essays, resume, letters of recommendation -- are
(5) read and reviewed for admission into those programs.
(6)     Q.  Okay. So in other words, for a student who
(7) graduates in the top ten percent of their Texas public high
(8) school, they are automatically admitted to the University of
(9) Texas pursuant to HB 588.
(10)    A.  For a student who is in the top ten percent at the
(11) time of their application -- and I make that distinction
(12) because they haven't graduated by the time that they're in
(13) our applicant pool --
(14)    Q.  Okay.
(15)    A.  -- if they are in the top ten percent as of the
(16) sixth semester of their high school year, which is the end
(17) of their junior year, and they apply prior to our
(18) application deadline, they're guaranteed admission to the
(19) University.
(20)    Q.  Okay. Is it ever the case that a student's
(21) seventh semester grades will be considered?
(22)    A.  Yes.
(23)    Q.  Okay.
(24)    A.  If those grades are submitted prior to the
(25) deadline -- Our deadline for the class of 2008 was

Page 16

(1) February 1st. And so for that deadline, which is now
(2) changing, the -- oftentimes students can submit seventh
(3) semester grades, what are typically called mid-year
(4) grades --
(5)     Q.  Okay.
(6)     A.  -- and that would be considered.
(7)     Q.  But -- but students who are in the top ten percent
(8) of their senior high school classes at Texas public schools
(9) at the time of their application are automatically admitted
(10) pursuant to HB 588.
(11)    A.  Those who are Texas -- who are graduating in Texas
(12) public schools, yes.
(13)    Q.  Okay. And then those same students, however, are
(14) not necessarily admitted to the major of their choice.
(15) Correct?
(16)    A.  That's correct.
(17)    Q.  Okay. Once they're admitted, their AI and PAI
(18) scores are still considered with regard to their placement
(19) in a particular major.
(20)    A.  Not quite. You said that once they're admitted,
(21) then their AI and PAI scores -- it's actually the reverse of
(22) that. We start the admissions process at their first-choice
(23) major. So in theory a student hasn't technically been
(24) admitted until we've admitted them to their major. We do
(25) have a process that we call intent to admit that we send to

Page 17

(1) every top ten percenter who completes their file prior to
(2) the deadline to say you will be admitted at least to Liberal
(3) Arts Undeclared and we do that so that they can move on with
(4) housing and financial aid and some of the other processes
(5) that require them to be admitted before they can pursue, you
(6) know, some of those other means. But we start the process
(7) at the first-choice major. So the official admits occur
(8) from the top down, first choice, second choice, and as we
(9) move through the process.
(10)    Q.  Okay. How is the personal achievement index
(11) determined for applicants that are outside the top ten?
(12)         MS. KNEELAND: Objection; form.
(13)    A.  What do you mean by personal achievement index?
(14)    Q.  (By Mr. McCarthy) It's my understanding that in
(15) addition to the academic index which measures objective
(16) things, like I think you said GPA -- or, I'm sorry --
(17)    A.  Class rank.
(18)    Q.  -- class rank and standardized test score, that
(19) there's also the personal achievement index which measures
(20) other factors.
(21)    A.  Uh-huh.
(22)    Q.  How is that personal achievement index determined?
(23)    A.  The personal achievement index is a number that's
(24) the result of a full file review of a review of each essay
(25) individually that each -- the read of each essay produces a

5  (Pages 14 to 17)

Page 18

(1) score on a scale of one to six and the read of the full file
(2) produces a score on a scale of one to six. Those three
(3) scores are combined to create the personal achievement index
(4) and then that number is used in the admissions -- in the
(5) admissions process.
(6)     Q. Okay. And what are the factors that make up that
(7) personal achievement score that's one of the components of
(8) the personal achievement index?
(9)     A. Of the personal achievement score, the full file
(10) review where the reader who is looking at the file and
(11) analyzing the file is looking at everything that's submitted
(12) by a student, it's a holistic read. In that holistic read
(13) the student's socioeconomic background, the activities
(14) they've been involved in, their leadership potential as well
(15) as leadership achieved, things they've already done, the
(16) opinion of others in regard to the student if they've
(17) submitted letters of recommendation, work experience, how
(18) the student spends their time outside of the classroom in
(19) volunteer activities. We emphasize both depth and breadth
(20) for students. We liken it to if you have only done one
(21) thing, perhaps you need to be an Olympic swimmer in order to
(22) have the type of depth that's required, but it's a review of
(23) all aspects of a student's life.
(24)     We look at everything within context to
(25) everything else. We look at how students spend their time

Page 19

(1) outside of the classroom relative to the rigor of their
(2) academic environment, we place students -- the number of
(3) hours they work relative to the activities they're involved
(4) in in high school. We examine the context of their family
(5) life and their family situation relative to everything else,
(6) everything they're doing at school and in the classroom. We
(7) know the school they're coming from, the size of the school,
(8) the type of community, we know their personal demographics
(9) as well and how those things relate to everything else
(10) that's in the file. Essentially everything that's submitted
(11) by the student is part of that review and as -- as you -- as
(12) the file is read, then the reader takes in all of that
(13) information in order to determine the personal achievement
(14) score that you're talking about.
(15)     Q. Okay. Am I correct that race is a factor that's
(16) considered as part of the personal achievement score?
(17)     A. That's correct, that's one of the demographics.
(18)     Q. And can you explain to me how race is considered
(19) in that process?
(20)     A. Race is contextual, just like every other part of
(21) the applicant's file. We are currently aware of the
(22) applicant's race. It's on the front page of the application
(23) that's being read, but that information is used in context
(24) with everything else that's part of the applicant's file.
(25) There's no factor on -- in the personal achievement read

Page 20

(1) that stands alone. Everything is dependent upon all other
(2) parts of the file to determine how you -- how you arrive at
(3) the personal achievement score.
(4)     Q. Could you give me an example where race would have
(5) some impact on an applicant's personal achievement score?
(6)     A. To be honest, not really. When we read files and
(7) when we're trained to read files, we read them in the
(8) context of the applicant pool. We sit -- when we begin our
(9) training with Dr. Bremen and we sit -- the senior staff of
(10) full file reads sit with the first several thousand files
(11) that come in for that applicant's year and we read through
(12) -- we spend a day reading through files to determine our --
(13) what these -- what the scores will be -- examples of what
(14) those scores will be. In order to -- it's impossible to
(15) say -- to give you an example of a particular student
(16) because it's all contextual. We don't believe in fictitious
(17) students. You know, when we're talking with students and
(18) they ask us kind of that same question, what do I need to
(19) do, you know, to get in or who do I need to be, it depends
(20) on everything that's part of the file and we don't know
(21) until we look at the file to be able to kind of give that --
(22) to determine what that score is.
(23)     Q. Okay. Now, when was it that the University added
(24) race as a factor to admissions decisions?
(25)     A. I believe that class -- the first class that it

Page 21

(1) was used for was the class of 2005.
(2)     Q. How did that change the way in which admissions
(3) officials who read applications consider those applications?
(4)     MS. KNEELAND: Objection; form.
(5)     A. It added another component to the file I think is
(6) the simplest answer. It's as though similarly you might --
(7) we might require letters of recommendation, which we
(8) currently don't. It added another piece of information to
(9) the file that could be considered in a holistic read.
(10)     Q. (By Mr. McCarthy) And are you one of the
(11) admissions officials who's a reader of applications?
(12)     A. I am.
(13)     Q. And did you -- did the University's -- I'm sorry.
(14) Did the admissions office -- Does the admissions office
(15) train readers in the holistic review of the applications?
(16)     A. Yes, we do.
(17)     Q. And did the manner in which readers review these
(18) applications change when race was added as a factor?
(19)     A. The manner in which we review applications, no,
(20) because we were already reviewing applications holistically
(21) and so we didn't have to change the nature of our file
(22) review. We simply added another component to that review
(23) and that was part of the discussions in the training and
(24) part of the items that we talked about in the course of our
(25) training.

6 (Pages 18 to 21)

Page 22

(1)　　Q. I'm going to show you what's been marked as
(2) Deposition Exhibit 1. This is what's commonly referred to
(3) as a Top Ten Report of the HB 588 Report and this is Report
(4) No. 10. Are you familiar with that?
(5)　　A. I am.
(6)　　Q. Can you turn to the second page of that report?
(7)　　A. Uh-huh.
(8)　　Q. The second page of the report lists a number of
(9) factors that are considered part of the personal achievement
(10) score?
(11)　　A. Uh-huh.
(12)　　Q. Could you read those factors?
(13)　　A. Sure. Scores on two essays, leadership,
(14) extracurricular activities, awards and honors, work
(15) experience, service to school or community, special
(16) circumstances which includes socioeconomic status of family,
(17) single-parent home, language spoken at home, family
(18) responsibilities, socioeconomic status of school attended,
(19) average SAT/ACT of school attended in relation to student's
(20) own SAT or ACT, and race, addition approved by the UT Board
(21) of Regents in 2003.
(22)　　Q. And am I correct in stating that each of those
(23) factors and special circumstances is considered
(24) holistically?
(25)　　A. Yes, they're all part of the holistic review.

Page 23

(1)　　Q. Okay. Do any of those factors or special
(2) circumstances ever receive any sort of numerical value?
(3)　　A. No. Aside from the score on the two essays, they
(4) each receive a score.
(5)　　Q. Okay.
(6)　　A. But beyond that, no.
(7)　　Q. So other than the essays which receive individual
(8) scores, are any of those factors or special circumstances
(9) given a numerical value at any time?
(10)　　A. No, the only part of this that receives a
(11) numerical value outside of the full file review would be the
(12) socioeconomic status of school attended and the average SAT
(13) or ACT of school attended in relation to student's own SAT
(14) and ACT. We call that adversity index. There's a
(15) calculation that's done to create a student's adversity
(16) index and those are two of the components of that.
(17)　　Q. How is that adversity index computed?
(18)　　A. To be honest, Mr. Gary Lavergne could better
(19) answer that question, could give you the formula for that, I
(20) can't.
(21)　　Q. Okay. And, I'm sorry, which of those factors or
(22) special circumstances go into that adversity index?
(23)　　A. Socioeconomic status of school attended and
(24) average SAT/ACT of school attended in relation to student's
(25) own SAT/ACT, I believe it's those two.

Page 24

(1)　　Q. So other than the essays which are given their own
(2) individual scores and the adversity index, none of those
(3) factors or special circumstances are given a numerical value
(4) at any time?
(5)　　A. No, they're not.
(6)　　Q. Okay. When application files are reviewed, is the
(7) same application file reviewed by multiple readers?
(8)　　A. Not in the fall in the normal course of the
(9) application. We have a two-part read process. There's the
(10) read that produces the essay scores and the personal
(11) achievement score to get the personal achievement index,
(12) that read is conducted by one person. There's a second read
(13) for the summer freshman class where there's another read at
(14) the file that doesn't produce a score at all.
(15)　　Q. Because personal achievement scores are determined
(16) in a holistic manner, does the score ultimately given to an
(17) applicant depend in some part on who the reader is that
(18) evaluates that application?
(19)　　A. I believe our process trains that to not be the
(20) case. The full file review, which is a holistic nature of
(21) the full file, is conducted by our most senior readers,
(22) admission personnel that have been working here or elsewhere
(23) for many, many, many years and have read a lot of files. We
(24) separated the two parts of the process, the essays which are
(25) mostly read by our admission counselors and those that we

Page 25

(1) hire to read files from the full file review to be reserved
(2) for the -- to be read by our most senior readers. Our
(3) training is rigorous and the entire point of that training
(4) is to remove individual readers from their individual
(5) thoughts about files and quality and to bring the admissions
(6) office to a consensus that we establish and we do that by
(7) creating our range finders that remind us and give examples
(8) of what we, as a group of admissions personnel, decided were
(9) representative scores in the personal -- for the personal
(10) achievement score.
(11)　　Q. Okay. When a senior reader does this second read
(12) of a file for purposes of the summer class --
(13)　　A. Uh-huh.
(14)　　Q. -- are they bound at all by the prior readers'
(15) determinations?
(16)　　MS. KNEELAND: Objection; form.
(17)　　You can answer.
(18)　　A. No, they're not. At the summer -- At the level of
(19) the summer freshman class, the reader is making an admission
(20) decision, not scoring the file.
(21)　　Q. (By Mr. McCarthy) Is that reader aware of the
(22) scores given to the file previously?
(23)　　A. Yes, they are. They're on the cover sheet.
(24)　　Q. Do the senior readers consider those scores at
(25) all?

7 (Pages 22 to 25)

Page 26

(1)    A. It's part of the review of the file. I mean, in
(2) reading a file, we read everything that's on the file,
(3) especially at that level. That, we know, is really the last
(4) opportunity a student has to be admitted to the University
(5) of Texas so everything is read and considered at that point.
(6) But they're not bound by the scores, it's not a comparison
(7) of scores. That's not the intent of the summer freshman
(8) class, to agree or disagree with those scores, but simply to
(9) read the file and make a decision on the file.
(10)    Q. Why is it that the senior readers can disregard
(11) those scores at that stage?
(12)        MS. KNEELAND: Objection; form.
(13)    A. The senior readers are the same level of reader
(14) that read the file in the first place and better trained --
(15) or more experienced at reading than those who read the
(16) essays. The person reading for summer freshman class was
(17) trained to read essays, as well as trained to read the
(18) entire file. It's not the intent at that point to spend our
(19) time agreeing or disagreeing with scores, but instead to
(20) read the file which contained -- usually contains exactly
(21) the same material that the original file contained and to
(22) make a decision on it. So it's not a question for us to
(23) disagree with the score or to question the score. We make
(24) note of it and move on through the file.
(25)    Q. (By Mr. McCarthy) Now am I correct in

Page 27

(1) understanding that -- Let me start that question again.
(2)        Am I correct that the point of the training
(3) of readers is to promote uniformity --
(4)    A. Uh-huh.
(5)    Q. -- among the evaluation?
(6)    A. That's right.
(7)    Q. So why is it that on this second-level read that
(8) score doesn't necessarily matter?
(9)        MS. KNEELAND: Objection; form.
(10)    A. We have a two-part process. The reading of the
(11) files -- the reading of the essays and the reading of the
(12) full file is -- is used to make admission decisions for the
(13) fall semester. That's where the scores on those files
(14) translate, put the student onto the matrix, and we make
(15) admission decisions from that matrix. The summer freshman
(16) class read, beyond establishing who is read for summer
(17) freshman class, there's no decision made on the matrix. So
(18) at this point students essentially start over and their file
(19) starts over. So we're aware of the scores that they had as
(20) they went through the process, but it's, in effect,
(21) irrelevant to what we're doing at the summer freshman class
(22) level. Summer freshman class level we're reading the file
(23) and making an admission decision on the file. We're not
(24) scoring the essays, we're not scoring the -- we're not doing
(25) any of that scoring in our heads. We're using the

Page 28

(1) experience of the reader at that level to make a decision to
(2) take or not take that student for the summer freshman class.
(3)    Q. (By Mr. McCarthy) Does the admissions office have
(4) a different objective with regard to the summer freshman
(5) class than they do for the fall freshman class?
(6)    A. Beyond admitting -- bringing in the summer
(7) freshman class, the objective is the same, to still bring in
(8) high-quality students, to still bring in to represent the
(9) vast diversity that we're looking for in our class, but we
(10) have a different method for achieving that end than we do
(11) for the fall semester.
(12)    Q. Why is it that the University -- Why is it that
(13) the admissions office has a different method to achieve this
(14) same objective?
(15)    A. Because we don't -- When we get to the summer
(16) freshman class, we are giving the best students who were not
(17) able to gain admission to the fall semester another
(18) opportunity to gain admission for the summer and we use a
(19) method that takes the individual student and only the
(20) individual student to make that decision. When we're
(21) examining students in the fall semester, we've read their
(22) file holistically and individually and then we've given it a
(23) score and put it on a matrix and we have a procedure that's
(24) then comparing groups of students to groups of students who
(25) have like scores and like AIs, but we believe that the

Page 29

(1) summer class -- because this is our last opportunity for
(2) students, that we want to look at an individual student and
(3) say, yes, we're going to admit you or, no, unfortunately we
(4) can't admit you and you can go to the Coordinated Admissions
(5) Program.
(6)    Q. So is the difference between the fall review and
(7) the summer review that the admissions office focuses more on
(8) the individual for the summer -- I mean, for the summer
(9) class?
(10)    A. The summer -- the summer class, the admission
(11) decision is as individualized as we believe we can make
(12) it --
(13)    Q. Okay.
(14)    A. -- which is different from the fall.
(15)    Q. Now with regard to the fall class, the applicants
(16) are placed on a matrix and compared with other applicants?
(17)    A. That's right.
(18)    Q. And how does the admissions office determine which
(19) students will be admitted to the fall class and which will
(20) not be admitted to the fall class?
(21)    A. We start the process -- Again, I mentioned earlier
(22) we talk about starting top down, which means we start at a
(23) student's first-choice major. After all the applications
(24) are received, deadline being February 1st, another ten days
(25) or so to process all of the documents and so usually by

8 (Pages 26 to 29)

Page 30

(1) mid-February we have our complete applicant pool and usually
(2) by the third week or so in February all files have been read
(3) and scored. So at this point every file that's complete by
(4) the deadline, that's been read and scored has an AI and a
(5) PAI and those students, applicants, then sit on their
(6) first-choice matrix for all the colleges and schools.
(7)     All through this process, from the minute we
(8) open the application, we've been admitting top
(9) ten percenters on a rolling basis who qualified for
(10) automatic admission in their major so we've already let go
(11) thousands of students who are admissible. So we're left at
(12) this point in late February -- mid to late February with
(13) students in their first-choice major on the first-choice
(14) matrix and we start the process there. And we typically
(15) start with three liaisons and liaisons are the associate
(16) directors or assistant directors who liaise between the
(17) admissions office and the school or majors they represent.
(18) We typically start with Business, Communications, and
(19) Engineering, those are our three most impacted programs. So
(20) three associate directors -- and I'm one of those -- we
(21) begin the admissions process by the three of us examining
(22) our matrix, determining the number of spaces that we have
(23) available outside -- that we've admitted so many for top
(24) ten percent already and we know what our top is and we start
(25) to look at our matrix and look at the number of students

Page 31

(1) that are sitting in the cells, compare that to the amount of
(2) space that we have, and we start essentially drawing our
(3) lines and moving those lines to the point that we can
(4) achieve the number that we're trying to achieve for
(5) admission into that class.
(6)     There are multiple other variables that are
(7) part of that. When we decide to admit a cell -- and a cell
(8) is represented by the intersection of the personal
(9) achievement and the academic index -- personal achievement
(10) index and academic index, we commit to admit everyone who is
(11) in that cell, we don't pick it apart. And so the three of
(12) us at that level with kind of those three most impacted
(13) majors have to be aware of who might be coming to a second
(14) choice because we don't give priority to first choice or
(15) second choice, students can move through the process. So we
(16) have to be aware of the cut, the line that needs to be made
(17) for -- that's going to be made in Communications and how
(18) that might affect Business and the line that's going to be
(19) made in Business and how that might impact Communications,
(20) how either of those might impact Engineering, how the
(21) Engineering majors, because they're admitted individually,
(22) might impact each other.
(23)     And so we typically sit in a room much
(24) smaller than this, but at a table together to start that
(25) process because we know that we'll be trading students, but

Page 32

(1) we begin it there with those three most impacted programs.
(2) And as we make progress with those majors, then we bring in
(3) the other schools and colleges and their liaisons to start
(4) moving through the rest of the process.
(5)     Q.  Now when you say "most impacted schools," what do
(6) you mean by most impacted?
(7)     A.  Those are our schools -- earlier when you asked if
(8) all top ten percenters were admitted to their major and I
(9) said not necessarily, if a school has exceeded their -- the
(10) number of spaces they have available for incoming freshman,
(11) exceeded 80 percent of their space, that dean is able to ask
(12) our director of admissions to limit the number of top ten
(13) percenters who are admissible to no more 75 percent of the
(14) class. And several of our programs have done so: The
(15) School of Business, College of Communications, the entire
(16) School of Engineering which is eight different majors,
(17) Kinesiology and Nursing are the programs that are impacted.
(18) So we limit the number of top ten percenters who can be
(19) admitted automatically to those schools. For instance,
(20) Business, only ten -- I believe it's four percent gain
(21) automatic admission, Engineering ranges from 2 percent to
(22) 9 percent, and each of the majors has a cutoff that's
(23) established and essentially announced. When we talk to
(24) students we tell them what that cutoff is. Once we
(25) establish it for the year, we don't deviate from it. So if

Page 33

(1) we say it's going to be four percent for Business, then we
(2) commit to four percent for Business.
(3)     So that's what I mean by impacted schools,
(4) those programs that have enrollment limitations for top
(5) ten percent applicants.
(6)     Q.  So if the -- if the business school has a
(7) limitation of four percent, then that means that only the
(8) top four percent of applicants admitted pursuant to HB 588
(9) who sought business as their first major will get in to
(10) that?
(11)     A.  Who -- Well, who sought business as either major
(12) because we may get to them as second choice.
(13)     Q.  Okay.
(14)     A.  It means that they will be admitted automatically
(15) without full review. If they meet the four percent
(16) threshold for Business and they apply to Business, they'll
(17) be admitted without going through the full review process
(18) per our house --
(19)     Q.  And how --
(20)     (Reporter interrupts)
(21)     A.  -- per our review read of House Bill 588.
(22)     Q.  (By Mr. McCarthy) How is it determined whether
(23) students -- How is it determined whether applicants will
(24) fall within that four percent?
(25)     A.  It's established by their class rank. The class

9  (Pages 30 to 33)

Page 34

(1) rank that's reported by the high school is how we make that
(2) determination. What we do on our side to determine the
(3) percentage for each of those majors is to look at the
(4) previous year's class at the twelfth time class day, see how
(5) much of that -- how -- at what level of top ten percent
(6) filled 75 percent of the class. So we go back and find
(7) the -- start counting the top ten percenters -- one percent,
(8) two percent, three percent -- until we reach the 75 percent
(9) mark and we use that, or as close to it as we might be, for
(10) the class that's coming in the following year.
(11)    Q. Okay. So in other words, if four percent is the
(12) number for the business school, does that mean that in the
(13) prior year 75 percent of the freshmen in the business school
(14) were the top four percent of their graduating high school
(15) class?
(16)    A. Approximately, because it may be that the
(17) 75 percent mark was at -- or let me rephrase that. Maybe
(18) the top four percent of the class was at the 69 percent
(19) mark, but the top five percent of the class was at the 78 --
(20) 76 percent mark, so we have to find the closest to it while
(21) being as conservative as we can be.
(22)    Q. Okay. So if the number is -- Just to make sure I
(23) understand, if the number is four percent for the business
(24) school, then that means that only students that get admitted
(25) to the University pursuant to House Bill 588 and are within

Page 35

(1) the top four percent of their high school class gets into
(2) the business school automatically?
(3)    A. Automatically, that's correct.
(4)    Q. Okay. But then other students who either get
(5) admitted to the University via House Bill 588 or even
(6) outside of the top ten might still be admitted to the
(7) business school.
(8)    A. Those students who are five through ten percent,
(9) as well as 11 percent on down, will all compete for -- can
(10) all compete for admission to Business.
(11)    Q. Okay. When the admissions office considers
(12) applicants by major like this, does it start with these most
(13) heavily impacted schools first?
(14)    A. Not every -- before -- To answer your question,
(15) not every school admits by major. The School of Business,
(16) for instance, admits at the school level. We admit to the
(17) -- directly to the School of Business. Engineering admits
(18) per major, Communications admits on a single credential for
(19) all communications majors. So it varies from school -- from
(20) school to school. Some admit by major, some admit by -- at
(21) the college level.
(22)    Q. Okay. To help -- to help me understand exactly
(23) how this works, can you give me an example of an applicant
(24) with a particular first choice and second choice and how
(25) they might be evaluated at one major and then another?

Page 36

(1)    A. Okay. A file has been read and scored, the
(2) student has a PAI and an AI. So let's say this particular
(3) student is top six percent, first-choice Business,
(4) second-choice Communications. The automatic admission --
(5) the automatic admission cutoff pursuant to House Bill 588
(6) for Business was four percent, so this student doesn't meet
(7) the threshold for automatic admission into Business.
(8) Business is still their first choice and that -- so that's
(9) where we'll consider them. So this student will be
(10) evaluated along with all other applicants who are non-top
(11) four percent on the basis of their AI and PAI. So the
(12) liaison for Business, as she's making her lines and
(13) establishing the cutoffs -- the AI-PAI cutoffs for the
(14) School of Business, this particular student will fall within
(15) those cuts or outside of those cuts. Still a top
(16) ten percenter, but theoretically, depending on the full --
(17) the full read of their file, they may not fall inside of the
(18) cuts made for Business because it's only twenty-five percent
(19) of the spaces and for that matter it's only 15 percent of
(20) the Texan spaces because we admitted 90 percent of the --
(21) for the class Texan.
(22)        So if the student does not fall -- if the
(23) student falls within the cuts, then they get admitted to
(24) Business, but they're admitted per review, not per
(25) House Bill 588. If the student's outside of the cut, then

Page 37

(1) that student cascades to their second-choice major, in this
(2) case Communications. Student's top six percent
(3) Communications, then that student would be automatically
(4) admitted to Communications because that's their cutoff for
(5) automatic admission, six percent. So the student was fully
(6) reviewed and considered for their first-choice major for
(7) Business, both from top ten percent as well as per review, did
(8) not gain admission, went to their second choice and meets
(9) the threshold -- top ten percent threshold for admission
(10) into Communications.
(11)    Q. Okay. How are the cutoff lines drawn for
(12) particular majors? Maybe this will help -- ...
(13)    A. It will.
(14)    Q. -- with an exhibit.
(15)        MR. McCARTHY:  Can I have this marked as
(16) Deposition Exhibit 7?
(17)        (Deposition Exhibit No. 7 marked for
(18)        identification)
(19)    Q. (By Mr. McCarthy) And this is marked as Deposition
(20) Exhibit No. 7 and this has a Bates number on it of D-837.
(21)    A. Okay.
(22)    Q. Are you familiar with this document?
(23)    A. I am.
(24)    Q. Okay. Can you tell me what it is?
(25)    A. Yes. This is an example of one of our matrixes.

Page 38

(1) This particular matrix is for the School of Nursing,
(2) non-residents -- non-Texas residents.
(3)     Q. Okay. And how does -- I should say this. Who, in
(4) the admissions office, is responsible for the drawing of the
(5) cutoff line?
(6)     A. The liaison for the college or school being
(7) represented is responsible for that, an associate or
(8) assistant director.
(9)     Q. Okay. And how does that individual determine
(10) where to draw this cutoff line?
(11)     A. They make the determination based on the number of
(12) students in the cells compared to the number -- the amount
(13) of space they have available for that particular major,
(14) college, or school.
(15)     Q. And how do they determine how much space they have
(16) available in their major?
(17)     A. That information is provided by me. At the
(18) beginning of the process we receive notification of the size
(19) of our class, whether or not we're going to hold the class
(20) steady -- hold the class steady at whatever the number is --
(21) 7400 has been the typical number -- or 72 to 7400. The --
(22) we work with the schools -- colleges and -- school colleges
(23) and deans about the class size they desire to bring in.
(24) Typically those two are the same because we establish
(25) university class size and then we work with the schools.

Page 39

(1) Sometimes they want to grow a little bit or shrink a little
(2) bit and we discuss that with the liaison, the director of
(3) admissions, and the dean at the beginning of the year. From
(4) those numbers -- those overall class numbers and from the
(5) numbers that are provided by each of the liaisons
(6) represented from their deans, I take all of those figures
(7) and separate out the number of enrolled students that we
(8) want to have for Texans, non-residents, and international
(9) students and we make those distinctions because each -- the
(10) three of those have different yield rates. We're committed
(11) to being an international institution and so we have an
(12) international class, we have a domestic non-resident portion
(13) of the class. Those two numbers make up about ten percent
(14) of our population, typically seven percent non-resident,
(15) three percent foreign, and then we have the remaining
(16) 90 percent of the spaces that are -- will be allotted for
(17) Texas residents.
(18)     The -- we -- I make determinations for the
(19) number of offers that need to be made based on the previous
(20) year through -- and the previous three years -- three-year
(21) average yield rate for the major or school that we're making
(22) the admission decisions for. So I'll utilize our yield
(23) tables that tell us -- we have years of yield data that tell
(24) us how many -- what the yield rate has been for a particular
(25) class and I'll make a comparison of the one-year yield rate,

Page 40

(1) which is the previous year, as well as the three-year
(2) average, to apply that yield rate to the number of students
(3) we want to matriculate to determine how many offers we need
(4) to make and I do that at the college level and at the major
(5) level. And so those numbers are then provided to the
(6) liaisons. They're ticking off from the beginning from --
(7) from the number of those spaces the top ten percenters
(8) because those students have committed once we've established
(9) the cutoff very early in the process. And so from their
(10) target number for the number of spaces they have, they're
(11) every day -- three times a day by this time of year ticking
(12) off the number of top ten percenters that have been
(13) admitted. And at the end of that process, they're left with
(14) the amount of space they have for residents, non-residents,
(15) and we send to the -- our graduate international admissions
(16) office -- they're responsible for admission of international
(17) students, so they get those figures from me and that's how I
(18) produce them.
(19)     Q. Okay. Now getting back to the numbers of
(20) non-residents and international students --
(21)     A. Uh-huh.
(22)     Q. -- you said that -- you said that seven percent of
(23) the average incoming class is reserved for non-resident
(24) domestic students?
(25)     A. That's correct.

Page 41

(1)     Q. And then three percent is for international
(2) students?
(3)     A. That's correct. And that fluctuates, eight and
(4) two, seven and three.
(5)     Q. Okay, so that fluctuates a bit from year to year?
(6)     A. Uh-huh.
(7)     Q. Okay. Does the University try to have that same
(8) ratio for the various schools or is that just a general
(9) number that applies to the freshman class?
(10)     A. It's the various schools. We make those
(11) distinctions at the school level or even major level for
(12) those programs that we admit by major. So those
(13) distinctions are fine-tuned depending on the level of admit
(14) that we're making.
(15)     Q. Okay. So if -- So at any given school at the
(16) University, the percentage of non-resident domestic students
(17) will be roughly seven percent?
(18)     A. Yes, approximately.
(19)     Q. And for international students approximately
(20) three percent?
(21)     A. Yes.
(22)     Q. And now once -- You explained to me how the number
(23) of available spaces is determined. Correct?
(24)     A. That's correct.
(25)     Q. Once that number is determined, how is the line

11  (Pages 38 to 41)

Page 42

(1) drawn that indicates the cutoff?

(2)    A. Well students have been read and scored and if

(3) they're sitting in their first-choice major, then they are

(4) sitting on the first-choice matrix and they're sitting at

(5) the intersection of their academic index and their personal

(6) achievement index. The -- the liaison is charged with

(7) finding the number of spaces -- the number of students to

(8) match the number of spaces that they have left. Our

(9) admissions process is one that's based on a holistic review

(10) of files. We -- we use that same mindset when we approach

(11) the drawing of the lines on the matrix such that we try,

(12) depending on where students fall because obviously they may

(13) be all over -- all over this matrix, they don't always line

(14) up where we want them to, we try to represent our line the

(15) same way that we represent our process, giving due justice

(16) to the student's academic strength as well as their personal

(17) achievement strength and we refer to that as the stair step.

(18)      And so liaisons try to stair step their lines

(19) so that they are capturing -- allowing students who are

(20) perhaps the brightest students to perhaps have a less robust

(21) personal achievement score and allow students who are the

(22) most able outside of the classroom to -- they -- it requires

(23) of them -- if they're less able in the classroom, but

(24) they're accomplishing outside of the classroom to have a

(25) higher threshold and so we utilize what we call the stair

Page 43

(1) step so that we -- if we drew the line vertically, we'd only

(2) be representing academic achievement; if we drew it

(3) horizontally, we'd only be recognizing personal achievement

(4) and so we try to honor both. And liaisons have full

(5) discretion in the drawing of their lines with the rules

(6) being that they have to take every one in a cell that's in a

(7) cell, there's no dividing of the cells, and every one that

(8) is above the line is admitted. And so the line is always

(9) drawn essentially from the top left down to the bottom right

(10) because everyone that will fall above that will gain

(11) admission.

(12)    Q. Okay. So when this line is drawn, it's drawn to

(13) attempt to maximize both the personal achievement and the

(14) academic ability.

(15)    A. Yes.

(16)    Q. Okay. What if there is more than one way to draw

(17) the line consistent with the stair-step rule that you

(18) indicated, what happens then?

(19)    A. The liaison has full discretion to determine where

(20) that line is drawn.

(21)    Q. So they have no guidelines limiting them in one

(22) way or another?

(23)    A. The -- Other than what I've just mentioned, I

(24) mean, that we respect the process in that way, no. I mean,

(25) they start the line from left to right and they move it

Page 44

(1) upwards, you know, across, but they get to make the decision

(2) based on where the students have fallen into the matrix as

(3) to where they draw that line.

(4)    Q. Okay. For particular majors -- where particular

(5) majors are evaluated individually, can they have different

(6) cutoff lines?

(7)    A. For the different majors?

(8)    Q. I should say this. For different majors -- where

(9) different majors in the same school are evaluated

(10) independently --

(11)    A. Uh-huh.

(12)    Q. -- can they have different cutoff lines?

(13)    A. Absolutely, yes, because at that point the

(14) major -- students are competing for that major, they're not

(15) competing against someone in another major. And so the

(16) level of competition is held only within that context.

(17)    Q. And for students that fall below and to the right

(18) of the cutoff line, how is it determined whether they go to

(19) second-level review or not?

(20)    A. They go -- they cascade to second-level review --

(21) second-choice review.

(22)    Q. Okay.

(23)    A. If they're in their first choice and the line has

(24) been drawn and they're not above the line, then they cascade

(25) to their second choice. And so the process begins again,

Page 45

(1) but we're now at students who are in their second-choice

(2) major or a combination of the two.

(3)    Q. Okay. In a given -- And let's look at Deposition

(4) Exhibit No. 7 that's in front of you. In a given matrix for

(5) a major such as that one --

(6)    A. Uh-huh.

(7)    Q. -- are some of the students within those cells

(8) there under review of their first major and some under

(9) review of their second major?

(10)    A. That's right.

(11)      MS. KNEELAND: Objection; form.

(12)      Sorry.

(13)    A. Yes. Yes, they are.

(14)    Q. (By Mr. McCarthy) So the students that are -- the

(15) students who are in that matrix being reviewed for their

(16) first major, if they fall below or to the right of the

(17) cutoff line, they get cascaded to their second major.

(18) Correct?

(19)    A. That's correct.

(20)    Q. What happens to the students that are below and to

(21) the right of the cutoff line who are there being reviewed

(22) for their second major?

(23)    A. Then they are cascaded to Liberal Arts Undeclared,

(24) which is our automatic third-choice major if they're not

(25) already. Their second-choice major may have been Liberal

12 (Pages 42 to 45)

Page 46

(1) Arts in which case they remain in that pool. But if the
(2) student is not admitted to their first- or second-choice
(3) major, they cascade to Liberal Arts Undeclared for a
(4) third-choice review and so they're in that matrix.
(5)     Q. Okay. Once students get to the third-choice major
(6) review in Liberal Arts Undeclared, is the cutoff line drawn
(7) in the same manner as it is for other majors and schools?
(8)     MS. KNEELAND: Objection; form.
(9)     A. If there's space for the College of Liberal Arts
(10) then, yes, there's a line drawn for fall admission to
(11) Liberal Arts Undeclared just as there are for all other --
(12)     (Reporter interrupts)
(13)     A. -- schools.
(14)     Q. (By Mr. McCarthy) And what happens to the
(15) applicants that don't make the cutoff line on the attempt of
(16) their third major?
(17)     MS. KNEELAND: Objection; form.
(18)     A. At this point we are completing admissions for the
(19) fall semester, so we -- if we have drawn a line for
(20) Liberal Arts Undeclared for residents and non-residents,
(21) then we've completed admission for the fall semester. All
(22) majors and colleges and schools are essentially full at that
(23) point. So the next determination that needs to be made is
(24) who's going to be reread for summer freshman class. And so
(25) the same matrix is used, the Liberal Arts Undeclared matrix

Page 47

(1) because everyone is there and we have only Texas residents
(2) are considered for summer freshman class. So if a
(3) non-resident is not admitted to Liberal Arts Undeclared for
(4) the fall semester, they receive a deny, that's the end of
(5) their -- end of their consideration. Texas residents, at
(6) this point there may be 9,000 or so students sitting on the
(7) Liberal Arts matrix, we draw our final line to admit to the
(8) fall semester, then have to determine how many we're going
(9) to read for summer freshman class. Our summer freshman
(10) class, enrolled is about 800 students and have a yield
(11) rate of 50 to 51 percent so we know that -- as is for all of
(12) our majors we, what we call, overbook, we overadmit and then
(13) let the yield get us down to our class size. So for summer
(14) freshman class we know to yield about 800 students, we need
(15) to admit 1500 to 1600 students to summer freshman class. We
(16) also watch the trend of the yield for summer freshman class,
(17) it's been going down, and so we kind of accommodate that as
(18) we're adjusting our numbers. So that tells us how many
(19) students we need to admit. Essentially we double that
(20) number to say we need to read 3,000 to 3100 files in order
(21) to make decisions for who will admit to summer freshman
(22) class, so we set the number at 3,000 to 3100 students. Then
(23) a line is drawn, just like it's drawn for all the -- for the
(24) fall admits, to capture 3,000 to 3100 students or so. In
(25) this case the students who fall within those lines are the

Page 48

(1) students that are read for summer freshman class. That's
(2) the end of the use of the matrix at that point once that
(3) line is drawn.
(4)     Q. (By Mr. McCarthy) Okay. So the cutoff line to
(5) determine who is reviewed for summer freshman class is drawn
(6) consistent with the same rules that apply to the drawing of
(7) the cutoff line for other matrixes.
(8)     A. Pursuant to the amount of space, yes.
(9)     Q. Okay. So it's pursuant to the amount of space and
(10) consistent with the stair-step rule.
(11)     A. That's right.
(12)     Q. Okay. And then how are these 3,000-some
(13) applicants reviewed for the summer freshman class?
(14)     A. Once we establish who those students are, we've
(15) set a date for senior staff reviewers -- I think that are 12
(16) of us that participate in summer freshman class rereads --
(17) we set aside a week to seven days that we'll conduct the
(18) summer freshman class review. Our processing unit prints
(19) every one of those files, they print -- they're bringing
(20) down the boxes for days because it takes awhile to get
(21) through all of those and we sit in a room in our director's
(22) office and we start reading files. And we read a file and
(23) make a determination of admit to summer freshman class,
(24) admit to CAP, and in some cases by this point we may have
(25) space in the fall -- small amounts of space in individual

Page 49

(1) programs in the fall that we may say we have "X" number --
(2) "X" amount of space in Business and some other major, but
(3) the files are read at that point to award and admit
(4) decision.
(5)     Q. Now if there's space in the fall at that point, is
(6) it because the yield rate was lower than expected?
(7)     A. Perhaps we've been seeing yield come in, we've
(8) been watching deposits at that point, we see that after we
(9) finish drawing all of the cuts and run what we call "end
(10) process," which is the final count of everything that we
(11) think will happen, that there's a little bit of space
(12) remaining in a major. So for those reasons there might be
(13) small amounts of space. For last year we didn't have any
(14) because we essentially filled with top ten percenters and
(15) the few remaining students that we put in some programs that
(16) we needed to assure had a class and so the box for fall was
(17) actually covered and you might want to really be sure you
(18) want to admit this student for the fall. We didn't have
(19) quite the liberty to admit students to the fall semester
(20) that we have in the past, but it's an option. If you see an
(21) outstanding student and you can think of no -- nothing but
(22) the fall to award them, it's an option.
(23)     Q. How often is it that there is an outstanding
(24) student at that stage of the game that has not been admitted
(25) to the fall class?

13 (Pages 46 to 49)

Page 50

(1)    A. Last year there were about 70 students that were
(2) put in the fall box and I wasn't able to put all of them in
(3) the fall semester, but we did take another look at them.
(4)    Q. How is it that that many students -- that many
(5) outstanding students makes it through without getting
(6) accepted to one of their majors?
(7)        MS. KNEELAND: Objection; form.
(8)    A. I would say that 70 out of 30,000 is not that
(9) many. I think it's actually representative of how
(10) competitive this is, but students select their first- and
(11) second-choice major and so sometimes they fall victim to the
(12) selections they made. For instance, it's not uncommon for a
(13) student to have first choice Business, second choice
(14) Communications which are two of our most impacted and most
(15) competitive schools on campus. Liberal Arts Undeclared is
(16) most impacted by top ten percent because every top
(17) ten percenter who is not awarded their first or second
(18) choice if they're impacted is awarded Liberal Arts and so
(19) those spaces are quickly acquired by top ten percenters. So
(20) the cutoff for top four Liberal Arts might be very, very
(21) high. So it's certainly plausible that -- I mean, a lot
(22) of -- many, many students in our summer freshman class we
(23) reprocess are outstanding students and it's because of the
(24) competitive nature of the limited number of spaces that
(25) non-top ten percenters had available to them in the fall

Page 51

(1) class.
(2)    Q. (By Mr. McCarthy) When senior readers review
(3) application files for the summer class, is it correct to say
(4) they're just making an admissions decision then?
(5)    A. Yes.
(6)    Q. Okay. So if -- And you're a senior reader.
(7) Correct?
(8)    A. Yes.
(9)    Q. So when you read an application for summer
(10) freshman class, when you complete your read of the
(11) application, you decide admit to the summer class or CAP
(12) program?
(13)    A. Yes.
(14)    Q. Okay. And the admissions office shoots to admit
(15) approximately, you said, 1500 to 1600 or so --
(16)    A. Uh-huh.
(17)    Q. -- students for the summer freshman class?
(18)    A. That's correct.
(19)    Q. Out of about 3,000 or 3100 applications?
(20)    A. That's correct.
(21)    Q. So do the senior readers monitor how -- do senior
(22) readers monitor how quick that summer class is filling up
(23) when they review the files?
(24)    A. Twice a day. At lunch I'll -- we count the boxes,
(25) our assistants are counting the boxes and they tell me how

Page 52

(1) many students we have in the CAP box, how many students we
(2) have in the summer box. I'll take those two numbers and
(3) subtract it from the total and put a sign on the door that
(4) says we've read -- we've read "X" number of files, we have
(5) this many in summer, this many in CAP, this many to go. The
(6) "to go" is often very important.
(7)    Q. So do the standards ever change during the summer
(8) review process based on how quickly the class is filling up?
(9)    A. No. What we've always seen for the years that
(10) I've been doing this, and I started managing this process in
(11) 2005, is that it stays fairly even. The numbers are fairly
(12) consistent throughout the process of the summer read. We
(13) don't see summer freshman class filling up faster than CAP
(14) or vice versa, but that -- and we monitor it for that
(15) purpose to make sure that we're staying consistent and
(16) that's always -- it's worked out that it has.
(17)        MR. McCARTHY: Can we take a break?
(18)        THE REPORTER: Off the record, 3:19.
(19)        (Recess)
(20)        THE REPORTER: On the record, 3:32.
(21)    Q. (By Mr. McCarthy) Dr. Ishop, why did the
(22) University first adopt the AI-PAI system of making
(23) admissions decisions back in 1997?
(24)        MS. KNEELAND: Objection; form.
(25)    A. After -- I'm speaking a little bit before my time,

Page 53

(1) I joined the staff in 1998. The University desired to go to
(2) an admissions process that was not formulaic or essentially
(3) strictly by the numbers and instead to evaluate -- we had
(4) reached a point where our application numbers were
(5) increasing significantly, we were beginning to control the
(6) size of our class because those application numbers were
(7) growing thereby becoming more selective and we wanted to
(8) institute an admissions process that was holistic rather
(9) than strictly based on test score and class rank, which was
(10) the process that we had prior to that. Many of our peer
(11) institutions use holistic review processes or a process that
(12) encompasses credentials and criteria beyond just test score
(13) and class rank and we were entering in to that same realm
(14) and wanting to have an admissions process that reflected
(15) that.
(16)    Q. (By Mr. McCarthy) Okay. What was the defect of
(17) the prior system?
(18)        MS. KNEELAND: Objection; form.
(19)    A. Considering an applicant on the basis of just
(20) their test score and class rank leaves out all of the life
(21) experience and circumstantial experience that that applicant
(22) faces that's also important not only to how they developed
(23) and the type of student they are, but also to what they can
(24) contribute to our campus. We're a fine academic
(25) institution, but we also are responsible for producing

14  (Pages 50 to 53)

Page 54

(1) leaders for our state, leaders for our nation for that
(2) matter, producing students who can return to their
(3) communities well prepared to lead their communities and
(4) there are aspects of that student's background that aren't
(5) captured by test score and class rank that we wanted to be
(6) able to examine.
(7)     Q. (By Mr. McCarthy) Well prior to the implementation
(8) of the AI-PAI system in 1997, isn't it the case that the
(9) University was employing some kind of an affirmative action
(10) type of program in admissions?
(11)     MS. KNEELAND: Objection; form.
(12)     A. There was. And prior to that it was part of the
(13) evaluation of test score and class rank, there was an
(14) affirmative action program that was in place as well.
(15)     Q. (By Mr. McCarthy) And so was part of the reasoning
(16) for the change in admission systems due to the Hopwood
(17) Decision?
(18)     A. It was the impetus for the change.
(19)     Q. Okay. In 2005 the University first started
(20) considering the fact of race in admissions. Correct?
(21)     A. That's correct.
(22)     Q. Prior to that time the University was conducting a
(23) holistic full file review process. Correct?
(24)     A. That's right.
(25)     Q. So why did the University decide to add race as a

Page 55

(1) factor to be considered in admissions decisions?
(2)     A. Because race is an important -- is an important
(3) credential to be considered. It's a -- it allows us to,
(4) just as the purpose of the holistic admissions process is to
(5) contextualize the student's application, race is a factor
(6) that helps us do that. It helps us examine the student in
(7) their totality, everything -- everything that they
(8) represent, everything that they've done, everything that
(9) they can possibly bring to the table. And so it was added
(10) once it was allowed to be added so that we could look at
(11) those students in that manner.
(12)     Q. What impact does the inclusion of race as a factor
(13) have on the class at large?
(14)     A. What do you mean by "impact"?
(15)     MS. KNEELAND: And I'm just going to ask --
(16) Off the record for a second.
(17)     (Discussion off the record)
(18)     Q. (By Mr. McCarthy) What -- what was the
(19) University's -- what was the University's goal or objective
(20) in adding race as a factor?
(21)     MS. KNEELAND: Again, Ms. Ishop has not been
(22) designated for the goals and objectives. That's topic
(23) No. 4, I believe, and 6 and 5 and those are for Dr. Walker.
(24)     MR. McCARTHY: Okay.
(25)     MS. KNEELAND: And, Dr. Ishop, I don't mean

Page 56

(1) to in any way intimate that you don't have some knowledge of
(2) that, it's just we picked a particular witness to talk on
(3) that topic.
(4)     THE WITNESS: Understood.
(5)     Q. (By Mr. McCarthy) Is it the case that the
(6) consideration of race may be beneficiary for some
(7) applicants?
(8)     A. What do you mean by "beneficial for some
(9) applicants"?
(10)     MR. McCARTHY: Can we mark this as Deposition
(11) Exhibit 8?
(12)     (Deposition Exhibit No. 8 marked for
(13) identification)
(14)     Q. (By Mr. McCarthy) Dr. Ishop, I'm -- I just handed
(15) you what's been marked as Deposition Exhibit No. 8. Can you
(16) tell me what that is?
(17)     A. Yes, this is my affidavit.
(18)     Q. Okay. Can you look at paragraph 4 on the
(19) affidavit?
(20)     A. Yes.
(21)     Q. In the paragraph that runs over to the second
(22) page, in that affidavit you say that race may be beneficial
(23) for minorities or non-minorities alike depending on the
(24) factors of a particular situation. Correct?
(25)     A. That's correct.

Page 57

(1)     Q. Okay. What did you mean by that?
(2)     A. That race, within the context of the rest of the
(3) application, can be beneficial to any applicant, to Whites
(4) as well as minority applicants.
(5)     Q. And how may the effect of race be beneficial?
(6)     A. Race is read within the context of the file, but
(7) the race is known within the context of the file. So when a
(8) file is being evaluated, whether that file is of a minority
(9) applicant or a majority applicant, the context of that
(10) student's cultural awareness, racial experiences, the
(11) context in which they may have placed themselves in or out
(12) of their -- their own environment could benefit any student.
(13)     Q. Could you give me an example of how it might help?
(14)     A. An example that I can think of is, you know, maybe
(15) one that we -- when we first began, you know, doing this
(16) process. We had a file from a student, this was a white
(17) male student from a suburban high school that sends us a lot
(18) of students who wrote in his essays and demonstrated on the
(19) his resume his involvement with an after-school activity
(20) group for a number of years in South Dallas, Dallas County
(21) in North Texas. And he described in his essay how he came
(22) out of his bubble -- and bubble is an admissions term -- a
(23) high school term that students use to describe their own
(24) environment -- and grew to learn a lot about himself and
(25) learn a lot about others by participating over a long period

15 (Pages 54 to 57)

Page 58

(1) of time in these other experiences. So the context of his
(2) race and his cultural awareness for others and experience
(3) with others was something that was considered when we were
(4) reviewing that file.
(5)     Q. Are there other ways in which race may be
(6) beneficial to them?
(7)     A. I don't know what you mean by "other ways." I
(8) mean, it's contextual, it's --
(9)     Q. I understand.
(10)     A. -- it's any number of ways.
(11)     Q. Is there another type of example? I mean, I guess
(12) your example, if I -- tell me if I characterize this
(13) correctly, but your example seems to indicate that race may
(14) work to the benefit of the applicant who's exhibited some
(15) sort of cultural awareness due to their race.
(16)     A. Uh-huh.
(17)     Q. Is that right?
(18)     A. That's right.
(19)     Q. Okay. Is there any other way that race may be
(20) beneficial?
(21)         MS. KNEELAND: Objection; form.
(22)     A. I think, you know, that's the -- the crux of the
(23) use of race is to contextualize that applicant's race and
(24) their experiences and what they've accomplished and what
(25) they present to us in their application. It's not to set

Page 59

(1) aside that demographic and make a distinction in the file.
(2) It's used with what all we know about the student, what we
(3) know that they've told us, what we know from what they
(4) haven't told us, perhaps their letters of recommendation
(5) have told us, what they tell us about their -- their
(6) background -- their family background, what we know about
(7) their school or their neighborhood. It's used within the
(8) context of all of that to determine the score that we give
(9) that file. So race is a nugget that helps us understand the
(10) and evaluate the file circumstances. It doesn't stand
(11) alone, you know, by itself so there's no -- it's difficult
(12) to give examples or it's difficult to -- it's impossible to
(13) say, you know, that there's, I guess, another way that it's
(14) used without, you know, saying again that it's
(15) contextualized.
(16)     Q. (By Mr. McCarthy) How many applicants' files do
(17) you read each year?
(18)     A. I probably review 1200 or so personally, me.
(19)     Q. And out of those approximately 1200 or so, how
(20) many of those applicants' files are impacted by their race
(21) in one way or another?
(22)         MS. KNEELAND: Objection; form.
(23)     A. I have no idea. I couldn't even begin to estimate
(24) that.
(25)     Q. (By Mr. McCarthy) But race is beneficial for some.

Page 60

(1)     A. The review of -- The fact that we include race in
(2) our admissions process and the fact that it's a criteria and
(3) it's a demographic that's part of the file that we're
(4) reading, it's as beneficial for some as their level of
(5) involvement with student council may be beneficial for some,
(6) as the strength of their letter of recommendation may be
(7) beneficial for some. So it's one of those criteria factors
(8) that may benefit some students, may not benefit other
(9) students, but it's not -- it's not based on their race, it's
(10) based on the context of their file.
(11)     Q. I think you have in front of you still what's
(12) marked as Deposition No. 1 -- or Deposition Exhibit No. 1.
(13) I'm sorry.
(14)     A. All right.
(15)     Q. And we talked about that before how on the second
(16) page there are listed a number of factors and special
(17) circumstances that fall within the components that make up
(18) the personal achievement score.
(19)     A. Uh-huh.
(20)     Q. Now is it inaccurate there that the school, in
(21) their official publication, indicates that race is a special
(22) circumstance?
(23)         MS. KNEELAND: Objection; form.
(24)     A. No.
(25)     Q. (By Mr. McCarthy) Well, it seems to me -- Is the

Page 61

(1) only way that you can describe how race impacts an
(2) applicant's file is through cultural awareness?
(3)     A. Through -- I think what I'm trying to explain is
(4) that race impacts a file contextually. A student's cultural
(5) awareness for us is how does -- how does a student
(6) contribute to -- In the various methods of diversity that
(7) we're trying to bring to our campus, one of those is racial
(8) diversity. But for us racial diversity is about how does
(9) the student maneuver in their own world, how do they
(10) maneuver in someone else's world, what kind of awareness do
(11) they have of their world. what kind of awareness do they
(12) have of the other possibilities that are out there?
(13) Students tell us that they seek UT Austin because it's a
(14) diverse campus. They mean a lot of things when they say --
(15) when they use the word "diversity."
(16)     So race as a factor is used to examine the
(17) context of that student's life represented by what that
(18) student tells us about themself, whereas a test score is
(19) used by itself. We can say what a test score is and a test
(20) score has a very specific purpose and it's an objective
(21) number, race is like all of the other factors that we have
(22) listed in the personal achievement index. It's as we
(23) examine socioeconomic status, it's as we examine language
(24) spoken in the home, it's as we look at the -- their
(25) extracurricular activities and the level of achievement

16 (Pages 58 to 61)

Page 62

(1) within those activities. It helps us put into prospective
(2) what that student has accomplished or not accomplished in
(3) their high school career.
(4)     Q. I believe you mentioned that the University seeks
(5) to promote many different kinds of diversities. Is that
(6) correct?
(7)     A. That's right.
(8)     Q. What kind of diversity does the use of race as a
(9) factor in admissions promote?
(10)     A. Using race in admissions helps us achieve racial
(11) diversity.
(12)     Q. Okay. When applicants are reviewed for the fall
(13) class --
(14)     A. Uh-huh.
(15)     Q. -- that's when they're placed on a matrix relative
(16) to other applicants. Correct?
(17)     A. That's right.
(18)     Q. As opposed to when they're reviewed for summer
(19) class, they're reviewed just individually.
(20)     A. That's right.
(21)     Q. Okay. And I think you said that when reviewed for
(22) the fall class, that means that they're compared against
(23) each other. Correct?
(24)     A. When reviewed for the fall class, once -- once the
(25) scores have been reached, they have a PAI and an AI score,

Page 63

(1) they are in a cell with -- presumably with other students.
(2) They may be one in a cell depending on the major, but
(3) presumably a group of students will have like scores.
(4)     Q. Uh-huh. And the various students in one given
(5) matrix are being compared against each other.
(6)     A. That's right.
(7)     Q. Okay. And in any given matrix, is it the case
(8) that some students may have benefited from the consideration
(9) of race and others not?
(10)     A. That's plausible.
(11)     Q. So is it accurate to say that the students who
(12) have not been benefited by race in that matrix have been
(13) negatively impacted by the positive benefit given to the
(14) students that have some benefit from race?
(15)         MS. KNEELAND: Objection; form.
(16)     A. No, I don't think -- I don't think so. I think
(17) what you're saying is that there are students in the cell
(18) who -- you're asking if there are students in the cell who
(19) have benefited --
(20)     Q. (By Mr. McCarthy) Uh-huh.
(21)     A. -- from the use of race being compared to students
(22) who have not benefited from the use of race. Perhaps. It's
(23) an unknown. When we're evaluating the cell, we're not
(24) evaluating individual files at that point. When we're in
(25) the matrix, we're making decisions on the number of students

Page 64

(1) that are within that cell so that the file had been read
(2) individually and scored, essays and resume, and the result
(3) of that placed the student within that -- within that cell,
(4) but --
(5)     Q. So the results of the review of their file
(6) determines what cell they're in.
(7)     A. That's right.
(8)     Q. And in a particular matrix, as we went over
(9) before, some students may have benefited from a
(10) consideration of race and some may not have benefited from a
(11) consideration of race.
(12)     A. Yes. I believe I -- if I understand your
(13) question, just as any other factor in a file may have
(14) benefited or not benefited another student, sure.
(15)     Q. Certainly socioeconomic status may benefit some in
(16) a matrix and not others in a matrix.
(17)     A. Uh-huh, yes.
(18)     Q. And the whole file review which takes into account
(19) that socioeconomic status ends up determining which cell
(20) they're in. Correct?
(21)     A. Right, the full file review, exactly.
(22)     Q. So then, again, I'll try to restate my question.
(23) I think before your answer was perhaps, but if a student is
(24) not benefited by a certain factor --
(25)     A. Uh-huh.

Page 65

(1)     Q. -- and another student is benefited by that same
(2) factor, couldn't it be said that the first student is
(3) negatively impacted by that factor?
(4)         MS. KNEELAND: Objection; form.
(5)     A. I think you're wanting to single out a factor and
(6) establish that that factor placed a student within a cell or
(7) not and I guess my hesitation is that a single factor from
(8) which a student benefits positively or negatively is not the
(9) determination for where a student is placed on the matrix.
(10)     Q. (By Mr. McCarthy) I understand -- I understand
(11) that it's a holistic review. I'm not meaning to say that
(12) either race or socioeconomic status itself puts a student in
(13) one given cell.
(14)     A. Okay.
(15)     Q. It's the entire full file review that determines
(16) what cell a student ends up in.
(17)     A. Right.
(18)     Q. But certainly each individual factor is a part of
(19) that full file review.
(20)     A. Sure. Students arrive at cells for different
(21) reasons because all of their files are different. So an
(22) individual student that's within a cell may have arrived at
(23) that cell from a different -- well, they did, they arrived
(24) at that cell from a different file and from a different
(25) review. So there are all sorts of combination of reads of

17  (Pages 62 to 65)

Page 66

(1) the file that help a student arrive at a certain cell. When
(2) we begin -- when we read files, we're not -- you know,
(3) looking at my -- my affidavit uses the term benefits, but I
(4) think what's most accurate is that it's not necessarily a
(5) question of -- in the reading of the file, it's not as
(6) though a file is read and a student benefits -- benefits
(7) from the use of race, meaning we move a student -- a
(8) student -- we're reading a file and we make a different
(9) determination because of what we read in regard to race,
(10) that race is used in combination with all of these other
(11) factors -- if it were socioeconomic status, same issue, if
(12) it were being Eagle Scout, same issue -- to help a student
(13) arrive at that particular cell. So students -- we start the
(14) process advantaging all students and, you know, kind of --
(15) we say in-house kind of so you want to be a six, which six
(16) is our top score, and we evaluate students based on that
(17) promise of full potential and then work our way to where a
(18) student actually achieved.
(19)     Q. And I understand that none of these factors are
(20) dispositive or determinative as to which cell a student ends
(21) up in, but isn't it the case that every one of these factors
(22) has some impact at the margin?
(23)         MS. KNEELAND: Objection; form.
(24)     Q. (By Mr. McCarthy) We'll try this in the reverse
(25) way. It is a holistic review of all of these factors and

Page 67

(1) special circumstances. Correct?
(2)     A. Correct.
(3)     Q. And that holistic review of all those factors and
(4) circumstances yields a personal achievement score.
(5)     A. That's correct.
(6)     Q. Which, in turn, with other components yields a
(7) personal achievement index.
(8)     A. Correct.
(9)     Q. Despite the fact that it is a holistic review,
(10) each factor is meaningful. Correct?
(11)     A. Yes.
(12)     Q. And each factor does, or at least has the ability
(13) to, impact personal achievement score. Correct?
(14)     A. Yes.
(15)     Q. So then isn't it the case that some applicants'
(16) scores must necessarily be affected by individual factors?
(17)     A. Yes.
(18)     Q. Okay. During the holistic read of an application
(19) file, would you characterize that read as subjective?
(20)     A. Yes.
(21)     Q. Are there any objective guidelines at all?
(22)     A. For the read of the full file that determines the
(23) personal achievement score, beyond our training -- and it's
(24) in the course of the training that we establish our
(25) uniformity for awarding scores -- it's a subjective process.

Page 68

(1)     Q. Okay. And I guess -- Earlier I think you stated
(2) that the adversity index gets some sort of score in an
(3) objective sense. Correct?
(4)     A. That's right.
(5)     Q. And the essays are evaluated in a holistic manner,
(6) but they ultimately receive an objective score. Correct?
(7)     A. They receive a score.
(8)     Q. A score.
(9)     A. It's a subjective read, but they receive a score.
(10)     Q. I'll take out the word objective. So there's a
(11) subjective holistic read of those essays and they receive a
(12) score.
(13)     A. That's right.
(14)     Q. And the remaining factors, aside from the essays,
(15) aside from the adversity index, are wholly subjective. Is
(16) that correct?
(17)     A. That's right.
(18)     Q. So is it possible that different readers could
(19) give different scores to the same application?
(20)     A. It's possible and it's something we, one, train
(21) against; but, two, we also have a standard of acceptance for
(22) there being a one-point differential between scores. We've
(23) conducted testing to assure that we're at that level and
(24) that's a -- that's kind of an industry standard for -- for
(25) reviewing.

Page 69

(1)     Q. I think Dr. Lavergne talked about that earlier,
(2) how within one point --
(3)     A. Right.
(4)     Q. -- of the true score, so to speak, is acceptable.
(5)     A. That's right.
(6)     Q. Okay. I want to go back to when you sort of gave
(7) me the timeline of the admissions process.
(8)     A. Okay.
(9)     Q. Am I correct in stating that when evaluating
(10) non-top ten applicants, the admissions office is aware of
(11) the numbers admitted through HB 588?
(12)     A. When evaluating all applicants -- and I make the
(13) distinction because, again, there are some of those top
(14) ten percenters who are not automatically admitted, so at any
(15) point in the admissions process we are aware of how many
(16) students have been admitted.
(17)     Q. And those -- Okay, I guess I'm a little unclear at
(18) this point.
(19)     A. Okay.
(20)     Q. Now am I correct in stating that students admitted
(21) pursuant to HB 588 are not actually admitted until they're
(22) placed within a school?
(23)     A. Correct.
(24)     Q. Okay. But it is known that they are intended to
(25) be admitted?

18 (Pages 66 to 69)

Page 70

(1)    A. Right, admissible.

(2)    Q. Admissible.

(3)    A. Intent to admit, yes.

(4)    Q. Are all of -- does the admissions office

(5) determine -- does the admissions office determine how many

(6) of those students are admissible before proceeding to

(7) evaluate applications of students outside of the top ten?

(8)    A. You're asking if we're involved with determining

(9) how many of the non-House Bill 588 admits to impacted majors

(10) are admissible, if we participate -- if we --

(11)   Q. Maybe I didn't -- maybe I didn't phrase this

(12) right, it's sort of complicated. What I want to try to find

(13) out here is whether the Office of Admissions first

(14) determines how many students are admissible pursuant to

(15) HB 588 before they proceed to evaluate applications outside

(16) of the top ten.

(17)   A. We are -- The first step of the process once we

(18) begin the admissions process outside of our rolling admit of

(19) top ten percenters who meet our threshold board mittance

(20) into the various majors, the first step of the process that

(21) we began in mid to late February time is to finalize our

(22) House Bill 588 admits, which means that we get all of those

(23) impacted majors to the 75 percent mark. It may be, for

(24) instance, that Business was set at four percent, but

(25) four percent only filled 72 percent of the class and so we

Page 71

(1) start counting down in rank order the Business applicants in

(2) top ten percent rank order from 95.9 percent down to get

(3) ourselves to the 75 percent mark so that we can honor the

(4) commitment that we put 75 percent in automatically. The

(5) next step -- So that then takes care of all of our House

(6) Bill 588 admit students. If they don't -- if they already

(7) committed to that first choice -- to that impacted program,

(8) then they are now in review and at this point top

(9) ten percenters and non-top ten percenters are competing

(10) simultaneously.

(11)   Q. I understand that, but does the -- but does the

(12) admissions office have a -- have a target number of non-top

(13) ten admits at that point?

(14)   A. We know how many spaces we have overall and we

(15) also know how many top ten percenters have applied, so we

(16) know how many are out there. What we don't know at that

(17) point is where will they be admitted and so we have to

(18) complete the process that either automatically admits them

(19) to their first- or second-choice major or admits them by

(20) review to their first- or second-choice major.

(21)        And I think the point I'm trying to make, I

(22) think to answer your question, is that we don't just finish

(23) top ten percent and then move on to non-top ten percent.

(24) Because on a given matrix, once we've admitted all the

(25) students to Business who are top four percent, now I have a

Page 72

(1) matrix of -- and this is purely an estimated number, purely

(2) a guess number -- 600 students and I have 80 spaces left to

(3) give to the College of Business, that's the remaining

(4) 15 percent of Texas residents for the College of Business;

(5) of those 800 students that are on the matrix, some of them

(6) are top five through ten percent, others of them are from

(7) any other class rank range. And so the admission decision

(8) is then made by drawing a line on the Business matrix to

(9) make that determination.

(10)   Q. I think I understand all that, that students --

(11) students that are admissible through HB 588 are not placed

(12) in their majors entirely before you start the process for

(13) the students that apply outside of the top ten.

(14)   A. Okay.

(15)   Q. Correct?

(16)        The only thing I'm trying to find out is when

(17) you start the process of reviewing applicants in the non-top

(18) ten, are you aware of the total admissible number of HB 588

(19) students? Not necessarily where they're placed, just the

(20) number.

(21)   A. The overall number for the class?

(22)   Q. Uh-huh.

(23)   A. Yes, because we know how many applied and

(24) completed their applications.

(25)   Q. Okay. So then is there a -- and I understand that

Page 73

(1) the decisions can't be made yet as to major without

(2) considering some of those HB 588 applicants with the non-top

(3) ten applicants, but is there a target number overall for the

(4) whole incoming freshman class in terms of non-top ten admits

(5) at that point?

(6)    A. The target number for non-top ten percent is the

(7) difference between the number of spaces we have and the

(8) number of top ten percenters who applied and complete their

(9) application by the deadline --

(10)   Q. Okay.

(11)   A. -- so yes.

(12)   Q. Okay. At that point does the Office of Admissions

(13) also have statistics about the racial demographics of those

(14) admissible under HB 588?

(15)   A. The Office of Admissions maintains a headcount --

(16) it's what we call EASI, Electronic Access to Student -- I

(17) can't remember what the "I" stands for right now --

(18) Information, I think. We have a headcount that essentially

(19) does that, counts applications. It tells us the number of

(20) applicants, the number of Texas residents, non-residents,

(21) foreign, number of -- there's a racial breakdown for each of

(22) those, we have -- and it breaks it down per semester,

(23) college, school, and major if it needs to -- if we need to

(24) see it at that level, we can see it at that level. That

(25) headcount exists for the Office of Admissions.

19 (Pages 70 to 73)

Page 74

(1)  Q. Okay. And is that information updated
(2)  continuously throughout the admissions process?
(3)  A. It updates nightly.
(4)  Q. Okay. So is it the case that admissions officers
(5)  on any given day can take a snapshot of what the admitted
(6)  class looks like so far?
(7)  A. Absolutely, it's part of our business. We have
(8)  weekly staff meetings and one of the things we look at is to
(9)  see the result of our admissions process. One, to see the
(10) result of our prospect pool, how many students are applying
(11) and what do those demographics look like, as well as to
(12) see -- It reflects what's been done. So if on -- if on a
(13) Monday liaisons have what we call released top ten percent
(14) decisions where we plug into the system and admit
(15) those top ten percenters who are automatically admissible,
(16) we'll see that reflected in the headcount the next day.
(17) Q. And does the status of that headcount on any given
(18) time change in any way the admissions office evaluates
(19) applications going forward?
(20)     MS. KNEELAND: Objection; form.
(21) A. No, not at all. It's purely used to, as we
(22) should, manage the enrollment of our class, to watch the
(23) results of our process. The only use that I use headcount
(24) for -- and I use it on a daily basis and there's a point
(25) where we update the system more frequently for a few days as

Page 75

(1)  we're rolling decisions very quickly -- I use it simply to
(2)  get totals, the total for the class so that the liaisons can
(3)  plug in and see that you've now admitted "X" number of
(4)  students, total students, Texas resident, and
(5)  foreign because we're counting our -- what we call our
(6)  1403 students which are students who are non-citizen Texans
(7)  per Legislation we have here in Texas.
(8)     So we update our total admits so that, again,
(9)  you know how many spaces you have left. So it's a running
(10) tally of how many Texans, non-residents, foreign students,
(11) and top ten percenters have been admitted. And there's a
(12) spreadsheet that I created that counts down, you know, for
(13) them so they know you now have "X" number of Texan spaces
(14) left and "X" number of non-residents spaces left.
(15) Q. (By Mr. McCarthy) So let's say for non-resident
(16) domestic students -- applicants I should say, at some point
(17) during the admissions process, is it ever the case that the
(18) admissions office realizes that non-resident domestic
(19) students have been accepted at a higher rate than normal
(20) thus far?
(21) A. We're not -- That's not what we're doing at that
(22) point. One, at that point in the game we haven't admitted
(23) too many non-residents, if at all --
(24) Q. Okay.
(25) A. -- because there's no rolling admission of

Page 76

(1)  non-residents, there's no top ten percent for non-residents
(2)  unless --
(3)  Q. Okay.
(4)  A. -- Texas high school. And so the purpose of the
(5)  evaluation and analysis at that point is to see how many
(6)  students have we admitted and to use that information to
(7)  know how many spaces we have left.
(8)  Q. Okay. And to know how many spaces that are left
(9)  not only in the freshman class totally, but also within the
(10) individual majors?
(11) A. We really don't operate from the standpoint of the
(12) freshman class.
(13) Q. Okay.
(14) A. It's our beginning number and it's where we hope
(15) to end up, but all of our work done -- all of our work that
(16) is done is done at the college level or the major level --
(17) Q. Okay.
(18) A. -- and at the end of the day, you know, at the end
(19) of this process all the liaisons have done the work for
(20) their college, I've watched those numbers get produced on
(21) EASI and I'm plugging it into my own spreadsheet which is
(22) where I manage the class and put in the yield rate so that
(23) I'm seeing what's going to happen with ultimate yield and at
(24) the end of that, if my hours and nights of not sleeping have
(25) come together, then what we wanted and what we accomplished

Page 77

(1)  should equal by the time the numbers that we've completed
(2)  admitting class.
(3)  Q. In other words, the admissions office is -- has an
(4)  end goal in mind for the entire class, but is always working
(5)  towards the individual school and major --
(6)  A. Right.
(7)  Q. -- just hoping in the end they get to the end
(8)  number.
(9)  A. Not hoping, I mean, it's well planned and we apply
(10) a yield rate and admission metrics to that, but we work from
(11) the individual college level and the total of those colleges
(12) equals the size of the class for the University.
(13) Q. I understand that. I'm sorry, I didn't mean to
(14) suggest that you were just hoping blindly. I get that it's
(15) all very scientific. And the goal for the entire class is
(16) broken down --
(17) A. Exactly.
(18) Q. -- to make up the individual goals for each
(19) individual college and major. Correct?
(20) A. That's right.
(21) Q. Okay. So naturally achieving your goal as to
(22) individual colleges and majors gets you to your goal of the
(23) class at large.
(24) A. That's right.
(25) Q. Okay.

20  (Pages 74 to 77)

Page 78

(1)         MR. McCARTHY: Can we take a break?
(2)         THE REPORTER: Off the record, 4:16.
(3)         (Recess)
(4)         THE REPORTER: On the record, 4:27.
(5)    Q.  (By Mr. McCarthy) Dr. Ishop, we talked a little
(6)    bit, I think, about the optional third essay that applicants
(7)    can submit.
(8)    A.  I don't believe we have.
(9)    Q.  Oh, we haven't? I'm sorry. Well, let's talk
(10)   about it then.
(11)   A.  Okay.
(12)   Q.  This optional third essay, how is that considered
(13)   in an applicant's file?
(14)   A.  It's a special circumstances essay where students
(15)   can essentially tell us anything they want. I believe it
(16)   says if you think there's anything else that you think that
(17)   the admissions office needs to know about, you put it here.
(18)   That is read as part of the personal achievement score.
(19)   It's not read as an essay, as a piece of writing, but rather
(20)   as part of the personal achievement score.
(21)   Q.  So that's considered part of the full file review
(22)   that goes to the personal achievement score.
(23)   A.  That's right.
(24)   Q.  Okay. Is there any consideration at all with
(25)   regard to the applicant's race or ethnicity with regard to

Page 79

(1)    the third essay?
(2)    A.  Again --
(3)         MS. KNEELAND: Objection; form.
(4)    A.  Again, contextually. Not in regard to just the
(5)    essay but, I mean, we know an applicant's race. If they
(6)    submit the -- that essay, you know, then that's part of the
(7)    read as well. Contextually, yes, it's part of what's
(8)    reviewed.
(9)    Q.  (By Mr. McCarthy) So if -- so if that gives
(10)   some -- So if the third essay gives some meaningful context
(11)   to the applicant's race, it goes into the holistic review.
(12)        MS. KNEELAND: Objection; form.
(13)   A.  It's all part of the holistic review.
(14)   Q.  (By Mr. McCarthy) Okay.
(15)   A.  I mean, it's -- The read of the file doesn't begin
(16)   in a particular place. Essentially the cover sheet is where
(17)   we start because that's where all the information -- that's
(18)   where a lot of the file is recorded and then the file is
(19)   read and the file is read for information. And wherever
(20)   there's information that helps us put that student in
(21)   context and kind of examine who they are and what they
(22)   represent, then that's what's used in determining --
(23)   arriving at that score.
(24)   Q.  Okay. So the -- the optional third essay could be
(25)   meaningful as to any of the factors that make up the

Page 80

(1)    personal achievement score --
(2)    A.  Right.
(3)    Q.  -- depending on the context given in the essay.
(4)    A.  Depending on the content of the essay. They --
(5)    students write on all -- What they think are special
(6)    circumstances, it's up to them to determine that and some of
(7)    it is more valuable than others, depending on the rest of
(8)    the file.
(9)    Q.  Okay. Is it ever the case that a student writes
(10)   about -- writes in the optional third essay something that
(11)   just has no bearing on their application?
(12)   A.  It could be. For instance, a student might write
(13)   about their legacy and tell us how many -- how much of their
(14)   family has attended UT Austin and why they want to be here
(15)   as well and we do not have -- our legacy policy is such that
(16)   we don't consider legacy. So in that sense, that
(17)   information is not useful for the read of the file.
(18)   Q.  So is it almost the same as if the student just
(19)   chose not to write the third essay?
(20)   A.  It's -- it's never negligible.
(21)   Q.  Okay. And it doesn't -- Then it doesn't work
(22)   against the student, that is?
(23)   A.  Right.
(24)   Q.  Okay.
(25)   A.  The information -- what they're typically doing is

Page 81

(1)    telling us -- expanding on other parts of the application
(2)    that we've seen already. In a lot of cases they're
(3)    representing in essay form what they represented in resume
(4)    form, that's very common. So in some cases it's just a
(5)    representation of information we've already seen. But all
(6)    of the components of the application are kind of read,
(7)    again, in context of one another, but some documents are
(8)    supporting documents. High school letters recommendation,
(9)    counselor letters of recommendation are an example of that.
(10)   Most often they're supporting things we've already gleaned
(11)   from the applicant's records. Sometimes they provide
(12)   additional information and sometimes they don't.
(13)   Q.  Okay. Is it always to the student's advantage to
(14)   submit an optional third essay?
(15)   A.  No, not necessarily. Most students don't.
(16)   Q.  I guess I should say the opposite. Is it -- is it
(17)   never to their disadvantage to submit the optional third
(18)   essay?
(19)        MS. KNEELAND: Objection; form.
(20)   A.  Is it never to their disadvantage -- a student --
(21)   Students are usually submitting materials that they believe
(22)   will be beneficial in some way. Rarely -- You know, so
(23)   circumstances in which a student might give us information
(24)   is such that we can use it to review favorably their file.
(25)   Rarely does a student give us something that would be --

21 (Pages 78 to 81)

Page 82

(1) would not be reviewed favorably. The question that we have
(2) when we're reviewing the file is does this -- is this
(3) information useful to how we score the applicant -- how we
(4) score the applicant and what kind of personal achievement
(5) score we give them. We start this process, again, at the
(6) top, you know. So you want to be a six, you know, how --
(7) let's see if you're a six and so we start reading. When we
(8) reading essays, we start reading full files, and we let the
(9) information that the student gives us -- give us drive where
(10) we end up with that score.
(11)      Q.  (By Mr. McCarthy) Okay. Dr. Bremen is it?
(12)      A.  Uh-huh.
(13)      Q.  Dr. Bremen talked earlier today, he explained a
(14) bit about the training that readers go through.
(15)      A.  Uh-huh.
(16)      Q.  And now I understand -- And I think you've
(17) testified to this, so I'll just ask you about it. Isn't it
(18) true that the training is, in part, meant to build consensus
(19) among the readers?
(20)      A.  Yes.
(21)      Q.  Okay. Are there some cases where readers fall out
(22) of line, so to speak, and have -- you know, give personal
(23) achievement scores that seem to be off?
(24)      A.  In -- in the training?
(25)      Q.  Yes, in the training.

Page 83

(1)      A.  Yes, that's part -- part of the process. We
(2) start -- we start very far apart and the idea is that over
(3) the course of the training we come to agreement on files
(4) that represent certain scores.
(5)      Q.  Is there ever a scenario where an individual
(6) reader is not coming to the consensus?
(7)      A.  No.
(8)      Q.  Okay. During the actual admissions process, is
(9) there ever any review done of the readers?
(10)      A.  Yes.
(11)      Q.  Okay.
(12)      A.  Dr. Lavergne conducts every couple -- every few
(13) years a reader reliability survey where we send a set of
(14) files through and have everyone read them, unaware, and
(15) those files are then compared to see how -- how we rank
(16) against each other. We also -- by virtue of the fact that
(17) we read in two -- two passes now, meaning that someone is
(18) reading the essays and someone else, a senior reader, is
(19) reading the full file, that has also allowed senior readers
(20) who've also been trained to read essays -- although they're
(21) not reading essays for the purposes of scoring essays -- to
(22) subtly monitor readers. Because if I have a file that I'm
(23) reading, I see the essay score that's been given, I'm
(24) reading the full file and so that's also a way that senior
(25) readers are able to kind of watch the actions of other

Page 84

(1) readers.
(2)      Last year we also had Dr. Bremen pull a
(3) second set of files and we sent those files through and he
(4) compared his scoring of those files per our training process
(5) to the -- to how they scored the files and indicated to us
(6) whether it was one up, one down, where he agreed or
(7) disagreed, and we followed up with staff members as
(8) necessary then, too.
(9)      Q.  Okay. So if there is a reader whose -- if there's
(10) a reader whose scores are not consistent with Dr. Bremen's
(11) research or -- Actually, let's just say if there's a reader
(12) who's scores are not consistent with Dr. Bremen's research,
(13) are they required to take more training?
(14)      MS. KNEELAND:  Objection; form.
(15)      A.  The result of that was that readers were within
(16) one point.
(17)      Q.  (By Mr. McCarthy) Okay.
(18)      A.  The -- if there was ever a question about a
(19) reader, then it was a conversation that I had with the
(20) reader --
(21)      Q.  Okay.
(22)      A.  -- and we'd pull the file and just talk about it.
(23) Staff members also -- the readers and staff members also, if
(24) they have questions about a file, they'll often consult a
(25) senior reader, usually me, to get an opinion on the read of

Page 85

(1) that file. So there's multiple instances of I'm not sures,
(2) what do you thinks, as well as more formalized processes to
(3) evaluate where readers are and how they're doing in the
(4) process.
(5)      Q.  So there is some formal and some informal
(6) mechanism for feedback.
(7)      A.  Yes.
(8)      Q.  Okay. And how often is it that your full file
(9) review results in you talking to the first reader about the
(10) essay score?
(11)      A.  Rarely at that level. And you're saying when the
(12) full file reviewer sees the essay scores.
(13)      Q.  Uh-huh.
(14)      A.  We didn't -- I didn't see much of that at all last
(15) year. It was more of readers asking questions.
(16) Particularly new readers, new staff members when they first
(17) come onboard and it's a new process for them, they often ask
(18) a lot of questions.
(19)      Q.  And how often does that happen?
(20)      A.  Pure speculation. Brand new reader last year
(21) might ask a couple of times or if they have a particular
(22) file -- even senior readers, when we're reading full files,
(23) I might ask one of my associates, you take a look at this
(24) and, you know, see what you think about it and we'll talk
(25) about it. So we all have -- we've all been trained, but we

22 (Pages 82 to 85)

Page 86

(1) all -- sometimes we need a second look, you know, to take a
(2) look at it.
(3)     Q. Sure, okay. I want to go back briefly to our
(4) discussion of cutoff lines earlier.
(5)     A. Okay.
(6)     Q. Did you testify that you sometimes make cutoff
(7) line decisions?
(8)     A. Yes, I do.
(9)     Q. Okay. And how do you determine where to draw the
(10) line if there's more than one option?
(11)     A. I make a decision based on the drawing of the
(12) lines that will get me closest to my target and also
(13) represent the stair step or represent both aspects of the
(14) admissions process.
(15)     Q. So what if there's an instance -- What do you do
(16) where you have two options that both gets you to the same
(17) target and both are consistent with the stair step?
(18)     A. I pick one.
(19)     Q. Do you have any guidelines for that?
(20)     A. It's a question of which gets me closest. I mean,
(21) you gave me an example of a matrix that is one of the
(22) sparsest matrixes we'll ever see. A non-resident for
(23) nursing is one of our smallest schools. The matrixes that
(24) we're typically working with for Texas residents, which are
(25) where our most difficult decisions are made, have upwards of

Page 87

(1) hundreds, the Liberal Arts majors has thousands of students
(2) within -- within those cells where individual cells might
(3) have 20, 30, 40, 200, 400, 500 students in them. And so
(4) it's a question, really, of how close can we get. And I
(5) can't think of -- in small numbers, like on this matrix,
(6) sure, we could probably draw it a couple of ways to get to
(7) 14, but what we're typically dealing with are much larger
(8) numbers than that and we don't find instances where you
(9) can -- you're going to have a different number and it may be
(10) off by one or two and that would be perfectly acceptable,
(11) but we just make a decision to pick a line and go with it.
(12)     Q. Okay. But let's just say in the instances where
(13) you have two choices that are both the same as far as the
(14) target is concerned and both the same as far as the
(15) stair-step rule is concerned, is there any -- is there any
(16) guideline at all or you just pick whichever?
(17)     A. Well, the guideline is always to try to reward the
(18) most accomplished student or group of students and where
(19) that is, is determined by how many students are in the
(20) adjacent cell. So it might be that the most accomplished
(21) student on a given matrix might be the cell of six that have
(22) sixes on their PAI, but a one-tenth lower achievement index
(23) or it might be that the closest adjacent cell that helps us
(24) get to our target has a higher AI, but a lower PAI. It
(25) depends on what else is sitting out there and we make the

Page 88

(1) decision accordingly.
(2)     Q. So -- And I guess is it fair to say that in those
(3) situations where you have two choices, both which go to the
(4) same target, both which comply with the stair-step rule,
(5) that the choice comes down to deciding whether to prefer PAI
(6) or AI?
(7)     A. Yes.
(8)     Q. And it just depends --
(9)     A. It depends on how many students are in those
(10) cells, how many are there. We pay a great deal of respect
(11) to our highest PAIs. Those students are some of the most
(12) accomplished students and we give a great deal of respect to
(13) them, but we also -- within the level of competition in all
(14) of these individual majors, some of them the competition is
(15) so intense that we can't fathom letting a 3.9 predicted --
(16) the AI -- we also call it predicted GPA -- go in favor of
(17) the 2.96. We -- You know, we may take that higher AI
(18) because that student is so phenomenal, you know, on an
(19) academic basis and we have to pay homage to that, but it
(20) really depends on who's sitting there and what the context
(21) of the entire cut looks like. It may be that the cut is
(22) already skewed academically because of the competition in
(23) the class and so maybe we give a little bit more credit for
(24) that rare six that's sitting up there or it may be skewed
(25) the other direction and so we're able to pick up the

Page 89

(1) students who have ones on their PAI, but have the high AI
(2) markers. It's really -- it's a balance --
(3)     Q. Okay.
(4)     A. -- kind of -- of all of those things.
(5)     Q. So in other words, there's not a simple guideline
(6) that makes those decisions.
(7)     A. No.
(8)     Q. It depends on the composition of the matrix as a
(9) whole.
(10)     A. That's right.
(11)     Q. Okay. I need to talk briefly about Topic No. 17.
(12)     A. Okay.
(13)     Q. This is about documents.
(14)     A. Okay.
(15)     Q. I promise I'll make it brief.
(16)     A. All right.
(17)     Q. Once this suit was filed, was there any sort of
(18) notification or instructions about preserving documents that
(19) was circulated throughout the admissions office?
(20)     A. Yes.
(21)     Q. Okay. Who issued that statement?
(22)     A. The director.
(23)     Q. Who's the director?
(24)     A. Dr. Walker.
(25)     Q. Dr. Walker, okay.

23  (Pages 86 to 89)

Page 90

(1)     And to whom did they issue it?

(2)  A.  To all staff, all admissions staff.

(3)  Q.  Okay.  Do you have a copy of that notice with you?

(4)  A.  No, I don't.  It was --

(5)     (Reporter interrupts)

(6)  A.  -- an e-mail, so it should be in the -- those

(7)  records.

(8)  Q.  (By Mr. McCarthy)  Okay.  And who was responsible

(9)  for collecting documents responsive to the plaintiffs'

(10)  discovery request?

(11)  A.  I was.

(12)  Q.  Okay.  And what files did you review to collect

(13)  responsive documents?

(14)  A.  A litigation hold was placed on all of our

(15)  electronic documents on our computers and hard drives and so

(16)  information was taken there, we contacted all staff members

(17)  to -- that -- well as part of Dr. Walker's request to

(18)  compile any information they had specific to the admissions

(19)  process for the freshman class of 2008 and have those

(20)  documents sent to me and so they were forwarded to me.

(21)  Q.  And so this search for responsive documents went

(22)  through electronic files, hard copy files, e-mail files?

(23)  A.  That's right.

(24)  Q.  Okay.  Do you believe that all documents

(25)  responsive to the plaintiffs' request have been produced to

Page 91

(1)  us at this time?

(2)  A.  I believe so.

(3)  Q.  Okay.

(4)     MR. McCARTHY:  Do you have any questions,

(5)  Mishell?

(6)     MS. KNEELAND:  I have just a couple.

(7)     EXAMINATION

(8)  BY MS. KNEELAND:

(9)  Q.  Dr. Ishop, what was the total number of spaces

(10)  available for Texas residents in the fall class of 2008, top

(11)  ten and non-top ten?

(12)  A.  Top ten and non-top ten was approximately -- about

(13)  10,200 or so.

(14)  Q.  So 10,200 were available for Texas residents.

(15)  A.  That's right.

(16)  Q.  And of those spaces, how many were available

(17)  outside of the top ten percent?

(18)  A.  Let me answer a different way because -- for the

(19)  number that I know.  We automatically admit top

(20)  ten percenters and for a few majors we have an automatic

(21)  admit for the most high-caliber academic students, we call

(22)  those A-rated students.  Outside of those two figures we

(23)  had -- I had 881 spaces remaining for non-top ten percent

(24)  applicant, Texas residents, to award decisions to.

(25)     MS. KNEELAND:  That's all I have.

Page 92

(1)     MR. McCARTHY:  I have another question.

(2)     FURTHER EXAMINATION

(3)  BY MR. McCARTHY:

(4)  Q.  Are there any schools or majors to which HB 588

(5)  does not apply?

(6)  A.  Yes.  School of Architecture and the College of

(7)  Fine Arts.

(8)  Q.  Okay.  So how are admissions decisions made for

(9)  Architecture and Fine Arts?

(10)  A.  The dean and faculty of the School of Architecture

(11)  works in concert with the admissions office, but they

(12)  essentially make their admission decisions.  We still read

(13)  the files and score the files and they're provided with all

(14)  that information, but they make the admission decisions.

(15)  Portfolios and such are also -- are required for

(16)  Architecture.

(17)     For Fine Arts, they make the -- the artistic

(18)  decision and we collaborate on the academic decision.  They

(19)  require auditions and portfolios in Fine Arts and so the

(20)  students have to pass those auditions and such and we work

(21)  in concert with them for -- on the academic component on the

(22)  file to make decisions.

(23)  Q.  And who are the individuals responsible for those

(24)  decisions in those schools?

(25)  A.  The liaison for the College of Fine Arts who is an

Page 93

(1)  assistant director and the associate director who is liaison

(2)  for the College of Architecture.

(3)  Q.  And do those officials have discretion to

(4)  disregard the AI and PAI scores when making admissions

(5)  decisions to those schools?

(6)  A.  The school of -- the College of Architecture

(7)  doesn't use -- they -- they have the matrix, but they make

(8)  decisions above and beyond the matrix because they have

(9)  other criteria as does the College of Fine Arts.

(10)  Q.  So they're not bound by the --

(11)  A.  Right.

(12)  Q.  -- matrix.

(13)  A.  That's correct.

(14)  Q.  Okay, all right.

(15)     MR. McCARTHY:  You have anything else?

(16)     MS. KNEELAND:  I have nothing else today.

(17)  Q.  (By Mr. McCarthy)  Okay.  Before I let you go,

(18)  Dr. Ishop, I just want you to think back -- We've been

(19)  talking for a while now.  Are there any answers that you

(20)  gave me during this time that looking back you'd like to

(21)  change or alter for any reason?

(22)  A.  I think the only one that comes to mind, I think

(23)  at the very beginning we were talking about the size of the

(24)  class and the number of admits and I think I used fewer than

(25)  13,000.  It's probably more accurate to say approximately

24  (Pages 90 to 93)

Page 94

(1) **12,000. I think I was a little high with that estimation.**
(2) **Q. Okay, thank you for that.**
(3) **A. That's it.**
(4) **Q. And is there anything that you forgot to tell me**
(5) **before that -- anything else that you might have forgotten**
(6) **to tell me before that you just thought of now?**
(7) **A. I don't think so, thank you.**
(8) **Q. Okay. All right. Well, that should be it. There**
(9) **is a very small chance, it's highly unlikely, that we'll**
(10) **want to talk to you more, but I should be done for now.**
(11) **A. Okay.**
(12) **Q. Thank you.**
(13) **A. Thank you.**
(14)     THE REPORTER: Off the record, 4:50.
(15)     (Deposition concluded)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 95

(1)          CHANGES AND SIGNATURE
(2) PAGE LINE CHANGE          REASON
(3) _____
(4) _____
(5) _____
(6) _____
(7) _____
(8) _____
(9) _____
(10) _____
(11) _____
(12) _____
(13) _____
(14) _____
(15) _____
(16) _____
(17) _____
(18) _____
(19) _____
(20)     I, KEDRA ISHOP, have read the foregoing deposition and
(21) hereby affix my signature that same is true and correct,
(22) except as noted above.
(23)
(24)     _____
(25)          KEDRA ISHOP

Page 96

(1) THE STATE OF _____)
(2) COUNTY OF _____)
(3)
(4)     Before me, _____, on this day
(5) personally appeared KEDRA ISHOP, known to me or proved to me
(6) on the oath of _____ or through
(7) _____ (description of identity card
(8) or other document) to be the person whose name is subscribed
(9) to the foregoing instrument and acknowledged to me that
(10) he/she executed the same for the purpose and consideration
(11) therein expressed.
(12)     Given under my hand and seal of office on this
(13) _____ day of _____, 2008.
(14)
(15)     _____
     NOTARY PUBLIC IN AND FOR
(16)     THE STATE OF _____
(17)
(18) My Commission Expires: _____
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 97

(1)      IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TEXAS
(2)            AUSTIN DIVISION
(3) ABIGAIL NOEL FISHER; and      )
     RACHEL MULTER MICHALEWICZ   )
(4)                              )
     Plaintiffs,            )
(5)                              )
                              )   Civil Action No.
(6) v.                         )   1:08-cv-00263-SS
                              )
(7) STATE OF TEXAS; UNIVERSITY OF )
     TEXAS AT AUSTIN; et al,     )
(8)                              )
     Defendants.          )
(9)
            REPORTER'S CERTIFICATE
(10)       ORAL DEPOSITION OF KEDRA ISHOP
            October 6, 2008
(11)
(12)     I, Tracie L. Chew, Certified Shorthand Reporter in and
(13) for the State of Texas, do hereby certify that, pursuant to
(14) the agreement of counsel, came on before me, on October 6,
(15) 2008, the following named person, KEDRA ISHOP, who was duly
(16) sworn to testify to the truth and nothing but the truth
(17) touching and concerning the matters in controversy in this
(18) cause; that she was thereupon carefully examined upon her
(19) oath and her examination reduced to typewriting under my
(20) supervision; and this deposition is a true record of the
(21) testimony given by said witness.
(22)     I further certify that I am neither attorney, nor
(23) counsel for, nor related to, nor employed by any of the
(24) parties to the action in which this testimony is taken; and,
(25) further, that I am not a relative nor employee of any

25 (Pages 94 to 97)

Page 98

(1)  attorney or counsel employed by the parties hereto or
(2)  financially interested in the action.
(3)     I further certify that the deposition transcript was
(4)  submitted on _____ to the witness or to the
(5)  attorney for the witness for examination, signature and
(6)  return to me by _____;
(7)     The original deposition was/was not returned to the
(8)  deposition officer on _____;
(9)     If returned, the attached Changes and Signature page
(10) contains any changes and the reasons therefor;
(11)    If returned, the original deposition was delivered to
(12) Mr. Thomas R. McCarthy, Custodial Attorney;
(13)    That $_____ is the deposition officer's charges to
(14) the Plaintiffs for preparing the original deposition
(15) transcript and any copies of exhibits;
(16)    WITNESS MY HAND AND SEAL OF OFFICE, this _____ day of
(17) _____, 2008.
(18)
(19)
             _____
(20)         TRACIE L. CHEW, CSR #6503
             Expiration: 12/31/2008
(21)         DepoTexas Austin
             Firm Registration No. 17
(22)         DepoTexas@aol.com
             Fax 512/478-2782
(23)
(24)
(25)

26  (Page 98)

97

1         IN THE UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF TEXAS
                   AUSTIN DIVISION

3   ABIGAIL NOEL FISHER; and      )
    RACHEL MULTER MICHALEWICZ      )
4                                  )
5        Plaintiffs,               )
                                   )
    v.                             )    Civil Action No.
6                                  )    1:08-cv-00263-SS
                                   )
7   STATE OF TEXAS; UNIVERSITY OF )
    TEXAS AT AUSTIN; et al,        )
8                                  )
         Defendants.               )
9
                   REPORTER'S CERTIFICATE
10            ORAL DEPOSITION OF KEDRA ISHOP
                    October 6, 2008
11

12      I, Tracie L. Chew, Certified Shorthand Reporter in and

13   for the State of Texas, do hereby certify that, pursuant to

14   the agreement of counsel, came on before me, on October 6,

15   2008, the following named person, KEDRA ISHOP, who was duly

16   sworn to testify to the truth and nothing but the truth

17   touching and concerning the matters in controversy in this

18   cause; that she was thereupon carefully examined upon her

19   oath and her examination reduced to typewriting under my

20   supervision; and this deposition is a true record of the

21   testimony given by said witness.

22      I further certify that I am neither attorney, nor

23   counsel for, nor related to, nor employed by any of the

24   parties to the action in which this testimony is taken; and,

25   further, that I am not a relative nor employee of any

98

1    attorney or counsel employed by the parties hereto or

2    financially interested in the action.

3        I further certify that the deposition transcript was

4    submitted on October 16th, 2008 to the witness or to the

5    attorney for the witness for examination, signature and

6    return to me by November 17th, 2008;

7        The original deposition was/was not returned to the

8    deposition officer on _____;

9        If returned, the attached Changes and Signature page

10   contains any changes and the reasons therefor;

11       If returned, the original deposition was delivered to

12   Mr. Thomas R. McCarthy, Custodial Attorney;

13       That $_____ is the deposition officer's charges to

14   the Plaintiffs for preparing the original deposition

15   transcript and any copies of exhibits;

16       WITNESS MY HAND AND SEAL OF OFFICE, this 14th day of

17   October , 2008.

18

19                              _____

20                              TRACIE L. CHEW, CSR #6503
                                Expiration:  12/31/2008
21                              DepoTexas Austin
                                Firm Registration No. 17
22                              DepoTexas@aol.com
                                Fax 512/478-2782
23

24

25