# EXHIBIT

# 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ABIGAIL NOEL FISHER; and RACHEL MULTER MICHALEWICZ<br>Plaintiffs,<br>v.<br>STATE OF TEXAS; UNIVERSITY OF TEXAS AT AUSTIN; et al,<br>Defendants. | Civil Action No. 1:08-cv-00263-SS |

ORAL DEPOSITION OF
GARY LAVERGNE
October 6, 2008

ORAL DEPOSITION of GARY LAVERGNE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on October 6, 2008, from 8:09 a.m. to 9:56 a.m., before Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of University of Texas at Austin, Main Building, Suite 210, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:
Mr. Thomas R. McCarthy
WILEY REIN, L.L.P.
1776 K Street, N.W.
Washington, DC 20006
202/719-7000

FOR THE DEFENDANTS:
Ms. Mishell B. Kneeland
OFFICE OF THE ATTORNEY GENERAL
Assistant Attorney General
300 West Fifteenth Street
Austin, Texas 78701
512/463-2004

ALSO PRESENT:

Mr. Leo Barnes

INDEX

PAGE
Appearances............................................ 2
GARY LAVERGNE
Examination by Mr. McCarthy........................ 4
Examination by Ms. Kneeland........................ 57
Further Examination by Mr. McCarthy................ 60
Changes and Signature................................. 62
Reporter's Certification................................ 64

EXHIBITS

NO. DESCRIPTION PAGE
1.................................................... 55
Implementation and Results of the Texas Automatic Admissions Law (HB 588)

* * * * *

THE REPORTER: On the record, 8:09.

GARY LAVERGNE,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. McCARTHY:

Q. Okay. Mr. Lavergne, my name is Thomas McCarthy --

MR. McCARTHY: And that's T-H-O-M-A-S, M-C-C-A-R-T-H-Y.

Q. (By Mr. McCarthy) -- and I represent the plaintiffs. Are you appearing here today in response to this notice of deposition?

**A. Yes.**

Q. Okay, thank you. Have you ever been deposed before?

**A. No.**

Q. Okay. Well, basically I'm going to ask you a series of questions about your role and responsibilities relevant to this suit and you'll be testifying on behalf of the defendants. Okay?

MS. KNEELAND: I'd just like to interpose here at this time that specifically we've designated Mr. Lavergne to testify with respect to one portion of No. 12 on Schedule A, which is the calculation of the AI and PAI scores and also on Topics 13 and 14.

MR. McCARTHY: Okay. And that's fine and I

will try to stay within that and if I ask you questions that are outside of what you prepared for, that's fine. If you say you don't know the answer --

THE WITNESS: Okay.

MR. McCARTHY: -- you're not prepared for that, then someone else will address it.

Q. (By Mr. McCarthy) But in any event, I will ask you a series of questions. Answer them to the best you can. If you don't know, feel free to say you don't know, but make sure that your answers are verbal. A nod of the head won't necessarily be picked up by the court reporter. And if you have a question you need to ask your attorney, that's fine, you can speak with Ms. Kneeland. I only ask that if I ask you a question, you answer the question first and then you can consult with her.

Also, if you need to take a break for some reason --

**A. Uh-huh.**

Q. -- we can take breaks if you need to go to the men's room or get a drink or whatever --

**A. Sure.**

Q. -- just let Ms. Kneeland know.

Do you have any questions about how this will proceed?

**A. No. Thank you.**

Q. Okay. And one other thing I should say is if I ask you a question that's a little bit unclear, feel free to let me know.
**A. Okay.**
Q. I'll try to state it as best I can.
**A. Sure.**
Q. Okay?
**A. Uh-huh.**
Q. Great. A few preliminary things. Have you taken any medications this morning or have you had -- ingested anything that might affect your ability to participate in this deposition?
**A. I take medication, but it doesn't affect my ability to participate in this deposition.**
Q. Okay, thank you. Did you meet with anyone to prepare for this deposition?
**A. Routine meetings with my attorneys.**
Q. Okay. And how many times did you meet with them? If you don't know exactly --
**A. Formally, informally a few times.**
Q. Okay. And what did you do to prepare?
**A. I looked up my record of research over the past eight years. I've been with the University for eight years --**
Q. Okay.

**A. -- and I just kind of refreshed my memory on what it is I've done --**
Q. Okay.
**A. -- in that eight-year period.**
Q. Okay. So you sort of looked over your past research and that kind of --
**A. Sure, uh-huh.**
Q. Okay. And what documents in particular did you look at?
**A. Well, most of them are posted online and have already been used by the plaintiffs --**
Q. Okay.
**A. -- the Top Ten Percent Report and other reports that we post routinely.**
Q. Okay. Were there any materials that -- any documents that you reviewed in preparation for the deposition that were not yet produced to us?
MS. KNEELAND: If you know.
**A. I'm not certain of that. I'm -- I do a lot of research and I'm certain that you haven't gotten everything I've done in the last eight years and quite frankly a lot of it is irrelevant to this case because I was reminded of exactly how much work I do for this university.**
Q. (By Mr. McCarthy) Okay. Well, if there's --
MR. McCARTHY: Mishell, if there's things

that Mr. Lavergne looked at that you guys haven't given us yet --
MS. KNEELAND: I don't know what he looked at because I wasn't with him when he did it, so I can't make any representation. If you would like to probe him more, make a formal request, that's fine --
MR. McCARTHY: Okay.
MS. KNEELAND: -- but I can't promise you documents that I'm not sure what they are, especially given his representation that he says they're not relevant to the lawsuit.
MR. McCARTHY: Okay.
Q. (By Mr. McCarthy) Well let me ask you a little bit, then. I guess what's been produced to us so far, we've seen, you know, the -- You mentioned the title of it, but I don't have it in front of me. It's the implementation and report on the experience with HB 588?
**A. Right. That's -- that's called the Top Ten Percent informally.**
Q. Right, and I know we've received those. What are -- what are some other of the documents that you looked at?
**A. Well an example of something that's irrelevant would be, for example, the reports that I do in the Coordinated Admissions Program which is a transfer program.**

Q. Uh-huh, sure.
**A. And I ended up looking at that because, you know, I do that every year and I do a lot of work for the -- for the Legislature, both in the interim and while they're in session.**
Q. Okay.
**A. And a lot of that has to do with, you know, how many kids we admitted from District 23 in the Senate and all that and I don't know that that's relevant to this particular case.**
Q. Okay. Did you --
**A. It was stuff like that that I did this week.**
Q. Sure. Was there anything else that's sort of in the nature of something similar to what that Top Ten Report is that was either any sort of study or assessment of --
**A. Huh-uh.**
Q. -- admissions, applications, enrollment, that kind of thing?
**A. The Top Ten Percent Report is on that subject as comprehensive a report as we have and -- and I frankly don't know how anything other than something negligible could be gleaned from what we haven't provided you thus far.**
Q. Okay, all right. What is your job title?
**A. My human resources title is program manager --**
Q. Okay.

Page 10

**A. -- but my working title -- and we're allowed to do that at the University -- is director of admissions research and policy analysis.**

Q. Okay. And how long have you been in this position?

**A. Since September of 2000.**

Q. Okay. And were you with the University before that?

**A. No. Before that I was the -- I functioned as the chief administrative officer for the SAT, the college admissions test for four states. So I worked for the College Board and before that I worked for -- in the same position for ACT for five states. So I'm the only person in the United States who's ever worked for both ACT and SAT before I came here.**

Q. Great.

**A. Testing is my background.**

Q. I can see.

**A. Uh-huh.**

Q. And other than your work background, what's your educational background?

**A. I got a bachelor's of arts in social studies education at the University of Louisiana, Lafayette, in 1976, I got a masters of education at the same institution in 1981, and I have an education specialist from McNeese**

Page 11

**University in 1988.**

Q. Okay. A little bit ago Ms. Kneeland identified the particular topics that you're going to testify about today.

**A. Uh-huh.**

Q. Are you able to testify fully as a corporate representative of the University on those matters?

**A. Yes.**

Q. Great, okay. As I said before, if I ask you a question that you're not prepared for, let me know and --

**A. Sure.**

Q. -- and we can keep moving along.

Okay. I'll start off with some stuff about the admissions process.

**A. Uh-huh.**

Q. Does the number of applicants for admission in any given year far exceed the number of slots available for incoming freshman students?

**A. Yes.**

Q. Okay. So does the University consider itself selective in that respect?

**A. Selective is kind of a non-standard term, but we're generally considered selective to a highly selective institution.**

Q. Okay. And about -- Approximately how many

Page 12

applications are received year to year for the incoming freshman class?

**A. Well, for the -- for example, this year we had 29,500 plus, last year it was not quite as many, but -- so we generally have in the last five years from 27 to 29,000 applications --**

Q. Okay.

**A. -- of which about 80 to 85 percent are complete.**

Q. Okay. And the ones that are not complete, are they considered -- are they considered among that number of -- that 29,000?

**A. Right, they're in that 29,000.**

Q. Okay. And those ones that are not complete, are they rejected?

**A. They're just in limbo and if they don't meet the deadline, then we basically cancel the application.**

Q. Okay. But still counts in the 29,000 number?

**A. Uh-huh.**

Q. Okay.

MS. KNEELAND: Just remember the court reporter can't take down "uh-huh," you have to say yes.

**A. Yes.**

Q. (By Mr. McCarthy) Thanks. About how many slots are available for incoming freshmen each year?

MS. KNEELAND: I'm just going to say we have

Page 13

Ms. Ishop -- or Dr. Ishop to testify as to all of this kind of stuff --

MR. McCARTHY: Okay.

MS. KNEELAND: -- so if we could really more limit Gary's testimony to the topics that I identified, that would be helpful.

MR. McCARTHY: Sure.

MS. KNEELAND: He has knowledge about this, but --

MR. McCARTHY: That's fine.

MS. KNEELAND: -- he also has limited time.

MR. McCARTHY: Got it.

Q. (By Mr. McCarthy) Okay. So, Mr. Lavergne, as I understand it, the University employs a system for making admissions decisions for the undergraduate school based on an applicant's academic index and their personal achievement index.

**A. Yes.**

Q. Okay. And this academic index is sometimes referred to as an AI score?

**A. That's correct.**

Q. Okay. And the personal achievement index is sometimes referred to as the PAI score?

**A. Yes.**

Q. Okay. And how long has the University employed

this system?
A. **It's before I got here in 2000, but my understanding is that it was first implemented with entering 1997.**
Q. Okay. And has the University during that time been keeping track of the level of minority enrollment in its incoming classes?
A. **Uh-huh, yes.**
Q. And that's with regard to application, admission, and enrollment?
A. **Yes, uh-huh.**
Q. All right. And then did the Texas Legislature pass HB 588 in 1998?
A. **They passed it during the regular session of 1997 --**
Q. Okay.
A. **-- and it was implemented here on the campus with the entering class of 1998.**
Q. Okay. And when they -- when the University implemented HB 588, they continued to use the AI-PI (sic) system for evaluating applications --
A. **Yes.**
Q. -- in conjunction with that. Isn't that right?
A. **Yes.**
Q. Okay. So if I understand this right, the

University utilized HB 588 to fill up a portion of the class and then the remainder of the class they used this AI-PAI system for evaluating the -- for the remainder of the class.
A. **We used it to -- well, under the law -- as provided for by the law, it's also used in some colleges and majors where there are more than 75 percent of the applicants -- or the slots that are filled by top ten percent people. So in some cases a top ten percent person will be subject to consideration of AI and PAI in order to determine whether or not they will get their first-choice major. So it's used -- it's used for more than just the non-top ten percent people. It can be used to determine what major a person will end up being enrolled in.**
Q. Okay. So just to make sure I understand, so for students that are admitted pursuant to HB 588, the AI-PAI system can be used to determine their placement in this particular major?
A. **In some cases, that's correct.**
Q. Okay, in some cases. So --
A. **The entitlement is admission to the University, not necessarily your first-choice of major.**
Q. Okay. So let me just back up a little bit to make sure I understand. So if an applicant is in the top ten and, you know, submits a proper application, then they're admitted to the school pursuant to HB 588. Is that correct?

A. **To the University.**
Q. To the University.
A. **Yeah.**
Q. But not necessarily their particular choice of major.
A. **Depending upon what that major is, that's correct.**
Q. Okay. And then after that for certain majors, the AI-PAI system may be used to determine which school, which major that applicant goes in to.
A. **That's correct.**
Q. Okay, all right. And then aside from those students who are admitted pursuant to HB 588, the AI-PAI system is used to make admissions decisions.
A. **For everyone else.**
Q. For everyone else.
A. **Uh-huh.**
Q. Okay. And -- and their AI and PAI also determines their placement in particular schools and majors as well?
A. **It -- it might.**
Q. It might.
A. **It might. For example, if their first-choice major is already full or if they didn't meet the standards for that particular school, they'll be cascaded to a second choice just like the top -- some top ten percent people were. So, yeah, in that respect it can be used that way as**

**well.**
Q. Okay.
MS. KNEELAND: And, again, I'll represent to you that Dr. Ishop is going to testify at great length about all of that.
MR. McCARTHY: Thanks, great, I'll move along. I don't want to take too much of your time, Mr. Lavergne.
Q. (By Mr. McCarthy) Okay. What is the significance of the AI score, what does that represent?
MS. KNEELAND: Object to the form.
You can answer.
A. **Okay, the AI is a combination of two things. The AI is the result of a multiple regression equation that uses test scores and class rank to predict a freshman-year GPA and that freshman-year GPA ranges, of course, from 0.0 to 4.0. So that -- that predicted GPA can be enhanced by a tenth of a point if the applicant exceeded our course requirements in high school. So the range -- the possible range of an AI is generally 0.0, which no one really gets. It could be up to a 4.1 because we added the tenth of a point for the extra coursework in high school. So the AI, the academic index, is essentially the predicted GPA probably plus a tenth of a point for excess coursework beyond our requirements.**

Q. (By Mr. McCarthy) Okay. And you said these AI scores are computed or calculated --
**A. Absolutely.**
Q. -- pursuant to a regression equation?
**A. To a regression equation. We take -- we take the 10 or 11 colleges and schools and we clump them into groups that have similar curriculum and there's an equation for each of those clumps and there's four altogether. For example, we'll put Nursing and Natural Sciences in one group because they tend to be more science-oriented and, say, communications and Liberal Arts in another group because they tend to be more Liberal Arts kind of thing. So -- and basically the -- so the AI -- the bulk of the AI is basically that -- the result of that multiple regression equation.**
Q. Okay. And then there's different equations for different majors, then?
**A. For different schools.**
Q. For different schools?
**A. We don't go down to the major level because we have, you know, 200 or so -- a hundred or 200 majors, so it's down to the school level. Now, some schools are big enough to have their own. Business is big enough for its own and Engineering is big enough for its own and then you have the Liberal Arts group and then the Natural Sciences**

**group.**
Q. Okay. And who is it that draws up these equations for the various --
**A. That's based on research I do.**
Q. Okay. And now the PAI score is a score that's supposed to represent an applicant's personal achievement.
**A. In general, yeah.**
Q. Okay. Do you have any role in determining how much weight is given to the particular factors that make up that PAI score?
**A. No. That was -- that was done back in 1997 --**
Q. Okay.
**A. -- and it was a result of a faculty council meeting as -- I was not there, but as I understand it, it was the result of a faculty council meeting when they drew up the -- basically the current admissions routine we have.**
Q. Okay. Now, the University -- we talked about before about how the University started implementing the HB 588 after that was passed and became a part of the admissions process in 1998.
**A. Uh-huh.**
Q. I want to back up a little bit before that and prior to 1997. In 1997 you said that the University began using this AI-PAI system.
**A. Uh-huh.**

Q. And what was the system that the University used before that to make admissions decisions?
**A. You know, I have a vague idea of what it is --**
Q. Okay.
**A. -- but I don't believe I can testify to that with authority.**
Q. That's fine. Do you know -- Are you able to testify about the admission statistics prior to 1997, say in 1996?
**A. Sure.**
Q. Okay. So in 1996 what were, roughly, the admission statistics in terms of minority enrollment?
MS. KNEELAND: I object to the form. For the freshman class?
MR. McCARTHY: Yes, I'm sorry. Let me ask that again, restate.
Q. (By Mr. McCarthy) So what were the -- what were the levels of minority enrollment in 1996 for the incoming freshman class?
**A. Okay. For the incoming freshman class, White -- well, I don't have -- I don't have percentages, but I can give you raw numbers.**
Q. That's fine.
**A. The incoming class was 6,430 and Whites made up 4,159, American Indian 34, African American 266, Asian**

**American 942, Hispanic 932, International 97. And this is from the statistical handbook that's posted online and that would be in the Office of Institutional Research, but today I think it's called Information Management and Analysis.**
Q. Okay.
**A. It's all posted back to the '80s, I think.**
Q. Thanks. Okay. So that was before 1997 -- and I'm just going to try to trace this and make sure I understand -- and then in 1997 the University implemented this AI-PAI system. Is that correct?
**A. That's correct.**
Q. And then in 1998 started using the HB 588 along with the AI-PAI system.
**A. That's correct.**
Q. Okay. And at some point when the University was using this -- using HB 588 and the AI-PAI system --
**A. Uh-huh.**
Q. -- did the levels of minority enrollment exceed those from 1996 for the incoming freshman class?
**A. By a percentage?**
Q. Yes.
**A. I believe that to be true. As of 1999, as I recall, they pretty much equaled the 1996 level -- or let's say approximately 1999, maybe 2000 or something.**
Q. Okay. In 2004 --

**A. Uh-huh.**
Q. -- what were the levels of minority enrollment in incoming freshman class?
**A. For all enrolled freshman White was 57 percent, Native American was less than one, African American was five, Asian American was 18, Hispanic was 17, International was three, and Unknown less than one percent.**
Q. Okay. Does the University keep statistics on the academic performance of students admitted outside of HB 588?
**A. Yes.**
Q. And does it keep those statistics broken down by race?
**A. Uh-huh, yes.**
Q. How does the academic performance of minority students admitted outside of HB 588 compare with the performance of non-minority students admitted outside of HB 588?
**A. It's a little lower. Let's see, are you talking about the non-top ten percent?**
Q. Yes.
**A. Okay. What specifically would you like to know?**
Q. I'm just asking generally how does the academic performance of minority students admitted outside of HB 588 compare with the performance of non-minority students admitted outside of --

**A. It's slightly lower.**
Q. Slightly lower?
**A. Yes.**
Q. What -- Does the University keep average GPAs?
**A. Yes.**
Q. And what are the average GPAs, let's say for 2004 if you have them broken down by year.
**A. Sure, I have it broken down. 2004 for White non-top ten percent was 3.02; for African American entering 2004, non-top ten percent was 2.58; for Asians it was 3.11; and for Hispanics it was 2.81.**
Q. Okay.
MS. KNEELAND: That seemed a little bit incomplete. He just told you what the non-top ten percent were, but he didn't tell you what the top ten percent were and you asked for a comparison.
MR. McCARTHY: I asked for -- I actually asked for non-top ten. I'm going to ask him also for the top ten.
MS. KNEELAND: Well, you asked him to compare it and it just didn't seem like a complete answer, but okay.
MR. McCARTHY: Okay.
Q. (By Mr. McCarthy) Just to make sure, those numbers that you just gave me, those are the numbers for minority and non-minority students admitted outside of HB 588.

**A. Yes, that's correct.**
Q. Okay.
**A. For 2004.**
Q. Yes, for 2004, thank you.
**A. Uh-huh.**
Q. And does the University keep similar statistics for students admitted pursuant to HB 588?
**A. Yes.**
Q. Yes? And let's use 2004 again. Could you give me the same statistics, but for students admitted pursuant to HB 588 --
**A. Okay.**
Q. -- both minority and non-minority?
**A. Entering 2004, top ten percent, White 3.31; top ten percent for African American 2.69; for Asian 3.38; and for Hispanics 2.92 -- I'm sorry, let me correct that -- no, that is correct, Hispanics, 2.92.**
Q. Okay, thank you. Does the University keep statistics on the academic performances of the students relative to their AI numbers that predicted their grade point averages?
**A. No. Not formally, no. Now I will -- As a matter of curiosity, I'll check that every now and then, but I don't write up any report. And I think it would be safe to say that I don't keep statistics, although I do look at them**

**every now and then.**
Q. In your viewing of those numbers, do they seem to correlate the predicted GPA and the actual academic performance?
**A. Not -- not very well because that's not the purpose of the PAI.**
Q. Okay.
**A. The PAI is not designed to predict anything.**
Q. I understand that. I'm sorry, maybe my question was unclear. I mean the AI, does --
**A. Oh, yes, yes. There we do very extensive validity studies because that's what the AI is supposed to do.**
Q. So the University does keep track of academic performance of students based -- compared to their predicted GPA.
**A. We do predicted validity studies on all of the elements of the AI and we do that in-house and we participate in research studies with both the College Board and ACT to validate that process.**
Q. And would you say, then, that the AI scores which predict freshman GPA, those correlate with actual academic performance?
**A. Through industry -- the industry would consider it a moderate to strong relationship -- positive relationship, yeah.**

Q. Okay. Does the University keep track of statistics -- I'm sorry, let me start that again.
Does the University keep track of statistics on the applicant's high school GPAs?
**A. No.**
Q. No?
**A. No. Now when you say "high school GPA," I'm assuming that you're referring to a computation using grades that results in a numerical value such as 1.0 to 4.0. We do not keep -- we do not collect those.**
Q. Does the University keep track of high school class ranks --
**A. Yes.**
Q. -- of students?
**A. Yes.**
Q. Okay. What is the average class rank of non-top ten applicants?
**A. My best estimate would be probably around 85 to 88 percentile ranking or basically the top 15 to top 12 or something like that.**
Q. Okay. And does that number tend to vary among race?
**A. Not that I've ever noticed, no.**
Q. Okay.
**A. No.**

Q. Does the University keep statistics on SAT scores of all the applicants?
**A. Absolutely, yes.**
Q. Okay. Do average SAT scores tend to vary among the various races?
**A. Yes.**
Q. Yes?
**A. Uh-huh.**
Q. Do you have data on those numbers with you today?
**A. Sure.**
MS. KNEELAND: And just, again, so we're clear, not every student takes the SAT. Some of them take the ACT.
MR. McCARTHY: I will ask about both --
MS. KNEELAND: Okay.
MR. McCARTHY: -- then we'll have the full information on it.
**A. The numbers I have with me today, okay, would be -- it's what we call the SAT equivalent and Ms. Kneeland is absolutely correct in that we will accept either one. Most students send us one of each and what we do is we'll take -- since we get so many more SAT scores than ACT scores, we will -- and in the case of this research study that I'm going to cite for you, we will take the ACT scoring, convert it using the concordance table to an SAT**

**equivalent and then we'll give the student the benefit of the best score, whether it's the actual SAT or the concorded ACT. So with what I'll -- I'm presuming you're going to be asking me for those scores in a second. Those scores will represent the highest value for each individual of the real SAT or the concorded ACT.**
Q. (By Mr. McCarthy) So for students that take both the SAT and the ACT, the University computes a concorded SAT score for that ACT score.
**A. That's correct.**
Q. And then the number that gets recorded in the statistics is the higher of those two.
**A. Right, that's correct.**
Q. And for students that take the SAT more than once, do they get the benefit of their higher score?
**A. In the admissions process, that's correct.**
Q. Okay. And then I'll ask you about those statistics. What -- let's take 2004, for example --
**A. Okay.**
Q. -- what were the average SAT scores for non-top ten applicants?
**A. Okay, White, non-top ten percent, 2004, was 1267; African American, non-top ten percent in 2004 was 1116; Asian American, non-top ten percent, 2004, 1304; and Hispanic, non-top ten percent, 2004, was 1189.**

Q. Okay.
**A. And this is from the Top Ten Percent Report.**
Q. Okay. And do you have those -- Do you have similar information for the incoming class of 2008, the freshman class?
**A. Not yet. That -- this report comes out generally around Thanksgiving because what happens is we have to give -- we have to give time for the courses that were taken -- for example, in the spring some of them are incomplete and some of these kids are going to complete that coursework, like, within the next couple of weeks so we generally give time for those incompletes to turn into a course grade so that we can get a better computation of the mean GPA.**
Q. Okay. What's the most recent year for which you have statistics on the SAT scores?
**A. Here would be entering 2006.**
Q. Okay.
**A. And would you like the same --**
Q. Sure, you can give me the 2006.
**A. Okay, 2006, non-top ten percent, White is 1286; 2006, African American, non-top ten percent, 1086; Asian American, non-top ten percent in 2006 is 1310; and Hispanic entering 2006, non-top ten percent, 1154.**
Q. Okay. And is -- would you say there's a consistent trend for the years for which the University

keeps statistics that it appears, at least from the two years you gave me -- Let me start this over.

It appears from the two years that you gave me that Asian American scores tend to be the highest in this group and then White students and then Hispanic students and then African American students.

A. I would say that's consistent with other institutions over time and throughout -- and geographically as well.

Q. Okay.

A. I don't know of any institution that doesn't have a similar profile.

Q. Okay. Does the University keep track of average AI scores for non-top ten applicants and top ten applicants?

A. Not -- not formally. I mean, when you say we keep track, I interpret that to mean do we issue reports like the top ten percent and all that and the answer -- if that -- if that's a proper assumption, then the answer is no; but if you're asking me do I look in to it every now and then well, yeah, I look in to it informally, but I don't -- I don't keep a record of it. I monitor everything almost -- well not every day, but very, very frequently and there are some things that I just -- I just kind of check up on it to make sure everything is working well and running well and that there's validity to what we do.

Q. So in other words, something like this, average AI scores that I just mentioned, you might check on that yourself, but you don't publish a formal report --

A. Oh, no.

Q. -- such as the Top Ten Report.

A. No.

Q. Okay. Well then based on your own observations --

A. Uh-huh.

Q. -- do average AI scores show the same kind of trend that the SAT scores show?

A. I don't know.

Q. Okay. Does the University keep track, either formally or informally, of the acceptance rates of non-top ten applicants?

A. Yes.

Q. Yes?

A. Uh-huh.

Q. And does the University keep track of these broken down by race?

A. I don't know. I know we -- I know the Stat Handbook which is produced by the Office of Information Management has that in its official publication. I can't recall specifically if it's broken down by race, but the acceptance rate is monitored among other -- among other reasons because the U.S. News and World Report survey

requires that. But, again, that's not out of Admissions, that's out of Information Management.

Q. Okay.

A. The research that we do is -- The purpose of the research I do is to make sure that the business of the Office of Admissions is done in a competent and valid way. The official reporting for the University for things like the U.S. News and World Report survey and stuff like that, that's done out of the Provost's office in an office called Information Management and Analysis. So we basically do business operations, but the official University's data comes from that office right next door.

Q. And the name of that office again is?

A. Information Management and Analysis.

Q. Okay. So the Information Management and Analysis office --

A. Uh-huh.

Q. -- does all of this research on admissions statistics. Is that correct?

A. Yeah. They -- they do reports, they do official University reports.

Q. So they do official University reports studying how the Office of Admissions conducts its business.

A. Well, I'll do that. I mean, I'll do -- I'll take care of our admissions business, okay, but for reporting to

the higher ed coordinating board, for example, you know, that's going to come out of those guys right there.

Q. Okay.

A. Now the difference is -- in our statistics are negligeable and for admitted -- applied, admitted, and some other categories, I'll provide the data to them. So our data is -- our data is valid.

Q. So they keep separate data than you keep yourself.

A. Well, for example -- for example, okay, when we talk about applications, okay, you brought up completed versus all applications. Some federal programs or some -- or the coordinating board, for example, when they ask for applications, they want only completed applications and that's a different number than from all applications. So, you know, it's just a matter of definition sometimes.

Q. Okay. We've talked about the top ten reports, some of your own informal observations and analysis of various admission data.

A. Uh-huh.

Q. What are other ways in which you analyze admissions data for the Office of Admissions?

A. Okay, could you repeat the question?

Q. Sure, sorry. Like I mentioned before, we've talked about how you do things like the Top Ten Report --

A. Right.

Page 34

Q. -- and how sometimes you do some informal observations and analysis of various admissions data.

A. Uh-huh.

Q. Are there other ways in which you analyze admissions data?

A. Sure.

Q. Are there any particular studies other than the Top Ten Report?

A. Well whenever the Legislature is in session, okay, they ask for data in hundreds of different ways, sliced and diced and all this other stuff, and a lot of it becomes political because they want it, you know, broken down by Legislative district. Okay? And then -- For example, they'll want to know what percentage of our incoming class comes from rural areas, you know, and they often don't define what rural is and so, you know, then we have to start looking at definitions of rural and so forth. And there are also issues of financial aid where we look at first-generation students and we break down these statistics by every way you can think. We do it by gender, we do it by income level, we do it by parental education, we do it by regions of the state, by county. I mean, we -- my office is basically the source of information for the freshman and transfer admissions process and so people come to me. And just when I think I've cut the data in every way it can be

Page 35

cut, somebody comes up with a new idea.

So the answer to your question is, you know, I doubt that you could come up with an idea for me to slice that data that I haven't been asked for in the past eight years because -- well, the Legislature alone, I mean, it can -- I work a lot of hours when they're in session --

Q. I'm sure you do.

A. -- because I'm really the sole source -- I'm really the sole source of admissions data, per se, and it's got to come from me.

Q. Okay. We talked a little bit about admissions under HB 588.

A. Uh-huh.

Q. Looking over the sort of course of time since HB 588 became part of the admissions process in 1998, can you tell whether there is a trend as to minority enrollment, whether it's increasing or decreasing in the freshman incoming classes?

MS. KNEELAND: Objection to the form.

You can answer.

A. There are -- there are two ways to report that. One way is to look at statistics for the entire entering freshman class which would include those populations not affected by the Top Ten Percent Law and therein you're talking about the out-of-state and the international

Page 36

students. Okay? My personal view is that it's better to look at the subset of entering freshmen who come to us from Texas high schools because that's -- that's the group affected by the Top Ten Percent Law. In general for an enrolled class since 19 -- I'm looking at 1997 to 2007, in an 11-year period minority enrollment has increased.

Q. (By Mr. McCarthy) So it shows a trend of increasing. This is minority enrollment through HB 588.

A. I would say a very small incremental increases since 1997, that's how I would characterize it.

Q. Okay. And would you say it's consistent or steady?

A. Well depends on what group you're looking at but, yeah, I'd say that.

Q. So it's, generally speaking, a consistent sort of small incremental upward trend.

A. I'd say it's a small incremental upward trend, yes.

Q. Okay. In the course of doing your admissions research, do you have occasion to measure the performance of other admissions office initiatives?

A. Yes, yes. Like -- well, not in the -- An example would be the CAP program which is our attempt to make sure that if you're a Texas resident and you apply here, that we never really say no, you can never come here. The CAP

Page 37

program which would allow students to spend their freshman year at a component institution and then come back as a transfer, I study the effect of that program insofar as I study how many people take us up on that offer, how many people matriculate on a component campus, how many people come back and how well they do once they get back. So, yeah, I've done those studies as well.

Q. Okay. Have you done studies -- have you done studies comparing the levels of minority enrollment under the non-top ten compared before 2005 and after 2005?

A. Well, the data is in the Top Ten Percent Report.

Q. Okay. Does your -- does your research and the data give you any idea as to what affect the use of race in admissions decisions has had on minority enrollment?

A. I can tell you what minority enrollment is, but my -- my role as a scientist is to try to go back to numbers. Okay? And I don't think that it's possible to come up with an equation or a numerical expression of the impact of race on enrollment because race doesn't have a specific numerical value.

Q. Okay. Do you have occasion to study the effect of other admissions initiatives on minority enrollment?

A. I'm not sure I understand your question.

Q. Well, it's my understanding that the University employs certain outreach efforts to help promote minority

Page 38

enrollment.
A. Yes.
Q. Do you have occasion to study the effectiveness of these outreach efforts?
A. No.
Q. No. Are you aware of anyone else in the University that would be doing research on the effectiveness of those outreach efforts?
A. Well, I guess related to that I would -- I study feeder schools, okay, and how many feeder schools we have and how many students come from each of those schools. So that's related to what you're saying. It's not -- it's more an attempt to answer questions from the Legislature about geographical diversity rather than racial diversity. Now, the LOS program was studied by a researcher in --
Q. I'm sorry, can I interrupt for just a minute --
A. Yes.
Q. -- and ask you what LOS stands for?
A. We have an outreach -- we have an outreach program called Longhorn Opportunity Scholars and -- Now, I don't work with that program, per se, but it is an outreach program and that program was studied by a researcher who is no longer with us and there are reports posted somewhere on the web, I'm certain of it, and they studied the performance of the students coming to us from those schools. My -- I'm

Page 39

a one-person office and, I mean, I don't even have an administrative assistant and quite frankly my time has been taken up with the Top Ten Percent Law and the demands placed upon us by the press, the Legislature, and the administration because it's a big deal here. And so since I've been here, it is not an exaggeration that three-quarters of my time has been dedicated to the Top Ten Percent Law and its -- and its effect on the University. So I don't -- I wish I had the luxury of the time to study those kinds of things that you're asking about, but that hasn't happened from my office. Now, that's not to say it hasn't been done. I haven't done it.
Q. Would you know who might have done that?
A. I would imagine it would have been someone at the Freshman Admissions Center if it was done at all.
Q. Okay. So we've been talking about various types of research that you do --
A. Uh-huh.
Q. -- about admissions data. This case is obviously about the University's use of race in making admissions decisions.
A. Uh-huh.
Q. Is there any other research or studies that you've done that might bear on the effectiveness of the University's use of race in admissions decisions?

Page 40

A. Specifically the use of race, no. But all of our studies validate the process as a whole and we study whether or not the students we admit -- for race or not, we study whether or not they're successful and we study whether or not they persist and stay here long enough to earn degrees and how many hours they take and mean GPAs and things like that. We do a great deal of research validating the process as opposed to validating the elements of the process --
Q. Uh-huh.
A. -- so that if -- if the process is flawed, we'll see it and it'll cause us to do an audit of what it is we do and why we do it and other things.
But if your specific question is do we do research validating the use of race, per se, the answer is no. And I don't think that research can be done because there is no numerical value involved in it, but we do a lot of research in terms of what happens to the people we admit for whatever reason and that's a lot of what I do.
Q. Okay.
A. A lot of it's broken down, top ten percent, non-top ten percent and so forth, but in the end we do traditional research that many universities do validating the process.
Q. Okay. Now a bit ago we talked about academic performance of non-top ten students and top ten students

Page 41

admitted pursuant to HB 588 --
A. Uh-huh.
Q. -- and the data that you gave me -- you gave me data for incoming class of 2004.
A. Uh-huh.
Q. And that showed that the top ten -- that HB 588 yielded students that had higher academic performance in terms of GPA point average at the University.
A. Uh-huh.
MS. KNEELAND: Again, you have to say yes for her.
A. Yes.
Q. (By Mr. McCarthy) I'll ask the question again to make it clear.
A. Okay.
Q. So -- so HB 588 yields students that have a higher academic performance at the University than students admitted outside of HB 588.
MS. KNEELAND: Object to the form.
A. In general, yes.
Q. (By Mr. McCarthy) Okay. Is that a consistent trend?
A. It's not -- it's not a hundred percent true a hundred percent of the time, but I would call it a trend, yeah, uh-huh.

Q. Okay.
**A. It's generally true, yeah.**
Q. So it's generally true that students admitted pursuant to HB 588 have a higher level of academic performance at the University than students admitted outside of HB 588.
**A. Yes.**
Q. Okay.
**A. Now, again, the form your question matters. If you're saying as a group do top ten percent students outperform non-top ten percent students, the answer is yes; but if in your question you mean the students who were admitted for no other reason than because of the top ten percent, okay, then I don't know that that question can be answered because some of those students would have been admitted anyway, top ten or non-top ten percent. So in order to answer that question in terms of the effect of the Top Ten Percent Law, you'd have to take out those kids who would have been admitted no matter what, okay, and I don't know that anybody can really do that so I'll qualify my answer. But the fact of the matter is that as a group, top ten percent students outperform non-top ten percent students.**
Q. Okay.
MR. McCARTHY: Can we take a break?

THE REPORTER: Off the record, 9:08.
(Recess)
THE REPORTER: On the record, 9:31.
Q. (By Mr. McCarthy) Okay, Mr. Lavergne, I just have a little bit more with you and we'll let you go --
**A. Sure.**
Q. -- few more questions.
We talked briefly about PAI scores --
**A. Okay.**
Q. -- and you mentioned that PAI scores don't have a number assigned to them -- I'm sorry, let me back that up.
PAI are a numerical value. Is that correct?
**A. Yes.**
Q. Okay. But you mentioned that the use of race as a factor in computing that PAI, the use of race doesn't get a numerical value.
**A. Not by itself, no.**
Q. Not by itself, okay. Given that it doesn't have a numerical value, is it the case that different people reviewing applications could have a different idea of how to consider race?
**A. Everyone is trained to look at the -- the application as a whole and if your question is does everyone think exactly alike, well clearly not.**
Q. And that is what I'm getting at. So it seems that

there may be -- because of, you know, not everyone thinks alike, there may be some variance as to how race is considered. Does the University do any analysis that's any sort of quality control --
**A. Uh-huh.**
Q. -- to see whether there's consistency --
**A. Yes.**
Q. -- in the weighing of race?
MS. KNEELAND: Object to the form.
You can answer.
**A. In the weighing of race? No, but there's no value -- no numerical value to race anyway. The only thing that can be controlled is that which has a value and that would be the scores actually assigned by evaluators which would be the three scores of the personal achievement index --**
Q. (By Mr. McCarthy) Okay.
**A. -- that being the personal achievement score and each of the two essays.**
Q. Okay.
**A. Now we do quality control of that because those -- that's what has consequence are the actual scores that are being assigned.**
Q. Uh-huh. And this personal achievement score --
**A. Uh-huh.**

Q. -- you indicated that race doesn't have a numerical value in that personal achievement score.
**A. That's correct.**
Q. Do the other components of the personal achievement score have numerical value?
**A. No.**
Q. None of the components of the --
**A. No, we have to remember -- I want to make sure we're talking about the same thing. There's a personal achievement index and there's a personal achievement score. Okay? One of the -- one of the elements of the personal achievement score might be president of the senior class. That doesn't have a numerical value.**
Q. Okay. And, again, let's talk about the personal achievement score as distinguished from the personal achievement index.
**A. Okay.**
Q. But that personal achievement score has a number of factors. Right?
**A. Uh-huh.**
Q. None of those has a numerical value?
**A. Not as an individual factor, no.**
Q. Okay.
**A. That's why it's called a holistic review.**
Q. Okay. And so you said there is some quality

Page 46

control --
A. Yes.
Q. -- done?
And is the quality control done to -- is the quality control analysis done in terms of the personal achievement score and as to the personal achievement index?
A. Uh-huh.
MS. KNEELAND: Object to the form.
You can answer.
MR. McCARTHY: I'll ask them separately, that'll be easier.
Q. (By Mr. McCarthy) So is there a quality control analysis done as to the personal achievement score?
A. Yes.
Q. And is there a quality control analysis done as to the personal achievement index?
A. Yes.
Q. Could you tell me a little bit about each of those one at a time?
A. **Sure. And the industry calls it interrater reliability and -- and that is the consistency of scoring by different individuals given, say, an experiment that has been set up. And what I did a couple years ago was to give all of the readers -- it's called an interrater reliability study -- give all of the readers the -- under controlled**

Page 47

**conditions the same applications and then we monitored how each of those readers scored those applications. Those -- As I recall I took 15 applications, gave it to all the readers, and then monitored the consistency of scoring. And this is done routinely in the industry. ACT does it for their essay readers, SAT did it for their essay readers, and it's a pretty straightforward study that looks at consistency of scoring.**
Q. Okay. And what is the term again?
A. **Interrater reliability.**
Q. Interrater reliability?
A. **Yes.**
Q. And that's --
A. **"Inter" being I-N-T-E-R, interrater reliability.**
Q. Okay. And this interrater reliability analysis is done separately for personal achievement scores and personal achievement indexes?
A. **I did it for -- well, I did it for the personal achievement score and the first essay and the second essay and because those three things make up a hundred percent of -- you know, I feel comfortable saying I did it for the personal achievement index as well.**
Q. Okay. So in other words, you did it for the components of the personal achievement index.
A. **Uh-huh, a hundred percent of the components of the**

Page 48

**personal achievement index, yeah.**
Q. Okay. And did you do this for the optional third essay as well?
A. **No.**
Q. No.
A. **Just essays one and two.**
Q. Okay.
A. **And the reason for that is because I don't think we had enough students doing the third essay. See, everyone had to do Essay 1 and 2 and so we had enough of a sampling there to do that.**
Q. Okay. So has the -- Do you know if anyone at the University has done any sort of quality control analysis of the scoring as to Essay No. 3, the optional one?
A. **Essay 3 --**
MS. KNEELAND: I'm sorry, object to the form.
You can answer it.
A. **Essay three is used by many people outside of the admissions office, like some -- you want to double check this, but my understanding is essay three is used on things like honors programs and so forth. And as to whether or not they did their own quality control studies, I don't know.**
Q. (By Mr. McCarthy) Okay. So you -- so is it accurate to say that you're unaware of whether the University does quality control analysis of the optional

Page 49

essay?
A. **That's correct.**
Q. Okay. When you did this interrater reliability analysis --
A. **Uh-huh.**
Q. -- of the personal achievement score, what did your results show?
A. **They showed that we were -- There are two measures. One is exact score, basically where two people assign exactly the same score. The general industry standard is that on a one-to-six scale like that, plus or minus one is generally acceptable. And as I recall, the results were that from 88 to 90 percent of the time we were within -- raters were within one score of -- of what we considered the true score. In a study like that, you establish a true score. And for purposes of this study, Dr. Bremen was asked to look at these files. As the instructor, he assigned the score that, for purposes of research, was considered the true score, then we -- then I sent out the 15 applications to all of the readers. We -- The only reader who wasn't part of this study was me and I couldn't be a part of my own study, but everybody else was. And from 88 to 90 percent of the time we were within one score of one another. And so the College Board, for example, in its SAT reading -- SAT writing test shoots for**

Page 50

**92 percent, so we were within two percent of the premier testing company of -- in the world.**

Q. And how is this true score determined?

**A. The instructor determines the -- we gave it to Dr. Bremen who is the, you know, national expert on this and I asked him to score that and he scored it. And so the -- the research answers the question how close do we come to our training --**

Q. Okay.

**A. -- and what we found is that our scores are 88 to 90 percent consistent with the training that we receive.**

Q. So just to make sure I understand, Dr. Bremen comes up with what's known as the true score and then --

**A. For purposes of that study, yeah.**

Q. Right. So Dr. Bremen comes up with what's known as the true score for purposes of the study --

**A. Yes.**

Q. -- and then in this quality control analysis, this interrater reliability analysis as you called it, 88 to 90 percent of the scores come within one point of Dr. Bremen's true score?

**A. That's correct.**

Q. Okay. I understand, thanks.

**A. Uh-huh.**

Q. Are there ever sort of individual readers that

Page 51

have wide variances from that true score?

**A. I found that to be very rare. Now I can't recall the exact numbers, but the standard deviation from the average score was really very narrow. Quite frankly, I was very surprised we had -- we had -- The people who did the reading held true to their training.**

Q. And if there is a reader who has a large variance from the true score --

**A. Uh-huh.**

Q. -- are they required to have additional training?

**A. That, I think, is outside of my -- my scope. I present the results to Dr. Walker and Dr. Ishop and you'll have to ask them if they did any remediation. I did the study, not the consequence of the study.**

Q. Understood. So this same type of interrater reliability analysis is done for each of the two required essays and for the personal achievement score.

**A. Uh-huh.**

MS. KNEELAND: You have to say yes.

**A. Yes. I'm sorry, yes.**

Q. (By Mr. McCarthy) Thank you. And how was the study done for the personal achievement score?

**A. It's done the same way. The personal achievement score is done by readers holistically on the one-to-six scale and the question is consistency. In a study like**

Page 52

**that, the true score is irrelevant. Okay? In a study like that, what's important is consistency because consistency is fairness. And whether the score is a three or a five or a six, the question is not that. It's if somebody gave a score of a four, I mean, will everybody else give it a score of a four? And we found that 88 to 90 percent of the time it was within one point.**

Q. Okay. So was there -- so when the interrater reliability study was done for the personal achievement score, was there a true score assigned before?

**A. Uh-huh, yes.**

Q. Okay. So same process.

**A. Same process.**

Q. Okay. So for the interrater reliability study for the personal achievement score, there was first a true score set --

**A. Uh-huh.**

Q. -- and then --

**A. Yes.**

Q. -- readers would assign a value.

**A. Yes.**

Q. And, again, was it about the same interval, 88 percent and 90 percent --

**A. Yes.**

Q. -- within one point of the true score?

Page 53

**A. Yes.**

Q. Okay.

(Reporter interrupts)

MR. McCARTHY: I'll break it up into a multiple question, that will be easier.

THE WITNESS: Okay.

Q. (By Mr. McCarthy) So for the interrater reliability study of the personal achievement score, there was first a true score assigned. Correct?

**A. Yes.**

Q. And then readers would review that application.

**A. Yes.**

Q. And they would assign a score.

**A. Their own score, yes.**

Q. Okay. So they would assign their own score for that application.

**A. Yes.**

Q. And the interrater reliability study showed that 88 to 90 percent of the time those readers came within one point, plus or minus, of the true score.

**A. That's correct.**

Q. Okay, thank you. Now the PAI score, you said that -- I'm sorry, the personal achievement score, no component of the personal achievement score is given a numerical value?

Page 54

**A. That's correct.**

Q. Okay. How does a reader arrive at a score for the personal achievement score if no component has any numerical value?

**A. By looking at the -- the application as a whole.**

Q. Okay.

MR. McCARTHY: Can we take a short break?

THE REPORTER: Off the record, 9:47.

(Discussion off the record)

THE REPORTER: On the record, 9:47.

Q. (By Mr. McCarthy) Mr. Lavergne, we've spent a lot of time during this deposition talking about a lot of data and statistics. Correct?

**A. Yes.**

Q. And a lot of that seems to have come from the HB reports that -- the HB 588 reports that you've been in charge of. Is that correct?

**A. That's correct.**

Q. Okay. Do you -- do you recognize this (tendering document)?

**A. Yes.**

MS. KNEELAND: I'm sorry, for the record, this?

MR. McCARTHY: Sorry.

Q. (By Mr. McCarthy) Do you -- do you recognize this

Page 55

report titled Implementation and Results of the Texas Automatic Admissions Law?

**A. Yes, I recognize that.**

Q. Okay.

MS. KNEELAND: And is that marked as a deposition exhibit?

MR. McCARTHY: Is that marked as a deposition exhibit?

MS. KNEELAND: Tom, I'm asking you are you marking that as a deposition exhibit?

MR. McCARTHY: Yes.

MS. KNEELAND: Okay, that never got in. Sorry.

MR. McCARTHY: Sorry.

(Deposition Exhibit No. 1 marked for identification)

**A. Uh-huh, yes.**

Q. (By Mr. McCarthy) And that's marked as Deposition Exhibit A?

**A. Exhibit No. 1.**

Q. I'm sorry. That's marked as Deposition Exhibit No. 1?

**A. Yes.**

Q. Okay. And is this Report 10?

**A. This is Report No. 10, Part One, yes.**

Page 56

Q. Okay. Now is this where the statistics and data are coming from that you've given me during the course of this deposition?

**A. Yes.**

Q. Okay.

**A. I can't remember using another report.**

Q. Okay.

**A. The vast bulk of everything I've cited comes from this report, yes.**

Q. Okay. Mr. Lavergne, we're just about done here, but before we go I want to ask you are there any answers that you gave me that you have any reason that you'd like to change at this point?

**A. No.**

Q. Okay. So is there anything that I asked you about that you couldn't think of that you've later recalled something that is relevant to one of those questions?

**A. Not that I can think of, no.**

Q. Okay. Well before I let you go here, I just want to let you know that there is a chance that I may recall you later this afternoon or tomorrow. It's not likely, but I may, but with that being said I've got no further questions.

MS. KNEELAND: I have a couple of follow-up questions I'd like to ask.

Page 57

EXAMINATION

BY MS. KNEELAND:

Q. You were talking to Mr. McCarthy about the personal achievement index. Do you recall that?

**A. Uh-huh, yes.**

Q. Is there a formula associated with the personal achievement index?

**A. Yes.**

Q. Can you tell me what that formula is -- or would you tell me what it is, please.

**A. Sure. The personal achievement index takes the personal achievement score and the scores from the first essay and the second essay and they're placed in an equation that looks like this: You take the personal achievement score times four, plus the average of the two essay scores times three, and divide that by seven and that is your personal achievement index.**

Q. So earlier when you were talking to Mr. McCarthy about the weight in the personal achievement index, is that what you were referring to, that formula?

**A. I was referring to the slightly greater weight given to the personal achievement score as opposed to the mean of the essays. That's what I -- when -- that's what I understood the question involving weight to be.**

Q. I want to turn to the achievement index. Are you

Page 58

familiar with whether or not the achievement index system is used at other universities?
**A. It's -- I'm in a position to say that because of my past experience in the testing companies that that is a common practice in all universities, certainly four-year institutions, that I've ever had to deal with in my career uses an academic index-like equation to predict freshman-year GPA. This -- this is an industry practice that every university I know of uses in some way.**
Q. Do you know if the equations, as you put it, are the same for every university?
**A. Different university -- It depends on what a university has access to. Most universities do what we do. They have ready access to test scores and something coming from the high school transcript, whether it's a percentile ranking like we use or a GPA like you described, but generally what happens is universities plug in those test scores in some way or another and something from the high school transcript in one way or another and it's called a multiple regression analysis. And it's an equation where, you know, computers will plug in those values and come up with the predicted freshman-year GPA. Where we are a little different from a lot of universities is that we look at the coursework that students take in high school and if it exceeds our requirements, we'll just manually add on --**

Page 59

**(Reporter interrupts)**
**A. -- add on that tenth of a point.**
Q. (By Ms. Kneeland) And I am not a statistician, but it's my understanding that when do you a multiple regression analysis, you're comparing to something. Is that correct?
**A. I don't understand your question. I'm comparing to what?**
Q. When you're doing the multiple regression analysis, what goes in to determining the factors in the multiple regression analysis?
**A. Whether or not what you put in the equation contributes significantly to the accuracy of the equation.**
Q. And is that based on -- at least here on the University of Texas at Austin's own population?
**A. Yes.**
Q. But the AI, in general, the University in Texas is not unusual or different in using something like that.
**A. No, we're quite conventional.**
MS. KNEELAND: I just had those follow-ups, so nothing else.
MR. McCARTHY: Can I just have one or two more real quick?
THE WITNESS: Sure.
MR. McCARTHY: Okay.

Page 60

FURTHER EXAMINATION
BY MR. McCARTHY:
Q. You and Ms. Kneeland spoke about the components of the PAI equation.
**A. Uh-huh.**
Q. I just want to make sure I understand that the third essay does not have its own value in that equation.
**A. For purposes of freshman admissions, that is correct.**
Q. Okay. Is the third essay part of the personal achievement score?
**A. No.**
Q. Okay.
**A. Well, let me backtrack on that. I'm sorry, I need to correct that answer. The personal achievement score comes from a complete review of everything the student presents to us. If a student sent in a third essay, that essay is read and it could be used for purposes of gaining information, but not purposes of determining a person's writing abilities as is the objective of the Essay 1 and Essay 2. So it could be used. If the person in the third essay volunteered information that is impressive in some way -- maybe in the third essay, grew up in Zaire or something like that and came -- and had a lot of experiences and stuff like that -- yeah, it could be used as part of**

Page 61

**the -- of the personal achievement score --**
Q. Okay.
**A. -- because it has information in it.**
Q. Sure. So -- so the optional third essay, when an applicant completes it, that optional third essay may have some effect on that applicant's personal achievement score.
**A. Yes.**
Q. Okay.
MR. McCARTHY: All right, that's all.
MS. KNEELAND: We'll pass for now, too.
THE REPORTER: Off the record, 9:56.
(Deposition concluded)

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

I, GARY LAVERGNE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_______________________

GARY LAVERGNE

THE STATE OF ____________)
COUNTY OF ______________)

Before me, ___________________, on this day personally appeared GARY LAVERGNE, known to me or proved to me on the oath of ______________ or through ______________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this ______ day of __________________, 2008.

_______________________

NOTARY PUBLIC IN AND FOR
THE STATE OF ______________

My Commission Expires: __________

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and )
RACHEL MULTER MICHALEWICZ )
)
Plaintiffs, )
)
v. ) Civil Action No.
) 1:08-cv-00263-SS
)
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al, )
)
Defendants. )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF GARY LAVERGNE
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, GARY LAVERGNE, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

attorney or counsel employed by the parties hereto or financially interested in the action.

I further certify that the deposition transcript was submitted on _________________ to the witness or to the attorney for the witness for examination, signature and return to me by _______________;

The original deposition was/was not returned to the deposition officer on _______________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Thomas R. McCarthy, Custodial Attorney;

That $_______ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

WITNESS MY HAND AND SEAL OF OFFICE, this ______ day of _______________, 2008.

TRACIE L. CHEW, CSR #6503
Expiration: 12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and )
RACHEL MULTER MICHALEWICZ )
)
Plaintiffs, )
)
v. ) Civil Action No.
) 1:08-cv-00263-SS
)
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al, )
)
Defendants. )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF GARY LAVERGNE
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, GARY LAVERGNE, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

attorney or counsel employed by the parties hereto or financially interested in the action.

I further certify that the deposition transcript was submitted on October 16th, 2008 to the witness or to the attorney for the witness for examination, signature and return to me by November 17th, 2008.

The original deposition was/was not returned to the deposition officer on ____________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Thomas R. McCarthy, Custodial Attorney;

That $________ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

WITNESS MY HAND AND SEAL OF OFFICE, this 14th day of October, 2008.

RealLegal, Notary for E-Transcript

TRACIE L. CHEW, CSR #6503
Expiration: 12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782