# EXHIBIT

# 7

Page 1

(1)       IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
(2)                 AUSTIN DIVISION

(3) ABIGAIL NOEL FISHER; and            )
    RACHEL MULTER MICHALEWICZ           )
(4)                                     )
         Plaintiffs,                    )
(5)                                     )
    v.                                  )   Civil Action No.
(6)                                     )   1:08-cv-00263-SS
                                        )
(7) STATE OF TEXAS; UNIVERSITY   OF     )
    TEXAS AT AUSTIN; et al,             )
(8)                                     )
         Defendants.                    )
(9)

(10)

(11) _____

(12)              ORAL DEPOSITION OF
                    MICHAEL ORR
(13)              October 6, 2008

(14) _____

(15)

(16)     ORAL DEPOSITION of MICHAEL ORR, produced as a witness

(17) at the instance of the Plaintiffs and duly sworn, was taken

(18) in the above-styled and numbered cause on October 6, 2008,

(19) from 1:03 p.m. to 1:59 p.m., before Tracie L. Chew,

(20) Certified Shorthand Reporter in and for the State of Texas,

(21) reported by machine shorthand at the offices of University

(22) of Texas at Austin, Main Building, Suite 210, Austin, Texas,

(23) pursuant to the Federal Rules of Civil Procedure and the

(24) provisions stated on the record or attached hereto.

(25)

Page 2

(1)         APPEARANCES
(2) FOR THE PLAINTIFFS:
(3)    Mr. Thomas R. McCarthy
       WILEY REIN, L.L.P.
(4)    1776 K Street, N.W.
       Washington, DC 20006
(5)    202/719-7000
(6)
(7) FOR THE DEFENDANTS:
(8)    Ms. Mishell B. Kneeland
       OFFICE OF THE ATTORNEY GENERAL
(9)    Assistant Attorney General
       300 West Fifteenth Street
(10)   Austin, Texas 78701
       512/463-2004
(11)
(12)
       ALSO PRESENT:
(13)
       Mr. Leo Barnes
(14)   Ms. Patricia C. "Patti" Ohlendorf
       Mr. Joseph D. Hughes
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 3

(1)              INDEX
(2)                                    PAGE
(3) Appearances.............................. 2
(4) MICHAEL ORR
(5)    Examination by Mr. McCarthy.......... 4
(6) Changes and Signature.................... 35
(7) Reporter's Certification................. 37
(8)
(9)            EXHIBITS
(10) NO. DESCRIPTION                     PAGE
(11)
(12)     (NO EXHIBITS WERE MARKED)
(13)
(14)
(15)
(16)
(17)           * * * * *
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 4

(1)           THE REPORTER: On the record, 1:03.
(2)           MICHAEL ORR,
(3) having been first duly sworn, testified as follows:
(4)           EXAMINATION
(5) BY MR. McCARTHY:
(6)    Q. How you doing today, Mr. Orr?
(7)    A. Good, Tom, how are you?
(8)    Q. Good. As I mentioned, my name is Tom McCarthy,
(9) I'm the attorney for the plaintiffs. And are you appearing
(10) here today in response to this notice of deposition?
(11)   A. I am.
(12)          MS. KNEELAND: And just for the record,
(13) Mr. Orr is designated by the University of Texas at Austin
(14) on Topics 8, 9, and 10. Eight is methods and initiatives
(15) aimed at increasing undergraduate minority enrollment at the
(16) University of Texas at Austin; 9 is the performance and
(17) evaluation, open paren, including relevant statistics, close
(18) paren, of methods and initiatives aimed at increasing
(19) undergraduate minority enrollment at the University of Texas
(20) at Austin; and 10 is the consideration of alternate methods
(21) and initiatives for increasing undergraduate minority
(22) enrollment at the University of Texas at Austin.
(23)          MR. McCARTHY: Thank you, Ms. Kneeland.
(24)          MS. KNEELAND: And Counsel has just reminded
(25) me this is from the prospective of the admissions office

Page 5

(1) only. If you would like to know other outreach that may be
(2) being done by other groups, we would need to get a different
(3) witness for that.
(4)          MR. McCARTHY: Okay. Would Bruce be
(5) available to do that?
(6)          MS. KNEELAND: No. For example, if minority
(7) fraternity organizations were doing outreach, that wouldn't
(8) be something within Mr. Orr's realm of knowledge.
(9)          MR. McCARTHY: Okay.
(10)   Q. (By Mr. McCarthy) Mr. Orr, have you ever been
(11) deposed before?
(12)   A. No, I have not.
(13)   Q. No, okay. Well, I'll tell you a little about how
(14) it will work here. Basically, I'm going to ask you a series
(15) of questions about your role and responsibilities at the
(16) University that relate to this lawsuit. You can just answer
(17) the questions to the best of your ability. I know that you
(18) were designated as a witness for the University only as to
(19) certain subjects and I'll try to stay within those subjects.
(20)   A. Okay.
(21)   Q. If I go outside of those and there's something
(22) that's outside of your jurisdiction or bailiwick so to
(23) speak, then please just say that you're not prepared to
(24) answer that and if you don't know something, go ahead and
(25) say you don't know. If I ask a question that's unclear,

### Page 6

(1) feel free to ask me to restate it clearly. If you feel like
(2) you need to talk to Ms. Kneeland, you're welcome to talk to
(3) her, but I ask that you answer my question first and you can
(4) then talk to her. If you need to take a break, go to the
(5) men's room, or get a drink of water, we can certainly take
(6) breaks while we're in here. Okay?
(7)    A. Sure.
(8)    Q. Does all that make sense?
(9)    A. You bet.
(10)    Q. Okay. I'm going to give you a couple of sort of
(11) standard logistical questions before we actually get started
(12) into what you do and what your role is at the University, so
(13) I'll do that right now.
(14)       Have you taken any medications or ingested
(15) anything that might affect in any way your ability to
(16) testify here on behalf of the University?
(17)    A. No.
(18)    Q. Okay. Have you met with anyone in preparation for
(19) this deposition?
(20)    A. Only the two counsel present --
(21)    Q. Okay.
(22)    A. -- discussion of how a deposition runs.
(23)    Q. Gotcha. Did you review any documents to prepare
(24) for this deposition?
(25)    A. I did.

### Page 7

(1)    Q. Okay. Can you tell me, like, which documents
(2) you -- or what documents you looked at and reviewed?
(3)    A. I mean, I went back -- part of the questions that
(4) you're asking are about evaluation of programming and I went
(5) back and looked at a variety of outlines for retreats that
(6) we had done and discussions that we had had about
(7) programming in general just to kind of refresh my memory
(8) about historically what had been talked about.
(9)    Q. Okay.
(10)       MR. McCARTHY: Have those been produced to
(11) us?
(12)       MS. KNEELAND: I don't believe they were
(13) called for by any of your production requests.
(14)       MR. McCARTHY: And they may not have been.
(15)       MS. KNEELAND: So I don't think they've been
(16) produced to you --
(17)       MR. McCARTHY: Gotcha.
(18)       MS. KNEELAND: -- because I don't think that
(19) they were called for.
(20)       MR. McCARTHY: Okay.
(21)    Q. (By Mr. McCarthy) Do you have them with you?
(22)    A. I don't.
(23)    Q. You don't?
(24)       MR. McCARTHY: Okay, can we take a break real
(25) quick?

### Page 8

(1)       THE REPORTER: Off the record, 1:08.
(2)       (Discussion off the record)
(3)       THE REPORTER: On the record, 1:09.
(4)    Q. (By Mr. McCarthy) Mr. Orr, what is your job title
(5) at the University?
(6)    A. My job title is associate director for college and
(7) school relations at the Office of Admissions.
(8)    Q. Okay. And what do you do in that role?
(9)    A. In that role I -- I supervise a group of
(10) admissions counselors that are based here in Austin, as well
(11) as supervise the satellite admissions centers in Dallas,
(12) Houston, San Antonio, in the Valley; I -- I'm also a liaison
(13) to the College of Communications, the College of Education
(14) from a management standpoint and a member of the senior
(15) staff at the Office of Admissions.
(16)    Q. Okay. How long have you been working in the
(17) admissions office at the University?
(18)    A. Since about 1991.
(19)    Q. Okay. And what is your educational background and
(20) training?
(21)    A. I'm a graduate of the University of Texas,
(22) bachelor's degree.
(23)    Q. Okay. Outside of your experience here at the
(24) University, do you have any other expertise or training that
(25) bears on the roles that you play here?

### Page 9

(1)    A. No.
(2)    Q. Okay. Are you able to testify fully today as a
(3) representative of the University of Texas?
(4)    A. Yes.
(5)    Q. Okay. I understand that you -- your duties sort
(6) of cover a lot of things that relate to minority outreach.
(7) Could you tell me a little bit about the University's
(8) minority outreach efforts?
(9)       MS. KNEELAND: Object to the form.
(10)       You can answer.
(11)    A. Well the Office of Admissions' activities --
(12) recruitment activities for all students, all high schools
(13) out of the admissions office come out of the Freshman
(14) Admission Center. There are a variety of different staff
(15) members that support those. Mine tend to be off campus. So
(16) if there's an activity, event, counseling, outreach, then it
(17) falls within my purview. There are also on-campus events
(18) that we do which is supervised by another individual. We
(19) have a alumni affairs group that works with alumni and
(20) student workers. So, you know, my involvement tends to be
(21) with the outreach. Things are off campus, although there
(22) are plenty of opportunities where individuals on campus will
(23) request services out of our offices.
(24)    Q. (By Mr. McCarthy) Okay. Could you tell me a
(25) little bit about some of the different initiatives that the

### Page 10

(1) University has undertaken in order to promote minority
(2) enrollment?
(3)     MS. KNEELAND: Object to the form.
(4)     You can go ahead and answer.
(5) A. All of our outreach -- Well, I mean, it consists
(6) of a variety of different things. It consists of visitation
(7) to high schools. We visit hundreds of high schools around
(8) the state every year, many of those visitations are multiple
(9) times during the year. We also will promote and attend
(10) college night programs around the state. We -- we will
(11) facilitate trips to campus, visitation, whether it be
(12) individuals that are just scheduling an opportunity to come
(13) down, we'll put them in groups and we work with that. We
(14) also, like I said earlier, facilitate visitations, trips,
(15) whether it be high schools bringing a group of students to
(16) campus and the activities that they're going to be involved
(17) in when they get down here or ones where we are -- we're
(18) more proactively inviting students to come down and visit.
(19) We correspond with students throughout the year and then we
(20) also in, I think, a large way what we do is we are customer
(21) service agents of the University for the broad population of
(22) individuals in the state.
(23) Q. (By Mr. McCarthy) Okay. Now, do you -- is one of
(24) the initiatives within your jurisdiction so to speak this
(25) minority -- I mean, I'm sorry, the Longhorn Opportunity

### Page 11

(1) Scholars (sic) program?
(2) A. Well that's something -- the initiative that's
(3) administered by the financial aid office, student -- Office
(4) of Student Financial Services. We definitely are involved
(5) in promoting that scholarship through correspondence and
(6) we're definitely out promoting the scholarship opportunity,
(7) sure.
(8) Q. And how does that program work?
(9) A. Basically the -- the University identified 70 high
(10) schools throughout the state where there was a number of
(11) allocated scholarships set aside for a student from that
(12) high school and so, you know, the student will apply for
(13) scholarships and we will award a certain number of
(14) scholarships from someone from that high school is the basis
(15) of it.
(16) Q. Okay. And what -- How do students qualify for
(17) those scholarships?
(18) A. They would need to graduate from that high school
(19) and be admitted to the University.
(20) Q. Okay. How were those particular high schools
(21) designated to be a part of the program?
(22) A. Those high schools were looked at in a variety
(23) of -- and this was a -- This came directly after the Hopwood
(24) Decision in a reaction to that and we looked at a variety of
(25) different things. We looked at socioeconomic status --

### Page 12

(1) average socioeconomic status of the student within those
(2) high schools, we looked at the population of
(3) first-generation students at that high school, we looked at
(4) the percentage of students who sent test scores to us from
(5) those high schools, and obviously started with the full
(6) breadth of high schools and worked our way down to 70 high
(7) schools that would be the cohort that those scholarships
(8) were represented under. And although I think the numbers
(9) may actually be 69 now because one school folded into
(10) another school, it's basically the same schools that it was.
(11) Q. Okay. And you said this started shortly after the
(12) Hopwood Decision?
(13) A. In -- after '96, I believe, is when -- and I may
(14) have that wrong when the exact scholarship started, but --
(15) Q. But around '96, '97, is that what you think?
(16) A. That's correct.
(17) Q. What are some of the other formal initiatives that
(18) the University has taken?
(19) A. In terms of recruitment?
(20) Q. Uh-huh.
(21) A. Recruitment is a combination of visibility in the
(22) market. One of the biggest initiatives that we took in that
(23) same time frame was the process of beginning to open
(24) outreach centers around the state. And so in -- you know,
(25) the first office to open was the Houston admission center

### Page 13

(1) and shortly following that we opened the Dallas center, we
(2) opened the San Antonio office, and literally this year we've
(3) opened up a Valley admission center. And so the idea is
(4) that it would provide services for students regionally so
(5) that they don't have to come to Austin to be able to do so
(6) and to use it as a platform to have broader access for
(7) students in their local area in their high schools.
(8)     But, you know, recruitment is not a complex
(9) thing. It's a combination of correspondence, visibility,
(10) and engagement with students, visitations of those students,
(11) and then backed by a strong customer service. And then
(12) there's also obviously scholarship components to
(13) recruitment, there are also elements of retention and
(14) programming on campus and students being tied to that. And
(15) so, you know, those are all, I think, aspects of recruitment
(16) that we're involved in.
(17) Q. Let's talk about these outreach centers.
(18) A. Uh-huh.
(19) Q. What kind of services do they provide to the
(20) students in those area?
(21) A. They provide information sessions on admissibility
(22) within the centers, we will hold receptions at those
(23) facilities from time to time. They are a -- basically a
(24) home base for counseling staff. And so one of the
(25) motivations for doing that was that when we were running all


Page 14

(1) of those services out of Austin, we were limited, number
(2) one, in terms of just staff availability. I mean, in this
(3) process we expanded the staff as well. So we were always
(4) limited by the number of staff and so it puts additional
(5) staff in a market to be committed 100 percent to those
(6) areas. The biggest part -- I think the biggest time
(7) consumer in terms of involvement that they play tends to be
(8) attending college night programs and also visiting high
(9) schools.
(10)   Q.  And can you describe what the college night
(11) programs are like?
(12)   A.  College night programs are a variety of different
(13) kind of college programs. There's an organization called
(14) TACRA (phonetic) which is admissions registrar organization
(15) that will put on college fairs for an entire week in a
(16) market, okay, and they will organize and work with the
(17) schools where, you know, there can be nine, twelve programs
(18) a day where they're taking place during the morning, the
(19) afternoon, maybe lunchtime, and they'll also hold evening
(20) programs. They can be a fair where a collection of tables
(21) that individuals are coming and exchanging ideas with you.
(22) When possible we tend to do presentations and that comes
(23) from just the level of attention that we draw and an ability
(24) to get out a single message to a lot of people.
(25)   Q.  When did the University first start opening these

Page 15

(1) outreach centers in other cities?
(2)   A.  The first one -- well, hold on, I'll tell you when
(3) we opened the first one because I have that written down --
(4) 1997 is when we opened -- hold on a second -- sorry, 2000,
(5) is when the Dallas center was opened, 2005 we opened the
(6) San Antonio.
(7)   Q.  How about the Houston center?
(8)   A.  It was opened in 2000, I think, I believe as
(9) well -- well '96 -- Houston was the first one that was
(10) opened, so I want to say that we opened that one '96, '97 --
(11)   Q.  Okay.
(12)   A.  -- 2000 we opened the Dallas center, 2005 we
(13) opened the San Antonio admission center, and then this year
(14) we opened the one in the Valley so that's '07 actually.
(15)   Q.  Okay. Can you tell me a little bit about the
(16) Presidential Achievement Scholarship program?
(17)   A.  Presidential Achievement Scholarship is -- it's a
(18) need-base scholarship, it's targeting -- it's not limited to
(19) LOS high schools and is a product of the financial aid
(20) office in terms of their packaging awards. Specific dollar
(21) amounts -- Do you have a specific question about it?
(22)   Q.  How do students qualify for those other than need?
(23)   A.  That's how they qualify, through need.
(24)   Q.  Okay. Could you tell me also about the Keep
(25) Texans in Texas Scholarship program?

Page 16

(1)   A.  That was a scholarship initiative that was created
(2) by Larry Burk in the financial aid office. The idea being
(3) was that there were -- there was concern that we were losing
(4) students to out of state and this gave the financial aid
(5) office the opportunity to be able to have a scholarship pool
(6) to be able to try to offset awards that students were
(7) getting from out-of-state offers to make the -- the -- you
(8) know, financially to make it more equitable and so that
(9) these students would be enticed to possibly stay in the
(10) State of Texas.
(11)   Q.  Okay. And what are the qualifications for that?
(12)   A.  Qualifications for that, the student had -- It's
(13) been some years since that was going, so it's been a while
(14) since I've looked at that. My memory on that was that a
(15) student had to have been offered a scholarship by an
(16) out-of-state student (sic) and then it was taken into
(17) consideration by the financial aid office. And so
(18) qualification was that the student had to have an admissions
(19) offer and an offer of scholarship from an out-of-state
(20) school and then financial aid would evaluate that student
(21) situation to see if they were eligible for the scholarship.
(22)   Q.  And about how long has that program been running?
(23)   A.  How long has it been running?
(24)   Q.  Yes, how long has it been running?
(25)   A.  This is -- I don't -- To be quite honest with you,

Page 17

(1) I don't know that that scholarship is still being used.
(2)   Q.  Okay.
(3)   A.  I mean, you need to check with somebody in
(4) financial aid, but this was maybe '98, maybe 2000 when that
(5) scholarship was proposed.
(6)   Q.  Okay. When was the -- When did the Presidential
(7) Achievement Scholarship begin?
(8)   A.  I don't know the exact starting date. Around that
(9) time. I mean, all these initiatives came up -- LOS, PAS
(10) were all post-Hopwood, so it started in '97, around then.
(11)   Q.  Would you say, like, late '90s is when many of
(12) these started?
(13)   A.  That's a good way to answer that question, yeah,
(14) late '90s.
(15)   Q.  What are -- what are the qualifications for the
(16) First Generation Scholarship?
(17)   A.  A student has to be first generation and need, I
(18) think -- I believe they have to be PELL eligible.
(19)   Q.  And did this -- did the First Generation
(20) Scholarship also begin in the late '90s?
(21)   A.  Yes.
(22)   Q.  Are all of these -- Well, let me back that up.
(23)         Is the Longhorn Opportunity Scholarship
(24) designed to help increase minority enrollment?
(25)   A.  I think it's one of the goals.

Affiliated Reporters & Video   800-969-2752
805 West 10th Street, Suite 400, Austin, Texas  78701

Page 18

(1) Q. Would you say that increasing minority enrollment
(2) is one of the goals of the Presidential Achievement
(3) Scholarship?
(4) A. I believe that those scholarships are directed
(5) towards students in need. So I think the main goal is to
(6) try to facilitate the students who have low income. I think
(7) in a residual way that these things promote a certain level
(8) of diversity on our campus and also have a residual effect
(9) of promoting minority enrollment.
(10) Q. Okay. Would you say the same about the First
(11) Generation Scholarship program?
(12) A. Sure.
(13) Q. So the First Generation Scholarship program is
(14) generally need-based, but does help promote minority
(15) enrollment?
(16)     MS. KNEELAND: Object to the form.
(17)     You can answer.
(18) A. Well the Keep Texans in Texas initiative, as a
(19) specific initiative I think its goal was to try to limit the
(20) brain drain out of the state and the idea that we were
(21) losing qualified students to out of state. And so I don't
(22) know that I would make that statement about Keep Texas in
(23) Texans (sic).
(24) Q. (By Mr. McCarthy) Okay. But the -- What about the
(25) First Generation Scholarship program?

Page 19

(1) A. I would say yes.
(2) Q. Yes, it does increase minority enrollment?
(3) A. Well I think that, yes, that it -- I'm sorry,
(4) you're asking PAS you said?
(5) Q. I'm asking you about the First Generation
(6) Scholarship.
(7) A. First Generation Scholarship. I think it has the
(8) same residual effect, yes.
(9) Q. Okay. Does the University keep statistics about
(10) the performance of students in these scholarship programs?
(11) A. I'm sure they do.
(12) Q. Okay. Does the University evaluate the
(13) performance of the scholarship programs themselves?
(14) A. In what way?
(15) Q. Well, you stated -- let's say with regard to the
(16) Longhorn Opportunity Scholarship --
(17) A. Right.
(18) Q. -- I think you said that its primary goal is
(19) need-based?
(20) A. That's true.
(21) Q. Okay. And then it has a sort of residual effect
(22) of increasing minority enrollment?
(23) A. Well, I mean, I think that -- here's the thing
(24) with all of these issues and that is that minorities are
(25) just -- well, there's a disproportionate representation in

Page 20

(1) terms of low income equating to minority populations in the
(2) State of Texas and the same is true for first generation.
(3) So in that sense then, yes, I think there's a residual
(4) benefit from promoting these initiatives which increases the
(5) minority enrollment at the University -- or at least works
(6) towards that end.
(7) Q. Does the University keep track of what extent
(8) these scholarship programs increase minority enrollment?
(9) A. That -- I don't believe so --
(10) Q. Okay.
(11) A. -- because they're not -- and the main reason for
(12) that is that they're not minority scholarships.
(13) Q. Does the University have any scholarship programs
(14) that are directly targeted at minorities?
(15) A. We do not.
(16) Q. What other initiatives or methods does the
(17) University undertake that have, as part of their goal, the
(18) increase in minority enrollment?
(19) A. Well, I mean, I think that -- you know, and I
(20) don't want to speak too broadly, but I think that all of the
(21) outreach activities on campus events, invitational programs,
(22) services are created in a way that is not only going to try
(23) to help all students -- I mean, the argument is I think that
(24) if you improve the quality of service for all students, that
(25) that's going to float everybody's boat and that minority

Page 21

(1) students are no different than other students in that way,
(2) that if you can provide a higher quality of service, if you
(3) can have them represented within the applicant pool, that
(4) the effect is going to be you will increase the level of
(5) diversity in your freshman class.
(6) Q. Has the University ever considered -- Let me start
(7) that again.
(8)     Has the University ever considered and
(9) rejected a proposal for increasing minority enrollment?
(10) A. Sure.
(11) Q. Could you give me an example?
(12) A. The National Hispanic Scholarship Fund approached
(13) the University and wanted to create a working relationship
(14) where the University would pony up some money for
(15) scholarships, they would pony up money for scholarships to
(16) specifically try to increase the Hispanic population on
(17) campus and that was a proposal that we walked away from,
(18) namely because it was race-specific and exclusitory and
(19) excluded, you know, students based on race.
(20) Q. Are you aware of any other similar -- Well, I
(21) shouldn't say similar. Are you aware of any other proposals
(22) to increase minority enrollment that the University
(23) rejected?
(24) A. Well, I mean, I think that there's a tremendous
(25) amount of discussion that we have internally within the

6 (Pages 18 to 21)

Page 22

(1) recruitment office and staff and oftentimes a variety of
(2) ideas have come up and I'd say that the ones that tend to be
(3) rejected are the ones that are race-exclusive. And so
(4) whether that -- you know, to give you a specific example of
(5) what that proposal was, I'd have to think a little bit about
(6) and go back over time and look at each one of those, but the
(7) reoccurring thing tends to be if it's race-specific, you
(8) know, or exclusitory, it's going to exclude some population,
(9) it's something that generally gets rejected. So --
(10) Q. Okay. Other than the formal programs and
(11) initiatives and scholarship we've discussed, are there other
(12) formal means by which the University increases minority
(13) enrollment?
(14)     MS. KNEELAND: Objection; form.
(15)     You can answer.
(16) A. Other ways -- Can you restate the question?
(17) Q. (By Mr. McCarthy) Sure. Other than the
(18) initiatives we discussed --
(19) A. Right.
(20) Q. -- are there additional initiatives that the -- in
(21) which the University engages that it increase minority
(22) enrollment?
(23)     MS. KNEELAND: Same objection.
(24) A. I believe that -- you know, my belief is the best
(25) recruitment strategy you could ever have is send back happy

Page 23

(1) applicants and happy students, satisfied, and students who
(2) have graduated and enjoyed their experience. So in many
(3) ways I think that the University is involved in so many
(4) different activities to try to increase the quality of the
(5) undergraduate experience for all students that you could
(6) argue that all of those activities are bound up in the idea
(7) of trying to increase the enrollment at the University in
(8) terms of all diversity that exists.
(9)     There are other programming. We have an
(10) Honors Colloquium that we have every year where we invite
(11) many, many students. We have a cohort of maybe 5 to 600
(12) students that will come to UT over the summer for a
(13) three-day period. I don't know if that's been discussed in
(14) this process, but another example of an activity that we're
(15) involved in.
(16) Q. (By Mr. McCarthy) What's the name of that
(17) activity?
(18) A. The Honors Colloquium.
(19) Q. The Honors Colloquium?
(20) A. Uh-huh.
(21) Q. Okay.
(22) A. The University is also involved in -- has outreach
(23) centers around the state that is working with younger-age
(24) students, eighth graders, to try to increase the pipeline
(25) of -- of these students in terms of test-taking and being

Page 24

(1) successful in high school that I think its goal is to
(2) increase the level of diversity on our campus. You know, I
(3) don't know that I've spelled out every single activity that
(4) we get involved in, but if you boil it down, all of these,
(5) under whatever name you're going to find them, at least out
(6) of the Office of Admissions, they tend to be an outreach
(7) program where we're visiting students in the field or
(8) bringing students to campus or we're corresponding with a
(9) student in some level of regularity or we're counseling the
(10) student or their parents.
(11)     So, you know, the majority of the
(12) University's activities, at least out of the admissions
(13) office, are bound up in that type of programming which has
(14) been under, you know, various names over the years. Some of
(15) these programs have gone through multiple name changes over
(16) time, but they basically come down to being the same kind of
(17) program.
(18)     MR. McCARTHY: Can we take a break?
(19)     THE REPORTER: Off the record, 1:36.
(20)     (Recess)
(21)     THE REPORTER: On the record, 1:44.
(22) Q. (By Mr. McCarthy) Mr. Orr, does the University
(23) monitor the efforts of other universities to increase
(24) minority enrollment?
(25) A. Do you mean the activities that are involved in or

Page 25

(1) the results?
(2) Q. Both, let's say activities first.
(3) A. Okay. Not -- Well, there are professional
(4) periodicals that are distributed that talk about the issues
(5) of recruitment in literature so in that sense we are very
(6) knowledgeable about what's being done nationally, things
(7) that people are doing. We tend to be closer to our
(8) competition in the state. So there are satellite admissions
(9) offices for the Texas A & M University in Houston and we are
(10) there as well, so antidotally we tend to be more familiar
(11) with what's going on at the ground locally, you know, and
(12) amongst our competition than we are maybe with what UCLA is
(13) doing because they're not necessarily a direct competition
(14) for us. In terms of the results of their activities, I have
(15) no way of knowing, you know, how they evaluate it or how
(16) they -- what the results of a particular activity were. To
(17) be sure, our competition has been dramatically increasing
(18) the number of their staff working in these areas and we
(19) have -- we have tried to increase our staff not necessarily
(20) directly because of that, but the marketplace is becoming
(21) more competitive and is requiring more bodies to be able to
(22) get the work done to cover the number of schools we want to
(23) cover. So in that sense we do.
(24)     The University of Texas will -- will document
(25) our enrollment after the twelfth class day and I believe

Affiliated Reporters & Video   800-969-2752
805 West 10th Street, Suite 400, Austin, Texas   78701

Page 26

(1) some of that is required to do so through the State and our
(2) competition will as well. So on a -- on the macro basis
(3) we're able to see what is the enrollment at this university,
(4) what is the enrollment at this university, but that may be
(5) the beginning and the end of it.
(6)    Q. Okay. Can you tell me about minority outreach
(7) efforts by offices other than the Office of Admissions?
(8)    A. Well I told you before about the outreach centers
(9) that we have that are working with younger students. We
(10) have a -- we have an alumni group that I told you about in
(11) the Office of Admissions. That's an admissions activity,
(12) but they will garner volunteers to do phone calls to
(13) applicants or admitted students. I know that the
(14) engineering -- College of Engineering does numerous
(15) recruitment events around the state, usually held at a
(16) business where they -- we will work with them about
(17) identifying students, the invitations that will go out, they
(18) will use the software package that we bought to be able to
(19) facilitate that process and we'll have multiple events
(20) around the state. The College of Business will hold
(21) multiple recruitment events, you know, usually in a bank or
(22) some other kind of third party throughout the state that we
(23) will support in the same way and oftentimes will attend.
(24) I'm trying to think of other good examples for you.
(25)        Most of the recruitment outreach tends to

Page 27

(1) come from either the admissions office -- we have three --
(2) Let me give you another example. We have three financial
(3) aid outreach counselors and they will do visits to high
(4) schools. They'll also meet with students at the end of the
(5) year to discuss the financial aid package with them. So
(6) that's another example of another entity.
(7)    Q. When they meet to discuss the financial aid
(8) package, is that prior to the time of application?
(9)    A. No, no, no, that's after the student's admitted.
(10)    Q. Okay.
(11)    A. So it's more of a yield event, I'd say. I mean,
(12) the idea being is that a lot of these low-income students
(13) are loan averse. The University is more expensive than
(14) their local entity that they could go to, so it's a
(15) discussion about the reasons why this is worth it, I think.
(16) You know, why do you want to spend more money to come here
(17) than to spend less money and stay at home and go there? And
(18) so it's a process of discussing that package and discussing
(19) the benefits, I think, of loans in many ways and trying to
(20) overcome loan aversion students.
(21)    Q. So is it fair to say that the University seeks to
(22) promote increased enrollment -- Sorry, let me start that
(23) again.
(24)        Is it accurate to say that the University
(25) seeks to increase minority enrollment through outreach at

Page 28

(1) the recruitment stage and efforts at the yield stage?
(2)    A. Yes.
(3)    Q. Okay. Does the University also engage in outreach
(4) designed to help minority applicants perform better in terms
(5) of acceptance rates?
(6)    A. No.
(7)        MS. KNEELAND: Object to the form.
(8)    A. No.
(9)    Q. (By Mr. McCarthy) No?
(10)    A. Other than the fact that -- Let me tell you where
(11) we would and where we wouldn't.
(12)    Q. Okay.
(13)    A. For example -- And you use the word "minority."
(14) You know, we recruit based on high school. Okay? And so we
(15) may be working in a high school having an activity, having
(16) an event and it is -- it is not minority -- it doesn't
(17) exclude other students. So generally speaking, it's a mixed
(18) audience you're working with. Okay? A lot of these
(19) students, particularly at certain high schools, are low
(20) income, first generation so they don't have parents,
(21) brothers, sisters, aunts, and uncles who have gone to
(22) college and gotten a degree. Low socioeconomics, these
(23) students are many times poor and below the poverty level and
(24) so our efforts is to try to reduce the barriers for someone
(25) understanding how to apply to a college. So there's steps

Page 29

(1) that you have to go through. Housing applications,
(2) financial aid applications, scholarship applications,
(3) admissions applications, you know, there's a long list of
(4) different things that are going to be barriers for someone
(5) who is naive to what they're going to be coming to. So I'd
(6) say the majority of our -- much of our effort is to try to
(7) overcome those hurdles. Okay?
(8)        Where we draw the line is we will not go and
(9) give a presentation on how to write essays, for example.
(10) And part of that is because we're not offering that to
(11) someone else and so why are we going to offer it to this
(12) population, number one; and the second one is, is that we're
(13) not English teachers, you know. The best person to teach
(14) this person how to write essays is in their high school and
(15) being paid to teach them to write.
(16)        So, you know, are we out there -- And I can't
(17) even remember what your initial question was. Do we do
(18) things to try to help students in the application process I
(19) believe is what you said and the answer to that would be
(20) absolutely we do; but are we trying to coax students in
(21) terms of preevaluating their application or their essay, the
(22) answer is no.
(23)    Q. Okay.
(24)    A. Does that --
(25)    Q. That does -- that does answer my question.

Page 30

(1) What does the University do to try to help
(2) students at the application stage?
(3) A. What does the University do to help students at
(4) the application stage?
(5) Q. Yeah. If I -- if I recall your testimony just a
(6) minute ago, you said that absolutely the University does try
(7) to do things to help applicants perform better at the
(8) application stage, but you said there's no coaching I think
(9) is the way you sort of --
(10) A. Right. So what are we doing to try to help
(11) students to encourage them to apply, is that what your point
(12) is? So maybe I --
(13) Q. Maybe my question's not clear enough, let me try
(14) it again. And I'll try to talk a little more clearly about
(15) what it is I'm getting at.
(16) A. Okay.
(17) Q. It seems to me there's -- there's things that the
(18) University does to help increase the applicant pool.
(19) Correct?
(20) A. Correct.
(21) Q. And there's things that the University does to
(22) help increase the yield of those students who have been
(23) accepted.
(24) A. Correct.
(25) Q. Okay. Does the University undertake efforts to

Page 31

(1) help the students perform better at the application stage;
(2) in other words, to increase the admit rates for students?
(3) MS. KNEELAND: Objection; form, but you can
(4) answer.
(5) A. Well like I said earlier, if understanding the
(6) process and what we value in the admissions process is
(7) helping that student prepare their application better, then
(8) the answer is yes.
(9) Q. (By Mr. McCarthy) Okay.
(10) A. If it is a process of coaching the student or
(11) preevaluating the application, the answer would be no. Does
(12) that make sense to you?
(13) Q. That does. And so what -- so what might the
(14) University do to educate applicants about the process?
(15) A. Okay, I think there's a variety of things. They
(16) need to, number one, understand what is required for
(17) submission, when that needs to be submitted; they need to
(18) understand that the way and processes which a student would
(19) receive aid because finances is always going to be a part of
(20) this process; they're going to need to understand that
(21) they're going to have to resolve the issues of housing and
(22) dormitory space and -- and really that's it. I mean,
(23) there's a process a student has to go through in order to be
(24) in the applicant pool and so our activities tend to be
(25) around reminding them of those dates.

Page 32

(1) And it really starts off with a broad-base
(2) explanation of this is what you're getting into, all right,
(3) and these are the things that we require, these are
(4) deadlines you're going to need to meet. And then as we go
(5) through the year, it's about meeting that student before the
(6) scholarship deadline and saying, okay, I'm here to remind
(7) you again you got the scholarship application, you have not
(8) submitted it, we need to get this in here so that you'll be
(9) eligible to compete for scholarships. And so the -- and
(10) even up until the point before the deadline we're working
(11) with high schools, giving them a list of all the students
(12) who applied and what's been turned in and submitted and what
(13) may still be missing from a student's application. And
(14) that's with all of the high schools in the state that we're
(15) doing that. It tends to be a more challenging endeavor
(16) the -- for inner city, you know, low-performance schools
(17) than it is for a majority suburban school and that just
(18) comes from the kind of experience that their parents and
(19) their community and the people around them have of the
(20) subject.
(21) Q. Does the University ever -- does the University
(22) ever advise potential applicants that, for example,
(23) participation in extracurricular activities might make it
(24) more likely that they could get accepted?
(25) A. Yes.

Page 33

(1) Q. Okay. Does the University -- does the University
(2) advise potential applicants to take the SAT or the ACT?
(3) A. Absolutely.
(4) Q. Does the University advise them to prepare in a
(5) certain way for those standardized tests?
(6) A. Not in terms of test preparation because I believe
(7) that -- There's a lot of debate whether test preparation
(8) even works. The College Board will tell you you can't teach
(9) to the test and so us putting a lot of effort behind test
(10) prep would be misguided. I think the better advice for
(11) students tends to be take it more than one time because part
(12) of -- part of a student's -- the average student's raising
(13) their scores comes from comfort with the test more so than
(14) it is that they're a more intellectual student that's walked
(15) in the second time. So not -- not so much on test prep.
(16) Q. Okay.
(17) MR. McCARTHY: I don't have anything else
(18) right now. Do you have --
(19) MS. KNEELAND: Yeah, I just have one quick
(20) question.
(21) EXAMINATION
(22) BY MS. KNEELAND:
(23) Q. You talked about the business and engineering
(24) schools doing outreach programs. Is that correct?
(25) A. That's correct.

9 (Pages 30 to 33)

(1) Q. Are those targeted towards minority students?
(2) A. No.
(3) MS. KNEELAND: That's all I have.
(4) MR. McCARTHY: Okay.
(5) FURTHER EXAMINATION
(6) BY MR. McCARTHY:
(7) Q. Mr. Orr, before we let you go, let me just ask you
(8) a couple of simple questions.
(9) A. Sure.
(10) Q. Is there any answer that you gave me this entire
(11) time that you feel like you need to change for any reason?
(12) A. No.
(13) Q. Okay. Have you thought of anything that might
(14) have answered a question before that you'd like to inform us
(15) about now?
(16) A. No.
(17) Q. Okay. Well, let me say that we -- there's a
(18) chance that we may recall you later this afternoon or
(19) tomorrow, it's not likely, but otherwise you're free to go.
(20) A. Okay.
(21) THE REPORTER: Off the record, 1:59.
(22) (Deposition concluded)

CHANGES AND SIGNATURE
PAGE LINE CHANGE        REASON

I, MICHAEL ORR, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MICHAEL ORR

(1) THE STATE OF _____)
(2) COUNTY OF _____)
(3)
(4) Before me, _____, on this day
(5) personally appeared MICHAEL ORR, known to me or proved to me
(6) on the oath of _____ or through
(7) _____ (description of identity card
(8) or other document) to be the person whose name is subscribed
(9) to the foregoing instrument and acknowledged to me that
(10) he/she executed the same for the purpose and consideration
(11) therein expressed.
(12) Given under my hand and seal of office on this
(13) _____ day of _____, 2008.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

My Commission Expires: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and   )
RACHEL MULTER MICHALEWICZ  )
                           )
   Plaintiffs,             )
                           )
v.                         )  Civil Action No.
                           )  1:08-cv-00263-SS
                           )
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al,    )
                           )
   Defendants.             )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF MICHAEL ORR
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, MICHAEL ORR, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.
I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

Page 38

(1) attorney or counsel employed by the parties hereto or
(2) financially interested in the action.
(3)     I further certify that the deposition transcript was
(4) submitted on _____ to the witness or to the
(5) attorney for the witness for examination, signature and
(6) return to me by _____;
(7)     The original deposition was/was not returned to the
(8) deposition officer on _____;
(9)     If returned, the attached Changes and Signature page
(10) contains any changes and the reasons therefor;
(11)    If returned, the original deposition was delivered to
(12) Mr. Thomas R. McCarthy, Custodial Attorney;
(13)    That $_____ is the deposition officer's charges to
(14) the Plaintiffs for preparing the original deposition
(15) transcript and any copies of exhibits;
(16)    WITNESS MY HAND AND SEAL OF OFFICE, this ____ day of
(17) _____, 2008.
(18)
(19)
         _____
(20)     TRACIE L. CHEW, CSR #6503
         Expiration: 12/31/2008
(21)     DepoTexas Austin
         Firm Registration No. 17
(22)     DepoTexas@aol.com
         Fax 512/478-2782
(23)
(24)
(25)

11 (Page 38)

37

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and           )
RACHEL MULTER MICHALEWICZ          )
                                   )
     Plaintiffs,                   )
                                   )
v.                                 )    Civil Action No.
                                   )    1:08-cv-00263-SS
                                   )
STATE OF TEXAS; UNIVERSITY OF      )
TEXAS AT AUSTIN; et al,            )
                                   )
     Defendants.                   )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF MICHAEL ORR
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, MICHAEL ORR, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

38

attorney or counsel employed by the parties hereto or financially interested in the action.

I further certify that the deposition transcript was submitted on October 16th, 2008 to the witness or to the attorney for the witness for examination, signature and return to me by November 17th, 2008:

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Thomas R. McCarthy, Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

WITNESS MY HAND AND SEAL OF OFFICE, this 14th day of October, 2008.

TRACIE L. CHEW, CSR #6503
Expiration: 12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782