# EXHIBIT

# 8

Page 1

(1)                    _UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF TEXAS
(2)                          AUSTIN DIVISION

(3)
        ABIGAIL NOEL FISHER; AND        *
(4)     RACHEL MULTER MICHALEWICZ,      *
                Plaintiffs,             *
(5)                                     *
        VS.                             *   No. 1:08-CV-00263-SS
(6)                                     *
        STATE OF TEXAS; THE UNIVERSITY  *
(7)     OF TEXAS AT AUSTIN; ET AL.,     *
                Defendants.             *
(8)

(9)

(10)  * * * * * * * * * * * * * * * * * * * * * * * * * *

(11)              RULE 30(b)(6) DEPOSITION OF

(12)                     BRUCE WALKER

(13)               TUESDAY, OCTOBER 7, 2008

(14)  * * * * * * * * * * * * * * * * * * * * * * * * * *

(15)

(16)          ORAL DEPOSITION OF BRUCE WALKER, produced as a

(17) witness at the instance of the Plaintiffs and duly sworn,

(18) was taken in the above-styled and numbered cause on the

(19) 7th day of October, 2008, from 8:08 a.m. to 10:35 a.m.,

(20) before Christy Leslie, CSR in and for the State of Texas,

(21) reported by machine shorthand, at The University of Texas,

(22) Texas Union, Chicano Culture Room 4.206, Austin, Texas,

(23) pursuant to the Texas Rules of Civil Procedure and the

(24) provisions attached hereto.

(25)

## Page 2

(1)
(2)          A P P E A R A N C E S

(3)   FOR THE PLAINTIFFS ABIGAIL NOEL FISHER and
      RACHEL MULTER MICHALEWICZ:
(4)      Mr. Thomas R. McCarthy
         WILEY REIN, L.L.P.
(5)      1776 K. Street, N.W.
         Washington, DC 20006
(6)      (202) 719-7000

(7)      - AND -

(8)      Mr. Paul M. Terrill
         THE TERRILL FIRM, P.C.
(9)      810 W. 10th Street
         Austin, Texas 78701
(10)     (512) 474-9100

(11)  FOR THE DEFENDANTS STATE OF TEXAS and UNIVERSITY
      OF TEXAS AT AUSTIN, ET AL.:
(12)     Ms. Mishell B. Kneeland
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
(13)     General Litigation Division
         P.O. Box 12548
(14)     Austin, Texas 78711-2548
         (512) 463-2120
(15)  ALSO PRESENT:
         Mr. Leo Barnes, The University of Texas at Austin
(16)     Mr. Jody Hughes, Attorney General's Office
         Mr. Robert O'Keefe, Attorney General's Office
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)                I N D E X
(2)   Appearances. . . . . . . . . . . . . . . . . . .    2
(3)   BRUCE WALKER
                                          PAGE
(4)      Examination by Mr. McCarthy . . . . . . .    4
(5)   Changes and Signature. . . . . . . . . . . . . .   64
      Reporter's Certificate . . . . . . . . . . . . . .  66
(6)
(7)            EXHIBIT INDEX
(8)   NO.   DESCRIPTION                    PAGE
(9)   9  Printout from The University of Texas Web site
         entitled Rankings & Kudos              10
(10)
      10  Press Release from The University of Texas Web site
(11)      entitled Enrollment of first-time freshman
          minority students now higher than before Hopwood
(12)      court decision                        14
(13)  11  Matrix for Texas students regarding majors   40
(14)  12  Opposition to Motion for Preliminary Injunction  55
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 4

(1)                    (8:08 a.m.)
(2)          TUESDAY, OCTOBER 7, 2008
(3)             BRUCE WALKER,
(4)   having been first duly sworn, testified as follows:
(5)             EXAMINATION
(6)   BY MR. McCARTHY:
(7)      Q   Good morning, Dr. Walker.
(8)      A   Morning.
(9)      Q   As I mentioned a bit ago when we met, my name is
(10)  Thomas McCarthy and I represent the Plaintiffs in this
(11)  case.
(12)         I want to ask you, are you appearing here
(13)  today in response to this notice of deposition?
(14)     A   Yes.
(15)     Q   Okay.
(16)         MS. KNEELAND:  Sorry.  For the record, at
(17)  this time I would like to note that Defendants --
(18)  Defendant The University of Texas at Austin has designated
(19)  Dr. Walker to testify on topics, in Schedule A of that
(20)  notice, 4 through 7 and the policy part of No. 17 which
(21)  relates to the preservation and search for responsive
(22)  documents.
(23)     Q   (By Mr. McCarthy)  Dr. Walker, have you ever been
(24)  deposed before?
(25)     A   No, I have not.

## Page 5

(1)      Q   Okay.  I'll let you know a little bit about how
(2)   the process works.  The attorneys have probably told you a
(3)   little bit about it.  But basically I'm going to ask you a
(4)   series of questions about your role and responsibilities
(5)   at the university that are relevant in this lawsuit.
(6)      A   Okay.
(7)      Q   When I ask you questions, just please answer to
(8)   the best of your ability.  If you don't know, feel free to
(9)   say you don't know.  If my question is unclear, feel free
(10)  to ask me to restate it.  If you have a question that you
(11)  want to ask your attorney, Ms. Kneeland, you're free to
(12)  ask her questions.  But please, if I have asked you a
(13)  question, answer the question first and then go ahead and
(14)  ask Ms. Kneeland a question.
(15)     A   Okay.
(16)     Q   If you would like to take a break at some point,
(17)  use the men's room, get a drink of water, anything like
(18)  that, just let us know.  We can certainly take some
(19)  breaks.
(20)     A   Okay.
(21)     Q   One other thing, if I ask you a question that's a
(22)  yes or no answer, please state "yes" or "no" and don't
(23)  just nod your head.  So that way the court reporter can
(24)  get it on the transcript.  Okay?
(25)     A   Yes.

Page 6

(1)   Q   All right.  Do you have any questions about that?
(2)   A   No.
(3)   Q   Okay.  Let me ask you a few logistical things
(4)   before we actually get started in the meat of this
(5)   deposition.
(6)         Have you taken any medications or ingested
(7)   anything that might affect your ability to participate in
(8)   this deposition?
(9)   A   Not that I know of, no.
(10)  Q   Okay.  Did you meet with anyone to prepare for
(11)  this deposition?
(12)  A   Yes.
(13)  Q   Who did you meet with?
(14)  A   My lawyers.
(15)  Q   Okay.  How many times did you meet with them?
(16)  A   I think three.
(17)  Q   Okay.  Did you review any documents to prepare
(18)  for this deposition?
(19)  A   Have I reviewed any?
(20)  Q   Yes.
(21)  A   Yes.
(22)  Q   Yes?
(23)  A   Yes.
(24)  Q   Do you remember what documents you reviewed?
(25)  A   Well, certainly the Schedule A.

Page 7

(1)   Q   Uh-huh.
(2)   A   And then just to refresh my memory on some of the
(3)   statistics and stuff, yeah.
(4)   Q   Okay.  So maybe you looked at like the Top Ten
(5)   reports, that kind of thing?
(6)   A   Right.
(7)   Q   Okay.  Is there anything that you -- are you
(8)   aware of any documents that you have looked at but have
(9)   not been produced to us?
(10)  A   I'm not aware of any, no.
(11)  Q   Okay.  All right.  Dr. Walker, what is your job
(12)  title?
(13)  A   I'm vice provost and director of admissions.
(14)  Q   Okay.  And how long have you been in that
(15)  position?
(16)  A   Since 1996.
(17)  Q   Did you hold any positions prior to that at the
(18)  university?
(19)  A   No, not at this university.
(20)  Q   Did you hold similar positions at other
(21)  universities?
(22)  A   Yes.
(23)  Q   What positions?
(24)  A   I was at the University of Delaware.  I was dean
(25)  of admissions and financial aid.  Then prior to that I was

Page 8

(1)   at the University of North Texas as associate director.
(2)   Q   Okay.  And what's your education?
(3)   A   I have an undergraduate degree in theology, a
(4)   master's degree in student personnel, and a doctorate in
(5)   higher ed administration.
(6)   Q   Okay.  Outside of your work experience and
(7)   education, do you have any other experience that relates
(8)   to your roles and duties here at the university?
(9)   A   Well, I spent eight years working for the college
(10)  board, which is the folks that sponsor the SAT.
(11)  Q   Okay.  Are you able to testify fully today as a
(12)  representative of The University of Texas?
(13)  A   Yes.
(14)  Q   Okay.  Generally stated, what is the university's
(15)  policy with regard to undergraduate admissions?
(16)        MS. KNEELAND:  Objection; form.
(17)        You can answer.  You can answer.  I was just
(18)  making an objection for the record.
(19)        THE WITNESS:  Oh.  I'm sorry.  I don't
(20)  always hear out of that ear, so...
(21)  A   You want to know what our process is?
(22)  Q   (By Mr. McCarthy)  What's the policy?  Do you
(23)  have -- like what is the -- does the admissions office
(24)  have a general statement policy?
(25)  A   Yes.  You mean how the admissions work?  I'm

Page 9

(1)   sorry.  I'm not --
(2)   Q   Yeah.
(3)   A   -- understanding your question.
(4)   Q   I mean like a mission statement.  Is there a
(5)   particular just general statement of the office of
(6)   admissions?
(7)   A   Yes.
(8)   Q   And what is the -- what is the office of
(9)   admissions' mission?
(10)  A   Is to recruit and enroll students in attempting
(11)  to have a very diverse student body and particularly a
(12)  freshman class.
(13)  Q   Okay.  And does the university consider itself
(14)  selective?
(15)  A   Yes.
(16)  Q   Okay.  Does the university consider itself
(17)  diverse?
(18)  A   Yes.
(19)  Q   Has the university been recognized for its
(20)  diversity?
(21)        MS. KNEELAND:  Objection; form.
(22)  A   I don't -- by who?  I'm sure I -- I'm sure we
(23)  have, but...
(24)        MR. McCARTHY:  I'm sorry.  Could we take a
(25)  short break?

3  (Pages 6 to 9)

Page 10

(1)         (Recess from 8:15 a.m. to 8:16 a.m.)
(2)         (Exhibit No. 9 marked)
(3)    Q   (By Mr. McCarthy) Dr. Walker, I'm handing to you
(4)    what has been marked as Deposition Exhibit 9.
(5)    A   Okay.
(6)    Q   Do you recognize what that is?
(7)    A   It's from our Web site.
(8)    Q   Uh-huh. And --
(9)    A   I know it's -- go ahead.
(10)   Q   Yes. It's from the Web site. And can you look
(11)   down towards the bottom of the first page and the top of
(12)   the second page and just read to me what you see there?
(13)        MS. KNEELAND: Where? It's --
(14)        MR. McCARTHY: I'm sorry. Here. I'll --
(15)        MS. KNEELAND: I'm sorry.
(16)        MR. McCARTHY: -- help you out.
(17)        MS. KNEELAND: It's a little vague.
(18)        MR. McCARTHY: Sorry. Starting at the
(19)   bottom of the second page.
(20)        THE WITNESS: Okay.
(21)   A   "The University of Texas at Austin ranks sixth in
(22)   the nation in producing undergraduate degrees for minority
(23)   groups, according to the May 31, 2007 edition of Diverse
(24)   Issues in Higher Education magazine."
(25)   Q   (By Mr. McCarthy) Okay. Can you continue a

Page 11

(1)    little bit?
(2)    A   "In addition to the overall standing, the
(3)    university ranks tenth nationally among the magazine's Top
(4)    100 producers of undergraduates for Hispanics, eighth for
(5)    Asian-Americans and 59th for American Indians."
(6)    Q   And you don't need to read the rest into the
(7)    record, but could you just take a look at it real quick
(8)    for me, the rest of that paragraph? And you can tell me
(9)    generally what the paragraph is highlighting.
(10)        MS. KNEELAND: I'm going to object. The
(11)   document speaks for itself. He doesn't need to summarize
(12)   it.
(13)        MR. McCARTHY: That's fine. Okay.
(14)   A   It's about our -- the rankings.
(15)   Q   (By Mr. McCarthy) Okay. Now, Dr. Walker, isn't
(16)   it true that in 1997 the university adopted a system for
(17)   making admissions decisions based on an Academic Index and
(18)   a Personal Achievement Index?
(19)   A   That is true.
(20)   Q   Okay. Do you recall -- I'm sorry. Why did the
(21)   university adopt that system?
(22)   A   Well, there was several reasons. The Fifth
(23)   Circuit Court had just made the decision in the Hopwood
(24)   case, and we could no longer use race in our admissions
(25)   process and we had been doing so for some time. So we

Page 12

(1)    were -- but we still were interested in diversity in its
(2)    full -- full meaning.
(3)         And so we -- I had just come, and we were
(4)    recreating or creating a process that could honor
(5)    diversity and recognize diversity, and so we created a
(6)    holistic review of applications. We redefined merit to be
(7)    much more inclusive than it had been before. There had
(8)    primarily only been test scores and rank prior to that
(9)    time, and we understand students are more than just a test
(10)   score and a rank. They bring other characteristics with
(11)   them to a university, and we wanted to be able to
(12)   recognize and reward those characteristics as best we
(13)   could.
(14)   Q   Okay. And was that admissions system that --
(15)   that was based on the Academic Index and Personal
(16)   Achievement Index, that was adopted at that time?
(17)   A   Yes.
(18)   Q   Was that successful in that respect?
(19)        MS. KNEELAND: Objection; form.
(20)   A   In what respect?
(21)   Q   (By Mr. McCarthy) You just explained why the
(22)   university adopted it.
(23)   A   Uh-huh.
(24)   Q   Was it successful in reaching those goals?
(25)   A   We haven't reached those goals yet, but it has --

Page 13

(1)    it did provide us the opportunity to look holistically at
(2)    a student as opposed to narrowly at a student. Yes, it
(3)    did accomplish that.
(4)    Q   Okay. And was the system intended to boost
(5)    minority enrollment?
(6)    A   It -- it was hopeful that it could, but that's
(7)    not the whole reason we did it, no.
(8)    Q   Was it a reason?
(9)    A   It was part of the reason, I would say.
(10)   Q   Okay. And for that reason, for the reason of
(11)   minority enrollment, has it been successful in promoting
(12)   minority enrollment?
(13)   A   Well, I can't -- I can't answer that. If I did
(14)   answer it, I would have to say I don't know because we
(15)   added so many other things to it later. Top Ten Percent,
(16)   a lot of other things that we did. So we never just
(17)   stayed with the very first use of this new system.
(18)   Q   In your -- are you referring to the fact that
(19)   HB 588 was implemented the following year?
(20)   A   Yes.
(21)   Q   Okay.
(22)   A   And other things, but...
(23)   Q   Sure. Okay. So in 1998 once the university
(24)   started implementing HB 588, the university continued to
(25)   use the AI/PIA system. Correct?

4 (Pages 10 to 13)

Page 14

(1) **A   That's correct. For those that were not**
(2) **automatically admitted.**
(3)    Q   Okay. And while the university was implementing
(4) HB 588 and using the AI/PIA system for those that were not
(5) admitted pursuant to HB 588, did the university increase
(6) minority enrollment?
(7)    **A   No. Increase it beyond what?**
(8)    Q   Did it increase it beyond where it had been prior
(9) to that?
(10)   **A   You're asking if 1988 minority enrollments were**
(11) **higher than 1997 minority enrollments?**
(12)   Q   No. I'm asking if they ultimately increased
(13) minority enrollment above the levels to which it had been
(14) prior.
(15)        MS. KNEELAND: Objection; form.
(16)   **A   I'm not sure I understand the question. And I'm**
(17) **sorry, but --**
(18)   Q   (By Mr. McCarthy) That's okay. That's okay.
(19)   **A   -- I need clarification.**
(20)        MR. McCARTHY: Could we take a short break?
(21)        (Recess from 8:23 a.m. to 8:25 a.m.)
(22)        (Exhibit No. 10 marked)
(23)   Q   (By Mr. McCarthy) Dr. Walker, I am handing you
(24) what's been marked as Deposition Exhibit No. 10. Can you
(25) tell me what that is?

Page 15

(1)   **A   It looks like a press release. Looks like it**
(2) **came from our Web site.**
(3)   Q   Uh-huh. And can you tell me what the title of
(4) that is?
(5)   **A   The title is "Enrollment of first-time freshman**
(6) **minority students now higher than before Hopwood court**
(7) **decision."**
(8)   Q   Okay. And can you see in that university press
(9) release where the minority enrollment levels prior to the
(10) Hopwood case were identified?
(11)   **A   Yes, the first paragraph.**
(12)   Q   Okay. And then what does it say those were?
(13)   **A   It says, "Diversity efforts at The University of**
(14) **Texas at Austin have brought a higher number of freshman**
(15) **minority students -- African-American, Hispanics and**
(16) **Asian-Americans -- to the campus than were enrolled in**
(17) **1996, the year a court ruling ended the use of affirmative**
(18) **action in the university's enrollment process."**
(19)   Q   Okay. And does that press release actually say
(20) what the percentages of African-American and Hispanic
(21) enrollment were prior to the Hopwood case?
(22)        I think if you're having trouble finding it,
(23) if you look at the second page.
(24)   **A   Okay.**
(25)   Q   If you look at -- there's a chart there.

Page 16

(1)   **A   Uh-huh.**
(2)   Q   That's data provided by The University of Texas
(3) at Austin Office of Institutional Research, and it shows
(4) the enrollment rates for freshmen in 1996.
(5)   **A   Yes.**
(6)   Q   Can you tell me what those were?
(7)   **A   1996, African-American, 4.1 percent. You want**
(8) **the percent?**
(9)   Q   Yes, please.
(10)   **A   1996, Hispanic, 14.5 percent. Asian-American,**
(11) **1996, 14.7 percent.**
(12)   Q   Okay. And now can I refer you to what's
(13) previously been marked as Deposition Exhibit No. 1?
(14)        MS. KNEELAND: You can refer him to it, but
(15) I think you'll have to hand it to him.
(16)        MR. McCARTHY: Yeah, I'll hand it to him.
(17)        MS. KNEELAND: Okay.
(18)        MR. McCARTHY: I just want to make sure I
(19) identify -- let him know what I want him to look at.
(20)   Q   (By Mr. McCarthy) That's Deposition Exhibit
(21) No. 1. Are you familiar with what that document is?
(22)   **A   Yes.**
(23)   Q   Okay. Can you tell me what that document is?
(24)   **A   It is a report from our admissions Web site**
(25) **called Implementation and Results of the Texas Automatic**

Page 17

(1) **Admissions Law -- that's House Bill 588 -- at The**
(2) **University of Texas-Austin. It's a demographic analysis**
(3) **of entering freshmen of fall of 2007.**
(4)   Q   And can you turn to Page 6 of that document?
(5)   **A   Yes.**
(6)   Q   Towards the bottom of Page 6 there is a chart
(7) that identifies enrollment rates for incoming freshman
(8) class.
(9)   **A   Okay.**
(10)   Q   Can you tell me for the year 2005 -- I'm sorry.
(11) For the year 2004. Can you tell me for the year 2004 what
(12) the enrollment rates were for African-Americans, Hispanic
(13) and Asian-American students?
(14)   **A   For '04?**
(15)   Q   Yes, '04.
(16)   **A   For African-American, 5 percent. For -- you said**
(17) **for Hispanic?**
(18)   Q   Uh-huh.
(19)   **A   Hispanic was 17 percent.**
(20)   Q   And could you tell me the Asian-American --
(21)   **A   Oh, I'm sorry.**
(22)   Q   -- also?
(23)   **A   Asian-American was 18 percent.**
(24)   Q   Okay. And all of those are higher than the
(25) minority enrollment rates for the incoming freshman class

5 (Pages 14 to 17)

Page 18

(1) in 1996, the year prior to Hopwood. Is that correct?
(2)   A   That is correct.
(3)   Q   Okay. In 2005 the university began considering
(4) race as a factor in undergraduate admissions. Correct?
(5)   A   That's correct.
(6)   Q   Was the university's decision to do that in part
(7) a response to the Grutter case?
(8)   A   In part.
(9)   Q   Okay. And what was the other reasoning behind
(10) it?
(11)   A   Well, we felt like we had not -- we had not yet
(12) attained critical mass for the benefits of -- the
(13) educational benefits that diversity would bring.
(14)   Q   What exactly is critical mass for the university?
(15)   A   Well, I think for our -- our purposes it's an
(16) adequate representation of minority students so that the
(17) benefits that can -- educational benefits that can be
(18) derived from diversity can actually happen.
(19)   Q   Okay. And has the university identified a
(20) numerical level of minority enrollment --
(21)   A   No.
(22)   Q   -- to which -- no. So the university has not
(23) defined what critical mass is as a number?
(24)   A   No.
(25)   Q   Okay. How will the university know when it has

Page 19

(1) reached critical mass?
(2)   A   Well, I think when we see the educational
(3) benefits happening and have happened, then we would know.
(4)   Q   So is the university currently not providing full
(5) benefits of a diverse education to its students?
(6)   A   Well, I -- we're providing the education and
(7) we're attempting to provide the full benefits of a
(8) diverse -- diversity education. We just haven't attained
(9) that critical mass yet.
(10)   Q   Has the university made any sort of projection as
(11) to when they will attain critical mass?
(12)   A   No.
(13)   Q   Does the university have any means of measuring
(14) their progress towards critical mass?
(15)   A   Yes.
(16)   Q   And how is that?
(17)   A   Well, there's one -- though diversity is spread
(18) across the university in all the things that we do, there
(19) is one window that we can actually -- through which we can
(20) actually look to see how we're doing. And the classroom
(21) is one of those -- is that window where we can look to see
(22) how we're doing. So that's one way to measure.
(23)   Q   And what does that window of the classroom tell
(24) the university about its progress towards critical mass?
(25)   A   That we haven't attained it yet.

Page 20

(1)   Q   What is it about that window of the classroom
(2) that tells the university that it has not attained
(3) critical mass yet?
(4)   A   Well, we have far too many classrooms where
(5) there's still no or only one minority student.
(6)   Q   And how many classrooms as a percentage or a
(7) whole number does the university have where there are only
(8) one or no minority student?
(9)   A   Well, we did a study and we -- depends on the
(10) size of the classroom. But let's say a classroom that has
(11) five or more students in it, more than half of the class
(12) had only one or no African-American students in them. And
(13) about the same, but slightly less percent had only one or
(14) no Hispanic students in them. And then we have a little
(15) bit higher representation of Asians.
(16)   Q   What -- I think you said that for classrooms --
(17) and please tell me if I'm wrong in restating what you just
(18) told me. I want to make sure I have this right.
(19)       I believe you said that for classrooms of --
(20) that have five or more students in them that 50 percent of
(21) the classrooms have only one or no African-American
(22) student?
(23)   A   That's an approximate.
(24)   Q   Approximate?
(25)   A   Yes.

Page 21

(1)   Q   Okay. Does the university have a goal in mind in
(2) terms of what percent that should be?
(3)   A   No.
(4)   Q   No. How will the university know it's reached
(5) critical mass if it doesn't have a goal?
(6)   A   Well, the students will let us know. We talk to
(7) them all the time about how they feel about their
(8) experience at the university, how they feel in the
(9) classroom. We still have students who tell us they feel
(10) isolated in the classroom, that they are the only, or the
(11) majority of students tell us that there is no diversity in
(12) the classroom. So we talk to the students on a regular
(13) basis, and this is what they tell us.
(14)   Q   Are these -- do these classrooms that tend to
(15) lack racial diversity as you have described tend to fall
(16) into certain schools or majors within the university?
(17)       MS. KNEELAND: Objection; form.
(18)   A   Not that I'm aware of, no. It's across all of
(19) the university classes.
(20)   Q   (By Mr. McCarthy) What is the university doing
(21) to try to remedy these numbers that are deficient?
(22)       MS. KNEELAND: Objection; form.
(23)   A   We're trying to recruit a diverse freshman class.
(24)   Q   (By Mr. McCarthy) In terms of minority
(25) enrollment?

6 (Pages 18 to 21)

Page 22

(1)  A  Well, in terms of every means of diversity that's
(2)  possible, including minorities, yes.
(3)  Q  I think right now -- but right now you're sort of
(4)  talking about minority enrollment, though.  Is that
(5)  correct?
(6)  A  That's correct.
(7)  Q  So in this respect, to remedy the -- the low
(8)  numbers of minority students in those classrooms, the
(9)  university is seeking to increase minority enrollment?
(10) A  That's correct.
(11) Q  Okay.  And how is the university seeking to
(12) increase minority enrollment?
(13) A  Well, there's a lot of ways that we do that.  We
(14) try to increase the number of minorities in our --
(15) representation of minorities in our applicant pool, in our
(16) prospect pool, and the number of students who get
(17) admitted, and then the number of students who enroll.  So
(18) that's our -- that's our plan, is to increase diversity of
(19) our applicant pool.
(20) Q  Is the university's use of race as a factor an
(21) admissions decision?
(22) A  As a factor?
(23) Q  Yes.
(24) A  Yes.
(25) Q  Is the university's use of race as a factor in

Page 23

(1)  admission decisions increasing minority enrollment at the
(2)  university?
(3)  A  I think so.
(4)  Q  Is the university making any attempt to measure
(5)  the effect of the use of race an admissions decision?
(6)  A  Well, we measure every freshman class by just
(7)  looking at the -- whether we have improved over the year
(8)  before.
(9)  Q  Is it accurate to say that the university is
(10) generally increasing its minority enrollment?
(11) A  In general, yes.
(12) Q  And I believe that you stated that the university
(13) takes lots of different measures in order to increase
(14) minority enrollment.  Is that correct?
(15) A  Yes.
(16) Q  Okay.  Does the university have any way of
(17) determining how much of that increased minority enrollment
(18) is due to any particular measure that the university has
(19) implemented?
(20) A  Not -- not really.  It's -- because college
(21) admissions and the decisions that 18-year-olds make is a
(22) very complex and complicated thing, and I don't think you
(23) ever know or you can never account for all the reasons why
(24) students make the decisions they make.  We -- we put out a
(25) lot of effort.  We do a lot of things to promote the

Page 24

(1)  university to the citizens of Texas, but we can never know
(2)  all the reasons students might have for attending the
(3)  university.
(4)  Q  So is it your testimony that it's unclear whether
(5)  the university's use of race in admissions decisions is
(6)  increasing minority enrollment?
(7)       MS. KNEELAND:  Objection; form.
(8)  A  Would you state that in a different way?
(9)  Q  (By Mr. McCarthy)  Sure.  Sure.
(10) A  I'm not sure.
(11) Q  Sorry I wasn't clear.
(12) A  Yes.
(13) Q  Is the university's use of race in admissions
(14) decisions increasing minority enrollment?
(15) A  It appears to be, yes.
(16) Q  Is it doing so in a measurable amount?
(17) A  Well, measurable to me, yes.
(18) Q  Can you explain how it's measurable to you?
(19) A  Well, a higher representation, higher percentage,
(20) higher numbers.
(21) Q  And those higher numbers, again, they're the
(22) product of many different initiatives that the university
(23) has undertaken.  Correct?
(24) A  Right.  That's correct.
(25) Q  And how much of that is attributable to the use

Page 25

(1)  of race?
(2)  A  I don't -- I don't think I can give an exact
(3)  answer to that because it's -- it's hard to separate that
(4)  from everything else.
(5)  Q  Okay.  Can you look back again at Deposition
(6)  Exhibit No. 1?  That's that HB 588 report.
(7)  A  Uh-huh.
(8)  Q  And turn to Page 6 again.  And, again, I would
(9)  like you to look at the bottom, which is a chart --
(10) A  Okay.
(11) Q  -- that shows enrollment levels for the incoming
(12) freshman classes.
(13) A  Uh-huh.
(14) Q  And 2005 was the year that the university
(15) introduced race as a factor in admissions decisions.
(16) Correct?
(17) A  That's correct.
(18) Q  Okay.  Could you tell me what the enrollment --
(19) what the percentage enrollment was of African-American
(20) students in 2005?
(21) A  What percent?
(22) Q  Yes.
(23) A  Five.
(24) Q  Five.  And could you tell me what it was for
(25) Hispanic students?

Page 26

(1)   A   Eighteen.
(2)   Q   And could you tell me what it was for
(3)   Asian-American students?
(4)   A   Seventeen.
(5)   Q   And all those numbers are 2005 numbers. Correct?
(6)   A   That's correct.
(7)   Q   Were those numbers any different than the same
(8)   numbers for the year of 2004?
(9)   A   Why don't I just read you the numbers from 2004.
(10)  Q   Sure, that's fine.
(11)  A   2004 was 5 percent for African American, 18
(12)  percent for Asian-American, and 17 percent for Hispanic.
(13)  Q   Okay. Dr. Walker, how much has minority
(14)  enrollment increased at the university since the
(15)  university began using race as a factor in admissions
(16)  decisions in 2005?
(17)  A   Shall I read from your chart or are you just --
(18)  Q   If you don't know the answer, that's fine, you
(19)  can check from the chart, I guess, and compare 2004 to the
(20)  most recent data.
(21)  A   Yes. It has increased by a few percentage
(22)  points.
(23)  Q   Okay. And that increase -- and of that increase
(24)  you don't know how much is attributable to the use of race
(25)  as a factor in admissions decisions. Is that correct?

Page 27

(1)   A   Well, the use of race -- beginning in 2005 is
(2)   the only thing that changed in 2005. It would be
(3)   reasonable to think that it had -- it had an effect.
(4)   Q   Okay. And are the university's -- I'm sorry.
(5)   You mentioned that the university takes -- undertakes a
(6)   number of initiatives to increase minority enrollment.
(7)   Correct?
(8)   A   That's correct.
(9)   Q   What are some of those other initiatives?
(10)  A   Other than?
(11)  Q   Other than the use of race in -- as a factor in
(12)  admissions decisions.
(13)  A   Well, we have done a lot of things. It's a very
(14)  broad attempt to create a diverse university. It would
(15)  start with the changes we made in 1996 prior to the class
(16)  entering in 1997. We moved to a different definition of
(17)  merit, a very much broader definition of merit that
(18)  included students' leadership roles, their participation
(19)  in extracurricular activities, their work experience,
(20)  their service in the community, their -- any special
(21)  circumstances in their family, their socioeconomic
(22)  standing, the -- whether or not they lived in a
(23)  single-family home, whether English was, you know, spoken
(24)  at home, a language other than English was spoken at home.
(25)  So we -- we changed that part of our admissions process.

Page 28

(1)          We also created a more I will call it
(2)   user-friendly process for students. We created a large --
(3)   we call it a customer service unit. It's a very large
(4)   telephone process, telephone bank, so we could be sure and
(5)   answer all of our calls. So that improved services to
(6)   students so they could reach us, so that they can complete
(7)   their application materials. We created a communication
(8)   group so that we could be sure that our communications to
(9)   students in the applicant pool was clear, that they
(10)  understood what they needed to do and what the deadlines
(11)  were for getting that done.
(12)         We put more people out in the field. We
(13)  opened -- to visit high schools, to increase the diversity
(14)  of our applicant pool. We opened admissions centers in
(15)  Houston, Dallas, San Antonio, and this last year in The
(16)  Valley so that we could put our professionals closer to
(17)  where the students lived, so we could talk to the
(18)  families, so they could feel that they had a local
(19)  contact.
(20)         We completely redid our Web site to make it
(21)  easy to read, easy to understand, easy to use. There's a
(22)  transactional part of it you may or may not have seen. I
(23)  doubt you have because you have to have an EID to get into
(24)  it. But we improved tremendously the transactional part
(25)  of our Web product so it would be easier for students to

Page 29

(1)   apply, to submit the documents they need to submit and to
(2)   track their application, to know whether they have
(3)   submitted everything, to look at what they have submitted.
(4)          So we invested a lot of money, time, effort
(5)   into improving our processes for applicants, to improve
(6)   our contact with students so that we could enhance our
(7)   applicant pool and then our admitted student pool. Those
(8)   are some of the things that we have done.
(9)   Q   In addition to those, I believe that Mr. Michael
(10)  Orr told us yesterday about several scholarship programs
(11)  that the university runs?
(12)  A   That's correct.
(13)  Q   The university runs a Presidential Achievement
(14)  Scholarship program. Correct?
(15)  A   That's correct.
(16)  Q   And a First Generation Scholarship program.
(17)  Correct?
(18)  A   That's correct.
(19)  Q   And also a Longhorn Opportunity Scholarship?
(20)  A   That's correct.
(21)  Q   And those scholarship programs have -- those
(22)  scholarship programs have helped increase minority
(23)  enrollment. Correct?
(24)  A   Yes. I would say yes.
(25)  Q   Okay. I want you to look at Deposition Exhibit

8 (Pages 26 to 29)

Page 30

(1) No. 1 again, Dr. Walker.
(2)   A   Okay.
(3)   Q   In the middle of Page 2 there's a list of factors
(4) and special circumstances that are -- make up part of the
(5) personal achievement score and a Personal Achievement
(6) Index.
(7)   A   That's correct.
(8)   Q   This is part of the admissions process. Correct?
(9)   A   Correct.
(10)   Q   Okay. Could you read me that list of factors and
(11) special circumstances?
(12)   A   "Scores on two essays, leadership,
(13) extracurricular activities, awards/honors, work
(14) experience, service to school or community, special
(15) circumstances such as socioeconomic status of the family,
(16) single-parent home, language spoken at home, family
(17) responsibilities, socioeconomic status of the school
(18) attended, average SAT/ACT of school attended in relation
(19) to the student's own SAT/ACT, race (addition approved by
(20) the UT Board of Regents in 2003."
(21)   Q   Okay. So prior to the addition of race that --
(22) I'm sorry. Let me start that again.
(23)       So prior to the 2005 admissions year, all of
(24) those factors and special circumstances were considered
(25) except for race. Correct?

Page 31

(1)   A   That is correct.
(2)   Q   Okay. Why did the university adopt those factors
(3) and special circumstances?
(4)   A   Within special circumstances?
(5)   Q   Why did the university adopt those factors and
(6) special circumstances?
(7)   A   Oh, and special circumstances. In order to
(8) expand the definition of merit, what it means to be a
(9) meritorious student.
(10)   Q   Okay. And was this all part of the university's
(11) goal of increasing diversity?
(12)   A   Yes.
(13)   Q   Yes. Okay. And I believe that you said that
(14) there are many kinds of diversity that the university
(15) seeks. Correct?
(16)   A   That is correct.
(17)   Q   When the university added the factor of race to
(18) that list, what kind of diversity was the university
(19) seeking to promote?
(20)   A   By the addition of race?
(21)   Q   Uh-huh.
(22)   A   Racial diversity.
(23)   Q   Okay. When the admissions office reviews
(24) applicant files, it considers all of these factors and
(25) special circumstances. Correct?

Page 32

(1)   A   That is correct.
(2)   Q   And those -- those factors and special
(3) circumstances are not assigned numerical values. Correct?
(4)   A   That is correct.
(5)   Q   So is it accurate to say that they are
(6) subjective?
(7)   A   Yes.
(8)   Q   The university employs many people in its
(9) admissions office. Correct?
(10)   A   Say that again?
(11)   Q   The university employs many people in its
(12) admissions office. Correct?
(13)   A   That's correct.
(14)   Q   And there are several people that review
(15) applicant files. Correct?
(16)   A   That's correct.
(17)   Q   Is it possible that these several people could
(18) consider differently those subjective factors?
(19)   A   I suppose anything is possible, but that's not
(20) the way we trained them.
(21)   Q   Okay. Dr. Walker, I'm going to show you what's
(22) been marked previously as Deposition Exhibit No. 7.
(23)   A   Okay.
(24)   Q   Do you understand what that document is?
(25)   A   Yes.

Page 33

(1)   Q   Okay. Is that one of the matrices that's used to
(2) determine which students are admitted to a particular
(3) major?
(4)   A   That is correct.
(5)   Q   Okay. And there's a cutoff line drawn that
(6) separates the students that are admitted from those that
(7) are not admitted. Correct?
(8)   A   That's correct.
(9)   Q   Is it accurate to say that a difference of
(10) one-tenth of an AI point can be determinative to whether a
(11) student is admitted or not admitted?
(12)       MS. KNEELAND: Objection; form.
(13)   A   One-tenth of an AI point?
(14)   Q   (By Mr. McCarthy) Yes, the Academic Index point.
(15)   A   Uh-huh.
(16)   Q   Is it accurate to state that one-tenth of an AI
(17) point can be determinative as to whether a student can be
(18) admitted or not admitted?
(19)   A   Yes.
(20)       MS. KNEELAND: Same objection.
(21)   Q   (By Mr. McCarthy) Okay. Could a difference of
(22) one PAI point be determinative as to whether a student is
(23) admitted or not admitted?
(24)       MS. KNEELAND: Objection; form.
(25)   A   Yes.

9 (Pages 30 to 33)

Page 34

(1)   Q   (By Mr. McCarthy)  Okay.
(2)         MR. McCARTHY:  Could we take a short break?
(3)         (Recess from 8:57 a.m. to 9:11 a.m.)
(4)   Q   (By Mr. McCarthy)  Dr. Walker, you testified that
(5)   the use of race as a factor in admissions helps increase
(6)   minority enrollment.  Correct?
(7)   A   That's correct.
(8)   Q   Does the use of race as a factor in admissions
(9)   help increase the enrollment level of African-Americans?
(10)  A   I believe so, yes.
(11)  Q   Does it help increase the enrollment of Hispanic
(12)  students?
(13)  A   I believe so, yes.
(14)  Q   Okay.  Now, because the use of race as a factor
(15)  in admissions is increasing levels of enrollment of
(16)  certain racial groups, it's necessarily decreasing the
(17)  enrollment of other racial groups.  Correct?
(18)  A   No, not necessarily.
(19)  Q   Well, it is sort of a zero-sum game, isn't it?
(20)  There's only 100 percent.  Right?
(21)  A   Right, but our -- the size of our freshman class
(22)  varies from year to year.
(23)  Q   I understand that.  But as percentage levels, if
(24)  some are going up, other ones must be going down.
(25)  Correct?

Page 35

(1)   A   Correct.
(2)   Q   So what effect is the use of race in admissions
(3)   decisions having on the enrollment of Asian-Americans?
(4)   A   Well, I can't say there's a direct correlation,
(5)   so I won't.
(6)   Q   Okay.  And what is -- what effect is the use of
(7)   race in admissions decisions having on the level of
(8)   enrollment of Caucasian students?
(9)   A   Again, I'm -- I'm not sure there's a
(10)  direct-and-only effect.
(11)  Q   Okay.  The use of race as a factor in admissions
(12)  decisions is increasing the enrollment rates of
(13)  African-Americans and Hispanic Americans.
(14)  A   It appears --
(15)  Q   Correct?
(16)  A   It appears to be, yes.
(17)  Q   Okay.  So then isn't it true that it's
(18)  necessarily reducing the enrollment rates of the remainder
(19)  of the student population?
(20)  A   Again, I don't -- I can't be sure it's a direct
(21)  and not affected by other things.
(22)  Q   Well, except that if the use of race is
(23)  increasing the one, if it is increasing the levels of
(24)  enrollment of Hispanic and African-American students, then
(25)  a necessary -- a necessary result is that it's reducing

Page 36

(1)   the levels of enrollment of the remainder of the student
(2)   body.  Correct?
(3)   A   Well, since we use race -- we don't -- since race
(4)   can apply to anyone, black, Hispanic, Asian, white, in our
(5)   process it's hard for me to isolate that one has been the
(6)   cause of the other.
(7)   Q   Okay.  So is it the case that the use of race in
(8)   admissions decisions can benefit nonminority students?
(9)         MS. KNEELAND:  Objection --
(10)  A   Yes.
(11)        MS. KNEELAND:  -- form.
(12)  Q   (By Mr. McCarthy)  Okay.  Can you explain how the
(13)  use of race can benefit a nonminority student?
(14)  A   Yes.  Our -- in our holistic process, race is one
(15)  of the factors that we use, and it's possible that -- and
(16)  it doesn't matter what the race is of the student.  When
(17)  you're reading the file, the reader is asking themselves
(18)  is that a -- what's the context in which we see all these
(19)  things from the student.  And race could be part of that
(20)  context.
(21)  Q   Can you give me an example of how the
(22)  consideration of race can benefit a nonminority student?
(23)  A   Oh, sure.  In Texas we -- I don't like to say
(24)  segregated schools, so what I say is racially identifiable
(25)  schools.  So if you're in a racially identifiable school

Page 37

(1)   and that race happens to be African-American, and you're a
(2)   white student, because you live in that area, and you turn
(3)   out to be president of the senior class, then that's
(4)   unusual given that you're white.  And it suggests an
(5)   unusual cultural connection that you just don't normally
(6)   see between African-American and white families.
(7)         So in that case, being white is -- is --
(8)   puts everything else in context and would be important to
(9)   our score for that student.
(10)  Q   Okay.  So that's -- that is a manner in which the
(11)  consideration of race could benefit a white student?
(12)  A   That's correct.
(13)  Q   Okay.  Are there other ways in which the
(14)  consideration of race might benefit a nonminority student?
(15)  A   I'm sure there are.  Let me see if I can conjure
(16)  up another --
(17)  Q   Well, you can think about it.
(18)  A   -- another example.
(19)  Q   If you think of another example, you can tell me
(20)  later.
(21)  A   Okay.
(22)        MS. KNEELAND:  And I want to be clear.
(23)  You're asking him to tell you hypothetical student
(24)  situations or --
(25)        MR. McCARTHY:  Yes.

10  (Pages 34 to 37)

Page 38

(1)　　　MS. KNEELAND: I'm not really clear what
(2) you're asking.
(3)　　　MR. McCARTHY: I'm trying to ask where --
(4) I'm trying to ask how the consideration of race can
(5) benefit a nonminority applicant.
(6)　　　MS. KNEELAND: Right. And I just want to be
(7) clear. You're asking him that sort of hypothetically in
(8) the absence of a file?
(9)　　　MR. McCARTHY: Yes.
(10)　　　MS. KNEELAND: Okay.
(11)　　　MR. McCARTHY: Yes. There's no file in
(12) front of us right now. Just hypothetically I just wanted
(13) an example of how it could work.
(14)　Q　(By Mr. McCarthy) Dr. Walker, so you just
(15) explained how the consideration of race in admissions
(16) decisions can benefit a nonminority student. Correct?
(17)　A　Correct.
(18)　Q　Okay. Approximately how many nonminority
(19) applicants are benefited in that manner?
(20)　　　MS. KNEELAND: Objection; form.
(21)　A　Well, I -- I have no way of knowing that because
(22) you would -- you would have to -- you would have to have
(23) an exact application of a number that lifted the student
(24) based on race and we don't do that, so I wouldn't have any
(25) way of knowing that.

Page 39

(1)　Q　(By Mr. McCarthy) The university doesn't keep
(2) any statistics on how many students are affected by the
(3) consideration of race in admissions decisions?
(4)　A　No.
(5)　Q　So then the university does not know how many
(6) minority students are affected in a positive manner by the
(7) consideration of race in admissions decisions?
(8)　A　No.
(9)　Q　Dr. Ishop testified yesterday that applicants
(10) being reviewed for the summer class are reviewed in
(11) isolation, individually so to speak. That's correct.
(12) Right?
(13)　A　That is correct.
(14)　Q　Okay. But students that are being reviewed for
(15) the fall class are compared against each other. Is that
(16) correct?
(17)　A　Yes. Yes.
(18)　Q　I can help you.
(19)　A　Yes.
(20)　Q　Yes?
(21)　A　Yes.
(22)　Q　For example, on the matrix that we looked at, I
(23) believe, that's in Deposition Exhibit No. 7 --
(24)　A　Yes.
(25)　Q　-- there's a number of students represented by

Page 40

(1) the cells in that matrix, and those students are being
(2) compared against each other. Correct?
(3)　A　That's correct.
(4)　Q　And that's on the basis of their --
(5)　A　Well --
(6)　Q　-- AI score. Go ahead. I'm sorry.
(7)　A　Right. This is a representation. This -- to me,
(8) it looks like a work document from a -- from a process --
(9) either very early in the process or very late in the
(10) process. But it is a representation of how lines are
(11) drawn and things like that, yes.
(12)　Q　Okay. And so -- I'm sorry.
(13)　　　MS. KNEELAND: I was going to say I'll
(14) interpose that Dr. Ishop testified that this is a matrix
(15) for non-Texas students, not for Texas students. It's not
(16) really representational of the process. With that
(17) objection, you can use it. I just wanted to make that
(18) clear.
(19)　　　MR. McCARTHY: Okay. I can grab one that's
(20) for Texas students. That's probably better.
(21)　　　Can we take a short break?
(22)　　　(Recess from 9:20 a.m. to 9:21 a.m.)
(23)　　　(Exhibit No. 11 marked)
(24)　Q　(By Mr. McCarthy) Dr. Walker, I'm handing you
(25) what has been marked as Deposition Exhibit No. 11.

Page 41

(1)　A　Okay.
(2)　Q　And can you tell me -- can you describe what that
(3) document is?
(4)　A　Again, it looks like a work document that is
(5) being used to estimate any certain point in time where we
(6) might draw the line for admission purposes, yes.
(7)　Q　Okay. That was a document that was produced to
(8) us. There's a Bates number down in the bottom right
(9) corner. Could you tell me what that is?
(10)　A　D-852.
(11)　Q　D-852. Okay. And that is -- that was produced
(12) to us as an actual matrix that was used at some point in
(13) an admissions process?
(14)　A　Uh-huh. Uh-huh.
(15)　Q　Okay. And can you tell me what's indicated in
(16) the handwriting on the top left?
(17)　A　Texas.
(18)　Q　Yes. And so is that a matrix of Texas students?
(19)　A　It is.
(20)　Q　Okay. All right. So -- so those students that
(21) are represented in the cells in that matrix are being
(22) compared against one another. Correct?
(23)　A　Have already been compared against --
(24)　Q　Yes. I'm sorry.
(25)　A　-- one another, yes.

11　(Pages 38 to 41)

Page 42

(1)   Q   So those students that are represented in the
(2)   cells in that matrix were compared against each other in
(3)   the admissions process. Correct?
(4)   A   In all of these, yes.
(5)   Q   And the cutoff line determines -- the cutoff line
(6)   determines which students are admitted and which students
(7)   are not. Correct?
(8)        MS. KNEELAND: Objection. I don't know if
(9)   you can tell that from this document.
(10)  A   It --
(11)  Q   (By Mr. McCarthy) Well, the cutoff line tells
(12)  which students are admitted based on that particular read
(13)  and which students are not admitted based on that
(14)  particular read. Correct?
(15)  A   I have no idea whether these students were
(16)  actually admitted -- were admitted or not. This, again,
(17)  appears to be a work document where we are trying to model
(18)  or anticipate where a line might be.
(19)  Q   Okay.
(20)  A   We may have moved that line --
(21)  Q   Okay.
(22)  A   -- in final.
(23)  Q   Okay. That's fine. You testified earlier that
(24)  in the -- in the review for fall admission students are --
(25)  I'm sorry.

Page 43

(1)        In the review for fall admission, applicants
(2)   are compared against one another. Correct?
(3)   A   That is correct.
(4)   Q   Okay. And some of those applicants are benefited
(5)   by the consideration of race in admissions decisions. Is
(6)   that correct?
(7)   A   That is correct.
(8)   Q   So if some of those applicants are benefited by
(9)   the use of race, isn't it necessarily the case that the
(10)  students who were not benefited by the use of race are, in
(11)  fact, negatively impacted?
(12)       MS. KNEELAND: Objection; form.
(13)  A   Well, since we -- since we don't specify that you
(14)  give extra weight for if they're African-American or extra
(15)  weight if they're Hispanic, we use every student's race,
(16)  doesn't matter what it is. So it could be that there's
(17)  students there that were advantaged by it and students
(18)  that just didn't have a score on that particular aspect.
(19)  Q   (By Mr. McCarthy) I understand that, and that's
(20)  what I'm getting towards. So there are some students that
(21)  benefit from the use of race and there's some students
(22)  that receive no benefit from the use of race?
(23)  A   That's correct.
(24)  Q   Okay. So since these students are being compared
(25)  against one another, isn't it necessarily the case that

Page 44

(1)   the students who receive no benefit from the use of race
(2)   are actually negatively impacted by the use -- by the
(3)   benefit of race to the other students?
(4)        MS. KNEELAND: Objection; form.
(5)   A   Well, to me the benefit of being in the applicant
(6)   pool is whether you get admitted or not. I mean, that's
(7)   the whole goal of this. And we look at all kinds of
(8)   diversity, race being one of them. It could be that the
(9)   student who you just described was benefited by a whole
(10)  lot of other things and got admitted. So in that case I
(11)  see no -- no way in which they got harmed by our use of
(12)  race.
(13)  Q   (By Mr. McCarthy) Admission -- admission to The
(14)  University of Texas is very competitive, isn't it?
(15)  A   It is.
(16)  Q   So -- so isn't it the case that admissions
(17)  decisions -- so isn't it the case that there's very close
(18)  competition for slots in the incoming freshman class at --
(19)  A   Yes.
(20)  Q   -- The University of Texas?
(21)       And all of these many factors, as you said,
(22)  some of them may benefit some student and some of them
(23)  might not benefit a student.
(24)  A   That's --
(25)  Q   Correct?

Page 45

(1)   A   -- correct.
(2)   Q   So isn't it the case that any one particular
(3)   factor might be dispositive as to a given student?
(4)        MS. KNEELAND: Objection; form.
(5)   A   Well, let me put it this way: No one factor can
(6)   get a student admitted, and I think we make that clear in
(7)   our instructions to the student, and no one factor will
(8)   get a student denied. It's a holistic approach.
(9)   Everything counts. Race counts, everything else counts.
(10)  So it would be impossible for me to tell you which one of
(11)  those students got admitted based on which characteristic.
(12)  It was the whole of the student. So I can't make those
(13)  kinds of comparisons.
(14)  Q   (By Mr. McCarthy) I understand that you cannot
(15)  identify a particular student that got in for a particular
(16)  reason. But each one of these factors that's considered
(17)  is meaningful. Correct?
(18)  A   That is correct.
(19)  Q   And they each contribute in some manner to the
(20)  applicant's personal achievement score. Correct?
(21)  A   If they have that characteristic, yes.
(22)  Q   Yes. So if a student has a characteristic that's
(23)  identified as one of the factors that makes up the
(24)  personal achievement score, then they are benefited by
(25)  that factor in terms of their overall personal achievement

12 (Pages 42 to 45)

Page 46

(1) score. Correct?
(2) **A  Right.**
(3) Q  So isn't it the case that -- isn't it the case
(4) that an applicant who is admitted at the margin -- I'm
(5) sorry. Let me start that question again.
(6) Isn't it the case that an applicant who just
(7) makes it over that cutoff line and is admitted to The
(8) University of Texas might have not been admitted in the
(9) absence of one of those factors?
(10) **A  Well, you're asking me to --**
(11) MS. KNEELAND: Objection to form. I'm
(12) sorry.
(13) **A  You're asking me a hypothetical question I'm not**
(14) **able to answer. Our process just doesn't work that way.**
(15) **I could not possibly go back and identify for you what one**
(16) **thing got a student admitted. That's not the way our**
(17) **process works.**
(18) Q  (By Mr. McCarthy) I understand that you couldn't
(19) identify the particular thing. However, how many -- how
(20) many factors are there in that -- I'm sorry. Let me give
(21) you back -- I think it's this one. Here we go.
(22) This is Deposition Exhibit No. 1, and that's
(23) Page 2, the Personal Achievement Index.
(24) **A  Uh-huh.**
(25) Q  Those factors there. So each one of those --

Page 47

(1) each one of those factors may contribute to an applicant's
(2) Personal Achievement Index. Correct?
(3) **A  That is correct.**
(4) Q  And none of those factors is assigned a
(5) particular value. Correct?
(6) **A  That is correct.**
(7) Q  So a student that is admitted -- I'm sorry. The
(8) personal achievement score that a student obtains is a
(9) function of how the -- how their characteristics meet
(10) those factors. Correct?
(11) MS. KNEELAND: Objection; form.
(12) **A  I'm not sure I can answer that question. I think**
(13) **I'm going to have to ask you to clarify for me.**
(14) Q  (By Mr. McCarthy) Okay. For any particular
(15) factor on that list, if an applicant's file exhibits the
(16) factor -- if -- for any -- if an applicant's file exhibits
(17) a given factor on that list, then that applicant receives
(18) some benefit from that factor that contributes to their
(19) personal achievement score. Correct?
(20) MS. KNEELAND: Objection; form.
(21) **A  Yes.**
(22) Q  (By Mr. McCarthy) And the absence of one of
(23) those factors in an applicant's file means that that
(24) applicant receives no benefit from that factor. Correct?
(25) **A  That is correct.**

Page 48

(1) MS. KNEELAND: Same objection, please.
(2) Q  (By Mr. McCarthy) So isn't it necessarily the
(3) case that the presence or absence of any one of those
(4) factors in an applicant's file could make a difference to
(5) their personal achievement score?
(6) MS. KNEELAND: Objection; form.
(7) **A  Well, that's a hypothetical question, and I --**
(8) **since none of our decisions hang on any one of these, I**
(9) **can't answer that question.**
(10) Q  (By Mr. McCarthy) I'm not asking you to identify
(11) any particular factor, to say which factor means more or
(12) less or which is dispositive or not. But the presence or
(13) absence of each factor makes a difference as to an
(14) applicant's personal achievement score. Correct?
(15) **A  That is correct.**
(16) Q  Which means that the presence or absence of those
(17) factors helps determine where a student lands on a matrix.
(18) Correct?
(19) **A  All of the factors, yes.**
(20) Q  Uh-huh. Each one contributes to where the
(21) student ends up on that matrix. Correct?
(22) **A  That is correct.**
(23) Q  So the presence or absence of any one of those
(24) factors contributes to where a student ends up on the
(25) matrix. Correct?

Page 49

(1) MS. KNEELAND: Objection; form. And I'll
(2) just make this easy. I'm going to have a standing
(3) objection to everything where it says presence or absence.
(4) And you can answer.
(5) **A  Well, if you look at things such as socioeconomic**
(6) **status, everybody's got one.**
(7) Q  (By Mr. McCarthy) Uh-huh.
(8) **A  Okay? But it -- and it goes from low to high.**
(9) **If you look at leadership, everybody could have leadership**
(10) **but some less than others.**
(11) Q  Uh-huh.
(12) **A  So I -- there's no way that I could look at any**
(13) **one student's file and tell you that the absence of**
(14) **something or the presence of something specific --**
(15) Q  Uh-huh.
(16) **A  -- was determinative in any way on that student's**
(17) **getting into the university or even their Personal**
(18) **Achievement Index. That's just not the way we do**
(19) **admissions.**
(20) Q  Okay. Well, let's look at -- I understand that
(21) you cannot look at a file and identify which factor made
(22) the difference. That's what you're testifying. Correct?
(23) **A  That is correct.**
(24) Q  Okay. Let's talk about the factor of leadership.
(25) **A  Okay.**

13 (Pages 46 to 49)

Page 50

(1)    Q   If a student exhibits leadership qualities in
(2)  their file, for example, they were president of the honor
(3)  society and captain of the volleyball team and lead some
(4)  community organization, that student might well receive
(5)  some benefit from the factor of leadership in their
(6)  personal achievement score.  Correct?
(7)    A   That's correct.
(8)    Q   Whereas a student who exhibited no leadership
(9)  qualities in any respect on their application file might
(10)  not receive any benefit from the factor of leadership in
(11)  their personal achievement score.  Correct?
(12)    A   That's correct.
(13)    Q   In other words, that factor of leadership helps
(14)  determine an applicant's personal achievement score.
(15)  Correct?
(16)    A   It's part of the whole of the -- of the --
(17)    Q   Yes.  In conjunction with the other factors.  So
(18)  that factor of leadership in conjunction with other
(19)  factors contributes to the applicant's personal
(20)  achievement score.  Correct?
(21)    A   That is correct.
(22)    Q   So that factor of leadership in conjunction with
(23)  the other factors helps determine where that applicant
(24)  falls on the matrix.  Correct?
(25)    A   Along with all the other stuff in the file.

Page 51

(1)    Q   Uh-huh.
(2)    A   Yes.
(3)    Q   And so that factor of leadership in conjunction
(4)  with the other factors and everything in the file
(5)  determines whether or not that student is admitted to The
(6)  University of Texas.  Correct?
(7)    A   No.
(8)    Q   No?
(9)    A   No.
(10)    Q   Can you explain why not?
(11)    A   Well, I think -- I thought I did, but let me try
(12)  to be clearer.  One student could have a leadership --
(13)  have leadership and another not and end up with exactly
(14)  the same Personal Achievement Index score.
(15)    Q   I understand that.
(16)    A   And you're asking me to tell you how they got
(17)  there and I can't.
(18)    Q   Well, I'm trying to make this clear that I'm
(19)  saying in conjunction with the other factors, so --
(20)    A   Yeah, but you're trying to make one of them
(21)  determinative and it isn't.
(22)    Q   I understand that it's not always determinative,
(23)  but one factor could be determinative for some applicant.
(24)  Isn't that the case?
(25)    A   No.

Page 52

(1)    MS. KNEELAND:  Objection; form.
(2)    Q   (By Mr. McCarthy)  No?
(3)    A   I can't say it is because I couldn't identify it.
(4)  It's everything.  That's the idea of holistic.  You look
(5)  at everything in the file.
(6)    Q   So --
(7)    A   And you're comparing every student with every
(8)  other student on everything in the file, not one thing in
(9)  the file.
(10)    Q   So is it the case that the factor of leadership
(11)  doesn't make a difference to an applicant's personal
(12)  achievement scores?
(13)    A   No, I didn't say that.  I think we determined
(14)  that it would, but it will not be the only thing.
(15)    Q   Okay.
(16)    A   And it's possible to get to the same score
(17)  without even having leadership.
(18)    Q   So the factor of leadership can make a
(19)  difference?
(20)    A   It could.
(21)    Q   Okay.  And the factor of socioeconomic status
(22)  could make a difference?
(23)    A   It could.
(24)    Q   And the factor of single-parent family could make
(25)  a difference?

Page 53

(1)    A   It could.
(2)    Q   And the factor of race could make a difference?
(3)    A   It could.
(4)    Q   Okay.
(5)    MR. McCARTHY:  Could we take a short break?
(6)    (Recess from 9:40 a.m. to 10:02 a.m.)
(7)    Q   (By Mr. McCarthy)  Dr. Walker, I would like to
(8)  look at -- I would like you to look at Deposition Exhibit
(9)  No. 1 again.
(10)    A   Okay.
(11)    Q   And that's the HB 588 report.  Could you turn to
(12)  Page 6?
(13)    A   Okay.
(14)    Q   And, again, at the bottom of this page there is a
(15)  chart that highlights enrollment rates.  Correct?
(16)    A   That is correct.
(17)    Q   Okay.
(18)    A   What did you say?
(19)    Q   There's a chart that reflects enrollment rates.
(20)  Correct?
(21)    A   Enrollment rates has a specific meaning to me --
(22)    Q   Oh, okay.
(23)    A   -- so --
(24)    Q   I'm sorry.
(25)    A   So --

14  (Pages 50 to 53)

Page 54

(1)  Q  I don't want to use jargon that's incorrect here.
(2)  But the chart at the bottom of the page displays
(3)  percentages of enrollments of various races over the last
(4)  several years. Correct?
(5)  A  That's correct.
(6)  Q  And earlier you testified that minority
(7)  enrollment rates went up from 2004 to 2005. Correct?
(8)  A  Well, I think what I testified is that the
(9)  proportion of African-American students in our freshman
(10)  class or Hispanics in our freshman class went up, yes.
(11)  Q  Okay. And you said -- and you testified earlier
(12)  that the only thing that changed in the 2005 admission
(13)  year was the addition of race as a factor in admissions
(14)  decisions. Correct?
(15)  A  That is correct.
(16)  Q  What happened to the percentage of white students
(17)  enrolled in the freshman class from 2004 to 2005?
(18)  A  In 2004 the percentage was 57 percent. In 2005
(19)  the percentage was 56 percent.
(20)  Q  And similarly, what happened with the percentage
(21)  enrollment of Asian-American students in the incoming
(22)  freshman class from 2004 to 2005?
(23)  A  In 2004 the Asian-American percentage was
(24)  18 percent, and in 2005 the Asian-American percentage was
(25)  17 percent.

Page 55

(1)  Q  Okay. Dr. Walker, are you familiar with the
(2)  Grutter case?
(3)  A  Yes.
(4)  Q  Okay. And are you familiar with the admissions
(5)  system that the University of Michigan Law School employed
(6)  in that case?
(7)       MS. KNEELAND: Objection; form.
(8)  A  Well, I'm familiar with what I can read about it.
(9)  Q  (By Mr. McCarthy) Okay. Isn't it true that in
(10)  this case the university has characterized its program
(11)  as -- I'm sorry.
(12)       Isn't it true that in this case the
(13)  university has characterized its admissions program as
(14)  precisely the type of system expressly upheld in Grutter?
(15)  A  I don't know that we used precisely, but yes. If
(16)  you don't use precisely, I'll stipulate to that, yeah.
(17)       (Exhibit No. 12 marked)
(18)  Q  (By Mr. McCarthy) Dr. Walker, I'm handing you
(19)  what has been marked as Deposition Exhibit No. 12.
(20)  A  Okay.
(21)       MR. McCARTHY: Can I take a break?
(22)       (Recess from 10:06 a.m. to 10:08 a.m.)
(23)  Q  (By Mr. McCarthy) Dr. Walker, I'm handing you
(24)  what has been marked as Deposition Exhibit No. 12.
(25)  A  Okay.

Page 56

(1)  Q  Do you know what that document is?
(2)  A  It looks like it's a legal document. It's the
(3)  "Opposition to the Motion for Preliminary Injunction."
(4)  Q  Uh-huh. That's a copy of the brief filed on
(5)  behalf of the university --
(6)  A  Okay.
(7)  Q  -- by the Attorney General's Office.
(8)  A  Okay.
(9)  Q  Can you turn to Page 16 of that brief?
(10)  A  Okay.
(11)  Q  And if you look at the text, the body of the
(12)  brief, if you look up about four lines from the bottom,
(13)  can you read where it describes -- can you read how the
(14)  Attorney General describes the program?
(15)  A  That sentence says, "That is unsurprising because
(16)  UT Austin's admissions program is precisely the type of
(17)  system expressly upheld in Grutter."
(18)  Q  Okay. Thank you. Now, the Supreme Court has
(19)  characterized the University of Michigan Law School's use
(20)  of race in admissions decisions as indispensable because
(21)  it raised the level of minority enrollment from 4 percent
(22)  to over 14 percent. Would you say that the
(23)  university's -- The University of Texas at Austin's use of
(24)  race is indispensable in promoting minority enrollment at
(25)  The University of Texas?

Page 57

(1)       MS. KNEELAND: I'm going to object to that.
(2)  To the extent you're asking him to make a legal conclusion
(3)  about what the Supreme Court might conclude about the
(4)  university's use of race, I'm going to -- I'm going to
(5)  direct him not to answer.
(6)       MR. McCARTHY: I'll make it clear. I'm not
(7)  asking what he thinks the Supreme Court would say.
(8)  Q  (By Mr. McCarthy) Dr. Walker, do you think The
(9)  University of Texas's use of race in admissions decisions
(10)  is indispensable to increasing minority enrollment?
(11)  A  Yes.
(12)  Q  Now, earlier you testified that you're not sure
(13)  how much the use of race in admissions decisions has an
(14)  effect on minority enrollment.
(15)  A  I think what I said was that I can't parse out
(16)  race from everything else.
(17)  Q  Okay. So I don't want to misrepresent what you
(18)  said before. So you can't parse it out. Correct?
(19)  A  [Nodding].
(20)  Q  So it's unclear how much the consideration of
(21)  race is making a difference as to minority enrollment
(22)  levels. Correct?
(23)  A  Would you repeat that question again?
(24)  Q  So it's unclear how much the consideration of
(25)  race is having effect on minority enrollment levels.

15  (Pages 54 to 57)

Page 58

(1)  Correct?
(2)  MS. KNEELAND: Objection; form.
(3)  A  So you have asked the negative, if it's unclear.
(4)  Q  (By Mr. McCarthy) Yes. You said --
(5)  A  I would say yes.
(6)  Q  -- you couldn't parse it. Yeah, okay. So it's
(7)  unclear, yes?
(8)  A  Yes.
(9)  Q  Okay. Then how in your opinion is the use of
(10) race indispensable to increasing minority enrollment?
(11) A  Well, it's -- first of all, it lends itself to
(12) having a -- the use of race lends itself to having a
(13) diverse class and all the ways that that can be described.
(14) And the benefits of having a diverse class are so enormous
(15) to us that if -- if the use of race has some help to us,
(16) then it's important -- and I think -- what was your word?
(17) Q  Indispensable?
(18) A  Indispensable to us to have that diverse class.
(19) If that -- if that helps us, then I would say -- I'll use
(20) your word -- indispensable.
(21) Q  Okay. Now, earlier you testified that the use of
(22) race promotes racial diversity. Correct?
(23) A  Yes.
(24) Q  Okay. So now, you -- now, I believe you said
(25) that the use of race helps promote all kinds of diversity

Page 59

(1)  at the university.
(2)  A  That is true.
(3)  Q  And how does it do that?
(4)  A  Well, everyone has a race. Right?
(5)  Q  Uh-huh.
(6)  A  So it's -- if race had a -- let me start the
(7)  statement over again. People that we admit are diverse
(8)  because we -- by design we're trying to have a diverse
(9)  class. Race as being only one of many, many ways that
(10) diversity could come. So when I said -- I think the word
(11) was that race helps us become diverse, then that's what I
(12) meant. You know, you don't come with just a race, you
(13) come with a lot of other characteristics as well.
(14) Q  Okay. So -- but how does the use of race promote
(15) those other characteristics?
(16) A  Well, I thought I just explained it, but maybe I
(17) didn't explain it very well. It's one of many factors.
(18) Race is one of many factors that we use.
(19) Q  Uh-huh.
(20) A  And we don't enroll a student just because they
(21) are black or just because they're white or just because
(22) they're Hispanic. They're going to bring a lot of other
(23) diversity pieces with them.
(24) Q  Uh-huh.
(25) A  So the use of race in that context brings all

Page 60

(1)  kinds of diversity, not just racial diversity, because
(2)  students are more than just their race.
(3)  Q  Students certainly are more than just race, but
(4)  isn't it those other factors aside from race that promote
(5)  other kinds of diversity aside from racial diversity?
(6)  MS. KNEELAND: Objection; form.
(7)  A  Say that again? Ask that question again, please.
(8)  Q  (By Mr. McCarthy) Students certainly are more
(9)  than just their race.
(10) A  That's correct.
(11) Q  But isn't it their characteristics other than
(12) race that promote the kinds of diversity there are other
(13) than racial diversity?
(14) A  Correct.
(15) Q  Okay. So doesn't a student's -- doesn't the
(16) university's use of race promote only racial diversity?
(17) A  No. I mean, you're -- no. I mean, it does --
(18) you're asking me to exclude all the other things the
(19) students bring with them and I can't do that.
(20) Q  I'm not asking you to exclude the other things
(21) that the students bring with them. I understand that
(22) students bring a lot of things and the university has very
(23) much a holistic, full-file review of students to try and
(24) promote lots of kinds of diversity.
(25) A  Including racial.

Page 61

(1)  Q  Including racial. And I don't dispute that at
(2)  all.
(3)  A  Right.
(4)  Q  And that's what -- I understand that's your
(5)  testimony and the testimony of other officials at the
(6)  university has been so far in this case, that all those
(7)  various factors and special circumstances are intended to
(8)  promote all kinds of diversity. Correct?
(9)  A  Correct.
(10) Q  But I'm having a hard time seeing how the use of
(11) race promotes anything other than racial diversity. So,
(12) again, let me ask you and I'll try to ask this in a
(13) different way.
(14) With the understanding that the university's
(15) program -- sorry. Let me start that again.
(16) With the understanding that the university's
(17) admissions program seeks to promote all kinds of
(18) diversity, isn't it true that the factor of race itself
(19) promotes only racial diversity?
(20) A  No. You used the word only, and that's -- no.
(21) Q  What other kinds of diversity are there?
(22) A  Oh, there's geographic diversity, there's --
(23) Q  Let's take geographic diversity.
(24) A  -- socioeconomic diversity, there's --
(25) MS. KNEELAND: Well, he wasn't done, so --

16 (Pages 58 to 61)

Page 62

(1)  Q  I'm sorry. Go ahead.
(2)      MS. KNEELAND: -- why don't you let him --
(3)  Q  Go ahead.
(4)      MS. KNEELAND: -- continue his list.
(5)  Q  (By Mr. McCarthy) Sorry.
(6)  A  There's geographic diversity, there's
(7)  socioeconomic diversity, there's the type of school you
(8)  came from, there's rural, inner city, suburban, there's
(9)  your background growing up, single-family home, there's --
(10) in Texas there's cultural diversity. We're a big state
(11) and different parts of Texas bring different types of
(12) culture. So there's -- there's lots of diversity that
(13) comes.
(14)  Q  Okay. All right. I would like to ask you now a
(15) little bit about HB 588.
(16)  A  Okay.
(17)  Q  How has HB 588 impacted enrollment at The
(18) University of Texas at Austin?
(19)  A  Ain't it a bitch?
(20)      THE WITNESS: Is there a word -- do you have
(21) a word for bitch?
(22)      THE REPORTER: I do. Thank you.
(23)  A  How has it impacted us? Well, a larger and
(24) larger percent of our admissions decisions are now made
(25) automatically through the Top Ten Percent bill. That's

Page 63

(1)  probably the biggest effect that it's had for us.
(2)  Q  (By Mr. McCarthy) Okay.
(3)      MR. McCARTHY: All right. We would like to
(4)  take a break.
(5)      (Recess from 10:18 a.m. to 10:35 a.m.)
(6)      MR. McCARTHY: We've got no more questions
(7)  to ask Dr. Walker right now.
(8)      MS. KNEELAND: All right. We'll reserve for
(9)  trial or whatever.
(10)      (Deposition concluded at 10:35 a.m.)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 64

(1)      CHANGES AND SIGNATURE
(2)  WITNESS NAME: BRUCE WALKER
(3)  DATE OF DEPOSITION: OCTOBER 7, 2008
(4)  PAGE  LINE    CHANGE        REASON
(5)  _____
(6)  _____
(7)  _____
(8)  _____
(9)  _____
(10) _____
(11) _____
(12) _____
(13) _____
(14) _____
(15) _____
(16) _____
(17) _____
(18) _____
(19) _____
(20) _____
(21) _____
(22) _____
(23) _____
(24) _____
(25) _____

Page 65

(1)  _____
(2)  _____
(3)  _____
(4)      I, BRUCE WALKER, have read the foregoing
(5)  deposition and hereby affix my signature that same is true
(6)  and correct, except as noted above.
(7)
(8)      _____
(9)          BRUCE WALKER
(10)
(11) THE STATE OF _____ )
(12) COUNTY OF _____ )
(13)      Before me, _____, on this day personally
(14) appeared BRUCE WALKER, known to me to be the person whose
(15) name is subscribed to the foregoing instrument and
(16) acknowledged to me that they executed the same for the
(17) purposes and consideration therein expressed.
(18)      Given under my hand and seal of office this
(19) _____ day of _____, _____.
(20)
(21)      _____
(22)      NOTARY PUBLIC IN AND FOR
(22)      THE STATE OF _____
(23)
(24)
(25)

17  (Pages 62 to 65)

Page 66

(1)        UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF TEXAS
(2)              AUSTIN DIVISION
(3)
ABIGAIL NOEL FISHER; AND      *
(4) RACHEL MULTER MICHALEWICZ,    *
           Plaintiffs,        *
(5)                           *
VS.                           *  No. 1:08-CV-00263-SS
(6)                           *
STATE OF TEXAS; THE UNIVERSITY *
(7) OF TEXAS AT AUSTIN; ET AL.,   *
           Defendants.        *
(8)
(9)        REPORTER'S CERTIFICATE
           RULE 30(b)(6) DEPOSITION OF BRUCE WALKER
(10)          TUESDAY, OCTOBER 7, 2008
(11)       I, Christy Leslie, Certified Shorthand Reporter
(12) in and for the State of Texas, hereby certify to the
(13) following:
(14)       That the witness, BRUCE WALKER, was duly sworn by
(15) the officer and that the transcript of the oral deposition
(16) is a true record of the testimony given by the witness;
(17)       That the deposition transcript was submitted on
(18) _____ to the witness or to the attorney for
(19) the witness for examination, signature and return to me by
(20) _____;
(21)       That the amount of times used by each party at
(22) the deposition is as follows:
(23)       Mr. Thomas R. McCarthy - 1 hr. 29 minutes
           Ms. Mishell B. Kneeland - 0 minutes
(24)
(25)       That pursuant to information given to the

Page 67

(1) deposition officer at the time said testimony was taken,
(2) the following includes counsel for all parties of record:
(3) FOR THE PLAINTIFFS ABIGAIL NOEL FISHER and
           RACHEL MULTER MICHALEWICZ:
(4)        Mr. Thomas R. McCarthy
           WILEY REIN, L.L.P.
(5)        1776 K. Street, N.W.
           Washington, DC 20006
(6)        (202) 719-7000
(7)        - AND -
(8)        Mr. Paul M. Terrill
           THE TERRILL FIRM, P.C.
(9)        810 W. 10th Street
           Austin, Texas 78701
(10)       (512) 474-9100
(11) FOR THE DEFENDANTS STATE OF TEXAS and UNIVERSITY
           OF TEXAS AT AUSTIN, ET AL.:
(12)       Ms. Mishell B. Kneeland
           OFFICE OF THE ATTORNEY GENERAL OF TEXAS
(13)       General Litigation Division
           P.O. Box 12548
(14)       Austin, Texas 78711-2548
           (512) 463-2120
(15)
(16)       That $_____ is the deposition officer's
(17) charges to the PLAINTIFFS ABIGAIL NOEL FISHER AND RACHEL
(18) MULTER MICHALEWICZ for preparing the original deposition
(19) transcript and any copies of exhibits;
(20)       I further certify that I am neither counsel for,
(21) related to, nor employed by any of the parties or
(22) attorneys in the action in which this proceeding was
(23) taken, and further that I am not financially or otherwise
(24) interested in the outcome of the action.
(25)       Certified to by me this the ____ day of

Page 68

(1) _____, 2008.
(2)
(3)
(4)
(5)        CHRISTY LESLIE, Texas _____ 652
(6)        Expiration Date: 12/31/09
           DepoTexas Austin
(7)        Firm Registration No. 17
           805 W. 10th Street, Suite 400
(8)        Austin, Texas 78701
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

18 (Pages 66 to 68)

Affiliated Reporters & Video   800-969-2752
805 West 10th Street, Suite 400, Austin, Texas   78701

66

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


ABIGAIL NOEL FISHER; AND          *
RACHEL MULTER MICHALEWICZ,         *
          Plaintiffs,             *
                                  *
VS.                               *   No. 1:08-CV-00263-SS
                                  *
STATE OF TEXAS; THE UNIVERSITY    *
OF TEXAS AT AUSTIN; ET AL.,       *
          Defendants.             *


REPORTER'S CERTIFICATE
RULE 30(b)(6) DEPOSITION OF BRUCE WALKER
TUESDAY, OCTOBER 7, 2008

          I, Christy Leslie, Certified Shorthand Reporter

in and for the State of Texas, hereby certify to the

following:

          That the witness, BRUCE WALKER, was duly sworn by

the officer and that the transcript of the oral deposition

is a true record of the testimony given by the witness;

          That the deposition transcript was submitted on

October 16th, 208 to the witness or to the attorney for

the witness for examination, signature and return to me by

November 17th, 208;

          That the amount of times used by each party at

the deposition is as follows:

          Mr. Thomas R. McCarthy - 1 hr. 29 minutes
          Ms. Mishell B. Kneeland - 0 minutes

          That pursuant to information given to the

67

1    deposition officer at the time said testimony was taken,

2    the following includes counsel for all parties of record:

3         FOR THE PLAINTIFFS ABIGAIL NOEL FISHER and
          RACHEL MULTER MICHALEWICZ:
4              Mr. Thomas R. McCarthy
               WILEY REIN, L.L.P.
5              1776 K. Street, N.W.
               Washington, DC 20006
6              (202) 719-7000

7         - AND -

8              Mr. Paul M. Terrill
               THE TERRILL FIRM, P.C.
9              810 W. 10th Street
               Austin, Texas 78701
10             (512) 474-9100

11        FOR THE DEFENDANTS STATE OF TEXAS and UNIVERSITY
          OF TEXAS AT AUSTIN, ET AL.:
12             Ms. Mishell B. Kneeland
               OFFICE OF THE ATTORNEY GENERAL OF TEXAS
13             General Litigation Division
               P.O. Box 12548
14             Austin, Texas 78711-2548
               (512) 463-2120

15

16        That $_____ is the deposition officer's

17   charges to the PLAINTIFFS ABIGAIL NOEL FISHER AND RACHEL

18   MULTER MICHALEWICZ for preparing the original deposition

19   transcript and any copies of exhibits;

20        I further certify that I am neither counsel for,

21   related to, nor employed by any of the parties or

22   attorneys in the action in which this proceeding was

23   taken, and further that I am not financially or otherwise

24   interested in the outcome of the action.

25        Certified to by me this the 14th day of

68

1    _____October_____, 2008.

2

3

4

5    _Christy L. Leslie_

6    CHRISTY LESLIE, Texas CSR 7652
     Expiration Date: 12/31/09

7    DepoTexas Austin
     Firm Registration No. 17

8    805 W. 10th Street, Suite 400
     Austin, Texas 78701

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25