# EXHIBIT

# 17

CAUSE NO. 1:08 CA 263SS

| | | |
|---|---|---|
| Abigail Fisher and Rachel Multer Michalewicz | § § § § | In The United States District Court |
| v. | § § | For The Western District of Texas |
| State of Texas, University of Texas at Austin, Mark Yudof, David Pryor, Barry Burgdorf, William Powers, et al | § § § § | (Austin Division) |

**AFFIDAVIT of KEDRA B. ISHOP**

STATE OF TEXAS
COUNTY OF TRAVIS

BEFORE ME, the undersigned authority, personally appeared Kedra B. Ishop, who, being by me duly sworn, upon his/her oath stated:

1. My name is Kedra B. Ishop. I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated in it.

2. I have been employed in the Office of Admissions at the University of Texas at Austin since 1998 and have held the position of Associate Director of Admissions since 2003. As part of my job duties I participate directly in all facets of the admissions process at the University. In particular I was very involved in all aspects of the 2008 admissions process which included the applications of Ms. Fisher and Ms. Michalewicz, who are plaintiffs in a suit recently filed against the University of Texas at Austin. I have recently reviewed the admissions files of both Ms. Fisher and Ms. Michalewicz.

3. The review of admissions applications involves a calculation of a predicated grade point average (pgpa) via a multiple regression equation. SAT/ACT score, class rank, and whether an applicant exceeds the UT required curriculum are factors in the calculation. This pgpa represents the Academic Index (AI) in the admissions process.

4. Beyond the calculation of the AI, the admissions process determines a Personal Achievement Index (PAI). The PAI is UT's holistic evaluation. Applicants are required to submit two essays. Applicants may choose to submit an optional third essay detailing special circumstances, a resume or detailed listing of extracurricular activities, honors, awards, work experience, service. In addition to encompassing essays, the PAI includes

Page 1 of 7

an evaluation of the applicant's demonstrated leadership qualities, extracurricular activities, honors and awards, work experience, community service, and a variety of special personal circumstances, including the socioeconomic status of the family and school, a single-parent home, languages other than English spoken at home, family responsibilities, and (starting with the fall class of 2005) race. No numerical factor is assigned to any component of the PAI. And race may be beneficial for minorities or non-minorities alike, depending on the factors of a particular situation. Further, applicants may choose to answer questions or present information related to other special circumstances to be considered in the evaluation of their file.

5.  Each essay is read and scored according to a scale of 1-6 by an admissions file reader. The application, including essays and any supplemental information provided by the applicant (i.e. letters of recommendation, additional essays, and resume) is reviewed and assigned a personal achievement score on a scale of 1-6. From the three scores, two essays and a personal achievement score, a PAI is computed. The value of personal achievement is given slightly more weight than the essays in the calculation.

6.  The purpose of reading admissions files is to produce a Personal Achievement Index. The readers are not making admissions decisions at the point of file review but are simply assigning a score. Nor is the reader making a judgment regarding academic strength, which is accounted for in the AI.

7.  Undergraduate admissions decisions are made for 11 Colleges and Schools within the University. Three competitive pools exist: Texas resident, non-resident, and foreign students. Admission decisions for Texas and non-resident applicants are made by the liaison to a particular college or school. Foreign admission decisions are made by admissions staff in the Graduate and International admissions office. Applicants are separated into these three pools and they compete only against themselves for admission.

8.  For 6 Colleges and Schools, decisions are made at the College/School level by the admissions office. The AI/PAI requirements for entry to these programs are the same regardless of the major admitted to within the college/school. These are Liberal Arts, Social Work, Nursing, Business, Communications, and Geosciences.

9.  For 3 colleges and schools decisions are made for specific majors by the admissions officers per our enrollment management principles. Natural Sciences decisions are made for Computer Science and all other majors. Education decisions are made for kinesiology, special education, bilingual education, and general education. Engineering decisions are made for architectural, aerospace, electrical and computer, chemical, civil, mechanical, and petroleum engineering.

10. Decisions for the remaining two, the School of Fine Arts and School of Architecture, are made within the Dean's offices and in consultation with the admissions office.

11. The admissions process begins by establishing automatic admissions cut-off's for individual colleges and schools. Per University policy, Top 10% impacted schools are allowed to restrict the percentage of their class that is automatically admitted. Business, Communications, Nursing, Kinesiology, and each major in Engineering restrict to no more than 75% of their program spaces being offered automatically per HB588. Fine Arts and Architecture do not grant HB588 (Top Ten Percent) automatic admissions.

12. The admissions office also establishes 'A' group and 'C' group parameters for some colleges and schools. These parameters are based on the Academic Index. Five colleges/schools had 'A' groups for the entering class of 2008: Natural Sciences (3.5 pgpa), Geosciences (3.6 pgpa), Liberal Arts (3.9 pgpa), Social Work (3.6 pgpa), and three programs in Education (ALD (3.6 pgpa), special education (3.4 pgpa), and bilingual education (3.4)). 'A' group applicants are those who have high AI's and who will be offered admission based solely on their AI. The exceptional academic strength of these applicants determines their earlier (rolling) admission, allowing the admissions office to offer earlier admittance to a highly competitive student. 'C' group applicants are those whose AI has typically rendered their admissions chances as highly unlikely. All applicants with a pgpa 2.599 and below are 'C' group applicants. These files are reviewed by a senior admissions reader and are referred for a full file review if warranted from the contents of the file. If referred for a full review, the review process is the same as the review of any other applicant. If not referred for full file review, the file is assigned review scores of 3-3-3.

13. Early on, in each year's admissions process there are training sessions for essay and full file readers, led by faculty member, Brian Bremen, a recognized national expert in holistic reading. For the entering class of 2008, 45 readers participated in essay/file review. - This year the reading process began in mid-October 2007 and ended in the third week of February 2008. Four full months of reading were required to review 17,131 files.

14. As files are read, the scores from the PAI are combined with the AI to place an applicant on the corresponding cell on the matrix for the college/school/major to which they are applying. Following the completion of file review, the liaisons for the three most impacted programs, Business, Communications, and Engineering, meet to begin the admission and cascade process. The number of applicants within the cells guides the liaison making admissions decision as he/she decides where to establish the cut-off for admits and cascades. When the line is drawn to establish the admitted cells, the

remaining applicants are cascaded to their second choice major, where the process begins again. Admission decisions are made while keeping in mind the number and quality of applicants cascading to a college/school/major as a second choice. This ensures that applicants have equal consideration for their first and second choice major. This process continues with all other college/school/majors until all non-admitted applicants are cascaded to Liberal Arts Undeclared for final Fall semester consideration.

15.     If a non-resident applicant is not admitted for their first or second choice major or into the Liberal Arts Undeclared major, the applicant is denied admission. If a resident applicant is not admitted but falls in a cell on their matrix grid close to applicants who were admitted, the applicant's file is re-read by a senior reader. Based on that second reading, the reader decides whether to admit the applicant to the fall semester, to the summer semester, or through the Coordinated Admission Program ("CAP"). CAP allows students to transfer to the University of Texas at Austin after completing the CAP terms, including 30 approved credit hours their freshman year at a participating System campus and maintaining at least a 3.2 GPA. All Texas residents are at least offered the option of participating in the CAP program through which they can be admitted into the University of Texas at Austin.

16.     The admissions process for the entering class of 2008 was an unprecedented experience. At the point of the admissions process in which 'review' decisions were made, 92% of the Texans spaces were awarded to Top 10% applicants. Approximately 841 spaces remained University wide for Texans to be admitted to the Fall semester after accounting for the top 10% automatic admits.

17.     It is my understanding that Ms. Fisher and Ms. Michalewicz have asked in their suit to be re-considered for admission under UT's current policy with the exception that race not be a factor. Reconsidering an applicant for the 2008 entering class utilizing the current holistic approach but without race as a consideration would require a significant and time intensive effort on the part of the Office of Admissions. This is so because the impact of race/ethnicity/and cultural background is contextually individualized to each applicant. It is not a value or figure that can be removed, after the fact; from the admissions process to determine is there is an alternative result. Race, ethnicity, and cultural background are a factor in the personal achievement component of the file review. Beginning with the senior staff review training in mid-October, the contextual influence of race, ethnicity, and cultural background is mixed into the holistic evaluation of all applicants. Readers are calibrated on the holistic evaluation of files and progress through the reading season making their decisions based on that calibration. At no point during the admissions process, is the racial or ethnic composition of admitted students tracked for the purposes of responding to diversity concerns. There is no place from which race can be removed except at the very beginning of the admissions process.

18. As previously discussed, the impact of HB588 admits was significant for the class of 2008. Given the lack space available due to the Top 10% Plan, it is accurate to say that neither Ms. Fisher nor Ms. Michalewicz would have gained admission through the fall review process. Their respective AI's of 3.3 (Fisher) and 3.1 (Michalewicz) were not high enough to gain admission to Business or Liberal Arts. Because of the lack of space beyond Top 10% admits in liberal arts, all applicants who cascaded to Liberal Arts undeclared were only eligible for Summer Freshman Class (SFC) admission or a Coordinated Admissions Program (CAP) offer unless their pgpa exceeded a 3.5. Consequently, as part of the standard review process, no PAI score, even a "perfect" score of 6-6-6, would have resulted in an admissions offer to the Fall semester for either Ms. Fisher or Ms. Michalewicz..

19. Cuts were drawn to re-read 3,029 applicants for consideration for the Summer Freshman Class. Both plaintiffs were considered in this review. It is at this point that a reconsideration of the plaintiff's files could be possible. .

20. The SFC re-read is a slightly different process than the Fall review process. At the point of the SFC read, all applicants have been read and scored; all have a PAI and AI. A qualifying AI/PAI combination places applicants in SFC re-reads. Approximately twice as many applicants are placed in the SFC re-read as there is space available for the SFC. Approximately 1,400 spaces were available in the SFC class. More than 3,000 applicants were re-read for this consideration.

21. During the re-read process, senior admissions staff readers convene in the Director's office for 5-6 days to re-read the more than 3,000 files to award the SFC spaces, remaining CAP spaces, and in the event that a truly exceptional applicant is found, a Fall space. Approximately 80 files were referred from SFC re-reads for Fall admission.

22. In re-reads the admissions staff makes an actual admission decision. These decisions are made individually and/or by consultation with another or multiple reader(s) at the reader's discretion. Re-read staff is aware of the scores previously assigned the files. Nonetheless, the entire file is read and a point-of-read decision is made on the applicant. The reader is not bound to the score assigned the file.

23. In order to determine the applicant pool in which the plaintiff's can be considered, the review process must be reversed to the point in which race/ethnicity/cultural background is accounted for in the holistic review process. To accurately represent the admissions process in a race-neutral way, the admissions staff must be recalibrated in the review of holistic files. This recalibration is necessary to allow the files to be

Page 5 of 7

reconsidered in a race-neutral way. Every file read is potentially influenced by the context of race/ethnicity/and cultural background. It is impossible to know which files, how they were influenced, or where they fell on the matrix. Thus, the matrix must be recreated to allow the AI/PAI cells to be refilled.

24. To recreate the Liberal Arts Undeclared matrix, the point at which SFC/CAP decisions are made it is necessary to retrain and re-read complete, Texan, non-HB588 applications. As previously mentioned, the point of impact for race/ethnicity/cultural background is unknown and to remove it means simply, to start over. As such, 10,296 files must be re-read.

25. To reverse this process, the admissions system must be reprogrammed to accommodate this re-read process. It is estimated that a reconfiguring of the admissions system would require approximately 3 weeks of full-time programming time by at least three analysts at a staff cost of approximately $12,876.

26. Following a reconfiguring of the admissions systems, the reprinting of 10,296 would produce approximately 72,072 pages of paper. The Office of Admissions has 4 high speed printers capable of printing approximately 1,000 pages a day. This rate of printing is more than sufficient for a typical admissions cycle but will require frequent cooling to produce 72,072 pages. This will require approximately 18 days of full-time printing accounting for cooling. Reprinting costs, including toner and paper, would cost approximately $3200. Additional printers would cost approximately $1500.

27. Personal achievement readers are generally expected to read 8 files per hour. The re-reading of 10,296 files would require 1,287 hours of reading. 22 readers read personal achievement. Each would read approximately 468 files. An estimated staff cost of $47,001 is necessary for 10 days of reading. Four readers are situated in satellites offices around the state of Texas. Additional costs of approximately $6500 would be incurred for lodging and meals for these staff members.

28. After all files are read and replaced on the Liberal Arts matrix, the SFC evaluation would be necessary to re-evaluate the plaintiff's in a race neutral way.

29. The minimal administrative burden would require 8.5 weeks of full-time commitment at the expense of any other administrative duties. Minimal staff costs would be approximately $69,577. This time frame presumes that no other administrative and admissions duties would occur during the Student Information Systems re-programming, re-print, or re-read process. Given the cyclical nature of the admissions process, it is unrealistic to assume that the Office of Admissions could cease its other admissions and administrative duties to accomplish this task in the aforementioned timeframe. Eight and

a half weeks from the date of this statement is beyond the start of classes for the SFC. The predominant result of the SFC re-read is a SFC or CAP admit/offer. Time alone would preclude the ability of offering an SFC admit to the plaintiffs.

*Kedra Ishop*
Kedra B. Ishop

SUBSCRIBED AND SWORN TO BEFORE ME on the 5th day of May 2008, to certify which witness my hand and official seal.

*Leea C. Mechling*

Notary Public in and for the State of Texas



LEEA C MECHLING
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-28-2011

Page 7 of 7