# EXHIBIT

# 26



# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

February 5, 1997

Mr. William P. Hobby                          Letter Opinion No. 97-001
Chancellor
University of Houston System                  Re:  Effect of *Hopwood v. State of Texas* on
1600 Smith, Suite 3400                        various scholarship programs of the University of
Houston, Texas  77002-7347                    Houston  (ID# 39347)


Dear Chancellor Hobby:

     We have received your opinion request dated January 15, 1997, in which you ask various
questions concerning the specific effect of the Fifth Circuit Court of Appeals decision in *Hopwood
v. State*, 78 F.3d 932 (5th Cir. 1996), *reh'g en banc denied*, 84 F.3d 720 (5th Cir. 1996), *cert.
denied*, 116 S. Ct. 2581 (1996). You first question the application of *Hopwood* to financial aid
programs and its precedential value in light of the 1978 decision of the United States Supreme Court
in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978).  You then ask about
*Hopwood's* impact on five specific scholarship programs and certain University of Houston data
collection activities.  Because of the importance of these issues to the higher education community
of this state, we have expedited a response to you.

     To answer your questions fully, however, it is first necessary to trace the development of the
Equal Protection case law involving governmental preferences based on race decided by the United
States Supreme Court.  We will then examine the *Hopwood* decision itself.

## Equal Protection Analysis

     The Equal Protection Clause, which is found in section 1 of the Fourteenth Amendment,
mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of
the laws."[1]  The Supreme Court has interpreted this to mean that any racial classification made by
government is highly suspect and must be reviewed under the most exacting judicial scrutiny. *City*

---

[1]Title 42 of the United States Code, section 2000d, provides: "No person in the United States shall on the ground
of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving federal financial assistance."  We do not discuss the requirements
of title VI in this opinion because it proscribes "only those racial classifications that would violate the Equal Protection
Clause or the Fifth Amendment." *Bakke*, 438 U.S. at 287 (J. Powell); *United States v. Fordice*, 505 U.S. 717 (1992) ("our
cases make clear, and the parties do not disagree, that the reach of title VI's protection extends no further than the Fourteenth
Amendment." (citations omitted)).  We note, however, that the prohibitions of title VI would apply to any institution, public
or private, that receives federal financial assistance.

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 3 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 3 of 25
Chancellor William P. Hobby - Page 2   (LO97-001)

of *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *Adarand Constructors v. Pena*, — U.S. —, 115 S. Ct. 2097, 2110 (1995). In *Bakke*, Justice Powell explained that:

> The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal . . . . Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination. This perception of racial and ethnic distinctions is rooted in our Nation's constitutional and demographic history.

438 U.S. at 291.

In *Bakke*, the Supreme Court invalidated a special admissions program that reserved sixteen of the one hundred seats in the first year medical school class to disadvantaged minority students[2] at the University of California at Davis. The proffered justifications for the program were the desire "to reduc[e] the historic deficit of traditionally disfavored minorities in medical school and the medical profession," the need to "counte[r] the effects of societal discrimination," the need to "increas[e] the number of physicians who will practice in communities currently underserved," and, to "obtain the educational benefits that flow from an ethnically diverse student body." *Id.* at 306.

Justice Powell, writing for a divided court,[3] ruled that the special admissions program violated

---

[2] The medical school targeted "Blacks, Chicanos, Asians, and American Indians" for this special treatment. *Id.* at 274.

[3] Four Justices—Brennan, White, Marshall, and Blackmun—joined in that part of the opinion that recognized the State's substantial interest in a specially devised admissions program that involved the competitive use of race and ethnicity. They interpreted the central meaning of the Court's decision to be that:

> Government may take race into account when it acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area.

*Bakke*, 438 U.S. at 325. They concluded that the school's "articulated purpose of remedying the effects of past societal discrimination is, under our cases, sufficiently important to justify the use of race-conscious admissions programs where there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access of minorities to the Medical School." *Id.* at 362. Although these four Justices approved of the use of past societal discrimination as a constitutionally sufficient justification for affirmative action, this was not the view of the Court's opinion, *see, e.g., id.* at 307-11, and has consistently not been the view of the Supreme Court in cases decided since *Bakke*, *see, e.g.*, *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986); *Croson*, 488 U.S. 469; *Adarand Constructors*, 115 S. Ct. 2097.

Four of the Justices—Stevens, Chief Justice Burger, Stewart, and Rehnquist—ruled that the program had violated title VI of the Civil Rights Act, which prohibits discrimination on the basis of race, color, and national origin in any program
(continued...)

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 4 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 4 of 25
Chancellor William P. Hobby - Page 3   (LO97-001)

the Equal Protection Clause of the Fourteenth Amendment because the proffered justifications were constitutionally insufficient to allow the racial preferences of the program. He noted that "[p]referring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the United States Constitution forbids." *Id.* at 307 (citations omitted). However, he also concluded that "the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." *Id.* at 320. But, "when a State's distribution of benefits or imposition of burdens hinges on ancestry or the color of a person's skin, that individual is entitled to a demonstration that the challenged classification is necessary to promote a substantial state interest." *Id.* Justice Powell did not agree with the medical school that it had a compelling interest in countering the effects of past societal discrimination. He explained his disapproval of this justification in the following passage:

> We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit. Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm.

*Id.* at 307-09 (citations omitted). Moreover, Justice Powell denied that the University of California had the competence or authority to make these determinations:

---

³(...continued)

or activity receiving federal financial assistance, because the medical school through the use of the special admissions program had discriminated against Alan Bakke on account of his race. In an opinion authored by Justice Stevens, these four Justices reasoned:

> The University through its special admissions policy, excluded Bakke from participation in its program of medical education because of his race. The University also acknowledges that it was, and still is, receiving federal financial assistance. The plain language of the statute therefore requires affirmance of the judgment below. A different result cannot be justified unless that language misstates the actual intent of the Congress that enacted the statute or the statute is not enforceable in a private action. Neither conclusion is warranted.

*Bakke*, 438 U.S. at 412. Having found a statutory violation, these four Justices saw no need in addressing the Equal Protection issue.

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 5 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 5 of 25
Chancellor William P. Hobby - Page 4   (LO97-001)

> [The University] does not purport to have made, and is in no position
> to make, such findings. Its broad mission is education, not the
> formulation of any legislative policy or the adjudication of particular
> claims of illegality. For reasons similar to those stated in Part III of this
> opinion, isolated segments of our vast governmental structures are not
> competent to make those decisions, at least in the absence of legislative
> mandates and legislatively determined criteria. . . . Before relying upon
> these sorts of findings in establishing a racial classification, a
> governmental body must have the authority and capability to establish,
> in the record, that the classification is responsive to identified
> discrimination. . . . Lacking this capability, [the University] has not
> carried its burden of justification on this issue.

*Id.* at 309-10 (citations omitted). The only interest Powell deemed constitutionally sufficient to justify a program that takes race and ethnicity into account was the school's interest in *educational* diversity, not the *ethnic* diversity practiced by the medical school. "The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element. [The University's] special admissions program, focused *solely* on ethnic diversity, would hinder rather than further attainment of genuine diversity." *Id.* at 315 (emphasis in original). Although Justice Powell believed a university could use *educational* diversity as a constitutionally sufficient justification for a special admissions program in which race or ethnicity was a factor, albeit not a determinative factor, the medical school had used race or ethnicity as the determinative factor, which he believed to be constitutionally impermissible.

Unfortunately, there was no clear majority in *Bakke*. Four Justices agreed with that portion of Justice Powell's opinion that invalidated the special admissions program, not because it violated the Equal Protection Clause but rather because it violated title VI.[4] In addition, four different Justices agreed with that portion of Justice Powell's decision which recognized that a state has a substantial interest that may be served "in a properly devised admissions program involving the competitive consideration of race and ethnic origin," not on educational diversity grounds but on grounds that the state may adopt a race-conscious program if needed to remove the disparate impact its actions otherwise may have and if there is reason to believe that the disparate impact itself is the result of past discrimination, either its own or society's at large.[5] *Id.* at 369. Moreover, there was

---

[4]*See* footnote 3, *supra.*

[5]*See* footnote 3, *supra.* These four Justices would not apply the strict scrutiny standard of review in equal protection cases involving race preferences by government. Rather, they would apply an intermediate standard of review: governmental race preferences designed to further remedial purposes would be constitutional if they served important governmental objectives and were substantially related to achieving those objectives. *Bakke,* 438 U.S. at 359; *see also Wygant,* 476 U.S. at 302 (Marshall, J., dissenting).

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 6 of 25
Case 1:08-cv-00263-SS     Document 29-5      Filed 04/17/2008     Page 6 of 25
Chancellor William P. Hobby - Page 5   (L09/-001)

no Court majority for the proposition that governmental preferences made on the basis of race or ethnicity must be reviewed under the strict scrutiny standard.

The Supreme Court next addressed the issue of racial preferences eight years later in *Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986), which involved a school board's policy of extending preferential protection against layoffs to minority employees because of their race. The school board justified its preference program on two grounds. First, the board argued that it had an interest in providing minority role models for its minority students as an attempt to alleviate the effects of societal discrimination. Second, the school board argued that it was attempting to remedy prior discrimination that it had perpetrated on minorities.

Again writing for a divided Court, Justice Powell, the author of the *Bakke* decision, disposed of the first justification quickly:

> This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination. . . .
>
> . . . .
>
> Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy. The role model theory announced by the District Court and the resultant holding typify this indefiniteness. There are numerous explanations for a disparity between the percentage of minority students and the percentage of minority faculty, many of them completely unrelated to discrimination of any kind. In fact, there is no apparent connection between the two groups. . . . No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

*Wygant*, 476 U.S. at 275-76 (emphasis in original). In reviewing the second justification, remedying past discrimination, Justice Powell's plurality opinion noted that

> a public employer like the Board must ensure that, before it embarks on an affirmative action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 7 of 25
Case 1:08-cv-00263-SS    Document 29-5     Filed 04/17/2008     Page 7 of 25
Chancellor William P. Hobby - Page 6    (LO97-001)

> Under strict scrutiny, the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose. "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."

*Id.* at 277, 280 (citations omitted). Although Justice Powell's plurality opinion recognized that the board had a compelling governmental interest in remedying the present effects of its past discrimination, it nonetheless invalidated the policy because it was not narrowly tailored to accomplish the remedial purpose. Justice Powell reasoned:

> Here . . . the means chosen to achieve the Board's asserted purposes is that of laying off nonminority teachers with greater seniority in order to retain minority teachers with less seniority. We have previously expressed concern over the burden that a preferential-layoffs scheme imposes on innocent parties. In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.
>
> . . . .
>
> While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive. We therefore hold that, as a means of accomplishing purposes that otherwise may be legitimate, the Board's layoff plan is not sufficiently narrowly tailored. Other, less intrusive means of accomplishing similar purposes—such as the adoption of hiring goals—are available. For these reasons, the Board's selection of layoffs as the means to accomplish even a valid purpose cannot satisfy the demands of the Equal Protection Clause.

*Id.* at 281-84 (citations omitted) (emphasis in original). Only three other Justices joined with Justice Powell in subjecting the board's racially preferential layoff policy to strict scrutiny review.

Three years later, in *Croson*, 488 U.S. 469, a majority of the Justices of the Supreme Court finally agreed that the Equal Protection Clause of the Fourteenth Amendment requires that racial preferences made by state and local governments be subject to strict scrutiny review. *See also Adarand Constructors*, 115 S. Ct. 2097 ("With *Croson*, the Court finally agreed that the Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments.").

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 8 of 25
Case 1:08-cv-00263-SS       Document 29-5       Filed 04/17/2008       Page 8 of 25
Chancellor William P. Hobby - Page 7   (LO97-001)

The *Croson* Court, in a decision written by Justice O'Connor, invalidated a set-aside program that "required prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more" minority-owned businesses.[6] If the prime contractor was a minority business, then it did not have to subcontract thirty-percent of the contract to another minority firm. *Croson*, 488 U.S. at 477-78.

The plan was adopted by the Richmond city council after a public hearing in which "[t]here was no direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors." *Id.* at 480. Rather, the city council found that there were present effects of past discrimination in the construction industry generally. The city council justified the set-aside by declaring that "it was 'remedial' in nature and enacted 'for the purpose of promoting wider participation by minority business enterprises in the construction of public projects.'" *Id.* at 478. The plan expired at the end of five years. *Id.*

The Supreme Court began its review of the set-aside program by announcing that strict scrutiny must be used in Equal Protection cases involving racial preferences made by government:

> As this Court has noted in the past, the "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights." *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S. Ct. 836, 846, 92 L. Ed. 1161 (1948). The Richmond Plan denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race. To whatever racial groups these citizens belong, their "personal rights" to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decision making.

> Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are . . . in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

> Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility. *See*

---

[6] The city defined minorities as "citizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Croson*, 488 U.S. at 478.

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 9 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 9 of 25
Chancellor William P. Hobby - Page 8   (LO97-001)

> *University of California Regents v. Bakke*, 438 U.S. at 298, 98 S. Ct. at
> 2752 (opinion of Powell, J.) ("[P]referential programs may only reinforce
> common stereotypes holding that certain groups are unable to achieve
> success without special protection based on a factor having no relation to
> individual worth."). We thus reaffirm the view expressed by the plurality
> in *Wygant* that the standard of review under the Equal Protection Clause
> is not dependent on the race of those burdened or benefited by a particular
> classification.

*Id.* at 493-94 (citations omitted). After strictly scrutinizing the set-aside program, the Supreme
Court ruled that the City of Richmond had shown no compelling governmental interest in
eradicating the present effects of past discrimination. To begin with, there was no evidence that
the city had discriminated against the preferred minorities, much less any evidence of the present
effects of the city's past discrimination against the preferred minorities. Indeed, the Court noted
that it would have been impossible for the city to have shown discrimination against Aleuts and
Eskimos, two of the preferred groups.[7] Moreover, the Court noted that the city could have justified
its program as a way to eradicate the present effects of past private discrimination in which the city
had been a passive participant:

> Thus, if the city could show that it had essentially become a "passive
> participant" in a system of racial exclusion practiced by elements of the
> local construction industry, we think it clear that the city could take
> affirmative steps to dismantle such a system. It is beyond dispute that
> any public entity, state or federal, has a compelling interest in assuring
> that public dollars, drawn from the tax contributions of all citizens, do
> not serve to finance the evil of private prejudice. *Cf. Norwood v.
> Harrison*, 413 U.S. 455, 465, 93 S. Ct. 2804, 2810, 37 L. Ed. 2d 723
> (1973) ("Racial discrimination in state-operated schools is barred by the
> Constitution and [i]t is also axiomatic that a state may not induce,
> encourage or promote private persons to accomplish what it is
> constitutionally forbidden to accomplish.").

---

[7]The Court said in this regard:

> There is *absolutely no evidence* of past discrimination against Spanish-speaking,
> Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction
> industry. The District Court took judicial notice of the fact that the vast majority of
> "minority" persons in Richmond were black. It may well be that Richmond has never had
> an Aleut or Eskimo citizen. The random inclusion of racial groups that, as a practical
> matter, may never have suffered from discrimination in the construction industry in
> Richmond, suggests that perhaps the city's purpose was not in fact to remedy past
> discrimination.

*Id.* at 506 (citation omitted) (emphasis added).

Chancellor William P. Hobby - Page 9   (LO97-001)

*Id.* at 492-93 (citations omitted). But the record was devoid of any evidence of past discrimination by the city's prime contractors in which the city had been a passive participant. Rather, the city justified its program on past industry-wide discrimination. In holding that this justification was constitutionally insufficient, the Court reasoned that:

> Like the "role model" theory employed in *Wygant*, a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It "has no logical stopping point."
>
> . . . .
>
> While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. Like the claim that discrimination in primary and secondary schooling justifies a rigid racial preference in medical school admissions, an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.
>
> It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, just as it was sheer speculation how many minority medical students would have been admitted to the medical school at Davis absent past discrimination in educational opportunities. Defining these sorts of injuries as "identified discrimination" would give local governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.

*Id.* at 498-99 (citations omitted). In addition to concluding that Richmond had shown no compelling governmental interest, the court also found that the program was not narrowly tailored for two reasons:

> First, there does not appear to have been any consideration of the use of race-neutral means to increase minority business participation in city contracting.
>
> . . . .
>
> Second, the 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing. It rests upon the "completely unrealistic" assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population.

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 11 of 25
Case 1:08-cv-00263-SS   Document 29-5      Filed 04/17/2008    Page 11 of 25
Chancellor William P. Hobby - Page 10    (LO97-001)

*Id.* at 507 (citation omitted). Thus, the Court ruled that the set-aside program violated the Equal Protection Clause and was, therefore, unconstitutional.

In 1993, the Supreme Court once again considered the use of race by state governments, this time in congressional redistricting legislation in which majority-minority districts were drawn pursuant to section 2 of the Voting Rights Act. The Court ruled, in *Shaw v. Reno*, 509 U.S. 630, 649 (1993), that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." In so ruling, the Court noted that in previous cases involving racial preferences, they had "held that the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest." *Id.* at 643.

The Court addressed the same issue again two years later, in *Miller v. Johnson*, —U.S.—, 115 S. Ct. 2475 (1995) and in *United States v. Hays*, —U.S.—, 115 S. Ct. 2431 (1995). In *Miller v. Johnson*, the Court explained that

> the essence of the equal protection claim recognized in *Shaw* is that the
> State has used race as a basis for separating voters into districts. Just as
> the State may not, absent extraordinary justification, segregate citizens
> on the basis of race in its public parks, buses, golf courses, beaches, and
> schools, so did we recognize in *Shaw* that it may not separate its citizens
> into different voting districts on the basis of race. The idea is a simple
> one: "At the heart of the Constitution's guarantee of equal protection
> lies the simple command that the Government must treat citizens 'as
> individuals, not "as simply components of a racial, religious, sexual, or
> national class."'" When the State assigns voters on the basis of race, it
> engages in the offensive and demeaning assumption that voters of a
> particular race, because of their race, "think alike, share the same political
> interests, and will prefer the same candidates at the polls." Race-based
> assignments "embody stereotypes that treat individuals as the product of
> their race, evaluating their thoughts and efforts--their very worth as
> citizens--according to a criterion barred to the Government by history
> and the Constitution."

*Miller*, 115 S. Ct. at 2485-86 (citations omitted). And in *Hays*, the Court ruled that "[w]here a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore, has standing to challenge the legislature's action. Voters in such districts may suffer the special representational

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 12 of 25
Case 1:08-cv-00263-SS   Document 29-5     Filed 04/17/2008     Page 12 of 25

Chancellor William P. Hobby - Page 11    (LO97-001)

harms racial classifications can cause in the voting context." *Hays*, 115 S. Ct. at 2436 (citation omitted.).[8]

In 1995, six years after *Croson*, the Supreme Court ruled that Equal Protection cases involving the use of racial preference by the *federal* government had to undergo strict scrutiny in order to assess their constitutionality. *Adarand Constructors*, 115 S. Ct. at 2113 ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests."). In reaching this result, Justice O'Connor, writing for the Court, reviewed the Equal Protection case law involving the use of racial preferences by government up through and including *Croson*. She distilled from these cases three general propositions regarding governmental racial classifications:

> First, skepticism: "'[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination.'" Second, consistency: "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefitted by a particular classification." And third, congruence: "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." Taken together, these three propositions lead to the conclusion that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.

*Id.* at 2111 (citations omitted).

With these cases as prologue, the Fifth Circuit Court of Appeals issued its decision in *Hopwood*.

## The Hopwood Decision

The *Hopwood* decision was issued on March 18, 1996. In *Hopwood*, a panel of the Fifth Circuit ruled that the defendants had shown no compelling state interest for an affirmative action program at the University of Texas School of Law that granted preferences to African-American and Mexican-American applicants. Specifically, the *Hopwood* panel ruled that: (1) diversity was not a compelling state interest; and, (2) the defendants had not presented sufficient evidence of a remedial need for the affirmative action program.

_____

[8]Last term, the Supreme Court struck down our state's congressional redistricting legislation as unconstitutional on the grounds that it violated the Equal Protection Clause of the Fourteenth Amendment because we had created three majority-minority districts that were not narrowly tailored to reach the state's compelling interest in complying with section 2 of the Voting Rights Act. *Bush v. Vera*, —U.S.—, 116 S. Ct. 1941 (1996).

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 13 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 13 of 25
Chancellor William P. Hobby - Page 12   (LO97-001)

As to the diversity basis for affirmative action, the Fifth Circuit concluded:

> In sum, the use of race to achieve a diverse student body, whether as a proxy for permissible characteristics, simply cannot be a state interest compelling enough to meet the steep standard of strict scrutiny. These latter factors may, in fact, turn out to be substantially correlated with race, but the key is that race itself not be taken into account. Thus, that portion of the district court's opinion upholding the diversity rationale is reversibly flawed.

*Hopwood*, 78 F.3d at 948 (footnotes omitted). The court ruled, by a vote of 2-1,[9] that Justice Powell's opinion in *Bakke* recognizing a compelling state interest in diversity is not, and has not been, the law. In reaching this conclusion, the panel reasoned:

> Justice Powell's argument in *Bakke* garnered only his own vote and has never represented the view of a majority of the Court in *Bakke* or any other case. Moreover, subsequent Supreme Court decisions regarding education state that non-remedial state interests will never justify racial classifications. Finally, the classification of persons on the basis of race for the purpose of diversity frustrates, rather than facilitates, the goals of equal protection.
>
> Justice Powell's view in *Bakke* is not binding precedent on the issue. While he announced the judgment, no other Justice joined in that part of the opinion discussing the diversity rationale. In *Bakke*, the word "diversity" is mentioned nowhere except in Justice Powell's single-Justice opinion. In fact, the four-Justice opinion, which would have upheld the special admissions program under intermediate scrutiny, implicitly rejected Justice Powell's position. *See* 438 U.S. at 326 n. 1, 98 S. Ct. at 2766 n.1 (Brennan, White, Marshall, and Blackmun JJ., concurring in the judgment in part and dissenting) ("We also agree with Mr. Justice POWELL that a plan like the "Harvard" plan . . . is constitutional under our approach, *at least so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination.*")(emphasis added). Justice Stevens declined to discuss the constitutional issue. . . .

---

[9]Although Judge Weiner did not join the panel's ruling that diversity was not a compelling state interest, he nonetheless ruled that the program was unconstitutional because it was not narrowly tailored to meet that interest since the affirmative action program benefitted only African-Americans and Mexican-Americans. *Hopwood*, 78 F.3d at 965-66. He noted that "[b]y singling out only those two ethnic groups, the initial stage of the law school's 1992 admissions process ignored altogether non-Mexican Hispanic Americans, Asian Americans, and Native Americans, to name but a few." *Id.* at 966.

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 14 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 14 of 25
Chancellor William P. Hobby - Page 13    (LO97-001)

> Thus, only one Justice concluded that race could be used solely for the
> reason of obtaining a heterogenous student body.

*Id.* at 944 (emphasis in original).

As to the remedial basis for affirmative action, the Fifth Circuit panel disagreed with the
district court's conclusion that the state had proven that remedial action was necessary. The district
court held that the state's "institutions of higher education are inextricably linked to the primary and
secondary schools in the system" and that the history of racially discriminatory practices in the
state's primary and secondary schools in the recent past had three present effects on the law school,
which it described as

> includ[ing] [1] the law school's lingering reputation in the minority
> community, particularly with prospective students, as a "white" school;
> [2] an underrepresentation of minorities in the student body; and [3]
> some perception that the law school is a hostile environment for
> minorities.

*Hopwood,* 861 F. Supp. at 572. The Fifth Circuit panel struck down the first and third effects—bad
reputation in the minority community as a white school and hostile environment—as being legally
insufficient to sustain the use of race in the admissions process. *Hopwood,* 78 F.3d at 953. It relied,
in doing so, on *Podberesky v. Kirwan,* 38 F.3d 147 (4th Cir. 1994), *cert. denied,* —U.S.—, 115 S.
Ct. 2001 (1995).

*Podberesky* involved an equal protection challenge to a race-based scholarship program at the
University of Maryland. The State of Maryland argued in *Podberesky* that the challenged scholarship
program was justified in order to eradicate the present effects of past discrimination. Maryland
argued that the separate scholarship program was needed because of the university's "poor reputation
within the African-American community" and because "the atmosphere on campus [was] perceived
as being hostile to African-American students." *Podberesky,* 38 F.3d at 152. The *Podberesky* court
rejected these justifications. It reasoned that any poor reputation by the school "is tied solely to
knowledge of the University's discrimination before it admitted African-American students." *Id.* at
154. Moreover, it found that "mere knowledge of historical fact is not the kind of present effect that
can justify a race-exclusive remedy. If it were otherwise, as long as there are people who have access
to history books, there will be programs such as this one." *Id.*

Utilizing the reasoning of *Podberesky,* the Fifth Circuit panel concluded:

> We concur in the Fourth Circuit's observation that knowledge of
> historical fact simply cannot justify current racial classifications. Even if,
> as the defendants argue, the law school may have had a bad reputation in
> the minority community, "[t]he case against race-based preferences does
> not rest on the sterile assumption that American society is untouched or
> unaffected by the tragic oppression of its past." *Maryland Troopers Ass'n*

Case 1:08-cv-00263-SS  Document 94-29  Filed 01/23/09  Page 15 of 25
Case 1:08-cv-00263-SS  Document 29-5  Filed 04/17/2008  Page 15 of 25
Chancellor William P. Hobby - Page 14  (LO97-001)

> *v. Evans*, 993 F.2d 1072, 1079 (4th Cir. 1993). "Rather, it is the very
> enormity of that tragedy that lends resolve to the desire to never repeat it,
> and find a legal order in which distinctions based on race shall have no
> place." *Id.* Moreover, we note that the law school's argument is even
> weaker than that of the university in *Podberesky*, as there is no dispute
> that the law school has never had an admissions policy that excluded
> Mexican Americans on the basis of race.
>
> The *Podberesky* court rejected the hostile-environment claims by
> observing that the "effects"—that is, racial tensions—were the result of
> present societal discrimination. 38 F.3d at 155. There was simply no
> showing of action by the university that contributed to any racial tension.
> Similarly, one cannot conclude that the law school's *past* discrimination
> has created any *current* hostile environment for minorities. While the
> school once did practice *de jure* discrimination in denying admission to
> blacks, the Court in *Sweatt v. Painter*, 339 U.S. 629 (1950), struck down
> the law school's program. Any other discrimination by the law school
> ended in the 1960's. *Hopwood*, 861 F. Supp. at 555.

*Hopwood*, 78 F.3d at 953 (emphasis in original).

Having disposed of two of the state's three present-effects arguments, the Fifth Circuit turned
its attention to the remaining effect: underrepresentation. Noting that "the state's use of remedial
racial classifications is limited to the harm caused by a specific state actor," *id.* at 950, the panel
disagreed with the district court's conclusion that evidence of "past discrimination on the part of the
Texas school system (including primary and secondary schools), reaching back perhaps as far as the
education of the parents of today's students, justifies the current use of racial classifications." *Id.* at
953-54. It ruled that the State of Texas is not the relevant state actor to scrutinize; the law school
is. Thus, to justify the use of affirmative action as a remedy, the evidence must show past
discrimination by the law school, not by the state and not by the University of Texas System
generally. The *Hopwood* panel noted that

> [s]trict scrutiny is meant to ensure that the purpose of a racial preference
> is remedial. Yet when one state actor begins to justify racial preferences
> based upon the actions of other state agencies, the remedial actor's
> competence to determine the existence and scope of the harm—and the
> appropriate reach of the remedy—is called into question. . . .
>
> . . . .
>
> Even if, *arguendo*, the state is the proper government unit to scrutinize,
> the law school's admissions program would not withstand our review. For
> the admissions scheme to pass constitutional muster, the State of Texas,
> through its legislature, would have to find that past segregation has present

Chancellor William P. Hobby - Page 15   (LO97-001)

> effects; it would have to determine the magnitude of those present effects;
> and it would need to limit carefully the "plus" given to applicants to remedy
> that harm. A broad program that sweeps in all minorities with a remedy that
> is in no way related to past harms cannot survive constitutional scrutiny.
> Obviously, none of those predicates has been satisfied here.
>
> In sum, for purposes of determining whether the law school's admissions
> system properly can act as a remedy for the present effects of past
> discrimination, we must identify the law school as the relevant alleged past
> discriminator. The fact that the law school ultimately may be subject to the
> directives of others, such as the board of regents, the university president, or
> the legislature, does not change the fact that the relevant putative
> discriminator in this case is still the law school. *In order for any of these
> entities to direct a racial preference program at the law school, it must be
> because of past wrongs at that school.*

*Id.* at 951-52 (emphasis added). The district court found just the opposite, however, stating that
"[i]n recent history, there is no evidence of overt officially sanctioned discrimination at the
University of Texas." *Hopwood*, 861 F. Supp. at 572. Thus, a unanimous Fifth Circuit panel[10]
concluded that there was no remedial justification for the law school's affirmative action program:

> [W]e hold that the University of Texas School of Law may not use
> race as a factor in deciding which applicants to admit in order to achieve
> a diverse student body, to combat the perceived effects of a hostile
> environment at the law school, to alleviate the law school's poor
> reputation in the minority community, or to eliminate any present effects
> of past discrimination by actors other than the law school.

*Hopwood*, 78 F.3d at 962.[11]

---

[10]Judge Weiner disagreed only with the panel's conclusion that diversity is not a compelling state interest; he agreed
with the remainder of the majority's opinion: "Although I join my colleagues of the panel in their holding that the law
school's 1992 admissions process fails to pass strict scrutiny, on the question of diversity I follow the solitary path of narrow
tailoring rather than the primrose path of compelling interest to reach our common holding." *Hopwood*, 78 F.3d at 966
(footnote omitted).

[11]In 1973, the District Court for the District of Columbia ordered the Office for Civil Rights ("OCR") of the United
States Department of Health, Education and Welfare ("HEW") (now the "Department of Education" or ("DOE")) to
investigate discrimination in Texas' system of higher education. *See Adams v. Richardson*, 356 F. Supp. 92 (D.D.C.),
*modified and aff'd*, 480 F.2d 1159 (D.C. Cir. 1973), *dism'd sub nom, Women's Equity Action League v. Cavazos*, 907
F.2d 742 (D.C. Cir. 1990). Following a two-year investigation, OCR found in 1980 that Texas had failed to eliminate the
vestiges of its segregated higher education system with regard to African Americans and that the state was in violation of
title VI of the Civil Rights Act of 1964, 42 U.S. § 2000d.

As a remedy, Texas agreed to adopt the Texas Equal Education Opportunity Plan for Higher Education ("the Texas
(continued...)

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 17 of 25
Case 1:08-cv-00263-SS   Document 29-5       Filed 04/17/2008    Page 17 of 25
Chancellor William P. Hobby · Page 16     (LO97-001)

The Fifth Circuit reversed and remanded the case to the district court in order for it to reconsider
the issue of damages and injunctive relief. The court stated that:

> According to the district court, the school had abandoned the
> admissions procedure—consisting of the separate minority
> subcommittee—that was used in 1992, 1993, and 1994. The court
> reasoned that, as a new procedure was developed for 1995, a
> prospective injunction against the school was inappropriate. We
> conclude, however, that, while the district court may have been
> correct in deciding that the new procedure eliminates the
> constitutional flaws that the district court identified in the 1992
> system, there is no indication that the new system will cure the
> additional constitutional defects we now have explained.

*Hopwood*, 78 F.3d at 958. The court went on to conclude that, "[i]n accordance with this opinion,
the plaintiffs are entitled to apply under a system of admissions that will not discriminate against
anyone on the basis of race." *Id.* However, the court decided that:

> It is not necessary . . . for us to order at this time that the law school be
> enjoined, as we are confident that the conscientious administration at the
> school, as well as its attorneys, will heed the directives contained in this
> opinion. If an injunction should be needed in the future, the district court,
> in its discretion, can consider its parameters without our assistance.

*Id.* at 958-59. Moreover, the Fifth Circuit agreed with the district court that punitive damages were
not warranted. However, it noted "*that if the law school continues to operate a disguised or overt
racial classification system in the future, its actors could be subject to actual and punitive
damages.*" *Id.* at 959 (emphasis added).

The panel's opinion suggests various race-neutral ways in which the law school could achieve
a diverse student body:

---

[11](...continued)

Plan"). OCR required that the Texas Plan include a commitment to "seek to achieve proportions of Blacks and Hispanic
Texas graduates from undergraduate institutions in the State who enter graduate study or professional schools in the State
at least equal to the proportion of white Texas graduates from undergraduate institutions in the State who enter such
programs."

In 1983, just eight years before the *Hopwood* plaintiffs applied to the law school, Texas agreed, under threat of
federal action, to formulate an acceptable plan to desegregate its higher education system, including the law school. In
January 1994, the Department of Education notified Governor Richards that OCR was overseeing Texas' desegregation
efforts and would review the Texas system in light of *United States v. Fordice*, 505 U.S. 717 (1992). DOE has yet to
determine that Texas' higher education system has come into compliance with title VI.

Despite this history, the Fifth Circuit Court noted that "to the extent that the OCR has required actions that conflict
with the Constitution, the directives cannot stand." *Hopwood*, 78 F.3d at 954 n.47.

Case 1:08-cv-00263-SS  Document 94-29  Filed 01/23/09  Page 18 of 25
Case 1:08-cv-00263-SS  Document 29-5  Filed 04/17/2008  Page 18 of 25
Chancellor William P. Hobby - Page 17  (LO97-001)

While the use of race *per se* is proscribed, state-supported schools may reasonably consider a host of factors—some of which may have some correlation with race—in making admissions decisions. The federal courts have no warrant to intrude on those executive and legislative judgments unless the distinctions intrude on specific provisions of federal law or the Constitution.

A university may properly favor one applicant over another because of his ability to play the cello, make a downfield tackle, or understand chaos theory. An admissions process may also consider an applicant's home state or relationship to school alumni. Law schools specifically may look at things such as unusual or substantial extracurricular activities in college, which may be atypical factors affecting undergraduate grades. Schools may even consider factors such as whether an applicant's parents attended college or the applicant's economic and social background.

For this reason, race often is said to be justified in the diversity context, not on its own terms, but as a proxy for other characteristics that institutions of higher education value but that do not raise similar constitutional concerns. Unfortunately, this approach simply replicates the very harm that the Fourteenth Amendment was designed to eliminate.

The assumption is that a certain individual possesses characteristics by virtue of being a member of a certain racial group. This assumption, however, does not withstand scrutiny. "[T]he use of a racial characteristic to establish a presumption that the individual also possesses other, and socially relevant, characteristics, exemplifies, encourages, and legitimizes the mode of thought and behavior that underlies most prejudice and bigotry in modern America." Richard A. Posner, *The DeFunis Case and the Constitutionality of Preferential Treatment of Racial Minorities*, 1974 SUP.CT.REV. 12 (1974).

To believe that a person's race controls his point of view is to stereotype him. The Supreme Court, however, "has remarked a number of times, in slightly different contexts, that it is incorrect and legally inappropriate to impute to women and minorities 'a different attitude about such issues as the federal budget, school prayer, voting, and foreign relations.'" Michael S. Paulsen, *Reverse Discrimination and Law School Faculty Hiring: The Undiscovered Opinion*, 71 TEX.L.REV. 993, 1000 (1993) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 627-28, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984)). "Social scientists may debate how peoples' thoughts and behavior reflect their background, but the Constitution provides that the government may not allocate benefits or burdens among individuals based on the assumption that race or

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 19 of 25
Case 1:08-cv-00263-SS   Document 29-5      Filed 04/17/2008    Page 19 of 25
Chancellor William P. Hobby - Page 18    (LO97-001)

ethnicity determines how they act or think." *Metro Broadcasting*, 497
U.S. at 602, 110 S. Ct. at 3029 (O'Connor, J., dissenting).

*Hopwood*, 78 F.3d at 946 (footnotes omitted).

    In short, *Hopwood* prohibits the use of educational diversity as a constitutionally sufficient
justification for affirmative action. Moreover, *Hopwood* recognizes that an affirmative action plan
can pass constitutional muster only if it remedies present effects of past acts of discrimination by the
specific governmental unit involved, in this case, the University of Texas Law School. Finally, the
decision suggests that the job of finding past discrimination and its present effects along with the
narrowly tailored remedy for those present effects can be made by the legislature. This suggestion
is especially compelling given Justice Powell's view in *Bakke* that the University of California was
not capable of establishing that the racial classification it created[12] was responsive to identified
discrimination. *Bakke*, 438 U.S. 265.

<h2 align="center"><u>Hopwood As Precedent</u></h2>

    On April 4, 1996, the Fifth Circuit Court of Appeals declined to reconsider the *Hopwood*
decision en banc.  On June 1, 1996, the Supreme Court declined to grant the State's Petition for
Writ of Certiorari.  As a result, the *Hopwood* decision is the law of the Fifth Circuit.  Practically
speaking, that means that educational diversity cannot be used to justify an affirmative action
program because, within the jurisdiction of the Fifth Circuit Court of Appeals, which includes Texas,
Louisiana, and Mississippi, educational diversity is not recognized as a compelling state interest.[13]

    As an initial matter, we need to address the precedential effect of *Hopwood*. First, it is clear
that a lower federal court may not overturn a ruling of the United States Supreme Court.  A clear
example of this is *Wallace v. Jaffree*, 472 U.S. 38 (1985).  In that case, the United States District
Court for the Southern District of Alabama upheld an Alabama public school prayer statute on the
ground that, while the statute was impermissible under existing Supreme Court authority, "the
United States Supreme Court has erred." *Id.* at 45 n.25. The Eleventh Circuit Court of Appeals
reversed, in an opinion cited with approval by the Supreme Court: "Federal district courts and
circuit courts are bound to adhere to the controlling decisions of the Supreme Court." *Id.* at 46
n.26.  The appellate court relied upon the authority of *Hutto v. Davis*, 454 U.S. 370, 375 (1982),
in which then-Justice Rehnquist wrote, "unless we wish anarchy to prevail within the federal judicial
system, a precedent of this Court must be followed by the lower federal courts no matter how
misguided the judges of those courts may think it to be." *Id.* at 375.

---

[12]"The special admissions program is undeniably a classification based on race and ethnic background." *Bakke*,
438 U.S. at 289.

[13]Since both Mississippi and Louisiana are under federal court orders requiring them to eradicate the present effects
of their past segregative higher education system, these states have not yet felt the effects of *Hopwood*. They will have to
conform their actions to *Hopwood* once they effect their remedy and are released from their respective court orders.

Case 1:08-cv-00263-SS  Document 94-29  Filed 01/23/09  Page 20 of 25
Case 1:08-cv-00263-SS    Document 29-5       Filed 04/17/2008    Page 20 of 25
Chancellor William P. Hobby - Page 19   (LU97-001)

The Fifth Circuit decision in *Hopwood*, however, is unlike *Wallace v. Jaffree* in that it does not purport to overturn *Bakke*. It asserts not that *Bakke* was wrongly decided, but that Justice Powell's opinion in the case does not articulate the proposition for which the case had theretofore been thought to stand, or in short, that *Bakke* does not stand for the proposition that maintaining a diverse student body is a compelling state interest that will survive strict scrutiny. Whatever one may think of this interpretation of *Bakke*, the state's chance to overturn it was in the petition for the writ of certiorari, which has been denied.[14]

The fact that the Supreme Court denied the petition for the writ of certiorari has no precedential significance.[15] However, it is well-settled that a panel decision of the Fifth Circuit on an issue of law, barring its reversal by an en banc decision of the Fifth Circuit or by the United States Supreme Court, must be followed by other Fifth Circuit panels. *See, e.g., Fowler v. Pennsylvania Tire Co.*, 326 F.2d 526 (5th Cir. 1964) ("[e]ven if prior decision of [the fifth] circuit court of appeals . . . were not in line with weight of authority elsewhere, it would be binding on [the fifth] circuit court of appeals under doctrine of stare decisis"); *Floors Unlimited v. Fieldcrest Cannon*, 55 F.3d 181 (5th Cir. 1995) ("under the stare decisis rule of [the Fifth] Circuit . . . one panel cannot overturn the decision of a prior panel in the absence of en banc reconsideration or a superseding Supreme Court decision"); *United States v. Parker*, 73 F.3d 48 (5th Cir. 1996) ("One appellate panel may not overrule a decision, right or wrong, of a prior panel, absent en banc reconsideration or a superseding contrary decision of the Supreme Court."). It is also well-settled that federal district courts in the Fifth Circuit are bound by Fifth Circuit precedent. *See, e.g., Cedillo v. Valcar Enter. & Darling Delaware Co.*, 773 F. Supp. 932, 936 (N.D. Tex. 1991) ("As a district court [is] bound by Fifth Circuit precedent, this court first turns to decisions of the circuit court to ascertain whether they command the outcome in this case."); *Jett Racing & Sales v. Transamerica Commercial Fin. Corp.*, 892 F. Supp. 161, 163 (S.D. Tex.1995) ("the decisions of [the Fifth Circuit Court of Appeals] . . . are binding on this Court"); *Patton v. United Parcel Service*, 910 F. Supp. 1250, 1269 (S.D. Tex. 1995) ("This [federal district] court . . . is bound by Fifth Circuit precedent.").

In sum, other panels of the Fifth Circuit and lower federal courts within the Fifth Circuit are bound by *Hopwood*.

---

[14]The State argued in its petition that "[t]he two-judge majority held that it was unconstitutional for the Law School even to *consider* the race of individual applicants 'for the purpose of obtaining a diverse student body,' in flat violation of [*Bakke*] . . . [w]hatever the status of *Bakke*, the issue should be decided by this Court, so that the same rule applies across the country." Petition for Writ of Certiorari at 14-15.

[15]*See State of Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919 (1950) ("[a denial of a petition for a writ of certiorari] does not remotely imply approval or disapproval of what was said by the Court of Appeals"); *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 365 n.1 (1973) ("denial of certiorari imparts no implication or inference concerning the Court's view of the merits"); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1336 (5th Cir. 1981) (the denial of certiorari [is] without precedential effect") (citing *Hughes Tool Co.* 409 U.S. 363); *Avco Corp. v. PPG Indus.*, 867 F. Supp. 84, 90 (D. Mass. 1994) ("[t]he fact that the Supreme Court has denied certiorari on this issue is not to be construed as adoption of the views of a circuit court") (citing *Maryland*, 338 U.S. 912).

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 21 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 21 of 25
Chancellor William P. Hobby - Page 20   (LOy7-007)

### The Reach of the Constitution:  The Requirement of State Action

Some of your questions involve the use of private money administered by the university for race-restricted scholarships.  In order to address these questions, we must first review the requirement of state action.  The Fourteenth Amendment proscribes states from taking any action that deprives people of the equal protection of the laws.  In *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), the Supreme Court explained that:

> The Civil Rights Cases . . . 'embedded in our constitutional law' the principle "that the action inhibited by the first section (Equal Protection Clause) of the Fourteenth Amendment is only such action as may fairly be said to be that of the States.  That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.". . .  It is clear, as it always has been since the Civil Rights Cases . . . that 'individual invasion of individual rights is not the subject matter of the amendment,' . . . and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it.  [Citations omitted.]

Thus, before strictly scrutinizing a program, the court must determine the level of state involvement.  This inquiry requires a fact-intensive review.  In *Burton*, the Supreme Court held that the exclusion of an African-American solely on account of color from a restaurant operated by a private owner under lease in a building financed by public funds and owned by the parking authority that was an agency of the State of Delaware, was discriminatory state action in violation of the Equal Protection Clause.  In reaching this conclusion after an extensive review of the facts, the Supreme Court said "[t]he State has so far insinuated itself into a position of interdependence with [the restaurant owner] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Id.* at 725.

In *Evans v. Newton*, 382 U.S. 296 (1966), the Supreme Court ruled that a park that had been donated to the City of Macon, Georgia pursuant to the will of former United States Senator A.O. Bacon of Georgia for the use of whites only could not be operated on a racially discriminatory basis.  The court said this about the difference between private action and state action:

> A private golf club . . . restricted to either Negro or white membership is one expression of freedom of association.  But a municipal golf course that serves only one race is state activity indicating a preference on a matter as to which the State must be neutral.  What is 'private' action and what is 'state action' is not always easy to determine.  *Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state*

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 22 of 25
Case 1:08-cv-00263-SS   Document 29-5      Filed 04/17/2008      Page 22 of 25
Chancellor William P. Hobby - Page 21   (LO97-001)

> *action.* The action of a city in serving as trustee of property under a
> private will serving the segregated cause is an obvious example. . . . Yet
> generalizations do not decide concrete cases. 'Only by sifting facts and
> weighing circumstances can we determine whether the reach of the
> Fourteenth Amendment extends to a particular case.'

*Id.* at 299 (emphasis added). Moreover, in *Shelley v. Kraemer*, 334 U.S. 1 (1948), the Supreme
Court ruled that the Equal Protection Clause of the Fourteenth Amendment prohibited a state from
enforcing racially restrictive covenants in a deed. In essence, *Shelley* teaches that although an
individual may engage in such private discrimination, the State cannot aid and abet it. The Court said:

> We conclude . . . that the restrictive agreements standing alone
> cannot be regarded as a violation of any rights guaranteed to petitioners
> by the Fourteenth Amendment. So long as the purposes of those
> agreements are effectuated by voluntary adherence to their terms, it would
> appear clear that there has been no action by the State and the provisions
> of the Amendment have not been violated . . . . But here there was more.

*Id.* at 13. The Court went on to rule "that in granting judicial enforcement of the restrictive
agreements . . . the States have denied petitioners the equal protection of the laws and that,
therefore, the action of the state courts cannot stand." *Id.* at 20.

More recently, in *Blum v. Yaretsky*, 457 U.S. 991 (1982), the Supreme Court articulated a
framework for determining state action:

> First . . . [t]he complaining party must show that "there is a
> sufficiently close nexus between the State and the challenged action of the
> regulated entity so that the action . . . may be fairly treated as that of the
> State itself. . . .

> Second, although the factual setting of each case will be
> significant, our precedents indicate that a State normally can be held
> responsible for a private decision only when it has exercised coercive
> power or has provided such significant encouragement, either overt or
> covert, that the choice must in law be deemed to be that of the State. . . .
> Third, the required nexus may be present if the private entity has exercised
> powers that are traditionally the exclusive prerogative of the State.
> [Citations omitted.]

*Id.* at 1004-05. Since the state action doctrine requires a fact-intensive inquiry, we cannot in this
opinion make those determinations. *See* Attorney General Opinions DM-383 (1996) at 2 (questions
of fact are inappropriate for opinion process), DM-98 (1992) at 3 (questions of fact cannot be
resolved in opinion process), H-56 (1973) at 3 (improper for attorney general to pass judgment on

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 23 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 23 of 25
Chancellor William P. Hobby - Page 22   (LO97-001)

matter that would be question for jury determination), M-187 (1968) at 3 (attorney general cannot make factual findings).

## Your Opinion Request

: Your letter seeks the answer to six questions concerning the impact of *Hopwood* on specific financial assistance and data collection programs. Before addressing these questions, we address several statements you make in the second paragraph of your letter.

First, you question the application of *Hopwood* to matters other than the admission of four students to the law school of the University of Texas. *Hopwood* involves the use of racial classifications by a state agency, the University of Texas, in the admissions process. As the Equal Protection cases reviewed in this opinion make clear, the use of racial classifications by government in any manner is suspect and is subject to the most stringent judicial scrutiny. *See Bakke*, 438 U.S. at 291 (race-based admissions); *Wygant*, 476 U.S. 267, 277-281 (race-based preferential layoff policy); *Croson*, 488 U.S. 469 (race-based set-aside in government contracting); *Shaw*, 509 U.S. at 649 (race-based redistricting); *Miller*, 115 S. Ct. 2475 (1995) (race-based redistricting); *Hays*, 115 S. Ct. 2431 (race-based redistricting); *Adarand Constructors*, 115 S. Ct. 2097, 2110 (race-based preferences in federal contracting); *Podberesky*, 38 F.3d 147 (4th Cir. 1994), *cert. denied*, — U.S.—, 115 S. Ct. 2001, 131 L.Ed.2d 1003 (1995) (race-based scholarship). Thus, strict scrutiny applies whenever governmental benefits or burdens are allocated on the basis of race or ethnicity.

Second, you question whether a 2-1 panel decision of the Fifth Circuit can be regarded as overruling the decision of the Supreme Court of the United States in *Bakke*, which expressly permits the consideration of race in admission to institutions of higher education. As stated previously, the Fifth Circuit's denial of reconsideration en banc and the Supreme Court's denial of the State's petition for writ of certiorari has resulted in the panel's decision being the law in the Fifth Circuit's jurisdiction: Texas, Louisiana, and Mississippi.

We turn now to your specific questions. You ask about privately donated, gender restricted scholarships. *Hopwood* does not affect the law applicable to privately donated, gender restricted scholarships. *Hopwood* involved a governmental preference made on the basis of race or ethnicity, not gender. Gender preferences, although also implicating the Equal Protection Clause, are reviewed by the courts under a different, less stringent constitutional standard.[16]

---

[16]Gender preference cases are subject to intermediate scrutiny. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, (1982) (party seeking to uphold statute that classifies individuals by gender must show that classification serves "important governmental objectives and that discriminatory means employed [are] substantially related to the achievement of those objectives"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41, (1985) (The intermediate scrutiny test falls between the "rationally related" and "strict scrutiny" tests. "A gender classification fails unless it is substantially related to a sufficiently important governmental interest."); *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.").

Case 1:08-cv-00263-SS   Document 94-29   Filed 01/23/09   Page 24 of 25
Case 1:08-cv-00263-SS   Document 29-5   Filed 04/17/2008   Page 24 of 25
Chancellor William P. Hobby - Page 23   (LO97-001)

You next ask whether privately donated, race restricted scholarships are impacted by *Hopwood*. Privately donated, race restricted scholarships implicate the state action analysis. We have no facts concerning the University of Houston's involvement with the program; moreover, as we noted previously, we cannot in an attorney general opinion resolve factual questions. However, we can say generally that the more involved the university is in administering the program, such as choosing the scholarship recipients or managing the scholarship fund, to mention just two areas of involvement, then the higher the probability that a court would imbue the scholarship program with the color of state action. *"Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the governmental limitations placed upon state action."* *Evans v. Newton,* 382 U.S. at 299. If state action exists, then in order to pass constitutional muster, the program must be justified by findings establishing that: (1) either your institution has discriminated in the not too distant past against the racial groups benefited by the preference or that your institution has been a passive participant in acts of private discrimination by specific private actors against the benefited racial groups; (2) there exist present effects of the past discrimination that are not due to societal discrimination; and, (3) the scholarship program is narrowly tailored to remedy those specifically identified present effects. Narrow tailoring requires that the program be aimed only at the racial groups that were the targets of the past discrimination and that the program last only for as long as necessary to eradicate the present effects of the past discrimination.

Your third question asks us to consider institutionally funded, race restricted scholarships. These scholarships are similar to those struck down by the Fourth Circuit in *Podberesky*, and must be justified in the manner outlined in response to question 2.

With respect to your fourth question concerning federally funded, race and gender restricted fellowships, we first note that this office cannot address the validity of a federally funded program. However, *Adarand* makes it clear that federally established racial classifications, like all others, are subject to strict scrutiny. *Adarand Constructors,* 115 S. Ct. at 2113 ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests."). As we previously noted, gender preferences established by government are subject to a less stringent standard of review and remain unaffected by *Hopwood*.

You also ask about an institutionally designed, race restricted internship program. The answer to your fifth question is the same as that for question four. The federal government bears the responsibility of justifying such a racial preference.

Finally, *Hopwood* does not affect your institution's ability to collect and report information from institutions regarding minority participation in higher education in Texas. The act of collecting data does not confer a benefit or a burden on any one race.

Chancellor William P. Hobby · Page 24   (LO97-001)

## S U M M A R Y

*Hopwood* proscribes the use of race or ethnicity, in the absence of a factual showing by an institution or the legislature which establishes: (1) either that the institution has discriminated in the not too distant past against the racial group benefited by the preference or that the institution has been a passive participant in acts of private discrimination by specific private actors against the benefited racial group; (2) that there exist present effects of the past discrimination that are not due to general societal discrimination; and, (3) that the scholarship is narrowly tailored to remedy those present effects. Unless or until these facts can be established, the consideration of race or ethnicity is expressly prohibited. Although, as always, individual conclusions regarding specific programs are dependent upon their particular facts, *Hopwood's* restrictions would generally apply to all internal institutional policies, including admissions, financial aid, scholarships, fellowships, recruitment and retention, among others.

Yours very truly,

Dan Morales

Dan Morales
Attorney General of Texas