# United States District Court
# Western District of Texas
# Austin Division

ABIGAIL NOEL FISHER AND §
RACHEL MULTER MICHALEWICZ, §
§
Plaintiffs, §
§
v. §          No. 1:08-CV-00263-SS
§
THE UNIVERSITY OF TEXAS AT AUSTIN; §
*ET AL.*, §
§
Defendants. §

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General for
Civil Litigation

ROBERT O'KEEFE
Chief, General Litigation Division

JAMES C. HO
Solicitor General
Texas Bar No. 24052766

JOSEPH D. HUGHES
Assistant Solicitor General
Texas Bar No. 24007410

MISHELL B. KNEELAND
Assistant Attorney General
Texas Bar No. 24038256

P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-2923
[Fax] (512) 474-2697

COUNSEL FOR DEFENDANTS

TABLE OF CONTENTS

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    *Grutter* Requires Courts To Defer to University Efforts Under the First Amendment To Achieve Diversity, Unless Plaintiffs Demonstrate Bad Faith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    UT Austin's Admissions Policy Plainly Satisfies—Indeed, Exceeds—the Constitutional Requirements Set Out in *Grutter*. . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    UT Austin Has a Compelling Interest in Achieving Diversity. . . . . . . . . . 8

        B.    The UT Austin Admissions Policy Is Narrowly Tailored To Further Diversity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.    UT Austin Is Even Easier To Defend Than the Policy Upheld in *Grutter*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    III.    Plaintiffs Have Failed To Demonstrate That UT Austin Pursues Diversity in Bad Faith or That Its Admissions Policy Is Otherwise Unconstitutional. . . . . . 14

        A.    The UT Austin Policy Is Plainly Supported By a Compelling Interest, and Plaintiffs Cannot Demonstrate That the Policy Is Not Necessary To Achieve Critical Mass—Let Alone Diversity—in the Classroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    Plaintiffs' Narrow Tailoring Arguments Are Precluded by *Grutter* and *Parents Involved*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

INDEX OF AUTHORITIES

**Cases**

*Comfort ex rel. Neumyer v. Lynn Sch. Comm.*,
  283 F. Supp. 2d 328 (D. Mass. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fisher v. Texas*,
  556 F. Supp. 2d 603 (W.D. Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gratz v. Bollinger*,
  539 U.S. 244 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Grutter v. Bollinger*,
  137 F. Supp. 2d 821 (E.D. Mich. 2001),
  *rev'd,* 288 F.3d 732 (6th Cir. 2002), *aff'd,* 539 U.S. 306 (2003). . . . . . . . . . . . . . . . . . . . 18

*Grutter v. Bollinger*,
  539 U.S. 306 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*,
  127 S. Ct. 2738 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11, 16, 20-21

*Regents of the Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Smith v. Univ. of Wash.*,
  392 F.3d 367 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 18

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Virginia*,
  518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Virginia*,
  766 F. Supp. 1407 (W.D. Va. 1991),
  *vacated and remanded*, 976 F.2d 890 (4th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 17

iii

# United States District Court
# Western District of Texas
# Austin Division

ABIGAIL NOEL FISHER AND                    §
RACHEL MULTER MICHALEWICZ,                 §
                                           §
                Plaintiffs,                §
                                           §
v.                                         §          No. 1:08-CV-00263-SS
                                           §
THE UNIVERSITY OF TEXAS AT AUSTIN;         §
*ET AL.*,                                  §
                                           §
                Defendants.                §

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Nothing of relevance has changed since the Court denied preliminary injunctive relief last year because Plaintiffs "failed to establish a substantial likelihood" that "UT's policy violates the Equal Protection Clause." *Fisher v. Texas*, 556 F. Supp. 2d 603, 609 (W.D. Tex. 2008). After extensive discovery, the parties agree on the material facts of this case, and that summary judgment is proper. The dispute concerns solely the proper interpretation of U.S. Supreme Court precedent.

Plaintiffs' concessions are many. They do not allege that the admissions policy at the University of Texas at Austin is functionally different from, or gives greater consideration to race than, the policy upheld in *Grutter v. Bollinger*, 539 U.S. 306 (2003). To the contrary, "Plaintiffs admit" that "UT's admissions process was modeled on [the] admissions program approved . . . in *Grutter*." *Fisher*, 556 F. Supp. 2d at 607. *See also id.* at 609 ("Plaintiffs do not contend UT's admissions policy functions as a quota system"). Nor do they seem to question the seriousness and

thoroughness with which UT Austin adopted its current policy in response to the June 2003 *Grutter* ruling—an extensive review process that included undisputed studies documenting the absence of a critical mass of unrepresented minorities in the classroom.  Pltfs' App. ¶ 80-81; Defts' App. ¶ 92.

Instead, Plaintiffs primarily question whether UT Austin *needs* the kind of policy upheld in *Grutter*.  Plaintiffs' overarching theory of liability is this:  They contend that the percentage plan adopted by the Legislature well before 2005 already provided UT Austin with a sufficient "critical mass" of underrepresented minorities.  But this contention proceeds from a number of mistaken premises.  To begin with, their claim rests on a faulty foundation—that percentage plans are a workable, race-neutral alternative for achieving diversity, a proposition *Grutter* expressly rejected. In addition, Plaintiffs' numerical approach to critical mass is fundamentally flawed in several ways: For example, they wrongly assume that (1) Hispanic and African-American students are interchangeable for purposes of determining critical mass, and (2) universities may be concerned only with critical mass across the entire student body, and cannot consider undisputed evidence documenting the absence of critical mass in the classroom.  Notably, Plaintiffs have previously disavowed the first premise, and have offered no support for the second.  Moreover, under *Grutter*, universities have a compelling interest in achieving *diversity*, and not just critical mass.  Plaintiffs' remaining arguments are equally meritless and also substantially precluded by *Grutter* itself.

Because this case presents no genuine issue of material fact; because universities enjoy broad discretion under the First Amendment to determine the composition of their student bodies; and because Plaintiffs cannot overcome the judicial deference to university officials commanded by *Grutter*, Defendants are entitled to summary judgment.

2

FACTUAL BACKGROUND[1]

In the wake of the *Hopwood* litigation, UT Austin overhauled its admissions policy in two fundamental ways in an effort to achieve its broad vision of diversity without any consideration of race. It implemented House Bill 588, also known as the Top 10% law, enacted in 1997 to generally guarantee admission to any public Texas university to Texas high school students who graduate in the top 10% of their class. Defts' App. ¶ 16. It also adopted a system of holistic review, which takes into account not only academic credentials but also family and socioeconomic background, extracurricular and volunteer activities, work history, personal hardships, and other character and leadership traits. *Id.* ¶ 27-28, 45-46, 86.

The June 2003 *Grutter* ruling expressly authorized universities to use race as part of a holistic system of admissions. In response, UT Austin launched a careful and extensive review process to determine, in the first instance, whether its broad interest in diversity (including but not limited to race) was already being adequately served—and if not, what additional measures would further that interest. *Id.* ¶ 90-94. Specifically, UT Austin commissioned a thorough study examining the presence or absence of critical mass and diversity within individual classrooms in the various departments and colleges throughout the University. *Id.* ¶ 92. This study established the lack of critical mass in the classroom and the need for enhanced efforts to achieve diversity. *Id.* The University also consulted with numerous legal scholars regarding the meaning of the *Grutter* ruling; various faculty members to obtain their insight into the educational benefits of diversity in

---

1.      Like Plaintiffs, Defendants attach an extensive Statement of Facts as an Appendix. Other than a few minor discrepancies not material to the disputed legal issues in the case, the parties do not appear to have any genuine disputes over any material fact. Defendants provide their own Statement of Facts simply to provide additional detail about the UT Austin admissions policy for the convenience of the Court.

3

undergraduate courses across different departments; and a leading expert on holistic review, Dr. Brian A. Bremen, who (in addition to serving as an associate professor of English at UT Austin) has served as a consultant to the Admissions Office since 1997, providing training to its essay readers and its admissions staff who conduct full file reviews. Defts' App. ¶ 92-93; Walker Aff. ¶ 10-12.

As a result of this intensive effort, University officials eventually concluded that UT Austin lacked critical mass and diversity, especially at the classroom level. Defts' App. ¶ 92; Walker Aff. ¶ 11-12. Accordingly, the University proposed adjusting its preexisting system of holistic review to include the consideration of race, consistent with the framework authorized in *Grutter*. Defts' App. ¶ 93-94; Walker Aff. ¶ 11-13. The proposal was circulated in June 2004, formally adopted in August 2004, and took effect starting with the entering class of 2005. Defts' App. ¶ 94-96.

Under this revised policy, race plays only a minor role in the admissions process. Every Texas applicant can be admitted to UT Austin at one of four stages. *Id.* ¶ 51. First, applicants can qualify for automatic admission to UT Austin (although not necessarily to their preferred academic program) under the Top 10% law. In addition, applicants who score particularly well on the Academic Index (AI), determined based on high school rank and standardized test scores, can also be admitted to certain programs automatically. *Id.* ¶ 52-53, 56. The vast majority of students admitted to UT Austin earn admission at this stage, based on strictly numerical academic criteria. *Id.* ¶ 57. For example, over 90% of Texas residents admitted in 2008 (the class to which Plaintiffs sought admission) were admitted based solely on Top 10% and AI, and without regard to PAI. *Id.*

The remaining applicants are subject to holistic review, a process that includes the development of a Personal Achievement Index (PAI) as well as consideration of AI. *Id.* ¶ 62. The PAI score is based on two required essays as well as the applicant's leadership, extracurricular

4

activities, honors and awards, work experience, community service, and special circumstances. *Id.* ¶ 29. Special circumstances include the applicant's socioeconomic background; the socioeconomic status of the applicant's high school; any special family responsibilities; and other elements, including race. *Id.* ¶ 46. The consideration of race may be beneficial to any UT Austin applicant—including whites and Asian-Americans. Pltfs' App. ¶ 91; Defts' App. ¶ 49. Finally, any Texas residents not admitted pursuant to the AI/PAI process are offered admission either through the summer program or the Coordinated Achievement Program (CAP). Defts' App. ¶ 78.

UT Austin also furthers its interest in diversity through a variety of vigorous recruitment and scholarship programs. Pltfs' App. ¶ 140-54; Defts' App. ¶ 102-18.

ARGUMENT

**I.    *GRUTTER* REQUIRES COURTS TO DEFER TO UNIVERSITY EFFORTS UNDER THE FIRST AMENDMENT TO ACHIEVE DIVERSITY, UNLESS PLAINTIFFS DEMONSTRATE BAD FAITH.**

Plaintiffs start off on the wrong foot when they mistakenly assert, based on *Gratz v. Bollinger*, 539 U.S. 244 (2003), and *Parents Involved in Community Schools v. Seattle School District No. 1*, 127 S. Ct. 2738 (2007), that UT Austin "bears a heavy burden" to justify its consideration of race. Pltfs' Br. at 7. This case is governed by *Grutter*, not *Gratz* or *Parents Involved*. *Grutter* contemplates a very different framework for judicial review when universities engage in "truly individualized consideration" of race "in a flexible, nonmechanical way"—as opposed to the inflexible policies struck down in *Gratz* and *Parents Involved*. *Grutter*, 539 U.S. at 334. This distinction is critical; "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause." *Id.* at 327. *See also Parents Involved*, 127 S. Ct. at 2753 ("The

5

entire gist of the analysis in *Grutter* was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group.").

Under *Grutter*, courts must give great deference to the expertise and judgment of university officials who are seeking to obtain the educational benefits of diversity. *See, e.g., id.* at 328 ("The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer."); *id.* at 333 (noting the Law School's "determination, based on its experience and expertise, that a 'critical mass' of underrepresented minorities is necessary to further its compelling interest in securing the educational benefits of a diverse student body"). Courts must presume that universities are acting in good faith in their pursuit of diversity, and the burden is on the plaintiff to prove otherwise. *See, e.g., id.* at 329 ("[G]ood faith on the part of a university is presumed absent a showing to the contrary.") (quotations omitted); *id.* at 339 (narrow tailoring requires only "serious, good faith consideration of workable race-neutral alternatives"); *see also id.* at 343 ("We take the Law School at its word that it . . . will terminate its race-conscious admissions program as soon as practicable.").

This framework for judicial review is profoundly different from the review applied by the Court in *Gratz* (and later in *Parents Involved*)—as even the dissenting Justices in *Grutter* emphatically recognized. *See id.* at 362 (Thomas, J., dissenting) ("unprecedented deference"); *id.* at 367 n.9 (Thomas, J., dissenting) ("incredible deference"); *id.* at 380 (Rehnquist, C.J., dissenting) ("unprecedented in its deference"). This Court has likewise construed *Grutter* as requiring deference to university officials both with respect to identifying the need for critical mass and diversity as well as determining that the Law School had achieved neither. 556 F. Supp. 2d at 608.

The reason for this "unprecedented deference" is simple.  This case involves the use of race within the university context, where courts must balance competing constitutional interests:  the Fourteenth Amendment rights of applicants to equal protection versus the First Amendment rights of universities, as a matter of academic freedom, to determine the composition of their student bodies.  *Grutter* expressly grounded its holding in "the academic freedom that long has been viewed as a special concern of the First Amendment," including "our tradition of giving a degree of deference to a university's academic decisions."  *Id.* at 324, 328 (quotations omitted).  As Justice Powell previously observed, "[t]he freedom of a university to make its own judgments as to education includes the selection of its student body."  *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (op. of Powell, J.) (citing *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result) (recognizing student admissions as one of "the four essential freedoms" of a university)).

In short, university admissions policies are entitled to broad judicial deference, so long as any consideration of race is flexible and individualized.  Under *Grutter*, courts need not—and should not—investigate every detail of a university admissions policy simply because an applicant would prefer that the university refrain from considering race in any manner.  After all, *Grutter* expressly contemplates that universities may use race in order to further diversity—and accordingly must be granted a range of discretion to do so.  Plaintiffs must affirmatively show that a university has adopted its admissions policy in bad faith.  Absent such a demonstration, *Grutter* forbids courts from second-guessing the educational judgments of university officials.

II.   **UT Austin's Admissions Policy Plainly Satisfies—Indeed, Exceeds—the Constitutional Requirements Set Out in *Grutter*.**

A.     **UT Austin Has a Compelling Interest in Achieving Diversity.**

Universities have a "compelling interest in securing the educational benefits of a diverse student body." *Grutter*, 539 U.S. at 333.  Since well before *Grutter*, UT Austin has long sought to enroll freshman classes that are both academically qualified and broadly diverse in many respects. Defts' App. ¶ 4.  The University's broad vision of student body diversity encompasses numerous dimensions, including culture; language; family, educational, geographic, and socioeconomic background; work and volunteer experiences; and leadership experience.  *Id.* ¶ 6.

This vision of diversity also includes race.  After the 2003 decision in *Grutter*, UT Austin launched an extensive and careful review process to determine whether any policy change was needed to achieve its broad vision of diversity.  As a result of this effort, University officials concluded that UT Austin lacked critical mass and diversity—especially at the classroom level. Defts' App. ¶ 92; Walker Aff. ¶ 11-12.  Accordingly, the University authorized consideration of race in admissions pursuant to the framework authorized in *Grutter*.  Defts' App. ¶ 93-94; Walker Aff. ¶ 11-13.  The proposal was circulated in June 2004, formally adopted in August 2004, and took effect starting with the entering class of 2005.  Defts' App. ¶ 94-96.

UT Austin believes what the *Grutter* decision confirms:  that numerous educational benefits flow from achieving a broadly diverse student body.  These benefits include (1) breaking down racial stereotypes; (2) promoting cross-racial understanding; (3) enhancing discussion and learning, both in the classroom and across campus; (4) preparing students to enter an increasingly diverse workforce and society; and (5) identifying and training the next generation of leadership in one of

8

the largest, most diverse states in the nation.  *Grutter*, 539 U.S. at 330-32; Walker Aff. ¶ 4.  This Court has likewise recognized that universities have a compelling interest in pursuing these various educational benefits by assembling a diverse student body.  *See* 556 F. Supp. 2d at 608.  Notably, the benefits of diversity extend well beyond campus life, as *Grutter* also reaffirms:  "In order to cultivate a set of leaders with legitimacy *in the eyes of the citizenry*, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.  *All members of our heterogeneous society* must have confidence in the openness and integrity of the educational institutions that provide this training."  539 U.S. at 332 (emphasis added).  Consistent with *Grutter*, UT Austin has determined that maintaining an open path to leadership is a critical element of its academic mission as the State's flagship university.  556 F. Supp. 2d at 608.

　　　To obtain these benefits, a university must achieve diversity at the classroom level, as well as across campus.  *Grutter* focuses specifically on the importance of achieving classroom diversity.  *See, e.g., id.* at 330 ("classroom discussion is livelier, more spirited, and simply more enlightening and interesting when the students have the greatest possible variety of backgrounds") (quotations omitted).  Accordingly, UT Austin commissioned a study on classroom diversity prior to revising its admissions policy.  That study revealed that a substantial number of classes with between five and twenty-four students (that is, those classes most likely to involve substantial classroom discussions) contained few if any African-American, Hispanic, and Asian-American students.  For example, in 2002, nearly 90% of such classes contained zero or only one African-American student; 46% contained zero or one Asian-American student; and nearly 43% contained zero or one Hispanic student.  Defts' App. ¶ 92.  Based on this study and other analysis, UT Austin determined that it

9

cannot achieve its broad vision of diversity in the classroom, as well as across campus, without an admissions policy that includes the consideration of race.  *Id.*

**B.      The UT Austin Admissions Policy is Narrowly Tailored To Further Diversity.**

*Grutter* establishes five criteria to gauge whether a university's use of race is narrowly tailored to achieve a diverse student body.  *See, e.g., Smith v. Univ. of Wash.*, 392 F.3d 367, 373 (9th Cir. 2004) (reciting *Grutter*'s five criteria).  UT Austin satisfies all five.

To begin with, a university "cannot use a quota system—it cannot insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants."  *Grutter*, 539 U.S. at 334 (quotations omitted).  Plaintiffs concede what the record confirms: that the UT Austin admissions policy is based on individualized consideration of applicants, not quotas.  Pltfs' App. ¶ 98; Defts' App. ¶ 49, 97-100.  As this Court has observed, "Plaintiffs do not contend UT's admissions policy functions as a quota system."  556 F. Supp. 2d at 609.

In addition, "a university's admissions program must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application."  *Grutter*, 539 U.S. at 337.  Again, Plaintiffs acknowledge that, "[w]hen UT Austin added race as a factor in admissions decisions, the manner in which UT Austin reviewed applications did not change.  Race was simply added as another component to UT Austin's full file review."  Pltfs' App. ¶ 42.  "Plaintiffs admit" that "UT's admissions process was modeled on Michigan Law School's admissions program approved . . . in *Grutter*."  556 F. Supp. 2d at 607.  As this Court has observed, the UT Austin policy is based on "a holistic, multi-factor, individualized assessment of each applicant, of which race is one of many factors."  *Id.* at 609.  *See also* Defts' App. ¶ 46.

10

Third, universities must undertake "serious, good faith consideration of workable race-neutral alternatives"; they are not required to "exhaust[] . . . *every* conceivable race-neutral alternative." *Grutter*, 539 U.S. at 339 (emphasis added).  *See also* 556 F. Supp. 2d at 609 (same).  UT Austin satisfies this requirement as well.  After extensive study in the wake of *Grutter*, the University concluded that, despite its best efforts, the existing admissions policy did not achieve diversity.  UT Austin had implemented its policy of holistic review in 1997, and the Legislature enacted the Top 10% law effective for the 1998 entering class.  In addition, as Plaintiffs acknowledge, UT Austin had undertaken numerous scholarship and recruitment efforts.  Pltfs' App. ¶ 140-154; Defts' App. ¶ 102-18.  Despite these efforts, University officials determined that they had not achieved critical mass, let alone diversity, in the classroom.  Moreover, as *Grutter* confirmed, percentage plans (like lottery systems) are not "workable" (because regardless of their numerical results, they sacrifice both academic quality and the broad vision of diversity that only individualized consideration can provide), *Grutter*, 539 U.S. at 340—while Plaintiffs themselves have described the Top 10% law as "race-conscious" rather than "race-neutral," Oral Argument Tr. at 14:20 (statement of Mr. Rein).[2]

UT Austin also easily satisfies *Grutter*'s fourth criterion, because its policy does "not unduly harm members of any racial group."  *Id.* at 341.  Plaintiffs concede that, as in *Grutter*, UT Austin does not consider the race of an applicant in and of itself, but only in the full context of the applicant's other qualities and accomplishments.  *See* Pltfs' App. ¶ 92 (race is "just like any other

---

2.     Of course, States are fully entitled to employ percentage plans, as Texas and other States have done notwithstanding their negative impacts on diversity as broadly and individually defined in *Grutter*.  As Justice Kennedy has been careful to note, mechanisms such as this "are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible." *Parents Involved*, 127 S. Ct. at 2792 (Kennedy, J., concurring).  Even the rejected *amicus* brief of the United States acknowledges this.  Brief of United States as *Amicus Curiae* in *Grutter v. Bollinger*, No. 02-241, at 8.

factor"); Dfts' App. ¶ 45; *cf. Grutter*, 539 U.S. at 319 ("In some cases, . . . an applicant's race may play no role, while in others it may be a 'determinative' factor."); *id.* at 341 ("Because the Law School considers all pertinent elements of diversity, it can (and does) select nonminority applicants who have greater potential to enhance student body diversity over underrepresented minority applicants.") (quotations omitted).

In fact, the UT Austin policy is even less burdensome than the policy upheld in *Grutter*, for this reason:  It is undisputed that the consideration of race, within the full context of the entire application, may be beneficial to *any* UT Austin applicant—including whites and Asian-Americans. Pltfs' App. ¶ 91; Defts' App. ¶ 49.  Under the UT Austin policy, no member of any racial or ethnic group has greater entitlement to favorable consideration than any other.  Defts' App. ¶ 49.  For example, a white applicant who was elected student body president at a predominantly African-American high school could offer a unique perspective on race relations that UT Austin recognizes and values, and thus could contribute more to diversity than an African-American applicant who lacks any record of cross-racial understanding.  Walker Aff. ¶ 16.  To be sure, this does not mean that, in the aggregate, the UT Austin policy will not have a positive effect on the number of underrepresented minorities offered admission—just as the Top 10% law was intended to do.  To continue with the prior example, it may be that, for every white student body president of a predominately African-American high school, there are three or four African-American applicants who either were elected student body president at a predominately white high school or feature some other similarly distinctive experience.  But the central point remains the same:  UT Austin's policy uses race in a less burdensome and more modest fashion than even the program upheld in *Grutter*.

Finally, *Grutter* provides that "race-conscious admissions policies must be limited in time" and undergo "periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." 539 U.S. at 342. UT Austin informally reviews its undergraduate admissions process on an annual basis to ensure that the process is effective in admitting academically qualified students who help make the educational environment rich, challenging, and holistically diverse. Defts' App. ¶ 101. In addition, UT Austin requires a formal review of the admissions process every five years to assess whether consideration of an applicant's race is still necessary to achieve a holistically diverse student body. *Id.* The first formal review will begin this fall. *Id.* These provisions plainly satisfy *Grutter*'s durational requirement.

**C.    UT Austin Is Even Easier To Defend Than the Policy Upheld in *Grutter*.**

UT Austin not only satisfies both prongs of the *Grutter* majority framework (in fact, it is as noted even less burdensome on any racial group than the policy upheld in *Grutter*). The University's policy also lacks certain elements that the four dissenting justices found suspicious.

In his dissent in *Grutter*, Justice Kennedy was troubled by the fact that Law School admissions officers kept a daily report throughout the process that tracked the racial composition of the population of students admitted into the incoming class as of that date. *See Grutter*, 539 U.S. at 391-92 (Kennedy, J., dissenting). He found the practice suspicious, especially in contrast to other universities that "do not keep ongoing tallies of racial or ethnic composition of their entering students." *Id.* at 392. The majority, of course, upheld the policy over Justice Kennedy's dissent. *Id.* at 336. What's more, UT Austin indisputably refrains from using such monitoring in its admissions process. Defts' App. ¶ 100.

13

Like Justice Kennedy, Chief Justice Rehnquist suspected that the policy upheld in *Grutter* was a de facto quota system in disguise.  *See Grutter*, 539 U.S. at 379 (Rehnquist, C.J., dissenting). In his dissent joined by Justices Scalia, Kennedy, and Thomas, he noted a correlation over a span of six years that he deemed "far too precise" (typically varying by just a few tenths of one percent) between the percentage of applicants and the percentage of admitted students who were African-American, Hispanic, or Native American—suggesting that the Law School was simply admitting individuals in proportion to the racial composition of the applicant pool.  *Id.* at 383.  Again, the majority rejected the Chief Justice's analysis of the data.  *Id.* at 336.  Moreover, UT Austin's admissions data reflect no such striking consistency—as Plaintiffs expressly concede.  *See* Pltfs' App. ¶ 98 ("UT Austin has not established a goal, target, or other quantitative objective for the admission and/or enrollment of under-represented minority students."); *see also* Pltfs' App. ¶ 103.

* * *

In sum, UT Austin does not just comply with all aspects of the *Grutter* framework; it exceeds *Grutter*—by considering the race of *any* applicant as a potential contribution to the diversity of the school depending on the entire application, and by satisfying even some of the concerns of the dissenting justices in *Grutter* by avoiding their proposed indicia of a possible de facto quota system.

III.  **PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT UT AUSTIN PURSUES DIVERSITY IN BAD FAITH OR THAT ITS ADMISSIONS POLICY IS OTHERWISE UNCONSTITUTIONAL.**

    A.  **The UT Austin Policy Is Plainly Supported by a Compelling Interest, and Plaintiffs Cannot Demonstrate That the Policy Is Not Necessary To Achieve Critical Mass—Let Alone Diversity—in the Classroom.**

According to their complaint, "[t]o the extent that UT Austin articulates an interest in promoting 'student body diversity,' Plaintiffs do not challenge this interest."  Pltfs' 2nd Amend.

Compl. ¶ 145.  That is precisely what UT Austin has done throughout this litigation.  556 F. Supp. 2d at 608.  Yet Plaintiffs now put forth essentially three theories as to how UT Austin has failed to articulate a compelling interest—none of which find any legal basis, either in *Grutter* or elsewhere.

1.      Plaintiffs' primary argument with respect to compelling interest is this:  UT Austin does not need to consider race in order to further any compelling interest, because its policy prior to *Grutter* was already sufficient to achieve a "critical mass" of "underrepresented minorities."  Pltfs' Br. at 18.  Specifically, they observe that, in the 2004 entering class (the last class admitted under the pre-*Grutter* policy), 4.5% of the admitted class was African-American and 16.9% was Hispanic. *Id.* (citing Pltfs' App. ¶ 79).  Plaintiffs say that this combined total of 21.4% alone constitutes a critical mass of underrepresented minorities.  This claim was unpersuasive during the preliminary injunction proceedings, and it continues to fail today, on several levels.

To begin with, Plaintiffs focus exclusively on campus-wide statistics.  At no time do they allege that UT Austin has also achieved critical mass in the *classroom*—let alone that it could do so even *without* the challenged policies.  These omissions are fatal to their claim.  After all, *Grutter* makes clear that critical mass should be "defined by reference to the educational benefits that diversity is designed to produce."  539 U.S. at 330.  Central among those educational benefits is that "classroom discussion is livelier, more spirited, and simply more enlightening and interesting when the students have the greatest possible variety of backgrounds."  *Id.* (quotations omitted).  This Court has likewise observed that, under *Grutter*, universities are entitled to deference in pursuing a critical mass that "encourages underrepresented minority students to participate in the classroom and not feel isolated."  556 F. Supp. 2d at 608 (quoting *Grutter*, 539 U.S. at 318).  As noted, UT Austin has

15

shown that it is unable to achieve critical mass in the classroom without considering race.  To rebut

that view, Plaintiffs present—nothing.  This omission is devastating to their case.

Plaintiffs' critical mass theory suffers from yet another fundamental, conceptual defect:  It

defies both Supreme Court precedent and common sense—not to mention Plaintiffs' own previous

statements—to *combine* the African-American and Hispanic student populations into a single,

undifferentiated whole to determine whether or not UT Austin has achieved a critical mass of

underrepresented minorities.  After all, this approach ignores the very purpose behind critical mass:

to ensure that "underrepresented minority students do not feel isolated or like spokespersons *for their*

*race*."  *Fisher*, 556 F. Supp. 2d at 608 (quoting *Grutter*, 539 U.S. at 319) (emphasis added).

Plaintiffs themselves seemed to acknowledge during the preliminary injunction hearing that

Hispanics and African-Americans are not interchangeable:

> THE COURT:  So since the Hispanic population is 20 percent, then we just
> shouldn't—the university shouldn't have any African American students?
>
> MR. REIN:  I don't think that's what we're saying because the African American
> student would have a diverse point of view from the Hispanic student.

Oral Argument Tr. at 19:18-23.  *Cf. Parents Involved*, 127 S. Ct. at 2754 ("the plans here employ

a limited notion of diversity, viewing race exclusively in white/nonwhite terms"); *id.* at 2760

("Classifying and assigning schoolchildren according to a binary conception of race is an extreme

approach in light of our precedents and our Nation's history."); *Smith*, 392 F.3d at 378 (rejecting the

notion of combining applicants from different Asian countries under the single label of "Asian-

American" for purposes of determining critical mass).

16

Plaintiffs appear to hold a different position today.  But they have offered no explanation or justification for this change.[3]

2.    Plaintiffs also contend that UT Austin is not pursuing a valid compelling interest because it has "failed to determine the level of minority enrollment necessary to realize the educational benefits of a diverse student body."  Pltfs' Br. at 15.  This argument is curious, considering that nothing in *Grutter* requires universities to set a target level of enrollment—and that, if anything, the absence of a numerical goal should make the UT Austin policy easier, not harder, to defend.  Consider this: in *Grutter*, the majority expressly confronted (and rejected) the criticism that the Law School, by establishing a target range for minority enrollment, had all but effectively installed a quota.  Notably, the Court in rejecting this claim said only that "*[s]ome* attention to

---

[3]    Plaintiffs' analysis of critical mass suffers from additional defects.  For example, neither of the two cases they cite support their rigid, numerical definition of critical mass.  *See* Pltfs' Br. at 18 (citing *Comfort ex rel. Neumyer v. Lynn Sch. Comm.*, 283 F. Supp. 2d 328 (D. Mass. 2003), and *United States v. Virginia*, 518 U.S. 515 (1996)).  *Comfort* did *not* approve a "20% figure" for critical mass; it merely noted that one witness had cited studies "describing a 20% figure."  283 F. Supp. 2d at 357.  Moreover, Plaintiffs fail to mention that the same witness also testified that, in her personal opinion, "[t]here is no 'magical number' . . . that indicates a critical mass."  *Id.*  The district court in *Virginia* identified "10% female enrollment" as sufficient only with respect to *women*—and did not address the unique issues that face racial minorities.  518 U.S. at 523 (quoting 766 F. Supp. 1407, 1438 (W.D. Va. 1991), *vacated and remanded*, 976 F.2d 890 (4th Cir. 1992)).  To state the obvious, "race and sex discrimination are different . . . . Racial groups comprise numerical minorities in our society, warranting in some situations a greater need for protection, whereas the population is divided almost equally between men and women."  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 154-55 (1994) (Rehnquist, C.J., dissenting) (citing authorities).  Plaintiffs offer no reason why this "greater need for protection" could not include critical mass.

Because Plaintiffs' critical mass theory is defective on its face, the Court need not address a more fundamental, philosophical difficulty with their claim—namely, their mistaken belief that universities have a compelling governmental interest only with respect to critical mass, as opposed to *diversity*, in the classroom.  *See, e.g.,* Pltfs' Br. at 7 (a university's "compelling government interest exists only to enable the achievement of 'critical mass,'" and no further use of race is permitted "beyond that goal"); *id.* at 18 ("UT Austin . . . achieved critical mass and, as a result, no longer had a basis for using race in its admission process.").  Notably, Plaintiffs' own complaint acknowledges that UT Austin has a compelling interest in achieving "diversity"—without once ever even uttering the term "critical mass."  Pltfs' 2nd Amend. Compl. ¶ 73, 75, 145.  The *Comfort* decision relied on by Plaintiffs likewise appears to acknowledge this point.  *See* 283 F. Supp. 2d at 357.

numbers . . . does not transform a flexible admissions system into a rigid quota."  539 U.S. at 336 (emphasis added).  Presumably the Court employed this language because, at a certain point, *too much* attention to numbers would in fact trigger constitutional scrutiny, even under the deferential *Grutter* standard.  Indeed, that is precisely what was urged by Chief Justice Rehnquist and Justice Kennedy, each of whom wrote in dissent that the Law School policy focused too heavily on certain numerical goals and was thus tantamount to a quota.  *See id.* at 383 (Rehnquist, C.J., dissenting); *id.* at 392 (Kennedy, J., dissenting).

This illustrates why the position advanced by Plaintiffs cannot be tolerated:  If they can now complain that UT Austin is guilty of paying *too little* attention to numerical goals, when others can already contend that another university has given *too much* weight to those very same targets, universities will be bombarded with litigation no matter which approach they adopt.  This "damned if you do, damned if you don't" approach effectively squeezes universities from both sides—precisely the opposite of the judicial deference to educational expertise and judgment about race expressly contemplated by *Grutter*.  *See also Smith*, 392 F.3d at 379 ("defining critical mass in terms of specific percentages would amount to outright racial balancing, which is patently unconstitutional") (quotations omitted).  Even Plaintiffs appear to recognize the difficulty their position presents.  *See* Oral Argument Tr. at 24:18-19 ("[Y]ou've got to kind of tiptoe through the tulips to meet Justice O'Connor's [*Grutter*] criteria.") (statement of Mr. Rein).[4]

---

4.      In a footnote, Plaintiffs suggest that *Grutter* itself requires universities to define critical mass in numerical terms.  Pltfs' Br. at 15 n.2 (citing district court in *Grutter*).  But the Supreme Court in *Grutter* expressly noted that the admissions officers "did *not* quantify critical mass in terms of numbers or percentages." 539 U.S. at 318-19 (emphasis added).  *See also id.* at 318 (citing testimony that "there is no number, percentage, or range of numbers or percentages that constitute critical mass").  The district court in *Grutter* likewise found that the Law School had refrained from defining critical mass in numerical terms. *See Grutter v. Bollinger*, 137 F. Supp. 2d 821, 835 (E.D. Mich. 2001) ("Professor Lempert testified that the

3.     Finally, Plaintiffs point out that UT Austin favors Hispanics over Asian-Americans by deeming only the former "under-represented." Pltfs' Br. at 16.  They suggest that this is somehow problematic (presumably from the perspective of Asian-Americans) because "the level of enrollment of Asian-American students lags behind the level of enrollment of Hispanic students."  *Id.*  UT Austin must therefore be mistaken in its critical mass determination, Plaintiffs conclude.  *Id.*

But the distinction between underrepresented and other minority groups comes from *Grutter* itself.  The majority repeatedly observed that, although universities may not engage in outright racial balancing, they may consider race as part of a holistic system of review if failure to do so would result in the absence of a critical mass of "underrepresented minorities."  539 U.S. at 329-30, 333.  *See also id.* at 316, 318-20.  Plaintiffs acknowledge that this is the case here:  "*Hispanics are underrepresented* at UT Austin when compared with the Hispanic population across the State of Texas,*" while "*Asian-Americans are not under-represented* at UT Austin when compared with the Asian-American population across the State of Texas."  Pltfs' Br. at 16 n.3 (emphasis added).  *See also* Oral Argument Tr. at 26:11-13 ("Asian students, if anything, are overrepresented; that is, if you take the demographics, their admittance is well beyond their demographic percentage.") (statement of Mr. Rein).

Moreover, Plaintiffs appear to exaggerate the importance of designating certain populations as underrepresented or overrepresented.  As previously noted, *supra* at 12, the race of *any* applicant, including Asian-Americans, may be considered favorably within the context of the overall

---

'11% to 17%' figure, which is the range he believes constitutes critical mass, was omitted from the final version of the admissions policy because percentages were too rigid and could be misconstrued as a quota.").

application as contributing to the diversity of UT Austin, Pltfs' App. ¶ 91, Defts' App. ¶ 49—thereby making the policy especially easy to uphold under *Grutter*.

**B.      Plaintiffs' Narrow Tailoring Arguments Are Precluded by *Grutter* and *Parents Involved*.**

Plaintiffs alternatively contend that the UT Austin admissions policy is not narrowly tailored to achieve the educational benefits that flow from a diverse student body.  As noted, *Grutter* establishes five specific narrow tailoring criteria—all of which are satisfied here.  Plaintiffs rely primarily on other theories—and on precedents from outside the university context—that have no bearing on the kind of flexible, individualized use of race expressly governed by *Grutter*.

1.      Plaintiffs rely heavily on a passage from *Parents Involved* to contend that the UT Austin policy is somehow invalid because it does not impact a sufficient number of minorities.  In effect, Plaintiffs oddly condemn UT Austin policy for the very same reason that *Grutter* upheld the University of Michigan Law School policy—because it uses race only in a modest, holistic fashion. This theory of insufficient impact is not new—they presented it during the preliminary injunction phase—and nothing of relevance has changed since.  It remains both counterintuitive and meritless.

In *Parents Involved*, the Supreme Court invalidated the rigid use of racial classifications in the K-12 context.  As one of its rationales, the Court observed that few students were actually impacted by the policy.  The Court made clear, however, that this rationale applied *only* to rigid racial classifications—in contrast to the flexible, individualized consideration of race in the university context upheld in *Grutter* and at issue here.  The school district had "not met its burden of proving these marginal changes . . . outweigh the cost of subjecting hundreds of students to disparate treatment based *solely* upon the color of their skin."  127 S. Ct. at 2760 (quotation omitted)

20

(emphasis added).  The policy upheld in *Grutter*, by definition, considered race only as one of numerous factors that further diversity.[5]  Moreover, Justice Kennedy, who provided the critical fifth vote in *Parents Involved*, made clear that he too joined the majority's analysis because it applied *only* to rigid racial classifications:  "[T]he number of students whose assignment depends on *express racial classifications* is limited.  I join . . . the Court's opinion because I agree that *in the context of these plans*, the small number of assignments affected suggests that the schools could have achieved their stated ends through different means."  *Id.* at 2793 (Kennedy, J., concurring) (emphasis added).  These different means "include . . . a more nuanced, individual evaluation of school needs and student characteristics that might include race as a component," as in *Grutter*.  *Id.*

2.    Plaintiffs also reprise their argument that the UT Austin policy is not narrowly tailored because the Top 10% plan is a workable race-neutral alternative that can achieve, and indeed has achieved, sufficient levels of diversity.  Nothing has changed since Plaintiffs sought, and this Court denied, preliminary injunctive relief based primarily on this theory.

To begin with, Plaintiffs state the wrong legal standard with respect to the consideration of race-neutral alternatives.  Plaintiffs contend that universities may consider race "only [as] a last resort," once again citing case law outside the university context.  Pltfs' Br. at 22.  But nothing in

---

5.    The contrast between the rigid racial classifications struck down in *Parents Involved* and the flexible admissions policies upheld in *Grutter* played a central role in the Court's analysis.  As the Court explained, "[t]he specific interest found compelling in *Grutter* was student body diversity 'in the context of higher education.'  The diversity interest was *not focused on race alone* but encompassed 'all factors that may contribute to student body diversity.'"  *Parents Involved*, 551 S. Ct. at 2753 (quoting *Grutter*, 539 U.S. at 328, 337) (emphasis added).  "The entire gist of the analysis in *Grutter* was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group."  *Id.*  By contrast, under the classifications at issue in *Parents Involved*, "race is not considered as part of a broader effort to achieve 'exposure to widely diverse people, cultures, ideas, and viewpoints'; race, for some students, is determinative *standing alone*."  *Id.* (quoting *Grutter*, 539 U.S. 330) (emphasis added).  "[Race] is not simply one factor weighed with others in reaching a decision, as in *Grutter*; it is *the* factor."  *Id.*

21

*Grutter* imposes this "last resort" standard.  To the contrary, *Grutter* expressly instructs that, when it comes to universities exercising their First Amendment rights to consider race in a flexible, individualized fashion, "[n]arrow tailoring does *not* require exhaustion of every conceivable race-neutral alternative," but merely "serious, *good faith* consideration of workable race-neutral alternatives."  *Grutter*, 539 U.S. at 339 (emphasis added).

Plaintiffs are also wrong on the merits.  The use of percentage plans as a "workable race-neutral" alternative was urged by the United States—and *rejected* by the Supreme Court—in *Grutter*.  Percentage plans are not "workable" because—no matter what numerical levels of racial diversity they might produce—such plans sacrifice too much in terms of academic quality and fail to further the broader vision of diversity that *Grutter* embraces.  (Moreover, as noted, Plaintiffs have described the Top 10% law as "race-conscious," not "race-neutral."  Oral Argument Tr. at 14.)

As *amicus*, the United States criticized the use of race in admissions as unconstitutional "because there are a variety of race-neutral alternatives available . . . that have led to racially diverse student bodies."  Brief of United States as *Amicus Curiae* at 8, *Grutter v. Bollinger*, 539 U.S. 306 (2003) (No. 02-241).  It specifically identified "Texas, which has operated without race-based admissions policies since they were invalidated by the Fifth Circuit in 1996, [as] a useful example."  *Id. See also id.* at 14-18.  But the Supreme Court squarely addressed—and rejected—that argument:

> The United States advocates 'percentage plans,' recently adopted by public undergraduate institutions in Texas, Florida, and California . . . .  The United States does not, however, explain how such plans could work for graduate and professional schools.  *Moreover, even assuming such plans are race-neutral, they may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university.*

539 U.S. at 340 (emphasis added, citation omitted).  As the Court recognized, percentage plans are simply not "capable of producing a critical mass without forcing [universities] to abandon the academic selectivity that is the cornerstone of [their] educational mission." *Id*.

The majority's rejection of percentage plans was (like its rejection of lottery systems) categorical and comprehensive.  Nothing in the Court's analysis turned on the precise numerical levels of racial diversity that could be achieved by a percentage plan, Pltfs' Br. at 24-25, because the proper objective is not strictly racial diversity, but rather the broader vision of diversity desired by a university, *Grutter*, 539 U.S. at 340.  The analysis also holds firm regardless of whatever public relations statements a university might issue with regard to its previous efforts to pursue diversity, including percentage plans. Pltfs' Br. at 4, 9, 24-25. It is wholly unremarkable—and constitutionally meaningless—that universities would emphasize any progress that they might have achieved. Indeed, one would *expect* universities to inform potential applicants that their campuses are welcoming to students of all stripes.  It would be alarming if they did anything else.  Nothing in the Constitution states that universities may not take steps to further diversity, unless they promise to refrain from discussing their successes in public.  And in any event, certainly in none of the public statements by UT Austin officials cited by Plaintiffs did the University ever concede that no further steps are educationally necessary (or constitutionally permissible) to achieve critical mass—let alone diversity—either across campus or in the classroom.

Finally, Plaintiffs urge that UT Austin first undertake additional steps to improve its yield rate among underrepresented minority students admitted under the Top 10% law, prior to considering race. But Plaintiffs have already conceded that UT Austin has undertaken numerous scholarship and recruitment efforts—and thus fall far short of demonstrating the bad faith required to overcome the

23

judicial deference to which UT Austin is entitled.  Pltfs' App. ¶ 140-54; Defts' App. ¶ 102-18.
Indeed, Plaintiffs acknowledged during the preliminary injunction hearing that UT Austin "work[s]
very hard to increase yield."  Oral Argument Tr. at 25:17-18 (statement of Mr. Rein).  They identify
other nationally known recruitment programs that the University does not utilize, but they offer no
specific evidence that adoption of any of these programs, in addition to the similar programs already
in existence at UT Austin, would actually increase its yield rate.  Pltfs' Br. at 27 n.7.  If judicial
deference to a university's academic judgment means anything, it surely means that a court cannot
force UT Austin to abandon policies developed by professional educators in favor of alternative
programs that might, in the unsupported opinion of interested laypersons, produce different results.

      3.     Plaintiffs also object that the policy is "over-inclusive" because UT Austin enrolls
a significant number of Hispanic graduates yet still considers Hispanics to be "under-represented."
Pltfs' Br. at 29.  But this is unremarkable.  UT Austin is the sixth largest university in the nation and
the flagship institution of Texas, one of the largest and most diverse States, so it is unsurprising that
even a high number of Hispanic graduates would still constitute underrepresentation in the aggregate.
As *Grutter* specifically states, one aspect of diversity is ensuring a critical mass of "underrepresented
minorities."   539 U.S. at 333.   Plaintiffs have already acknowledged that "Hispanics are
underrepresented at UT Austin when compared with the Hispanic population across the State of
Texas." Pltfs' Br. at 16 n.3.  *See Fisher*, 556 F. Supp. 2d at 608 ("Universities throughout the United
States serve vastly different communities and constituencies . . . . Smaller schools may need fewer
minority students in order to achieve critical mass than massive state universities like UT.  The
University of Hawaii or University of Wisconsin may have significantly different diversity needs .
. . than the University of Georgia or the University of Texas at Austin.").

4.      Plaintiffs do not dispute that the UT Austin policy provides for periodic review once every five years, and that the first formal review since adoption of the policy in 2004 will take place this fall.  Plaintiffs simply predict that the review will be "meaningless" and "a hollow exercise." Pltfs' Br. at 30.  This unforgiving posture—condemning as a charade an effort UT Austin is only just about to undertake—directly contradicts the presumption of "good faith" and judicial deference to which universities are constitutionally entitled under *Grutter* and the First Amendment.  539 U.S. at 329.  Plaintiffs' primary basis for questioning the University's motives—UT Austin's failure to articulate a numerical goal for its use of race, Pltfs' Br. at 30—only strengthens, rather than weakens, the constitutionality of its admissions policy, as previously explained.

Plaintiffs also complain that the policy lacks a precise end date.  But that was true of the policy upheld in *Grutter*.  In his dissent, Chief Justice Rehnquist complained that "the Law School's program fails strict scrutiny because it is devoid of any reasonably precise time limit on the Law School's use of race in admissions."  539 U.S. at 386 (Rehnquist, C.J., dissenting).  The majority expressly rejected this argument, noting that "[w]e take the Law School at its word that it would 'like nothing better than to find a race-neutral admissions formula' and will terminate its race-conscious admissions program as soon as practicable," and that "[w]e expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today."  *Id.* at 343. In short, Plaintiffs once again ask this Court to adopt positions expressly rejected in *Grutter*.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Partial Summary Judgment.

25

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General for Civil Litigation

ROBERT O'KEEFE
Chief, General Litigation Division


/s/ James C. Ho
JAMES C. HO
Solicitor General
Texas Bar No. 24052766

JOSEPH D. HUGHES
Assistant Solicitor General
Texas Bar No. 24007410

MISHELL B. KNEELAND
Assistant Attorney General
Texas Bar No. 24038256

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-2923
[Fax] (512) 474-2697

COUNSEL FOR DEFENDANTS

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of February, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ James C. Ho
James C. Ho