**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| ABIGAIL NOEL FISHER, and | § | |
| RACHEL MULTER MICHALEWICZ, | § | |
| *Plaintiffs*, | § | **CIVIL ACTION NO. 1:08-CV-00263-SS** |
| | § | |
| v. | § | |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN; | § | |
| et al., | § | |
| *Defendants*. | § | |

**DEFENDANTS' STATEMENT OF FACTS**

Defendants University of Texas at Austin ("UT Austin"); Kenneth I. Shine; David B. Prior; William Powers, Jr.; Board of Regents of the University of Texas System, John W. Barnhill, Jr., H. Scott Caven, Jr., James R. Huffines, Janiece Longoria, Colleen McHugh, Robert B. Rowling, James D. Dannenbaum, Paul Foster, Prentice L. Gary; and Bruce Walker file this Statement of Facts in Support of their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment pursuant to Local Rule CV-7.

**I.      UT Austin's Undergraduate Admissions for 2008**

1.      UT Austin considers itself a highly selective institution.  Deposition of Kedra B. Ishop, taken October 6, 2008 ("Ishop Dep.") 9:20-23 (cited excerpts attached at Tab 2); Deposition of N. Bruce Walker, taken October 7, 2008 ("Walker Dep.") 9:13-15 (cited excerpts attached at Tab 5); Deposition of Gary Lavergne taken October 6, 2008 ("Lavergne Dep.") 11:20-24 (cited excerpts attached at Tab 3).

2.      In recent years, UT Austin has received applications from approximately four times the number of students it has space to enroll in its freshman class.  "Implementation and Results of the Texas Automatic Admissions Law (HB 588) at UT Austin," Oct. 28, 2008 ("*2008*

*Top 10 Report*") at 6, Exhibit C to the Affidavit of Gary M. Lavergne, executed February 19, 2009 ("Lavergne Aff."), attached at Tab 8 (2006: 27,315 applications, 7,417 enrolled; 2007: 27,237 applications, 7,479 enrolled).

3.      For the class entering Summer/Fall 2008, UT Austin received 29,501 applications, offered admission to 12,843 applicants and ultimately enrolled 6,715 students as first-time freshman. *2008 Top 10 Report* at 6.

4.      UT Austin's admissions policy is designed for the purpose of admitting a meritorious and diverse student body. Walker Dep. at 9:10-12.

5.      Diversity is a "major priority" for UT Austin's students, faculty and staff, and it is UT Austin's aim to set a "high standard for diversity in higher education." UT Austin's Office of Division of Diversity and Community Engagement, "2008 Impact Report" at 4, Exhibit A to the Affidavit of Gregory Vincent, executed February 23, 2009 ("Vincent Aff."), attached at Tab 10.

6.      The University's broad vision of diversity encompasses various aspects of the human experience, including an applicant's culture; language; family, educational, geographic, and socioeconomic background; work, volunteer, or internship experiences; and leadership experience, among other elements. Walker Dep. 27:16-24. This broad vision of diversity also includes race. Walker Dep. 59:7-23; "Proposal to Consider Race and Ethnicity in Admissions," June 25, 2004 (the "*2004 Proposal*") at 3-4, attached as Exhibit A to the Affidavit of N. Bruce Walker, executed February 23, 2009 ("Walker Aff."), attached as Tab 11.

7.      The policy is intended to enhance the educational experience of students on campus. *2004 Proposal* at 24. It is also intended to identify and develop the next generation of

leadership, with the understanding and expectation that many of the University's graduates will become future leaders of Texas. *2004 Proposal* at 24-25.

8.     The University expects that its students will experience concrete benefits from diversity. Walker Aff. ¶ 4. In the University's judgment, these include, but are not limited to, cross-racial understanding; cross-ethnic understanding; and the breaking down of racial, ethnic, and geographic stereotypes. Walker Aff. ¶ 4. Students—regardless of race—should not feel like spokespersons for their race. Walker Dep. 21:6-13. UT Austin's admissions staff has read studies that tout other benefits: diversity promotes learning outcomes and better prepares students for an increasingly diverse work force, for society, and for entry into professions, where they will need to deal with people of different races, cultures, languages, and backgrounds. Walker Aff. ¶ 4. And the University's administrators know that graduates of the University of Texas will go on to become future leaders of this state, in government, industry, and public service, and perhaps others. Walker Aff. ¶ 4.

A.     **Selection Pool**

9.     Applicants do not compete with the entire universe of students who apply for the entering freshman class at UT Austin. Affidavit of Kedra B. Ishop, executed February 23, 2008 ("Ishop Aff."), attached at Tab 7, ¶ 7. The UT Austin admissions policy instead compares each applicant only to those other applicants who share both (1) the same residential status and (2) the same self-selected, preferred academic program.[1] Ishop Aff. ¶¶ 7-10.

10.     UT Austin first places each applicant into one of three selection pools based on their residential status—Texas residents, non-residents (applicants residing within the United States but outside Texas), and foreign students. Ishop Aff. ¶ 7.

---

[1] Admission to several majors or programs is different than the process described in this section (for example, majors such as Fine Art and Architecture require auditions or specialized portfolios and are not subject to the Top 10% law). Ishop Dep. 92:10-22. The Plaintiffs did not apply to these programs. Ishop Aff. ¶ 2.

11.     Approximately 90% of all slots available in the entering class are allotted for Texas residents.  Ishop Dep. 39:16-17.

12.     Applicants are then further divided based on their desired academic program. Ishop Dep. 14:11-15; 36:1-9. In some cases, applicants may be compared to other applicants based on the school or college that offers the intended major designated by the applicant.  Ishop Dep. 35:14-21.  For example, all applicants who state a preference for any of the majors within the School of Business will be compared to all other Business School applicants, regardless of major.  Ishop Dep. 35:15-16.  In other cases, applicants may be compared to other applicants based on the particular major they prefer.  For example, those who select a major within the School of Engineering are compared only to other applicants who select the same major.  Ishop Aff. ¶ 9. In the case of the College of Natural Sciences, applicants who select a major in Computer Sciences are compared to other applicants who select that same major; all other applicants within the College of Natural Sciences are compared with one another regardless of intended major. Ishop Aff. ¶ 9.

**B.     Factors Considered in the Admissions Process**

13.     The decision to admit one particular applicant over another within the same selection pool turns on one or more of the following three factors: (1) high school class rank ("HSR"), (2) Academic Index ("AI"), and (3) Personal Achievement Index ("PAI").  *2008 Top 10 Report*, at 2; Ishop Dep. 30:3-31:15.  A student's class rank is based on the applicant's high school grades only, while the AI and PAI are numbers generated by the UT Austin admissions office based on additional information provided to UT Austin by the applicant or an outside reporting agency such as the College Board.  Ishop Aff. ¶¶ 3-4; Ishop Dep. 16:8-12; *2008 Top 10 Report* at 2-3.

14.     The first two factors (class rank and AI) are based solely on an applicant's academic performance.  *2008 Top 10 Report* at 2.  The third factor (PAI) is a number derived from scoring the applicant's admissions essays and an admissions officer's holistic review of an applicant's entire application file.  *2008 Top 10 Report* at 3.

15.     The vast majority of Texas residents admitted to the freshman class are offered admission based on either class rank or a high AI alone, without any consideration of the PAI. Ishop Aff. ¶ 7.  For example, for the class entering Fall 2008, only 841 available spaces in the freshman class remained available for Texas residents (out of 10,200 available spaces) after all automatic admissions based on academic performance were made.  Ishop Dep. 91:9-24.

## 1.     Class Rank and the Top Ten Percent Law

16.     Texas law requires UT Austin to give primary consideration to the applicant's class rank, without regard to other criteria.  *2008 Top 10 Report* at 1-2; *see also* TEX. EDUC. CODE § 51.803.  Effective starting with the fall entering class of 1998, UT Austin (like all public universities in Texas) must offer admission to any applicant who graduates in the top ten percent of his or her class from a high school in Texas, pursuant to a Texas law known as House Bill 588 or, more commonly, the "Top 10%" law.  *2008 Top 10 Report* at 1-2; TEX. EDUC. CODE § 51.803.  The law applies to every public high school in Texas, as well as every private high school in Texas that ranks its students and makes those rankings available to university admissions officers.  TEX. EDUC. CODE § 51.803(a).

17.     Although Texas law guarantees every Top 10% applicant automatic admission to UT Austin, the applicant is not guaranteed admission to his or her preferred academic program within UT Austin.  Ishop Dep. 14:16-19; Lavergne Dep. 15:20-21.

5

18.     Applicants who are eligible for guaranteed admission under the Top 10% law, but who are not admitted into either their first or second choice academic program due to space limitations within those programs, are entitled to admission to UT Austin as an undeclared major in the College of Liberal Arts.  Ishop Dep. 50:15-18.

### 2.     Academic Index (AI)

19.     The review of admissions applications involves a calculation of a predicated grade point average ("PGPA") via a multiple regression equation.  SAT/ACT scores and class rank are used to determine an applicant's PGPA.  Ishop Aff. ¶ 3; Lavergne Dep. 17:13-25.

20.     The PGPA is a number that attempts to predict the applicant's freshman year grade point average for a particular academic program.  Lavergne Dep. at 17:13-18:18.   Its functional range is 0.00 to 4.00 and it is calculated through a multiple regression equation using numerical components from two sources: (1) high school class rank and (2) standardized test scores from either the SAT or the ACT.  Lavergne Dep. 17:13-25, *2008 Top 10 Report* at 2.

21.     An applicant's Academic Index (AI) is derived by combining the applicant's PGPA with a bonus of 0.1 points (called a "units plus"), if the applicant qualifies for it.  Ishop Aff. ¶ 3.  The "units plus" bonus is awarded to those applicants who take more than UT Austin's minimum high school coursework requirements in at least two of three designated subject areas. Ishop Aff. ¶ 3; Lavergne Dep. 17:13-25; 2008 Top 10 Report at 2.  If an applicant does not qualify for the "units plus" bonus, his PGPA and AI will be the same.  Ishop Aff. ¶ 3.  The opportunity to receive the 0.1 bonus makes 4.1 the highest AI recognized by the Office of Admissions.  Ishop Aff. ¶ 3; Lavergne Dep. 17:13-25.

22.     For purposes of calculating the applicant's PGPA, the applicant's class rank is based on his or her grade point average relative to others in the same high school class at the

6

time of application, which typically occurs either at the end of junior year (after six semesters) or halfway through the senior year of high school (after seven semesters).  Ishop Dep. 15:15-16:6.

23.     Applicants may choose to submit either SAT or ACT test scores.  Ishop Dep. 12:3-6; Lavergne Dep. 27:21-28:3.

24.     For applicants who take the SAT or ACT more than once, UT considers only the highest total score from any single test.  Ishop Dep. 12:3-6; *2008 Top 10 Report* at 5 n.5.

25.     The particular formula used to calculate an applicant's PGPA varies depending on the particular academic program within UT Austin to which the applicant applies.  Lavergne Dep. 18:5-12.  Different colleges and schools weigh the Math and Critical Reading components of an applicant's standardized test score differently.  Lavergne Dep. 18:5-12.  Liberal Arts, Communications, Fine Arts, Social Work, and Education use the same formula to calculate PGPA; Nursing, Natural Sciences, Geosciences, and Architecture use another; and the Schools of Engineering and Business each have their own unique formulas. *2008 Top 10 Report* at 5 n.6.

26.     The PGPA formulas, without the 0.1 bonus, as reflected in the *2008 Top 10 Report*, are:

---

**For Liberal Arts, Communications, Fine Arts, Social Work, and Education**:
PGPA =   $-0.19949 + (\text{SAT V} * 0.00142) + (\text{SAT M} * 0.00191) + (\text{HSR} * 0.01459)$
OR
$0.09689 + (\text{ACT E} * 0.02513) + (\text{ACT M} * 0.04577) + (\text{HSR} * 0.01351)$

**For Nursing, Natural Sciences, and Architecture:**
PGPA =   $-1.10339 + (\text{SAT V} * 0.00088166) + (\text{SAT M} * 0.00230) + (\text{HSR} * 0.02416)$
OR
$-0.51242 + (\text{ACT E} * 0.00824) + (\text{ACT M} * 0.05007) + (\text{HSR} * 0.02199)$

**For Engineering:**
PGPA =   $-1.53545 + (\text{SAT V} * 0.00072937) + (\text{SAT M} * 0.00313) + (\text{HSR} * 0.02285)$
OR
$-1.78910 + (\text{ACT E} * 0.01074) + (\text{ACT M} * 0.07335) + (\text{HSR} * 0.02708)$

---

> **For Business:**
> PGPA =   $-2.31253 + (SAT\ V * 0.00157) + (SAT\ M * 0.00229) + (HSR * 0.03419)$
> OR
> $-2.14521 + (ACT\ E * 0.02892) + (ACT\ M * 0.05405) + (HSR * 0.03409)$
>
>
> SAT V = SAT Verbal Score; SAT M = SAT Math Score
> ACT E = ACT English Score; ACT M = ACT Math Score
> HSR = High School Class Rank

*2008 Top 10 Report* at 5 n.6.

### 3.      Personal Achievement Index (PAI)

27.      For those applicants who are neither automatically admitted into their first-choice academic program on the basis of superior academic performance alone, nor presumptively denied admission due to a low PGPA (see discussion of "C" group applicants below), UT Austin admissions officials undertake a holistic review of the entire application file to determine an applicant's PAI.  *2008 Top Ten Report* at 3; Ishop Aff. ¶¶ 4, 12.

28.      In addition to the applicant's class rank, standardized test scores, and high school transcript, an application file consists of the geographic and personal background information submitted on the standard application form and two required essays.  *2008 Top Ten Report* at 2-3; Ishop Aff. ¶ 4; Ishop Dep. 12:13-13:5.   An applicant's file may also contain letters of recommendation; an optional third essay detailing any special circumstances or other personal information the applicant wishes to share; and anything else the applicant includes with the application, such as a resume, artwork, or writing samples.  Ishop Aff. ¶ 4; Ishop Dep. 12:13-13:21.

29.      The PAI is determined based on a weighted average of scores the applicant receives for each of the two required essays and a "personal achievement" score given to the applicant based on a holistic review of the file, with slightly greater weight given to the personal

achievement score.  Ishop Aff. ¶ 5; *2008 Top Ten Report* at 3.  For each component, the applicant receives a score on a scale of 1 to 6, with 6 being the highest score possible.  Ishop Aff. ¶¶ 5, 18; *2008 Top Ten Report* at 3.  The PAI is computed by averaging the two essay scores and then multiplying that number by three; multiplying the personal achievement score by four; adding those two subtotals together; and then dividing the sum by seven:  [(average essay score x 3) + (personal achievement score x 4)] / 7.  Lavergne Dep. 57:11-17.

*a.*     *Essay Scores*

30.    Applicants must submit two essays.  Ishop Dep. 12:15-17; *2008 Top 10 Report* at 3.

31.    For the fall entering class of 2008, the first essay question (Essay A) directed applicants to "describe someone who has made an impact on your life and explain how and why this person is important to you."  Ishop Aff. ¶ 4, Ex. A.  Essay B instructed applicants to "choose an issue of importance to you"—whether personal, school-related, political, local, or international—and explain "the significance of that issue to yourself, your family, your community, or your generation." Ishop Aff. ¶ 4, Ex. A.

32.    Each of the two required essays are read and scored on a scale of 1-6 (6 being the highest possible score) by one of twenty-three members of the admissions staff specially trained to read and score essays.  Ishop Aff. ¶¶ 5, 13.

33.    Essays are scored based on the quality of the writing, without regard to the subject matter chosen or the viewpoint expressed.  Deposition of Brian Bremen, taken October 6, 2008 ("Bremen Dep.") 10:18-21 (cited excerpts attached at Tab 1).  In scoring, readers are instructed to consider the complexity of thought, substantiality of development, and facility of language

demonstrated by the essay.  Bremen Dep. 10:20-21.  The two required essays are scored in comparison to other essays from the same admissions pool.  Bremen Dep. 10:3-12.

34.     An optional third essay, Essay C, invites applicants to describe any personal information that UT Austin should consider, such as "exceptional hardships, challenges, or opportunities that have shaped or impacted your abilities or academic credentials, personal responsibilities, exceptional achievements or talents, educational goals, or ways in which you might contribute to an institution committed to creating a diverse learning environment."  Ishop Dep. 78:12-20.  Unlike the two required essays, the optional essay is not given its own score at any stage of the admissions process; rather, it is read as part of the holistic review of the applicant's file that determines the applicant's personal achievement score.  Bremen Dep. 18:10-21; 20:18-20.

35.     To ensure consistent scoring across all of the admissions office's essay readers, UT Austin requires training of essay readers on an annual basis by Dr. Brian Bremen, an associate professor in UT Austin's English Department. Bremen Dep. 7:16-17; 31:7-11.  Dr. Bremen has been a consultant for the College Board for approximately thirty years, and he chaired the Test Development Committee for the SAT II writing test.  Bremen Dep. 8:16-18.  He has served as a consultant to UT Austin's admissions office for more than twelve years.  Walker Aff. ¶ 7.

36.     For each annual training, Dr. Bremen selects, out of a pool of about a thousand essays, approximately thirty-six to serve as exemplars for each essay topic—with about six samples for each of the six possible essay scores.  Bremen Dep. 27:15-22.

37.     The training begins by giving readers a set of essays, with scores pre-marked in ascending order, so that they can learn the differences in scoring.  Bremen Dep. 27:23-24.

Readers are then given sample essay sets to score, with the actual scores concealed.  Bremen Dep. 27:25-28:2.  Readers then together read through groups of exemplar essays for each score possible (one through six) until the readers develop a high degree of consistency in similarly scoring the same essay amongst different readers.  Bremen Dep. 27:7-14.

38.     The goal of the training is to ensure that all readers assign either the same score to any particular essay, or vary by no more than one point above or below the essay's true score, Lavergne Aff. ¶ 8. Bremen Dep. 25:1-13; 29:15-20.

39.     Readers are also given a scoring guide that describes typical characteristics of essays with particular scores.  Bremen Dep. 52:15-53:9; "Scoring Guide," Affidavit of Brian Bremen, executed February 23, 2009 ("Bremen Aff."), attached at Tab 6,. ¶ 6 & Ex. A.  For example, an essay scoring a 6 must demonstrate "clear and consistent competence," "effectively and insightfully address the writing task," be "well-organized and fully developed," and display "consistent facility in the use of language."  Bremen Dep. 52: 19-25; "Scoring Guide," Bremen Aff. Ex. A.  An essay scoring a 1 "demonstrates incompetent writing," reflects "very poor organization" and "very thin development," and contains "expressions so awkward that meaning is somewhat obscured."  "Scoring Guide," Bremen Aff. Ex. A.

40.     Readers leave the training session with a packet consisting of 36 exemplar essays for each question type that represent each score on the scoring scale and to which the readers can refer during the reading process.  Bremen Dep. 27:17-28:14; 26:6-8.

41.     In addition to this training, UT Austin also conducts "inter-rater reliability analyses" every several years, to ensure consistency among readers.  Ishop Dep. 83:12-16; Lavergne Dep. 47:15-22, 51:15-20.  The most recent analysis, conducted in 2005, showed that essay readers scored within one point of each other 91% of the time, comparable to the reader

consistency goals set by the College Board for the SAT writing test.   Lavergne Aff. ¶ 8; Lavergne Dep. 49:6-50:22.

42.      In 2007, Dr. Bremen also sampled readers' essay scores against his own scores to ensure reader reliability.  Ishop Dep. 84:12-16

43.      Consistency of essay scoring is further enforced when senior readers undertake a holistic review the entire applicant's file, including the essays.  Ishop Dep. 83:16-84:1.  These senior readers review the essays and other aspects of the file for purposes of determining the personal achievement score, not the writing quality of the essays, but the senior readers have also been trained on essay reading and thus are able to informally review and monitor scoring.  Ishop Dep. 83:16-84:1.

### b.      Personal Achievement Score

44.      Twenty-two senior members of the UT Austin admissions office conduct a holistic review of entire application files, including the two required essays and any supplemental information provided by the applicant (such as the optional third essay and any letters of recommendation), in order to determine the personal achievement score.  Bremen Dep. 16:15-17:13.  At this stage, all three essays (if the applicant included the optional third essay) are reviewed for substantive content and for what they reveal about the applicant as a person, rather than for writing quality.  Bremen Dep. 16:15-17:13, 18:5-19:4.

45.      Every applicant is awarded a personal achievement score of 1-6 based on the reader's holistic evaluation of the applicant's demonstrated leadership qualities, extracurricular activities, honors and awards, work experience, community service, and a variety of special circumstances.  Ishop Aff. ¶ 5; Ishop Dep. 18:9-19:14.  All components are considered in the context of the applicant's entire file, and no numerical value is ever assigned to any of the

individual factors that may make up the personal achievement score.  Ishop Aff. ¶ 5; Ishop Dep. 23:1-6; Bremen Dep. 22:7-10.

46.     The component of the personal achievement score that involves consideration of an applicant's special circumstances includes the socioeconomic status of the applicant's family (parents' education and combined income); whether the applicant is from a single-parent home; whether a language other than English is primarily spoken in the applicant's home; special family responsibilities, such as earning income or caring for other family members, that reduce the applicant's available time for other extracurricular activities; the socioeconomic status of the applicant's high school; the average SAT/ACT score of students attending the applicant's high school in relation to the applicant's own score; and, beginning with applications for the 2005 entering class, the applicant's race or ethnicity.  Ishop Dep. 22:13-20; Bremen Dep. 44:1-6.

47.     In evaluating personal achievement, reviewers consider both the breadth and depth of an applicant's involvement in activities and pursuits.  Ishop Dep. 18:19-20.  Reviewers look for applicants who have maximized the opportunities presented by their circumstances and made a meaningful difference, whether through volunteering or other community involvement, family commitments, or working.  Bremen Dep. 23:1-15.

48.     The training for the readers who determine the personal achievement score is similar to the training given to essay readers, in that the goal is to develop consensus and uniformity in scoring amongst readers.  Bremen Dep. 25:1-13, 26:16-27:7.  First, senior admissions officers select two or three files from a group of approximately 50 that each officer believes exemplify each of the six possible personal achievement scores.  Bremen Dep. 26:16-27:5.  Each officer's selected files are then read and scored by four other senior officers.  Bremen Dep. 26:16-27:7.  Those files that receive the same score by all five readers are then used as

exemplar files for all of the senior readers to instruct them on what a "perfect" file for each of the six possible scores looks like. Bremen Dep. 26:16-27:7. File readers are trained in this manner to achieve consistency across file readers, with the goal being that all readers will assign either the same score to the same file or vary by no more than one point above or below the true score. Bremen Dep. 25:1-4.

49.      At no time is any individual factor ever determinative. Walker Dep. 45:5-12. And consideration of race, in the context of an entire application, can benefit any applicant, regardless of race. Ishop Aff. ¶ 5; Ishop Dep. 57:14-58:4; Walker Dep. 36:21-37:9.

50.      According to the most recent inter-rater reliability analysis conducted on the file reading process in 2005, readers scored within one point of each other 88% of the time, consistent with industry standards. Lavergne Aff. ¶ 8; Lavergne Dep. 52:8-53:21.

### C.      The Admissions Decision Process

51.      UT Austin admits all freshmen into a specific academic program offered by the University. Ishop Dep. 16:22-24. A student who is ultimately offered admission as a freshman in a particular academic program at UT Austin is typically admitted at one of four distinct stages in the process: (1) automatic admission to their first choice of academic program based on either the Top 10% law or a particularly high AI; (2) admission into either their first or second choice of academic program, based on their AI and PAI scores; (3) admission as an undeclared major in the College of Liberal Arts (for Texas residents and non-residents only); and (4) admission through the summer program, based on a second read of the entire application file (Texas residents only). Ishop Dep. 29:21-31:5; 44:23-45:2; 45:20-25; 46:14-47:2. Most students admitted as freshmen to UT Austin are granted admission at the first stage of the process. Ishop Dep 91:19-24.

1.    **Automatic Admission Based on Either the Top 10% Law or a High
      PGPA**

52.    A large majority of applicants who are offered admission to UT Austin are
admitted based solely on class rank, pursuant to the Top 10% Law. *2008 Top 10 Report* at 9,
Table 2b. For the Summer/Fall 2008 entering class, 81% of all enrolled students from Texas
high schools were admitted under the Top 10% Law. *2008 Top 10 Report* at 9, Table 2b. By
comparison, for the fall entering class of 1998, the first year that the Top 10% Law took effect,
41% of enrolled students from Texas high schools were admitted under the Top 10% Law. *2008
Top 10 Report* at 9, Table 2b.

53.    Although the Top 10% Law requires admission only into UT Austin, and not
necessarily into the applicant's preferred academic program, many schools and colleges within
UT Austin grant admission to every applicant who qualifies under the Top 10% Law and selects
that school or college as his or her first choice of academic program. Ishop Aff. ¶ 7.

54.    Some academic programs could fill most of their admission slots based on the
first choice preferences of Top 10% applicants alone, while others, such as the School of
Business, would be oversubscribed based on that population alone. Ishop Dep. 14:20-15: 32:7-
14; Ishop Aff. ¶ 11. For those programs that could fill 80% or more of the space in their
freshman class based on the first choice preferences of Top 10% applicants alone (known as
"impacted" programs), UT Austin caps the percentage of Top 10% applicants that will be
*automatically* admitted to those programs at 75% of the program's available admission slots.
Ishop Dep. 14:20-15:5, 32:7-14.

55.    For 2008 admissions, the School of Business, College of Communication, School
of Engineering, School of Nursing, and the Kinesiology and Health Education programs within
the College of Education were all considered impacted programs, and capped their automatic

Top 10% admissions accordingly.  Ishop Aff. ¶ 11; Ishop Dep. 32:15-19.  For example, the School of Business offered automatic admission to only those Top 10% applicants who graduated within approximately the top 4% of their high school class and selected a business major as their first choice.  Ishop Dep. 32:19-21.  The remaining 25% of the slots were filled using the AI/PAI matrix, as described below, a process that included both Top 10% and non-Top 10% applicants.  Ishop Dep. 35:4-10.

56.     In addition to those automatically admitted under the Top 10% rule, UT Austin's admissions office also establishes "A" and "C" group parameters for some colleges and schools; these parameters are used to automatically admit, or presumptively deny, applicants based on their AI alone.  Ishop Aff. ¶ 12.

57.     For 2008 admission, five colleges or schools admitted applicants automatically on a rolling basis if their AI exceeded a particular threshold (so-called "A" group applicants): Natural Sciences (3.5 AI); Geosciences (3.6 AI); Liberal Arts (3.9 AI); Social Work (3.6 AI); and three programs in Education (Applied Learning & Development (3.6 AI); Special Education, (3.4 AI), and Bilingual Education, (3.4 AI)).  Ishop Aff. ¶12.  After all admissions offers based solely on academic performance (either pursuant to the Top 10% rule or due to the applicant's high AI) were made for the Fall 2008 entering freshmen class, only 841 available admissions slots (out of a possible 10,200) remained open for Texas residents.  Ishop Dep. 91: 19-21.

58.     UT Austin has also established an academic "floor" below which certain applicants are deemed presumptively inadmissible (designated "C" group applicants).  Ishop Aff. ¶ 12.

59.     For the Fall 2008 entering freshman class, applicants with an AI of 2.599 and below were designated "C" group applicants.  Ishop Aff. ¶ 12.

60.     The files of "C" group applicants are reviewed by a senior admissions reader and are referred for full file review only if the reader determines that the file warrants full review, in which case the review process proceeds in the same manner as for all other applicants.  Ishop Aff. ¶ 12.

61.     If a "C" group applicant is not selected for full file review, the applicant is by default assigned a set of PAI scores of "3(essay 1)-3(essay 2)-3(personal achievement)", which—in conjunction with the applicant's relatively low AI—effectively precludes admission to the freshman class.  Ishop Aff. ¶ 12.

## 2.     Admission Into Either First or Second Choice Academic Program Through the AI/PAI Matrix

62.     Admissions slots that remain in each academic program after allotted slots are filled by those who are automatically admitted due to their Top 10% status or high AI are filled based on the applicant's combined AI and PAI scores.  Ishop Aff ¶¶ 11-12; Ishop Dep. 29:18-30:14.

63.     In this process, applicants are clustered into groups of applicants who share the same combination of AI and PAI scores, and each group is considered for admission based solely on those scores.   A liaison (an associate or assistant director of admissions) is assigned to manage the admissions process at this stage for each academic program.  Ishop Aff. ¶ 14; Ishop Dep. 30:11-17, 38:6-8.

64.     The process begins when the admissions office generates an initial AI/PAI matrix for each academic program.  Ishop Aff. ¶ 14; Ishop Dep. 30:1-6.

65.     On each matrix, PAI scores are plotted on the vertical left axis ascending from 1 to 6 in whole-number increments; AI scores (which are first multiplied by a factor of 100 to derive a whole number ranging from 000 to 410) are plotted on the horizontal bottom axis,

starting at the far left with 410 and descending in increments of 10.  The cell that represents the highest combination of AI and PAI scores is located in the top left hand corner of the matrix, and the lowest combination can be found in the bottom right hand corner.  The 2008 Top Ten Report includes the following sample illustration of the AI/PAI matrix (or "decision grid"):



*2008 Top 10 Report* at 3.

66.     Each cell on the matrix contains a number representing the total number of applicants who share that particular combination of AI and PAI scores.  Ishop Dep. 31:7-11; 62:24-63:3.

67.     Every academic program's initial matrix is populated by only those applicants who selected that program as their first choice.  Ishop Dep. 30:1-6.

68.     The liaison then makes an initial determination as to which cells are likely to be admitted, taking into consideration (1) the number of available spaces left in the program, (2) the number of applicants in each cell, and (3) the desire to admit those with the highest combinations of AI and PAI scores.  Ishop Dep. 42:2-43:4; 87:17-89:10.  Liaisons have discretion as to where to draw the initial decision line, applying these considerations.  Ishop Dep. 43:19-20.

69.    Starting with the cell in the top left hand corner reflecting the highest combination of AI and PAI scores, each liaison adds adjacent cells based on these considerations until enough cells have been tentatively considered for admission to fill the remaining slots in each program. Ishop Aff. ¶ 14.  This results in a "stair-step" decision line on the matrix, as seen in the following example from the class of Fall 2008:



Ishop Aff. ¶ 14 at Ex. B.  After the initial decision line is drawn, all cells above the line are tentatively considered for admission.  Ishop Aff. ¶ 14.

70.    At the conclusion of this initial stage, any applicant who does not fall within one of the cells tentatively considered for admission into their first choice of academic program may now be considered for admission into their second choice program.  Ishop Dep. 44:17-25.  This is accomplished by updating every program's matrix so that each cell now represents the total number of applicants with that particular combination of AI and PAI scores who have designated that program as either their first choice or (for those students not tentatively admitted to their first-choice program) their second choice.  Ishop Dep. 44:23-45:10.

71.    Adding these second choice applicants to the matrix will, for many programs, increase the total number of students that fall within one of the cells that have been tentatively considered for admission, and exceed the number of slots available in that particular program.

Ishop Aff. ¶ 14.  When that occurs, each liaison must manage program enrollment by adjusting the initial set of cells considered for admission to match the available number of slots, again taking into consideration the desire to admit those with the highest combination of AI and PAI scores.  Ishop Aff. ¶ 14.

72.      Each program's matrix is then updated again to reflect the availability of any new second choice applicants that emerge from this adjustment process.  Ishop Aff. ¶ 14.  At the conclusion of this second round, each liaison makes a final determination of which cells to admit to each program, and all applicants who fall within any of those cells are accordingly deemed admitted.  Ishop Aff. ¶ 14.

### 3.      Admission as an Undeclared Major in Liberal Arts (Texas Residents and Non-Residents Only)

73.      Any remaining Top 10% applicants not admitted into either their first- or second-choice program are offered admission as an undeclared major in the College of Liberal Arts. Ishop Dep. 14:11-19; 50:15-19.   This compliance process typically exhausts most of the remaining slots for admission.  Ishop Dep. 49:13-14; 50:18-19.

74.      When admissions decisions were made for the Fall 2008 semester, only 186 admissions slots remained available in the College of Liberal Arts undeclared major program for Texas residents after automatically admitting all Top 10% applicants and those applicants with a sufficiently high AI (3.9 and above).  Ishop Aff. ¶ 14

75.      To fill these remaining slots in the College of Liberal Arts, an AI/PAI matrix is created and populated with those Texas resident applicants who failed to gain admission to either their first- or second- choice academic programs.  Ishop Aff. ¶ 14.  The admissions office then draws the stair-step admission line on this matrix to capture the number of applicants necessary

to complete the fall entering class and offers these applicants admission as an undeclared major in the College of Liberal Arts.  Ishop Dep. 6:2-23; Ishop Aff. ¶ 14.

76.     At this point, all remaining applicants not yet offered admission who are not Texas residents are denied admission.  Ishop Aff. ¶ 15; Ishop Dep. 47:2-5.

### 4.     Admission to Summer and CAP Programs (Texas Residents Only)

77.     UT Austin has developed a summer program that allows an additional group of Texas residents to be admitted to the University, provided that they are willing to begin their coursework early, during the summer months immediately preceding the beginning of the fall semester.  Ishop Aff. ¶ 15.

78.     Any Texas resident who fails to gain admission to the fall semester freshman class will either be offered admission to UT Austin as a freshman through the Summer Freshman Class program, or can qualify for a transfer to UT Austin after her freshman year provided that she complies with the terms of the Coordinated Admissions Program ("CAP").  Ishop Aff. ¶ 15.

79.     To determine who will be offered admission through the summer program, a group of senior admissions staff members give a second read to the entire file of those Texas residents who narrowly failed to gain fall admission as an undeclared major in the College of Liberal Arts based on their AI and PAI scores.  Ishop Aff. ¶ 15; Ishop Dep. 47:8-48:25.

80.     In 2008, 3,029 applicants were granted a second read based on having AI and PAI scores just below those admitted for the fall semester under the third stage of the admissions process.  Ishop Aff. ¶ 15.  Specifically, the applicants granted this second read were those with the highest combination of AI/PAI scores that remained on the AI/PAI matrix for the College of Liberal Arts, undeclared major, after all admissions decisions for Fall 2008 were made.  Ishop

Aff. ¶ 15.  The following is the "second read" matrix for the Fall 2008 admission cycle (with the arrow pointing to that side of the stair-step line that was granted a second read):



Ishop Aff. ¶ 15 at Ex. C.  Of the 3,029 applicants granted a second read, approximately half were offered admission into the Summer Freshman Class program. Ishop Aff. ¶ 15.

81.    Any Texas resident applicant not offered admission as a freshman to either the Fall or Summer programs may qualify for a transfer to UT Austin through CAP.  Ishop Aff. ¶ 15. Any student who accepts the offer of CAP admission may transfer into UT Austin after their freshman year if they have completed 30 approved credit hours at a participating UT System campus and have maintained a GPA of at least 3.2 at that school.  Ishop Aff. ¶ 15.

    **D.    The Admissions Process after *Grutter***

82.    The precise methodology by which UT Austin compares applicants with others of the same residential status and preferred academic program has undergone a certain amount of change over the past 15 years as a result of court decisions, legislation, and University policy. *2008 Top 10 Report* at 2, 4.

83.    The core elements of UT Austin's admissions process have remained largely constant since the entering class of 1997, when UT Austin began using the AI/PAI system. Walker Dep. 11:15-19; *2008 Top Ten Report* at 4.

84.     Beginning with applicants for the Fall 2005 entering class, and following the U.S. Supreme Court's June 2003 ruling in *Grutter v. Bollinger*, 539 U.S. 306 (2003), UT Austin added race as an element considered in undergraduate admissions; however, it did so under the existing four-stage admissions process described above.  Ishop Dep. 54:19-21; Ishop Aff. ¶ 4.

85.     Prior to 1997, UT Austin's undergraduate admissions policy focused primarily on an applicant's class rank and SAT or ACT score.  *2008 Top 10 Report* at 2.  UT Austin also utilized an affirmative action admissions policy designed to increase enrollment of minority students, particularly African-American and Hispanic students.  Ishop Dep. 54:8-14.

86.     In *Hopwood v. Texas*, 78 F.3d 932 (5th Cir.), *cert. denied*, 518 U.S. 533 (1996), the Fifth Circuit prohibited UT Austin from considering race in any manner in admissions.  In response to that decision, UT Austin changed its undergraduate admissions program by ceasing the use of race as a factor in admissions and adding a holistic evaluation of applicants.  *2008 Top 10 Report* at 4.

87.     Applicants for the eight entering classes between 1997 and 2004 were evaluated using the AI/PAI system, without any consideration of race.  Walker Dep. 11:15-19; *2008 Top Ten Report* at 4.

88.     The only substantive difference between the AI/PAI system in place from 1997 to 2004 and the AI/PAI system in place today is that, starting with applications for the 2005 entering class, UT Austin authorized its admissions reviewers to consider race or ethnicity in their holistic determination of an applicant's personal achievement score.  Walker Dep. 30:23-31:1; *2008 Top Ten Report* at 4.

89.     UT Austin adopted this change in response to the decision of the U.S. Supreme Court in *Grutter v. Bollinger*, 539 U.S. 306 (2003), which upheld the University of Michigan's

use of race as a factor in its law school admissions program and abrogated the *Hopwood* decision.  *2008 Top Ten Report* at 4.

90.    Following the *Grutter* decision, the Board of Regents of the University of Texas System adopted a resolution authorizing each System campus to consider whether or not to alter their admissions policies in light of *Grutter*.  Walker Aff. ¶ 8, 9.

91.    Pursuant to that resolution, UT Austin convened a group of admissions staff, professors, and lawyers to consider whether and how its admissions policies should be modified in response to *Grutter*.  Walker Aff. ¶ 10.

92.    As a part of its consideration, UT Austin considered whether or not the campus and—of critical importance, the classrooms—had a critical mass of underrepresented minorities (that is, Hispanic and African Americans).  Walker Dep. 18:9-13; 19:17-20:15.  The University also conducted a study, the results of which were cited in a report in November 2003, that examined the presence or absence in undergraduate classrooms of students from the four most prevalent racial/ethnic groups on campus (White, African-American, Asian, and Hispanic). Walker Aff. ¶ 11; "*Diversity Levels of Undergraduate Classes at the University of Texas at Austin, 1996-2002*" (the "*Diversity Study*"), Lavergne Aff. Ex. B.  The results of the Diversity Study showed that, in 2002, in the classes in the category that UT Austin considers most relevant for examining student participation and interaction (i.e., classes with 5-24 students), 90% had one or zero African-American students, 46% had one or zero Asian-American students, and 43% had one or zero Hispanic students.  Walker Aff. ¶ 11; *Diversity Study* at 8 (Table 3); *2004 Proposal* at 26, Table 8.  Based on this study, UT Austin concluded that it had not attained a critical mass of underrepresented minorities.  Walker Aff. ¶ 11; *2004 Proposal* at 24-25. Because critical mass is a necessary (but not sufficient) condition of achieving diversity, UT

Austin further concluded, based on the study, that the educational benefits of a diverse student body were not being provided to all the University's undergraduate students.  Walker Aff. ¶ 11; Walker Dep. 18:11-13; *2004 Proposal* at 25.  In making this determination, the University did not set a specific numeric goal for critical mass.  Walker Dep. 18:19-19:3.  Rather, officials discovered when talking with students that minority students still felt isolated in the classroom and a majority of undergraduates believed there was no diversity in the classroom.  Walker Aff. ¶ 12; Walker Dep. 21:6-12.

93.     After several months of study and deliberation, including retreats, interviews, review of data of diversity in the classroom, and other factors, UT Austin decided to authorize the consideration of race in its undergraduate admissions policy.  Walker Aff. ¶¶ 10-13.

94.     On June 25, 2004, UT Austin internally circulated a document entitled "Proposal to Consider Race and Ethnicity in Admissions."  *2004 Proposal* at 1.  The document proposed the limited use of race in admissions at UT Austin and expressed the University's "intent to comply with the law as expressed in the decisions of the United States Supreme Court in the cases of *Grutter v. Bollinger*, 123 S.Ct. 2325 (2003), and *Gratz v. Bollinger*, 123 S.Ct. 2411 (2003)."  *2004 Proposal* at 1.

95.     In August 2004, after almost a year of deliberations, the UT System approved a revised admissions policy for UT Austin that included an applicant's race in the list of special circumstances that reviewers can consider in determining the applicant's personal achievement score.  Walker Aff. ¶ 14.

96.     This change took effect starting with applications for the freshman entering class for Fall 2005.  Ishop Aff. ¶ 4.  As a practical matter, this meant that: (1) an applicant's race (if reported by the applicant) was now included on the application file; and (2) readers were now

taught to include race, but only in the same manner as any other special circumstance.  Walker Aff. ¶ 15.

97.    Like every other component of an application, race alone does not determine any applicant's personal achievement score.  Bremen Dep. 44:15-19, 59:14-25; Ishop Dep. 19:20-20:3; Walker Aff. ¶ 15.

98.    File readers are trained to consider race in conjunction with an applicant's demonstrated sense of cultural awareness.  Bremen Dep. 40:24-41:22, 60:16-19.  Depending on the content of the application, race can positively impact the holistic evaluation of any applicant, including Caucasian applicants, or may have no impact whatsoever.  Ishop Dep. 57:2-12; Bremen Dep. 32:7-19; Walker Dep. 36:3-37:6.

99.    An applicant's race is considered only to the extent that the applicant, viewed holistically, will contribute to the broader vision of diversity desired by UT Austin.  Ishop Dep. 55:2-11.

100.    No admissions officer or anyone else at UT Austin monitors the racial or ethnic composition of the group of admitted students at any time during the admissions process in order to consider whether an applicant will be admitted.  Ishop Aff. ¶ 17.

101.    As an internal practice, the UT Austin admissions office informally reviews its various admissions procedures each year.  Walker Aff. ¶ 16.  Additionally, UT Austin's undergraduate admissions policy requires periodic, formal review of the use of race.  Walker Aff. ¶ 16; *2004 Proposal* at 6, 32.  Every five years, the admissions process for the freshman class is reviewed to assess whether consideration of race is necessary to create a diverse student body, or whether race-neutral alternatives exist that are able to achieve the same results.  *2004 Proposal* at 32.  The first formal review is scheduled to begin in Fall 2009.  *2004 Proposal* at 32.

**II.    Race-Neutral Recruitment and Outreach Efforts**

102.    Following the *Hopwood* decision in 1996, UT Austin began using a number of race-neutral recruitment efforts, aimed at improving the overall diversity of its student body, that remain in place today.  Affidavit of Michael K. Orr, executed February 20, 2009 ("Orr Aff."), attached at Tab 9, ¶¶ 3-21; Deposition of Michael Orr, taken October 6, 2008 ("Orr Dep.") 20:19-21:5 (cited excerpts attached at Tab 4).

103.    In addition, UT Austin has made substantial efforts to increase the quantity and quality of services provided to all prospective students.  Orr Aff. ¶¶ 3-21; Orr Dep. 20:19-21:5.

**A.    Scholarship Programs**

104.    UT Austin created the Longhorn Opportunity Scholarship ("LOS") program after the *Hopwood* decision in 1996.  Orr Aff. ¶ 7; Orr Dep. 12:11-16.  The LOS program identifies high schools in underserved communities with historically few UT matriculates and provides a guaranteed number of scholarships to the Top 10% applicants who graduate from those schools. Orr Aff. ¶ 7.  The scholarships are intended to increase the number of Top 10% students from these historically underrepresented schools who choose to come to UT Austin.  Orr Aff. ¶ 7.

105.    UT Austin originally identified 39 high schools as LOS schools, based on criteria such as students' average socioeconomic status, population of first-generation students, and the percentage of students that send test scores to UT Austin.  Orr Dep. 11:25-12:5.  There are currently 69 schools that UT Austin identifies as LOS schools.  Orr Aff. ¶ 7.

106.    In addition to the LOS program, UT Austin initiated two other scholarship programs following the *Hopwood* decision in 1996.  The Presidential Achievement Scholarship ("PAS") is a need-based scholarship that is based on a student's family income, high school characteristics, and the student's academic performance relative to others in that high school.

27

Orr Aff. ¶ 6; Orr Dep. 15:17-23.  Finally, the First Generation Scholarship Program provides need-based scholarships to students who would be the first in their family to attend college.  Orr Aff. ¶ 9; Orr Dep. 17:15-18.

107.    These scholarship programs are aimed at helping enable qualified students from lower socioeconomic backgrounds to attend UT Austin.  Orr Dep. 18:1-12, 19:15-20.  They are not limited to minority students.  Orr Dep. 20:13-15; 21:8-22:9.

108.    From 1997 to 2007, UT Austin awarded $59 million in scholarships, with another $20 million of tuition waivers awarded.  Orr Aff. ¶ 10.  In 2007, UT Austin awarded $5.8 million through the PAS and LOS scholarships alone.  Orr Aff. ¶ 10.

**B.    Regional Admissions Centers**

109.    Starting in 1996, UT Austin's annual recruitment budget was increased by $500,000.  Orr Aff. ¶ 12.

110.    Since then, UT Austin has established three new regional admissions centers in addition to the existing centers in Houston: Dallas (2000), San Antonio (2005), and Harlingen (2007).  Orr Aff. ¶ 12; Orr Dep. 15:2-14.  The purpose of these centers is to increase UT Austin's visibility and interaction with prospective students, parents, and high school administrators within their respective geographic markets.  Orr Aff. ¶ 12.

111.    The centers provide a location to host receptions and information sessions about the admissions process, and serve as a home base for counseling staff.  Orr Dep. 13:19-24.

112.    Staff in these regional admissions centers have helped coordinate more than 1,000 College Day/Night events held at high schools across the state.  Orr Aff. ¶ 12.  Additionally, these centers coordinated approximately 1,000 day visits to high schools statewide to encourage prospective Top 10% students to apply and enroll at UT Austin.  Orr Aff. ¶ 12.

C.    **Other Significant Programs and Events**

113.    UT Austin holds as many as 5 annual "Longhorn Lock-In" events, which are overnight visits to UT Austin for prospective students.  Orr Aff. ¶ 17.  These events serve prospective students from targeted high schools in the Dallas, San Antonio, Houston, and Rio Grande Valley areas.  Orr Aff. ¶ 17.

114.    As part of its UT Scholars program, UT Austin organizes overnight campus visits for admitted scholarship recipients from Dallas, Houston, San Antonio, the Rio Grande Valley, and central Texas.  Orr Aff. ¶ 18.  More than 300 students participate annually.  Orr Aff. ¶ 18.

115.    UT Austin conducts three "Longhorn for a Day" campus visit programs for prospective students from Dallas, San Antonio, Laredo, and Houston.  Orr Aff. ¶ 19.  Over 150 students participate annually.  Orr Aff. ¶ 19.

116.    UT Austin annually hosts four "Longhorn Saturday" events on campus for prospective students and their families.  Orr Aff. ¶ 20.  This program has hosted more than 3,000 individuals and a related program, called "Rise and Shine," has hosted over 1,200 persons.  Orr Aff. ¶ 20.  Registration and attendance at both events is open to all.  Orr Aff. ¶ 20.

117.    UT Austin also holds an annual program called the Honors Colloquium that brings 500-600 students for a three-day campus visit during the summer.  Orr Dep. 23:9-15.

118.    UT Austin hosts an annual, multi-day conference on campus for high school counselors called "Counselors Colloquium" to focus attention on the University.  This program is offered at no cost for those who could not otherwise afford to attend, in order to ensure broad representation of high school counselors.  Orr Aff. ¶ 21.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General for Litigation

ROBERT B. O'KEEFE
Chief, General Litigation Division


/s/ James C. Ho
JAMES C. HO
Texas Bar No. 24052766
Solicitor General
james.ho@oag.state.tx.us

JOSEPH D. HUGHES
Texas Bar No. 24007410
Assistant Solicitor General

MISHELL B. KNEELAND
Texas Bar No. 24038256
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
mishell.kneeland@oag.state.tx.us
512-463-2120
512-320-0667 *fax*
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of February, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ James C. Ho
JAMES C. HO
Solicitor General