# TAB 1

**Bremen Deposition**

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ABIGAIL NOEL FISHER; and ) | |
| RACHEL MULTER MICHALEWICZ, ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. |
| VS. ) | 1:08-cv-00263-SS |
| ) | |
| STATE OF TEXAS; UNIVERSITY ) | |
| OF TEXAS AT AUSTIN; et al, ) | |
| Defendants. ) | |

ORAL DEPOSITION

OF

BRIAN BREMEN

TAKEN OCTOBER 6, 2008

AFFILIATED REPORTERS & VIDEO

Certified Shorthand Reporters & Videographers

805 West 10th Street, Suite 400, Austin, Texas 78701
(512) 478-2752   FAX (512) 478-2782   1-800-969-2752

1

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
                           AUSTIN DIVISION

ABIGAIL NOEL FISHER; and        )
RACHEL MULTER MICHALEWICZ       )
                                )
     Plaintiffs,                )
                                )
v.                              )    Civil Action No.
                                )    1:08-cv-00263-SS
                                )
STATE OF TEXAS; UNIVERSITY  OF  )
TEXAS AT AUSTIN; et al,         )
                                )
     Defendants.                )
```

---

ORAL DEPOSITION OF
BRIAN BREMEN
October 6, 2008

---

ORAL DEPOSITION of BRIAN BREMEN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on October 6, 2008, from 10:03 a.m. to 11:58 a.m., before Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of University of Texas at Austin, Main Building, Suite 210, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

```
 1                      APPEARANCES
 2  FOR THE PLAINTIFFS:
 3      Mr. Thomas R. McCarthy
        WILEY REIN, L.L.P.
 4      1776 K Stree, N.W.
        Washington, DC 20006
 5      202/719-7000
 6
 7  FOR THE DEFENDANTS:
 8      Ms. Mishell B. Kneeland
        OFFICE OF THE ATTORNEY GENERAL
 9      Assistant Attorney General
        300 West Fifteenth Street
10      Austin, Texas 78701
        512/463-2004
11
12
    ALSO PRESENT:
13
        Mr. Leo Barnes
14      Ms. Patricia C. "Patti" Ohlendorf
15
16
17
18
19
20
21
22
23
24
25
```

3

1                              INDEX

2                                                                    PAGE

3    Appearances.........................................      2

4    BRIAN BREMEN

5        Examination by Mr. McCarthy.........................  4

6    Changes and Signature................................   62

7    Reporter's Certification.............................   64

8

9                            EXHIBITS

10   NO. DESCRIPTION                                            PAGE

11       2............................................................   33
           Office of Admissions - Freshman Application Review
12         Sheet

13       3............................................................   37
           Freshman Application Review Sheet
14

15       4............................................................   51
           Essays, Instructions, and Scoring Guide

16       5............................................................   54
           Sample Essay A
17
         6............................................................   56
18         Sample Essay A

19

20                            * * * * *

21

22

23

24

25

Affiliated Reporters & Video   800-969-2752
805 West 10th Street, Suite 400, Austin, Texas   78701

Page 6

(1) procedure?
(2) A. No.
(3) Q. Okay, great. I'm going to ask you just a few more
(4) sort of standard logistical questions before we actually get
(5) started into the meat of this.
(6)     Have you taken any medications or ingested
(7) anything that might affect your ability to testify here
(8) today?
(9) A. No.
(10) Q. Okay. Did you meet with anyone to prepare for
(11) this deposition?
(12) A. Yes.
(13) Q. Okay. Did you meet with Ms. Kneeland?
(14) A. Yes.
(15) Q. Did you meet with anyone else?
(16) A. Leo Barnes.
(17) Q. Okay. About how many times did you meet with
(18) them?
(19) A. I met with Ms. Kneeland and Leo once and then once
(20) before with Leo and Patti Ohlendorf. I forgot her last
(21) name.
(22) Q. Okay.
(23)     MS. KNEELAND: And just so you know, she's
(24) legal counsel for the University of Texas at Austin as
(25) well --

Page 7

(1)     MR. McCARTHY: Thank you.
(2)     MS. KNEELAND: -- to clear that up before you
(3) ask.
(4) Q. (By Mr. McCarthy) Did you review any documents in
(5) preparation for this deposition?
(6) A. Well, the only reason I'm -- I had given documents
(7) to Leo and I don't believe, though, that we actually
(8) reviewed them. We talked about them, but didn't look at
(9) them.
(10) Q. Okay.
(11)     MS. KNEELAND: I think he's stating the
(12) difference between he gave documents for us to produce to
(13) you versus having gone over them.
(14)     MR. McCARTHY: That's what I figured.
(15) Q. (By Mr. McCarthy) Okay. What is your job title?
(16) A. I'm an associate professor in the Department of
(17) English.
(18) Q. Okay. And what are your responsibilities with
(19) regard to the admissions program?
(20) A. The admissions program hired me awhile ago now as
(21) a cross-campus consultant to help them with the essay
(22) process in admissions.
(23) Q. Okay. And how long have you been in that position
(24) with the admissions office?
(25) A. I want to say about 15 years --

Page 8

(1) Q. Okay.
(2) A. -- 13 to 15.
(3) Q. Okay. Have you held any other positions while
(4) you've been at UT Austin?
(5) A. Just the associate professorship.
(6)     MS. KNEELAND: Just -- You mean positions at
(7) UT Austin or do you mean other positions outside of the
(8) University?
(9)     MR. McCARTHY: I mean other positions at UT
(10) Austin.
(11)     MS. KNEELAND: Then I think you answered.
(12)     THE WITNESS: Right.
(13)     MR. McCARTHY: Okay.
(14) Q. (By Mr. McCarthy) Have you held other positions
(15) outside of UT Austin that relate to these duties?
(16) A. Yeah. I've been a consultant for the
(17) College Board for about 30 years now. I was the chair of
(18) the Test Development Committee for the SAT II writing test,
(19) I was a chief reader for the SAT II writing test, and was a
(20) member of the SAT Writing Test Development Committee when
(21) the SAT II writing test was suspended and that test then
(22) became part of the overall SAT battery. I was then a
(23) special consultant for the College Board once the SAT
(24) writing test was administered where I would fly up to
(25) Iowa City every time there was an administration of the SAT

Page 9

(1) to sat up the scoring and training procedures for that test.
(2) Q. Okay. And what's your educational background?
(3) A. My educational background, I was a AB in economics
(4) from Princeton University, taught high school for eight
(5) years and while I was doing that went back and worked on a
(6) master's degree in English, and then went back to Princeton
(7) to finish a Ph.D. in English literature.
(8) Q. Are you able to testify on behalf of the
(9) University of Texas at Austin for the purposes of the topics
(10) that Ms. Kneeland mentioned earlier?
(11) A. As far as the essays and the training goes,
(12) absolutely.
(13) Q. Okay. Can you tell me about the training that's
(14) given to the readers that review applications?
(15) A. Sure. This is the same process that we used at
(16) the College Board for grading -- for evaluating essays.
(17) It's a process known as holistic scoring. It was actually
(18) developed in the '60s by a woman named Trudy Conlan at
(19) Educational Testing Services and it's -- also I should say I
(20) developed a workshop for the College Board for in, again,
(21) essay scoring and evaluating essays as a piece of writing.
(22)     Would you like me to explain the process
(23) itself?
(24) Q. Sure, please continue.
(25) A. All right. The major principle, I guess, of

Page 10

(1) holistic scoring is that you try to establish a set criteria
(2) for an essay as an overall piece of writing. Would you use
(3) a -- Using a six-point scale, you evaluate a population of
(4) essays according to, you know, again, those that are good,
(5) as good, better than the majority, those that are not as
(6) successful, less successful, you know, than the majority of
(7) the essays. It's a -- a process that involves evaluating a
(8) population of essays beforehand in order to pick sample
(9) essays for particular score points so that the training
(10) can -- will involve, then, triangulating between a set of
(11) principles in holistic scoring, a scoring guide, and these
(12) sets of samples.
(13)    Q.  Okay. Now, you talked about -- In your answer
(14) there you talked about setting up a scoring guide?
(15)    A.  Yes, the scoring guide.
(16)    Q.  What do you mean by that?
(17)    A.  The scoring guide is a set of really varying
(18) descriptions for each score point so that -- I tell readers
(19) that they want to sort of evaluate each essay in three
(20) dimensions so that you're looking at complexity of thought,
(21) substantiality of development, and facility with language
(22) and so -- I believe there's a copy of the scoring guide that
(23) we use in the material that I gave to Leo and Mishell, but
(24) that each score point then has a description along with it
(25) that's really made specific, though, in relation to the

Page 11

(1) sample essays that readers then are trained on.
(2)    Q.  Okay. So now this scoring guide, you talked about
(3) complexity of the issues --
(4)    A.  Complexity of thought.
(5)    Q.  Sorry, complexity of thought and the
(6) substantiality of the --
(7)    A.  Of development.
(8)    Q.  -- development, and the facility with language?
(9)    A.  That's correct.
(10)   Q.  Okay. So those -- Are those sort of the major
(11) components that you look at when you review an essay?
(12)   A.  Well you want to negotiate among those three axes
(13) really, those three components.
(14)   Q.  Okay. So in other words, an essay that shows the
(15) complexity and the facility and the substantiality is one
(16) that will get a higher score.
(17)   A.  In varying degrees, sure.
(18)   Q.  Okay.
(19)   A.  Absolutely, yeah. I was going to say it might be
(20) helpful for me to actually look at the scoring guide if
(21) we're going to talk about it.
(22)       MS. KNEELAND: It's Mr. McCarthy's
(23) deposition. I don't know if he has it with him, so --
(24)       MR. McCARTHY: I intend -- I intend to show
(25) it to you in a little bit and we'll talked about.

Page 12

(1)       THE WITNESS: Okay, sure.
(2)    Q.  (By Mr. McCarthy) Okay. When you were first
(3) talking about how the holistic review is done and you
(4) mentioned the scoring guide, you also talked about setting
(5) criteria. And was that the scoring guide?
(6)    A.  I --
(7)    Q.  You used the word setting criteria, I believe.
(8) Maybe I misheard you.
(9)    A.  Well in other words, the -- the scoring guide
(10) establishes the criteria -- the general criteria, general
(11) descriptions for each score point.
(12)   Q.  Okay.
(13)   A.  Those descriptions, though, are made specific in
(14) relation to the sample essays, then, the readers are trained
(15) on --
(16)   Q.  Okay.
(17)   A.  -- if that helps.
(18)   Q.  Okay, yeah. And we'll get back to that in a
(19) little bit.
(20)       Let me ask you this. How often is training
(21) given to the application readers?
(22)   A.  There's two -- two times when -- when the readers
(23) are trained. The senior staff -- Each group is trained
(24) once. The senior staff is trained once and then the group
(25) of junior staff readers are trained a second time.

Page 13

(1)    Q.  Okay. And senior staff, would these be the senior
(2) readers?
(3)    A.  They're senior members of the admissions staff.
(4)    Q.  Okay. And is this training repeated after certain
(5) periods of time?
(6)    A.  No. There -- there are validity studies done and
(7) checks throughout the reading process to make sure that
(8) readers are staying on point in line.
(9)    Q.  Okay. I'm not sure if it's Dr. or Mr. Lavergne,
(10) but he was testifying earlier a little bit about interrater
(11) reliability studies.
(12)   A.  Yeah.
(13)   Q.  Is that what you're talking about?
(14)   A.  There's that, there's also the fact that files and
(15) essays will -- you know, can be reviewed, say, by the senior
(16) staff or by another person looking at that file and then
(17) checking to make sure that the essay scores and the PAI
(18) scores seem in line --
(19)   Q.  Okay.
(20)   A.  -- with what they would give.
(21)   Q.  Okay. So in addition to this interrater
(22) reliability study --
(23)   A.  Right.
(24)   Q.  -- there is some review by senior admissions
(25) officials that's sort of a quality control?

Page 14
(1) A. Yes.
(2) Q. And from time to time when quality control
(3) analysis is done, is it the case that some readers have been
(4) giving sort of variant PAI scores or essay scores?
(5) A. You know, I -- I have to admit I don't know, I'm
(6) not really part of that process.
(7)     MS. KNEELAND: Can we just go off the record
(8) a second?
(9)     (Discussion off the record)
(10) Q. (By Mr. McCarthy) Okay. When -- when a reader is
(11) reviewing an application to determine a personal achievement
(12) score -- well, can you -- can you talk about that? Can you
(13) talk about how readers determine a personal achievement
(14) score from an applicant's file?
(15) A. Sure. I should say up front that it's different
(16) than reading the essays holistically. There was a holistic
(17) evaluation now of the entire file and so the essays
(18) themselves are used differently in that process in which
(19) readers are told to read the essays first and score them
(20) holistically. Then with the PAI determination, there's this
(21) negotiation between a breadth of involvement with a depth of
(22) involvement. There are a number of criteria, then, that
(23) we've established to, again, use a six-point scale to
(24) evaluate a file in terms of whether this is better or as
(25) good of the majority or, you know, in the lower half.

Page 15
(1) There's that -- that sense of someone who has made a
(2) difference, there is, you know, someone who has maximized
(3) circumstances is another sort of criteria that's used, and,
(4) you know, someone who's gone outside of themselves, really
(5) gotten involved with the community, with a job, with a
(6) family, made a difference again in some way.
(7) Q. Okay.
(8)     MS. KNEELAND: And I'm not interrupting to be
(9) obstructionist, I'm interrupting just so the record's clear
(10) because we have some looseness in our characterization
(11) sometimes. When he's talking about the personal achievement
(12) index right now, he's talking about the personal achievement
(13) score which is one to six that feeds into the PAI
(14) calculation that Mr. Lavergne talked about.
(15)     MR. McCARTHY: I'll just ask him a question
(16) and make sure he can make that clear.
(17)     MS. KNEELAND: Okay.
(18)     MR. McCARTHY: That's what I thought.
(19) Q. (By Mr. McCarthy) Okay. So when you're talking
(20) about reviewing a file and I think you mentioned for breadth
(21) and depth of involvement --
(22) A. Right.
(23) Q. -- you were talking about reviewing to determine a
(24) personal achievement score --
(25) A. That's right.

Page 16
(1) Q. -- which is a part of the personal achievement
(2) index.
(3) A. Index, that's correct.
(4) Q. Okay. And you said that the reader reviews first
(5) the essays?
(6) A. That's -- that's the way they've been trained.
(7) First they score the essays holistically, then they look at
(8) the entire file holistically for specific information,
(9) again, how it will show this particular applicant's personal
(10) achievement.
(11) Q. Okay. And when they review the whole file to
(12) determine that personal achievement score, do you mean the
(13) whole file apart from the essays or the essays --
(14) A. The essays are included as a part of that file.
(15) Q. Okay. So the essays are read -- Let me back up.
(16)     So readers are trained to read and score the
(17) essays individually first.
(18) A. And to evaluate them as a piece of writing. So in
(19) other words, it's the quality of the essay as a piece of
(20) writing. That's the holistic essay score.
(21) Q. Okay. So first -- So the readers are trained to
(22) review and score in a holistic manner the essays
(23) individually first.
(24) A. That's correct.
(25) Q. And then after that --

Page 17
(1) A. Right.
(2) Q. -- the readers are trained to review the entire
(3) file, including those essays, and they review the entire
(4) file holistically.
(5) A. Yes. There, though, the essays are used for any
(6) specific information they may reveal or verify.
(7) Q. So, okay, let me ask about that. So in other
(8) words, when the essays are reviewed and it's part of the
(9) holistic review of the entire file --
(10) A. Right.
(11) Q. -- they are no longer considered for the quality
(12) of the writing?
(13) A. It's more information that they reveal; in other
(14) words, there's one time where just as part of an applicant's
(15) resume he had a line item that was Kings and Queens of the
(16) Court. It was in his essay that you learn that Kings and
(17) Queens of the Court was a charity basketball game that this
(18) guy had established at Phillips Andover in order to raise
(19) scholarship money for needy students. So that information,
(20) right, in other words, elevated what was just a bold
(21) description in to really valuable information.
(22) Q. Okay. So I guess would it be accurate to say,
(23) then, that when the essays are reviewed as part of the
(24) holistic review of the entire file, they are reviewed for
(25) this breadth and depth of involvement?

5 (Pages 14 to 17)

Page 18

(1) A. Could you repeat that?
(2) Q. Sure. So when the essays are reviewed as part of
(3) the holistic review of the entire file, the essays are
(4) reviewed for this breadth and depth of involvement?
(5) A. The essays are reviewed in the -- for the way that
(6) they contribute to the reader's understanding of the
(7) student's breadth and depth of involvement --
(8) Q. Okay.
(9) A. -- yeah.
(10) Q. Okay. And then there's also an optional third
(11) essay that's part of the application.
(12) A. Right.
(13) Q. Where does that come into play in the holistic
(14) review?
(15) A. If it's there, again, it would be for the
(16) information it reveals about the applicant's involvement as
(17) a student.
(18) Q. Okay. And does that go into the personal
(19) achievement score?
(20) A. I believe it would be part of the -- it would be
(21) part of the personal achievement score, right. I want to
(22) make sure about the score versus the index.
(23) Q. So it's part of the personal achievement score as
(24) distinguished from the personal achievement index. Well,
(25) actually, I should restate that. It's a part -- So the

Page 19

(1) third essay is part of the personal achievement score which
(2) is a component of the personal achievement index.
(3) A. Right. It would be read along with the other
(4) information in that file, yes.
(5) Q. Okay. In this third essay, if the third essay
(6) contributes nothing to the breadth and depth of the
(7) applicant's involvement, does it just have no effect on the
(8) personal achievement score?
(9) A. I would imagine.
(10) Q. Would it be possible for the third essay to have a
(11) negative effect on the personal achievement score?
(12) A. You know, throughout the holistic process you're
(13) always told -- or readers are always told to reward students
(14) for what they do well, so you really don't discuss things in
(15) terms of negative effects, taking away.
(16) Q. Okay. So then would you say that the third essay
(17) would not have a negative effect on a --
(18) A. Well, you hope -- We're getting double negatives
(19) here. I would say the third essay, along with other -- any
(20) other information in that file, you know, determines what
(21) you reward that student for having achieved.
(22) Q. Okay. And that makes sense to me and I'm just
(23) trying to understand exactly what that means.
(24) A. Sure.
(25) Q. So is it the case, then, that the third essay

Page 20

(1) would either have a positive effect or no effect on the
(2) personal achievement score?
(3) A. Well, the only -- the only reason I'm hesitant to
(4) answer is that in holistic evaluation, you really don't want
(5) to isolate any one item. The metaphor that I've used to
(6) train people since I came to Texas is it's like judging
(7) chili. You know, either a chili's damn good, you know, or
(8) that chili stinks. It's -- You know, it's afterwards that
(9) the individual ingredients, you know, come in to play, you
(10) know, where the beans could have been cooked better or, you
(11) know, the cayenne pepper wasn't very hot. So, you know,
(12) it's not that something doesn't count more than something
(13) less, it's not that something doesn't count at all, it's
(14) that all of the ingredients are evaluated as a whole.
(15) Q. Okay. So I guess is it impossible to say whether
(16) the third essay might have a negative effect on the personal
(17) achievement score?
(18) A. The only thing you can say is that the third essay
(19) is one of a set of criteria that a reader would be expected
(20) to judge and evaluate in that holistic manner.
(21) Q. Okay. I guess I'm just having a hard time
(22) understanding and I'm thinking about your example with the
(23) chili --
(24) A. Sure.
(25) Q. -- and to me, like, chili could be pretty good,

Page 21

(1) but the beans be not very good and that would detract from
(2) the overall, you know, rating of the chili.
(3) A. Absolutely.
(4) Q. Okay. So it seems to me that this third essay
(5) was -- something about it was poor -- if it was poorly done,
(6) that is, and, you know, it seems possible that it could have
(7) a negative effect on personal achievement score or that it
(8) might just not have any negative effect at all, just as a
(9) positive or a nothing thing, but not a negative thing.
(10) A. I guess I'm not sure what you mean by "poorly
(11) done."
(12) Q. I don't know what I mean either. I'm trying to
(13) figure out what the holistic review is.
(14) A. Yeah.
(15) Q. And I'm sorry I'm having difficulty understanding.
(16) We'll move along and I'll ask some more questions and we'll
(17) see if I can understand the holistic review process.
(18) A. Sure thing.
(19) Q. Let me ask, when did the University begin
(20) including this optional third essay?
(21) A. You know, I honestly don't know.
(22) Q. Okay. How are the various personal achievement
(23) factors weighed or -- I mean, not to use the word weighed, I
(24) know that's -- How are the personal achievement factors
(25) considered when computing the personal achievement score?

6 (Pages 18 to 21)

Page 22

(1) MS. KNEELAND: Object to the form.
(2) You can answer it if you can.
(3) A. Yeah, again, in other words, if you're asking how
(4) individual factors within the file add up to the personal
(5) achievement score --
(6) Q. (By Mr. McCarthy) Uh-huh.
(7) A. -- you know, again there's that holistic
(8) consideration. You can't -- And readers are, you know,
(9) strictly sort of instructed not to break things down into
(10) individual criteria and then add them up. Again, it's a
(11) sort of holistic impression that is made specific with,
(12) again, sets of samples, though these samples are reached by
(13) unanimous agreement among the senior staff.
(14) Q. Okay.
(15) A. And one other thing with the samples. There are
(16) always ranges with any score point, so you try get some
(17) sense of the range within a score point.
(18) Q. Could you give me an example of what you might see
(19) in an applicant's file that would result in them getting a
(20) high personal achievement score?
(21) A. Sure. Again, you know, there will be variety -- a
(22) variety of types. You know, we've said if there is only one
(23) activity that that student has -- Let's say the only thing
(24) that that student has is that they swim, but they're an
(25) Olympic-level swimmer, right, that's that mixture of breadth

Page 23

(1) with depth. We may have someone else who's been, you know,
(2) a recognized leader in a variety of activities, student
(3) government along with, you know, teams, along with clubs,
(4) has a job, was promoted to manager and, you know, in that
(5) way is seen to be an outstanding candidate. You may have
(6) someone who had to work two jobs to help support a family
(7) and so didn't have the opportunity to get involved with a
(8) lot of school activities, but has still been outstanding in
(9) those jobs, still involved with the community, still
(10) distinguished themselves as someone, again, who has made a
(11) difference. So there's really a kind of variety of ways in
(12) which students will distinguish themselves. And, again,
(13) it's those -- that idea of maximizing circumstances of
(14) someone who's made a difference and of kind of mixing this
(15) breadth and depth of experience.
(16) Q. Okay. Let's use your example of an Olympic
(17) swimmer.
(18) A. Sure.
(19) Q. So an Olympic swimmer is, you know, a person who
(20) had nothing really in their file in terms of personal
(21) achievement other than that they were an Olympic swimmer.
(22) They have a very high level of depth of involvement, but not
(23) necessarily not breadth. What -- what kind of personal
(24) achievement score might that type of applicant get?
(25) A. If they were, you know, an Olympic swimmer, I

Page 24

(1) mean -- you know, I have to say the danger of answering
(2) questions about sort of hypothetical files is the same
(3) danger, I guess, of answering about hypothetical essays.
(4) And so I've always made it a practice of never to answer
(5) questions about hypothetical essays because, you know, what
(6) I found is what's in my mind when I answer that is often
(7) different than what's in the mind of the person that's
(8) asking me. So I guess I'd have to see the file is what I'm
(9) saying and then I could show you sort of in that file what
(10) is it that made that person a six or a five or a four or a
(11) three, a two, or a one.
(12) Q. Okay.
(13) A. It's very hard to answer in the abstract in a
(14) hypothetical.
(15) Q. And I guess part of the reason is that -- I should
(16) ask you. Is part of the reason for that that there can be a
(17) range of personal achievement scores that might be
(18) appropriate for any one given applicant's file?
(19) A. I don't think so. Could you repeat that again?
(20) Q. Is part of the reason why it's -- Let me just ask
(21) this and make it easier.
(22) For any given applicant's file --
(23) A. Right.
(24) Q. -- is there an acceptable range of personal
(25) achievement scores?

Page 25

(1) A. No. I mean, you would -- The one thing we ask in
(2) both the essays and the personal achievement score is that
(3) if there was any kind of variance, it would be at least
(4) contiguous scores. But you hope for exact agreement so that
(5) the training is always aiming for everyone to see this file
(6) in exactly the same way.
(7) Q. And when you say contiguous scores, do you mean up
(8) or down one from --
(9) A. Yes.
(10) Q. Okay. Up or down one from a mean?
(11) A. No, no, upper one -- up or down one from -- you
(12) know, from other -- what other readers would give that
(13) score.
(14) Q. Okay. And now Mr. or Dr. Lavergne -- I'm sorry, I
(15) can't remember -- testified earlier about how quality
(16) control tests are done and he talked about interrater
(17) reliability analysis.
(18) A. Correct.
(19) Q. And he said that when these studies are done,
(20) first a true score is assigned to an applicant's file. Is
(21) that correct?
(22) A. Yes.
(23) Q. Okay. Can you tell me a little bit about that
(24) process?
(25) A. What we -- we've used with the essays, they have

Page 26

(1) been essay scores that I've determined and then for the
(2) files, that those are essay scores, again, that the senior
(3) staff has unanimously agreed on. So those would determine
(4) those sort of target scores for both the essays and then for
(5) the personal achievement score.
(6)  Q.  Okay. So when training is conducted, are the
(7) trainees in that class given practice essays to review?
(8)  A.  Yeah. The training is actually different for the
(9) essays than for the personal achievement scores.
(10)  Q.  Okay, we'll do those one at a time.
(11)  A.  Okay.
(12)  Q.  Why don't we do -- why don't we talk about
(13) personal achievement scores.
(14)  A.  Okay.
(15)  Q.  Tell me how that's done.
(16)  A.  The 14 or 15 senior staff members are in a room
(17) with a pile of about 40 or 50 files in front of them.
(18) They're each then asked to find two or three files that they
(19) think are perfect examples of a particular score point. And
(20) they should be different score points, so one may be a five,
(21) one may be a three, one may be a one, one may be a six.
(22) They get those then, you know, two or three files, make a
(23) sort of packet of them, and put their name on it and have
(24) recorded their scores. Then those packets are read by four
(25) other members of the senior staff, so for a total of five

Page 27

(1) evaluations. Then as a group we see what scores were given
(2) to what files and files that receive a unanimous agreement
(3) on the score point are then used for those samples. So in
(4) other words, these are files where five members of the
(5) senior staff and then everyone else sort of in review
(6) agrees, yes, that is a perfect three, yes, that's a perfect
(7) five.
(8)  Q.  Okay. Could you tell me a little bit about the
(9) similar process for the personal achievement score?
(10)  A.  That was the personal achievement score.
(11)  Q.  Oh, I'm sorry, I thought that was the essays.
(12)  A.  No, no, the essays --
(13)  Q.  I'm sorry. Can tell me a little bit about the
(14) same process, but for the essays?
(15)  A.  Sure. The essays -- before the training occurs, I
(16) get about a thousand samples of each essay and from those
(17) thousand I'm the one who picks, then, examples of particular
(18) score points and put together packets, then, to train the
(19) readers on so that the first set that they look at -- there
(20) are about five or six set of six essays, then, that they are
(21) given to look at, so a total of about 36 essays for -- you
(22) know, for each essay type.
(23)     The first one they look at is in ascending
(24) order a one, a two, a three, a four, a five, a six. The
(25) second set, then, they look at, there's one for each score

Page 28

(1) point, but they're not in order so the readers have to put
(2) it in order. They then put it back in alphabetical order.
(3) Right? Each of these samples is marked by an alphabet
(4) letter, not by the score point. So they put it back in
(5) alphabetical order and we take scores. All right? So I say
(6) for Paper K, who gave it a six, who gave it a five, who gave
(7) it a four, a three, a two, a one? So then after that second
(8) set of six -- we sort of get one for each score point, so
(9) now they have two essays for each score point to use as
(10) samples. We go through a number of sets of three -- and
(11) these can be any score -- to get them used to that variety
(12) within the population that they're going to see, as well as
(13) the variety within a score point and get them to, you know,
(14) hone in on what the correct score is. And, again,
(15) through -- You know, there is a little bit of peer pressure
(16) involved, I mean, through group agreement. I mean, it's
(17) amazing the group -- you know, I tell groups -- I've trained
(18) groups across the country in holistic scoring and the most
(19) accurate group I've ever trained is the admissions staff.
(20) Amazing agreement.
(21)  Q.  Okay. And now if there is disagreement, let's say
(22) if there is one reader who's training in a class who is
(23) consistently off the rest of the group for whatever reason,
(24) does that individual receive extra training?
(25)  A.  You know, we've never really had that. I mean,

Page 29

(1) what happens in training inevitably is there will be one or
(2) two where somebody will be just off. The real value of
(3) training I've told readers is that really in training you
(4) learn your own peccadilloes as a reader and so it's really
(5) sort of to learn, you know, what do you respond to a little
(6) too critically, what do you need to back away from, you
(7) know, what do you need to -- maybe take a cup of coffee
(8) before you read, you know, a second time. So, you know,
(9) we've -- you know, I don't know that we've had a case where
(10) there's somebody who has just been consistently off through
(11) training.
(12)  Q.  So then is the training designed to sort of work
(13) out this uniformity?
(14)  A.  Absolutely, to gain consensus. I mean, that's
(15) what -- One of the principles of the holistic scoring is
(16) that readers are asked to go with the group agreement and so
(17) that the main thing is that they learn how the group would
(18) score a particular essay, that they learn to recognize, you
(19) know, a variety of successful strategies, styles, ways of
(20) responding to a particular prompt.
(21)  Q.  Okay. Before 2005 the factor of race was not a
(22) consideration in the admissions process. Correct?
(23)  A.  I believe that's correct.
(24)  Q.  Well, let's say this. Was the -- was the holistic
(25) training any different before race became a consideration in

Page 30

(1) admissions decisions than it is now?
(2) A. No. I mean, I think it was one of the strengths
(3) of our training process that, you know, the only way
(4) throughout that we've considered, you know, race and
(5) ethnicity in any way is the way a student or an applicant
(6) will reveal a sense of cultural awareness with regard to
(7) that issue. That's really the only way it's entered into
(8) the personal achievement. It's never really been a factor
(9) in the essay scoring. That's remained -- Both have remained
(10) exactly the same.
(11) Q. Okay. So has the training with regard to the
(12) personal achievement score -- Sorry. Has the training with
(13) regard to the personal achievement score changed at all
(14) since the introduction of race as a factor?
(15) A. Not in any substantial way that I would say.
(16) Q. In any substantial way. Any small way?
(17) A. Again, no. I mean, we've -- you know, we've
(18) talked kind of throughout the admissions process and, again,
(19) given the criteria of, you know, someone who shows, you
(20) know, an awareness of their community, you know, a sense
(21) of -- altruistic sense of contributing to -- you know, to
(22) the community, to their schools, to their families. The
(23) only way I think, you know, again, race and ethnicity has
(24) entered into the process in any way is, again, the way it
(25) reveals that sense of cultural awareness I would say.

Page 31

(1) Q. Okay. Now, admissions officials who read
(2) applicants' files -- Let me back up.
(3) Are admissions officials who review
(4) applicants' files given training at periodic intervals?
(5) A. I'm only involved with that -- those two -- those
(6) two meetings, those two trainings.
(7) Q. Okay. So but do people repeat the training after
(8) a year or two years?
(9) A. Oh, it's very year we repeat the training.
(10) Q. Every year.
(11) A. Yes.
(12) Q. Okay. So there must have been training prior to
(13) the introduction of race as a factor and then again
(14) afterwards.
(15) A. Absolutely, sure.
(16) Q. In these training classes, did any of these
(17) individual readers ask a question, how do we do this now
(18) that race is a factor?
(19) A. I think it was less -- I mean, there were meetings
(20) that we -- that I was a part of with the admissions
(21) committee outside of the training where those discussions
(22) really took place. I think, you know, if -- if it did come
(23) up at all during the training, again, the answer was exactly
(24) the answer that I've given you; in other words, that the
(25) only way race is a criteria is the way that it enters -- it

Page 32

(1) would enter into -- Well I guess I would say as an
(2) individual criteria, it's never been really anything
(3) important.
(4) Q. So as an individual criteria, race has some
(5) consideration to the extent it contributes to the
(6) applicant's cultural awareness.
(7) A. Well that's why I hesitated to say that it had any
(8) individual impact at all because what's more important is
(9) the way an applicant reveals some sense of cultural
(10) awareness and that has really very little to do -- it has
(11) nothing to do with a particular racial or ethnic background.
(12) You know, there have been -- I remember one sample, in fact,
(13) from the personal achievement scores was, you know, an Anglo
(14) student who lived in a predominantly Hispanic community and
(15) how that unusual position of being an Anglo as a minority
(16) revealed to that particular person, you know, again, aspects
(17) of cultural awareness that showed a kind of maturity, a real
(18) reflectiveness and, again, a sense of how this particular
(19) individual was able to contribute to that community.
(20) Q. Okay.
(21) A. So, you know, that's the way that, again, that
(22) sense of maturity with regard to cultural awareness has been
(23) sort of the major focus.
(24) Q. Okay.
(25) MR. McCARTHY: Can we take a break for a few

Page 33

(1) minutes?
(2) THE REPORTER: Off the record, 10:43.
(3) (Recess)
(4) THE REPORTER: On the record, 10:50.
(5) Q. (By Mr. McCarthy) Dr. Bremen, you've been
(6) discussing scoring of essays and personal achievement scores
(7) and training. In order to help me understand how this
(8) works, I want to give you -- can I give you an application
(9) and you can look at it --
(10) A. Sure.
(11) Q. -- and give me an idea of how it might work?
(12) Okay. This is --
(13) MR. McCARTHY: Can I have this marked as an
(14) exhibit?
(15) (Deposition Exhibit No. 2 marked for
(16) identification)
(17) Q. (By Mr. McCarthy) Dr. Bremen, do you see what's
(18) marked as Deposition Exhibit 2?
(19) A. Uh-huh.
(20) Q. And can you tell me what that is?
(21) A. It's a file from the year 2006 --
(22) Q. Okay.
(23) A. -- of an applicant.
(24) Q. And I think it has Bates numbers at the bottom.
(25) Could you tell me what those are, the pages, just so we

Page 38

(1) if you notice organization/position, swimming, varsity
(2) captain, four years, so there's a four in the margin; club
(3) swimming, three years, three in the margin.
(4)     Q. And so is that tracked to -- I'm sorry, let me
(5) back up.
(6)         Is that noted because that relates to that
(7) applicant's depth of involvement?
(8)         MS. KNEELAND: Object to the form.
(9)         MR. McCARTHY: I'm sorry, what's the
(10) objection?
(11)         MS. KNEELAND: I think it presupposes facts
(12) that he hasn't testified to. I just objected to form --
(13)         MR. McCARTHY: Okay.
(14)         MS. KNEELAND: -- he can answer it.
(15)         MR. McCARTHY: I just was wondering what
(16) form, if it was vague or whatever.
(17)     Q. (By Mr. McCarthy) Let me try and ask it again.
(18)     A. Sure.
(19)     Q. Earlier you talked about how a personal
(20) achievement score is determined considering an individual's
(21) depth and breadth of involvement. Correct?
(22)     A. As one -- one set of criteria, right, that we use,
(23) sure.
(24)     Q. Sure. So that's one set of criteria, the depth
(25) and breadth of involvement --

Page 39

(1)     A. Right.
(2)     Q. -- is one set of involvement.
(3)     A. Right.
(4)     Q. So would -- would the amount of time an individual
(5) has spent on a certain project or activity, does that relate
(6) to the depth of involvement?
(7)     A. No, not necessarily. It shows more consistency of
(8) involvement over time which would be another -- if you look
(9) at the description, there's also a scoring guide for the
(10) personal achievement scores and, again, one through six.
(11) And there in those descriptions it talks about consistency
(12) of involvement as opposed to sporadic as opposed to somebody
(13) who's a member as opposed to an officer. So I think that
(14) the number of years that they're involved with an activity
(15) speaks more to their consistency of involvement.
(16)     Q. Okay. All right. The personal achievement score
(17) is given a numerical value but, again, I believe you
(18) testified that the components that make up that score don't
(19) get numerical values themselves.
(20)     A. Yes, that you don't want -- Since it's reached
(21) holistically, you don't want individual criteria to be
(22) considered in an individual way. You want them to be
(23) considered holistically.
(24)     Q. Okay. What is the benefit of considering it
(25) holistically as opposed to giving numerical value to each

Page 40

(1) component?
(2)     A. I think you get greater objectivity.
(3)     Q. All right.
(4)     A. In other words, with, say, essays, for example,
(5) you always tell readers not to focus on, say, individual
(6) errors, that they may be so irritated by a comma splice that
(7) they miss two or three really nice sentences. And so by
(8) focusing on those individual criteria, you may actually skew
(9) your sense of the entire piece that you are looking at,
(10) whether that's an essay or whether that's a file.
(11)     Q. Okay. Now speaking in terms of essays, so -- so
(12) when an essay is reviewed holistically, does the grammar,
(13) punctuation, et cetera, not make a difference to the score?
(14)     A. It's actually one of the principles of holistic
(15) scoring. It's not that these things don't count, it's not
(16) that any one of them count more than one of the others.
(17) It's that you want your overall impression of the essay as
(18) it relates to those samples in relation to the scoring --
(19) scoring guide descriptions to determine the score that
(20) some -- that an essay gets.
(21)     Q. Okay. You testified before that race may play a
(22) factor in personal achievement scores where it shows some
(23) sense of cultural awareness?
(24)     A. Well, I guess I wouldn't put it that way, I --
(25) because I believe what I said was that the only way that

Page 41

(1) race and ethnicity enter into a consideration of personal
(2) achievement score is the way in which a student reveals a
(3) sense of cultural awareness.
(4)     Q. Okay.
(5)     A. So in other words, it doesn't depend on the race
(6) and ethnicity of the applicant, it depends on their
(7) awareness of race and ethnicity as a cultural issue.
(8)     Q. Okay. And that's the only way that race is a
(9) factor.
(10)     A. That's the only way in the training that I've done
(11) with the admissions group that we've talked about it.
(12)     Q. Okay. So that race -- I'm sorry, I'm just trying
(13) to understand.
(14)     A. Sure.
(15)     Q. So race is only a factor to the extent it reveals
(16) some sort of cultural awareness on the part of the
(17) applicant.
(18)     A. Again --
(19)     Q. I'm sorry if I'm misstating this, I'm just trying
(20) to --
(21)     A. Because race wouldn't be the factor, it's the
(22) exhibition of cultural awareness that's the factor.
(23)     Q. Okay. So -- so race only impacts a personal
(24) achievement score to the extent that it reveals something
(25) about the cultural awareness of the applicant?

Page 42

(1) A. I think you're still using it as a cause; in other
(2) words -- and it doesn't have that causal relationship.
(3) Q. Okay. So -- so I guess what it sounds like you're
(4) saying, then, is race isn't really a factor at all.
(5) A. An applicant's race is part of their file and so
(6) you would read the entire file and, again, get a sense of,
(7) you know, that student's achievement. So that's -- I guess,
(8) that's -- you know, that's as close as I could come to
(9) saying how race is simply part of an applicant's profile and
(10) so since you read the entire file and read all of the, you
(11) know, various things that are in that file and to then come
(12) to some evaluation of that person's personal achievement.
(13) Q. Okay. So it's certainly the applicant's race is
(14) part of the file.
(15) A. Uh-huh.
(16)     MS. KNEELAND: You need to --
(17) A. Yes.
(18) Q. (By Mr. McCarthy) Certainly the applicant's race
(19) is part of the file. Correct?
(20) A. Yes.
(21) Q. But it has no impact on the personal achievement
(22) score in and of itself?
(23) A. In and of itself, no.
(24) Q. Okay. So then why is it that race is listed as
(25) one of the special circumstances to be considered in

Page 43

(1) computing a PAI score?
(2) A. I'm not sure what you mean by race is listed as
(3) one of the special circumstances.
(4) Q. In the University's publications about the
(5) admissions process, in Report 10 -- What I have here is
(6) Deposition Exhibit 1, this is commonly known as HB 588
(7) Report, this is Report No. 10. Are you familiar with this?
(8) A. Not -- not intimately.
(9) Q. Not intimately, okay. Can you take a look and see
(10) if you recognize it?
(11) A. Sure (examining document).
(12) Q. Go ahead and take a moment to flip through it.
(13) A. Sure, I know of this. I have heard about the
(14) report, never actually read through it --
(15) Q. Okay.
(16) A. -- in any detailed way.
(17) Q. Okay, that's fine. If I could turn to a page
(18) here, this is the second page of Deposition Exhibit 1, this
(19) HB 588 report, Report No. 10 and it talks about the factors
(20) that go into the personal achievement index there. Do you
(21) see that, it's sort of in the middle of the page?
(22) A. Yes, sir.
(23) Q. Can you just read through those factors for me?
(24) A. Scores on two essays, leadership, extracurricular
(25) activities, awards, honors, work experience, service to

Page 44

(1) school or community. Special circumstances: Socioeconomic
(2) status of family, single-parent home, language spoken at
(3) home, family responsibility, socioeconomic status of school
(4) attended, average SAT/ACT of school attended in relation to
(5) student's own SAT/ACT, race, parenthesis, addition approved
(6) by the UT Board of Regents in 2003.
(7) Q. So the University in their official publications
(8) states that race is one of the special circumstances to be
(9) considered as part of a PAI score. Correct?
(10) A. It is listed here, yes, sir.
(11) Q. Okay.
(12)     MS. KNEELAND: Just off the record for a
(13) second.
(14)     (Discussion off the record)
(15) Q. (By Mr. McCarthy) So -- so, Dr. Bremen, again --
(16) And I'm not trying to belabor the point, I just want to make
(17) sure I understand. So race in and of itself has no impact
(18) on a personal achievement score.
(19) A. Race in and of itself I would say no.
(20) Q. Well, let me -- let me try and come up with an
(21) example here. Okay. Well, actually, you had an example
(22) earlier. You talked about a Caucasian student --
(23) A. Right.
(24) Q. -- who grew up in racially diverse community, I
(25) think you said it was a heavily Hispanic community.

Page 45

(1) A. That's correct.
(2) Q. And an essay written by such an applicant, if it
(3) revealed a real sense of cultural awareness, in that respect
(4) that cultural awareness could contribute positively to that
(5) applicant's personal achievement score.
(6) A. That's correct, yes.
(7) Q. Okay. So in that instance, is it that that
(8) applicant's race contributed to their personal achievement
(9) score?
(10) A. Well, I guess I would say the fact that they were
(11) Anglo in a heavily Hispanic community certainly led to that
(12) student's understanding of, you know, a variety of positions
(13) within racial groups within American culture sort of at
(14) large and border culture in particular. So, you know, and
(15) this is, I think, what happens, again, with kind of holistic
(16) evaluations. Certainly the student's racial background and
(17) ethnicity is part of that hodgepodge that led to this sense
(18) of cultural awareness. So you really can't separate out any
(19) one factor, right, they all contribute to what was revealed
(20) in that case, a mature sophisticated sense of cultural
(21) awareness.
(22) Q. Okay. And it's that cultural awareness as
(23) revealed through the essay in that example?
(24) A. Essays, as well as extracurricular activities,
(25) involvement in the community, particular clubs,

Page 50

(1) personal achievement score of a non-minority student?
(2)     MS. KNEELAND: Object to the form.
(3)   A. Readers -- you know, readers are trained to
(4) evaluate amongst, you know, a range of factors and come to
(5) some holistic decision. So, again, it's that isolation of
(6) individual factors that doesn't jive with the holistic
(7) evaluation.
(8)   Q. (By Mr. McCarthy) Okay. All right, let me give
(9) you an example. If you have two applicants' files that are
(10) essentially the same in terms of personal achievements in
(11) terms of, let's say, school activities, work activities, and
(12) the like, but one is, let's say, a Hispanic student that
(13) grew up in a predominantly Hispanic neighborhood or
(14) community and the other one is Hispanic student what grew up
(15) in a predominantly White community, would you expect to see
(16) some difference in their personal achievement scores?
(17)     MS. KNEELAND: Object to the form.
(18)     You can answer it.
(19)   A. Again, I'd have to see the files. It's really
(20) impossible to answer questions about hypothetical files.
(21)     MR. McCARTHY: Can we take a break?
(22)     THE REPORTER: Off the record, 10:20.
(23)     (Recess)
(24)     THE REPORTER: On the record, 10:41.
(25)   Q. (By Mr. McCarthy) Dr. Bremen, we're going to

Page 51

(1) continue a little bit more here and this won't take too
(2) long.
(3)   A. Absolutely.
(4)     MR. McCARTHY: I'd like to mark this as
(5) Deposition Exhibit No. 4.
(6)     (Deposition Exhibit No. 4 marked for
(7)     identification)
(8)   Q. (By Mr. McCarthy) Dr. Bremen, can you take a look
(9) at what's Deposition Exhibit 4? It's a few pages that are
(10) all Bates numbered there, and can you just take a look at it
(11) and sort of see what it is?
(12)   A. (Examining document.)
(13)   Q. Are you familiar with what it is?
(14)   A. Yes, I am.
(15)   Q. And can you tell me what it is?
(16)   A. It's a collection of the admission essay topics,
(17) Topic A, B, D, and then instructions for Essay C, Special
(18) Circumstances, the principles of holistic scoring handout,
(19) and the scoring guide for the essay scoring.
(20)   Q. Okay. Now you can certainly use those as a
(21) reference, but can you tell me a little bit about the
(22) principles of holistic scoring?
(23)   A. Sure. The principles of holistic scoring are
(24) really the guidelines for readers to engage the process of
(25) holistic scoring of essays. The first -- first principle to

Page 52

(1) read quickly for impression of the whole essay and score
(2) immediately, not to reread or analyze, not to let the
(3) scoring guide become a crutch, for them to use the standards
(4) they've internalized from the range finders. So that's that
(5) triangulating among the scoring guide the sample essays and
(6) the essay that's in front of them.
(7)     No. 3, which I think is the most important,
(8) to read supportively, to look for and reward what's done
(9) well rather than what's been done badly or omitted.
(10)     And then No. 4, take everything in the essay
(11) into account, organization, spelling, diction, sentence
(12) structure, everything. There are ten criteria as you go
(13) through.
(14)   Q. Okay. And could you tell me a little bit about
(15) the scoring guide?
(16)   A. Sure. The scoring guide is a series of
(17) descriptions from a score of six down to a score of one that
(18) characterizes the essay and that score point in general
(19) terms. So a score of six, for example, reads, An essay in
(20) this category demonstrates clear and consistent competence,
(21) though it may have occasional errors. Such an essay
(22) effectively and insightfully addresses the writing task, is
(23) well organized and fully developed using clearly appropriate
(24) examples to support ideas, displays consistent facility in
(25) the use of language, demonstrating variety in sentence

Page 53

(1) structure and range of vocabulary.
(2)     Five then moves down to reasonably consistent
(3) competence, it effectively addresses the writing task,
(4) generally well organized and adequately developed using
(5) appropriate examples to support ideas, it displays facility
(6) in the use of language demonstrating some syntactic variety
(7) and range of vocabulary.
(8)     These are basically the criteria that we used
(9) for the SAT II writing test by the College Board.
(10)   Q. Okay. And can you tell me in practice, how does
(11) it work out -- in practice, how can you discern a score of
(12) six from a score of five on two essays?
(13)   A. The -- You know, the thing about holistic scoring
(14) is everybody always thinks that you're trying to distinguish
(15) between James Joyce and Virginia Woolf. They'd both get
(16) sixes. Really it's between two sentences that you can
(17) barely make out, that's a one, and just a really enjoyable,
(18) well-developed, thoughtful, insightful piece of writing that
(19) takes you through an interesting idea and that's a six.
(20)     So, again, there's a variety of criteria that
(21) could enter into the difference between a score point. It's
(22) not that, you know, any one, say, criteria predominates for
(23) a score point. It's that negotiation among the facility
(24) with language, the complexity of thought, and the
(25) substantiality of development.

Page 58

(1) one is more important than the other, though in this case it
(2) really is the very thin development along with the poor
(3) organization of thought that puts this at the bottom.
(4) Q. (By Mr. McCarthy) Okay. Now, with regard to
(5) Deposition Exhibit No. 6 that you were currently speaking
(6) about --
(7) A. Right.
(8) Q. -- would it be reasonable for that essay to get a
(9) score of two or is one the only acceptable number?
(10) A. No, this is a solid one and this is -- this is why
(11) it's used in the sample selection to get readers to see what
(12) a one needs to be.
(13) Q. Okay. And then sort of in that same light, the
(14) one that we talked about before that which was Deposition
(15) Exhibit No. 5, the one about Eleanor Roosevelt, that is a
(16) six and only a six?
(17) A. We would hope that all of the readers would see
(18) that and give it a score of a six, yes.
(19) Q. Okay. All right. Let's move along a little bit
(20) to how the holistic scoring applies to the personal
(21) achievement score. How do those principles of holistic
(22) scoring apply to the personal achievement score?
(23) A. The descriptions are different on the personal
(24) achievement score that you're looking -- and I'm not going
(25) to remember the exact wording, but you are looking for,

Page 59

(1) again, a sense of laudable achievement and that that
(2) achievement can be manifested in a variety of ways. It can
(3) be through school activities, through community work,
(4) through a job even, and that you are looking for a sense of
(5) maturity and -- I don't believe the word sophistication is
(6) used, but I know that maturity enters into that score point.
(7) Then similar to the scoring guide for the essays, there are
(8) varying adjectives, right, for the score of five, score of
(9) four, score of three, two, one.
(10) Q. Okay. Now earlier when we talked about personal
(11) achievement scores, we talked a little bit about how race is
(12) a component of those personal achievement scores.
(13)         MS. KNEELAND: Object to the form.
(14) Q. (By Mr. McCarthy) When we -- Am I correct in
(15) stating that race does not, in and of itself, play a role in
(16) the personal achievement score?
(17) A. I guess I'm more comfortable saying, right, that
(18) an applicant's -- I guess I would agree with that, yeah,
(19) sure.
(20) Q. Okay. So in and of itself race plays no -- in and
(21) of itself race has no effect on an applicant's personal
(22) achievement score?
(23) A. In and of itself.
(24) Q. Yes, in and of itself and I'm qualifying with in
(25) and of itself.

Page 60

(1) A. Right.
(2) Q. So in and of itself race has no impact on
(3) individual's personal achievement score.
(4) A. That's correct.
(5) Q. Okay. Now where race does have some impact on a
(6) personal achievement score, that's where it shows some
(7) revelation about the applicant's cultural awareness.
(8)         MS. KNEELAND: Object to the form.
(9) Q. (By Mr. McCarthy) Correct?
(10) A. No. Again, it's a kind of causal relationship in
(11) that sentence that makes me say --
(12) Q. Okay.
(13) A. -- you know, no.
(14) Q. I'm sorry, please go ahead and state it in your
(15) words, then, because I --
(16) A. A student's exhibition of cultural awareness and a
(17) sense of sophistication about their positioning within
(18) culture, that's what is -- that's what's rewarded with a
(19) score for the personal achievement.
(20) Q. Okay. Do you know about how often that -- that
(21) type of -- Let me back up a little bit here.
(22)         Do you know how often it is that applicants
(23) have that type of cultural awareness exhibited in their
(24) file?
(25) A. I really don't. I mean, not reading the files, I

Page 61

(1) wouldn't know in terms of the population.
(2) Q. Okay. I don't think I have anything else right
(3) now, but before I let you go, let me just ask you a few
(4) simple questions.
(5)         Are there any answers you've given me today
(6) that you thought about and you'd like to change for any
(7) reason?
(8) A. No.
(9) Q. Okay. Is there anything that you've thought of
(10) that you wish you had stated earlier when I asked you a
(11) question?
(12) A. No.
(13) Q. Okay. Well before we conclude, let me just say I
(14) don't think this is likely, but there's a chance that I'll
(15) recall you back to ask you a few questions this afternoon or
(16) tomorrow. Again, I don't think it's likely --
(17) A. Okay.
(18) Q. -- and I don't want to interfere with your time
(19) and I appreciate your time here so far. Okay?
(20) A. You bet.
(21) Q. Thanks.
(22)         MS. KNEELAND: We'll reserve.
(23)         THE REPORTER: Off the record, 11:58.
(24)         (Deposition concluded)
(25)

64

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
ABIGAIL NOEL FISHER; and      )
RACHEL MULTER MICHALEWICZ     )
                              )
     Plaintiffs,              )
                              )
v.                            )    Civil Action No.
                              )    1:08-cv-00263-SS
                              )
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al,       )
                              )
     Defendants.              )
```

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF BRIAN BREMEN
October 6, 2008

    I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, BRIAN BREMEN, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

    I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

65

1  attorney or counsel employed by the parties hereto or
2  financially interested in the action.
3       I further certify that the deposition transcript was
4  submitted on October 16th, 2008 to the witness or to the
5  attorney for the witness for examination, signature and
6  return to me by November 17th, 2008;
7       The original deposition (was) was not returned to the
8  deposition officer on November 7, 2008;
9       If returned, the attached Changes and Signature page
10 contains any changes and the reasons therefor;
11      If returned, the original deposition was delivered to
12 Mr. Thomas R. McCarthy, Custodial Attorney;
13      That $490.25 is the deposition officer's charges to
14 the Plaintiffs for preparing the original deposition
15 transcript and any copies of exhibits;
16      WITNESS MY HAND AND SEAL OF OFFICE, this 14th day of
17 October, 2008.

_____
TRACIE L. CHEW, CSR #6503
Expiration:  12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | (REASON) |
|---|---|---|---|
| 9 | 1 | change "sat" to "set" | (incorrect word) |
| 10 | 2 | change "Would you" to "We would" | (incorrect transcription) |
| 12 | 14 | change "then, the" to "then, that the" | (missing word) |
| 14 | 25 | change "of the" to "as the" | (incorrect transcription) |
| 17 | 14 | change "there's" to "there was" | (incorrect transcription) |
| 19 | 18 | change "getting" to "getting into" | (incorrect transcription) |
| 20 | 13 | change "less" to "else" | (incorrect transcription) |
| 26 | 2 | change "essay" to "p.a." | (incorrect transcription) |
| 27 | 20 | change "set" to "sets" | (incorrect transcription) |
| 31 | 9 | change "very" to "every" | (incorrect transcription) |

I, BRIAN BREMEN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

BRIAN BREMEN

THE STATE OF Texas )
COUNTY OF Travis )

    Before me, Carolyn Coleman, on this day personally appeared BRIAN BREMEN, known to me or proved to me on the oath of _____ or through University identification (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

    Given under my hand and seal of office on this 22nd day of October, 2008.

Carolyn V. Coleman
Notary Public
State of Texas
My Commission Expires
JANUARY 21, 2009

Carolyn V. Coleman
NOTARY PUBLIC IN AND FOR
THE STATE OF Texas

My Commission Expires: Jan. 21, 2009