# TAB 3

# Lavergne Deposition

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and      )
RACHEL MULTER MICHALEWICZ,    )
    Plaintiffs,              )
                           )   Civil Action No.
VS.                           )   1:08-cv-00263-SS
                           )
STATE OF TEXAS; UNIVERSITY    )
OF TEXAS AT AUSTIN; et al,    )
    Defendants.              )

ORAL DEPOSITION

OF

GARY LAVERGNE

TAKEN OCTOBER 6, 2008

AFFILIATED REPORTERS & VIDEO

Certified Shorthand Reporters & Videographers

805 West 10th Street, Suite 400, Austin, Texas 78701
(512) 478-2752   FAX (512) 478-2782   1-800-969-2752

```
                                                                    1

            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                       AUSTIN DIVISION

ABIGAIL NOEL FISHER; and      )
RACHEL MULTER MICHALEWICZ     )
                              )
     Plaintiffs,              )
                              )
v.                            )   Civil Action No.
                              )   1:08-cv-00263-SS
                              )
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al,       )
                              )
     Defendants.              )
```

---

ORAL DEPOSITION OF
GARY LAVERGNE
October 6, 2008

---

ORAL DEPOSITION of GARY LAVERGNE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on October 6, 2008, from 8:09 a.m. to 9:56 a.m., before Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of University of Texas at Austin, Main Building, Suite 210, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
                                                            2
 1                         APPEARANCES
 2   FOR THE PLAINTIFFS:
 3       Mr. Thomas R. McCarthy
         WILEY REIN, L.L.P.
 4       1776 K Street, N.W.
         Washington, DC 20006
 5       202/719-7000
 6
 7   FOR THE DEFENDANTS:
 8       Ms. Mishell B. Kneeland
         OFFICE OF THE ATTORNEY GENERAL
 9       Assistant Attorney General
         300 West Fifteenth Street
10       Austin, Texas 78701
         512/463-2004
11
12
     ALSO PRESENT:
13
         Mr. Leo Barnes
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1                              INDEX

2                                                              PAGE

3  Appearances............................................  2

4  GARY LAVERGNE

5       Examination by Mr. McCarthy........................  4
        Examination by Ms. Kneeland........................ 57
6       Further Examination by Mr. McCarthy................ 60

7  Changes and Signature.................................. 62

8  Reporter's Certification............................... 64

9

10                             EXHIBITS

11 NO. DESCRIPTION                                           PAGE

12   1..................................................... 55
       Implementation and Results of the Texas Automatic
13     Admissions Law (HB 588)

14

19                        *   *   *   *   *

Page 10

(1) A. -- but my working title -- and we're allowed to do
(2) that at the University -- is director of admissions research
(3) and policy analysis.
(4) Q. Okay. And how long have you been in this
(5) position?
(6) A. Since September of 2000.
(7) Q. Okay. And were you with the University before
(8) that?
(9) A. No. Before that I was the -- I functioned as the
(10) chief administrative officer for the SAT, the college
(11) admissions test for four states. So I worked for the
(12) College Board and before that I worked for -- in the same
(13) position for ACT for five states. So I'm the only person in
(14) the United States who's ever worked for both ACT and SAT
(15) before I came here.
(16) Q. Great.
(17) A. Testing is my background.
(18) Q. I can see.
(19) A. Uh-huh.
(20) Q. And other than your work background, what's your
(21) educational background?
(22) A. I got a bachelor's of arts in social studies
(23) education at the University of Louisiana, Lafayette, in
(24) 1976, I got a masters of education at the same institution
(25) in 1981, and I have an education specialist from McNeese

Page 11

(1) University in 1988.
(2) Q. Okay. A little bit ago Ms. Kneeland identified
(3) the particular topics that you're going to testify about
(4) today.
(5) A. Uh-huh.
(6) Q. Are you able to testify fully as a corporate
(7) representative of the University on those matters?
(8) A. Yes.
(9) Q. Great, okay. As I said before, if I ask you a
(10) question that you're not prepared for, let me know and --
(11) A. Sure.
(12) Q. -- and we can keep moving along.
(13)     Okay. I'll start off with some stuff about
(14) the admissions process.
(15) A. Uh-huh.
(16) Q. Does the number of applicants for admission in any
(17) given year far exceed the number of slots available for
(18) incoming freshman students?
(19) A. Yes.
(20) Q. Okay. So does the University consider itself
(21) selective in that respect?
(22) A. Selective is kind of a non-standard term, but
(23) we're generally considered selective to a highly selective
(24) institution.
(25) Q. Okay. And about -- Approximately how many

Page 12

(1) applications are received year to year for the incoming
(2) freshman class?
(3) A. Well, for the -- for example, this year we had
(4) 29,500 plus, last year it was not quite as many, but -- so
(5) we generally have in the last five years from 27 to 29,000
(6) applications --
(7) Q. Okay.
(8) A. -- of which about 80 to 85 percent are complete.
(9) Q. Okay. And the ones that are not complete, are
(10) they considered -- are they considered among that number
(11) of -- that 29,000?
(12) A. Right, they're in that 29,000.
(13) Q. Okay. And those ones that are not complete, are
(14) they rejected?
(15) A. They're just in limbo and if they don't meet the
(16) deadline, then we basically cancel the application.
(17) Q. Okay. But still counts in the 29,000 number?
(18) A. Uh-huh.
(19) Q. Okay.
(20)     MS. KNEELAND: Just remember the court
(21) reporter can't take down "uh-huh," you have to say yes.
(22) A. Yes.
(23) Q. (By Mr. McCarthy) Thanks. About how many slots
(24) are available for incoming freshmen each year?
(25)     MS. KNEELAND: I'm just going to say we have

Page 13

(1) Ms. Ishop -- or Dr. Ishop to testify as to all of this kind
(2) of stuff --
(3)     MR. McCARTHY: Okay.
(4)     MS. KNEELAND: -- so if we could really more
(5) limit Gary's testimony to the topics that I identified, that
(6) would be helpful.
(7)     MR. McCARTHY: Sure.
(8)     MS. KNEELAND: He has knowledge about this,
(9) but --
(10)     MR. McCARTHY: That's fine.
(11)     MS. KNEELAND: -- he also has limited time.
(12)     MR. McCARTHY: Got it.
(13) Q. (By Mr. McCarthy) Okay. So, Mr. Lavergne, as I
(14) understand it, the University employs a system for making
(15) admissions decisions for the undergraduate school based on
(16) an applicant's academic index and their personal achievement
(17) index.
(18) A. Yes.
(19) Q. Okay. And this academic index is sometimes
(20) referred to as an AI score?
(21) A. That's correct.
(22) Q. Okay. And the personal achievement index is
(23) sometimes referred to as the PAI score?
(24) A. Yes.
(25) Q. Okay. And how long has the University employed

Page 14

(1) this system?
(2) A. It's before I got here in 2000, but my
(3) understanding is that it was first implemented with entering
(4) 1997.
(5) Q. Okay. And has the University during that time
(6) been keeping track of the level of minority enrollment in
(7) its incoming classes?
(8) A. Uh-huh, yes.
(9) Q. And that's with regard to application, admission,
(10) and enrollment?
(11) A. Yes, uh-huh.
(12) Q. All right. And then did the Texas Legislature
(13) pass HB 588 in 1998?
(14) A. They passed it during the regular session of
(15) 1997 --
(16) Q. Okay.
(17) A. -- and it was implemented here on the campus with
(18) the entering class of 1998.
(19) Q. Okay. And when they -- when the University
(20) implemented HB 588, they continued to use the AI-PI (sic)
(21) system for evaluating applications --
(22) A. Yes.
(23) Q. -- in conjunction with that. Isn't that right?
(24) A. Yes.
(25) Q. Okay. So if I understand this right, the

Page 15

(1) University utilized HB 588 to fill up a portion of the class
(2) and then the remainder of the class they used this AI-PAI
(3) system for evaluating the -- for the remainder of the class.
(4) A. We used it to -- well, under the law -- as
(5) provided for by the law, it's also used in some colleges and
(6) majors where there are more than 75 percent of the
(7) applicants -- or the slots that are filled by top
(8) ten percent people. So in some cases a top ten percent
(9) person will be subject to consideration of AI and PAI in
(10) order to determine whether or not they will get their
(11) first-choice major. So it's used -- it's used for more than
(12) just the non-top ten percent people. It can be used to
(13) determine what major a person will end up being enrolled in.
(14) Q. Okay. So just to make sure I understand, so for
(15) students that are admitted pursuant to HB 588, the AI-PAI
(16) system can be used to determine their placement in this
(17) particular major?
(18) A. In some cases, that's correct.
(19) Q. Okay, in some cases. So --
(20) A. The entitlement is admission to the University,
(21) not necessarily your first-choice of major.
(22) Q. Okay. So let me just back up a little bit to make
(23) sure I understand. So if an applicant is in the top ten
(24) and, you know, submits a proper application, then they're
(25) admitted to the school pursuant to HB 588. Is that correct?

Page 16

(1) A. To the University.
(2) Q. To the University.
(3) A. Yeah.
(4) Q. But not necessarily their particular choice of
(5) major.
(6) A. Depending upon what that major is, that's correct.
(7) Q. Okay. And then after that for certain majors, the
(8) AI-PAI system may be used to determine which school, which
(9) major that applicant goes in to.
(10) A. That's correct.
(11) Q. Okay, all right. And then aside from those
(12) students who are admitted pursuant to HB 588, the AI-PAI
(13) system is used to make admissions decisions.
(14) A. For everyone else.
(15) Q. For everyone else.
(16) A. Uh-huh.
(17) Q. Okay. And -- and their AI and PAI also determines
(18) their placement in particular schools and majors as well?
(19) A. It -- it might.
(20) Q. It might.
(21) A. It might. For example, if their first-choice
(22) major is already full or if they didn't meet the standards
(23) for that particular school, they'll be cascaded to a second
(24) choice just like the top -- some top ten percent people
(25) were. So, yeah, in that respect it can be used that way as

Page 17

(1) well.
(2) Q. Okay.
(3) MS. KNEELAND: And, again, I'll represent to
(4) you that Dr. Ishop is going to testify at great length about
(5) all of that.
(6) MR. McCARTHY: Thanks, great, I'll move
(7) along. I don't want to take too much of your time,
(8) Mr. Lavergne.
(9) Q. (By Mr. McCarthy) Okay. What is the significance
(10) of the AI score, what does that represent?
(11) MS. KNEELAND: Object to the form.
(12) You can answer.
(13) A. Okay, the AI is a combination of two things. The
(14) AI is the result of a multiple regression equation that uses
(15) test scores and class rank to predict a freshman-year GPA
(16) and that freshman-year GPA ranges, of course, from 0.0 to
(17) 4.0. So that -- that predicted GPA can be enhanced by a
(18) tenth of a point if the applicant exceeded our course
(19) requirements in high school. So the range -- the possible
(20) range of an AI is generally 0.0, which no one really gets.
(21) It could be up to a 4.1 because we added the tenth of a
(22) point for the extra coursework in high school. So the AI,
(23) the academic index, is essentially the predicted GPA
(24) probably plus a tenth of a point for excess coursework
(25) beyond our requirements.

Page 18

(1) Q. (By Mr. McCarthy) Okay. And you said these AI
(2) scores are computed or calculated --
(3) A. Absolutely.
(4) Q. -- pursuant to a regression equation?
(5) A. To a regression equation. We take -- we take the
(6) 10 or 11 colleges and schools and we clump them into groups
(7) that have similar curriculum and there's an equation for
(8) each of those clumps and there's four altogether. For
(9) example, we'll put Nursing and Natural Sciences in one group
(10) because they tend to be more science-oriented and, say,
(11) communications and Liberal Arts in another group because
(12) they tend to be more Liberal Arts kind of thing. So -- and
(13) basically the -- so the AI -- the bulk of the AI is
(14) basically that -- the result of that multiple regression
(15) equation.
(16) Q. Okay. And then there's different equations for
(17) different majors, then?
(18) A. For different schools.
(19) Q. For different schools?
(20) A. We don't go down to the major level because we
(21) have, you know, 200 or so -- a hundred or 200 majors, so
(22) it's down to the school level. Now, some schools are big
(23) enough to have their own. Business is big enough for its
(24) own and Engineering is big enough for its own and then you
(25) have the Liberal Arts group and then the Natural Sciences

Page 19

(1) group.
(2) Q. Okay. And who is it that draws up these equations
(3) for the various --
(4) A. That's based on research I do.
(5) Q. Okay. And now the PAI score is a score that's
(6) supposed to represent an applicant's personal achievement.
(7) A. In general, yeah.
(8) Q. Okay. Do you have any role in determining how
(9) much weight is given to the particular factors that make up
(10) that PAI score?
(11) A. No. That was -- that was done back in 1997 --
(12) Q. Okay.
(13) A. -- and it was a result of a faculty council
(14) meeting as -- I was not there, but as I understand it, it
(15) was the result of a faculty council meeting when they drew
(16) up the -- basically the current admissions routine we have.
(17) Q. Okay. Now, the University -- we talked about
(18) before about how the University started implementing the
(19) HB 588 after that was passed and became a part of the
(20) admissions process in 1998.
(21) A. Uh-huh.
(22) Q. I want to back up a little bit before that and
(23) prior to 1997. In 1997 you said that the University began
(24) using this AI-PAI system.
(25) A. Uh-huh.

Page 20

(1) Q. And what was the system that the University used
(2) before that to make admissions decisions?
(3) A. You know, I have a vague idea of what it is --
(4) Q. Okay.
(5) A. -- but I don't believe I can testify to that with
(6) authority.
(7) Q. That's fine. Do you know -- Are you able to
(8) testify about the admission statistics prior to 1997, say in
(9) 1996?
(10) A. Sure.
(11) Q. Okay. So in 1996 what were, roughly, the
(12) admission statistics in terms of minority enrollment?
(13)         MS. KNEELAND: I object to the form. For the
(14) freshman class?
(15)         MR. McCARTHY: Yes, I'm sorry. Let me ask
(16) that again, restate.
(17) Q. (By Mr. McCarthy) So what were the -- what were
(18) the levels of minority enrollment in 1996 for the incoming
(19) freshman class?
(20) A. Okay. For the incoming freshman class, White --
(21) well, I don't have -- I don't have percentages, but I can
(22) give you raw numbers.
(23) Q. That's fine.
(24) A. The incoming class was 6,430 and Whites made up
(25) 4,159, American Indian 34, African American 266, Asian

Page 21

(1) American 942, Hispanic 932, International 97. And this is
(2) from the statistical handbook that's posted online and that
(3) would be in the Office of Institutional Research, but today
(4) I think it's called Information Management and Analysis.
(5) Q. Okay.
(6) A. It's all posted back to the '80s, I think.
(7) Q. Thanks. Okay. So that was before 1997 -- and I'm
(8) just going to try to trace this and make sure I
(9) understand -- and then in 1997 the University implemented
(10) this AI-PAI system. Is that correct?
(11) A. That's correct.
(12) Q. And then in 1998 started using the HB 588 along
(13) with the AI-PAI system.
(14) A. That's correct.
(15) Q. Okay. And at some point when the University was
(16) using this -- using HB 588 and the AI-PAI system --
(17) A. Uh-huh.
(18) Q. -- did the levels of minority enrollment exceed
(19) those from 1996 for the incoming freshman class?
(20) A. By a percentage?
(21) Q. Yes.
(22) A. I believe that to be true. As of 1999, as I
(23) recall, they pretty much equaled the 1996 level -- or let's
(24) say approximately 1999, maybe 2000 or something.
(25) Q. Okay. In 2004 --

Page 26

(1) Q. Okay. Does the University keep track of
(2) statistics -- I'm sorry, let me start that again.
(3)     Does the University keep track of statistics
(4) on the applicant's high school GPAs?
(5) A. No.
(6) Q. No?
(7) A. No. Now when you say "high school GPA," I'm
(8) assuming that you're referring to a computation using grades
(9) that results in a numerical value such as 1.0 to 4.0. We do
(10) not keep -- we do not collect those.
(11) Q. Does the University keep track of high school
(12) class ranks --
(13) A. Yes.
(14) Q. -- of students?
(15) A. Yes.
(16) Q. Okay. What is the average class rank of non-top
(17) ten applicants?
(18) A. My best estimate would be probably around 85 to
(19) 88 percentile ranking or basically the top 15 to top 12 or
(20) something like that.
(21) Q. Okay. And does that number tend to vary among
(22) race?
(23) A. Not that I've ever noticed, no.
(24) Q. Okay.
(25) A. No.

Page 27

(1) Q. Does the University keep statistics on SAT scores
(2) of all the applicants?
(3) A. Absolutely, yes.
(4) Q. Okay. Do average SAT scores tend to vary among
(5) the various races?
(6) A. Yes.
(7) Q. Yes?
(8) A. Uh-huh.
(9) Q. Do you have data on those numbers with you today?
(10) A. Sure.
(11)     MS. KNEELAND: And just, again, so we're
(12) clear, not every student takes the SAT. Some of them take
(13) the ACT.
(14)     MR. McCARTHY: I will ask about both --
(15)     MS. KNEELAND: Okay.
(16)     MR. McCARTHY: -- then we'll have the full
(17) information on it.
(18) A. The numbers I have with me today, okay, would
(19) be -- it's what we call the SAT equivalent and Ms. Kneeland
(20) is absolutely correct in that we will accept either one.
(21) Most students send us one of each and what we do is we'll
(22) take -- since we get so many more SAT scores than ACT
(23) scores, we will -- and in the case of this research study
(24) that I'm going to cite for you, we will take the ACT
(25) scoring, convert it using the concordance table to an SAT

Page 28

(1) equivalent and then we'll give the student the benefit of
(2) the best score, whether it's the actual SAT or the concorded
(3) ACT. So with what I'll -- I'm presuming you're going to be
(4) asking me for those scores in a second. Those scores will
(5) represent the highest value for each individual of the real
(6) SAT or the concorded ACT.
(7) Q. (By Mr. McCarthy) So for students that take both
(8) the SAT and the ACT, the University computes a concorded SAT
(9) score for that ACT score.
(10) A. That's correct.
(11) Q. And then the number that gets recorded in the
(12) statistics is the higher of those two.
(13) A. Right, that's correct.
(14) Q. And for students that take the SAT more than once,
(15) do they get the benefit of their higher score?
(16) A. In the admissions process, that's correct.
(17) Q. Okay. And then I'll ask you about those
(18) statistics. What -- let's take 2004, for example --
(19) A. Okay.
(20) Q. -- what were the average SAT scores for non-top
(21) ten applicants?
(22) A. Okay, White, non-top ten percent, 2004, was 1267;
(23) African American, non-top ten percent in 2004 was 1116;
(24) Asian American, non-top ten percent, 2004, 1304; and
(25) Hispanic, non-top ten percent, 2004, was 1189.

Page 29

(1) Q. Okay.
(2) A. And this is from the Top Ten Percent Report.
(3) Q. Okay. And do you have those -- Do you have
(4) similar information for the incoming class of 2008, the
(5) freshman class?
(6) A. Not yet. That -- this report comes out generally
(7) around Thanksgiving because what happens is we have to give
(8) -- we have to give time for the courses that were taken --
(9) for example, in the spring some of them are incomplete and
(10) some of these kids are going to complete that coursework,
(11) like, within the next couple of weeks so we generally give
(12) time for those incompletes to turn into a course grade so
(13) that we can get a better computation of the mean GPA.
(14) Q. Okay. What's the most recent year for which you
(15) have statistics on the SAT scores?
(16) A. Here would be entering 2006.
(17) Q. Okay.
(18) A. And would you like the same --
(19) Q. Sure, you can give me the 2006.
(20) A. Okay, 2006, non-top ten percent, White is 1286;
(21) 2006, African American, non-top ten percent, 1086; Asian
(22) American, non-top ten percent in 2006 is 1310; and Hispanic
(23) entering 2006, non-top ten percent, 1154.
(24) Q. Okay. And is -- would you say there's a
(25) consistent trend for the years for which the University

Page 46

(1) control --
(2) A. Yes.
(3) Q. -- done?
(4) And is the quality control done to -- is the
(5) quality control analysis done in terms of the personal
(6) achievement score and as to the personal achievement index?
(7) A. Uh-huh.
(8) MS. KNEELAND: Object to the form.
(9) You can answer.
(10) MR. McCARTHY: I'll ask them separately,
(11) that'll be easier.
(12) Q. (By Mr. McCarthy) So is there a quality control
(13) analysis done as to the personal achievement score?
(14) A. Yes.
(15) Q. And is there a quality control analysis done as to
(16) the personal achievement index?
(17) A. Yes.
(18) Q. Could you tell me a little bit about each of those
(19) one at a time?
(20) A. Sure. And the industry calls it interrater
(21) reliability and -- and that is the consistency of scoring by
(22) different individuals given, say, an experiment that has
(23) been set up. And what I did a couple years ago was to give
(24) all of the readers -- it's called an interrater reliability
(25) study -- give all of the readers the -- under controlled

Page 47

(1) conditions the same applications and then we monitored how
(2) each of those readers scored those applications. Those --
(3) As I recall I took 15 applications, gave it to all the
(4) readers, and then monitored the consistency of scoring. And
(5) this is done routinely in the industry. ACT does it for
(6) their essay readers, SAT did it for their essay readers, and
(7) it's a pretty straightforward study that looks at
(8) consistency of scoring.
(9) Q. Okay. And what is the term again?
(10) A. Interrater reliability.
(11) Q. Interrater reliability?
(12) A. Yes.
(13) Q. And that's --
(14) A. "Inter" being I-N-T-E-R, interrater reliability.
(15) Q. Okay. And this interrater reliability analysis is
(16) done separately for personal achievement scores and personal
(17) achievement indexes?
(18) A. I did it for -- well, I did it for the personal
(19) achievement score and the first essay and the second essay
(20) and because those three things make up a hundred percent
(21) of -- you know, I feel comfortable saying I did it for the
(22) personal achievement index as well.
(23) Q. Okay. So in other words, you did it for the
(24) components of the personal achievement index.
(25) A. Uh-huh, a hundred percent of the components of the

Page 48

(1) personal achievement index, yeah.
(2) Q. Okay. And did you do this for the optional third
(3) essay as well?
(4) A. No.
(5) Q. No.
(6) A. Just essays one and two.
(7) Q. Okay.
(8) A. And the reason for that is because I don't think
(9) we had enough students doing the third essay. See, everyone
(10) had to do Essay 1 and 2 and so we had enough of a sampling
(11) there to do that.
(12) Q. Okay. So has the -- Do you know if anyone at the
(13) University has done any sort of quality control analysis of
(14) the scoring as to Essay No. 3, the optional one?
(15) A. Essay 3 --
(16) MS. KNEELAND: I'm sorry, object to the form.
(17) You can answer it.
(18) A. Essay three is used by many people outside of the
(19) admissions office, like some -- you want to double check
(20) this, but my understanding is essay three is used on things
(21) like honors programs and so forth. And as to whether or not
(22) they did their own quality control studies, I don't know.
(23) Q. (By Mr. McCarthy) Okay. So you -- so is it
(24) accurate to say that you're unaware of whether the
(25) University does quality control analysis of the optional

Page 49

(1) essay?
(2) A. That's correct.
(3) Q. Okay. When you did this interrater reliability
(4) analysis --
(5) A. Uh-huh.
(6) Q. -- of the personal achievement score, what did
(7) your results show?
(8) A. They showed that we were -- There are two
(9) measures. One is exact score, basically where two people
(10) assign exactly the same score. The general industry
(11) standard is that on a one-to-six scale like that, plus or
(12) minus one is generally acceptable. And as I recall, the
(13) results were that from 88 to 90 percent of the time we were
(14) within -- raters were within one score of -- of what we
(15) considered the true score. In a study like that, you
(16) establish a true score. And for purposes of this study,
(17) Dr. Bremen was asked to look at these files. As the
(18) instructor, he assigned the score that, for purposes of
(19) research, was considered the true score, then we -- then I
(20) sent out the 15 applications to all of the readers. We --
(21) The only reader who wasn't part of this study was me and I
(22) couldn't be a part of my own study, but everybody else was.
(23) And from 88 to 90 percent of the time we were within one
(24) score of one another. And so the College Board, for
(25) example, in its SAT reading -- SAT writing test shoots for

13 (Pages 46 to 49)

Page 50

(1) 92 percent, so we were within two percent of the premier
(2) testing company of -- in the world.
(3)   Q. And how is this true score determined?
(4)   A. The instructor determines the -- we gave it to
(5) Dr. Bremen who is the, you know, national expert on this and
(6) I asked him to score that and he scored it. And so the --
(7) the research answers the question how close do we come to
(8) our training --
(9)   Q. Okay.
(10)  A. -- and what we found is that our scores are 88 to
(11) 90 percent consistent with the training that we receive.
(12)  Q. So just to make sure I understand, Dr. Bremen
(13) comes up with what's known as the true score and then --
(14)  A. For purposes of that study, yeah.
(15)  Q. Right. So Dr. Bremen comes up with what's known
(16) as the true score for purposes of the study --
(17)  A. Yes.
(18)  Q. -- and then in this quality control analysis, this
(19) interrater reliability analysis as you called it, 88 to
(20) 90 percent of the scores come within one point of
(21) Dr. Bremen's true score?
(22)  A. That's correct.
(23)  Q. Okay. I understand, thanks.
(24)  A. Uh-huh.
(25)  Q. Are there ever sort of individual readers that

Page 51

(1) have wide variances from that true score?
(2)   A. I found that to be very rare. Now I can't recall
(3) the exact numbers, but the standard deviation from the
(4) average score was really very narrow. Quite frankly, I was
(5) very surprised we had -- we had -- The people who did the
(6) reading held true to their training.
(7)   Q. And if there is a reader who has a large variance
(8) from the true score --
(9)   A. Uh-huh.
(10)  Q. -- are they required to have additional training?
(11)  A. That, I think, is outside of my -- my scope. I
(12) present the results to Dr. Walker and Dr. Ishop and you'll
(13) have to ask them if they did any remediation. I did the
(14) study, not the consequence of the study.
(15)  Q. Understood. So this same type of interrater
(16) reliability analysis is done for each of the two required
(17) essays and for the personal achievement score.
(18)  A. Uh-huh.
(19)       MS. KNEELAND: You have to say yes.
(20)  A. Yes. I'm sorry, yes.
(21)  Q. (By Mr. McCarthy) Thank you. And how was the
(22) study done for the personal achievement score?
(23)  A. It's done the same way. The personal achievement
(24) score is done by readers holistically on the one-to-six
(25) scale and the question is consistency. In a study like

Page 52

(1) that, the true score is irrelevant. Okay? In a study like
(2) that, what's important is consistency because consistency is
(3) fairness. And whether the score is a three or a five or a
(4) six, the question is not that. It's if somebody gave a
(5) score of a four, I mean, will everybody else give it a score
(6) of a four? And we found that 88 to 90 percent of the time
(7) it was within one point.
(8)   Q. Okay. So was there -- so when the interrater
(9) reliability study was done for the personal achievement
(10) score, was there a true score assigned before?
(11)  A. Uh-huh, yes.
(12)  Q. Okay. So same process.
(13)  A. Same process.
(14)  Q. Okay. So for the interrater reliability study for
(15) the personal achievement score, there was first a true score
(16) set --
(17)  A. Uh-huh.
(18)  Q. -- and then --
(19)  A. Yes.
(20)  Q. -- readers would assign a value.
(21)  A. Yes.
(22)  Q. And, again, was it about the same interval,
(23) 88 percent and 90 percent --
(24)  A. Yes.
(25)  Q. -- within one point of the true score?

Page 53

(1)   A. Yes.
(2)   Q. Okay.
(3)       (Reporter interrupts)
(4)       MR. McCARTHY: I'll break it up into a
(5) multiple question, that will be easier.
(6)       THE WITNESS: Okay.
(7)   Q. (By Mr. McCarthy) So for the interrater
(8) reliability study of the personal achievement score, there
(9) was first a true score assigned. Correct?
(10)  A. Yes.
(11)  Q. And then readers would review that application.
(12)  A. Yes.
(13)  Q. And they would assign a score.
(14)  A. Their own score, yes.
(15)  Q. Okay. So they would assign their own score for
(16) that application.
(17)  A. Yes.
(18)  Q. And the interrater reliability study showed that
(19) 88 to 90 percent of the time those readers came within one
(20) point, plus or minus, of the true score.
(21)  A. That's correct.
(22)  Q. Okay, thank you. Now the PAI score, you said
(23) that -- I'm sorry, the personal achievement score, no
(24) component of the personal achievement score is given a
(25) numerical value?

Page 54

(1)  A. That's correct.
(2)  Q. Okay. How does a reader arrive at a score for the
(3) personal achievement score if no component has any numerical
(4) value?
(5)  A. By looking at the -- the application as a whole.
(6)  Q. Okay.
(7)     MR. McCARTHY: Can we take a short break?
(8)     THE REPORTER: Off the record, 9:47.
(9)     (Discussion off the record)
(10)    THE REPORTER: On the record, 9:47.
(11)  Q. (By Mr. McCarthy) Mr. Lavergne, we've spent a lot
(12) of time during this deposition talking about a lot of data
(13) and statistics. Correct?
(14)  A. Yes.
(15)  Q. And a lot of that seems to have come from the HB
(16) reports that -- the HB 588 reports that you've been in
(17) charge of. Is that correct?
(18)  A. That's correct.
(19)  Q. Okay. Do you -- do you recognize this (tendering
(20) document)?
(21)  A. Yes.
(22)     MS. KNEELAND: I'm sorry, for the record,
(23) this?
(24)     MR. McCARTHY: Sorry.
(25)  Q. (By Mr. McCarthy) Do you -- do you recognize this

Page 55

(1) report titled Implementation and Results of the Texas
(2) Automatic Admissions Law?
(3)  A. Yes, I recognize that.
(4)  Q. Okay.
(5)     MS. KNEELAND: And is that marked as a
(6) deposition exhibit?
(7)     MR. McCARTHY: Is that marked as a deposition
(8) exhibit?
(9)     MS. KNEELAND: Tom, I'm asking you are you
(10) marking that as a deposition exhibit?
(11)    MR. McCARTHY: Yes.
(12)    MS. KNEELAND: Okay, that never got in.
(13) Sorry.
(14)    MR. McCARTHY: Sorry.
(15)    (Deposition Exhibit No. 1 marked for
(16)    identification)
(17)  A. Uh-huh, yes.
(18)  Q. (By Mr. McCarthy) And that's marked as Deposition
(19) Exhibit A?
(20)  A. Exhibit No. 1.
(21)  Q. I'm sorry. That's marked as Deposition
(22) Exhibit No. 1?
(23)  A. Yes.
(24)  Q. Okay. And is this Report 10?
(25)  A. This is Report No. 10, Part One, yes.

Page 56

(1)  Q. Okay. Now is this where the statistics and data
(2) are coming from that you've given me during the course of
(3) this deposition?
(4)  A. Yes.
(5)  Q. Okay.
(6)  A. I can't remember using another report.
(7)  Q. Okay.
(8)  A. The vast bulk of everything I've cited comes from
(9) this report, yes.
(10)  Q. Okay. Mr. Lavergne, we're just about done here,
(11) but before we go I want to ask you are there any answers
(12) that you gave me that you have any reason that you'd like to
(13) change at this point?
(14)  A. No.
(15)  Q. Okay. So is there anything that I asked you about
(16) that you couldn't think of that you've later recalled
(17) something that is relevant to one of those questions?
(18)  A. Not that I can think of, no.
(19)  Q. Okay. Well before I let you go here, I just want
(20) to let you know that there is a chance that I may recall you
(21) later this afternoon or tomorrow. It's not likely, but I
(22) may, but with that being said I've got no further questions.
(23)     MS. KNEELAND: I have a couple of follow-up
(24) questions I'd like to ask.
(25)

Page 57

(1)         EXAMINATION
(2) BY MS. KNEELAND:
(3)  Q. You were talking to Mr. McCarthy about the
(4) personal achievement index. Do you recall that?
(5)  A. Uh-huh, yes.
(6)  Q. Is there a formula associated with the personal
(7) achievement index?
(8)  A. Yes.
(9)  Q. Can you tell me what that formula is -- or would
(10) you tell me what it is, please.
(11)  A. Sure. The personal achievement index takes the
(12) personal achievement score and the scores from the first
(13) essay and the second essay and they're placed in an equation
(14) that looks like this: You take the personal achievement
(15) score times four, plus the average of the two essay scores
(16) times three, and divide that by seven and that is your
(17) personal achievement index.
(18)  Q. So earlier when you were talking to Mr. McCarthy
(19) about the weight in the personal achievement index, is that
(20) what you were referring to, that formula?
(21)  A. I was referring to the slightly greater weight
(22) given to the personal achievement score as opposed to the
(23) mean of the essays. That's what I -- when -- that's what I
(24) understood the question involving weight to be.
(25)  Q. I want to turn to the achievement index. Are you

64

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and )
RACHEL MULTER MICHALEWICZ )
                           )
      Plaintiffs,          )
                           )
v.                         )   Civil Action No.
                           )   1:08-cv-00263-SS
                           )
STATE OF TEXAS; UNIVERSITY OF )
TEXAS AT AUSTIN; et al,    )
                           )
      Defendants.          )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF GARY LAVERGNE
October 6, 2008

I, Tracie L. Chew, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me, on October 6, 2008, the following named person, GARY LAVERGNE, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative nor employee of any

65

1  attorney or counsel employed by the parties hereto or
2  financially interested in the action.
3      I further certify that the deposition transcript was
4  submitted on October 16th, 2008 to the witness or to the
5  attorney for the witness for examination, signature and
6  return to me by November 17th, 2008.
7      The original deposition (was)/was not returned to the
8  deposition officer on November 7, 2008;
9      If returned, the attached Changes and Signature page
10 contains any changes and the reasons therefor;
11     If returned, the original deposition was delivered to
12 Mr. Thomas R. McCarthy, Custodial Attorney;
13     That $513.40 is the deposition officer's charges to
14 the Plaintiffs for preparing the original deposition
15 transcript and any copies of exhibits;
16     WITNESS MY HAND AND SEAL OF OFFICE, this 14th day of
17 October, 2008.



_____
TRACIE L. CHEW, CSR #6503
Expiration: 12/31/2008
DepoTexas Austin
Firm Registration No. 17
DepoTexas@aol.com
Fax 512/478-2782

62

1        CHANGES AND SIGNATURE

2   PAGE         LINE         CHANGE                                REASON

3   _24_____ _18-25_____ see statement immediately below

4   _25_____ _1-8_____ I misunderstood and thought the question was about the PAI rather than the AI. Thus, my answer beginning with lines 22 on page 24 and ending on line 1 of page 25 is inappropriate to the keeping of statistic for the AI. (It is appropriate as a response for the keeping of the statistics for the PAI). It should also be noted that the confusion was quickly cleared up beginning with line 9 on page 25 and plaintiff's attorney has correct information relative to the collection of statistics regarding the AI with testimony beginning with line 9 on page 25.

5   25_____ 16_____ change "*predicted*" to "*predictive*"     wrong word

6
7
8
9
10
11
12
13
14
15
16
17
18
19

20     I, GARY LAVERGNE, have read the foregoing deposition

21  and hereby affix my signature that same is true and correct,

22  except as noted above.

23
24                        *[signature]*
                          GARY LAVERGNE
25

63

1  THE STATE OF TEXAS
2  COUNTY OF TRAVIS
3
4      Before me, Leea C. Mechling , on this day

5  personally appeared **GARY LAVERGNE**, known to me or proved to

6  me through

7  University of Texas ID card (description of identity card

8  or other document) to be the person whose name is subscribed

9  to the foregoing instrument and acknowledged to me that

10  he/she executed the same for the purpose and consideration

11  therein expressed.

12      Given under my hand and seal of office on this

13  31st day of October , 2008.

14

15  *[signature: Leea C. Mechling]*
    NOTARY PUBLIC IN AND FOR
16  THE STATE OF Texas
17
18  My Commission Expires: 8/28/2011
19
20         LEEA C MECHLING
21         NOTARY PUBLIC
22         State of Texas
           Comm. Exp. 08-28-2011
23
24