# TAB 5

# Walker Deposition

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ABIGAIL NOEL FISHER; and    )
RACHEL MULTER MICHALEWICZ,   )
    Plaintiffs,          )
                   )       Civil Action No.
VS.                         )       1:08-cv-00263-SS
                   )
STATE OF TEXAS; UNIVERSITY  )
OF TEXAS AT AUSTIN; et al,   )
    Defendants.          )

RULE 30(b)(6) DEPOSITION

OF

BRUCE WALKER

TAKEN OCTOBER 7, 2008

**AFFILIATED** REPORTERS & VIDEO

*Certified Shorthand Reporters & Videographers*

805 West 10th Street, Suite 400, Austin, Texas 78701
(512) 478-2752   FAX (512) 478-2782   1-800-969-2752

1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                   AUSTIN DIVISION

 3
    ABIGAIL NOEL FISHER; AND      *
 4  RACHEL MULTER MICHALEWICZ,    *
             Plaintiffs,          *
 5                                *
    VS.                           *  No. 1:08-CV-00263-SS
 6                                *
    STATE OF TEXAS; THE UNIVERSITY *
 7  OF TEXAS AT AUSTIN; ET AL.,   *
             Defendants.          *
 8

 9

10   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11              RULE 30(b)(6) DEPOSITION OF

12                     BRUCE WALKER

13               TUESDAY, OCTOBER 7, 2008

14   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15

16          ORAL DEPOSITION OF BRUCE WALKER, produced as a

17  witness at the instance of the Plaintiffs and duly sworn,

18  was taken in the above-styled and numbered cause on the

19  7th day of October, 2008, from 8:08 a.m. to 10:35 a.m.,

20  before Christy Leslie, CSR in and for the State of Texas,

21  reported by machine shorthand, at The University of Texas,

22  Texas Union, Chicano Culture Room 4.206, Austin, Texas,

23  pursuant to the Texas Rules of Civil Procedure and the

24  provisions attached hereto.

25
```

2

              A P P E A R A N C E S

FOR THE PLAINTIFFS ABIGAIL NOEL FISHER and
RACHEL MULTER MICHALEWICZ:
     Mr. Thomas R. McCarthy
     WILEY REIN, L.L.P.
     1776 K. Street, N.W.
     Washington, DC 20006
     (202) 719-7000

     - AND -

     Mr. Paul M. Terrill
     THE TERRILL FIRM, P.C.
     810 W. 10th Street
     Austin, Texas 78701
     (512) 474-9100

FOR THE DEFENDANTS STATE OF TEXAS and UNIVERSITY
OF TEXAS AT AUSTIN, ET AL.:
     Ms. Mishell B. Kneeland
     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     General Litigation Division
     P.O. Box 12548
     Austin, Texas 78711-2548
     (512) 463-2120

ALSO PRESENT:
     Mr. Leo Barnes, The University of Texas at Austin
     Mr. Jody Hughes, Attorney General's Office
     Mr. Robert O'Keefe, Attorney General's Office

3

1                              INDEX

2      Appearances. . . . . . . . . . . . . . . . . . .      2

3      BRUCE WALKER
                                                          PAGE
4            Examination by Mr. McCarthy . . . . . . .      4

5      Changes and Signature. . . . . . . . . . . . .      64
       Reporter's Certificate . . . . . . . . . . . .      66
6

7                         EXHIBIT INDEX

8      NO.     DESCRIPTION                             PAGE

9      9    Printout from The University of Texas Web site
            entitled Rankings & Kudos                     10
10

11     10   Press Release from The University of Texas Web site
            entitled Enrollment of first-time freshman
            minority students now higher than before Hopwood
12          court decision                                14

13     11   Matrix for Texas students regarding majors      40

14     12   Opposition to Motion for Preliminary Injunction  55

15

16

17

18

19

20                                        '

21

22

23

24

25

Page 6

(1)    Q    All right.  Do you have any questions about that?
(2)    **A    No.**
(3)    Q    Okay.  Let me ask you a few logistical things
(4)    before we actually get started in the meat of this
(5)    deposition.
(6)         Have you taken any medications or ingested
(7)    anything that might affect your ability to participate in
(8)    this deposition?
(9)    **A    Not that I know of, no.**
(10)    Q    Okay.  Did you meet with anyone to prepare for
(11)    this deposition?
(12)    **A    Yes.**
(13)    Q    Who did you meet with?
(14)    **A    My lawyers.**
(15)    Q    Okay.  How many times did you meet with them?
(16)    **A    I think three.**
(17)    Q    Okay.  Did you review any documents to prepare
(18)    for this deposition?
(19)    **A    Have I reviewed any?**
(20)    Q    Yes.
(21)    **A    Yes.**
(22)    Q    Yes?
(23)    **A    Yes.**
(24)    Q    Do you remember what documents you reviewed?
(25)    **A    Well, certainly the Schedule A.**

Page 7

(1)    Q    Uh-huh.
(2)    **A    And then just to refresh my memory on some of the**
(3)    **statistics and stuff, yeah.**
(4)    Q    Okay.  So maybe you looked at like the Top Ten
(5)    reports, that kind of thing?
(6)    **A    Right.**
(7)    Q    Okay.  Is there anything that you -- are you
(8)    aware of any documents that you have looked at but have
(9)    not been produced to us?
(10)    **A    I'm not aware of any, no.**
(11)    Q    Okay.  All right.  Dr. Walker, what is your job
(12)    title?
(13)    **A    I'm vice provost and director of admissions.**
(14)    Q    Okay.  And how long have you been in that
(15)    position?
(16)    **A    Since 1996.**
(17)    Q    Did you hold any positions prior to that at the
(18)    university?
(19)    **A    No, not at this university.**
(20)    Q    Did you hold similar positions at other
(21)    universities?
(22)    **A    Yes.**
(23)    Q    What positions?
(24)    **A    I was at the University of Delaware.  I was dean**
(25)    **of admissions and financial aid.  Then prior to that I was**

Page 8

(1)    at the University of North Texas as associate director.
(2)    Q    Okay.  And what's your education?
(3)    **A    I have an undergraduate degree in theology, a**
(4)    **master's degree in student personnel, and a doctorate in**
(5)    **higher ed administration.**
(6)    Q    Okay.  Outside of your work experience and
(7)    education, do you have any other experience that relates
(8)    to your roles and duties here at the university?
(9)    **A    Well, I spent eight years working for the college**
(10)    **board, which is the folks that sponsor the SAT.**
(11)    Q    Okay.  Are you able to testify fully today as a
(12)    representative of The University of Texas?
(13)    **A    Yes.**
(14)    Q    Okay.  Generally stated, what is the university's
(15)    policy with regard to undergraduate admissions?
(16)         MS. KNEELAND:  Objection; form.
(17)         You can answer.  You can answer.  I was just
(18)    making an objection for the record.
(19)         THE WITNESS:  Oh.  I'm sorry.  I don't
(20)    always hear out of that ear, so...
(21)    **A    You want to know what our process is?**
(22)    Q    (By Mr. McCarthy)  What's the policy?  Do you
(23)    have -- like what is the -- does the admissions office
(24)    have a general statement policy?
(25)    **A    Yes.  You mean how the admissions work?  I'm**

Page 9

(1)    sorry.  I'm not --
(2)    Q    Yeah.
(3)    **A    -- understanding your question.**
(4)    Q    I mean like a mission statement.  Is there a
(5)    particular just general mission statement of the office of
(6)    admissions?
(7)    **A    Yes.**
(8)    Q    And what is the -- what is the office of
(9)    admissions' mission?
(10)    **A    Is to recruit and enroll students in attempting**
(11)    **to have a very diverse student body and particularly a**
(12)    **freshman class.**
(13)    Q    Okay.  And does the university consider itself
(14)    selective?
(15)    **A    Yes.**
(16)    Q    Okay.  Does the university consider itself
(17)    diverse?
(18)    **A    Yes.**
(19)    Q    Has the university been recognized for its
(20)    diversity?
(21)         MS. KNEELAND:  Objection; form.
(22)    **A    I don't -- by who?  I'm sure I -- I'm sure we**
(23)    **have, but...**
(24)         MR. McCARTHY:  I'm sorry.  Could we take a
(25)    short break?

3  (Pages 6 to 9)

Page 10

(1)        (Recess from 8:15 a.m. to 8:16 a.m.)
(2)        (Exhibit No. 9 marked)
(3)    Q   (By Mr. McCarthy)  Dr. Walker, I'm handing to you
(4)  what has been marked as Deposition Exhibit 9.
(5)    A   Okay.
(6)    Q   Do you recognize what that is?
(7)    A   It's from our Web site.
(8)    Q   Uh-huh.  And --
(9)    A   I know it's -- go ahead.
(10)   Q   Yes.  It's from the Web site.  And can you look
(11) down towards the bottom of the first page and the top of
(12) the second page and just read to me what you see there?
(13)       MS. KNEELAND: Where?  It's --
(14)       MR. McCARTHY: I'm sorry.  Here.  I'll --
(15)       MS. KNEELAND: Sorry.
(16)       MR. McCARTHY: -- help you out.
(17)       MS. KNEELAND: It's a little vague.
(18)       MR. McCARTHY: Sorry.  Starting at the
(19) bottom of the second page.
(20)       THE WITNESS: Okay.
(21)   A   "The University of Texas at Austin ranks sixth in
(22)  the nation in producing undergraduate degrees for minority
(23)  groups, according to the May 31, 2007 edition of Diverse
(24)  Issues in Higher Education magazine."
(25)   Q   (By Mr. McCarthy)  Okay.  Can you continue a

Page 11

(1)  little bit?
(2)    A   "In addition to the overall standing, the
(3)  university ranks tenth nationally among the magazine's Top
(4)  100 producers of undergraduates for Hispanics, eighth for
(5)  Asian-Americans and 59th for American Indians."
(6)    Q   And you don't need to read the rest into the
(7)  record, but could you just take a look at it real quick
(8)  for me, the rest of that paragraph?  And you can tell me
(9)  generally what the paragraph is highlighting.
(10)       MS. KNEELAND: I'm going to object.  The
(11) document speaks for itself.  He doesn't need to summarize
(12) it.
(13)       MR. McCARTHY: That's fine.  Okay.
(14)   A   It's about our -- the rankings.
(15)   Q   (By Mr. McCarthy)  Okay.  Now, Dr. Walker, isn't
(16) it true that in 1997 the university adopted a system for
(17) making admissions decisions based on an Academic Index and
(18) a Personal Achievement Index?
(19)   A   That is true.
(20)   Q   Okay.  Do you recall -- I'm sorry.  Why did the
(21) university adopt that system?
(22)   A   Well, there was several reasons.  The Fifth
(23)  Circuit Court had just made the decision in the Hopwood
(24)  case, and we could no longer use race in our admissions
(25)  process and we had been doing so for some time.  So we

Page 12

(1)  were -- but we still were interested in diversity in its
(2)  full -- full meaning.
(3)        And so we -- I had just come, and we were
(4)  recreating or creating a process that could honor
(5)  diversity and recognize diversity, and so we created a
(6)  holistic review of applications.  We redefined merit to be
(7)  much more inclusive than it had been before.  There had
(8)  primarily only been test scores and rank prior to that
(9)  time, and we understand students as more than just a test
(10)  score and a rank.  They bring other characteristics with
(11)  them to a university, and we wanted to be able to
(12)  recognize and reward those characteristics as best we
(13)  could.
(14)   Q   Okay.  And was that admissions system that --
(15) that was based on the Academic Index and Personal
(16) Achievement Index, that was adopted at that time?
(17)   A   Yes.
(18)   Q   Was that successful in that respect?
(19)       MS. KNEELAND: Objection; form.
(20)   A   In what respect?
(21)   Q   (By Mr. McCarthy)  You just explained why the
(22) university adopted it.
(23)   A   Uh-huh.
(24)   Q   Was it successful in reaching those goals?
(25)   A   We haven't reached those goals yet, but it has --

Page 13

(1)  it did provide us the opportunity to look holistically at
(2)  a student as opposed to narrowly at a student.  Yes, it
(3)  did accomplish that.
(4)    Q   Okay.  And was the system intended to boost
(5)  minority enrollment?
(6)    A   It -- it was hopeful that it could, but that's
(7)  not the whole reason we did it, no.
(8)    Q   Was it a reason?
(9)    A   It was part of the reason, I would say.
(10)   Q   Okay.  And for that reason, for the reason of
(11)  minority enrollment, has it been successful in promoting
(12)  minority enrollment?
(13)   A   Well, I can't -- I can't answer that.  If I did
(14)  answer it, I would have to say I don't know because we
(15)  added so many other things to it later.  Top Ten Percent,
(16)  a lot of other things that we did.  So we never just
(17)  stayed with the very first use of this new system.
(18)   Q   In your -- are you referring to the fact that
(19)  HB 588 was implemented the following year?
(20)   A   Yes.
(21)   Q   Okay.
(22)   A   And other things, but...
(23)   Q   Sure.  Okay.  So in 1998 once the university
(24)  started implementing HB 588, the university continued to
(25)  use the AI/PIA system.  Correct?

4  (Pages 10 to 13)

Page 18

(1) in 1996, the year prior to Hopwood.  Is that correct?
(2)     **A   That is correct.**
(3)     Q   Okay.  In 2005 the university began considering
(4) race as a factor in undergraduate admissions.  Correct?
(5)     **A   That's correct.**
(6)     Q   Was the university's decision to do that in part
(7) a response to the Grutter case?
(8)     **A   In part.**
(9)     Q   Okay.  And what was the other reasoning behind
(10) it?
(11)     **A   Well, we felt like we had not -- we had not yet**
(12) **attained critical mass for the benefits of -- the**
(13) **educational benefits that diversity would bring.**
(14)     Q   What exactly is critical mass for the university?
(15)     **A   Well, for our -- our purposes it's an**
(16) **adequate representation of minority students so that the**
(17) **benefits that can -- educational benefits that can be**
(18) **derived from diversity can actually happen.**
(19)     Q   Okay.  And has the university identified a
(20) numerical level of minority enrollment --
(21)     **A   No.**
(22)     Q   -- to which -- no.  So the university has not
(23) defined what critical mass is as a number?
(24)     **A   No.**
(25)     Q   Okay.  How will the university know when it has

Page 19

(1) reached critical mass?
(2)     **A   Well, I think when we see the educational**
(3) **benefits happening and have happened, then we would know.**
(4)     Q   So is the university currently not providing full
(5) benefits of a diverse education to its students?
(6)     **A   Well, I -- we're providing the education and**
(7) **we're attempting to provide the full benefits of a**
(8) **diverse -- diversity education.  We just haven't attained**
(9) **that critical mass yet.**
(10)     Q   Has the university made any sort of projection as
(11) to when they will attain critical mass?
(12)     **A   No.**
(13)     Q   Does the university have any means of measuring
(14) their progress towards critical mass?
(15)     **A   Yes.**
(16)     Q   And how is that?
(17)     **A   Well, there's one -- though diversity is spread**
(18) **across the university in all the things that we do, there**
(19) **is one window that we can actually -- through which we can**
(20) **actually look to see how we're doing.  And the classroom**
(21) **is one of those -- is that window where we can look to see**
(22) **how we're doing.  So that's one way to measure.**
(23)     Q   And what does that window of the classroom tell
(24) the university about its progress towards critical mass?
(25)     **A   That we haven't attained it yet.**

Page 20

(1)     Q   What is it about that window of the classroom
(2) that tells the university that it has not attained
(3) critical mass yet?
(4)     **A   Well, we have far too many classrooms where**
(5) **there's still no or one minority student.**
(6)     Q   And how many classrooms as a percentage or a
(7) whole number does the university have where there are only
(8) one or no minority student?
(9)     **A   Well, we did a study and we -- depends on the**
(10) **size of the classroom.  But let's say a classroom that has**
(11) **five or more students in it, more than half of the class**
(12) **had only one or no African-American students in them.  And**
(13) **about the same, but slightly less percent had only one or**
(14) **no Hispanic students in them.  And then we have a little**
(15) **bit higher representation of Asians.**
(16)     Q   What -- I think you said that for classrooms --
(17) and please tell me if I'm wrong in restating what you just
(18) told me.  I want to make sure I have this right.
(19)         I believe you said that for classrooms of --
(20) that have five or more students in them that 50 percent of
(21) the classrooms have only one or no African-American
(22) student?
(23)     **A   That's an approximate.**
(24)     Q   Approximate?
(25)     **A   Yes.**

Page 21

(1)     Q   Okay.  Does the university have a goal in mind in
(2) terms of what percent that should be?
(3)     **A   No.**
(4)     Q   No.  How will the university know it's reached
(5) critical mass if it doesn't have a goal?
(6)     **A   Well, the students will let us know.  We talk to**
(7) **them all the time about how they feel about their**
(8) **experience at the university, how they feel in the**
(9) **classroom.  We still have students who tell us they feel**
(10) **isolated in the classroom, that they are the only, or the**
(11) **majority of students tell us that there is no diversity**
(12) **in the classroom.  So we talk to the students on a regular**
(13) **basis, and this is what they tell us.**
(14)     Q   Are these -- do these classrooms that tend to
(15) lack racial diversity as you have described tend to fall
(16) into certain schools or majors within the university?
(17)         MS. KNEELAND:  Objection; form.
(18)     **A   Not that I'm aware of, no.  It's across all of**
(19) **the university classes.**
(20)     Q   (By Mr. McCarthy)  What is the university doing
(21) to try to remedy these numbers that are deficient?
(22)         MS. KNEELAND:  Objection; form.
(23)     **A   We're trying to recruit a diverse freshman class.**
(24)     Q   (By Mr. McCarthy)  In terms of minority
(25) enrollment?

Affiliated Reporters & Video   800-969-2752
805 West 10th Street, Suite 400, Austin, Texas  78701

Page 26

(1)   A   Eighteen.
(2)   Q   And could you tell me what it was for
(3)   Asian-American students?
(4)   A   Seventeen.
(5)   Q   And all those numbers are 2005 numbers.  Correct?
(6)   A   That's correct.
(7)   Q   Were those numbers any different than the same
(8)   numbers for the year of 2004?
(9)   A   Why don't I just read you the numbers from 2004.
(10)  Q   Sure, that's fine.
(11)  A   2004 was 5 percent for African American, 18
(12)  percent for Asian-American, and 17 percent for Hispanic.
(13)  Q   Okay.  Dr. Walker, how much has minority
(14)  enrollment increased at the university since the
(15)  university began using race as a factor in admissions
(16)  decisions in 2005?
(17)  A   Shall I read from your chart or are you just --
(18)  Q   If you don't know the answer, that's fine, you
(19)  can check from the chart, I guess, and compare 2004 to the
(20)  most recent data.
(21)  A   Yes.  It has increased by a few percentage
(22)  points.
(23)  Q   Okay.  And that increase -- and of that increase
(24)  you don't know how much is attributable to the use of race
(25)  as a factor in admissions decisions.  Is that correct?

Page 27

(1)   A   Well, the use of race in -- beginning in 2005 is
(2)   the only thing that changed in 2005.  It would be
(3)   reasonable to think that it had -- it had an effect.
(4)   Q   Okay.  And are the university's -- I'm sorry.
(5)   You mentioned that the university takes -- undertakes a
(6)   number of initiatives to increase minority enrollment.
(7)   Correct?
(8)   A   That's correct.
(9)   Q   What are some of those other initiatives?
(10)  A   Other than?
(11)  Q   Other than the use of race in -- as a factor in
(12)  admissions decisions.
(13)  A   Well, we have done a lot of things.  It's a very
(14)  broad attempt to create a diverse university.  It would
(15)  start with the changes we made in 1996 prior to the class
(16)  entering in 1997.  We moved to a different definition of
(17)  merit, a very much broader definition of merit that
(18)  included students' leadership roles, their participation
(19)  in extracurricular activities, their work experience,
(20)  their service in the community, their -- any special
(21)  circumstances in their family, their socioeconomic
(22)  standing, the -- whether or not they lived in a
(23)  single-family home, whether English was, you know, spoken
(24)  at home, a language other than English was spoken at home.
(25)  So we -- we changed that part of our admissions process.

Page 28

(1)   We also created a more I will call it
(2)   user-friendly process for students.  We created a large --
(3)   we call it a customer service unit.  It's a very large
(4)   telephone process, telephone bank, so we could be sure and
(5)   answer all of our calls.  So that improved services to
(6)   students so they could reach us, so that they can complete
(7)   their application materials.  We created a communication
(8)   group so that we could be sure that our communications to
(9)   students in the applicant pool was clear, that they
(10)  understood what they needed to do and what the deadlines
(11)  were for getting that done.
(12)  We put more people out in the field.  We
(13)  opened -- to visit high schools, to increase the diversity
(14)  of our applicant pool.  We opened admissions centers in
(15)  Houston, Dallas, San Antonio, and this last year in The
(16)  Valley so that we could put our professionals closer to
(17)  where the students lived, so we could talk to the
(18)  families, so they could feel that they had a local
(19)  contact.
(20)  We completely redid our Web site to make it
(21)  easy to read, easy to understand, easy to use.  There's a
(22)  transactional part of it you may or may not have seen.  I
(23)  doubt you have because you have to have an EID to get into
(24)  it.  But we improved tremendously the transactional part
(25)  of our Web product so it would be easier for students to

Page 29

(1)   apply, to submit the documents they need to submit and to
(2)   track their application, to know whether they have
(3)   submitted everything, to look at what they have submitted.
(4)   So we invested a lot of money, time, effort
(5)   into improving our processes for applicants, to improve
(6)   our contact with students so that we could enhance our
(7)   applicant pool and then our admitted student pool.  Those
(8)   are some of the things that we have done.
(9)   Q   In addition to those, I believe that Mr. Michael
(10)  Orr told us yesterday about several scholarship programs
(11)  that the university runs?
(12)  A   That's correct.
(13)  Q   The university runs a Presidential Achievement
(14)  Scholarship program.  Correct?
(15)  A   That's correct.
(16)  Q   And a First Generation Scholarship program.
(17)  Correct?
(18)  A   That's correct.
(19)  Q   And also a Longhorn Opportunity Scholarship?
(20)  A   That's correct.
(21)  Q   And those scholarship programs have -- those
(22)  scholarship programs have helped increase minority
(23)  enrollment.  Correct?
(24)  A   Yes.  I would say yes.
(25)  Q   Okay.  I want you to look at Deposition Exhibit

8  (Pages 26 to 29)

Page 30

(1) No. 1 again, Dr. Walker.
(2)     A    Okay.
(3)     Q    In the middle of Page 2 there's a list of factors
(4) and special circumstances that are -- make up part of the
(5) personal achievement score and a Personal Achievement
(6) Index.
(7)     A    That's correct.
(8)     Q    This is part of the admissions process.  Correct?
(9)     A    Correct.
(10)     Q    Okay.  Could you read me that list of factors and
(11) special circumstances?
(12)     A    "Scores on two essays, leadership,
(13) extracurricular activities, awards/honors, work
(14) experience, service to school or community, special
(15) circumstances such as socioeconomic status of the family,
(16) single-parent home, language spoken at home, family
(17) responsibilities, socioeconomic status of the school
(18) attended, average SAT/ACT of school attended in relation
(19) to the student's own SAT/ACT, race (addition approved by
(20) the UT Board of Regents in 2003."
(21)     Q    Okay.  So prior to the addition of race that --
(22) I'm sorry.  Let me start that again.
(23)         So prior to the 2005 admissions year, all of
(24) those factors and special circumstances were considered
(25) except for race.  Correct?

Page 31

(1)     A    That is correct.
(2)     Q    Okay.  Why did the university adopt those factors
(3) and special circumstances?
(4)     A    Within special circumstances?
(5)     Q    Why did the university adopt those factors and
(6) special circumstances?
(7)     A    Oh, and special circumstances.  In order to
(8) expand the definition of merit, what it means to be a
(9) meritorious student.
(10)     Q    Okay.  And was this all part of the university's
(11) goal of increasing diversity?
(12)     A    Yes.
(13)     Q    Yes.  Okay.  And I believe that you said that
(14) there are many kinds of diversity that the university
(15) seeks.  Correct?
(16)     A    That is correct.
(17)     Q    When the university added the factor of race to
(18) that list, what kind of diversity was the university
(19) seeking to promote?
(20)     A    By the addition of race?
(21)     Q    Uh-huh.
(22)     A    Racial diversity.
(23)     Q    Okay.  When the admissions office reviews
(24) applicant files, it considers all of these factors and
(25) special circumstances.  Correct?

Page 32

(1)     A    That is correct.
(2)     Q    And those -- those factors and special
(3) circumstances are not assigned numerical values.  Correct?
(4)     A    That is correct.
(5)     Q    So is it accurate to say that they are
(6) subjective?
(7)     A    Yes.
(8)     Q    The university employs many people in its
(9) admissions office.  Correct?
(10)     A    Say that again?
(11)     Q    The university employs many people in its
(12) admissions office.  Correct?
(13)     A    That's correct.
(14)     Q    And there are several people that review
(15) applicant files.  Correct?
(16)     A    That's correct.
(17)     Q    Is it possible that these several people could
(18) consider differently those subjective factors?
(19)     A    I suppose anything is possible, but that's not
(20) the way we trained them.
(21)     Q    Okay.  Dr. Walker, I'm going to show you what's
(22) been marked previously as Deposition Exhibit No. 7.
(23)     A    Okay.
(24)     Q    Do you understand what that document is?
(25)     A    Yes.

Page 33

(1)     Q    Okay.  Is that one of the matrices that's used to
(2) determine which students are admitted to a particular
(3) major?
(4)     A    That is correct.
(5)     Q    Okay.  And there's a cutoff line drawn that
(6) separates the students that are admitted from those that
(7) are not admitted.  Correct?
(8)     A    That's correct.
(9)     Q    Is it accurate to say that a difference of
(10) one-tenth of an AI point can be determinative to whether a
(11) student is admitted or not admitted?
(12)         MS. KNEELAND:  Objection; form.
(13)     A    One-tenth of an AI point?
(14)     Q    (By Mr. McCarthy)  Yes, the Academic Index point.
(15)     A    Uh-huh.
(16)     Q    Is it accurate to state that one-tenth of an AI
(17) point can be determinative as to whether a student can be
(18) admitted or not admitted?
(19)     A    Yes.
(20)         MS. KNEELAND:  Same objection.
(21)     Q    (By Mr. McCarthy)  Okay.  Could a difference of
(22) one PAI point be determinative as to whether a student is
(23) admitted or not admitted?
(24)         MS. KNEELAND:  Objection; form.
(25)     A    Yes.

9  (Pages 30 to 33)

Page 34

(1)  Q   (By Mr. McCarthy)  Okay.
(2)       MR. McCARTHY:  Could we take a short break?
(3)       (Recess from 8:57 a.m. to 9:11 a.m.)
(4)  Q   (By Mr. McCarthy)  Dr. Walker, you testified that
(5)  the use of race as a factor in admissions helps increase
(6)  minority enrollment.  Correct?
(7)  **A   That's correct.**
(8)  Q   Does the use of race as a factor in admissions
(9)  help increase the enrollment level of African-Americans?
(10) **A   I believe so, yes.**
(11) Q   Does it help increase the enrollment of Hispanic
(12) students?
(13) **A   I believe so, yes.**
(14) Q   Okay.  Now, because the use of race as a factor
(15) in admissions is increasing levels of enrollment of
(16) certain racial groups, it's necessarily decreasing the
(17) enrollment of other racial groups.  Correct?
(18) **A   No, not necessarily.**
(19) Q   Well, it is sort of a zero-sum game, isn't it?
(20) There's only 100 percent.  Right?
(21) **A   Right, but our -- the size of our freshman class**
(22) **varies from year to year.**
(23) Q   I understand that.  But as percentage levels, if
(24) some are going up, other ones must be going down.
(25) Correct?

Page 35

(1)  **A   Correct.**
(2)  Q   So what effect is the use of race in admissions
(3)  decisions having on the enrollment of Asian-Americans?
(4)  **A   Well, I can't say there's a direct correlation,**
(5)  **so I won't.**
(6)  Q   Okay.  And what is -- what effect is the use of
(7)  race in admissions decisions having on the level of
(8)  enrollment of Caucasian students?
(9)  **A   Again, I'm -- I'm not sure there's a**
(10) **direct-and-only effect.**
(11) Q   Okay.  The use of race as a factor in admissions
(12) decisions is increasing the enrollment rates of
(13) African-Americans and Hispanic Americans.
(14) **A   It appears --**
(15) Q   Correct?
(16) **A   It appears to be, yes.**
(17) Q   Okay.  So then isn't it true that it's
(18) necessarily reducing the enrollment rates of the remainder
(19) of the student population?
(20) **A   Again, I don't -- I can't be sure it's a direct**
(21) **and not affected by other things.**
(22) Q   Well, except that if the use of race is
(23) increasing the one, if it is increasing the levels of
(24) enrollment of Hispanic and African-American students, then
(25) a necessary -- a necessary result is that it's reducing

Page 36

(1)  the levels of enrollment of the remainder of the student
(2)  body.  Correct?
(3)  **A   Well, since we use race -- we don't -- since race**
(4)  **can apply to anyone, black, Hispanic, Asian, white, in our**
(5)  **process it's hard for me to isolate that one has been the**
(6)  **cause of the other.**
(7)  Q   Okay.  So is it the case that the use of race in
(8)  admissions decisions can benefit nonminority students?
(9)       MS. KNEELAND:  Objection --
(10) **A   Yes.**
(11)      MS. KNEELAND:  -- form.
(12) Q   (By Mr. McCarthy)  Okay.  Can you explain how the
(13) use of race can benefit a nonminority student?
(14) **A   Yes.  Our -- in our holistic process, race is one**
(15) **of the factors that we use, and it's possible that -- and**
(16) **it doesn't matter what the race is of the student.  When**
(17) **you're reading the file, the reader is asking themselves**
(18) **is that a -- what's the context in which we see all these**
(19) **things from the student.  And race could be part of that**
(20) **context.**
(21) Q   Can you give me an example of how the
(22) consideration of race can benefit a nonminority student?
(23) **A   Oh, sure.  In Texas we -- I don't like to say**
(24) **segregated schools, so what I say is racially identifiable**
(25) **schools.  So if you're in a racially identifiable school**

Page 37

(1)  **and that race happens to be African-American, and you're a**
(2)  **white student, because you live in that area, and you turn**
(3)  **out to be president of the senior class, then that's**
(4)  **unusual given that you're white.  And it suggests an**
(5)  **unusual cultural connection that you just don't normally**
(6)  **see between African-American and white families.**
(7)  **So in that case, being white is -- is --**
(8)  **puts everything else in context and would be important to**
(9)  **our score for that student.**
(10) Q   Okay.  So that's -- that is a manner in which the
(11) consideration of race could benefit a white student?
(12) **A   That's correct.**
(13) Q   Okay.  Are there other ways in which the
(14) consideration of race might benefit a nonminority student?
(15) **A   I'm sure there are.  Let me see if I can conjure**
(16) **up another --**
(17) Q   Well, you can think about it.
(18) **A   -- another example.**
(19) Q   If you think of another example, you can tell me
(20) later.
(21) **A   Okay.**
(22)      MS. KNEELAND:  And I want to be clear.
(23) You're asking him to tell you hypothetical student
(24) situations or --
(25)      MR. McCARTHY:  Yes.

10  (Pages 34 to 37)

Page 42

(1)     Q   So those students that are represented in the
(2)   cells in that matrix were compared against each other in
(3)   the admissions process.  Correct?
(4)     **A   In all of these, yes.**
(5)     Q   And the cutoff line determines -- the cutoff line
(6)   determines which students are admitted and which students
(7)   are not.  Correct?
(8)         MS. KNEELAND:  Objection.  I don't know if
(9)   you can tell that from this document.
(10)    **A   It --**
(11)    Q   (By Mr. McCarthy)  Well, the cutoff line tells
(12)  which students are admitted based on that particular read
(13)  and which students are not admitted based on that
(14)  particular read.  Correct?
(15)    **A   I have no idea whether these students were**
(16)  **actually admitted -- were admitted or not.  This, again,**
(17)  **appears to be a work document where we are trying to model**
(18)  **or anticipate where a line might be.**
(19)    Q   Okay.
(20)    **A   We may have moved that line --**
(21)    Q   Okay.
(22)    **A   -- in final.**
(23)    Q   Okay.  That's fine.  You testified earlier that
(24)  in the -- in the review for fall admission students are --
(25)  I'm sorry.

Page 43

(1)         In the review for fall admission, applicants
(2)   are compared against one another.  Correct?
(3)     **A   That is correct.**
(4)     Q   Okay.  And some of those applicants are benefited
(5)   by the consideration of race in admissions decisions.  Is
(6)   that correct?
(7)     **A   That is correct.**
(8)     Q   So if some of those applicants are benefited by
(9)   the use of race, isn't it necessarily the case that the
(10)  students who were not benefited by the use of race are, in
(11)  fact, negatively impacted?
(12)        MS. KNEELAND:  Objection; form.
(13)    **A   Well, since we -- since we don't specify that you**
(14)  **give extra weight for if they're African-American or extra**
(15)  **weight if they're Hispanic, we use every student's race,**
(16)  **doesn't matter what it is.  So it could be that there's**
(17)  **students there that were advantaged by it and students**
(18)  **that just didn't have a score on that particular aspect.**
(19)    Q   (By Mr. McCarthy)  I understand that, and that's
(20)  what I'm getting towards.  So there are some students that
(21)  benefit from the use of race and there's some students
(22)  that receive no benefit from the use of race?
(23)    **A   That's correct.**
(24)    Q   Okay.  So since these students are being compared
(25)  against one another, isn't it necessarily the case that

Page 44

(1)   the students who receive no benefit from the use of race
(2)   are actually negatively impacted by the use -- by the
(3)   benefit of race to the other students?
(4)         MS. KNEELAND:  Objection; form.
(5)     **A   Well, to me the benefit of being in the applicant**
(6)   **pool is whether you get admitted or not.  I mean, that's**
(7)   **the whole goal of this.  And we look at all kinds of**
(8)   **diversity, race being one of them.  It could be that the**
(9)   **student who you just described was benefited by a whole**
(10)  **lot of other things and got admitted.  So in that case I**
(11)  **see no -- no way in which they got harmed by our use of**
(12)  **race.**
(13)    Q   (By Mr. McCarthy)  Admission -- admission to The
(14)  University of Texas is very competitive, isn't it?
(15)    **A   It is.**
(16)    Q   So -- isn't it the case that admissions
(17)  decisions -- so isn't it the case that there's very close
(18)  competition for slots in the incoming freshman class at --
(19)    **A   Yes.**
(20)    Q   -- The University of Texas?
(21)        And all of these many factors, as you said,
(22)  some of them may benefit some student and some of them
(23)  might not benefit a student.
(24)    **A   That's --**
(25)    Q   Correct?

Page 45

(1)     **A   -- correct.**
(2)     Q   So isn't it the case that any one particular
(3)   factor might be dispositive as to a given student?
(4)         MS. KNEELAND:  Objection; form.
(5)     **A   Well, let me put it this way:  No one factor can**
(6)   **get a student admitted, and I think we make that clear in**
(7)   **our instructions to the student, and no one factor will**
(8)   **get a student denied.  It's a holistic approach.**
(9)   **Everything counts.  Race counts, everything else counts.**
(10)  **So it would be impossible for me to tell you which one of**
(11)  **those students got admitted based on which characteristic.**
(12)  **It was the whole of the student.  So I can't make those**
(13)  **kinds of comparisons.**
(14)    Q   (By Mr. McCarthy)  I understand that you cannot
(15)  identify a particular student that got in for a particular
(16)  reason.  But each one of these factors that's considered
(17)  is meaningful.  Correct?
(18)    **A   That is correct.**
(19)    Q   And they each contribute in some manner to the
(20)  applicant's personal achievement score.  Correct?
(21)    **A   If they have that characteristic, yes.**
(22)    Q   Yes.  So if a student has a characteristic that's
(23)  identified as one of the factors that makes up the
(24)  personal achievement score, then they are benefited by
(25)  that factor in terms of their overall personal achievement

12  (Pages 42 to 45)

Page 58

(1) Correct?

(2)         MS. KNEELAND: Objection; form.

(3)     A   So you have asked the negative, if it's unclear.

(4)     Q   (By Mr. McCarthy)  Yes.  You said --

(5)     A   I would say yes.

(6)     Q   -- you couldn't parse it.  Yeah, okay.  So it's

(7) unclear, yes?

(8)     A   Yes.

(9)     Q   Okay.  Then how in your opinion is the use of

(10) race indispensable to increasing minority enrollment?

(11)     A   Well, it's -- first of all, it lends itself to

(12) having a -- the use of race lends itself to having a

(13) diverse class and all the ways that that can be described.

(14) And the benefits of having a diverse class are so enormous

(15) to us that if -- if the use of race has some help to us,

(16) then it's important -- and I think -- what was your word?

(17)     Q   Indispensable?

(18)     A   Indispensable to us to have that diverse class.

(19) If that -- if that helps us, then I would say -- I'll use

(20) your word -- indispensable.

(21)     Q   Okay.  Now, earlier you testified that the use of

(22) race promotes racial diversity.  Correct?

(23)     A   Yes.

(24)     Q   Okay.  So now, you -- now, I believe you said

(25) that the use of race helps promote all kinds of diversity

Page 59

(1) at the university.

(2)     A   That is true.

(3)     Q   And how does it do that?

(4)     A   Well, everyone has a race.  Right?

(5)     Q   Uh-huh.

(6)     A   So it's -- if race had a -- let me start the

(7) statement over again.  People that we admit are diverse

(8) because we -- by design we're trying to have a diverse

(9) class.  Race as being only one of many, many ways that

(10) diversity could come.  So when I said -- I think the word

(11) was that race helps us become diverse, then that's what I

(12) meant.  You know, you don't come with just a race, you

(13) come with a lot of other characteristics as well.

(14)     Q   Okay.  So -- but how does the use of race promote

(15) those other characteristics?

(16)     A   Well, I thought I just explained it, but maybe I

(17) didn't explain it very well.  It's one of many factors.

(18) Race is one of many factors that we use.

(19)     Q   Uh-huh.

(20)     A   And we don't enroll a student just because they

(21) are black or just because they're white or just because

(22) they're Hispanic.  They're going to bring a lot of other

(23) diversity pieces with them.

(24)     Q   Uh-huh.

(25)     A   So the use of race in that context brings all

Page 60

(1) kinds of diversity, not just racial diversity, because

(2) students are more than just their race.

(3)     Q   Students certainly are more than just race, but

(4) isn't it those other factors aside from race that promote

(5) other kinds of diversity aside from racial diversity?

(6)         MS. KNEELAND: Objection; form.

(7)     A   Say that again?  Ask that question again, please.

(8)     Q   (By Mr. McCarthy)  Students certainly are more

(9) than just their race.

(10)     A   That's correct.

(11)     Q   But isn't it their characteristics other than

(12) race that promote the kinds of diversity there are other

(13) than racial diversity?

(14)     A   Correct.

(15)     Q   Okay.  So doesn't a student's -- doesn't the

(16) university's use of race promote only racial diversity?

(17)     A   No.  I mean, you're -- no.  I mean, it does --

(18) you're asking me to exclude all the other things the

(19) students bring with them and I can't do that.

(20)     Q   I'm not asking you to exclude the other things

(21) that the students bring with them.  I understand that

(22) students bring a lot of things and the university has very

(23) much a holistic, full-file review of students to try and

(24) promote lots of kinds of diversity.

(25)     A   Including racial.

Page 61

(1)     Q   Including racial.  And I don't dispute that at

(2) all.

(3)     A   Right.

(4)     Q   And that's what -- I understand that's your

(5) testimony and the testimony of other officials at the

(6) university has been so far in this case, that all those

(7) various factors and special circumstances are intended to

(8) promote all kinds of diversity.  Correct?

(9)     A   Correct.

(10)     Q   But I'm having a hard time seeing how the use of

(11) race promotes anything other than racial diversity.  So,

(12) again, let me ask you and I'll try to ask this in a

(13) different way.

(14)         With the understanding that the university's

(15) program -- sorry.  Let me start that again.

(16)         With the understanding that the university's

(17) admissions program seeks to promote all kinds of

(18) diversity, isn't it true that the factor of race itself

(19) promotes only racial diversity?

(20)     A   No.  You used the word only, and that's -- no.

(21)     Q   What other kinds of diversity are there?

(22)     A   Oh, there's geographic diversity, there's --

(23)     Q   Let's take geographic diversity.

(24)     A   -- socioeconomic diversity, there's --

(25)         MS. KNEELAND: Well, he wasn't done, so --

16 (Pages 58 to 61)

66

1                   UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                          AUSTIN DIVISION

3

ABIGAIL NOEL FISHER; AND          *
4   RACHEL MULTER MICHALEWICZ,        *
            Plaintiffs,            *
5                                      *
VS.                               *   No. 1:08-CV-00263-SS
6                                      *
STATE OF TEXAS; THE UNIVERSITY *
7   OF TEXAS AT AUSTIN; ET AL.,       *
            Defendants.            *
8

9                      REPORTER'S CERTIFICATE
          RULE 30(b)(6) DEPOSITION OF BRUCE WALKER
10                   TUESDAY, OCTOBER 7, 2008

11          I, Christy Leslie, Certified Shorthand Reporter

12   in and for the State of Texas, hereby certify to the

13   following:

14          That the witness, BRUCE WALKER, was duly sworn by

15   the officer and that the transcript of the oral deposition

16   is a true record of the testimony given by the witness;

17          That the deposition transcript was submitted on

18   *October 11th, 2008* to the witness or to the attorney for

19   the witness for examination, signature and return to me by

20   *November 17th, 2008;*

21          That the amount of times used by each party at

22   the deposition is as follows:

23          Mr. Thomas R. McCarthy - 1 hr. 29 minutes
            Ms. Mishell B. Kneeland - 0 minutes
24

25          That pursuant to information given to the

67

1   deposition officer at the time said testimony was taken,

2   the following includes counsel for all parties of record:

3       FOR THE PLAINTIFFS ABIGAIL NOEL FISHER and
        RACHEL MULTER MICHALEWICZ:
4           Mr. Thomas R. McCarthy
            WILEY REIN, L.L.P.
5           1776 K. Street, N.W.
            Washington, DC 20006
6           (202) 719-7000

7           - AND -

8           Mr. Paul M. Terrill
            THE TERRILL FIRM, P.C.
9           810 W. 10th Street
            Austin, Texas 78701
10          (512) 474-9100

11      FOR THE DEFENDANTS STATE OF TEXAS and UNIVERSITY
        OF TEXAS AT AUSTIN, ET AL.:
12          Ms. Mishell B. Kneeland
            OFFICE OF THE ATTORNEY GENERAL OF TEXAS
13          General Litigation Division
            P.O. Box 12548
14          Austin, Texas 78711-2548
            (512) 463-2120

15

16      That $518.60  is the deposition officer's

17  charges to the PLAINTIFFS ABIGAIL NOEL FISHER AND RACHEL

18  MULTER MICHALEWICZ for preparing the original deposition

19  transcript and any copies of exhibits;

20      I further certify that I am neither counsel for,

21  related to, nor employed by any of the parties or

22  attorneys in the action in which this proceeding was

23  taken, and further that I am not financially or otherwise

24  interested in the outcome of the action.

25      Certified to by me this the 14th day of

68



1    October, 2008.

CHRISTY LESLIE, Texas CSR 7652
Expiration Date: 12/31/09
DepoTexas Austin
Firm Registration No. 17
805 W. 10th Street, Suite 400
Austin, Texas 78701

64

```
1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  BRUCE WALKER

3    DATE OF DEPOSITION:  OCTOBER 7, 2008

4    PAGE    LINE      CHANGE                REASON

5    Page 14 - line 10    1998            Correction

6    Page 62 - line 19  It's been a bitch.  Correction

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

65

1 _____

2 _____

3 _____

4          I, BRUCE WALKER, have read the foregoing

5 deposition and hereby affix my signature that same is true

6 and correct, except as noted above.

7

8                    *Bruce Walker*

                   BRUCE WALKER

9

10

11 THE STATE OF *Texas*        )

12 COUNTY OF *Travis*          )

13          Before me, *Leea Mechling*, on this day personally

14 appeared BRUCE WALKER, known to me to be the person whose

15 name is subscribed to the foregoing instrument and

16 acknowledged to me that they executed the same for the

17 purposes and consideration therein expressed.

18          Given under my hand and seal of office this

19 *30th* day of *October*        , *2008* .

20

21          *Leea Mechling*

                   NOTARY PUBLIC IN AND FOR

22          THE STATE OF *Texas*

23

24                    LEEA C MECHLING
                      NOTARY PUBLIC
25                    State of Texas
                      Comm. Exp. 08-28-2011