# TAB 11

# Walker Affidavit

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| ABIGAIL NOEL FISHER, and | § | |
| RACHEL MULTER MICHALEWICZ, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 1:08-CV-00263-SS** |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| et al., | § | |
| *Defendants.* | § | |

**AFFIDAVIT OF N. BRUCE WALKER**

| | |
|---|---|
| **THE STATE OF TEXAS** | § |
| | § |
| **COUNTY OF TRAVIS** | § |

BEFORE ME, the undersigned authority, personally appeared N. BRUCE WALKER, who, being by me duly sworn, upon his oath stated:

1.    My name is N. Bruce Walker. I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated in it. I make this affidavit in support of Defendants' Motion for Summary Judgment and in opposition to Plaintiffs' Motion for Summary Judgment.

2.    I am the Vice Provost and Director of Admissions for the University of Texas at Austin, a position I have held since 1996. I have been involved in college admissions, either as an admissions officer or as an administrator at the College Board for a total of 35 years. As part of my job duties, I participate directly in all facets of the admissions process at the University. In particular, I am responsible for guiding and administering the University's admission policy as the University strives to meet its mission.

3.    Generally stated, the goal of the Admissions Office is to admit a meritorious and diverse student body. In addition to academic credentials, the University also looks to an applicant's life experiences, including an applicant's culture; race, language; family, educational, geographic, and socioeconomic background; and the applicant's personal achievement such as work, volunteer, or internship experiences; and leadership experience, among other elements.

4.    UT Austin values diversity for the educational benefits it produces. Knowing that graduates of the University of Texas will go on to become future leaders of this state, in government, industry, and public service, and perhaps others, the University understands its responsibility to provide a student body that permits all students to experience concrete benefits from diversity. In the University's judgment, these benefits include, but are not limited to, cross-

Page 1 of 5

racial understanding, cross-ethnic understanding, the breaking down of racial, ethnic, and geographic stereotypes. In my many years in admissions, I have read studies that tout other benefits: diversity promotes learning outcomes and better prepares students for an increasingly diverse work force, for civic responsibility in a diverse society, and for entry into professions, where they will need to deal with people of different races, cultures, languages, and backgrounds.

5.     Holistic review places value on the applicant's achievements in the context of their life experiences, which bear directly on the multifaceted diversity that an applicant would bring to the University, should he or she be admitted and enroll.

6.     The holistic review process was put in place, under my guidance, for the entering freshman class of 1997. This holistic review process is similar to that used at many selective universities, whether public or private. In that process, the University looks not just at the academic achievements of an applicant, but also applies additional considerations that take into account an applicant's full life experiences, including their personal achievements. For the 1997 admissions cycle, the factors considered by the admissions office included:

- Scores on two essays
- Leadership
- Extracurricular Activities
- Awards/honors
- Work experience
- Service to school or community
- Special circumstances:
  - Socio-economic status of family
  - Single parent home
  - Language spoken at home
  - Family responsibilities
  - Socio-economic status of school attended
  - Average SAT/ACT of school attended in relation to student's own SAT/ACT

7.     In connection with putting the holistic review in place, the University developed an extensive training program for staff who would read the applications. To find someone to develop and provide training, I contacted the College Board, who administers the Scholastic Achievement Test ("SAT") to obtain recommendations for an expert in holistic review training. To my surprise, Brian A. Bremen, who is an Associate Professor of English here at the University, was recommended. I interviewed Dr. Bremen, learned that he had been involved with the College Board for many years as a trainer for holistic reading and hired him to work with the University on its admissions process. Dr. Bremen has served as a consultant to the University in this capacity for 12 years.

8.     In 2003, the Supreme Court issued its decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003). That case was one that was widely followed in higher education circles, and a case

which we at the University tracked very closely.  As a result, when *Grutter* was decided, the University faced an important decision: whether or not to use race in its admissions process.

9.      Once the Board of Regents of the University of Texas System authorized its component institutions to consider whether or not to use race, the University undertook a thoughtful review of its process.

10.     In August of 2003, the Office of Admissions convened a retreat and invited faculty and attorneys to join the admission staff and Dr. Brian Bremen, our trainer.  Over the course of a weekend, we debated what, if any, difference injecting race into the holistic review process would make in attracting and admitting under-represented minority students.  The consensus was that using race would benefit the University by increasing the number under-represented minority students and thus further the University's overall goal of having a student body that is meritorious and diverse in a variety of educationally relevant ways.

11.     The University also conducted a study, the results of which were cited in a report of November 20, 2003, that examined the presence or absence in undergraduate classrooms of the four most prevalent racial categories (White, African-American, Asian, Hispanic). The results of the study showed that, in 2002, 90% of (5-24 student) classes had one or zero African-American students, 46% had one or zero Asian-American students and 43% had one or zero Hispanic students.   Based on this study, UT Austin concluded that it had not attained a critical mass of underrepresented minorities.  Because critical mass is a necessary (but not sufficient) condition of achieving diversity, UT Austin further concluded, based on the study, that the educational benefits of a diverse student body were not being provided to all the University's undergraduate students.

12.     The University also relied on anecdotal information from students – those who have the most direct interaction in the classroom.  Their observations backed up what the study data revealed – that there was insufficient minority representation for the full benefits of diversity to occur.

13.     UT Austin concluded that it could not accomplish its diversity goals without considering race in admissions.  As a result, the University put forth a proposal to consider race in its admissions process.   A true and correct copy of the *Proposal to Consider Race and Ethnicity in Admissions,* June 25, 2004 (hereinafter, "2004 "Proposal"), is attached as Exhibit A.

14.     In August 2004, after almost a year of deliberations, the UT System approved a revised admissions policy for UT Austin that included an applicant's race in the list of special circumstances that reviewers can consider in determining the applicant's personal achievement score.  Beginning with the entering class of 2005, the University's list of considerations for personal achievement included:

- Scores on two essays
- Leadership
- Extracurricular Activities

Page 3 of 5

- Awards/honors
- Work experience
- Service to school or community
- Special circumstances:
  - Socio-economic status of family
  - Single parent home
  - Language spoken at home
  - Family responsibilities
  - Socio-economic status of school attended
  - Average SAT/ACT of school attended in relation to student's own SAT/ACT
  - Race

15.    As a practical matter, the only changes of note in the process were that: (1) an applicant's race (if reported by the applicant) was now included in the application file; and (2) readers were now taught to include race in the same manner as any other special circumstance. Race, like any other factor, is by itself never determinative of an admissions decision and like every other factor is never considered in isolation or out of the context of the other aspects of the student's application file.  Race is considered as part of the larger holistic review of every applicant regardless of race.  No applicant is reviewed separately or differently because of their race or any other factor.  An applicant's race, standing alone, is neither a benefit nor detriment to any applicant.  Instead, race provides – like language, whether or not someone is the first in their family to attend college, and family responsibilities – important context in which to evaluate applicants, and is only one aspect of the diversity that the University seeks to attain.

16.    The University believes that its holistic method of considering the race of all applicants benefits under-represented minorities in the same way that our use of "race-neutral" factors such as socio-economic status at home or languages spoken do.  Adding race to the other factors that we consider simply increases the chance that an underrepresented minority student will be sufficiently meritorious and diverse in all the ways that we consider educationally relevant.  Again, however, race considered in context can be a positive thing for any applicant.  It is not rare for UT Austin to admit a white student who was the president of a white majority high school, and neither is it uncommon for UT Austin to admit a Hispanic student was president of a Hispanic majority high school.  Setting aside for a moment the other factors that we would consider, both of these students would be valued for taking leadership roles in their respective high schools, but their race in this narrow example would not be of particular moment in terms of overall diversity.  On the other hand, both a white student who is president of his or her majority African-American high school and an African-American student who is president of his or her majority white high school bring an additional aspect of diversity when one considers the relative rarity of being a student leader who can reach across racial lines.

16.    The University's policy calls for formal review of the use of race every five years.  Also, as an internal practice, the UT Austin admissions office informally reviews its various admissions procedures each year.



N. Bruce Walker

SUBSCRIBED AND SWORN TO BEFORE ME on the ___23rd___ day of February 2009, to certify which witness my hand and official seal.

Notary Public in and for the State of Texas

```
LEEA C MECHLING
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-28-2011
```

# Bruce Walker Affidavit

# Exhibit A

The University of Texas at Austin

**PROPOSAL TO CONSIDER RACE AND ETHNICITY IN ADMISSIONS**

June 25, 2004

On August 7, 2003, the Board of Regents of The University of Texas System adopted a resolution authorizing each institution to develop and propose plans to consider race and ethnicity as part of the admission process.  In response, The University of Texas at Austin herein submits recommendations to alter its admission processes for graduate students, law students, and undergraduates.  It is the intent of the University to comply with the law as expressed in the decisions of the United States Supreme Court in the cases of *Grutter v. Bollinger*, 123 S.Ct. 2325 (2003), and *Gratz v. Bollinger*, 123 S.Ct. 2411 (2003).

## I. RATIONALE

The Supreme Court expresses the rationale for diversity as a compelling state interest that can justify the use of race in university admissions.  (*Grutter,* 123 S.Ct. at 2339).   One value of diversity in the classroom, according to the Court, is that it breaks down stereotypes *Id.* at 2329-40.  This value in turn presupposes a sufficient number of minority students, or "critical mass."  To break down stereotypes, there should be enough minority students for classroom discussion to reflect "a variety of views among minority students."  *Id.* at 2334.  A second value of diversity is that it "promotes cross-racial understanding." *Id.* at 2339.  A third value is that diversity in the classroom "better prepares students for an increasingly diverse workforce and society."  *Id.* at 2340.  "[T]he skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints."  *Id.*

Each of these educational values of diversity applies to the process of education at The University of Texas at Austin.

The Court expressed a fourth value of diversity in the context of educating a diverse population.  "In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity."  *Id.* at 2341.  Because college degrees are often prerequisite to many types of leadership in our country and our state, the University plays a key role in preparing a diverse set of leaders.

Moreover, racial and ethnic minority group members continue to be underrepresented in many of the occupations that require a college degree.   Table 1 presents census data that show that Black and Hispanic individuals in the United States are a consistently smaller proportion of these occupations than their proportion of the labor force. [1]

---

[1] The term "Black" is used whenever it was the designation used in the source document, as is the case with Tables 1 and 2, which were produced by federal agencies.

**TABLE 1**
**PROPORTION OF SELECTED OCCUPATIONS**
**WHO ARE BLACK OR HISPANIC, 2002, UNITED STATES**

| Selected Occupations | Percent Black | Percent Hispanic |
|---|---|---|
| **Total employed in labor force, all occupations** | 10.9% | 12.2% |
| **Selected Occupations** | | |
| **Architects** | 2.3 | 5.2 |
| **Engineers** | 4.5 | 4.0 |
| **Computer System Analysts** | 6.9 | 5.2 |
| **Natural Scientists** | 4.1 | 2.9 |
| **Pharmacists** | 8.0 | 2.5 |
| **Teachers, College and University** | 5.4 | 5.4 |
| **Lawyers** | 4.6 | 3.1 |
| **Editors and Reporters** | 4.7 | 3.3 |

SOURCE:  U.S. Bureau of the Census, Statistical Abstract of the U.S., 2003, p. 399, Table 615

The University of Texas at Austin prepares degree candidates in each of the fields as well as many others.  Although not all of its graduates stay within the state, reviewing the occupational composition within the state of Texas is a useful comparison.  Table 2 presents EEOC data from 2000 for the state of Texas.

Hispanics comprise a fraction of the Texas labor force that is more than twice their fraction of the national labor force.  The Black proportion of the Texas labor force is just slightly lower than the national proportion.  In most occupations in Texas, as in the nation, minorities are underrepresented in these occupations.

In Texas, unlike the nation, the fraction of pharmacists who are Black is larger than the fraction of Blacks in the labor force.  In other occupations, the fraction of Blacks is well below their overall representation in the labor force.  The fraction of Hispanics in these occupations is well below their representation in the labor force.  There is not yet a visibly diverse set of leaders in these and many other occupations that require a college degree.

**TABLE 2**
**PROPORTION OF SELECTED OCCUPATIONS**
**WHO ARE BLACK OR HISPANIC, 2002, TEXAS**

| Selected Occupations | Percent Black | Percent Hispanic |
|---|---|---|
| **Total employed in labor force, all occupations** | 10.5% | 27.5% |
| **Selected Occupations** | | |
| **Architects** | 2.4 | 11.5 |
| **Engineers** | na | Na |
| **Computer System Analysts** | 8.4 | 9.7 |
| **Natural Scientists** | na | Na |
| **Pharmacists** | 11.7 | 12.4 |
| **Teachers, College and University** | 5.3 | 10.9 |
| **Lawyers** | 3.9 | 8.1 |
| **Editors and Reporters** | 4.9 | 12..1 |

SOURCE:  Derived by the Texas State Data Center from the Census 2000 EEO Data available at the following site:  http://www.census.gov/eeo2000/index.html. Occupational codes are slightly different from those used in Table 1.
na = not available

The relative shortage of qualified minority professionals is translated into additional under-representation in leadership positions that are normally occupied by seasoned professionals.  In 2003, for example, minorities accounted for only 8.8% of the nearly 7,500 director seats among the Standard & Poor 1500 companies.[2]  Public universities such as The University of Texas at Austin bear a special responsibility in ensuring that "the path to leadership be visibly open to talented and qualified individuals."

DIVERSITY BROADLY CONSIDERED

The Court did not approve the pursuit of racial diversity alone, but only as part of a broader conception that values many forms of diversity.  "The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Grutter* , 123 S.Ct. at 2328-29 (quoting Justice Powell's opinion in *Regents of the Univ. of California v. Bakke*, 438 U.S. 265 (1978)).   Therefore, as the recommendations below will

---

[2] Chris Luna, "Companies need to do more to create diverse boardrooms," Dallas Morning News (27 April 2004): 11a.

demonstrate, consideration of race and ethnicity will serve as but one component of many in a holistic admission review of applicants to be graduate students, law students, or undergraduates.

## II. ADMISSIONS PROGRAMS TO BE NARROWLY TAILORED

### A. INDIVIDUAL CONSIDERATION

Universities may *not* set aside a fixed number of seats for minority applicants. *Bakke*; *Grutter*, 123 S.Ct. at 2342. They may *not* award a fixed number of points to minority applicants. *Gratz*, 123 S.Ct. at 2427-28. They may *not* put minority applications "on separate admissions tracks." *Grutter*, 123 S.Ct. at 2342. They may *not* consider race in a "mechanical" way. *Id.* at 2343. "Outright racial balancing" remains "patently unconstitutional." *Id.* at 2339. This proposal does not involve any of these proscribed methods.

What universities *may* do is "consider race or ethnicity more flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Id.* at 2343. The Court emphasized that the law school admission process was "highly individualized and holistic" for all races. *Id.* Any part of the admissions process that considers race must be individualized. But the Court clearly implies that a school could have color-blind admissions at the top and bottom of the distribution, and consider race on an individualized basis only in a discretionary zone in middle of the applicant pool. Gratz, 123 S.Ct. at 2429 n.21. In this proposal, individualized consideration will be used whenever a race-neutral method, such as the admission of the top decile of high school graduates, is not used.

### B. THE WEIGHT GIVEN TO RACE/ETHNICITY

The Court never specified how much weight can be given to race. It stated that race cannot be a guarantee of admission for all minimally qualified minority candidates. But it acknowledged that in "any plan that uses race as one of many factors," "race is likely outcome determinative for many members of minority groups." *Grutter,* 123 S.Ct. at 2371. The Court rejected the argument that race can be given no more weight than other diversity factors. It recognized that the Law School plan gave special attention to underrepresented minorities as "one particular type of diversity." *Id.* at 2342. It said that universities must consider "all pertinent elements of diversity, . . . although not necessarily according them the same weight." *Id.* at 2342, quoting Justice Powell in *Bakke*. The Court noted that the Harvard plan of the 1970s, which it endorsed, "gave greater weight to race than to some other factors."[3] *Id.* at 2342.

---

[3] Beyond that, the best evidence of what the Court is prepared to approve is what it actually did approve at Michigan's law school. The Court quoted the testimony of plaintiff's expert witness that race "is an extremely strong factor in the decision for acceptance," and that minority applicants "are given an extremely large allowance." *Id.* at 2334. But this expert also conceded "that race is not the predominant factor in the Law School's admissions calculus." *Id.* (Court's paraphrase). The Law School's expert testified that in 2000, 35% of underrepresented minority applicants were admitted, and that if race had not been

The Court requires that all admitted students be qualified, but also recognizes that who is qualified depends on standards that vary from school to school. The Court emphasized that the law school's "policy stresses that 'no applicant should be admitted unless we expect that applicant to do well enough to graduate with no serious academic problems'."*Id.* at 2332.

In this proposal, there is no intention that an unqualified applicant would ever be admitted. The position faced by The University of Texas at Austin is that for every degree program, there are many more qualified applicants than there are spaces, and there must be procedures in place to choose among many applicants who could be successful in their degree programs. None of the admissions programs described in this proposal assigns a specific weight to be given to race or ethnicity.

### C.   QUOTAS AND GOALS

The Court rejected quotas but approved of goals. "Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are reserved exclusively for certain minority groups." *Id.* at 2342, quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 496 (1989) (plurality opinion). "In contrast, 'a permissible goal . . . require[s] only a good-faith effort . . . to come within a range demarcated by the goal itself.'" *Grutter*, 123 S.Ct. at 23, quoting *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 495 (1987) (O'Connor J., concurring in part). The Court noted that the proportion of underrepresented minorities in the law school's entering class had varied from 13.5% to 20.1%, "a range inconsistent with a quota." *Grutter,* 123 S.Ct. at 2343.

Michigan's law school defined its goal as a "critical mass," and refused to specify a number. One official testified that "critical mass" meant "meaningful representation," and enough minority students to encourage minority participation in classroom discussion and to avoid feelings of racial isolation. *Id.* at 2333-2334. Justice Kennedy asserted that the law school had historically defined "critical mass" as at least 12% of the student body. The Court emphasized that minority enrollment varied from year to year and differed significantly from minority percentages in the applicant pool. *Id* at 2371. In her separate opinion in *Gratz*, Justice O'Connor added that "the weight attributed to a particular quality may vary from year to year depending on the 'mix' both of the student body and the applicants for the incoming class," again quoting Justice Powell. *Gratz,* 123 S.Ct. at 2432 (O'Connor J., concurring). The Court rejected the claim that commitment to "critical mass," however defined, turned the law school's plan into a quota.

Further, the Court's discourse makes clear that the goal (or critical mass), and the weight given to race, can take some account of the relative size and qualifications of different minority groups in the applicant pool.

---

considered, only 10% would have been admitted. *Id.*. Underrepresented minorities constituted 14.5% of the entering class; if race had not been considered, they would have been only 4% of the entering class. *Id.*

### D.  CONSIDERATION OF RACE-NEUTRAL ALTERNATIVES

The Court said that narrow tailoring requires "serious, good faith consideration of workable, race-neutral alternatives that will achieve the diversity the university seeks." *Grutter*, 123 S.Ct. at 2344.  University of Texas administrators have been struggling with these issues for many years, and in Texas, they have been experimenting with race-neutral alternatives for seven years.  Administrators already have a good idea of what has worked and what has not, and with what side effects and costs.  What is presented below, in condensed form, is a record of these judgments.

"Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative.  Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups."  *Id.* The Court indicates that an institution must use race-neutral alternatives only if they "serve the interest about as well."  *Id.*  An institution is not required to use race-neutral alternatives that would significantly lower admission standards, admit unqualified students, or impede other important educational objectives.

### E.  PERIODIC REVIEW

The Court also said that "race-conscious admissions policies must be limited in time."  *Id.* at 2346.  But it did not require universities to announce an arbitrary time limit in advance, nor did the Court set such a time limit.  Its much publicized reference to what might happen in 25 years is a prediction, not a time limit or a rule of law:

> Since [1978], the number of minority applicants with high grades and test scores has indeed increased.  We *expect* that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today.

*Id.* at 2347 (emphasis added).

What the Court did require is periodic review of our policies.  "[T]he durational requirement can be met by sunset provisions in race-conscious admissions policies and periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity."  *Id* at 2346.  The Court also said that schools "should draw on the most promising aspects" of race-neutral alternatives developed in other states.  *Id.*

This proposal establishes a schedule for periodic reviews to assess whether, and to what extent, consideration of race/ethnicity is still needed.

### F.  THE TOP 10% LAW

The constitutionality of percentage plans was not at issue in these cases, but they were offered as race-neutral alternatives that ended the need for consideration of race.  The Court squarely rejected that argument, noting that percentage plans do not work for graduate and professional schools and that they preclude individualized consideration of applicants,

and hinting that they may not be race neutral. *Id.* at 2345.  The University of Texas at Austin will comply with state laws affecting admissions, including the current requirement for automatic admission of students graduating in the top decile of an accredited high school.

The Top Ten Percent legislation affects only freshman undergraduate admissions. Because the admission processes for graduate students, law students, freshmen, and transfer are independent of one another, the present document is organized according to categories of students.  However, officials responsible for implementation in each category will consult with University's attorneys to assure full compliance with the law.

## III.    GRADUATE PROGRAMS (EXCLUDING LAW)

### A.  RATIONALE

An undergraduate education provides the foundation on which many students build and continue their intellectual development. Graduate training is essential to become proficient in a specific discipline, conduct advanced research, and contribute to the development of new knowledge.  The objectives of graduate study are to develop intellectual breadth, to obtain specialized training, and to develop the skills necessary to assume a role of leadership in the academic field of study and in society.  Emphasis is placed on the acquisition and development of knowledge, problem solving, methodologies for pursuing original research, teaching skills, intellectual leadership, and creative expression in the student's discipline.

To meet the objectives of graduate study, the educational environment must foster a robust exchange of ideas and provide exposure to differing perspectives.  In the absence of a diverse environment, graduates will not be prepared to meet the challenges of creating knowledge and becoming leaders in an increasingly diverse workforce and academy.  Conversely, creating a dynamic and diverse environment will help ensure that graduates are prepared to succeed, to prosper, to lead, and to shape the future.  Graduate degree programs produce the leaders in business (M.B.A.), education (Ed.D.), social work (M.S.S.W.), information (M.S.I.S.), research institutions and universities (Ph.D.). To have a visibly diverse class of leaders, it is important that graduate programs across the board educate a diverse group of students.

### B.  DIVERSITY BROADLY CONSIDERED

A diverse student body is not only racially and ethnically diverse, but also diverse in work experience, family and socioeconomic background, cultural background, language, leadership experience, creative experience, and artistic talent, to cite just a few examples. The section below lists a number of aspects of diversity that will be considered in the holistic, full-file review.

### C.  ADMISSION PROGRAM TO BE NARROWLY TAILORED

#### 1.  INDIVIDUAL CONSIDERATION

The Graduate School sets general policies and guidelines for admission and endorses the admission of students who meet both departmental and Graduate School admission criteria.  Although responsibility for graduate admissions ultimately rests with the Vice Provost and Dean of Graduate Studies, admission decisions are made by admissions committees at the graduate program and departmental levels.  These admission decisions are already holistic and based on the review of the full file.  Specifically, the decisions are based on (1) an assessment of the academic strength of the applicant's record and potential for advanced study and (2) an individualized, holistic review of each application that considers how the applicant might contribute to, and benefit from, the diversity of educational environment of the department of choice as well as the broader university.  Some departments also consider factors based on mandates and standards dictated by their fields and professions.  However, graduate programs and departments will not use any mechanical means to sort their applications.  For example, there will be no cutoff scores on standardized examinations such as the Graduate Record Examination.

The following basic criteria and additional personal factors are currently considered in making graduate admission decisions.  It must be emphasized that this list is not exhaustive and that certain graduate programs may weigh factors differently.  Indeed, for some programs, certain of these criteria might be deemed more important than others.  This proposal would add consideration of race and ethnicity to the other "special circumstances" under Additional Personal Factors.

Basic Admission Criteria

- Applicant's upper-division undergraduate grade point average
- Applicant's undergraduate education transcript(s)
- Applicant's GRE (or GMAT) scores
- Letters of reference
- Personal statement

Additional Personal Factors

- Personal statement (essay) and portfolio (if required)
  - Evidence of commitment to the field
  - Professional goals
  - Specific research interests (if pertinent to degree program)
- Publications or writing sample (if pertinent to degree program)
- Leadership
- Interviews
- Auditions (if pertinent to degree program)
- Extracurricular activities
- Professional memberships, awards, and honors
- Work experience
- Laboratory experience (if pertinent to degree program)
- Service to undergraduate institution or community
- Special circumstances, such as
  - Socioeconomic status of family

- Single parent
- Language spoken at home
- Family responsibilities
- Overcoming adversity, including disabilities
- Cultural background
- Other information in the file

### 2.  THE WEIGHT GIVEN TO RACE/ETHNICITY

Race or ethnicity would be added as one among the many factors considered as part of a holistic, full-file review.  No particular weight would be assigned to this factor, and the significance of this factor might vary from program to program.

### 3.  QUOTAS AND GOALS

Consideration of race and ethnicity in the admission process does not mean that members of particular racial or ethnic groups will be admitted automatically.  There will be no separate tracks for minority groups in the admission process.  Moreover, because the Supreme Court decision specifically excludes any automatic admission based on race or ethnicity, graduate programs will not participate in any arrangements or consortia that require <u>automatic</u> admission.

### 4.  CONSIDERATION OF RACE-NEUTRAL ALTERNATIVES

Graduate admissions policies and guidelines have been race-neutral since 1997, as a result of the court decision in the case of *Hopwood v. Texas,* 78 F.3d 932 (5th Cir. 1996) in 1996.  Following that decision, the Graduate School of The University of Texas at Austin attempted to achieve racial diversity by increasing its recruiting efforts and by initiating two race-neutral fellowship programs:  The McNair Scholars Fellowship Program and the South Texas Graduate Fellowship Program.

*McNair Scholars Fellowship Program*

The Ronald McNair Program is a national, race-neutral program that assists low-income and first-generation undergraduate college students who wish to prepare for graduate school.  Funded by the U.S. Department of Education, this program, named for the African American scientist and astronaut who was killed in 1986 accident of the space shuttle *Challenger*, offers selected undergraduates access to  research opportunities, faculty mentors, opportunities to publish and present research findings, and preparation for the Graduate Record Examination and graduate-level coursework.  It is an excellent undergraduate preparation for attending graduate school.

The McNair Scholars Fellowship Program was initiated by the Graduate School in 1999 to encourage undergraduate McNair participants to pursue a graduate education at The University of Texas at Austin.  To be eligible for the McNair Scholars Fellowship Program, applicants must be admitted to a graduate program at The University of Texas at Austin and must be nominated by the graduate adviser of the program of study.  The McNair Scholars Fellowship Program covers tuition and required fees for the first year of

study at the University.  This fellowship may be held in combination with any other appointment or fellowship.  McNair Fellows are also eligible for an application fee waiver when applying for admission to the Graduate School.

A total of 35 McNair Fellows have received first-year graduate school support since the program's inception in 1999.  Table 3 indicates that the largest portion of McNair Fellows are Hispanics (43%), followed by whites (26%), and African Americans (17%).

**Table 3**
**McNair Fellowships**

|  | 1999 | | 2000 | | 2001 | | 2002 | | 2003 | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | N | % | N | % | N | % | N | % |
| White | 1 | 33.33 |  |  | 1 | 14.28 | 3 | 37.5 | 4 | 40 |
| Native American |  |  | 1 | 14.28 |  |  |  |  |  |  |
| African American | 1 | 33.33 | 1 | 14.28 | 2 | 28.57 | 1 | 12.5 | 1 | 10 |
| Asian American |  |  | 2 | 28.57 |  |  |  |  |  |  |
| Hispanic | 1 | 33.33 | 2 | 28.57 | 3 | 42.86 | 4 | 50 | 5 | 50 |
| International |  |  |  |  | 1 | 14.28 |  |  |  |  |
| Unknown |  |  | 1 | 14.28 |  |  |  |  |  |  |
| Total | 3 | 100 | 7 | 100 | 7 | 100 | 8 | 100 | 10 | 100 |

Source: Office of Graduate Studies, The University of Texas at Austin

*South Texas Graduate Fellowship Program*

The South Texas Graduate Fellowship Program is a race-neutral program instituted at the University in Fall, 2002.  It offers first-year fellowships to students who have graduated, or who are graduating, from a public university in South Texas (including Bexar County) and who enter a master's or doctoral program at The University of Texas at Austin.  These merit-based fellowships are awarded to outstanding incoming graduate students, allow recipients who are not Texas residents to pay in-state tuition, may be held in combination with any other appointment or fellowship, and require recipients to register as full-time students for the duration of the award.

To be eligible, an applicant must be nominated by the graduate adviser of a particular graduate program, must be a full-time graduate student in good academic standing, and must have received an undergraduate degree from one of the following institutions:

> The University of Texas at Brownsville
> The University of Texas - Pan American

The University of Texas at San Antonio
Texas A&M University - Corpus Christi
Texas A&M University - Kingsville
Texas A&M International University - Laredo

A total of 40 South Texas Graduate Fellows have been funded at The University of Texas at Austin since the program's inception in 2002.  Table 4 indicates that the largest portion of South Texas Graduate Fellows are Hispanics (63%), followed by whites (35%).

**Table 4**
**South Texas Graduate Fellows**

|  | 2002 | | 2003 | |
| --- | --- | --- | --- | --- |
|  | N | % | N | % |
| White | 9 | 45 | 5 | 25 |
| Native American |  |  |  |  |
| African American |  |  |  |  |
| Asian American |  |  | 1 | 5 |
| Hispanic | 11 | 55 | 14 | 70 |
| International |  |  |  |  |
| Unknown |  |  |  |  |
| Total | 20 | 100 | 20 | 100 |

SOURCE: Office of Graduate Studies, The University of Texas at Austin

No other race-neutral alternatives have appeared to be feasible for graduate programs.  There is no workable equivalent to a percentage plan that would work for graduate studies.  Moreover, the competition for good graduate students is especially intense, and most of the nation's excellent graduate schools were neither limited to race-neutral methods nor were as limited in graduate fellowship funding as The University of Texas at Austin has been.  The result is that the Graduate School has not been successful in achieving racial diversity.

Prior to the *Hopwood* decision, enrollment percentages for African Americans and Hispanics in graduate programs were marginal at best.  Since that time, these percentages have decreased substantially and remain below the 1996 levels, demonstrating that the current race-neutral admission model has failed to yield a racially diverse student body or to achieve "critical mass."

Table 5 shows the characteristics of entrants to graduate programs for Fall, 2003, compared with earlier years.  The 2003 data indicate that of the entrants, 0.3% were

11

Native Americans, 2.2% were African Americans, and 8.1% were Hispanics.  By comparison, the 1996 data indicate 0.3% enrollment for Native Americans, 3.6% for African Americans, and 8.1% for Hispanics.  (See Table 5.)  Over this period of time, the absolute number of African American entrants declined from 103 to 76.  The absolute number of Hispanic entrants rose from 243 to 276, but this was not so large an increase as that of the entering graduate population.

**Table 5**
**Graduate Fall and Summer Entrants Combined**
**1996-2003**

| | 1996 | | 1997 | | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | | 2003 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | N | % | % | N | % | N | % | N | % |
| White | 1,803 | 63.0 | 1,829 | 63.0 | 1,685 | 58.1 | 1,673 | 54.5 | 1,722 | 55.7 | 1,685 | 54.1 | 1,853 | 53.3 | 1,946 | 57.3 |
| Native American | 10 | .3 | 10 | .3 | 16 | .6 | 12 | .4 | 9 | .3 | 9 | .3 | 7 | .2 | 10 | .3 |
| African American | 103 | 3.6 | 69 | 2.4 | 63 | 2.2 | 63 | 2.1 | 76 | 2.5 | 56 | 1.8 | 78 | 2.2 | 76 | 2.2 |
| Asian American | 142 | 5.0 | 129 | 4.4 | 148 | 5.1 | 187 | 6.1 | 167 | 5.4 | 178 | 5.7 | 238 | 6.9 | 233 | 6.9 |
| Hispanic | 243 | 8.5 | 206 | 7.1 | 169 | 5.8 | 197 | 6.4 | 190 | 6.1 | 226 | 7.3 | 270 | 7.8 | 276 | 8.1 |
| International | 561 | 19.6 | 662 | 22.8 | 779 | 26.8 | 876 | 28.5 | 873 | 28.2 | 871 | 28.0 | 916 | 26.4 | 753 | 22.2 |
| Unknown | | | | | 42 | 1.4 | 63 | 2.1 | 54 | 1.7 | 87 | 2.8 | 112 | 3.2 | 105 | 3.1 |
| Total | 2,862 | 100 | 2,905 | 100 | 2,902 | 100 | 3,071 | 100 | 3,091 | 100 | 3,112 | 100 | 3,474 | 100 | 3,399 | 100 |

**SOURCE:** Office of Institutional Research, The University of Texas at Austin, Statistical Handbook, 2002-2003 edition

The failure of race-neutral strategies is also apparent in the total enrollment among the thirteen colleges and schools at The University of Texas at Austin with graduate programs (excluding the School of Law, which is covered separately in Section IV).  Thus for Fall, 2002, five of the colleges and schools had one or no Native Americans enrolled in graduate programs, two had one or no Hispanic students enrolled in doctoral programs, and six had one or no African Americans enrolled in doctoral programs.  Table 6 indicates that the educational benefits of racial diversity are not available for the graduate students in many of the graduate programs at U.T.-Austin.

Within the colleges and schools, the lack of minority student representation at the program level is even more revealing.  For the same period (Fall, 2002), 95% of the 127 graduate programs (excluding Law) at The University of Texas at Austin had one or no Native American students, 77% had one or no African American, and 45% had one or no Hispanics.  The situation was similar in Fall, 2003, when 97% of the graduate programs had one or no Native Americans, 73% had one or no African Americans, and 47% had one or no Hispanics.  Many of The University of Texas at Austin graduate programs, therefore, approach what the Supreme Court has called "the inexorable zero." *Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977).

12

**Table 6**
**Graduate Fall 2002 Enrollment by College, Level, Ethnicity, and Gender**

| COLLEGE | LEVEL | White N | Native American N | African American N | Asian American N | Hispanic N | International* N | Unknown N | Total N |
|---|---|---|---|---|---|---|---|---|---|
| ARCHITECTURE | M | 127 | | 5 | 9 | 13 | 43 | 3 | 200 |
| | D | 6 | | | 1 | 1 | 6 | | 14 |
| | Total | 133 | | 5 | 10 | 14 | 49 | 3 | 214 |
| BUSINESS ADMIN | M | 826 | 5 | 20 | 177 | 80 | 324 | 56 | 1,488 |
| | D | 31 | 1 | 1 | 3 | 2 | 72 | 2 | 112 |
| | Total | 857 | 6 | 21 | 180 | 82 | 396 | 58 | 1,600 |
| COMMUNICATION | M | 217 | 1 | 6 | 16 | 36 | 66 | 13 | 355 |
| | D | 111 | 1 | 14 | 12 | 16 | 65 | 5 | 224 |
| | Total | 328 | 2 | 20 | 28 | 52 | 131 | 18 | 579 |
| EDUCATION | M | 355 | 1 | 26 | 13 | 74 | 85 | 13 | 567 |
| | D | 453 | 6 | 64 | 20 | 106 | 119 | 10 | 778 |
| | Total | 808 | 7 | 90 | 33 | 180 | 204 | 23 | 1,345 |
| ENGINEERING | M | 363 | 1 | 8 | 65 | 31 | 449 | 9 | 926 |
| | D | 243 | 3 | 5 | 37 | 20 | 651 | 8 | 967 |
| | Total | 606 | 4 | 13 | 102 | 51 | 1,100 | 17 | 1,893 |
| FINE ARTS | M | 252 | 1 | 5 | 4 | 24 | 50 | 10 | 346 |
| | D | 187 | | | 12 | 17 | 86 | 6 | 308 |
| | Total | 439 | 1 | 5 | 16 | 41 | 136 | 16 | 654 |
| INFORMATION** | M | 179 | | 2 | 4 | 27 | 30 | 9 | 251 |
| | D | 26 | | | 1 | 3 | 10 | | 40 |
| | Total | 205 | | 2 | 5 | 30 | 40 | 9 | 291 |
| LAW | | 1,070 | | 7 | 54 | 87 | 150 | 49 | 69 | 1,486 |
| LIBERAL ARTS | M | 360 | 1 | 7 | 22 | 65 | 95 | 15 | 565 |
| | D | 710 | 6 | 32 | 30 | 97 | 271 | 20 | 1,166 |
| | Total | 1,070 | 7 | 39 | 52 | 162 | 366 | 35 | 1,731 |
| NATURAL SCIENCES | M | 300 | 1 | 2 | 21 | 22 | 183 | 19 | 548 |
| | D | 440 | 2 | 1 | 37 | 14 | 494 | 12 | 1,000 |
| | Total | 740 | 3 | 3 | 58 | 36 | 677 | 31 | 1,548 |
| NURSING | M | 120 | | 8 | 7 | 19 | 4 | 6 | 164 |
| | D | 21 | | 3 | 2 | 4 | 8 | | 38 |
| | Total | 141 | | 11 | 9 | 23 | 12 | 6 | 202 |
| PHARMACY | M | 17 | | | | 3 | 3 | 1 | 24 |
| | D | 23 | | 4 | 6 | 8 | 46 | | 87 |
| | Pharm D | 121 | 1 | 7 | 58 | 44 | 1 | 3 | 235 |
| | Total | 161 | 1 | 11 | 64 | 55 | 50 | 4 | 346 |
| PUBLIC AFFAIRS | M | 130 | 2 | 10 | 11 | 18 | 35 | 5 | 211 |
| | D | 9 | | 1 | | 1 | 12 | 1 | 24 |
| | Total | 139 | 2 | 11 | 11 | 19 | 47 | 6 | 235 |
| SOCIAL WORK | M | 211 | 2 | 11 | 9 | 42 | 13 | 14 | 302 |
| | D | 29 | | 6 | 3 | 4 | 17 | 2 | 61 |
| | Total | 240 | 2 | 17 | 12 | 46 | 30 | 16 | 363 |
| INTERCOLLEGIAL PROGRAMS | M | 46 | | | 6 | 5 | 8 | 3 | 68 |
| | D | 18 | | | | 1 | 24 | 2 | 45 |
| | Total | 64 | | | 6 | 6 | 32 | 5 | 113 |
| TOTAL UT AUSTIN | M | 3,503 | 15 | 110 | 364 | 459 | 1,388 | 176 | 6,015 |
| | D | 2,307 | 19 | 131 | 164 | 294 | 1,881 | 68 | 4,864 |
| | Pharm D | 121 | 1 | 7 | 58 | 44 | 1 | 3 | 235 |
| | Law | 1,070 | | 7 | 54 | 87 | 150 | 49 | 69 | 1,486 |
| | Total | 7,001 | 42 | 302 | 673 | 947 | 3,319 | 316 | 12,600 |

M=Master's   D=Doctoral   PharmD=Doctor of Pharmacy   T=Total
*   International student figures include foreign exchange students.
**  In Fall 2002, the Graduate School of Library and Information Science was renamed the School of Information.
Note:  Intercollegial Programs are administered by the Graduate School, as opposed to one of the academic colleges/schools.

**SOURCE:** Office of Institutional Research, The University of Texas at Austin, Statistical Handbook, 2002-2003 edition

Using 1997-2002 data from the Office of Graduate Studies, Table 7 provides further evidence of the failure of race-neutral policies at the graduate level.  The table reveals that the doctoral degrees awarded to African Americans during those years are concentrated in just a few colleges.  Essentially, four colleges have graduated 90% (n=93) of all African American students earning PhDs and EdDs during those five years.  This is a compelling example of how, under race-neutral policies, there is a lack of African American doctoral students across the disciplines and a corresponding lack of opportunity for students in all disciplines to engage in learning in the context of diverse points of view, experiences, and values.

**Table 7**
**PhDs and EdDs Awarded to African Americans, 1997-2002**

| College/School | Number | Percent |
|---|---|---|
| School of Architecture | 0 | 0.0 |
| McCombs School of Business | 0 | 0.0 |
| LBJ School of Public Affairs | 0 | 0.0 |
| School of Nursing | 0 | 0.0 |
| College of Fine Arts | 1 | 1.1 |
| School of Information | 1 | 1.1 |
| College of Pharmacy | 1 | 1.1 |
| School of Social Work | 2 | 2.2 |
| College of Natural Sciences | 4 | 4.3 |
| College of Engineering | 6 | 6.5 |
| College of Communication | 9 | 9.7 |
| College of Liberal Arts | 19 | 20.4 |
| College of Education | 50 | 53.8 |
| Total | 93 | |

SOURCE: Office of Graduate Studies, The University of Texas at Austin

While the University cannot claim to have achieved racial diversity in graduate programs prior to the *Hopwood* decision, student data from the seven race-neutral years since *Hopwood* indicate even less diversity.  Race-neutral admission policies have not only failed to increase racial diversity, they have also exacerbated the appearance that the University is largely closed to nonwhite applicants and does not provide a welcoming, supportive environment to underrepresented minority students.  The Graduate School is committed to continuing race-neutral programs such as the McNair and South Texas initiatives in order to build upon their strengths.  However, such race-neutral programs cannot by themselves bring the University to "critical mass."

14

## 5. PERIODIC REVIEW

The proposed policy will be reviewed every five years, with the next review beginning in Fall, 2009.

## 6. CONCLUSION

In *Grutter v. Bollinger* and *Gratz v. Bollinger*, the Supreme Court upheld the constitutionality of race-conscious admission policies designed to promote diversity in higher education. The decisions are supported by the following statements:

> "Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." *Grutter*, 123 S.Ct. at 2340-41.

> "We have repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to 'sustaining our political and cultural heritage' with a fundamental role in maintaining the fabric of society . . . For this reason, the diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals regardless of race or ethnicity." *Id.* at 2340.

> [Higher education] "must be inclusive of talented and qualified individuals of every race and ethnicity, so that all members of our heterogeneous society may participate in the educational institutions that provide the training and education necessary to succeed in America." *Id.* at 2341.

Together, these Supreme Court decisions affirm the importance of achieving racial diversity. The major requirement of the Court is that students be considered individually and holistically. In addition, the Court's decisions validate a university's need to seek more than token numbers of minority students and to reach instead an appropriate "critical mass" in order to achieve educational objectives.

Instituting race-conscious graduate admission policies is not only a legitimate goal for The University of Texas at Austin, it is a societal imperative, especially in the State of Texas. Employers both want and need graduates who can function effectively in an environment that is increasingly global and multicultural in almost all fields. Population projections indicate that racial diversity in Texas and across the United States will continue to grow, and that eventually most large urban populations will have a majority of people of color. Given these inevitabilities, it is critical that graduate students at The University of Texas at Austin experience a learning environment that provides exposure to diverse ideas and cultures, in addition to an opportunity for leadership development in a complex, multifaceted world.

The enrollment data presented with this proposal demonstrate emphatically that the Graduate School has not reached the "effective participation" or "critical mass" referred to in recent Supreme Court decisions. Not only have the percentages of Native Americans, African Americans, and Hispanics in the total graduate enrollment decreased

in the years since race-neutral polices were mandated by the courts, but in a preponderance of the graduate programs at the University, representation of Native Americans, African Americans, and Hispanics is either negligible or absent.

The Graduate School of The University of Texas at Austin should keep the best of what it has developed in the years since *Hopwood*. However, based on recent Supreme Court decisions, the Graduate School should also resume consideration of race and ethnicity to ensure the creation of a diverse graduate student body.

### Proposed Race-Conscious Graduate Admission Policy

As authorized by the Board of Regents, The University of Texas at Austin has reviewed its graduate admission policies to determine the success of race-neutral alternatives to affirmative action. Having completed that review, the University submits the following proposal to add race and ethnicity as considerations in the current holistic review of applications for admission to all graduate programs administered by the Office of Graduate Studies at The University of Texas at Austin.

### IV.     SCHOOL OF LAW

#### A.  RATIONALE

*Grutter v. Bollinger*, 123 S.Ct. 2325 (2003), and *Gratz v. Bollinger*, 123 S.Ct. 2411 (2003), hold that public universities and their components (which include the Law School) have a compelling interest in diversity in their student bodies, including but not limited to racial and ethnic diversity.

The Court recognized diversity in two distinct senses. One is diversity in the classroom, which requires sufficient numbers of minority students to reveal the diverse viewpoints among them. See *id.* at 2341. With respect to African Americans, even the 2003 experience is marginal for this purpose. The first-year Law School class at The University of Texas at Austin is divided into four sections, each of which is further divided into three or four small sections for one class. These small-section classes are a hugely expensive investment in first-year instruction; the Law School makes this investment because of the faculty's judgment that the small sections are such an important part of first-year instruction that the investment is justified. Thirty African American students divided among twelve to sixteen small sections means one or two, occasionally three, African American students in each small section. Such numbers do not serve the pedagogic purposes of a critical mass.

The Court's second meaning of diversity is that "the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Id.* On this criterion, a critical mass in Texas is necessarily larger than a critical mass in Michigan. A majority of the college-age population in Texas is African American or Hispanic, and this percentage has increased sharply in the years since *Hopwood*. (These data were computed from www.census.gov.) Even if the Law School believed that its 2003 minority numbers were sustainable, those numbers in 2003 left minority students much more underrepresented than they were with similar numbers in 1990 or 1992. As the state's minority population grows,

the numbers needed to create the visible appearance of openness in the Law School also grows.  Tables 1 and 2, above, show that Black and Hispanic minority groups remain substantially underrepresented among attorneys in Texas and in the nation.

## B. DIVERSITY BROADLY CONSIDERED

Historically, the Law School gave special consideration to African Americans and Mexican Americans.  The rationale was that these were the two groups with an historic claim on Texas.  These groups had lived in the state and been the targets of discrimination in the state for a very long time.  That is a past-discrimination rationale; it is not *Grutter's* rationale.

*Grutter's* rationale is diversity, very broadly defined.  On *Grutter's* rationale, any identifiable and underrepresented group contributes to diversity and is as much deserving of affirmative action as African Americans and Mexican Americans.  The most important implication of this rationale is that an ethnicity classification should now extend to all Hispanics, not just Mexican Americans.

In addition, the School of Law, through its holistic, full-file review, will consider a variety of characteristics besides race and ethnicity that may fairly be considered contributors to diversity.

## C. ADMISSIONS PROGRAMS TO BE NARROWLY TAILORED

### 1. INDIVIDUAL CONSIDERATION

The Supreme Court requires that any consideration of race or ethnicity take place in the context of a selection process that is "highly individualized" and "holistic."  *Grutter*, 123 S.Ct. at 2343.  The Law School may consider race or ethnicity more flexibly "as a 'plus' factor in the context of individualized consideration of each and every applicant."  *Id*. at 2342.  This individualized review must give each applicant an opportunity to explain the ways in which he or she might contribute to diversity, and all those diverse contributions must be considered--not just racial diversity, but all forms of intellectual and experiential diversity.  The Law School's existing essays and full-file review appear to satisfy these requirements.

a.  Evidence of individualized consideration

In upholding the admission process at the University of Michigan Law School, the Court relied on evidence that "the Law School frequently accepts nonminority applicants with grades and test scores lower than underrepresented minority applicants (and other nonminority applicants) who are selected."  *Id*. at 2330.  Such evidence may be the most effective and objective way to prove that diversity factors other than race and ethnicity genuinely matter.  As a consequence of the Law School's serious commitment to the Court's broad conception of diversity, there will be white and Asian applicants admitted from the same range of grades and test scores as underrepresented minority candidates benefiting from affirmative action.

17

b.  No guarantees

The Law School cannot make decisions in a way that guarantees admission to all or generally all minority applicants with at least minimum qualifications.  This means that some qualified minority applicants must be rejected.  This may also mean slower progress in terms of racial diversity, but to the Court, it is essential evidence that underrepresented minority candidates are in genuine competition with white and Asian candidates.

c.  Separate admission tracks

The rule against separate admission tracks does not preclude separate tracks if applicants are sorted into the tracks on a completely color-blind basis.  For example, as a matter of federal law the Law School could have a portion of the process at the top or bottom of the applicant pool that is color-blind and mechanical.  (At the undergraduate level, the Texas Top 10% Plan is a color-blind and mechanical separate track.)  The Law School, however, does not desire to create such a separate track.  Therefore, the Law School will abandon the process in which some admission application files were diverted to review by faculty panel.  All files will be reviewed in one unified administrative process.

## 2.  THE WEIGHT GIVEN TO RACE/ETHNICITY

It is impossible to specify with any precision how much weight should be given to race.  It is even difficult to measure how much weight has been given to race in any given year.  The Court is clear in *Grutter* that race may carry more weight than other diversity factors.  The Court is equally clear that race cannot effectively guarantee admission to all qualified minority applicants, or have a fixed or mechanical weight in the process.

A principal justification for renewed consideration of race is that, by considering race directly, the Law School will be able to admit stronger minority candidates and fewer minority candidates who are weaker but fit some proxy.  This implies a floor under affirmative action:  as compared to 2002 and 2003, the Law School should admit fewer applicants with academic credentials well below the main body of the entering class.  (*Texas Education Code* §51.822 precludes rejecting any applicant wholly or principally because of his or her LSAT score, but it does not preclude rejection of candidates who still appear weak after full-file review.)

Of course, the Law School should also keep the benefit of what has been learned in the seven years since *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996).  It has honed its recruiting skills and its prelaw institutes are expanding the applicant pool.  It seems reasonable to expect that the Law School can increase minority enrollment while giving race somewhat less weight than in the era before *Hopwood.*

## 3.  QUOTAS AND GOALS

No part of this review will be mechanical.  The Law School will *not* set aside a fixed number of seats for minority applicants.  It will *not* award a fixed number of points to minority applicants.  It will *not* put minority applications "on separate admissions tracks."  It

will *not* consider race in a "mechanical" way. "Outright racial balancing" remains "patently unconstitutional." *Id*. at 2339.

### 4. CONSIDERATION OF RACE-NEUTRAL ALTERNATIVES

Before considering race in admission, a school must give "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Grutter*, 123 S.Ct. at 2345. However, a school need not use race-neutral alternatives that sacrifice academic excellence or that do not work "about as well" as considering race. *Id*. at 2344. Thus, the Law School may consider both the degree of diversity achieved with race-neutral alternatives and the academic cost of achieving diversity with those methods as compared to direct consideration of race. The resolution at the meeting of the Board of Regents on August 7, 2003, directs The University to consider both costs and benefits.

The Law School has used a variety of race-neutral alternatives for the seven years, from 1997 to 2003, since *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996). In 1996, the school considered race for part of the admission season, before *Hopwood* was decided and again after the court issued a stay. Below is a summary of the costs and benefits of race-neutral alternatives experienced by the Law School over the seven race-neutral years.

*The Extent of Diversity Achieved*

The district court opinion in *Hopwood*, 999 F.Supp. 561 (W.D. Tex. 1994), reports enrollment data for African Americans and Mexican Americans back to 1983. The Law School has similar data for the years since the opinion. Thus enrollment data for over fourteen years are available. Enrollment of these two minority groups fluctuated widely during these fourteen years. Despite aggressive efforts with race-neutral alternatives, for six of the seven race-neutral years (1997 to 2002), enrollment did not reach the lowest levels achieved in any of the fourteen affirmative-action years for either group. In 2003, the Law School re-entered that range. African American enrollment at 6% remained below the mean for the affirmative action years. Mexican American enrollment at 13.9% was, at least for 2003, near the high end of the range of the affirmative action years.

The experience of 2003 does not appear to represent a new status quo that can reliably be replicated. Nonfarm employment peaked in February, 2001, and total employment declined more or less continuously from then until the arrival of the 2003 entering class. (These data are available at http://data/bls.gov/cgi-bin/surveymost.) Such weak economic conditions limit the job opportunities of new college graduates, reduce the opportunity costs of continued education, and thus lead to higher application rates and higher yield rates. The number of applications from whites and African Americans increased sharply in 2002, and modestly further in 2003 (although African American applications still remained well below their range for the affirmative action years). The number of applications from Mexican Americans increased sharply in 2003. Yield (the percentage of offers of admission that are accepted) increased for all ethnic groups, but most dramatically for underrepresented minorities. The 2003 yields for African Americans and Mexican Americans exceeded any levels seen in the sixteen years for which the Law School

19

has yield records; in the case of African Americans, the 2003 yield exceeded the previous high by a large margin. These very high yields presumably reflect the economy; there is no reason to believe that either the application rate or the yield rate will continue at these high levels once the economy improves.

High yields can also result from making offers to applicants deeper in the applicant pool. Such offers are a cost of relying on race-neutral alternatives, as explained below. The one point to make here is that in 2002, the Law School went even deeper into the pool than in 2003 but enrolled many fewer minority students. This is further evidence that aggressive use of race-neutral alternatives does not necessarily produce diverse enrollment, and that the continuing weak economy played a major role in The University's 2003 enrollment.

*The Costs of Race-Neutral Alternatives*

Over the past seven years, the Law School has developed an array of race-neutral alternatives. The most important of these are the prelaw programs at University of Texas System institutions in El Paso, San Antonio, and the Rio Grande Valley, which help to strengthen the pool of minority applicants. The University of Texas at El Paso, The University of Texas at San Antonio, and The University of Texas-Pan American each conducts a pre-law program ("Institute") to assist students with law school preparation. The institutes provide an intensive pre-law curriculum that includes the study of legal research and writing and LSAT preparation. In addition, students are given an introduction to first-year law courses such as "Contracts" and "Torts" to enhance the analytical skills of the students and to improve their written and oral communication skills. The Law School of The University of Texas at Austin has partnered with these institutes by offering instruction from its faculty and by providing financial support. The dean and other administrative staff visit each campus each year. These schools were selected because they serve regions of the state that produce few law students and few lawyers. However, the Law School has no similar program to serve African Americans because there is no similar race-neutral criterion to justify such a program in race-neutral terms. To create such a program that targets African Americans, race would have to be considered explicitly.

A second important part of the Law School's effort has been ever-more-intense recruiting of minority students. There is broad agreement that this should continue.

A third and critical feature of any race-neutral pursuit of diversity is the identification of proxies for minority status. In Texas, the most important such proxy has been geography. Preferring applicants from certain regions of the state increases the number of minority students, especially Mexican Americans.

Affirmative action by proxy has a large cost that has been little understood. In such a system, the Law School must pass over strong minority applicants who do not fit the proxy and admit weaker applicants of all ethnicities who do fit the proxy. Once this is understood, one would predict that effective use of any strong proxy for minority status would result in a somewhat weaker class, with a larger gap between white and minority students, as compared to admission based principally on academic criteria and ethnicity. This prediction is confirmed by enrollment data.

20

The *Hopwood* trial focused on the class admitted in 1992.  At that time, the Law School considered applicants in light of the Texas Index, calculated as LSAT score plus ten times undergraduate grade point average (GPA).  The coefficients in the Texas Index changed over the years, and the Law School no longer uses it in the admission process, but the data for calculating it are still available.  In the study undertaken to support the present proposal to change the Law School admission process, the 1992 formula was used to recalculate the Texas Index for the lower ranges of more recent enrolled classes.  Data for four groups of years were compared:  1992-96 (when the Law School considered race in admission); 1997-99 (the years with the fewest minority students); 2000-02 (years with somewhat more minority students, but still fewer than the lowest years of affirmative action); and 2003.  Although there appeared to be some random fluctuation year-by-year, clear patterns emerged in comparing the groups of years.

Achieving diversity by race-neutral means requires a longer "tail," with more students in the tail.  Even though the applicant pool tends to get stronger over time, and even though in 2002 and 2003 the Law School had an unusually large number of applications and offered admission to a smaller percentage of applicants, the school enrolled more students with low and very low Texas Indexes than eight to twelve years ago when race was explicitly considered.  And inevitably (because decisions were made on a race-neutral basis), a notably higher percentage of students admitted with low Texas Index scores were white.

The gap in entering credentials between white and underrepresented minority students was larger in 2003 than in the affirmative action years.  The growth in the gap was modest on some measures and larger on other measures, but the direction was uniform.  On every measure--every combination of means, medians, LSAT scores, GPAs, African Americans, Mexican Americans--the gap increased.  It has increased because many of the strongest minority students could not be admitted.  If they were not strong enough to be admitted without consideration of race and they did not fit a race-neutral proxy, they could not be admitted.

For nearly fifteen years, from the early 1980s to the *Hopwood* decision in 1996, the central goal of the Law School admission policy was to maintain diversity while gradually shrinking the credential gap between white and minority students.  Shrinking the gap produces a better educational experience, better race relations within the Law School, and more successful minority students and minority lawyers.  Reversing that trend and expanding the gap is a high cost to pay for the use of alternatives that are formally race-neutral.

Another adverse consequence of using race-neutral admission has been the negative effect on the admission of out-of-state minority students.  In the affirmative action years, African American students came to the Law School from Texas and from out-of-state, both in substantial numbers; since *Hopwood*, the Law School has had very few nonresident African American students.  In 2003, it had only one.  This was a loss of an important source of diversity, especially in the broad sense in which the Supreme Court defines the concept.

Another formally race-neutral method that has been essential to success is that the Law School privatized a large portion of its financial aid effort. Friends of the Law School raised and administered funds for minority scholarships. Of course, this is race-neutral only at the level of state action. Privatization has the significant cost that the Law School surrenders control of an important part of its mission. Financial aid affects recruiting and matriculation; it affects students' satisfaction and ability to succeed after they come to the Law School; and it affects their debt load and prospects after they graduate. If the Law School resumes consideration of race, it can resume responsibility for an important part of its obligation to its students.

*Adequate Levels of Diversity*

If the Law School believed that 2003 levels of diversity were sustainable, and if it believed that these levels of diversity had been achieved at acceptable cost, should it claim success and conclude that race-neutral alternatives are adequate? The answer is "No." Recovering to what the Law School achieved eight to twelve years ago is not a reasonable measure of success.

The Supreme Court in *Grutter* approved pursuit of what the University of Michigan called a "critical mass" of minority students. The Court did not define "critical mass." The Court's emphatic rejection of quotas necessarily implies that a critical mass cannot be defined in terms of a specific number. 123 S.Ct. at 2339. The Court approved the affirmative action effort at Michigan's Law School, which in practice had produced enrollment of underrepresented minorities ranging from 13.5% to 20.1% of the entering class. The Law School at The University of Texas at Austin did not reach even the bottom of that range in any post-*Hopwood* year before 2003; it was within that range in 2003.

It is of course unconstitutional to use affirmative action in pursuit of racial balance. Racial balance is not at issue in the Law School; the school has never come close to racial balance, and it has never sought racial balance as a goal to be achieved with affirmative action. But the magnitude of underrepresentation matters. To be "visibly open" is in part a matter of appearances. When minority population grows steadily but minority enrollment in the Law School does not, the school does not appear to be visibly open. To the minority community, the Law School may even appear to have a cap on minority enrollment. A critical mass of minority students at Texas would be a somewhat higher percentage than has been achieved to date.

## 5. PERIODIC REVIEW

Both the Court's opinions and the Regents' resolution require periodic review of any program that considers race. The Law School will continue to monitor its experience, along with population data and experience elsewhere, and will be prepared to abandon consideration of race if diversity can be achieved at reasonable cost by some race-neutral means. The proposed policy will be reviewed every five years, with the next review beginning in Fall, 2009.

## 6.  CONCLUSION

Minority enrollment levels of 2003 are probably not sustainable by the Law School, were achieved at high academic cost, and did not yet represent a critical mass.  The Law School should keep the best of what it has developed, especially the prelaw programs and its more intensive recruiting efforts.  Success in these efforts should reduce the extent to which race must be considered.  Resumption of modest consideration of race and resumption of the goal of reducing the gap between minority students and white students should enable the Law School to reduce the number of offers to marginal applicants and increase the strength of the class.

### *Proposed Race-Conscious Admission Policy  for the School of Law*

The following admission plan is proposed for the School of Law ("Law School") at The University of Texas at Austin.

1.    The Law School will continue full-file review of each admission application as described in the 2004 *Admissions Bulletin*.

2.    The Law School will add "race and ethnicity" to the list of factors to be considered.

3.    The Law School will end the traditional procedure by which some admission application files are diverted to review by panels of faculty members.  All files will be reviewed in one unified administrative process.

### V.    UNDERGRADUATE ADMISSIONS

### A.  RATIONALE

A comprehensive college education requires a robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of competencies required of future leaders.  This type of academic environment is a goal of The University of Texas at Austin and admission decisions must take into account this goal.  The University of Texas at Austin handles a very large number of undergraduate applications and must select from among a highly qualified pool only the number of students it can accommodate.  In light of the institutional goal, admission decisions result from both an assessment of the academic strength of each applicant's record and an individualized, holistic review of each applicant, taking into consideration the many ways in which the academically qualified individual might contribute to, and benefit from, the rich, diverse, and challenging educational environment of the University.

Following the decision made in *Hopwood v. Texas*, 78F.3d 932 (5th Cir. 1996), The University of Texas at Austin has made good faith efforts to achieve racial and ethnic diversity through a three-pronged, race-neutral process for freshman admission: the holistic evaluation of individual applications, the aggressive implementation of the Texas "Top 10% Law" (House Bill 588 of the 75th Regular Session of the Texas Legislature), and the Longhorn Opportunity Scholarship program. Pre-*Hopwood* diversity

levels were not restored until 1999, when all three of the admission initiatives had been fully implemented.  But restoration to pre-*Hopwood* levels is not sufficient.

In the case of *Grutter v. Bollinger*, the Supreme Court gave institutions of higher education direction as to when race-conscious admission policies are appropriate: considering race and ethnicity is acceptable if doing so is consistent with the institution's mission and there is a compelling educational reason for achieving a more diversified student body.  The Court accepted the principle of a "critical mass" of underrepresented minority students.  The ruling instructed institutions not to use what has been called "racial balancing" or to try to match campus racial and ethnic representation with that of a political entity such as a city or state.  Instead, the Court allowed for an investigation into whether there is a critical mass of minority students in the educational setting.

In *Grutter*, the Court clearly recognized the educational value of diversity at the classroom level (e.g., robust exchange of ideas, more spirited discussions, etc.).  This renewed and Court-sanctioned emphasis on educational benefits prompted the University to examine minority representation in undergraduate courses.  Results indicate that, in a large percentage of those courses, some minority groups are represented by only one student or by none at all.  The University of Texas at Austin did not have a critical mass of minority students sufficient to provide an optimal educational experience in 1996 (the pre-*Hopwood* period), and after seven years of good faith race-neutral admission policies, the University still has not reached a critical mass at the classroom level.[4]

If The University of Texas at Austin is to accomplish its mission and fulfill its flagship role, it must prepare its students to be the leaders of the State of Texas.  In the near future, Texas will have no majority race; tomorrow's leaders must not only be drawn from a diverse population but must also be able to lead a multicultural workforce and to communicate policy to a diverse electorate.  The University has a compelling educational interest to produce graduates who are capable of fulfilling the future leadership needs of Texas.

Because the University's educational mission includes the goal of producing future educational, cultural, business, and sociopolitical leaders, the undergraduate experience for each student must include *classroom* contact with peers of differing racial, ethnic, and cultural backgrounds.  The proposal to consider race in the admission process is not an exercise in racial balancing but an acknowledgment that significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population prevent the University from fully achieving its mission.  In short, from a racial, ethnic, and cultural standpoint, students at the University are currently being educated in a less-than-realistic environment that is not conducive to training the

---

[4] Moreover, while the number of minorities at the University in 2003 was higher than in 1996, this was a result of the decision to increase the size of entering freshman classes to accommodate growing numbers of students admitted because of their top 10% high school rank.  Such increases in enrollment cannot be sustained by an already overcrowded campus.  It must also be stated that the percentage of underrepresented minorities in the entering freshman class for 2003 was the same as in 1996.

leaders of tomorrow.  For the University adequately to prepare future leaders, it must include a critical mass of students from traditionally underrepresented backgrounds.

Critical mass, which is an adequate representation of minority students to assure educational benefits deriving from diversity, affects in a positive way all students because they learn that there is not "one" minority or majority view.  In addition, the Court recognized that critical mass is essential in order to avoid burdening individuals with the role of "spokespersons" for their race or ethnicity.  Thus, there is a compelling educational interest for the University not to have large numbers of classes in which there are no students--or only a single student--of a given underrepresented race or ethnicity

The use of race-neutral policies and programs has not been successful in achieving a critical mass of racial diversity at The University of Texas at Austin.  While the number of African American and Hispanic students has risen slightly above 1996 levels, these students still represent only 3% and 14%, respectively, of the entering freshman class.  (See Table 9)  The race-neutral efforts have also failed to improve racial diversity within the classroom.  In fact, Table 8 demonstrates that for Fall, 2002, there were *more* classes with no or only one African American or Hispanic student than there had been in Fall, 1996.  With so few underrepresented minorities in the classroom, the University is less able to provide an educational setting that fosters cross-racial understanding, provides enlightened discussion and learning, and prepares students to function in an increasingly diverse workforce and society.

**Table 8**
**Representation of Racial and Ethnic Groups in UT Austin Undergraduate Classes**
**Fall 1996 Compared to Fall 2002**

| Fall 1996 | Fall 2002 |
|---|---|
| **In classes of 5 or more students (n=4,742):**<br>• 46% had no African Americans; 73% had one or none;<br>• 10% had no Hispanics; 25% had one or none;<br>• 19% had no Asian Americans; 38% had one or none;<br>• <1% had no whites; 1% had one or none. | **In classes of 5 or more students (n=5,631):**<br>• 52% had no African Americans; 79% had one or none;<br>• 12% had no Hispanics; 30% had one or none;<br>• 16% had no Asian Americans; 33% had one or none;<br>• <1% had no whites; <1% had one or none. |
| **In classes of 5-24 students (n=2,880):**<br>• 59% had no African Americans; 86% had one or none;<br>• 16% had no Hispanics; 38% had one or none;<br>• 27% had no Asian Americans; 52% had one or none;<br>• <1% had no whites; 1% had one or none. | **In classes of 5-24 students (n=3,616):**<br>• 65% had no African Americans; 90% had one or none;<br>• 18% had no Hispanics; 43% had one or none;<br>• 23% had no Asian Americans; 46% had one or none;<br>• <1% had no whites; 2% had one or none. |

In keeping with its experience, the University proposes to retain its race-neutral policies (automatic admission of some students based on class rank, the individual review of student applications, and intensive recruiting from Longhorn Opportunity Scholarship schools) and to supplement these policies with the consideration of race and ethnicity as a special circumstance during individual review.

## B.  DIVERSITY BROADLY CONSIDERED

In the freshman admission process of The University of Texas at Austin, the concept of merit is necessarily broad in order to honor the aforementioned principles that guide the decision process.  In the section below, there is a detailed discussion of the many factors that are taken into account in the holistic, full-file review.

## C.  ADMISSIONS PROGRAMS TO BE NARROWLY TAILORED

### 1.  INDIVIDUAL CONSIDERATION

The individual consideration of freshman applicants takes account of two vectors of information: a summary of their academic records, called the academic index, and a summary of their personal achievement.

The Academic Index (AI) is based on the following elements of the student's high school record.

- o   High school class rank
- o   Completion of the high school curriculum required by the University
- o   Strength of high school course selection
- o   SAT/ACT score

The Academic Index (AI) is determined by a multiple regression equation using a high school percentile ("HSR") derived from an explicit class rank [1-(class rank/class size) *100], and verbal and math test scores from the ACT Assessment or the SAT I: Reasoning Test. The equation produces a predicted freshman-year grade point average (GPA).[5]  After a review of the high school transcript, an applicant may be assigned a tenth of a predicted grade point for exceeding the University's required high school curriculum.  Thus, the value of the AI ranges from 4.10 to 0.00.

The personal achievement of each applicant is judged on the basis of the following elements.  Race and ethnicity are proposed additions to this list.

- o   Scores on two essays

---

[5] The equations vary by area of intended major as follows.

*For Liberal Arts, Communication, Fine Arts, Social Work, and Education:*

Predicted Freshman GPA = -0.19949 + (SAT Verbal * 0.00142) + (SAT Quantitative * 0.00191) + (HSR * 0.01459)

Predicted Freshman GPA = 0.09689 + (ACT English * 0.02513) + (ACT Math * 0.04577) + (HSR * 0.01351)

*For Nursing, Natural Sciences, and Architecture:*

Predicted Freshman GPA = -1.10339 + (SAT Verbal * 0.00088166) + (SAT Quantitative * 0.00230) + (HSR * 0.02416)

Predicted Freshman GPA = -0.51242 + (ACT English * 0.00824) + (ACT Math * 0.05007) + (HSR * 0.02199)

*For Engineering:*

Predicted Freshman GPA = -1.53545 + (SAT Verbal * 0.00072937) + (SAT Quantitative * 0.00313) + (HSR * 0.02285)

Predicted Freshman GPA = -1.78910 + (ACT English * 0.01074) + (ACT Math * 0.07335) + (HSR * 0.02708)

*For Business:*

Predicted Freshman GPA = -2.31253 + (SAT Verbal * 0.00157) + (SAT Quantitative * 0.00229)  + (HSR * 0.03419)

Predicted Freshman GPA = -2.14521 + (ACT English * 0.02892) + (ACT Math * 0.05405) + (HSR * 0.03409)

- o Leadership
- o Extracurricular activities
- o Awards and honors
- o Work experience
- o Service to school or community
- o Special circumstances:
  - ▪ Socioeconomic status of family
  - ▪ Single parent home
  - ▪ Language spoken at home
  - ▪ Family responsibilities
  - ▪ Overcoming adversity
  - ▪ Cultural background
  - ▪ Other information in the file

Personal achievement is determined through a holistic approach to the reading of application files.  To ensure fairness and consistency, readers receive training in holistic reading.  No reader is exempt from this training, which is intended to calibrate the readers so that scores are reflective of the students' records rather than the readers' personal preferences.

Readers are trained by a specialist in holistic scoring.  The trainer is a faculty member at The University of Texas at Austin with extensive national experience in holistic scoring and training of readers.  All readers must go through training every year regardless of how many years they have read files in the admission process. This annual training helps establish consistency.

All applicants are required to submit two essays. Each essay is read and scored on a scale of 1 to 6 (6 being high) by a trained admission officer.  The application, including any attachments an applicant chooses to provide, is then reviewed by the same reader. A "personal achievement" score on a scale of 1 to 6 is assigned to the application.

The personal achievement score determined through holistic reading is assigned to the applicant and considered along with the academic information when determining an admission decision.  Staff members seek to admit those students whose academic and personal achievement record indicates a good match for The University of Texas at Austin.  Invariably, there will be applicants on the "cusp," i.e., at the margin of being admitted or rejected.  In fact, there are several hundred such applicants in a large applicant pool.  In the process that is herein being proposed, senior members of the admissions staff will conduct a second review of the files of applicants who are at this margin to determine which applicants will be admitted to fill the remaining spaces.  The consideration of both academic and personal achievements assures the selection of an admitted class consisting not only of academically qualified individuals with a high probability of success, but also individuals who can enrich classroom discussions with their unique experiences.  In a class where all are academically qualified, some individuals may have been admitted primarily on the strength of their academic record, others on their personal achievements.  In this process, the first to be selected will have demonstrated excellence in both--rather than one.

28

Due to state law, some applicants are admitted automatically by virtue of being in the top 10% of their graduating class; for them, Personal Achievement is not used for determining admission to The University of Texas at Austin.  However, Personal Achievement may be used for determining whether a "top 10%" student will be admitted into a specific college, such as Business or Communication.

## 2.  WEIGHT GIVEN TO RACE/ETHNICITY

The factors that are included in personal achievement are not given individual weights.  Each forms a piece of the whole of the personal achievements of the student.  The intent is to sort the applicant pool on the strength of personal achievement from "most impressive" (6) to "least impressive" (1).  Or, said another way, from "who will add the most to The University of Texas at Austin campus" (6), to "who has the least to offer The University of Texas at Austin campus" (1).  Race, ethnicity, and cultural background, while important, are only three of many factors to be considered by the reader when establishing a contextual background for the student's achievements and in determining potential contributions to The University of Texas at Austin campus.

## 3.  QUOTAS AND GOALS

No specific goal will be established in terms of the numbers of students with specific characteristics who are admitted.

## 4.  CONSIDERATION OF RACE-NEUTRAL ALTERNATIVES

Since the *Hopwood* decision in 1996, The University of Texas at Austin has had a race-neutral admission process.  The comparison year for the effectiveness of race-neutral policies has traditionally been 1996, the last year in which the University was able to consider an applicant's race.  (See Table 9)  The United States Supreme Court in *Grutter v. Bollinger* has determined that the use of race is permissible in college admission if race-neutral alternatives are found to be ineffective or unworkable substitutes for race-conscious policies in enrolling a "critical mass" of minority students.  The Court also acknowledged that the quality of an education need not be sacrificed in order to implement race-neutrality in an admission process.

**Table 9**
**Entering Freshmen**
**Summer and Fall Combined**
**1996-2002**

| | Enrolled | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1996 | | 1997 | | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| White | 4,159 | 65 | 4,730 | 67 | 4,399 | 65 | 4,447 | 63 | 4,801 | 63 | 4,447 | 61 | 4,882 | 62 |
| Native American | 34 | <1 | 36 | 1 | 37 | <1 | 28 | <1 | 32 | <1 | 34 | <1 | 35 | <1 |
| African American | 266 | 4 | 190 | 3 | 199 | 3 | 286 | 4 | 296 | 4 | 242 | 3 | 272 | 3 |
| Asian American | 942 | 15 | 1,130 | 16 | 1,133 | 17 | 1,221 | 17 | 1,325 | 17 | 1,413 | 19 | 1,452 | 18 |
| Hispanic | 932 | 14 | 892 | 13 | 891 | 13 | 976 | 14 | 1,011 | 13 | 1,024 | 14 | 1,137 | 14 |
| International | 97 | 2 | 107 | 2 | 83 | 1 | 82 | 1 | 217 | 3 | 139 | 2 | 157 | 2 |
| Unknown | 0 | 0 | 0 | 0 | 2 | <1 | 0 | 0 | 4 | <1 | 38 | <1 | 0 | 0 |
| Total | 6,430 | 100 | 7,085 | 100 | 6,744 | 100 | 7,040 | 100 | 7,686 | 100 | 7,337 | 100 | 7,935 | 100 |

SOURCE: The University of Texas at Austin, Office of Institutional Research, Statistical Handbook, 1996-2002 editions.

The race-neutral processes that the University has used since the court decision in the *Hopwood* case are described below.

a       Individual Holistic Review of Freshman Applications

   Beginning with 1997, the University implemented the race-neutral alternative of holistically reading files and broadening the factors used to make admission decisions to include subjective criteria (e.g., essays, awards and honors, service, work experience) and special circumstances that put an applicant's achievements into context. Admission of African American and Hispanic freshmen declined in real numbers and as percentages of the class until other measures were subsequently implemented.

b       The Texas Top 10% Automatic Admissions Law (HB 588)

   Since 1998, the University's freshman admissions have largely been governed by the Texas Top 10% Automatic Admissions Law (*House Bill* 588 of the 75th Texas Legislature, 1997). The law is race-neutral insofar as any student graduating in the top 10% of his or her high school class must be admitted as a first-time freshman.

   The combination of the automatic admission of top 10% students and holistic review for those not in the top 10% resulted in only a slight improvement in racial diversity from 1997 to 1998. African American enrollment increased by 9 students, but was still below the 1996 level. And the number of Hispanic freshmen declined by 1 while also remaining below the 1996 level.

Moreover, the Texas Top 10% Plan now threatens the quality of the educational experience at The University of Texas at Austin.  In 2002, as a result of an attempt to accommodate growing numbers of automatically admitted top 10% students, the entering freshman class size rose to an historic high of 7,935.  Table 10 illustrates the growth of top 10% admission since 1998.

**Table 10**
**Growth in the Number and Percentage of**
**Automatically Admitted Top 10% Students, 1998-2003**

| Year | Top 10% Enrolled | Total Enrolled | % Who Were Top 10% |
|------|------------------|----------------|---------------------|
| **1998** | 2,513 | 6,744 | **37%** |
| **1999** | 2,925 | 7,040 | **42%** |
| **2000** | 3,346 | 7,686 | **44%** |
| **2001** | 3,423 | 7,337 | **47%** |
| **2002** | 3,932 | 7,935 | **50%** |
| **2003** | 4,279 | 6,544 | **65%** |

SOURCE: Office of Admissions, The University of Texas at Austin

From 1998 through 2003, the number of top 10% students enrolling in the freshman class at The University of Texas at Austin through automatic admission increased by 70%.  The number will continue to rise as more students seek the top 10% entitlement to the flagship university.  The University of Texas at Austin cannot sustain this growth.  The 2002 academic year was a critical one in which total enrollment of more than 52,000 stretched the capacity of the faculty, staff, and facilities to a degree that negatively affected the educational experience of students.


c      Longhorn Opportunity Scholarships (LOS)

A third race-neutral alternative was introduced for the 1999 entering class. Longhorn Opportunity Scholarships (LOS) were added as incentives for top 10% students in high schools with no history of sending students to The University of Texas at Austin and with an average parental income of $35,000 or less. This effort serves underrepresented, low-income, first-generation students. There were 39 LOS schools in the first year. The entering class of 1999 illustrates the combined use of automatic admission of top 10% students, LOS offers, and the use of holistic reading for those not in the top 10% (see Table 9)  Both African American and Hispanic representation returned to their 1996 levels. The actual numbers of minorities were higher, an increase accomplished by enlarging the class size by 610 students above the 1996 level. This larger class size also allowed for the growth in the number of automatically admitted top 10% students.

Since implementation of the Longhorn Opportunity Scholarship program, the number of schools to which LOS scholarships are allocated has increased to 70. The University

31

also implemented a special program to help ensure the success of LOS  students who enrolled.  But as the number of LOS schools has increased, both initiatives have required additional resources.

The holistic review of applications, the Top 10% Law, and the Longhorn Opportunity Scholarship program represent many years of good faith race-neutral efforts to enroll a diverse undergraduate student body.  However, increasing the size of the entering freshman classes, as has been done in the past, can no longer be used as a strategy to sustain race-neutral alternatives.  The University is already the largest single-campus institution of higher education in the United States.  Severe and well-publicized budget constraints preclude the required growth in the faculty and facilities needed to accommodate continued growth in the student population.  And the University's budget does not allow for an unlimited increase in the number of Longhorn Opportunity Scholarships or an unlimited increase in the capacity of its support program.

### 3.  PERIODIC REVIEW

The undergraduate admission process will be reviewed annually to ensure that it is effective in admitting academically qualified individuals who contribute to a rich, diverse, and challenging educational environment at The University of Texas at Austin. In addition, the admission process will be reviewed every five years to assess whether consideration of an applicant's race is necessary in order to create a diverse student body, or whether race-neutral alternatives exist that are able to achieve the same results.  The next review will begin in Fall, 2009.

### 4.  PROPOSED POLICY

The proposed policy is to include race and ethnicity among the factors in the assessment of personal achievement, and then proceed as described above.  This procedure will be used only for applicants who are not guaranteed admission by the race-neutral, automatic means of the Top Ten Percent law.

## VI.  TRANSFER ADMISSIONS

### A.  RATIONALE

The use of race-neutral policies has not been successful in achieving a critical mass of racial diversity at The University of Texas at Austin.  This failure has been reflected as much among entering transfer students as it has been among entering freshman.  In 1996, the percentage of African Americans in the entering transfer class was 2.3% and the percentage of Hispanics was 14.3%.  By 2003, the percentage of entering transfers who were African Americans had risen to only 2.9% while the percentage of entering transfer Hispanics had dropped to 13.7%.  Even more telling is the fact that in 2003 the percentage of entering African American transfer students (2.9%) was lower than the percentage of entering African American freshmen (4.1%), and the percentage of entering Hispanic transfer students (13.7%) was lower than the percentage of entering

32

Hispanic freshmen (14.6%). To this may be added the observation that the percentage of Hispanic transfers has dropped in each of the past two years. The low percentages of African American and Hispanic transfer students also contribute to the situation demonstrated in Table 8 and discussed above, viz., for Fall, 2002, there were more classes with no or only one African American or Hispanic student than there had been in Fall, 1996. Transfer admissions are currently succeeding neither in the objective of providing additional educational diversity nor in developing a visibly diverse leadership class.

### B. DIVERSITY BROADLY CONSIDERED

To be eligible for transfer admission, an applicant must have graduated from high school or earned a diploma through the General Educational Development (GED) Test, and must have completed at least 24 semester hours of transferable credit. Any student who is not eligible to continue studies at another college or university because of academic or disciplinary reasons is not eligible for admission to The University of Texas at Austin. The applicant may have to meet additional requirements to transfer into specific areas of study. (Students interested in studying pharmacy must first be admitted by the director of admissions to the pre-pharmacy program in the College of Natural Sciences. Once the student has been admitted and has satisfied the pre-pharmacy requirements, he or she may apply to the professional program in the College of Pharmacy. See the section, below, concerning "Admission to the College of Pharmacy.")

A completed application includes the application itself, the application fee, and official transcripts of all work at all colleges attended, including enrollment in concurrent course work while in high school. In order to receive consideration, the application must be received by the Office of Admissions by the published deadline.

The following academic achievement factors are considered in transfer admissions:

- o Grade point average (GPA) earned in all college work
- o Number of courses taken
- o Courses required for admission into specific areas of study, including the GPA earned in those courses
- o Educational goals
- o Exceptional achievement or special talents
- o Audition (where required)
- o Portfolio (where required)
- o Test of English as a Foreign Language (TOEFL) scores (where required)
- o Essay(s)

The following characteristics are considered to put the academic achievements into context:

- o Socio-economic standing
- o Educational level of parents
- o Demonstrated ability to overcome past educational deficiencies
- o Cultural background

33

- o  Employment, internship, other educational experiences
- o  Personal experience or hardships that have helped shape one's life
- o  Personal responsibilities

## C.  ADMISSIONS PROGRAMS TO BE NARROWLY TAILORED

### 1.  INDIVIDUAL CONSIDERATION

Transfer admission decisions will be reached through a holistic approach to the reading of application files.  In order to ensure fairness and consistency, all readers will receive special training in holistic reading.  No reader will be exempt from this training, which is intended to calibrate the readers so that scores are reflective of the students' records rather than the readers' personal preferences.

Readers will be trained by a specialist in holistic scoring.  The trainer is a faculty member at The University of Texas at Austin with extensive national experience in holistic scoring and training of readers.  All readers will be required to go through training every year regardless of how many years they have read files in the admission process.  This annual training will help establish consistency.

The application files of transfer students will be read individually to select the applicants whose prior academic performance, educational goals, aspirations, background, and personal characteristics indicate a good match for The University of Texas at Austin.  Readers will consider the preparation of the applicant for the intended major as well as the contribution that the applicant will make to the classroom and community life of the University.  The original readers will make an admission decision or forward a file to the Associate Director with a recommendation.  Upon reviewing the file, the Associate Director will make the final admission determination.

### 2.  THE WEIGHT GIVEN TO RACE/ETHNICITY

Race/ethnicity would be added as one factor among the other factors considered as part of the contextual factors that are listed above.  No particular weight would be given to race or ethnicity.

### 3.  QUOTAS AND GOALS

No numerical goal or quota will be set for specific racial or ethnic groups among the transfer applicants.

### 4.  CONSIDERATION OF ALTERNATIVES

The race-neutral methods previously used for the admission of transfer students have not produced the level of diversity that is educationally desirable nor the level that adequately produces a visibly diverse leadership class.

**5.** PERIODIC REVIEW

The proposed holistic, full-file procedure will be reviewed in five years, with the next review occurring in 2009.

**6.** PROPOSED POLICY

The proposed policy is to add race and ethnicity among the many factors that are already considered in admission.

VII.   PHARMACY ADMISSIONS

A.   RATIONALE

The proposed change to a holistic review process for transfer students that includes race and ethnicity among the elements to be considered for admission affects the College of Pharmacy. In the procedure described below, race and ethnicity would be added to the "additional personal factors" considered in a holistic review of pharmacy applicants. The entry-level professional degree in Pharmacy is the Pharm.D., and both transfer and continuing students are admitted to the Pharm.D., at the beginning of their junior year.

Pharmacists are important professionals in health-care delivery, and producing pharmacists from diverse backgrounds is integral to producing a visibly diverse leadership class. Using race-neutral methods, the Pharm.D. program has not been as successful as The University would like in diversifying its class, especially with African American students. In 1997, the percentage of African Americans in the Pharm.D. program was 6% and by 2003 the percentage had dropped to 2%.[6] With Hispanic students the program was more successful, partly because the Pharmacy Scholars Program (see details below). The percentage of Pharm.D. students in 1997 who were Hispanic was 7% and by 2003 the percentage was 19%, with some fluctuations up and down in the intervening years.

B.   DIVERSITY BROADLY CONSIDERED

The admission to the university and the College of Pharmacy are separate and independent processes. Students must first be admitted to the University by the director of admissions according to the normal undergraduate procedures. Generally a student then applies for admission to the College of Pharmacy during the student's sophomore year. A student is admitted to the professional curriculum in Pharmacy by the dean, following recommendation by the Admissions Committee of the College of Pharmacy, according to the procedures indicated below. If the number of eligible applicants for the professional curriculum exceeds the number that available facilities can accommodate, final selection is made by the College of Pharmacy Admissions Committee and the dean.

As a condition of admission to the College of Pharmacy, each student must sign a statement that he or she agrees to accept assignment to any one of the college's internship regions throughout the state.  Cooperative arrangements for pharmacy education exist with academic units and health care institutions in the following internship regions: Austin/Temple, Dallas/Fort Worth, El Paso, Galveston/Houston, the Rio Grande Valley, and San Antonio.  Internship regions may be added or deleted at any time based on the availability of resources.  Elective regions, which provide limited internship experiences for a specified period of time (less than four months), may also be available.

---------------------------

[6] The starting date of 1997 is used here rather than 1996 because of a discontinuity in the location of the Pharm.D. program at The University.  Before 1997, the Pharm.D. program was a part of the Office of the Graduate Studies.  After 1997, the Pharm.D. program was reorganized and its admission process was substantially changed.

Students assigned to San Antonio and Pharmacy Scholars students from The University of Texas at El Paso and The University of Texas - Pan American in Edinburg must spend approximately a year and a half to two years in those regions; students assigned to the other regions spend only the final year of the program (the internship year) in their assigned region.

Students are assigned to internship regions through a computer-generated random lottery number system that takes students' ranked preferences into account.  Since most students relocate to internship regions outside the Austin area, region assignment occurs during the latter part of the second professional year to allow students adequate time to make personal and financial arrangements.  There are no exceptions to the region assignment process.  If a student fails to agree to accept assignment to any region, he or she will not be admitted to the College of Pharmacy.

## C.  ADMISSIONS PROGRAMS TO BE NARROWLY TAILORED

### 1.  INDIVIDUAL CONSIDERATION

Admission to the professional curriculum in Pharmacy is competitive.  Each file is individually assessed for the following factors.

1.  Basic Admission Criteria

   o  Scholarship as indicated by grade point average and Pharmacy College Admission Test (PCAT) scores.  In evaluating the applicant's academic record, the committee pays particular attention to the courses required for admission.[7]

   _____

   [7]The applicant should have completed at least sixty-three semester hours and must have completed the following forty-five semester hours:

   a.  Nine hours of biology, including cellular and molecular biology, structure and function of organisms, and genetics
   b.  Eight hours of general chemistry with laboratory
   c.  Three hours of freshman-level rhetoric and composition
   d.  Three hours of sophomore-level survey of literature
   e.  Three hours of mathematics (differential and integral calculus)
   f.  Three hours of statistics
   g.  Eight hours of organic chemistry with laboratory
   h.  Four hours of microbiology with laboratory
   i.  Four hours of physics with laboratory

2.  The remaining semester hours should include

   a.  Six hours of American history
   b.  Six hours of American government, including Texas government
   c.  Three hours of fine arts or humanities coursework chosen from archaeology, architecture, art (including art education, art history, design, studio art, visual art studies), classics (including classical civilization, Greek, Latin), fine arts, humanities, music (including music, instruments, ensemble), philosophy (excluding courses in logic), or theatre and dance
   d.  Three hours of social and behavioral sciences coursework chosen from anthropology, economics, geography, linguistics, psychology, sociology, and social work

3.  The applicant must fulfill the foreign language requirement as given under the "Basic Education Requirements" in the College of Pharmacy section of the current *Undergraduate Catalog* before seeking admission to the professional curriculum.

- o Personal statement
- o Letters of recommendation

4. Additional Personal Factors

- o Extracurricular activities that demonstrate community involvement and leadership potential
- o Honors and awards
- o Interview.  Applicants are screened for interview based on academic record, exposure to the profession, special life circumstances, and any other compelling factors.  If invited for an interview, then other factors are considered such as, but not limited to:

  - ▪ On-site written essay
  - ▪ Knowledge of, and motivation for, pharmacy as a career
  - ▪ Life-long learning strategies
  - ▪ Critical thinking skills

- o Special life circumstances, such as, but not limited to:

  - ▪ Single parent
  - ▪ Socioeconomic status of family
  - ▪ First generation attending college
  - ▪ Overcoming adversity
  - ▪ Resident of an underserved and/or health professions shortage area of the state
  - ▪ Cultural background
  - ▪ Other information in the file

- o Because the University is a public institution, preference is given to applicants who are legal residents of Texas and to applicants from states without colleges of pharmacy.

## 2.  THE WEIGHT GIVEN TO RACE/ETHNICITY

Race/ethnicity would be added as one factor among the other factors considered as part of the contextual factors that are listed above.  No particular weight would be given to race or ethnicity.

---

4. The applicant must remove all deficiencies in high school units by the means prescribed in General Information before seeking admission to the professional curriculum.

### 3. QUOTAS AND GOALS

No numerical goal or quota will be set for specific racial or ethnic groups among the transfer applicants.

### 4. CONSIDERATION OF ALTERNATIVES

The Pharmacy Scholars Program is available to highly qualified high school seniors entering the University of Texas at El Paso (UTEP) or The University of Texas - Pan American (UT Pan Am).  It offers these students conditional admission to The University of Texas at Austin College of Pharmacy once they complete the prepharmacy requirements of the program at The University of Texas at El Paso or The University of Texas - Pan American.  Although a valuable race-neutral method, the Pharmacy Scholars Program has not been adequate to produce a level of diversity that is educationally desirable nor the level that adequately produces a visibly diverse leadership class.

### 5. PERIODIC REVIEW

The proposed holistic, full-file procedure will be reviewed in five years, with the next review occurring in 2009.

### 6. PROPOSED POLICY

The proposed policy is to add race and ethnicity among the many factors that are already considered in admission to the College of Pharmacy.

### GENERAL CONCLUSION

Since 1997, no other university in the United States has had more experience with race-neutrality in admission or made greater good-faith attempts to achieve critical mass and diversity than The University of Texas at Austin.  Experience has shown that there is no single way to achieve classroom diversity consistent with a high-quality educational experience.  The race-neutral strategies used by the University and described above have not produced a critical mass of underrepresented minority students at the classroom level.  There is no reason to believe that they will do so in the future unless enrollment is allowed to increase to unmanageable and irresponsible levels.

Race-neutral policies have been very useful in producing a student body of strong academic ability and should not be abandoned entirely.  Therefore, The University seeks to continue these or similar policies and to combine them with a consideration of race and ethnicity in the admission process.  This race-conscious consideration will be integrated into aholistic, individual assessment of each student's background and record.